# EXHIBITS J, L, Q AND S ARE RELEVANT EXCERPTS FROM DEPOSITION TRANSCRIPTS

# THERE IS NO EXHIBIT "R"

# EXHIBIT J

# Commonwealth of Massachusetts

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CYNTHIA DECAIRE,

                          Plaintiff

VS.

JOHN D. ASHCROFT, in his official
position as Attorney General of the
United States,

                          Defendant

Docket No.
C.A. 10593WGY

DEPOSITION of **DAVID M. DIMMITT**, a Witness called by Counsel on behalf of the **Plaintiff**, pursuant to the Massachusetts Rules of Civil Procedure, before Nancy J. Stone, a Certified Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of Segal, Roitman & Coleman, 11 Beacon Street, Boston, Massachusetts, on Friday, February 18, 2005 commencing at 10:07 a.m.

*Accurate Reporting Services*
*36 West Street*
*Whitman, MA 02382*
*(781) 447-9520*

**APPEARANCES**:

Indira Talwani, Esq.
Segal, Roitman & Coleman
11 Beacon Street
Boston, MA 02109
REPRESENTING THE PLAINTIFF

Barbara D. Cottrell, Esq.
Assistant United States Attorney
Northern District of New York
James T. Foley United States Courthouse
445 Broadway
Room 231
Albany, New York 12207
REPRESENTING THE DEFENDANT AND THE WITNESS

1        P R O C E E D I N G S

2                * * *

3        It is hereby stipulated and agreed that the

4   deposition transcript will be read and signed

5   within 30 days of receipt under pains and

6   penalties of perjury or shall be deemed signed.

7        It is further stipulated and agreed that all

8   objections, except objections as to the form of

9   the questions and motions to strike, are reserved

10  to the time of trial.

11

12        **DAVID M. DIMMITT**, first having duly been

13  sworn, on oath, was questioned and testifies as

14  follows:

15

16                **DIRECT EXAMINATION**

17  (By Ms. Talwani)

18  Q    Could you state your name for the record, please.

19  A    David Dimmitt.

20  Q    By whom are you employed?

21  A    The United States Marshals Service.

22  Q    What is your position with the United States

23       Marshals Service?

24  A    Chief Deputy US Marshal.

Page 5

1    Q    To what district are you assigned?

2    A    The Northern District of New York.

3    Q    Have you had your deposition taken before?

4    A    For this case?

5    Q    For any case?

6    A    I had a deposition taken for a case involving an
7         employee disciplinary action in Northern New York.

8              **MS. TALWANI:**  I will assume you
9         understand my questions if you answer them, so if
10        you don't understand my questions please ask.
11        Please be careful not to talk over me and I'll try
12        to do the same for you.

13             **THE WITNESS:**  Sure.

14   Q    (by Ms. Talwani)  How long have you been the chief
15        in the Northern District of New York?

16   A    I was promoted to chief in the Northern District
17        of New York in April of 1999.

18   Q    What was your position and duty station prior to
19        April of '99?

20   A    Prior to April of '99 I was a supervisor in
21        Albany, New York for a period covering May '98
22        through April '99.

23   Q    And prior to that?

24   A    I was a supervisory deputy and deputy in the

Page 6

1   District of Nebraska.

2   Q   What period of time?

3   A   From 1989 -- October of '89 through April or May

4       of '98.

5   Q   And prior to that?

6   A   I was a special agent with the United States

7       Department of State and the period was October '85

8       through October '89 when I went to Nebraska.

9   Q   Were you with the Marshals Service prior to the

10      special agent position?

11  A   Yes, my employment with the Marshals Service first

12      started in December of 1983.  I was assigned to

13      the District of Nebraska until October '89 when I

14      -- October '85 when I was employed by the United

15      States Department of State.

16  Q   And along the way between October '85 and 2003,

17      did you cross paths with William Fallon at some

18      point?

19  A   Yes, upon my return to the Marshals Service I had

20      to go back through what they call Marshals Service

21      basic deputy school and that was shortly after I

22      came back on board in October of '89.  I think it

23      was after Christmas, probably the first part of

24      1990.  He was a student in that class and that's

Page 7

1    where I first met Bill Fallon.

2  Q    I have a very simplistic question about e-mail,

3       maybe not so simplistic.

4       Do you have an e-mail address now at the

5       Marshals Service?

6  A    Yes.

7  Q    Is it specific to the Northern District of New

8       York or is it a Marshals Service address?

9  A    I think it is now a Marshals Service address.  We

10      just switched from an old system -- Northern New

11      York just was switched over to Microsoft Outlook

12      Express.  They call it being j'conned which I

13      think opens up my e-mail globally or at least when

14      you read the -- how you get addresses or other

15      people's addresses it's global.  It takes in the

16      Department of Justice.

17 Q    Was the old system a groupwide system?

18 A    Yes.

19 Q    At some point you were here in an acting position

20      in the District of Massachusetts?

21 A    Yes.

22 Q    Did you change e-mail addresses at that point in

23      time?

24 A    I think --  I don't believe I changed.  There was

Page 22

1    what I was dealing with as a chief in the district
2    because it was very confusing as it was explained
3    to me by the Marshal and Paul Durette in regards
4    to how it all transpired, and it is still
5    confusing to me today.  I know either the Marshal
6    or Paul Durette, maybe both of them, explained to
7    me that Deputy DeCaire had filed an EEO complaint
8    based on, I believe, an assignment to Worcester
9    and that Deputy Williams had filed a complaint
10   based on, I believe, a training issue.  There may
11   have been other --  At first I was told it was a
12   training issue and then on further inquiry I found
13   that in addition to -- in Deputy DeCaire's case
14   the Worcester issue there was also background in
15   regards to the meeting the Marshal had with both
16   deputies and what may have been discussed at that
17   meeting.
18  Q    Do you recall hearing or reading anything about
19       complaints concerning a job rotation or rotation
20       of assignment from Worcester to Boston court
21       operations?
22  A    Yes.
23  Q    And did you understand that to be part of the
24       complaint?

Page 23

1    A    Yes, I think it was.

2    Q    Did you understand also part of the complaint

3         issue concerned Deputy DeCaire's assignment back

4         to court operations in Boston in February of 2003?

5    A    This is why it's all so confusing to me still

6         today.  I at some point read material e-mails

7         either the former chief and the Marshal had

8         generated with Deputy DeCaire.  It could have been

9         --  At some point I found out that there were

10        issues with -- with Deputy DeCaire being assigned

11        to Worcester; there were issues with the -- the

12        one-on-one meeting the Marshal had with Deputy

13        DeCaire, and there were issues with the people

14        being called from Worcester to work in Boston on,

15        I guess, a rotational basis to help support the

16        workload in Boston.  And then at some point as I

17        recall -- I don't know if it was explained to me

18        or I read it that Deputy DeCaire was re-assigned

19        to Boston instead of the rotation -- instead of

20        being assigned in Worcester had been assigned to

21        Boston.

22   Q    And did you understand that was also part of the

23        complaint?

24   A    Yes, I'm sure --  Yes, it is, I guess.

Page 24

1   Q   What steps did you take to try to figure what was

2        going on with this EEO complaint once you learned

3        about it?

4   A   Well, one of the -- one of the first things I did

5        unilaterally on my own -- because there were a

6        number of other parallel things going on or had

7        gone on in prior grievances, the Department of

8        Labor stuff, I went and reviewed everyone's

9        personnel file so I could determine based on

10       personnel action forms in there who was supposed

11       to be where in the district, what their

12       documented office of assignment was.

13  Q   And what did you learn with regard to Deputy

14       DeCaire?

15  A   I believe her documented office of assignment was

16       Boston.

17  Q   And did you look for anything else in reviewing

18       the personnel file other than the office of

19       assignment?

20  A   No, I think when I initially went through them --

21       I know what I was looking for was who's documented

22       assigned where and where are they actually now

23       while I'm in northern -- or in Massachusetts.  I

24       suppose as I flipped through them I saw other

Page 25

1   stuff but my goal was to find out who is

2   officially assigned where in this district.

3   Q   Do you recall as you flipped through what you

4       learned about Cyndy DeCaire's record?

5   A   The only thing I recall in regards to Cyndy

6       DeCaire's record was, one, I found a -- I think

7       it's an SF52 or 50. I found a document that said

8       she was assigned to Massachusetts or to the

9       District of Massachusetts, Boston office. I saw

10      some temporary assignments where she had been an

11      acting supervisor, I believe, in Worcester, may

12      have been some others that were temporary acting

13      positions, I don't recall. I think that's about

14      it.

15  Q   Did you learn at some point that she had been

16      assigned for a number of years to the

17      investigations unit prior to Marshal Dichio

18      arriving here?

19  A   I don't think that was in the personnel file but,

20      yes, at some point whether it was discussions with

21      her when I first got here or whether it was me

22      knowing that ahead of time that she had been in

23      investigations and on the warrant squad. I was

24      aware prior to my arrival and her being assigned

Page 26

1     to court operations that she had done other jobs

2     in the District of Massachusetts to include

3     investigations.

4   Q   Did you know that she had for a continuous period

5     of time been doing investigations?

6   A   I don't know how long.  At one -- At some point I

7     had the opportunity to -- Deputies were

8     submitting their promotion packages, I would have

9     been the one reviewing.  I remember receiving hers

10    and others that were putting in packages to be

11    13s.  I would have read through that and would

12    have noted that she had been for some period of

13    time in investigations because I recall reading

14    the various experience items that she had done in

15    investigations.

16   Q   And you came to know at some point that she had

17    been a team leader in investigations prior to

18    being assigned to Worcester?

19   A   I'm sure that was in the promotion package.  I

20    don't know that I read it.  I knew through the

21    office that, I guess, she was a team leader in

22    investigations.  I don't know that there was

23    something on paper -- there may have been.  I'm

24    sure she was a team leader.

Page 27

1  Q  You mentioned that there were these two EEO

2     complaints, was Allison Hodgkins' EEO complaint

3     still pending at the same time?

4  A  I -- I don't think so but I honestly don't know.

5     The two that I made myself familiar with were the

6     ones that were filed either just before I got

7     there or immediately upon my arrival.  I think

8     there --  At least having been here for over four

9     months it became -- I became aware there were lots

10    of various grievances, EEO complaints, filed by a

11    lot of different employees that may or may not

12    have been closed with the former administration.

13    I don't know --  I'm not familiar with Allison

14    Hodgkins' EEO complaint at all.  She probably

15    filed one, I don't know, I'm just not familiar

16    with it.

17 Q  Did you sit down and have a conversation with

18    Cyndy DeCaire about her EEO complaint?

19 A  No.

20 Q  Any reason why you did not do that?

21 A  Early on upon my arrival Deputy DeCaire's demeanor

22    towards me was open and -- and it was what I would

23    describe as a healthy communication.  Shortly

24    after that I had a meeting with -- or two staff

Page 28

1    meetings, one with the court side, one with what
2    would, I guess, be called the investigative side
3    where I was explaining to everyone how I viewed
4    the Marshals Service and how we all fit in and
5    indicated at the meeting this wasn't going to be a
6    meeting to discuss individual issues. We were
7    going to talk about each branch as a team.
8        Cyndy had broached the topic during the
9    meeting about her transfer to Worcester and at
10   least me sitting there indicating that she wanted
11   to go to Worcester. Number one, I explained this
12   wasn't a meeting where I was going to discuss
13   individual issues; it was team issues. And I
14   explained to her briefly that I had no intention
15   during my stay to reorganize the office
16   personnelwise from one office to another; that I
17   was going to during my stay leave it as the
18   documents said people should be and let the
19   permanent chief coming in make a decision on who
20   should be in what office and where. And after
21   that --
22  Q   I want to interrupt you and ask you a follow-up
23      question on that meeting. I want to give you two
24      different scenarios and I want to ask you a

Page 29

1   question that when you think about those two

2   different scenarios if you're sure of what it was

3   that Cyndy DeCaire was saying in that meeting or

4   what you may have assumed in hearing what she was

5   saying.  So, my question may be a little more

6   complicated than it should be but let me give it a

7   try.

8        It was your understanding from reading the

9   EEO complaint that Cyndy wanted to be in

10  Worcester, is that correct?

11  A   No, because I don't think I had -- I don't even --

12  Until I became a party to the EEO complaint I

13  don't think I had actually read the EEO complaint.

14  Q   At the time of the meeting when you went into the

15  meeting did you have an understanding that Cyndy

16  was unhappy about something, had filed some

17  grievance?

18  A   Yes.

19  Q   And did that understanding come from your

20  conversations with the Marshal?

21  A   Yes, and I probably reviewed e-mails that were

22  generated between the former chief, Deputy

23  DeCaire, and the Marshal.

24  Q   And was it your understanding as you went into

Page 30

1    that meeting that Deputy DeCaire's big beef was

2    that she hadn't gotten the HIDTA position in

3    Worcester?

4    A    Probably at that point it was still unclear to me

5    did Deputy DeCaire ask the Marshal in the meeting

6    or indicate to the Marshal in their meeting that

7    she wanted to go to Worcester, got assigned to

8    Worcester, but didn't get the HIDTA position and

9    then the Worcester assignment -- and from what I

10   understood the Worcester assignment became an

11   issue in this EEO complaint and she got

12   reassigned to Boston prior to my arrival based on

13   work load.

14       It was never clear to me where Deputy DeCaire

15   really wanted to be.  Did she want to be in

16   Worcester?  Did she want to be in Worcester only

17   if she was the HIDTA representative?  Or whether

18   she wanted to be in Boston.  There were a number

19   of other issues with people that had been assigned

20   elsewhere prior to my arrival which is why I went

21   through the personnel files to find out on

22   documentation who was assigned where.  Deputy

23   DeCaire was assigned to Boston.  My intention was

24   to leave it like that during my tenure as -- as

Page 31

1        the chief in this district.

2    Q    Did you understand that she may have been unhappy

3        that her assignment in Boston was court operations

4        rather than warrants?

5    A    Yes.

6    Q    And you had that understanding at the time of that

7        meeting?

8    A    Probably, yes.

9    Q    And the question that Cyndy DeCaire asked you

10       involved the alleged -- or involved the manpower

11       shortage and the new 082s arriving, correct?

12   A    I don't recall if -- if at meeting the 082

13       subjects came up.  I do recall two people

14       addressing individual issues at the meeting, one

15       of them was Deputy DeCaire.  Deputy DeCaire was

16       the first one to bring up an individual issue at

17       this meeting, as I recall the issue was her being

18       assigned to Worcester.  If there -- that was part

19       of it.  Being assigned to investigations may have

20       also been part of it, I don't recall.  I do

21       remember the Worcester because I remember

22       responding, one, this is not the time that we're

23       going to discuss individual issues, that can be

24       done with me not with the whole group of people,

Page 32

1   and I recall saying, "I am not going to move

2   anyone to another office without some very good

3   reasons," that I was going to leave people

4   assigned where they were assigned based on

5   documentation.  And it was after that meeting that

6   Deputy DeCaire's demeanor towards me did a 180.

7  Q   I'm going to move to after that meeting but I

8      still want to stick with at the meeting.  And I

9      understand what you said.  I understand your

10     answer.  What I'm trying to figure out is as you

11     sit here today can you recall whether Deputy

12     DeCaire's words were to the effect of:  I want to

13     go back to Worcester, or words to the effect of:

14     Why was I moved here from Worcester and how long

15     will I be here in this position?  They are

16     slightly different and I'm asking you if you can

17     recall which of those two things she may have

18     said, if any?

19  A   I don't recall.  I just remember the generalities

20     of the discussion.

21  Q   And is it fair to say the following, that

22     Worcester came up but as you sit here today you do

23     not recall whether Worcester came up in the

24     context of this is where I was moved from versus

Page 33

1    this is where I want to move to?

2    A    As I sit here today reflecting back on that

3        conversation and that meeting in my mind I recall

4        her wanting -- or the impression I received as I

5        sat there her wanting not to be in Boston but to

6        be in Worcester.

7    Q    And I understand that and I understand that's why

8        you responded the way you did.  What I'm just

9        trying to figure out because a lot of what happens

10       in a lot of these cases is obviously what do

11       people actually say and what do people understand

12       from what they say.  What I'm trying to figure

13       today as you sit here was was that simply your

14       impression that you had based on the combination

15       of, one, the word Worcester coming in and your

16       understanding of something of this background from

17       the Marshal or Paul Durette or whatever or whether

18       Cyndy DeCaire actually came out and made that leap

19       and said:  I want to go back to Worcester?

20   A    My recollection is Cyndy DeCaire, Deputy DeCaire,

21       broached the topic at that meeting of her being in

22       Worcester versus being in Boston.  I don't know if

23       there was a gigantic leap.  I just recall the

24       topic of the conversation and the only reason I

Page 34

1    recall it is because immediately after that

2    meeting Deputy DeCaire's demeanor towards me

3    changed 180 degrees based upon my stance that I

4    was not going to make any convenience personnel

5    moves during my tenure as the interim chief but

6    would leave it open to the next chief that would

7    come in and be here career-wise.  That's why I

8    recall that particular conversation.

9  Q    I'm going to ask you one more time just because I

10    am really trying to figure as best I can what were

11    the actual words.  And I clearly understand what

12    your impression was but I do want to try to figure

13    out what the actual words were.

14         Cyndy DeCaire asked if she would be

15    transferred out of court operations at that

16    meeting, correct?

17  A    I -- I do not recall that but quite likely it was

18    part of the conversation that involved Worcester

19    but I do not remember that actual topic.  The only

20    reason I remember the Worcester topic is because,

21    one, it went counter to what I had read or heard

22    about the EEO complaint and, two, Deputy DeCaire's

23    demeanor towards me after that meeting changed.

24    But she could have asked about court operations I

Page 35

1    just honestly don't remember.

2    Q    And am I correct that you then made the decision

3         not to approach her about what was going on with

4         the EEO complaint?

5    A    I may have been advised by headquarters not to

6         approach, I -- I don't recall.  I made a number of

7         phone calls to get advice on how to handle this

8         situation I had walked into and not necessarily

9         resolve it but do I attempt to intercede or do I

10        let it move through its natural course.  I believe

11        I was advised to let it move through its natural

12        course unless an employee who had filed a

13        grievance or a complaint came to me and then go

14        ahead and move through it.

15   Q    Did you have any understanding about why Cyndy

16        DeCaire had been moved to Boston to court

17        operations?

18   A    I -- I believe I --  In addition to conversations

19        with the Marshal and Paul Durette there were also

20        e-mails generated by the previous chief, Timothy

21        Bane, the Marshal, and Deputy DeCaire.  It was

22        through conversations with the district management

23        and those e-mails that Cyndy DeCaire had been

24        reassigned to Boston due to work load.  It may

Page 36

1    have involved deputies or other people being

2    transferred or going -- There was someone on

3    military leave. As it was explained to me and as

4    I think I read in e-mails generated by others that

5    it had to do with work load in Boston versus work

6    load in Worcester and she was reassigned to Boston

7    to address the work load in Boston.

8    Q    During the 120 days that you were in Boston were

9         assignments of personnel, additional assignments

10        of personnel, made to the Worcester office?

11   A    I don't believe -- I don't believe anyone was

12        moved from Springfield to Worcester or Boston to

13        Worcester or vice versa. I think a new employee,

14        maybe an 082, had been assigned to Worcester while

15        I was here.

16   Q    And when the new 082 was assigned to Worcester

17        that represented a change then in staffing,

18        correct?

19   A    Yes, it meant one more operational employee in the

20        district.

21   Q    And that operational employee was going to be

22        assigned to Worcester?

23   A    Yes, I believe so.

24   Q    And there were additional operational employees

Page 37

1  being assigned to Boston as well because there

2  were a few new 082s coming into Boston as well,

3  correct?

4  A    Yes, I think it was two or three.

5  Q    With the new assignments did you have any

6  conversations with the Marshal about locations of

7  any employees?

8  A    I may have had conversations with the Marshal in

9  regards to the 082s coming on board but I don't

10 recall specifics.

11 Q    Did you have any discussion with the Marshal at

12 any time during your tenure here about Deputy

13 DeCaire's location, assigned location?

14 A    Location as far as?

15 Q    Boston versus Worcester?

16 A    I'm sure I did.

17 Q    What do you recall talking about?

18 A    Well, it probably was generated by me trying to

19 get an idea of what the EEO grievance complaint

20 was about which is probably why I asked to see

21 e-mails that were generated prior to me getting

22 here.

23 Q    But if I understand your testimony what you told

24 these deputies at this meeting was while you were

Page 38

1      here nobody is moving anywhere location-wise?

2  A   From a convenience factor it was -- it was --  I

3      told the deputies at the meeting --  Let's put it

4      I told Deputy DeCaire at the meeting that it was

5      not my intention during my tenure as the interim

6      chief to intervene with what -- where people were

7      officially assigned for a convenience matter.

8  Q   Putting aside the question of intervening, was it

9      your position that during your 120-day assignment

10     here it was inappropriate for you to consider the

11     number of personnel in each of the offices?

12 A   No, it would not have been inappropriate for me to

13     consider the number of personnel in each office as

14     it related to the work load in each office.  I'm

15     sure I looked at that periodically depending on

16     new people coming in or other people being

17     reassigned or leaving.

18 Q   And in connection with that did you have

19     discussions with the Marshal about the number of

20     people at different offices?

21 A   I'm sure I did, yes.

22 Q   Is there any reason why Cyndy DeCaire's job

23     location would not have been part of the question

24     of where do we have people?

Page 39

1    A    I'm sure it was.  Her job location upon my arrival

2         was Boston assigned to the court division.  I'm

3         sure I discussed in general how we were going to

4         address the movement of 1811s from courts through

5         prisoners through investigations.  I'm sure I had

6         discussions in that regard.

7    Q    And did you have discussions with the Marshal

8         about Cyndy DeCaire's job assignments?

9    A    Probably, yes, in association with me asking

10        questions as to the grievance attempting to get a

11        clearer picture on what Deputy DeCaire's

12        grievances were because it was, as I said earlier,

13        extremely confusing to me coming in here whether

14        she wanted to be in Worcester, whether she didn't

15        want to be in Worcester, whether she wanted to be

16        in Worcester only in the capacity of a HIDTA

17        deputy, whether she wanted to be in Boston,

18        whether she wanted to be in Worcester and rotate

19        into Boston.  When I got here Deputy DeCaire was

20        assigned to Boston court operations, that doesn't

21        mean that depending on what occurs in the district

22        work-load-wise versus manpower-wise that she might

23        not -- or others might not be moved within their

24        particular duty city location.

Page 40

1   Q   But she wasn't considered for any other job in her

2       duty, was she, during the time you were here?

3   A   No, I think there was -- there was consideration

4       and discussions in regards to -- Because there

5       were -- I think Walter Doherty, a supervisor, was

6       promoted to -- not promoted but reassigned as a

7       circuit court judicial security inspector which

8       left an opening as a -- for a supervisor in court

9       operations. I remember having discussions with

10      the Marshal. I don't know if Paul Durette was --

11      if he had gone to work for the Department of

12      Homeland Security at this point or not but I had

13      discussions on who would best be suited or would

14      -- would warrant to take that -- that supervisory

15      role and I remember discussing Deputy DeCaire,

16      Deputy Hodgkins.

17  Q   Deputy Lawler?

18  A   Lawler?

19  Q   Lawler?

20  A   Nancy?

21  Q   Annette.

22  A   Annette, yes, probably her as well. There may

23      have been some other male deputies, I don't

24      recall, but there were discussions and it was

Page 41

1    determined to offer Deputy Hodgkins an opportunity

2    to take that position.  I believe she accepted.

3    Shortly after she accepted I think headquarters

4    notified district that -- at least at that point

5    they weren't going to --  They were going to take

6    away a supervisor from the district, therefore, if

7    someone took that position it wouldn't be a paid

8    position.  You would do it but you wouldn't get

9    paid.

10   Q    I believe you were talking about moving people

11       between the different positions within the

12       location.  What about the move from court

13       operations to investigations, is it your testimony

14       that she was considered for that at any time

15       during the time that you were there?

16   A    During my tenure early -- early on or about midway

17       I had discussions with the Marshal about setting

18       up a rotation in regards to 1811s assigned to

19       court operations and 1811s assigned to

20       investigations.  It was --  As I recall at the

21       time they had an 1811 -- I don't remember what the

22       terminology they called this position but it was

23       someone who sat on the court operations desk and

24       handled the frontline duties, phone calls, court

Page 42

1  scheduling, making sure prisoners were in the

2  right court rooms. I don't remember what the

3  position was called but they had prior to me

4  getting here assigned people to that position and

5  I do recall having discussions with the Marshal as

6  to that would be a -- a good spot to start in

7  regards to moving 1811s out of court operations

8  into investigations and out of investigations into

9  court operations.

10      In theory an 1811 assigned to court

11  operations would do an assignment on the court

12  operations desk and upon successfully completing

13  that assignment or proving that they had some of

14  the traits they're looking for in leaders in

15  district that that might be a likely spot to

16  rotate people from going into a court room to --

17  to manning the court operations desk and then from

18  manning the court operations desk into

19  investigations. And then at some point a lot of

20  personnel changes occurred. I think they may have

21  done away with the court operations desk, I don't

22  really recall.

23  Q   Was Cyndy considered for the court operations desk

24      position?

Page 43

1    A    I believe she was in the rotation because when I

2         got here there was a deputy assigned to it.  As I

3         recall he had been there three or four months and

4         then moved him out.  A deputy came back from JTTF,

5         I don't recall his name -- Jeff something.

6    Q    Christo?

7    A    Christo.  Jeff Christo came back from JTTF and was

8         assigned to court operations.  Wasn't particularly

9         happy with being assigned to court operations and

10        he did come in and discuss it with me which is

11        what I explained to him we have to work where the

12        work is needed.  There was an opening -- I don't

13        recall the circumstances but there was a spot open

14        in investigations.  Jeff Kimball was the guy on

15        the desk, was rotated off the desk, put into

16        investigations.  He had done a fabulous job up

17        there.  And then I believe Jeff Christo was placed

18        there and at some point was moved from there to

19        investigations, and then at that point I don't

20        recall if it was contemporary with Walter Doherty

21        being reassigned as a JSI for the circuit, the

22        district not getting another supervisor position,

23        that it was determined that -- that the desk

24        officer or the court operations officer would be

Page 44

1    handled by whoever the acting supervisor was, I

2    believe.

3    Q    So, Cyndy DeCaire did not have a turn at rotation

4         for court operations officer?

5    A    Not during my tenure that I know of.

6    Q    But am I correct then that although these are all

7         deputy marshal positions, 1811 positions, there

8         are skill sets that in your opinion a deputy would

9         need to have and would gain and be something that

10        would be needed in investigations above and beyond

11        the starting skill set in court operations?

12   A    I don't understand that question.

13   Q    It sounded like what you said is that the person

14        would hold the court operations officer position

15        that would give them skill, experience, and based

16        on doing a good job there they could then move on

17        to warrants, is that fair?

18   A    Yes.

19   Q    And that there's a skill set on the warrants side

20        that not every court operations person can do?

21   A    I don't know that it's they can do but may not

22        want to do.  All 1811s have been trained in

23        investigations, some 1811s are better

24        investigators than others, some investigators

Page 45

1      prefer not to investigate.  I mean, it's -- it's

2      -- Some are good investigators and some are

3      average and some prefer not to investigate at all.

4  Q   Do you have any reason to think that Cyndy DeCaire

5      was not a good investigator?

6  A   I have absolutely no reason to think that Cyndy

7      DeCaire was not a good investigator.

8  Q   The fact that she was not only in investigations

9      for a number of years but had been selected as a

10     team leader in investigations would suggest that

11     she has a good experience and skill set there,

12     correct?

13 A   Correct.

14 Q   But I am correct that during the time you were

15     there she was not considered for any of the open

16     spots in warrants?

17 A   I don't -- I do believe there was some

18     consideration.  Early on there were issues with --

19     with Supervisory Jeff Bohn and Deputy DeCaire's

20     relationship with Supervisory Bohn and going into

21     the investigative side with him being a supervisor

22     over investigations.  At some point that became a

23     moot point where he was not a supervisor on the

24     investigative side he was a supervisor on the

Page 46

1    prisoner ops side.  I don't know how that

2    timing-wise occurred with openings in

3    investigations.  I know I never didn't consider

4    Deputy DeCaire as possibly going over into

5    investigations.  It would be just a matter of

6    timing.  I had no problem with Deputy DeCaire

7    going into investigations.

8    Q    I guess my question isn't really whether you had

9         any problems with Deputy DeCaire going into

10        investigations; I guess my question would be to

11        your knowledge did Marshal Dichio have any

12        questions, issues about Deputy DeCaire going into

13        investigations or elsewhere?

14   A    Initially, his concern -- and I think it was in

15        e-mails from the prior chief and himself --

16        initially I do recall the issue Supervisory Deputy

17        Jeff Bohn being over there.  There were

18        discussions in that regard I recall.  After Jeff

19        Bohn's reassignment to another supervisory

20        position I think I recall having conversations

21        with the Marshal in regards to who would move

22        through that desk operation leadership position in

23        court operations.

24             As I recall it was -- Jeff Kimball was

Page 47

1    leaving, Jeff Christo -- Scott Kimball.  The
2    deputy that was there when I arrived in district
3    would move off that desk, another deputy would
4    move on.  As an opening occurred if they sat on
5    that desk and proved themselves as far as from an
6    initiative, leadership, attitude, all those things
7    that I as a chief was looking for in those that
8    would lead within this district -- had an
9    opportunity to go up there and prove themselves
10   that when an opportunity arose and there was
11   another area within the Boston office that they
12   wanted to go work we would try to get them there
13   but it was matter of work load.  I think at some
14   point it became a matter of positions that once
15   existed being limited by our headquarters.  I
16   recall Cyndy DeCaire coming up on that rotation.
17   I think she did after I left but while I was here
18   I don't believe she sat as the court operations
19   desk officer.
20  Q    When you say she came up on that rotation, is that
21       the rotation for leadership positions?
22  A    I would define it as a leadership role within
23       court operations, yes.
24  Q    When you say she came up meaning her name came up?

Page 48

1   A   No, there was not a written list but -- but of

2        those 1811s that were currently assigned in court

3        operations and trying --   The goal was to work

4        them all through that court operations desk

5        officer position.

6   Q   Why?

7   A   To give them an opportunity to lead within court

8        operations, to coordinate all the courts, all the

9        prisoners, be a quasi manager within court

10      operations and then move on.

11   Q   And that was experience you thought they should

12      have before they would be permitted to work in

13      warrants?

14   A   I don't know that it was necessarily warrants.  It

15      was -- it was good experience to demonstrate

16      leadership characteristic traits in -- in Boston

17      in the district, an area where one can see the

18      potential of someone being a supervisor.

19   Q   I guess what I'm missing here is that I understand

20      what you're saying about it being a leadership

21      position towards a supervisory position but I'm

22      really just asking you now simply about

23      assignments to the investigation unit and not

24      supervisory.  Are you saying in order to get an

Page 49

```
 1        assignment into the investigation unit you would
 2        have to prove leadership in court operations
 3        first?
 4   A    Not necessarily, no.
 5   Q    Was she considered for any openings in
 6        investigations while you were there?  Not
 7        leadership openings but simply a deputy spot in
 8        warrants.
 9   A    She was probably considered, yes.  I don't believe
10        she was chosen.
11   Q    I understand she wasn't chosen and I don't want
12        you to guess.  So, when you say she probably was
13        considered do you remember any discussion about
14        hey, Cyndy has a couple years experience in
15        investigations and we've got a spot in
16        investigations why don't we move her there.  Do
17        you ever recall hearing anyone saying that?
18   A    I recall having discussions with the Marshal about
19        replacing vacancies in investigations.  During
20        those discussions a number of people's names to
21        include Cyndy DeCaire's came up.
22   Q    Cyndy was never selected?
23   A    No, not while I was here.
24   Q    Did the Marshal ever give you any reason why Cyndy
```

1    should not be selected?

2  A    No, I was probably playing a counselor role, a

3    recommendation role, to the Marshal in regards to

4    the selection.  I would normally make a

5    recommendation to the Marshal.

6  Q    And you on no occasions recommended Cyndy for

7    moving to warrants?

8  A    Not during my tenure here, no.

9  Q    Not at any time because that's the only time you

10    would have been giving recommendations?

11  A    No, not to moving to investigations, no.

12  Q    And the reason for that was that she had not yet

13    done this leadership role in operations?

14  A    No, I don't believe that was the -- the reason.

15    There had been two individuals that had done it,

16    had demonstrated initiative -- Jeff Christo, as I

17    recall, who impressed me when he took over that

18    role after Scott Kimball left.  He made

19    significant attempts --  And I think they may

20    still use them -- to computerize and make

21    electronic a lot of the operation up there.  He

22    went that extra mile in  making -- taking steps to

23    computerize that operation versus all the paper

24    going from one point in the office to the other he

Page 51

1  set it up to where it could be, as I recall,

2  e-mailed or at least picked up off a shared drive

3  and that impressed me.

4  Q  So, it was sort of a reward?

5  A  To?

6  Q  You used the investigative position as a reward to

7  people?

8  A  Not at all.

9  Q  As a commendation for having done this good work

10  that impressed you?

11  A  I was -- During my stay here if -- if --  I

12  recall he went there because there was -- there

13  was an opening.  I recall talking to the Marshal

14  in regards to who would go there and I recall

15  telling the Marshal I was extremely impressed with

16  Jeff Christo's performance on the desk and that

17  taking all other things into consideration I would

18  recommend him to be an individual to receive the

19  Marshal's consideration in getting that job.

20  Q  And included in those all other considerations was

21  the fact that you had a deputy there on staff in

22  court operations who had a number of years of

23  experience in investigations who you know would be

24  able to do a good job; you had scarce resources,

Page 52

1   and that wasn't a factor in consideration for who

2   should have the warrant position?

3   A    I don't understand the question.

4   Q    You just said you were considering all other

5        factors.  Was one of the factors that you had a

6        deputy marshal on staff in court operations who

7        had several years of experience in investigations,

8        who to your knowledge had done a good job in

9        investigations, who the Marshals Service had

10       trained essentially, she had had that experience

11       there, and yet that was not a factor to consider

12       to give her the recommendation to move into?

13  A    No, I'm sure I considered all of that in regards

14       to Deputy DeCaire.

15  Q    Nonetheless you never made a recommendation to

16       include Deputy DeCaire?

17  A    At that stage I had -- I had recommended Jeff

18       Christo.

19  Q    You never made any recommendation that she be

20       considered to just make a lateral move into

21       warrants?

22  A    No, because there still was a need for personnel,

23       1811s, 082s, DEOs in court operations.

24  Q    As positions opened up in warrants they were

Page 53

1    filled by somebody from somewhere, correct?

2  A  Yes.

3  Q  And Cyndy DeCaire was never permitted to be one of

4     those people?

5  A  During my tenure, no, she wasn't.  She wasn't

6     recommended.  She wasn't assigned there, no.

7  Q  As we sit here today do you know any reason why

8     Cyndy DeCaire can't move to warrants?

9  A  As I sit here today not knowing the specific work

10    load of Boston court operations, the workload of

11    Boston investigative side I don't know.  I do know

12    that in general in the Marshals Service in New

13    York it's -- I'm required to have 1811s in court

14    operations; I'm required to pull 1811s off

15    investigations and assign them to court operations

16    because of work load.

17 Q  But when an opening comes up in warrants, as

18    openings come up in warrants, do you know any

19    reason why Cyndy DeCaire can't have one of those

20    positions?

21 A  Unless it was associated with work load, no, I do

22    not.

23 Q  Shortly after you arrived here Paul Durette was

24    removed from his assistant chief responsibilities,

Page 86

1    keys were, where the cell phone was, where a

2    number of things were, and I was speaking with

3    them.

4    Q    What I'm just trying to figure is how much of the

5         Marshal's conversation you heard and how much you

6         didn't hear.  So, am I correct then that there was

7         a significant period of time while you were

8         dealing with these other issues that the Marshal

9         and the Chief were talking but you don't have any

10        first-hand knowledge of what happened in that

11        conversation?

12   A    No, I didn't -- I didn't hear everything that was

13        being said between the Marshal and the Chief at

14        that point where I was attempting to find keys to

15        the vehicle.

16   Q    Did you ever find the second set of keys?

17   A    As I recall the second set were in the ashtray

18        with the first set which disappointed me.

19             MS. COTTRELL:  May I propose that we

20        take a break here.

21             THE WITNESS:  I'd like to keep going.

22             MS. TALWANI:  We've got a bunch more and

23        we should take a break.  Let me just finish up

24        with the meeting in Brockton and then we'll take a

Page 88

```
 1    Q    That's what I mean.  You didn't maintain notes at
 2         the time?
 3    A    No.
 4    Q    When the court operations supervisor position
 5         opened up because Supervisory Deputy Marshal
 6         Doherty was leaving the position you did receive
 7         an e-mail from Deputy DeCaire that she was
 8         interested in the position, correct?
 9    A    Yes.
10    Q    Who else told you they were interested in the
11         position?
12    A    I recall Allison Hodgkins broaching it, maybe Jeff
13         Christo.  I had a number of conversations with
14         Jeff Christo I don't know that any of them were in
15         regards to the court operations.  Maybe Allison
16         was the only one that came in and spoke to me.
17    Q    What was the basis on which you made the
18         recommendation for who should fill that position?
19    A    Well, I remember having discussions with the
20         Marshal regarding Deputy DeCaire, Deputy Hodgkins
21         --  How do you say her last name?  Allison.  And
22         it was determined -- and probably recommended
23         Allison because Deputy DeCaire had already done an
24         acting supervisory position that was -- required a
```

Page 89

1    personnel action, good for your promotion package.

2    I recommended Allison initially based on, one, she

3    hadn't been an acting supervisor.  Two, it

4    originally was going to be one that generated an

5    actual personnel action and it would be payment

6    and a record of doing the position of a

7    supervisor.  She hadn't done one so I recommended

8    her.

9  Q    Money obviously is money but the record of it

10        would have been useful for a promotion package?

11  A    Yes.  If there's a documented record it's more

12        likely to get points if you have documentation

13        versus I was an acting supervisor for three months

14        but never got paid or didn't get an upgrade.

15  Q    And who was involved in the decision on filling

16        that position?

17  A    I believe it was just the Marshal and I.

18  Q    Were you the assigning official or the Marshal?

19  A    I think normally the Marshal was the actual

20        assigning official.  I know I recommended her and

21        unless the Marshal disagreed with it would have

22        notified her and assigned her.

23  Q    And in this case the Marshal agreed with it?

24  A    Yes.

Page 90

1   Q   What did you know at the time that you made that

2       recommendation about Allison Hodgkins' EEO

3       complaint?

4   A   I didn't know anything about the details of her

5       complaint.

6   Q   Did you know anything about it all?

7   A   I don't think so.  I knew there was an EEO

8       complaint but there were many EEO complaints

9       sitting out there in EEO complaint land in the

10      district of which I knew nothing about.  I had

11      heard there were grievances, complaints, I don't

12      know what Allison's was about.

13   Q   Did you know there was an allegation of actions

14      that happened after the Marshal came?

15   A   With?

16   Q   Allison.

17   A   I don't recollect it, no.

18   Q   What was your discussion with the Marshal, if any,

19      about Cyndy DeCaire having that position?

20   A   I remember discussing that position and I remember

21      discussing -- the Marshal and I discussing the

22      fact that it would only be appropriate and fair.

23      Cyndy DeCaire has an acting position on record in

24      her personnel file, Allison doesn't, this would be

Page 91

1    a good opportunity to give Allison a chance to be

2    an acting supervisor to determine if it's

3    something she really wants to do or if she would

4    be successful at it, demonstrate potential at the

5    supervisory level.  I discussed specifically with

6    the Marshal the fact that Cyndy DeCaire had

7    already had warrants in Worcester -- and I

8    remember discussing that with him.

9  Q  In addition to discussing that fact, anything else

10    that either you or the Marshal said about Cyndy?

11  A  No, I don't believe so.  There may have been

12    discussion as to attitude, I -- I don't recall.  I

13    know the deciding factor for me was Cyndy had one

14    Alison didn't.  Let's give Allison a chance.

15  Q  I'm not concerned with just what the deciding

16    factor was for you my question is about what

17    conversation happened because ultimately the

18    Marshal is the one who is making the decision and

19    I have a right to know and I am entitled to your

20    best recollection as to the words that you used

21    and the words he used.

22  A  I don't recall the words the Marshal used.  I

23    don't recall my exact words.  I do recall the fact

24    that -- I do recall knowing that Cyndy DeCaire had

Page 92

1    a personnel action and an acting supervisor
2    position in Worcester and I knew Alison didn't.
3    The specifics of our discussion I honestly don't
4    remember and I don't remember the words that were
5    used.

6    Q    Do you have any understanding of what the
7    allegation was that was made by the Brockton
8    police officer, the specifics of what the Marshal
9    supposedly said?

10   A    Paul Durette told me that the Marshal -- that
11   there was going to be another EEO issue based on
12   the fact that the Marshal had had a conversation
13   with a Brockton police officer in the basement of
14   the garage about Deputy DeCaire.  The specifics of
15   that conversation I don't recall but it -- they
16   weren't positive comments as it was explained to
17   me.  I don't remember the exact comments the
18   Marshal was supposed to have said but they weren't
19   positive comments that were made to this police
20   officer.

21   Q    Did you ever review the affidavit that was filed
22   in this matter by the police officer?

23   A    No.

24   Q    Did you know that he had filed one?

Page 93

1   A    No.

2            **MS. TALWANI:**  Off the record for a

3   moment.

4                  (Off the record)

5   Q    (by Ms. Talwani)  According to Joseph Cummings'

6   affidavit under oath Marshal Dichio said that as

7   long as he was here, Deputy DeCaire was, quote,

8   going nowhere.

9   A    That's probably what Paul Durette told me.

10  Q    And what I'm trying to figure out here is not just

11  why you made the recommendations you made, I have

12  why you made them also in your prior affidavit,

13  but what I'm trying to figure out here and what I

14  have a right to know here is what the Marshal did

15  or did not do that was inconsistent with that

16  statement.  What the Marshal did in any way to

17  stop Cyndy from moving anywhere, what the Marshal

18  did in any way to encourage Cindy being able to

19  stay anywhere, to what extent the Marshal, in

20  fact, made sure that as long as he was there she

21  was not going anywhere, okay.

22            So, I understand you got to the

23  recommendation that you made but what I am trying

24  to figure out here and what I'm entitled to know

Page 94

1    is what the Marshal said or did in that discussion

2    with regard to anything about Cyndy?

3  A  The Marshal at no point in time ever made a

4    statement similar to that to me in our discussions

5    with movement to various assignments within the

6    office involving Deputy DeCaire or other deputies,

7    never ever said anything like that to me.  There

8    were discussions regarding an individual deputy's

9    attitude, leadership, about the various

10   characteristics to include discussions on Deputy

11   DeCaire's attitude and leadership traits.  He

12   would discuss that.  I don't recall specifics of

13   it but it would be discussed.

14  Q  Let's start with that.  What, if anything, did

15   Marshal Dichio ever say to you about Cyndy

16   DeCaire's past performance before the Marshal had

17   been there?

18  A  I don't -- I don't recall him saying anything

19   specific about Cyndy DeCaire's past performance.

20   I know he was aware that Cyndy DeCaire was -- and

21   articulated to me that she was a competent

22   investigator.  I never heard him say otherwise.

23  Q  Did he relate to you the opinion, whether it was

24   his or somebody else's, that Cyndy DeCaire had

Page 103

1   A   I did have reason in my own mind to believe it may

2       not have been true or there may have been other

3       circumstances based on Cyndy's performance and

4       attendance while I was the chief deputy in the

5       district.   I never knew of anything similar to

6       occur that I saw while I was there that would lead

7       me to believe there may not have been underlying

8       circumstances to whatever that incident was.

9   Q   And were you aware that she had, in fact, received

10      a superior accomplishment award or some similar

11      award during her time as an acting supervisor

12      there?

13  A   I believe I was aware of that, yes.

14  Q   Deputy DeCaire requested that she be considered

15      for the warrant coordinator position that was made

16      vacant when Allison Hodgkins became the acting

17      supervisor, correct?

18  A   Yes.

19  Q   Was she considered for that position?

20  A   Yes, discussed not -- not recommended by me and

21      the Marshal didn't disagree with my

22      recommendation.   I had recommended -- I don't

23      remember the fellow's name, Sugrue, based on

24      conversations I'd had with him during my tenure

Page 104

1    there immediately prior to making a decision as to

2    who might go in as the warrant or HIDTA

3    coordinator, I don't remember which it was.

4    Q    Did he say he wanted to be the warrant

5    coordinator, Paul Sugrue?

6    A    In my discussions with him he did, yes.

7    Q    Any other reason why the selection was made of

8    Paul Sugrue?

9    A    He had expressed to me that he had an interest in

10    being a supervisor in the Marshals Service.  I

11    thought this would be a perfect opportunity for

12    him to see if that's what he really wanted to do.

13    There are a lot of people that think they want to

14    be supervisors and once they get the job find out

15    that they don't want to be supervisors.  I recall

16    that being part of my decision to recommend him.

17    Q    And was the warrant coordinator position as you

18    understood it another thing that would matter in a

19    promotion package?

20    A    Yes, if an individual wrote it up appropriately it

21    would benefit you, I would imagine, yes.

22    Q    I'm going to back up a couple questions.  I had

23    started asking you about the conversations that

24    you had with the Marshal about Deputy DeCaire and

Page 105

1        I started out by asking you about anything that

2        was discussed regarding her acting supervisor

3        position in Worcester.  I'm going to follow that

4        up by asking you if you had any conversations with

5        the Marshal about her performance in the time

6        period from when the Marshal arrived until the

7        time period in which you arrived?

8    A   The discussions about Deputy DeCaire under those

9        time frames predominately dealt with the -- the

10       confusion of wanting to go to Worcester, not

11       wanting to be in Worcester, coming back to Boston,

12       wanting to be HIDTA in Worcester but couldn't be

13       HIDTA in Worcester because Jeff Bohn was the HIDTA

14       supervisor.  I remember numerous conversations

15       along those lines with the Marshal in regards to

16       Deputy DeCaire probably most generated by me

17       trying to figure out what the heck was going on.

18   Q   Was it the Marshal's view that he had tried to

19       make things better for Deputy DeCaire?

20   A   That was my impression, yes.

21   Q   And it was the Marshal's view that after he had

22       tried to make things better for Deputy DeCaire she

23       had, essentially, caused a fuss?

24   A   He knew he didn't --  He could not explain to me

Page 106

1    when I asked about Deputy DeCaire's assignment to
2    Worcester, then the rotation.  He explained to me
3    the rotation and why the rotation was needed.  I
4    could understand that.  He explained to me that
5    Deputy DeCaire asked him to go -- wanted to be in
6    Worcester; he assigned her to Worcester.  After
7    getting assigned to Worcester in general ops
8    instead of HIDTA there was some unhappiness there
9    -- Started the rotation with Sue Williams and
10   Deputy DeCaire because of where they lived.  I
11   don't know where they lived it's just how it was
12   explained to me -- closer to Boston.  And then at
13   some point they lost someone else, someone went on
14   military leave.  I don't recall that there was --
15   The decision that was made prior to me getting
16   there that would just bring Cyndy back to Boston
17   to do court operations there because that's where
18   there was a need and that's what happened.  I
19   don't ever recall discussing her performance
20   specifically other than it was fine.  There was no
21   problems with Cyndy's performance to my knowledge
22   -- brought to my knowledge in court operations.
23   She was doing a fine job as far as I know.
24   Q    Let me try to make sure I've got that.  The only

Page 107

1    conversations that you can recall having with the
2    Marshal about Cyndy's performance in the time
3    period from when he arrived until when you arrived
4    either were that her performance was fine or had
5    to do with her movement to Worcester and her
6    dissatisfaction about what had happened there,
7    correct?
8    A    Yes.
9    Q    And as you sat there then and as you sit here now
10       the whole thing about what happened with the
11       movements to Worcester and the dissatisfaction
12       about it didn't make much sense to you, correct?
13   A    No, it doesn't.
14   Q    But you did not find out if there was a different
15       explanation from Deputy DeCaire about what was
16       going on, correct?
17   A    Correct.
18   Q    And you operated with the assumption that what the
19       Marshal had said was correct; namely, that he had
20       tried to accommodate her and that she had
21       complained about it?
22   A    Yes.
23   Q    When did you leave the district?
24   A    In July.  I ended up staying longer.  In July some

Page 108

1    time.

2    Q    Did you have any communications with the new

3         chief, Fallon, about the EEO matter?

4    A    I'm guessing that I did.  I don't know

5         specifically.  I would probably have briefed him

6         on it when he got here.

7    Q    Do you recall any information or do you know any

8         information you would have provided to him about

9         this whole matter during that transition that you

10        have not provided here?

11   A    Not that I recall but if you can be specific.  I

12        don't believe I went into as much detail with him

13        as I've had to go into here.

14   Q    I'm just trying to find out if there's anything

15        specifically that you remember relaying to Chief

16        Fallon about this whole matter?

17   A    I don't recall.  I don't recall relaying anything

18        but I probably did.

19   Q    Finally, the time periods that I've asked you

20        about that the Marshal spoke with you about

21        predated you arriving so let me ask you the

22        question just to make sure we got everything.

23             Did the Marshal talk to you about Cyndy's

24        work performance during that same time period when

1  you were there?

2  A  I recall having discussions with Marshal while I

3     was interim chief in regard to Cyndy's performance

4     and Cyndy's performance in court operations was

5     fine.

6  Q  Again, as best as you can recall tell me what

7     happened, who would initiate these conversations?

8  A  My guess is he initiated them.  He may have asked

9     me how are things going in court operations, any

10    issues, everybody show up, anybody have any

11    problems.  I mean, they --

12 Q  Did he ever ask you:  Is Cyndy showing up on time?

13 A  I'm sure he did.  He asked me about a number of

14    people whether they were showing up on time or

15    not.

16 Q  A number of specific people?

17 A  Well, Cyndy.  I don't remember everyone's names

18    because some were 082s.  I remember the 1811s that

19    are involved in this case specifically.

20 Q  Of the 1811s who did he ask you about?

21 A  I know he asked me about some people in

22    investigations once or more than once as to what

23    they were doing and how late they were working.

24    There was -- there was issues with people taking

Page 114

1  official and probably would have told Allison:

2  You've been assigned to do this job.

3  Q  Under question seven it says (as read:)  Attempts

4  by Chief Dimmitt to engage in a dialogue with

5  Ms. DeCaire that would allow for healthy

6  discussion regarding any matter continues to meet

7  with negative results.

8  A  Yes.

9  Q  What efforts did you make to engage in a dialogue

10  with Deputy DeCaire?

11  A  Prior to that staff meeting I spoke of earlier I

12  was able to --  I moved through the office.  I

13  didn't stay in my office I moved through talking

14  to people discussing -- open door.  Prior to that

15  one staff meeting I was able to go to Cyndy

16  DeCaire's cubicle and have open free discussions.

17  Subsequent to the meeting where I didn't address

18  the assignment issue her behavior towards me --

19  her demeanor took a 180.  It was more cold

20  shoulder, don't bother me.  She'd do a greeting

21  but any attempts that I would make as I went to

22  her cubicle would be met with one sentence replies

23  and:  I'm busy.  Not necessarily quote, quote, I'm

24  busy, but I wasn't able to have discussions with

Page 115

1   her like I had been able to prior to this meeting.

2   I would go to her cubicle daily and attempt to

3   engage in conversation as I did 082s, 1811s,

4   anyone in there I would on a daily basis go out

5   and attempt to mingle, to be a part of whatever

6   was going on in that squad room to include

7   investigations.

8   Q    When you would mingle with her she was civil?

9   A    Yes.

10  Q    And she responded to your questions?

11  A    Yes.

12  Q    She just didn't go beyond the questions?

13  A    No.

14  Q    Did you ever call her into your office and ask her

15       what was going on?

16  A    No, I never called anyone into my office other

17       than Jeff Bohn.

18  Q    When you say here (as read:)  Attempts by Chief

19       Dimmitt to engage in a dialogue about anything,

20       what you're talking about is just this walking by

21       the cubicle and that she didn't volunteer beyond

22       what you were starting to discuss with her?

23  A    Inter-relations.  I think once I ended up at a

24       lunch table that she was sitting there and I would

Page 116

1    attempt to engage in conversation with her in much

2    the same way I did with others.  Hers were not

3    impolite but curt answers and then would move on

4    and go about her own business.

5  Q  Is that the reason you didn't respond to her

6    e-mail about her interest in the position?

7  A  I think when I got her e-mail the decision had

8    already been made.  I do recall going to the

9    cubicle and attempting to discuss it.  Upon my

10    arrival one of the main issues in my opinion that

11    was causing some of the problems in this district

12    was the fact that everybody communicated via

13    e-mail versus  one-on-one.  At that very same

14    staff meeting I told everyone -- I told the

15    supervisors at a prior meeting and told the

16    Marshal at our meeting, told the assistant chiefs

17    and at the general op staff meeting --

18    investigative staff meeting made it perfectly

19    clear to everyone that it was my management style

20    that if you had an issue to raise  please come to

21    me, the door is open I'd like to talk about it.

22    Don't precede a meeting with an

23    e-mail, come to me I'm always here, and then if

24    you want to memorialize the meeting with an e-mail

Page 117

1    later that's fine.  But I wanted to establish a

2    little more interpersonal relations within this --

3    that office in particular and had asked that

4    people come see me first before doing an e-mail.

5    A lot of people did.  Cyndy's e-mail preceded any

6    meeting.  I think it was either very close to or

7    after we had reached a decision on Allison and/or

8    anyone else.  I never responded to her.  I did go

9    to the -- to the cubicle and attempt to discuss

10   it.

11   Q   Did you go to the cubicle and say to her:  Cyndy,

12       you didn't get the job?  When you say you

13       attempted to discuss it, you mean you went there

14       and you wanted to have a conversation but she

15       didn't have a conversation?

16   A   No, she --  No, I went there to discuss whoever

17       got the job -- I don't remember if it was Allison

18       or whatever other job she wanted but whatever

19       e-mail it was related to I did go to the cubicle

20       and attempt to open up a discussion.

21   Q   I just want to be clear because I'm not talking

22       right now about what your intent was; I'm talking

23       right now about what your words were.  So, she

24       applies for the job and I guess my question is did

Page 118

1  you ever say to her -- She doesn't apply for the
2  job she lets you know she is interested in the
3  job.  Did you ever say to her the words:  We're
4  not giving you the job we're giving it to someone
5  else or words to that effect?

6  A  I may have said words to that effect as I'm
7  standing by her cubicle or where I may have met
8  her but for the record I'll just say no, I didn't
9  say words to that effect.

10 Q  So, if she were to state she sent these in and
11 never heard anything back as far as you know
12 that's a true statement?

13 A  I -- I never responded electronically.  I did
14 attempt to respond in person.

15 Q  When you say you attempted to respond, is that by
16 you have a conversation and then she didn't
17 initiate anything beyond anything you said and,
18 therefore, you didn't tell her what you were going
19 to tell her?

20 A  I...

21 Q  She didn't cut you off when you spoke, did she?

22 A  On at least one occasion she may have.  She may
23 have been doing something else.  I recall numerous
24 times where I would attempt to engage in some

Page 119

1  healthy dialogue with Deputy DeCaire outside these
2  particular e-mails post staff meeting where I
3  said, "I'm not making any office changes," but my
4  attempts to enter into dialogue were -- were
5  stopped by one-word answers or I'm busy or I've
6  got to do this or I need this phone call.  I
7  didn't want to push it any further than I may have
8  already pushed it when I didn't -- when I said I
9  wasn't going to make decisions regarding people
10 being assigned to various offices.
11 Q    Just so we're clear about this attempt to enter
12      conversations and we're not here arguing about
13      what was right or wrong about how this was done.
14 A    No.
15 Q    We're just trying to figure out the facts here.
16      What I understand you to be saying is that you
17      essentially attempted to reopen conversations
18      through small talk to put it mildly?
19 A    Yes.
20 Q    And that didn't go anywhere?
21 A    No.
22 Q    As to the substantive questions raised, can I have
23      this position, can I be considered for this
24      position, you did not have a conversation with her

Page 120

1   that addressed those substantive questions?

2   A   No.

3   Q   On question eight which related to the warrant

4       coordinator position, --

5   A   What page is that?

6   Q   Eight of 12.

7           Again in the middle of that paragraph the EEO

8       person wrote it as Chief Dimmitt was the assigning

9       official but, again, you were the recommending

10      official and the Marshal was the assigning

11      official?

12  A   I would describe myself as the recommending

13      official, yes.

14  Q   And in question 12 it refers to an allegation

15      about taking on the Marshals Service and changing

16      the attitudes.

17  A   Yes.

18  Q   Putting aside the specific wording, "Take on the

19      Marshals Service," did you have a discussion at

20      that meeting with court operations about attitude

21      and working with the Marshals Service?

22  A   Yes.

23  Q   Can you describe what you said in that regard in

24      your words?

Page 121

A     At -- At both meetings I tried to lay out my
management style and how I prioritize probably at
the opening of the meeting or close to the opening
of the meeting I would describe how I intend to
manage during my stay in Boston and I would
describe it as -- as sitting here today there
isn't any one of us bigger than the Marshals
Service, that my needs as a deputy or a chief
deputy don't exceed the needs of the Marshals
Service.

      As I recall, because I've done it on numerous
occasions, I describe it as first there's the
Marshals Service and the needs of the Marshals
Service and then there's the districts within the
Marshals Service and the needs of the districts
within the Marshals Service.  After we deal with
-- with the Marshals Service mission, goals, and
needs we deal with the district's mission, goals,
and needs then we get into individual mission,
goals, and needs, but until we take care of the
Marshals Service and the district it's difficult
to address any one specific individual employee's
desires until we take care of the other big
business.  If we take care of the big business

Page 122

1  then we can start concentrating on an individual's

2  particular desires.

3      I recall saying the only thing that precedes

4  this whole formula is personal needs, family

5  issues, supersedes the Marshals Service, the

6  district, any individual, but when it came to

7  whether you wanted to be in a HIDTA task force, in

8  investigations or court operations or judicial

9  security inspector that we first had to get all

10  the big work done and make sure that's done and

11  then move into an individual's desires is

12  basically how I phrase it.

13  Q   The answer to question 14 the EEO officer wrote it

14  down as follows (as read:)  US Marshal Dichio

15  never told the Brockton Chief of Police that "The

16  reason for a change in HIDTA leadership was

17  because Jeff Bohn has a girlfriend who filed an

18  EEO complaint against him."

19      I am correct however that you did not hear --

20  A   I never heard that statement made.

21  Q   But you also did not hear much of the Marshal's

22  conversation with the Chief, correct?

23  A   I heard the first part why he was discussing why,

24  one, Jeff Bohn was no longer on it which was in

Page 123

1   conjunction with this particular police officer's

2   saying he is going to remove Brockton from it.

3   After that I didn't hear a lot of what was said.

4          **MS. TALWANI:**  That's all I have.

5          **MS. COTTRELL:**  I'll keep it short.

6

7                    <u>**CROSS EXAMINATION**</u>

8   (By Ms. Cottrell)

9   Q   Once you arrived in Boston and you met the

10      Marshal, would you describe your day-to-day

11      interrelationship with the Marshal?

12  A   The Marshal would arrive; we would have a sitdown

13      briefing.  A lot of the day-to-day stuff involved

14      the judges, meetings with the judges, maybe

15      meetings with other police agencies.  A lot of it

16      initially dealt with the EEO stuff here in front

17      of us.  I mean, it was -- it was just your general

18      management district performance discussions.  He

19      was easy to speak to; he listened well.  Sometimes

20      he took the recommendations and sometimes he

21      considered them and didn't take my

22      recommendations.  My impression on the day-to-day

23      he just wanted to make this a better place both

24      operationally and environment-wise, that's all I

# EXHIBIT S

# Commonwealth of Massachusetts

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYNTHIA DECAIRE,<br>                    Plaintiff<br><br>VS<br><br>JOHN D. ASHCROFT, in his office<br>position as Attorney General of the<br>United States,<br>                    Defendant | VOLUME I<br><br>CIVIL ACTION NO.<br>10593WGY |

DEPOSITION of **DAVID B. TAYLOR**, a Witness called by

Counsel on behalf of the **Plaintiff**, taken pursuant to the applicable

provisions of the Federal Rules of Civil Procedure, before Joanne

Whalen, a Professional Court Reporter and Notary Public in and for

the Commonwealth of Massachusetts, at the Law Office of Segal,

Roitman & Coleman, 11 Beacon Street, Suite 500, Boston,

Massachusetts, on Tuesday, February 15, 2005, commencing at 1:33

p.m.

*Accurate Reporting Services*
36 West Street
Whitman, MA 02382
(781) 447-9520

1        **P R O C E E D I N G S**

2                    *

3        **DAVID TAYLOR**, first being duly sworn, on

4    oath, was questioned and testified as follows:

5                **DIRECT EXAMINATION**

6    (By Ms. Talwani)

7    Q    State your name for the record, please?

8    A    David B. Taylor, T-a-y-l-o-r.

9    Q    By whom are you employed?

10    A    I'm a Justice, United States Marshal Service.

11    Q    When did you begin your employment with the

12        Marshal Service?

13    A    1985.

14    Q    Can you just briefly summarize the positions

15        you've held with the Marshal Service?  Start at

16        the beginning.

17    A    Plain old deputy.  Let's see, I was in L.A.  I

18        was a deputy.  My next duty station was the

19        breaker service.  My next duty station was

20        Newark, New Jersey as a deputy.  I had a lot of

21        NASAF responsibilities there.  I came to Boston

22        in -- I believe it was the fall of '89, plain

23        old deputy.  Opened the Worcester office the

24        fall of '95 whereas a deputy in charge of that

Page 5

1    office until, I want to say, 2000 when I was

2    assigned to the New England HIDTA Fugitive Task

3    Force and I ran the task force as a Central

4    Division till the fall of 2002 when I got

5    promoted to judicial security inspector for the

6    District of Massachusetts.  But I was -- my

7    office was back in Boston.  I was there and

8    then into acting assistant chief deputy.  I

9    believe it was the latter part of April of

10   2003.  And got a permanent promotion in January

11   2004, Assistant Chief Deputy U.S. Marshal and

12   I'm still there.

13   Q    When the Worcester office opened in the fall of

14        '95, how many deputies were assigned to the

15        Worcester office?

16   A    Actually, I was solo until like January of '96

17        or it could have been the spring and then Kevin

18        Wahl came out and then a few weeks later Sue

19        Williams came out, so there was three of us.

20   Q    Am I correct that initially the supervision of

21        the Worcester office was by a supervisor

22        assigned to both -- assigned responsibilities

23        for both Springfield and Worcester, is that

24        correct?

Page 6

1   A   Yes.

2   Q   At some point there were acting supervisors

3       appointed, --

4   A   Yes.

5   Q   -- is that correct?

6   A   Yeah.

7   Q   Am I correct that Sue Williams was an acting

8       supervisor?

9   A   Yes.

10  Q   And after Sue Williams, --

11  A   Cindy.

12  Q   -- Cindy DeCaire?

13  A   Yes.

14  Q   At the time that Cindy DeCaire was the acting

15      supervisor of the Worcester office, were you

16      still a --

17  A   Task force member, yes.

18  Q   Let me just back up a minute.  Your answer is

19      what I was trying to figure out and I

20      appreciate that.  But in order for our record

21      to be clear I need to finish my question before

22      you answer it.

23  A   All right.

24  Q   So let me try again.  At what point did you

Page 47

1  Q    And Deputy DeCaire would have been included in

2       that group?

3  A    Yeah.

4  Q    You probably said something about the different

5       individuals who were possible candidates,

6       correct?

7  A    Yeah, sure.

8  Q    Do you recall what you would have or what you

9       did say about Deputy DeCaire?

10 A    I don't.

11 Q    Can you think of any reason as you sit here now

12      that you would have said don't move Deputy

13      DeCaire over to warrants?

14 A    No.

15 Q    Can you think of any reason as you sit here now

16      where you would have said Deputy Kimball is a

17      better choice than Deputy DeCaire for that

18      position?

19 A    No.  Again, pretty much all equal, you know.

20 Q    Around April 21st Supervisory Deputy Doherty

21      was leaving his position as court operations

22      supervisor.

23 A    2002?

24 Q    2003.

1   A   2003?

2   Q   There was going to then be an acting court

3       supervisor --

4   A   Yeah.

5   Q   -- court operations supervisor?  Were you

6       involved in giving any recommendations about

7       who should be -- who the acting --

8   A   Yes.

9   Q   -- court supervisor --

10   A   Yes.

11   Q   -- court operations supervisor should be?

12   A   Yeah.

13   Q   Who did you recommend?

14   A   Again, I put forward a few names.

15   Q   Did they include Cindy DeCaire?

16   A   No.

17   Q   Who did they include?

18   A   I suggested, yeah, Annette Lawlor, Alison

19       Hodgkins.  I think those were the two I

20       recommended.

21   Q   Why those two?

22   A   To my knowledge neither one of them had ever

23       had the opportunity and they were both -- had

24       both been on the job -- they were senior,

Page 49

1    senior deputies.

2    Q    Do you know whether Deputy Lawlor had any

3         interest in the position?

4    A    I learned later that she didn't.  She did not

5         have any interest.

6    Q    Were you asked your opinion about Deputy

7         DeCaire for the position?

8    A    Yes.

9    Q    Who asked you your opinion?

10   A    I think it was the chief and the marshal.  I

11        think they both asked me my opinion.

12   Q    And here we're talking about Acting Chief

13        Dimmitt?

14   A    Yeah, just for the record.  Dimmitt was a

15        chief.  He is a chief.  He was brought in as a

16        chief from another district, so he wasn't

17        really an acting chief.  He was acting chief

18        for the District of --

19   Q    Yeah, he was.

20   A    -- Massachusetts.

21   Q    His Massachusetts' title was acting chief.  His

22        Marshal Service title was chief?

23   A    Yes.

24   Q    Dave Dimmitt?

Page 50

1   A   Yes.

2   Q   So you were asked by both the marshal and by

3       Chief Dimmitt --

4   A   Yeah.

5   Q   -- about Deputy DeCaire?

6   A   Only as in okay, these are the deputies that we

7       can consider for this.  What's your opinion and

8       why?

9   Q   What did you say about Deputy DeCaire?

10  A   I said she already had an acting supervisory

11      job, so in fairness to other senior deputies,

12      my opinion would be to give somebody else a

13      piece of the pie.

14  Q   This was a 120 day position, correct?

15  A   Yes.

16  Q   And Alison Hodgkins got the position?

17  A   Yes.

18  Q   At the time had Alison Hodgkins filed an EEO

19      complaint as well?

20  A   I heard that she had, previous administration,

21      and it was ongoing, I guess.  I don't know.

22  Q   Is there any reason you recommended women only?

23  A   No.

24  Q   When Alison Hodgkins was promoted to the acting

Page 51

1        supervisor job, the position of warrant

2        coordinator opened up, correct?

3    A   Yes.

4    Q   Were you asked your -- for input into the

5        decision or for your recommendation --

6    A   Yes.

7    Q   -- on the decision of who should be the warrant

8        coordinator?

9    A   Yes.

10   Q   Who did you recommend?

11   A   Paul Sugrue.

12   Q   Were you asked your opinion about whether

13       Deputy DeCaire should be placed in that

14       position?

15   A   Yes.

16   Q   What was your response?

17   A   Again, it was very similar to the other one.

18       And my recommendation was Paul Sugrue, to give

19       him an opportunity that he hadn't had before

20       and I thought he'd be a good -- you know, a

21       good step, showing some management

22       responsibilities.

23   Q   Had Deputy Sugrue applied for the position --

24   A   I don't know.

Page 52

1   Q   -- or asked about the position?

2   A   I don't know.  I've read after that that he

3       didn't solicit it nor want it, but he didn't

4       refuse it.

5   Q   You say you read it, is that in reading Deputy

6       DeCaire's complaint?

7   A   Yeah.

8   Q   Did you review that before coming in today?

9   A   Yes.

10  Q   What else did you review, what other documents?

11  A   I think that was it.

12  Q   Did you review your own affidavit --

13  A   No.

14  Q   -- to the EEO?

15  A   No.  Probably should have.

16  Q   You'll get a chance to see it.  When the 120

17      days were up on the acting court supervisor

18      position, --

19  A   Yeah.

20  Q   In the past, when 120 day periods had been up,

21      subsequent 120 day assignments have been given,

22      --

23  A   Right.

24  Q   -- right?  For example, in Worcester Sue

Page 53

1    Williams had it for 120 days and then Deputy

2    DeCaire had it for 120 days, correct?

3  A  Yeah.

4  Q  In this case, was Cindy DeCaire considered for

5    the acting court operations position at the end

6    of that first 120 days that Annette Lawlor --

7    I'm sorry -- that Alison Hodgkins was in the

8    position?

9  A  I don't think anyone was.

10  Q  Why not?

11  A  I'm pretty sure, and I think the chief would be

12    much clearer on this than me, but I think we

13    learned that headquarters wasn't going to back

14    fill Walter Doherty's job, I think.  I think

15    we lost a supervisor's job somewhere along the

16    line.

17  Q  But do you know when you lost a supervisor's

18    job?

19  A  That's what I'm not clear on.

20  Q  At the end of the 120 days, what happened to

21    Alison Hodgkins' position?

22  A  She stayed doing it, but she wasn't getting

23    paid.

24  Q  But they didn't do a selection like they did in

Page 63

1  A  Jeff's would be handling more of the problem

2     areas dealing with the institutions, the

3     lawyers.  Where Paul's was more court

4     operations part of it, making sure they were --

5     the schedule was done, you know, deputies

6     assigned, courts assigned, you know, who's

7     covering what, guards brought in.

8  Q  So you're saying that Paul Sugrue was

9     responsible for --

10 A  No, Paul Dunne.

11 Q  I'm sorry.  Paul Dunne was responsible for the

12    day-to-day assignments of the court operations

13    deputies?

14 A  That's my recollection, yeah.

15 Q  There was a position -- another position that

16    opened up in October of 2003, a warrant

17    coordinator position.  Did you give any

18    recommendations or have any input into that

19    position?

20 A  Let's see, in October, I probably did.  Yeah, I

21    probably, you know, gave some names.

22 Q  Was Deputy DeCaire included in the names that

23    you gave?

24 A  I don't know.  If she was still in Boston, --

Page 64

1   Q   September of --

2   A   -- she would have been.  If she was in

3       Worcester, she wouldn't have been.

4   Q   September 29, 2003.

5   A   Was she still in Boston?

6   Q   Yes.

7   A   Then I'm sure her name was in the mix.

8   Q   Do you know, again, any reason why she should

9       not have been appointed to the warrant

10      coordinator position at that point?

11  A   No.  Again, unless --  As I've previously

12      stated, in an effort to give everybody an

13      opportunity, you know, a bite out of the pie,

14      you know, somebody else might have got it

15      instead of her.

16  Q   Is that the reason Kevin Donahue was selected?

17  A   I was going to say, I think Kevin Donahue was

18      selected to that, yeah.

19  Q   Now, at the time where was Kevin working?

20  A   I'm not sure.

21  Q   Your statement that if she had been in

22      Worcester, she wouldn't have been considered

23      for it.  Why?

24  A   It's like a separate entity of itself.  You

Page 65

1   know, unless he had wanted to be considered for

2   it, you know?

3   Q   Well, if she had put herself in for it,

4       actually given her name in to be considered?

5   A   Yeah, then she would have been considered.

6   Q   But you --

7   A   I mean, I would have considered it, you know?

8   Q   But no matter how many times she puts her name

9       in, it's your position that because she'd done

10      it once before, someone else should have the

11      position?

12  A   Only if they're of equal, you know,

13      capabilities or whatever.  If --

14  Q   So until everybody who's equal to her gets a

15      chance, she doesn't get to be warrant

16      coordinator again?

17  A   I think that's fair.

18  Q   And equal is defined how, seniority?

19  A   No, not necessarily.

20  Q   Abilities?

21  A   Abilities.  Definitely ability, sure.  And if

22      somebody doesn't want it and they so state they

23      don't want it, then, you know, why would you

24      give it to them.  I mean, I wouldn't give it to

1       them.  Maybe somebody else would, but I

2       wouldn't.

3   Q   Now, when this court reorganization occurred

4       with the supervisors, did you have a problem

5       with the fact that Deputy DeCaire was in court

6       operations and her fiance was one of the

7       supervisors of court operations?

8   A   Problem, no.  Concern, yes.

9   Q   Why no problem, why yes concern?

10   A   Just looking at it from other deputies'

11       perspectives.  If the person I'm living with

12       I'm supervising, that's not fair to the other

13       deputies.  If that person's going to get a

14       shake because of a situation, I don't think

15       it's fair.  I'm not sure what time frame you're

16       talking about.

17   Q   Before she got married.  After Jeff Bohn gets

18       assigned to court operations supervisor, but

19       before she gets married.

20   A   Yeah.

21   Q   Paul Dunne --

22   A   Yeah.

23   Q   -- is supervising there as well?

24   A   Right.

Page 67

1  Q  Did you view there to be a problem given that

2      they were living together and that Jeff was one

3      of the two supervisors in court operations?

4  A  Again, I was concerned with it.  You know, and

5      that's why Paul Dunne was her supervisor.  We

6      broke it down into assigning -- trying to

7      assign equal amount of evaluations to each

8      supervisor and I don't believe Cindy -- I'm

9      ninety-nine percent certain that Cindy was

10     assigned to Paul Dunne.

11         MS. COTTRELL:  We're within five minutes

12     of 3:00.

13         MS. TALWANI:  Okay, we're not within five

14     minutes of being done, I'm afraid.

15  A  Those stack of papers for me?

16  Q  But you can see, out of all of these I only

17     pulled one.

18  A  That's a good sign.

19  Q  When did you learn that Cindy DeCaire and Jeff

20     Bohn had gotten married?

21  A  After the wedding.

22  Q  You weren't invited?

23  A  No.  It was right down the street from my

24     house, too.  I could have got them a better

Page 68

1    deal at the place they got it if they had

2    spoken up.  It was after.

3  Q  Were you involved in the --

4  A  I don't know what date it was.

5  Q  Were you involved in the decision to move

6    Deputy DeCaire out of court operations or out

7    of the Boston court operations?

8  A  Yeah, I was privy to it.  I don't know how much

9    input I had.

10  Q  Who discussed it with you?

11  A  The chief.

12  Q  Did the chief discuss with you the options that

13    the Marshal Service had in how to handle this

14    problem?

15  A  I believe we went over different areas.  Again,

16    --

17  Q  Did the chief discuss with you the possibility

18    of moving Cindy back to warrants?

19  A  I don't remember.  He could have.

20  Q  Did you have an opinion about Cindy going back

21    to warrants?

22  A  Again, you know, I'd throw different options

23    out.  You know, we can do this, we can do this,

24    we can this, we can do --  You know, it wasn't

Page 69

1      my decision.

2    Q   But that was one of the options, wasn't it?

3    A   I imagine it was.  I don't have any clear

4        recollection of it.  But, you know, just from

5        the operation --

6    Q   Other than the possibility that there was a bar

7        on somehow Cindy going back to warrants as a

8        punishment for something, there was no reason

9        for her not to be able to go to warrants, was

10       there?

11   A   No.

12           MS. TALWANI:  Good enough place to stop.

13       Off the record.

14                            *

15                            *

16   (Whereupon, the deposition suspended at 2:58 p.m.)

17