# EXHIBIT Q

# Commonwealth of Massachusetts

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CYNTHIA A. DECAIRE,
            Plaintiff

VS.

JOHN D. ASHCROFT, in his official
position as Attorney General
of the United States,
            Defendant

Volume I

Exhibits 1-6

Docket No.
04-10593WGY

DEPOSITION of **ANTHONY DICHIO**, a Witness

called by Counsel on behalf of the **Plaintiff**, pursuant

to the Massachusetts Rules of Civil Procedure, before

Leanne L. Murphy, a Certified Court Reporter and Notary

Public in and for the Commonwealth of Massachusetts, at

the Law Office of Segal, Roitman & Coleman, 11 Beacon

Street, Boston, Massachusetts, on Tuesday, October 26,

2004, commencing at 11:01 a.m.

*Accurate Reporting Services*
*36 West Street*
*Whitman, MA  02382*
*(781) 447-9520*



**APPEARANCES:**

Indira Talwani, Esq.
Segal, Roitman & Coleman
11 Beacon Street
Suite 500
Boston, MA  02108
REPRESENTING THE PLAINTIFF

Barbara D. Cottrell, Esq.
Assistant United States Attorney
Northern District of New York
James T. Foley U.S. Courthouse
445 Broadway, Room 231
Albany, NY  12207
REPRESENTING THE DEFENDANT

**ALSO PRESENT:**

Cynthia A. DeCaire
Plaintiff

Page 3

<u>I N D E X</u>

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> |
|---|---|---|
| Anthony Dichio | | |
| (by Ms. Talwani) | 4 | |
| (by Ms. Cottrell) | | (None) |

<u>E X H I B I T S</u>

| <u>Number</u> | <u>Description</u> | <u>Page</u> |
|---|---|---|
| | (Retained by Counsel) | |
| Plaintiff's | | |
| Exhibit No. 1 | Job description for 1811 | 26 |
| Exhibit No. 2 | Joe description for 082 | 26 |
| Exhibit No. 3 | Affidavit dated 6/5/03 | 60 |
| Exhibit No. 4 | Affidavit dated 6/5/03 | 60 |
| Exhibit No. 5 | Supplemental affidavit | 60 |
| Exhibit No. 6 | Handwritten notes | 63 |

# P R O C E E D I N G S

1

**ANTHONY DICHIO**, first being duly sworn,

on oath, was questioned and testified as follows:

\*

**MS. TALWANI:**  We've agreed to the usual

stipulations here, all objections, except as to

form, and motions to strike are held until the

trial; the court reporter does not need to keep the

original, it can be sent to the party; the witness

has 30 days to sign the deposition transcript under

the pains and penalties of perjury.  So stipulated?

**MS. COTTRELL:**  So stipulated.

\*

## DIRECT EXAMINATION

(By Ms. Talwani)

Q    Have you had your deposition taken before?

A    No.

Q    I'm sure your counsel has told you the basic rules,

but most importantly if you don't understand any

question that I ask, please tell me you don't

understand the question.  If you answer, I will be

assuming that you understood what I said.  We can't

talk over each other where the court reporter can't

get it down.  If you need a break at any time, let

Page 5

1   me know.  If you don't know the answer to the

2   question, I am entitled to your best recollection.

3   I don't want you to guess, but I do want you to

4   tell me what you do remember on things that I ask

5   you.

6               Just briefly on your background, what's

7   your education?

8   A   I have a bachelor's degree in criminal justice.

9   Q   Where is that from?

10  A   Curry College.  I'm a graduate from the

11      Massachusetts State Police Academy; I was a state

12      trooper for 22 years.  I trained in the Secret

13      Service Academy, protection -- dignitary protection

14      school, state police, and I have a bachelor's at

15      Curry College, and the U.S. Marshal Service

16      Academy.

17  Q   What is the U.S. Marshal Service Academy?

18  A   It was for the marshals.  It was two weeks

19      administration and then training, firearms and

20      combative training.

21  Q   So, two weeks total included administration --

22  A   One week was hands-on and the other week was admin.

23  Q   I'm sorry?

24  A   Administration for the Marshal Service.

Page 6

1  Q  I'm sorry, I don't understand.  One week is

2     hands-on training.  What does that mean?

3  A  It would be the range, defensive training, it would

4     be also ethics, all about part of the Marshal

5     Service.  As the U.S. Marshal, my responsibility is

6     overseeing the U.S. Marshal Services.

7  Q  And then you said one week administration?

8  A  Then it would be all going through basically all

9     the new stuff and again through ethics because

10    every time you go there, there's always ethics, but

11    it's about how we operate and how we do our job and

12    who we report to, the deputy director, director.

13  Q  Were these classes that you attended in Washington?

14  A  Yes, one was in Washington and one was in

15     Louisiana.

16  Q  When did you attend the class in Washington?

17  A  I was sworn in on August 6th as the U.S. Marshal

18     and then I think the Louisiana academy was the end

19     of August and possibly towards October.  They wait

20     until they have about 25 marshals before they have

21     a class.  So, somewhere September, October was when

22     I would go to Washington for that course.

23  Q  Can you give me briefly your work history before

24     coming to the U.S. Marshal's Office?

Page 27

1  A   I believe it was in the packet from Tim Bane.

2  Q   Is it your understanding that this is the 082 job

3      description?

4  A   It's my understanding.  I can't -- you know, I

5      don't know if it's current, but it's my

6      understanding.

7  Q   Have you received any different job descriptions

8      other than the ones that would've been in your

9      original packet?

10 A   The job descriptions of 082s, 1811s and DEOs,

11     that's all the job descriptions I have, that I'm

12     aware of.

13 Q   What I've shown as Exhibit 1 and 2, to the best of

14     your knowledge, were working --

15 A   My deputies.

16 Q   -- job descriptions for your deputies?

17 A   Yes.

18 Q   When you started at the Marshal Service, were you

19     given information by anyone about the promotion

20     process at the Marshal Service?

21 A   When I arrived there, I was told -- on my desk was

22     a piece of paper with the top five.  If anybody's

23     going for a promotion here in the Marshal Service,

24     they take their exam -- I don't follow the process.

Page 28

1   What will happen is apparently they take an exam

2   and then they go down to Washington for their

3   interviews and Washington does the interviews and

4   their top five get submitted to the marshal, and

5   the marshal goes over -- that's when I would get --

6   the deputies would submit their résumés to me, and

7   then I'd go through it and then I decide who I

8   think is best out of the top five for me.  They

9   don't have to be number one on the list either;

10  it's up to me, then I check it off by how I rank

11  them.  So, I get the top five and I rank them one

12  to five, then it gets submitted back to

13  headquarters, and headquarters has the final say.

14  I guess it would go through the board and the

15  director has the final say.

16  Q   Under this process, as you understand it, are you

17      allowed to select someone for a promotion who is

18      not one of the top five?

19  A   Yes, the top -- No.  If they have the top five, no,

20      I can't go -- if they're not on the list, I cannot

21      say, hey, what happened to this person.  If they

22      don't make it, they don't make it, and that's it.

23  Q   If someone didn't put in a promotion package,

24      they're not going to be on the list?

1   A   Right.

2   Q   If someone is deemed by headquarters to not be

3       within the top five, you're not allowed to give

4       them the position, correct?

5   A   Right.  It could be six or seven or somewhere

6       around there.  It doesn't always have to be five,

7       there may be six or seven on it.  It's not etched

8       in stone, the top five.  Usually it's the top five,

9       but they may have -- somebody might do a lateral

10      over and they'd throw that person on.

11  Q   Let me rephrase the question and make sure I

12      understand it.  I appreciate that clarification.

13              You receive a list from headquarters

14      which tends to be five people but could be a couple

15      more?

16  A   Yeah, it could be a few more.

17  Q   And your job is to select one of those people from

18      the list and then send that recommendation back to

19      headquarters?

20  A   My job is to rank that list from one to whatever it

21      may be, eight, five, and so the person who is

22      number one is my pick, but that doesn't necessarily

23      happen.  They will go through it and one may be my

24      pick but might say they put in for Florida, say, so

1       they may get also a call for Florida, so it may not

2       happen for them, then I have to go to number two.

3       They will say: Well, Marshal, you didn't get one,

4       you have number two.

5   Q   Do you have the option of ranking, for example, out

6       of a top five one, two and three and basically

7       saying no to four and five?

8   A   No, you're supposed to put -- write all of them

9       down.  So, even if I didn't want somebody, that

10      person would be number five, say.

11   Q   You said that when you arrived there were these

12      essentially packages on your desk for Tony Visalli

13      and --

14   A   I think it was Tony --

15   Q   -- Jeff Bohn?

16   A   I'm trying to think.  When I came here, there was

17      so much at the time, but there was a packet for

18      promotions and I'm trying to think.  I think it was

19      Tony's and then Jeff Bohn -- I'm trying to think of

20      names that were in there, like Dave Taylor, Alison

21      was on the first one, Alison was on the second one.

22      There were, yeah, a couple of different things.

23   Q   Was Dave Taylor on one of those two lists?

24   A   Dave Taylor was on the HIDTA list.  Dave Taylor was

# Commonwealth of Massachusetts

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

CYNTHIA A. DECAIRE,
        Plaintiff

VS.

JOHN D. ASHCROFT, in his official
position as Attorney General
of the United States,
        Defendant

VOLUME II

Exhibits 7-15

Docket No.
04-10593WGY

---

CONTINUED DEPOSITION of **ANTHONY DICHIO**, a Witness

called by Counsel on behalf of the **Plaintiff**, pursuant

to the Federal Rules of Civil Procedure, before Leanne

L. Murphy, a Certified Court Reporter and Notary Public

in and for the Commonwealth of Massachusetts, at the

United States District Court, One Courthouse Way,

Boston, Massachusetts, on Tuesday, December 14, 2004,

commencing at 10:32 a.m.

*Accurate Reporting Services*
36 West Street
Whitman, MA  02382
(781) 447-9520



**APPEARANCES**:

Indira Talwani, Esq.
Segal, Roitman & Coleman
11 Beacon Street
Suite 500
Boston, MA  02108
REPRESENTING THE PLAINTIFF

Barbara D. Cottrell, Esq.
Assistant United States Attorney
Northern District of New York
James T. Foley U.S. Courthouse
445 Broadway, Room 231
Albany, NY  12207
REPRESENTING THE DEFENDANT

**ALSO PRESENT**:

Cynthia A. DeCaire
Plaintiff

Page 33

1  Q  During the week that Cindy, as you said, did not do

2     the rotation did you go to Worcester?

3  A  I don't know.

4  Q  Do you recall what decision you made about the

5     court operation coverage next?

6  A  You mean the rotational one?

7  Q  Yes.

8  A  It was Walter Doherty's responsibility to work with

9     a supervisor out there, which would've been Tom.

10    If the courts aren't covered, the judges get upset.

11    So, during the time Sue Williams was here, the

12    rotation, I thought, would be fair and work out

13    well, but it wasn't going to work out well.

14 Q  And the reason it wasn't going to work out was

15    because Cindy had a pre-approved leave and so

16    therefore that was a problem?

17 A  No.

18 Q  What was the reason it wasn't going to work out?

19 A  Because we have to be consistent in the courts and

20    I can't worry about a supervisor trying to get a

21    body to come in here to court.  It makes it --

22    Every day the courts change, so I wanted to be

23    consistent.  So, I changed from rotational to

24    permanently assigning a junior deputy to courts so

Page 34

1       we'd be consistent.

2    Q  Why didn't you do that in the first place?

3    A  I told you why.  I tried to be fair and let them

4       just take turns where they could still be in

5       Worcester and Boston so they get the best of both

6       worlds.

7    Q  Why did you stop doing it?

8    A  Because it wasn't working out.

9    Q  Why wasn't it working out?

10   A  Because it wasn't going to be consistent.  I had to

11      -- Each day the supervisors would have to call if

12      they needed a body or not and it just wasn't going

13      to work out.  So, it's much better that somebody's

14      permanently assigned here so they're there and

15      every day they'll be on the schedule and there's no

16      calling to find out is deputy so and so there; no,

17      they're out sick today.  It just didn't work out.

18   Q  This wasn't something you had anticipated ahead of

19      time?

20   A  Anticipated what?

21   Q  What basically you're saying to me is that you made

22      this decision because you thought this was a fair

23      decision, and then within a week you changed your

24      mind and the reason you now think it's not going to

Page 35

1    work -- even though that's the more fair decision,

2    the reason you now change your mind about it is

3    because you're saying it's not going to work out,

4    and the reason you're saying it's not going to work

5    out is because someone would have to call every

6    day.  My question is, why didn't figure this out

7    beforehand?

8  A  Because I didn't think it would be a problem.  I

9    thought that it would work out.  I thought that if

10   a deputy is assigned one week at a time that it

11   would be fine, but then I didn't consider if

12   somebody called in sick and that changes the plan

13   for the supervisor scrambling to get a body or if

14   they're out on vacation.  Yeah, it became a

15   problem.  So, I didn't want it to become a problem

16   because I was already short in Boston ten deputies,

17   so just permanently assign the junior deputy to

18   Boston so that there is no problem.

19 Q  How is this different from any other person calling

20   in sick who's assigned to court operations?

21 A  Because if they call in sick they're assigned to

22   that area.  If it's Worcester or Boston they call

23   in sick and then you work with it.  But each day

24   the schedules from Boston come out and they have to

Page 36

1    call the supervisor, Tom, and work with it.  As a

2    manager, as a marshal, I found the best way to

3    handle that is permanently assign a deputy.

4    Q    And the reason that you chose Cindy to be the

5         person who was going to be permanently assigned to

6         Boston court operations?

7    A    She was the most junior deputy in court operations

8         in Worcester and locality-wise, but she was the

9         most junior deputy.

10   Q    Why didn't you move someone from warrants?  Once

11        you realized it was going to be permanently filling

12        it, why didn't you move someone from the warrants?

13   A    I didn't move anybody from warrants.

14   Q    I know.  Why didn't you?  Why did you only choose

15        Boston court operations, Cindy DeCaire to --

16   A    Because I chose Worcester court operations to come

17        over here to work court operations.

18   Q    I just want to make sure I understand what's your

19        position here.  Because you wanted to make things

20        work out well for Cindy and because she had

21        requested to move to Boston, you initially were

22        planning her to Boston, correct?

23             **MS. COTTRELL:**  Do you mean Worcester?

24   A    You mean Worcester?

Page 37

1    Q   I'm sorry, to Worcester originally. I'm just going

2         to make sure I understand these steps. Number one,

3         you thought Cindy wanted to move to Worcester,

4         correct?

5    A   Number one, I didn't think; I know. Cindy asked me

6         to go to Worcester, yes.

7    Q   I'm glad you know what's in her head. Number one,

8         it was your understanding that Cindy wanted to move

9         to Worcester, correct?

10   A   Cindy told me she wanted to go to Worcester, yes.

11   Q   When a question came up after the HIDTA position

12        was filled you gave her a choice between warrants

13        and Worcester, and in order to fulfill her request

14        you moved her to Worcester, correct?

15   A   Correct.

16   Q   And then when you needed a body in court operations

17        in Boston you didn't move anybody from warrants,

18        you didn't give Cindy a choice to move back to

19        warrants. You simply decided that Cindy, who, by

20        your testimony, wanted to be in Worcester

21        preferable over any position in Boston, you wanted

22        to move her back to Boston?

23   A   I had to make a change to bring somebody to the

24        court operations and I was taking from Worcester in

Page 38

1    court operations, that's where I was taking from,

2    and Cindy was the junior deputy.  That's the reason

3    why, yes.

4  Q    And that's the only thing you considered?

5  A    That's right.

6  Q    Whereas before you were considering how far

7    people's commute was and whether to be nice to them

8    and the wear on the cars and stuff, at this point

9    it no longer mattered where her residence was?

10  A    I needed to bring somebody back and I was bringing

11    somebody back from court operations and I took from

12    Worcester, and Cindy was the junior deputy.  She

13    lived in Westboro at the time and she wasn't that

14    far.  Junior deputy and locality at the time was

15    Worcester -- I mean Westboro.

16  Q    It's your testimony now that her residence wasn't

17    far from Boston?

18  A    My testimony is that she lives in Westboro.  Just

19    to clarify, Worcester to Boston is less than 50

20    miles.  They commute back and forth.  There is no

21    change, so it doesn't make a difference as far as

22    if they lived in Worcester or if they lived in

23    Westboro, I'm saying.  It's 50 miles.

24  Q    Maybe I misunderstood you.  I understood your

Page 39

1   testimony from the first day to be that you thought

2   it made sense for people to live closer to home and

3   that was an important priority for you.

4 A Yeah, that was important.

5 Q And your understanding was that Cindy really

6   preferred to be in Worcester?  That was your

7   understanding, correct?

8 A Correct.

9 Q Despite those feelings about wanting to have these

10   commutes shorter for everybody and despite knowing

11   that Cindy, as you understood it, really wanted to

12   be in Worcester, it was your decision that she was

13   going to be the person to fill the 082 position

14   that was left by Jamie Viator?

15 A I didn't pick on Cindy.  If Sue Williams was junior

16   to Cindy it would've been Sue Williams that was

17   permanently assigned here; it wouldn't have been

18   Cindy.  But the case is -- the fact of the matter

19   is that Cindy's the junior deputy there, so that's

20   why she's here.

21 Q Let's talk about that conversation with Paul

22   Durette.  You were referring to a conversation with

23   Paul Durette about the EEO complaint.  Tell me

24   about that conversation.

Page 47

1   A   The time he's talking about, I have no idea.  As

2       far as me telling Paul what to say, I never ever --

3       absolutely not ever told him what to say.

4   Q   Did you ask him if he would support you?

5   A   No.  Would I ask Paul to support me?

6   Q   Yes.

7   A   Absolutely not.

8   Q   After you had this discussion with headquarters

9       about the complaint and Paul Durette and getting an

10      acting chief in, did you at some point have an

11      opportunity to read Cindy DeCaire's complaint?

12  A   Cindy DeCaire's EEO complaint?

13  Q   Yes.

14  A   I got an e-mail from Bob Wesley, I think, regarding

15      her complaint.  That's the first time I ever saw

16      it.  I don't remember the date.

17  Q   What do you understand your role to be, if any,

18      when a subordinate complains of discrimination in

19      the Marshal Service?

20  A   If somebody complains of discrimination and goes

21      through the chain of command, any disciplinary

22      action or anything is taken -- the chief is the

23      posing official, I'm the deciding official -- but

24      if there's any discrimination it would be dealt

Page 48

1    with immediately.

2  Q  Who is supposed to be looking into whether the

3     facts alleged are true or not true?

4  A  The facts of what?

5  Q  The EEO complaint.  You started talking about

6     discipline, but I'm just trying to find out who's

7     looking into whether these facts are true or not.

8  A  Headquarters makes the deciding -- it's

9     headquarters.

10 Q  If someone says, Marshal, I think what you did was

11    discriminatory, am I correct to understand that you

12    have no role in doing anything in considering

13    whether you did something right or wrong or any

14    evaluation of yourself?

15 A  No.  My role -- When I received a call that an EEO

16    was filed against me, they -- you know, you can't

17    do anything about it, questions will come out, you

18    answer them, send them back to us, you cannot

19    retaliate against anybody regarding the EEO

20    complaint.  And I said: No problem, that's not --

21    you know, I won't.

22 Q  Did you read the EEO complaint?

23 A  When it came to me, yeah, and I had to answer

24    questions.

Page 49

1   Q   When you found out about the complaint, did you

2       discuss the allegations of the complaint with

3       anybody?

4   A   I wouldn't have discussed it with Paul.  I answered

5       the questions.  I don't recall discussing it.  I'd

6       have to look at the dates.  I don't know who at the

7       time was -- If Dave Dimmit was assigned to me at

8       the time, I could've told him that I received an

9       EEO complaint.

10  Q   From that time to the present, who at the Marshal

11      Service have you discussed Cindy's complaint with?

12  A   Probably Dave Dimmit.

13  Q   Anyone else?

14  A   I mean, if anything, management.  I don't recall if

15      I talked to anybody about Cindy's complaints.

16  Q   How about your current chief?

17  A   You mean Bill Fallon?

18  Q   Yes.

19  A   He knows about it now.

20  Q   My question is whether you talked about it with

21      him.

22  A   I didn't sit down and talk to -- Specifically that

23      Cindy filed an EEO?  No.

24  Q   No, the specific allegations in the complaint,

1      what's she asking for, anything about it.

2   A   No.  What's she's asking for?  No.  If I said

3      anything, I'm here in the office working on the EEO

4      complaints.

5   Q   Dave Dimmit would be the only person you would've

6      talked with about it?

7   A   At the time it would probably be Dave Dimmit on the

8      EEO stuff, but no specifics, no.

9   Q   You mentioned that Walter Doherty would have a need

10     for somebody and then there'll be the question of

11     filling it back and forth.  Did you discuss with

12     Walter Doherty that you had made the decision to

13     assign Cindy to him?

14   A   Not till after the fact.

15   Q   After you made that decision how did you let Walter

16     Doherty know that Cindy had been assigned to him?

17   A   When the transfers came out, Walter would've known.

18   Q   How would he have known?

19   A   Because the e-mail would come out saying that Cindy

20     would be effective such and such a date and will be

21     assigned.

22   Q   The new supervisor learned of this decision by the

23     same e-mail that the entire Marshal Service learned

24     about it?

Page 51

1   A   It wouldn't have come from me.  Walter Doherty then

2       would've sat down with Paul Durette, then Paul

3       Durette would've told him.  It wouldn't be me.

4       They don't come to me.

5   Q   The only step you would've taken would've been to

6       say to Paul Durette make it so?

7   A   I would give Paul Durette the assignments, send it

8       out, and then Paul Durette handled it from there.

9   Q   You had no conversation with Walter Doherty before

10      assigning Cindy to him as to whether this was the

11      right thing to do, wrong thing to do, good thing to

12      do, bad thing to do?

13  A   No, I don't recall.  Like I said, when I did the

14      rotations, then it changed sometime during that to

15      permanent.

16  Q   Why was Cindy required to leave her government

17      vehicle in Worcester and make her own way home when

18      she was notified of this transfer?

19  A   You'd have to talk to Tom Bezanson regarding that.

20      Tom was assigned to her.  Cindy left the car there.

21      I called Tom and asked about the situation and he

22      said -- this is all hearsay -- he said that Cindy

23      left the car because the front wheels aren't

24      working, there's something wrong with the steering.

Page 70

```
 1    Q    My question is simply do you recall that after that

 2         happened you then received this e-mail from her?

 3    A    If that's the way -- Yeah, I received several

 4         e-mails regarding this.  So, if that's the next

 5         one, then I received it.  I don't know exactly the

 6         -- I don't know all the dates when the e-mails came

 7         in.

 8    Q    But at any rate, you saw it around the same time

 9         that this whole issue came up?

10    A    Yes.

11    Q    The reason Cindy was transferred back to Boston

12         court operations, according to you, was because

13         there was a manpower problem and she had the least

14         seniority in the Worcester office, correct?

15    A    Worcester court.  It's different.

16    Q    After she was moved back to the court operations

17         was there any limit placed or requirement placed

18         that she could never move out of the Boston court

19         operations?

20    A    No.

21    Q    Was there any reason when the manpower problem was

22         addressed why Cindy would be required to stay in

23         the Boston court operations?

24    A    If the manpower came back why Cindy would stay
```

Page 71

1  there?  When Cindy was transferred back then, I

2  remember having a conversation with Cindy that it

3  wouldn't be permanent in there, she was in a

4  cubicle and that this would be temporary, that you

5  would eventually go back to Worcester, when the

6  manpower came back that you would probably go back

7  to Worcester.  So, it's not permanent, I said.

8  Q  This was an 082 position she filled, correct?

9  A  No, it's not an 082 position.  It happens to be an

10     082 that left.  It's not an 082 position.

11 Q  An 082 had left and therefore there was a vacancy

12     and that was the position she filled?

13 A  She filled the court operations.  An 082 left,

14     which is a vacancy in the court operations where I

15     had -- Annette Lawlor's an 1811, Frank Dawson's an

16     1811, Alison Hodgkins an 1811.  So, she's working

17     in the court operations.  It doesn't matter what

18     title you have, it's court operations.

19 Q  I understand that.  But I am correct that the

20     reason that you needed her was because an 082 left,

21     correct?

22 A  The 082 left, right.

23 Q  In March of 2003 the Marshal Service received three

24     new 082s, correct?

Page 72

1   A   I don't know.  I mean, I'd have to see all the

2       stats.

3   Q   What would you need to see?

4   A   Who the deputies are that arrived there.  We

5       received deputies there, 082s.  I'd have to think

6       which ones arrived at certain times here.  I had

7       Gary Olivera, he was a DEO and became an 082, and

8       John Whitcomb was an admin person that became an

9       082, Mike Hughes was a DEO and became an 082, if

10      that's the time you're talking about.

11              (Ms. Talwani confers with client)

12  Q   How about the three who came from the academy?

13  A   I don't know the dates.  They came after this.

14      When they came -- I don't know the dates they

15      arrived, but they were -- it was Kevin, Shawn, and

16      Joe Norton, I believe.

17              (Ms. Talwani confers with client)

18  Q   After these 082s started arriving why didn't you

19      send Cindy back to Worcester?

20  A   Because we were still short in Boston.  I mean,

21      there was still no -- there was three -- I can't --

22      we lost -- like, Shawn Bianchi's no longer here,

23      he's gone to Virginia.  We were short.  We're still

24      short.  There's still a lot of work here, so Cindy

1    still remained here at that time.

2    Q   When you had this conversation with her and you

3        said to her, well, it's temporary, you weren't

4        talking about just getting one more person, you

5        were talking about getting how many more people

6        before Cindy could go back?

7    A   I have no idea how many people.  It was temporary,

8        that eventually she would go, whether it would be

9        next week or whether it would be two years from

10      now.

11   Q   What would it depend on?

12   A   It depends on the manpower and everything else.

13   Q   What's the everything else?

14   A   The manpower between what we have in Boston,

15      Worcester, Springfield.  It depends on manpower

16      shortage, depending on the demand in the Boston

17      court.

18   Q   As people arrived, did they all come to Boston?

19   A   No.  When they came from the academy, I think Shawn

20      Redicki went to Worcester.

21   Q   How come he went to Worcester instead of to courts

22      in Boston and Cindy go back to Worcester?

23   A   When he went to the academy, he came out of the

24      academy assigned to Worcester.  He lives way out in

Page 74

```
 1            that area, so he was assigned to that.
 2      Q     What you're saying that in that case it was
 3            location but not seniority?
 4      A     He came from the academy to there.  He applied, he
 5            graduated from the academy, and he was assigned to
 6            Worcester.
 7      Q     Who assigned him there?
 8      A     Who assigned him there?
 9      Q     Yes.  He was assigned is a passive voice.  Who
10            assigned him to Worcester?
11      A     When he came through -- When I looked at names,
12            locations -- It could've been myself and my chief
13            who discussed if this guy was from way out there --
14            he graduated from the naval academy or something,
15            he lived out in Worcester, he was assigned to
16            Worcester when he graduated.  So, it would be
17            myself and probably the chief when we discussed
18            bodies coming here.
19      Q     So, bodies would come here and you would make a
20            decision on where to assign them and the decision
21            was based on where they lived, except for Cindy's
22            case it was based on what?
23      A     Cindy's case is that she was assigned to Boston.
24      Q     Are you saying, by the way, that Shawn never was
```

Page 75

1   assigned to Boston?

2   A   Shawn came out of the academy -- Shawn Redicki came

3       out of the academy and went to Worcester as an 082.

4   Q   Are you sure of that?  He didn't come to Boston

5       first?

6   A   He might've come in to sign in.  If you want to

7       know exactly, you have to find out from the AO.

8   Q   I'm having a hard time finding anything out from

9       the AO, so I have to ask you for now.

10  A   Oh, really?

11  Q   You're making a distinction about when he was

12      assigned when he first got here.  Is it your

13      testimony that a different set of criteria applied

14      to new hires than it did to people who were already

15      here?

16  A   When you get a call from Washington, they pick --

17      you know, like example, Mike Hughes, he didn't want

18      to go to Pennsylvania, he wanted to stay here.

19      When you get a call from the academy you need to

20      know in advance where you're going to be or they

21      don't go into the academy.  So, when I'm looking at

22      people, I look for people who live in Boston, look

23      for people that will be maybe Worcester, people

24      from Springfield so then they can go into those

Page 76

1      areas so that I wouldn't have to move somebody from

2      Boston to Worcester because now I get somebody that

3      lives out there that could stay there.

4   Q  Did you let somebody know that there was an opening

5      in Worcester?

6   A  Did I let somebody know?

7   Q  Yes.  Did they call from Washington and they said

8      can we put this guy in Worcester and you said yes,

9      we have an opening there?

10  A  I decided when this person came from the academy

11     that this person would go to Worcester.  I decided

12     this person lives out there and will go to

13     Worcester.

14  Q  Just so we're very clear here because you were

15     using the passive voice, even though you knew by

16     your testimony it was your understanding that Cindy

17     would rather be in Worcester, even though you had

18     moved her to court operations because of seniority,

19     it was your decision to put a new hire in Worcester

20     rather than transferring Cindy back to Worcester?

21  A  I moved Cindy back to Boston, right.  Seniority is

22     a factor.  It doesn't have to be.  There was never

23     -- When I was here there was never any seniority

24     here.  The chief and the marshal could do whatever

Page 77

1  they want as far as personnel.  That's one of my

2  criteria in trying to be fair, you don't have to,

3  but Cindy was moved.  When I made that move, right,

4  she was junior in the courts and I brought her back

5  to Boston, I told her it was temporary.  When Shawn

6  graduated he lived out in that area, he went right

7  from the academy to there.

8  Q  So, your view is that it is a more fair system to

9     use seniority even if you're not required to use

10    it?

11 A  Seniority, job performance, and locality is how I

12    decided to start things in this office.

13 Q  Originally with the interviews and stuff?

14 A  Right, and then after job performance.  If they

15    don't do well when they get in that position that

16    they're going to be pulled out if they're not

17    performing.

18 Q  Was Cindy not doing well in court operations in

19    Boston?

20 A  As far as I know, you'd have to ask the

21    supervisors.  I didn't have any complaints and I

22    got no e-mails.

23 Q  Did you have any complaints about her performance

24    in court operations in Worcester?

Page 78

1   A   You'd have to speak to the supervisors.

2   Q   I will be deposing the supervisors, but right now

3       I'm asking you whether you received any complaints

4       about Cindy's performance in Worcester.

5   A   I have no e-mails from no one.

6   Q   Do you have any complaints about Cindy's

7       performance in warrants before she was transferred

8       out of there?

9   A   I had no complaints in warrants when she was

10      transferred out, but she asked me to leave.

11  Q   That's not the question.

12  A   She asked me to leave.

13  Q   We'll be here a very long time if every question

14      has extra testimony that isn't responsive to the

15      question.  You will have an opportunity with your

16      attorney, whether it's by affidavit or at trial or

17      on cross-examination here, to give your side of the

18      story.  Right now I'm entitled to the answers to

19      the questions that I ask.  Okay?

20  A   Yes.

21  Q   Cindy's transfer to the Boston court operations was

22      temporary, correct?

23  A   Temporary.

24  Q   In fact, you didn't have to do any paperwork

Page 79

1      because she was still on the books as being in

2      Boston, correct?

3  A  I don't do any paperwork when it comes to that.

4  Q  And you don't direct any paperwork to be done?

5  A  I don't do any paperwork.  The chief will let them

6      know with the AO if he has to type something up or

7      the assistant chief.  I don't direct the AO to type

8      them.

9  Q  You let Cindy know that this was going to be

10     temporary and that you would move her back to

11     Worcester?

12  A  Yes.

13  Q  And a new hire, Shawn Redicki, was subsequently

14     placed in Worcester, correct?

15  A  As an 082, yes.

16  Q  Well, you just told me a little earlier that there

17     wasn't a difference in the court operations job

18     between an 082 and an 1811, correct?

19  A  He came out of the academy as an 082, I'm telling

20     you, not an 1811.

21  Q  My question is quite simple.  Did this gentleman

22     come as a new hire into a deputy U.S. marshal

23     position in Worcester court operations after you

24     told Ms. DeCaire that her position in Boston court

Page 80

1    operations was temporary?  Yes or no.

2    A    I believe so.  I don't know the dates -- I don't

3         have all the times that Cindy was back and forth.

4    Q    It was back and forth a lot, wasn't it?

5    A    She was back and forth a few times.

6    Q    At the point when you removed Jeff Bohn from his

7         position as the HIDTA supervisor, what position was

8         he given?

9    A    He was taken from the HIDTA supervisor and he put

10        into handling the prisoners.  He wasn't managing

11        any people at the time.

12   Q    Did he subsequently have a role in managing any

13        people?

14   A    He did eventually.

15   Q    What people did he manage?

16   A    He came back to the court operations and managed --

17        we split it up -- the chief split it up.  They

18        assigned different deputies to Jeff, different

19        deputies to Alison.

20   Q    If Alison wasn't there, was Jeff the supervisor for

21        court operations?

22   A    If Alison wasn't there she would've also -- she

23        would assign a deputy to be acting supervisor.

24        That's the way it goes.

Page 81

1   Q   Is it your testimony that Jeff Bohn, as the

2       supervisor of court operations, was never

3       responsible for supervising Cindy DeCaire when she

4       was assigned to Boston court operations?

5   A   He didn't do her paperwork.  When Cindy came back

6       here, you know, he couldn't supervise her.  Did

7       they have conversation?  I'm sure they probably did

8       have conversation, but we tried to keep it apart as

9       best as possible.

10  Q   The reason that Cindy couldn't have the HIDTA

11      position or one reason she couldn't have the HIDTA

12      position in Worcester was because Jeff was the

13      supervisor, correct?

14  A   Right.

15  Q   Why wasn't it a problem when Jeff came back to

16      court operations to have Cindy in court operations?

17  A   When Jeff came back to court operations is when

18      Cindy ended up moving back to Worcester.

19  Q   Is that your testimony?

20  A   When Jeff was assigned there -- I don't know the

21      dates, but we spoke to headquarters regarding the

22      situation that we wanted to give Jeff another

23      opportunity to work with people, but if he did work

24      in court operations that he would have dealings

Page 82

1   with Cindy, and legal counsel said it's best if

2   Cindy went back to Worcester so they wouldn't have

3   that conflict there.

4   Q   Your testimony is that that happened as soon as

5       Jeff was moving back?

6   A   I don't know exactly when it happened.

7   Q   Do you have any idea?  One month later, three

8       months later, five months later?

9   A   I have no idea.

10  Q   It's quite possible, isn't it, that Jeff was

11      supervising for quite a while before Cindy was

12      moved back?

13  A   No, not that I'm aware of.

14  Q   Do you know approximately how long after he was

15      moved from the HIDTA supervisor position that he

16      got responsibilities in court operations?

17  A   I don't know.

18  Q   Do you know when you moved Cindy back to Worcester?

19  A   I'd have to look at the different dates.  Cindy,

20      when she went back -- I mean, there were several

21      different reasons why Cindy kept coming back and

22      forth.

23  Q   Tell me.

24  A   One, she requested to go to Worcester, then we were

Page 83

1    short in Boston and she came back, then when Jeff

2    became the supervisor in court operations Cindy

3    went back to Worcester.  Then when she went back to

4    Worcester, a short time after that she filed the

5    letter to Supervisor Bohn saying she's pregnant and

6    she requested light duty, so then she came back --

7  Q  You don't mean to Supervisor Bohn?

8  A  Excuse me?

9  Q  You don't mean to Supervisor Bohn?

10 A  Supervisor Tom Bezanson out in Worcester.  She

11    filed that, then we got a call that she's pregnant

12    and she's requesting light duty, and then we gave

13    her light duty, then she came back to Boston again.

14    So, those are the times that she came back and

15    forth.

16 Q  Do you recall that in March of 2003 there was a

17    warrant investigator position open?

18 A  A warrant investigator position?

19 Q  Yes.  After you moved Cindy to court operations a

20    position opened in warrants, do you remember that?

21 A  As a deputy, not a supervisor?

22 Q  Just a deputy.

23 A  People were moving all around, but there was --

24    there are positions that opened back and forth.

Page 88

1    A    I considered Dave Dimmit's recommendation to me

2         that Scott Kimball should go next in there and I

3         signed off on it.  Now, you'll have to talk to the

4         chief on how many other people he considered for it

5         and how he narrowed it down.

6    Q    Had you talked to the chief about Cindy's EEO

7         complaint?  I believe your testimony was you

8         thought you had, correct?

9    A    Dave Dimmit?

10   Q    This was Dave Dimmit we were talking about.

11   A    I'm sure at one time or another we had a

12        conversation that I received the EEO.

13   Q    Did Dave Dimmit know that Cindy had filed a

14        complaint in which she had made allegations about

15        her various transfers?

16   A    I don't know.

17   Q    He had no knowledge of that?

18   A    I have no idea.

19   Q    As the person who was making the hiring

20        recommendations for you, did you take any steps to

21        make sure that he was aware of different concerns

22        you might have about where people had been in the

23        past or people were going in the future?

24   A    No, I didn't tell him.

Page 89

1   Q   Did you tell him that you had told Cindy DeCaire

2         that her assignment to court operations in Boston,

3         which she had protested to you, was temporary?

4   A   I don't believe I talked to Dave Dimmit.  I talked

5         to Cindy.

6   Q   So, you tell Cindy that she's there in a temporary

7         position and then you leave it to Dave Dimmit to

8         make the recommendations for who's going to move

9         where, but you never alert Dave Dimmit to the fact

10        that you had to move Cindy?  Even though you

11        believed Cindy would prefer to be somewhere else,

12        you had to move Cindy to court operations because

13        of seniority, but nonetheless you never conveyed

14        this information to Dave Dimmit?

15  A   I believe I talked to Dave Dimmit on how to

16        transfer people within the office.  I left the

17        operation up to my chief because that's his

18        responsibility, is handle the operation.  He makes

19        recommendations to me.  I can agree or disagree or

20        say no, I don't want to do this, or yes.  I try not

21        to get involved in the operation.

22  Q   When he came in, did you sit down and give him any

23        information or background on the reports who were

24        reporting to you?

Page 90

1    A    On the reports that are reporting to me?

2    Q    The people.  Your subordinates.  Did you sit down

3         with Dave Dimmit and say, you know, here's what's

4         going on in the office, here's what I've got here,

5         here's --

6    A    No.  Dave Dimmit sits down with me and he tells me

7         this is what's going on, this is what the

8         supervisor is doing, this is what -- The

9         supervisors report to the A-chief and the A-chief

10        goes to the chief and the chief comes to me.  I

11        don't get involved in the day-to-day operation on

12        all that stuff.

13   Q    When Dave Dimmit started here in the District of

14        Massachusetts, did you give him any information or

15        share your experience and your knowledge with him

16        when he started or did he have to learn everything?

17   A    He didn't have to learn anything.  He was a chief

18        from northern New York.

19   Q    So, he didn't need to learn anything about the

20        people who worked here?

21   A    All he had to do -- I asked him to come in here.

22        He was here because I could not trust Paul Durette

23        as my assistant chief, that's why Dave Dimmit was

24        assigned to me for 120 days.  So, he was to come in

Page 91

1    here and make the district work and make

2    recommendations to me where he thought things could

3    be improved or where the problems were, and that's

4    when we sat down.

5  Q   Did you sit down and tell him where there were any

6    problems or was he supposed to come here and figure

7    out where the problems were?

8  A   He sat down with the assistant chief and they went

9    through the operation.

10  Q   So, the only information he had about what had

11    transpired here between August 2nd when you started

12    and March whenever when he started was what he

13    learned from Paul Durette?

14  A   As far as the operation.  As far as personnel,

15    there was -- he wasn't informed on any personnel

16    issues here, if there were any problems, no.  He

17    was to go out there, learn on his own, and see

18    who's the workers, who's not the workers, and make

19    decisions.

20  Q   So, although you had told Cindy that her position

21    was temporary, was there anybody who knew that

22    besides you and Cindy?

23  A   I don't know.

24  Q   What made it temporary if you weren't the one

Page 92

1    making the recommendations to move people out of

2    there?

3    A    It made it temporary because I told Cindy back then

4         on August 26th when she repeatedly asked me to go

5         to Worcester and she wanted be closer to her mother

6         and daughter that I would make it happen, and I

7         made it happen.  When I had to send her back here,

8         sure I felt bad, but I told her it was temporary,

9         that she would go back, and eventually it happened.

10   Q    I'm trying to figure out what the word temporary

11        means.  There are no records to show this because

12        you don't do records and you don't tell anyone

13        who's making a hiring recommendation about trying

14        to move her out.  What does it mean that it's

15        temporary?

16   A    It isn't hiring recommendations, it's just moving

17        deputies around.  They used to rotate deputies, you

18        try to rotate them in there, and that's what we're

19        trying to do.  You know, some deputies will be

20        there for three or four months and they move out or

21        whatever, six months, and they go back to court

22        operations and some will go into the warrant squad.

23        As a matter of fact, in January deputies will be

24        moved out of the warrant squad.

Page 93

1    Q    And will Cindy have an opportunity to have one of

2         those positions?

3    A    You'll have to ask Chief Fallon who's next in line.

4    Q    Is there a line?  Is there a list?

5    A    It will be the recommendations of the supervisor in

6         the warrant squad who they feel now should come

7         into the warrant squad and then we'll take that

8         advice, and then the final decision will be between

9         the chief and I who actually will go in there.

10   Q    It's your testimony that's starting in January?

11   A    I'm trying to guess where the next rotation will

12        come, but you'd have to ask Chief Fallon when the

13        next -- it's somewhere around there, January.

14   Q    How many rotations have there been?

15   A    There's probably been, I think, a couple.

16   Q    Has Cindy ever been considered for any of these

17        positions?

18   A    Cindy was already in the warrant squad and then she

19        came out and then she went to Worcester and she

20        came back.

21   Q    So, she's not going to get another chance for the

22        rotation because she's already done that once?

23   A    No.  Everybody will get a chance to go back in

24        there unless there were performance problems in

1    there.

2    Q    Do you have performance problems with Cindy

3         DeCaire?

4    A    I didn't say Cindy had a performance problem, I

5         told you.

6    Q    Have you considered Cindy DeCaire for a warrant

7         investigation's position at any point since you

8         transferred her to Boston court operations in

9         February of 2003?

10   A    Cindy has been -- Cindy will be considered.

11   Q    Please.  It's going to take us all day for you to

12        answer my questions.

13                   Past tense, has she been considered at

14        any point between February of 2003 and the present

15        for a position in warrants?

16   A    Not at this point.

17   Q    How many rotations have there been?

18   A    I couldn't tell you.

19   Q    Why has she not been considered?

20   A    She's been on light -- Cindy's been on light duty

21        for -- you'd have to find out from the AO how long

22        she's been on light duty, so she can't go into the

23        warrant squad.

24   Q    Is she on light duty right now?

1   A   She's not on light duty right now.

2   Q   It would be your testimony that while she was on

3       light duty she couldn't be in warrants?

4   A   Right, she couldn't be then at the time.

5   Q   And other time periods other than the period of

6       time that she was on light duty, why couldn't she

7       be in warrants?

8   A   Her name didn't come up to go into the warrant

9       squad.

10  Q   Did Dave Dimmit report to you about a meeting that

11      he had shortly after he came here in which Cindy

12      DeCaire asked whether she would be transferred out

13      of court operations?

14  A   No.

15  Q   He didn't tell you about that?

16  A   That Cindy asked to be transferred out?

17  Q   That at a meeting with a group of deputy U.S.

18      marshals Cindy DeCaire asked Dave Dimmit whether

19      she was going to be transferred out of court

20      operations since she had been transferred there

21      because of a manpower shortage.

22  A   No, I never had a conversation about that.

23  Q   Dimmit never came and reported that to you?

24  A   I don't remember him ever telling me that.

Page 96

1    Q   In April when Deputy Marshal Jeff Christo was

2         assigned to warrants, what was the basis of that

3         decision?

4    A   I don't remember if he came -- He was at the JTTF,

5         I don't know when he came back, and then I think

6         when he came back he went into the warrant squad.

7    Q   If I told you when he came back he was in courts

8         and then he moved to the warrant squad after that,

9         is that --

10   A   That's possible.

11   Q   Do you know why it would've been him who got to

12       move from courts to warrants rather than Cindy?

13   A   No, I don't know.

14   Q   When Deputy Marshal Doherty left --

15   A   Supervisor.

16   Q   Sorry.  When Supervisor Deputy U.S. Marshal Doherty

17       left, there was an open position for a supervisor

18       of court operations, correct?

19   A   Yes.

20   Q   And you received an e-mail from Cindy that she was

21       interested in the position, correct?

22   A   I don't think I received it.  I think it was

23       probably sent to the A-chief or somewhere.  I don't

24       think it directly came to me, but I probably

Page 97

1    received something cc'd from the chief or the
2    assistant chief.  I don't think she e-mailed me
3    directly.

4    Q    But you received a cc on it, correct?

5    A    I'm sure I probably did.

6                 **MS. TALWANI:**  Mark this next.

7                      (Whereupon, the below-described
8                      e-mail dated 4/21/03 was marked
9                      Exhibit No. 10.)

10   Q    You were aware, correct, that --

11   A    Of her interest, yes.

12   Q    Please let me finish the question.

13   A    I'm so sorry.

14   Q    You were aware that Cindy DeCaire was interested in
15        the acting supervisor position in court operations,
16        correct?

17   A    Yes.

18   Q    Did you consider her for that position?

19   A    She was one considered, yes.

20   Q    What was the criteria that was used for who got the
21        position?

22   A    Again, Chief Dimmit after Cindy's and Alison's --
23        he recommended Alison to become an acting
24        supervisor.  Cindy was already at one point in her

Page 98

1    career a temporary supervisor in Worcester back in,

2    I think, '91, June of '91, so that would already

3    put her out of -- she wouldn't -- she was already

4    acting supervisor, so now you have to try to be

5    fair and give it to somebody else that didn't have

6    that opportunity.  So, it came down and Alison got

7    it to be fair.

8  Q   Who was involved in the decision-making?

9  A   Again, Dave Dimmit made a recommendation, I agreed,

10     I thought it would be fair, and Alison got the

11     position.  Cindy already had an opportunity back

12     then in June of '91.

13 Q   At the time that the position was given to Alison,

14     she had a pending discrimination complaint,

15     correct?

16 A   With who, me?

17 Q   With the United States Marshal Service.

18 A   Yeah, she had a pending discrimination suit.

19 Q   Did this resolve that suit?

20 A   You'd have to ask her.

21 Q   Do you know anything about her EEO complaint?

22 A   No, I never read her EEO complaint.  I know she

23     filed an EEO against the former administration.

24 Q   It would be your testimony that there are no

Page 99

1       allegations in there about you?

2    A  I have never seen it.  I have no idea.

3    Q  Wouldn't it be hard for you to understand whether

4       there is a perception by people of unfairness in

5       the office if you don't even read their complaints?

6    A  If I don't read Alison's EEO complaint?

7    Q  Yes.

8    A  If they want me to read it, they would send it to

9       me.  They wouldn't want me to get involved in it.

10      I'm not involved in EEO complaints.

11   Q  You keep talking about wanting to be fair and

12      wanting people to enjoy their jobs and people to

13      have a good work relationship, you had a great work

14      environment in your other place.  Wouldn't it be

15      incumbent upon you as the manager to at least

16      listen to what people were saying didn't feel fair

17      to them?

18   A  I didn't look at their EEO complaints.  I came in

19      here and I was fair from the start.  I've done

20      everything fair.  So, if there was a problem from

21      the past with the administration, I'm not going to

22      get involved in that.  I never did get involved in

23      if one deputy was not a good worker, one was.  I

24      tried to start fresh and do my own thing in there.

Page 100

1    Q   Exhibit 28 to the reporter investigation of 2003

2         that was provided by the Marshal Service counsel

3         says that, "The investigator notes that Deputy U.S.

4         Marshal Alison L. Hodgkins filed an EEO complaint

5         in 2002, which was investigated during the fall of

6         2002, wherein she alleged that U.S. Marshal Dichio

7         was one of the alleged discriminating officials.

8         One of the issues was non-selection."

9    A   I'm not aware of that at all.

10   Q   You have no knowledge whatsoever that Alison

11        Hodgkins complained about non-selection?

12   A   No knowledge.  I just found out.  Right now is the

13        first time I've heard of that.

14   Q   Do you know whether the chief responded to Cindy's

15        e-mail about replacing Walter on an acting basis?

16   A   No.

17   Q   Just to be clear, in your conversation with Dave

18        Dimmit about this position was there a discussion

19        about both Cindy DeCaire and Alison Hodgkins having

20        the position or was there only a conversation about

21        Alison Hodgkins having the position?

22   A   Both of them were discussed.  Alison has been on

23        the list several times for promotions and she

24        didn't get it because back then Tim Bane didn't

Page 101

1    recommend her to get it.  I went with my, at the

2    time, chief's recommendations because I was there

3    just a few weeks, but she did -- Alison was on the

4    list.  So, maybe that's why she filed, she's been

5    on the list and has never been promoted.  I don't

6    know.  Cindy's name did come up and Alison's name

7    did come up; however, Cindy's name -- she already

8    had an acting position and Alison didn't, and

9    that's why I went with Dimmit's recommendation.

10   Q    Again, this isn't a performance issue, this is

11        simply that she had already had an opportunity as

12        an acting supervisor and therefore someone else was

13        going to have a chance?

14   A    Yes.

15   Q    At the time, Alison was holding the warrant

16        coordinator position, correct?

17   A    She was in warrants and then came over to that

18        position, yes.

19   Q    In fact, it was warrant coordinator, correct?

20   A    Right, warrant coordinator.  She was working with

21        Tony Visalli.

22   Q    She was in warrants and she was now being moved

23        over to court operations as acting supervisor, so

24        you needed to fill the warrant coordinator

Page 102

1    position, correct?

2    A    Yes.

3    Q    And Cindy asked to be considered for that too,

4         right?

5    A    She did.

6                   MS. TALWANI:  We'll mark this as the

7         next one.

8                          (Whereupon, the below-described

9                          e-mail dated 4/23/03 was marked

10                         Exhibit No. 11.)

11   Q    You're looking at the document that's been marked

12        by the court reporter as Exhibit 11.  You received

13        this e-mail, correct, letting you know that she was

14        interested in the warrant coordinator position?

15   A    Yes.

16                   MS. TALWANI:  Off the record a minute.

17                   (Discussion off the record)

18   Q    I'm showing you Exhibit 11.  That's the e-mail you

19        received that alerted you that Cindy was interested

20        in the warrant coordinator position, correct?

21   A    Yes.

22   Q    Was she considered for the warrant coordinator

23        position?

24   A    No.

1    Q    Why wasn't she considered?

2    A    She was not part of the warrant squad.  The warrant

3         coordinator was a new position and it was going to

4         come from within.

5    Q    But it wasn't a new position at this point, it had

6         been filled by Alison Hodgkins, correct?

7    A    It's a new position.  I'm not saying it was brand

8         new then, but the warrant coordinator -- Alison was

9         there first and then Alison moved on and now it's

10        open again, right, and it's to be filled from

11        within the warrant squad.

12   Q    But wouldn't you be down one warrant person now

13        with Alison going to be acting supervisor of court

14        operations?

15   A    I don't know if Scott Kimball came back then.  I

16        don't know the dates.  There was somebody brought

17        in.  The warrant coordinator was -- I think Paul

18        Sugrue went to that position, and then I don't know

19        if somebody else came into the warrant squad also.

20   Q    So, Cindy DeCaire was not considered for the

21        warrant coordinator position that opened up in

22        April?

23   A    Right.

24   Q    Did Paul Sugrue request to be considered for that

Page 104

1        position?

2    A   I don't know.  He wouldn't request it from me, it

3        would've been made within Dimmit and Tony Visalli.

4    Q   Well, you received the cc of the request from

5        Cindy.  Did you receive any other request or copies

6        of request?

7    A   Not that I'm aware of.

8    Q   Did Dave Dimmit discuss with you his recommendation

9        to offer the position to Paul Sugrue?

10    A   I don't recall if he talked to me directly or if he

11       just talked to Tony Visalli.  I would say he

12       probably did talk to me after him and Tony deciding

13       on Paul Sugrue and I'm sure that the chief would've

14       come in to me to say this is what we're deciding,

15       and I'd say yes or no.  So, he must've.

16    Q   That's your assumption of what would've happened

17       because that was the normal course of business?

18    A   Right.

19    Q   But you have no specific recollection?

20    A   Right.  I don't recall unless I got an e-mail from

21       him.

22    Q   To your knowledge, was any other candidate

23       considered other than Pau Sugrue?

24    A   I have no idea.

Page 105

1   Q   Do you recall that in September 2003 Deputy Wahl

2        became the warrant coordinator?

3   A   Deputy Wahl in Boston?  He wouldn't have come to

4        Boston, no.

5   Q   He was in Worcester and he stayed in Worcester, but

6        do you recall that he became a warrant coordinator?

7   A   In Worcester?

8   Q   Yes.

9   A   I have no idea if he became a warrant coordinator

10       in Worcester.

11   Q   That decision would've been made by someone --

12   A   It must've been --

13   Q   -- below you?

14   A   In Worcester it must've been made by Tom Bezanson

15       out there as the Worcester supervisor.

16   Q   Does Tom run these things by anybody in Boston or

17       does he just get to do these things?

18   A   As a supervisor, if he wants to assign somebody

19       within his district, he might assign them.  I don't

20       talk to Tom at all as far as the operation; it

21       would be Dave Taylor or the chief.

22   Q   An acting supervisor can only be in the position

23       for 120 days, correct?

24   A   No.

Page 106

1    Q    What happens after 120 days?

2    A    They can be in the position for up to one year.

3    Q    As an acting?

4    A    Not to exceed one year.  So, it's 120 days.  If it

5         goes 120 days and, you know, to be fair you can

6         rotate and get somebody else for 120 days or you

7         can also give it to that person for 120 days and

8         not to exceed one year.

9    Q    You can just keep giving it on 120-day positions?

10   A    Right.  If you want to float around, give somebody

11        else an opportunity to be fair.

12   Q    If Alison Hodgkins was given the position in April

13        of '03, 120 days later presumably the question

14        would come up of what happens to the position

15        again.  Are you aware that Cindy DeCaire expressed

16        an interest in the acting supervisor position of

17        court operations a second time?

18   A    I think I remember seeing an e-mail cc'd to me

19        because I think she was interested in warrant squad

20        and court operations.

21                  **MS. TALWANI:**  Mark this as the next one.

22                  (Whereupon, the below-described

23                  e-mail dated 8/21/03 was marked

24                  Exhibit No. 12.)

Page 107

1    Q    I'm showing you a document that's been marked as

2         Exhibit 12.  You were aware that she had made this

3         request, correct?

4    A    I believe I was aware of it.

5    Q    Do you know whether Cindy DeCaire was considered

6         for the acting position?

7    A    I don't know.  This acting position -- Are we

8         talking about the Walter Doherty position?

9    Q    Yes.

10   A    Is that what we're referring to here?

11              **MS. DECAIRE:**  Yeah, still his open

12        position.

13   A    I'm not aware if she was considered.  But I just

14        also want to let you know that Walter Doherty's

15        position was axed from headquarters.  There was no

16        -- the position ended because we were down

17        deputies.  You need a ratio of 8-to-1 for a

18        supervisor.  So, when Walter left, I thought I was

19        going to be able to replace Walter and that's when

20        Alison went over there.  But then, I don't know,

21        maybe a month later we got the call that that

22        position was not being replaced, so there was no

23        money for -- so that position ended, it didn't

24        exist any longer.

Page 108

1   Q  It's your testimony that 30 days after Alison

2       Hodgkins started in that position there was no

3       money in it anymore?

4   A  No, it's not my testimony 30 days.  At one point I

5       received a call that that position wasn't being

6       replaced, they weren't replacing Walter Doherty's

7       position.  We had four supervisors at the time and

8       now we're down to three.

9   Q  The acting supervisor receives additional pay,

10      correct?

11   A  If headquarters posts it.

12   Q  So, just as an acting they don't receive additional

13      pay?

14   A  If it's posted they would receive additional pay.

15      In Alison's case there was no money involved at all

16      because they didn't replace Walter Doherty.

17   Q  Was something placed in her file to show that she

18      had the position of acting supervisor?

19   A  I'm sure there is something in there.  No money,

20      but you'd have to get it from Bill Ryan.

21   Q  I'm trying.  Would there be something in her file

22      showing when the acting position ended?

23   A  Yes, it should be.

24   Q  It would be your testimony that somewhere right

Page 109

1      around the time that that position ended is when

2      you received notice that the position wasn't going

3      to be filled?

4    A    No, I received notice way before it ended.  I would

5      say in the beginning, the first month and month and

6      a half maybe from headquarters that Walter

7      Doherty's position wasn't going to be filled, and

8      then it as brought to Alison's attention that she's

9      not going to receive any money for this position.

10      She still wanted to stay up there and do the job

11      for experience, she said she'd stay without the

12      pay.  That's what I know.  You'd have to find out

13      from the chief and the assistant chief as far as

14      that position is concerned and the AO as far as the

15      money.

16    Q    Is it your testimony that there was no second

17      go-round?  There was the initial decision to pick

18      someone for that acting supervisor position and

19      that was Alison Hodgkins, but there were was no

20      second go-round of trying to decide who should be

21      in there next?

22    A    As far as I know, there probably wouldn't have been

23      because there was no position.  It was canceled

24      after, so that would've ended.

Page 110

1   Q   This is Dave Taylor's affidavit.  Question 7,

2        "Ms. DeCaire alleges that she was not considered

3        for the position of acting supervisor for court

4        operations during September 2003.

5        "Are you familiar with this issue?  If so, describe

6        your role in filling this position.  Did you

7        recommend Ms. DeCaire for the position?  Explain

8        why or why not.

9        "ANSWER:  Every 1811 was considered for this

10       position.  I don't recall when I made the

11       recommendation to fill this position; however, I

12       did not recommend Ms. DeCaire for this position.  I

13       recommended to the chief and to the marshal Alison

14       Hodgkins and Annette Lawlor for the position."

15              Any recollection of any of that, having

16       Annette Lawlor recommended to you, Alison Hodgkins?

17   A   I don't recall the conversation with Taylor or the

18       chief.

19   Q   As you're sitting here today, do you know whether

20       the acting supervisor position was filled once or

21       twice?

22   A   I would say it was filled once by Alison.  That's

23       the only one I recall up on the desk.

24   Q   Do you have any recollection if there was any

Page 111

1          process or effort to fill it a second time?

2      A   There shouldn't have been a process to be filled

3          the second time because there was no money

4          involved.

5      Q   So, Dave Taylor was just making this up?

6      A   You'll have to talk to Dave Taylor.

7      Q   I will.  But to your knowledge --

8      A   When I got the word that this position is ended, I

9          can't -- there is no acting position to fill for

10         money, there isn't.  When Alison was put there it

11         was with the intention that should would get

12         compensated for being an acting supervisor of the

13         court operation because we absolutely needed it.

14         Walter, when he was there, he was stressed out

15         between the courts and the prisoners.  We wanted

16         somebody there and Alison was there, but then there

17         was no position, they weren't replacing Walter.

18         So, there was no money involved in there and she

19         decided she would still stay and try to organize

20         this, change things, and she stayed without any

21         compensation.  That's the extent of my involvement

22         over there, so you'd have to speak to Taylor and

23         the chief on anything else.

24     Q   Is it fair to say you have no knowledge of any

Page 112

1   efforts by your chief or assistant chief to fill

2   the acting supervisor position a second time?

3 A I have no knowledge of that, but I mean a lot of

4   people were up on the desk at different times

5   filling in.  But as far as I knew, Alison was the

6   only one up there that was trying to do an acting

7   position.

8 Q I understand she was the only one up there.  What

9   I'm trying to find out is whether or not there was

10   an effort to find someone to fill the position for

11   a second 120-day period of time.

12 A I don't believe there was because, like I told you,

13   I received a call that that position is canceled,

14   so you wouldn't fill it.

15 Q Are there any documents to help you figure out when

16   you received that call?

17 A No.  I mean, they should have -- If you call

18   headquarters, they should have when -- They post

19   the jobs, so they should have an order saying that

20   this job was canceled in Boston and that would tell

21   you when the call was or when that transaction took

22   place.  Again, it would be Bill Ryan.

23 Q If Alison Hodgkins had started in the acting

24   position before the word was given to you that the

Page 113

1    position was not going to be filled, would she also

2    have higher pay for a period of time until the

3    notice came?

4    A    No.

5    Q    In September of 2003 the warrant coordinator

6         position came open again and it was given to Kevin

7         Donahue.  Do you know why the position was given to

8         Kevin Donahue and not Cindy DeCaire?

9    A    No.  I take that back.  Hold on.  If Cindy wasn't

10        in the warrant squad and Kevin Donahue was in the

11        warrant squad, I don't know.  I have no idea what

12        transpired.  Kevin Donahue -- I'm sorry.  You'll

13        have to find out from Dave Dimmit.  I believe Kevin

14        Donahue was transferred into -- I think he was

15        transferred into the warrant squad and then from

16        there he became warrant coordinator, but I couldn't

17        say 110 percent if that was the case.

18   Q    You have no knowledge one way or another of how the

19        selection was made?

20   A    I don't recall.

21   Q    It doesn't do any good for us to be spending time

22        here guessing.

23   A    I said I don't recall.  I think he would've been in

24        the warrant squad and then became warrant

Page 114

1  coordinator, but I can't say beyond a shadow of

2  doubt that's how that happened for Kevin Donahue.

3  Q  Because if he was in court operations and was moved

4     to warrant coordinator, that would be contradictory

5     to your understanding of how you were doing all of

6     this?

7  A  Yes, it would be.

8  Q  And it wouldn't really explain why Cindy was still

9     stuck in court operations and not being permitted

10    to move over to the warrant position?

11 A  You'll have to speak to Dave Dimmit on all that

12    because I don't recall.

13 Q  Because basically he was the one making these

14    decisions and you weren't involved in them?

15 A  The transfers took place.  I don't recall how that

16    transpired other than I would assume that he was

17    already in the warrant squad, if that was the case

18    with Kevin Donahue.  You would have to look back on

19    the transfers.

20 Q  This was September 2003.  We're actually not

21    talking about Dimmit, are we?

22 A  Or Fallon.

23 Q  Chief Fallon, wouldn't it be?

24 A  Dimmit left the end of June, beginning of July of

Page 115

1       '03, then Fallon came in in the middle of July.

2       So, if that's the case it would've been Chief

3       Fallon involved in that.

4    Q    In your prior affidavit -- this is now the June 24,

5       2004 affidavit in the second investigation -- it

6       says here in question 10, "Ms. DeCaire alleges that

7       on September 23, 2003 she was not considered for

8       the position of acting supervisor of court

9       operations.

10      "Did you instruct or suggest that Ms. DeCaire not

11      be considered or appointed to this position?  If

12      so, why?  Who was the assigning official?  Who was

13      given the assignment and how long did the

14      assignment last?"

15           And your answer was no, you did not

16      instruct she not be considered for the position and

17      that Alison Hodgkins was given the assignment.

18           Does that refresh your recollection that

19      on September 23 --

20   A    Alison was given the position.

21   Q    The acting supervisor of court operations?

22   A    Court operations?

23   Q    That's what it says here.

24   A    Oh, I said that she was given court operations.

Page 116

1    Q    September 23, 2003, that's the second go-round.

2         She was assigned in April and then again in

3         September.

4    A    So, it just continued.  I don't know the dates as

5         far as how long Alison was there.

6    Q    So, you really don't have any knowledge whatsoever

7         about the second 120-day period?

8    A    There shouldn't have been another 120 days -- I

9         mean, a posting.  There's no money involved in that

10        position because Walter Doherty's position was

11        canceled.  So, you'd have to speak to Chief Fallon

12        if that's the case, but there wasn't any.

13   Q    In your signed affidavit here that she was given

14        the assignment, you actually know nothing about

15        that fact?

16   A    I know that she's been up on the desk all that

17        time.  She's been doing the court operation from --

18        When Walter left, Alison was given that assignment.

19        And when she got off the desk -- You would have to

20        look through her files how long she was on the

21        desk.  I couldn't tell you how long she was on the

22        desk.

23   Q    When you were asked why Ms. DeCaire was not

24        considered for the position of warrant coordinator

1      in September of 2003, your answer is, "The warrant

2      coordinator must be a deputy in the warrant squad"?

3  A   Yes.

4  Q   And that continues to be your testimony?

5  A   Yes.

6  Q   It's your testimony that the triggering event for

7      Cindy coming back to Worcester was that Jeff had

8      been reassigned his supervisory position and

9      therefore you were directed by Washington that

10     Cindy would need to go back, is that correct?

11  A   To go back to Worcester?

12  Q   Yes.

13  A   When Jeff was coming into -- Yes.

14  Q   Why was she moved to Worcester when you needed to

15     get her out from under the line of command with

16     Jeff rather than to warrants?

17  A   She was moved back to Worcester.  I don't know why,

18     but we sent her back to Worcester.  They talked to

19     general counsel and they thought it would be the

20     best interest, right, if she was in Worcester where

21     there is no conflict between them.

22  Q   Was there any conflict between warrants and court

23     operations?

24  A   I didn't look into it any further.  That was their

Page 118

1    recommendation and I did it.

2    Q    Who gave the directive that Cindy needed to go back

3         to Worcester?

4    A    Chief Fallon.

5    Q    Is it fair to say that there was at least some

6         period of time that transpired -- we can figure out

7         what the records were -- but there was at least

8         some period of time between when Jeff was moved to

9         court operations and when Cindy was moved back to

10        Worcester, correct?

11   A    Some period of time?

12   Q    Yes.  At least maybe a couple of weeks, maybe a

13        little more than that, but there was some chunk of

14        time before --

15   A    There may have been because they were probably

16        trying -- the chief was trying to figure out what

17        to do with this now that we wanted to give Jeff an

18        opportunity to become a supervisor and manage

19        people and try to get him back into the swing of

20        things, so there may have been.  You know, I can't

21        tell you.

22   Q    Why was Cindy given only four hours notice that she

23        had to move back to Worcester?

24   A    I have no idea of four hours.

Page 119

1    Q    Did have any role in why the directive was a move

2         immediately, pack up your things and leave?

3    A    What was the date?

4    Q    The date was actually October 14th.

5    A    She was away, she was on leave.  She should've

6         received a phone call from Tom Bezanson as far as

7         with a message to report to his office, I guess.

8    Q    Are you guessing or do you know this?  Because I

9         don't want to spend --

10   A    I didn't talk to Tom or listened to him when he

11        made the phone call.  But he should've called

12        Cindy, left a message on her phone to report to

13        Worcester on the 3rd, and she left -- she came to

14        Boston on the 4th, so I don't know about the four

15        hours you're talking about.

16   Q    I'm not talking about February and moving from

17        Worcester to Boston.  I'm now talking about after

18        you got the directive from the general counsel of

19        moving her from Boston back to Worcester, she was

20        again given only four hours direction and that

21        would've been Paul Dunne who told her.  Do you have

22        any idea why the urgency all of a sudden?

23   A    No.  I mean, other than if Jeff was on the desk

24        there, the conflict -- I have no idea.  You'd have

Page 120

1    to speak to Paul Dunne.

2    Q    This time, was this a temporary or a permanent

3         assignment?

4    A    The one in October?

5    Q    Yes.

6    A    That should've been a permanent assignment back to

7         Worcester this time, and I believe --

8    Q    Why was this one a permanent assignment but the

9         first one a temporary assignment or non-permanent

10        assignment?

11   A    The first one when she requested to go there, I

12        wanted her to stay there, but then things changed

13        and as managers we have the right to move them left

14        and right.  I wanted Cindy stay there and she was

15        brought back.  Now it's permanent.  Fallon is the

16        new chief, so things are changed and I'm letting

17        him run the operation and just keep me informed,

18        and he did.  As far as I know, the paperwork was

19        also filled out this time to make Cindy permanent

20        in Worcester.

21   Q    Did anyone tell Tom Bezanson whether this was a

22        real transfer or a temporary transfer?

23   A    I would imagine the chief would've spoke to him.

24   Q    But again, you have no idea?

Page 121

1    A    I wouldn't have spoken to Tom.

2    Q    Let me just make sure I understand your role here,

3         because obviously it looks like we're going to need

4         to spend more time with some of your deputies.

5              It was your understanding that Cindy

6         wanted to be in Worcester, correct?

7    A    Back in August.  August 26th.

8    Q    In February of 2003 after you were aware that she

9         had filed a complaint, you moved her to Boston,

10        correct?  Yes or no.

11   A    I moved her to Boston when there was a shortage of

12        people.

13   Q    I understand that that's your reason why.  I'm

14        asking simply a question about the timing.

15             In February of 2003 after you received

16        word of the complaint -- this is chronologically

17        how it happened -- you then moved her to Boston,

18        correct?

19   A    Yes.

20   Q    And you were aware that she did not want to be in

21        Boston courts, correct?

22   A    When I transferred her?  No, I wasn't aware that

23        she did not want to be in Boston courts.

24   Q    You certainly learned right after --

Page 122

1    A    Down the line she wasn't happy there.

2    Q    Between March of 2003 and October of 2003 there

3         were a number of new 082s who came to the District

4         of Massachusetts, correct?

5    A    There were.

6    Q    At least one of them was moved to Worcester,

7         correct?

8    A    One graduated from the academy and went right to

9         Worcester.  It wasn't a move from Boston to

10        Worcester, so that person was never assigned to

11        Boston.

12   Q    And there were a number of openings in the warrant

13        investigations unit, correct?

14   A    I don't know how many number of openings there

15        were.

16   Q    I'm not asking you the number.

17   A    I don't know.

18   Q    There were a number, correct?

19   A    That, I don't know.

20   Q    I can go through it again.  A number of people

21        moved over from --

22   A    Were transferred, you mean?

23   Q    Correct.

24   A    There were people that transferred here and there,

Page 123

1  yes.

2  Q  So, people were transferred from court operations

3     to the warrant investigation unit, correct?

4  A  Yes.

5  Q  Throughout this time, your chief or assistant chief

6     was making the recommendations of who should either

7     move to warrant investigations or to any other open

8     positions, correct?

9  A  Yes.

10 Q  And at no time did you tell anybody that you had

11    told Cindy that this move to court operations in

12    Boston was a temporary move, correct?

13 A  I don't recall.  I remember talking to Cindy in the

14    operation room.  You know, I don't remember if -- I

15    never sat down specifically and said to any of them

16    that, you know, this is temporary for Cindy.  I

17    told her this was temporary.  I don't recall

18    sitting down with anyone and saying that.

19 Q  Did you ever suggest to your chief or assistant

20    chief that Cindy be considered for any of the

21    positions outside of the court operations Boston

22    position at any time?

23 A  Yes.

24 Q  What did you suggest?

Page 124

```
 1  A   I suggested the joint terrorism task force, the
 2      FBI.  I think that Cindy would enjoy that and the
 3      next time around I'd like you to consider Cindy for
 4      that too.
 5  Q   Who did you make that suggestion to?
 6  A   I think that was to Bill Fallon probably.
 7  Q   When would that have been?
 8  A   I don't remember when, but I do remember talking
 9      about Cindy and the joint terrorism task force,
10      that she may be happy there.
11  Q   Who did he recommend?
12  A   He put down -- right now it's Joe Cummings right
13      now.  My goal is to put two people -- I originally
14      used to have to two people -- not Joe.  I'm sorry.
15      Joe Sacata*, which he's still not in there yet.
16      That was a while ago that his name came up and he's
17      still not clear yet in the interim security
18      clearance, top secret clearance, but Cindy's name
19      was also put into that group.  It was Joe and
20      Cindy.
21  Q   Any other times that you've made recommendation
22      that she be considered for any other position or
23      vacancy, acting, permanent or temporary?
24  A   No, that was it, just recently.  I don't know when
```

Page 125

1    it was, but joint terrorism task force.  I told him

2    to consider Cindy also.

3  Q  At some point after Cindy was transferred to

4    Worcester did you learn that she had requested

5    light duty?

6  A  I did.

7  Q  Were you involved in the decision about what light

8    duty would be offered to her?

9  A  No, Chief Fallon was involved in making up a

10   schedule, find out where work was needed.

11 Q  You had no role in that?

12 A  Not making it up, no.

13 Q  Did you have any role in any other part of it?

14 A  I did.

15 Q  Tell me what role you had.

16 A  I guess the call came from Tom Bezanson to Chief

17   Fallon that Cindy was requesting light duty -- her

18   doctor was requesting light duty for her because

19   she's pregnant.  So, from there Chief Fallon --

20   they could use work -- admin work in Springfield,

21   Worcester and Boston.  So, Chief Fallon made up a

22   schedule for Cindy, and I think Cindy came in.  It

23   was Springfield, Worcester, Boston, and Cindy

24   didn't like it.  I receive a call -- I think Lisa

Page 126

1   Dickinson called Chief Fallon that Cindy called

2   complaining that we're bouncing her around.  So,

3   Lisa asked if we would do that with anyone else.

4   Absolutely.  Light duty -- where the work is

5   needed.  So, that's when I got involved and I said

6   to Bill, well, see if we can schedule -- see what

7   you can do with Worcester and Boston.  So, Bill

8   figured out a schedule because we tried to keep her

9   in Worcester so she could still make her doctor's

10  appointments.  I think it might've been maybe two

11  days in Worcester and three days in Boston.  And

12  that's what he gave her, she didn't like it, and

13  from my recollection I believe she took sick for

14  the first three days, then she came back on a

15  Thursday and -- she came back to work and she said

16  she'd do it, and she did that.  And then from there

17  I recall them asking me -- saying that Cindy was

18  concerned about the cameras in the control room, if

19  they were going to be harmful to her unborn child,

20  and they needed to investigate that after she was

21  assigned to the control room.

22  Q   Before we get to the control room, when Lisa

23      Dickinson called you and asked you --

24  A   She didn't call me.  She called Chief Fallon.

Page 127

1  Q   When Lisa Dickinson called Chief Fallon and asked

2      whether this was the same assignment other people

3      would be given, what information did you have about

4      what had happened for other people who had

5      requested limited duty at the Marshal Service?

6  A   I didn't have any information.

7  Q   To your knowledge, what information did Chief

8      Fallon have?

9  A   I have no idea what he told her.  He said he was

10     being fair, but I don't know.

11 Q   But he's newer than you are?

12 A   No, he's not.  Chief Fallon's a career person.

13     He's a chief, he's sat on a disciplinary panel.  He

14     just actually left the disciplinary panel now after

15     two years.  He knows more about the Marshal Service

16     than I will ever know.

17 Q   The experience of limited duty work in the District

18     of Massachusetts, any knowledge about that?

19 A   What I'm informed is that limited duty, light duty,

20     it's up to the marshal of that district to grant

21     it.

22 Q   My question is whether you have any knowledge about

23     what the practice has been in the past in the

24     District of Massachusetts.

Page 128

1  A  No, I don't know what the practice has been in the

2     past.  I'm not concerned about the past.

3  Q  Did Chief Fallon have any knowledge about what the

4     practice was in the past here?

5  A  I don't know.

6  Q  When Lisa Dickinson asked whether Cindy was being

7     treated the same as any other person, what were you

8     and Chief Fallon comparing her to?

9  A  I wasn't comparing to anything.  Chief Fallon spoke

10    to her.

11 Q  Well, he relayed to you what he told Lisa

12    Dickinson, correct?

13 A  He told her that he treats everybody fair.

14 Q  I understand that's your view.  But he didn't have

15    anyone in his mind that he was comparing --

16 A  You'd have to speak to Chief Fallon.

17 Q  Were you aware of any complaints about the control

18    room prior to the time that Cindy was assigned to

19    it?

20 A  The only complaint that I was aware of was the

21    noise factor in the control room.  It used to be a

22    VCR unit over there, all the recordings.  Now it's

23    digital, so it's loud, so it's difficult to hear.

24    I've been in the process of moving that unit into

Page 129

1      the other control room where the CSOs are, and we

2      actually combined the CSOs with the deputies over

3      here.  That's the only thing I've ever been aware

4      of.

5  Q   Are you aware of complaints about heat?

6  A   Unaware.

7  Q   Are you aware of any efforts to put different air

8      conditioning in?

9  A   With the unit in there, it gets hot in there, so

10     they try to keep the place cool.

11 Q   So, you're aware that it gets hot in there?

12 A   Yeah, because the unit has to be cold -- the VCR

13     stuff has to be kept cool, so they did -- they put

14     a unit in there with a tube for air to try to keep

15     everything cool.  But as far as anything else, no.

16                 **MS. TALWANI:**  Off the record.

17                 (Off the record)

18                       (Whereupon, the below-described

19                       GSA report was marked Exhibit

20                       No. 13.)

21 Q   I'm showing you a document that's been marked by

22     the court reporter as Exhibit 13.  Have you seen

23     this before?

24                 (Witness views document)

Page 130

1    A    No, I -- As far as Patrick, I don't know.  I know

2        there was a ventilation system in the control room,

3        but I wasn't involved in anything in there.

4    Q    So, you had no knowledge that there were concerns

5        about the excessive heat in the control room?

6    A    Yeah, the heat -- they had something in the heat --

7        regarding the heat in there.  They had a unit in

8        there with ducts.  But as far as me being involved

9        in any of that, no, that would've been Dave Taylor

10       involved in this, and they were working on --

11       they're still working on trying to make the control

12       room better as far as hot and cold inside there.

13    Q    Were you aware at the time that Cindy DeCaire was

14       assigned to the control room that it was

15       excessively hot?

16    A    No, I wasn't aware there were any problems that

17       would hurt anyone in there.

18    Q    I'm not talking about that would hurt.  Let's just

19       talk about that it's uncomfortable.

20    A    No.

21    Q    Did you know that it was excessively hot in the

22       control room?

23    A    No, not excessively hot.

24    Q    Were you aware that there were funding requests

Page 131

1        going on to try to figure out to get different air

2        conditioning in there?

3     A  I know there was stuff going on, yes.

4     Q  Why was there stuff going on if there wasn't a

5        problem?

6     A  I told you the problem -- what I was told was just

7        going in there, it's loud inside the control room.

8     Q  So, the only problem that you knew about was noise?

9        You didn't know about any problem about heat?

10    A  The heat?  That we left the door open -- the door

11       was left open over there in the control room and

12       the VCR area was loud.  Now, when these -- when

13       Cindy requested light duty, everything was made up

14       and Cindy agreed to go in there.  If Cindy had a

15       problem, she should've spoke to the Chief that she

16       didn't want to go in the control room.  It was

17       never brought to my attention there was a problem

18       in there.  The only time I ever found out there was

19       a problem in here is when I received a call from

20       headquarters that Jeff Bohn called OSHA.  That's

21       the only time I ever knew there was a problem.

22       They came out and investigated it and the air

23       quality was still fine as far as I was told.

24    Q  What about the temperature?

Page 132

A    I was told the air quality -- I don't know that
     they investigated the entire thing other than
     there's a problem in here, they came out right
     away.  I talked to Dave Barnes and said, Dave, this
     is the first I'm hearing of this.  Jeff never
     talked to me, he never talked to Dave Taylor, the
     assistant chief, he didn't talk to anyone.  So,
     nobody -- I was never aware of any problem in there
     other than it was loud and, yes, it can get hot in
     there and you're supposed to leave the door open,
     it gets hot and cold in there.

Q    It's your testimony that at the time you assigned
     Cindy there you were not aware of any problems
     other than noise in the control room?

A    No, I was not aware of any major problems in there
     as far as heat, air condition, but I know it was
     loud in there and that it could get hot, but no
     major problems.  Nobody ever brought it to my
     attention that there were any problems in there.
     The door was left open and it continues to -- it's
     still -- actually, that unit is out now.

Q    The assignment that you understood it was going to
     be that Cindy was going to work in Worcester and
     Boston.  Did that change at some point?

Page 133

1   A   I don't recall if it changed.

2   Q   Do you have any knowledge about the assignment

3       being changed to work in the control room five days

4       a week?

5   A   I don't know what her schedule was, if it was five

6       days, three days.  I don't know.

7   Q   Chief Fallon would be the person I should ask?

8   A   I don't keep track whether the deputies are in and

9       out every day.

10  Q   I'm not asking you to keep track whether they're in

11      and out.  Although, on that subject, have you ever

12      asked anyone to check out when Cindy DeCaire was in

13      and out?

14  A   Check out?

15  Q   To let me know.

16  A   No, that's up to the supervisor to check.

17  Q   Is it your testimony that you have never asked one

18      of Cindy's supervisors about her schedule?

19  A   I've told the supervisors they're held accountable

20      for the deputies.  That's what I tell the

21      supervisors.

22  Q   Have you asked one her supervisors specifically

23      where is Cindy, what's her schedule, why isn't she

24      here?

Page 134

1    A    No.  Where she is?  No.

2    Q    Who normally is in the control room?

3    A    You'd have to ask the supervisors.

4    Q    Do you know of any other 1811 deputy U.S. marshal

5         ever being assigned there?

6    A    Assigned to where?

7    Q    To the control room.

8    A    Cindy was assigned to the control room for light

9         duty.

10   Q    I understand that.

11   A    And by her coming in there -- we had guards in

12        there.  We had to cut back.  By her working in

13        there saved us thousands of dollars in guard hire.

14        I couldn't tell you.  You'd have to ask the

15        supervisors.

16   Q    To your knowledge, do you know of any other 1811

17        criminal investigators who've been assigned while

18        they were on light duty or any other time to the

19        control room?

20   A    I couldn't tell you, to my knowledge.

21   Q    Do you know what a worklife request is?

22   A    I received a worklife request -- The first time I

23        ever saw that was when Cindy requested worklife,

24        wanted to work part-time.  Actually, I think I got

Page 135

1  two requests for Cindy -- worklife.  That's the

2  only time I ever saw it.

3  Q  What was the first one that you received?

4  A  I can't recall.

5  Q  Do you recall that she requested to work in

6     Worcester during the last two weeks of her

7     pregnancy?

8  A  I can't recall what they were.  I recall the second

9     one.  The second one was that she wanted to work

10     part-time.  She didn't want to -- September 20th,

11     because that was recently, she asked to stay for

12     six months part-time.

13  Q  And that was denied?

14  A  Right.

15  Q  What about the first worklife request, was that

16     granted or denied?

17  A  I don't think any worklife was granted, as far as I

18     can remember.

19  Q  Did you have any involvement in the decision to

20     grant or deny the worklife requests?

21  A  Yeah, I would've denied it if it came on my desk.

22  Q  Why?

23  A  Because I didn't agree with it.

24  Q  Which one?

Page 136

1   A   Either one.

2   Q   If you didn't know what the first one was asking

3        for, how can you say you didn't agree with it?

4   A   If you put it in front of me, then I'd be able to

5        read it and then I'd know.

6   Q   You just testified a second ago that you disagreed

7        with it and you would've denied it.  I'm asking you

8        how you can say that.

9   A   I denied both of them, I'm telling you.  So, I

10      don't know what the first one was all about; I

11      can't remember it.  The second one was she was

12      pregnant and I remember that.  After she had the

13      baby she wanted to go part-time, because that was

14      recently.  Cindy's been out of work, I don't know,

15      six, seven months.  I can't tell you how long it's

16      been.  She went out -- left work without pay.

17            (Ms. Talwani confers with client)

18   Q   I can represent to you that the first worklife

19      request was that she work from Worcester during the

20      last two weeks of her pregnancy.  Can you tell me

21      why you would've denied that one?

22   A   I don't recall.  I don't know if she was out there

23      or she wasn't out there.  I don't know.  I don't

24      remember that, if that was the request.

1    Q   I'm representing to you that that was the request.

2         But your response is you don't know why you

3         would've denied a request like that?

4    A   Right, I don't know.  If that was the request and

5         she wanted to be out there for the last two weeks

6         of her pregnancy, no, I can't imagine I wouldn't

7         have sent her out there.  So, I don't recall saying

8         no to that.

9    Q   Because your philosophy that you testified to the

10        first time is you think family is very important?

11    A   Absolutely.  I told that to Cindy from day one, I

12        think family is very important.

13    Q   So, if she was there in the last two weeks of her

14        pregnancy, you would understand --

15    A   It would be reasonable, absolutely.

16    Q   Are you familiar with Jeff Bohn's worklife request?

17    A   I'm not familiar with it.

18              **MS. TALWANI:**  Off the record for a

19    minute.

20              (Off the record)

21               (Whereupon, the below-described

22               worklife request was marked

23               Exhibit No. 14.)

24    Q   I'm showing you a document that is marked as

Page 151

1    A   I raised it because --

2    Q   -- it questions her judgment, correct?

3    A   I raised it because you asked me what Ruth May will

4        testify, and I told you what Ruth May will testify.

5        I'm talking about Cindy's job performance.  These

6        people will tell you what she's done in the past.

7        I wasn't there to observe it.  Just like I told

8        Tim, everybody's treated fairly.  So, they will

9        testify.

10   Q   Let me just make sure I understand your view of

11       your relationship with Cindy DeCaire since the date

12       she filed this complaint.  It is your understanding

13       that you're on directions not to talk to her, is

14       that correct?

15   A   My relationship with Cindy DeCaire, when I first

16       came here we had a great relationship.  Right,

17       Cindy?

18   Q   I don't think it's appropriate to be asking her.

19   A   I'm sorry.  But we had a good relationship, you

20       know, and --

21   Q   And it broke down because she was upset at your

22       decisions?

23   A   Apparently, right.

24   Q   And then since then it's your understanding you're

Page 152

1    not supposed to talk to her, correct?

2    A   I'm not supposed to talk to her about the EEO

3        stuff.

4    Q   Can you talk to her about what jobs she would like

5        to be doing at the Marshal Service?

6    A   I'm sure I could.

7    Q   Could you talk to her about her future in the

8        Marshal Service?

9    A   Yes, I could.  I'm sure I could.

10   Q   Have you ever had any attempt to have any

11       conversation with her since she filed this

12       complaint?

13   A   No.  All we basically do is we're professional to

14       each other.  You know, I'll say hello.  But no,

15       I've never talked to Cindy about anything else.

16   Q   Is there any possibility as long as this complaint

17       is pending that Cindy can move anywhere forward in

18       the U.S. Marshal Service?

19   A   Absolutely, yes.

20   Q   What does she need to do in order to move out of

21       the locked box that she seems to be in?

22   A   This is perception here.  She sees it one way, I

23       see it the other.  I told you that Cindy's name

24       came up for the joint terrorism task force.  Now, I

Page 153

```
 1         didn't consult with her to see if she's interested,

 2         but I believe that she would be interested in that,

 3         but that would ultimately be her decision.  Just

 4         like when I sent to her Worcester, I gave Cindy the

 5         choice to go to Worcester or to stay --

 6    Q    Since you supposedly gave her the choice in

 7         September of 2002 it seems to be she hasn't had a

 8         choice about anything, correct?

 9    A    No, she has a choice.  I mean, Cindy --

10    Q    What's her current choices right now?

11    A    She's in Worcester.  She actually can go out in the

12         street and hunt down fugitives.  She can do all

13         that from Worcester.  She's an 1811 who has the

14         flexibility all around to be --

15    Q    Since she filed the EEO charge, every single move

16         that she's applied for has been denied.  I'd like

17         to ask you what steps she needs to take in order to

18         be permitted to be considered to move forward with

19         her career.

20    A    She will move forward.  Did you take the exam on

21         Saturday?  I'm sorry.  There was an 1811 -- there

22         was a promotional exam and she has to take that.  I

23         don't know if she took it.  I would hope she did

24         because that's the only way you can move forward in
```

Page 154

1    this position here.  But absolutely.  I have never

2    ever retaliated to hurt her.  I want all my

3    deputies to move forward, and she will.  Like I

4    said, the joint terrorism task force is the next

5    thing coming up.  We used to have two assigned to

6    the Boston unit, one was on international

7    terrorism, one was domestic terrorism.  Right now

8    Joe Sacata hopefully will get over there, but I

9    told Ken Keiser, the director, FBI sacked it and

10   I'd like to get somebody else in there.  I didn't

11   say Cindy, but I did tell my people that I want you

12   to think about Cindy going in there.  And also

13   Jeff, we -- I moved Jeff into a supervisory role

14   managing people.  I think Jeff's a bright guy, I

15   think he's very knowledgeable and I want to give

16   him another chance, and I still want to give Cindy

17   a chance.  It's not -- I'm not picking on Cindy,

18   absolutely not, but she will get a chance to move

19   on.  I think the Marshal Service is great.  It just

20   hasn't happened yet.  I mean, there's been a lot

21   that happened when I came here in August of '02,

22   all the problems, and I've only been here a couple

23   of years, a little over two years, and trying to

24   work different things out.  I'm not perfect, but I

Page 155

1    absolutely have always been fair.  That's my whole

2    life, honesty, hard work, fairness.  I'm not making

3    everybody happy, but I've always been fair and did

4    the best I could.  I start at seniority, job

5    performance and locality.  But yeah, Cindy will

6    eventually get into something else.  But right now

7    in Worcester, she's -- the people that are out

8    there have the flexibility to go out and hunt down

9    fugitives and everything.  So, in Worcester you

10   have the best of both worlds, you can do both.

11 Q   There was a warrant coordinator position in

12   Worcester.  She wasn't considered for that.

13 A   I don't have a warrant coordinator position.  The

14   only warrant coordinator position that I have in

15   Boston is right there who does all the paperwork,

16   which would be Paul Sugrue.  So, if Tom Bezanson

17   created somebody in there, that might've been

18   internally.  That could be a collateral duty.

19   There are collateral duties that all the deputies

20   have.  Cindy does, you know, CPR stuff.  There's a

21   whole list of collateral duties; I don't get

22   involved in any of that.  Chief Fallon can give you

23   a list of all the deputies who have collateral

24   duties.  They're all assigned different things.

Page 156

1    Q   We got a little bit sidetracked on Ruth May.  Dan

2        Spellocy, what does he have to offer in this case?

3    A   Dan Spellocy -- Cindy was supposed to go out to

4        Worcester for an assignment out there and she

5        arrived late.  Dan never received a call from her,

6        he had no idea where she was, there was no excuse

7        why she came in late.

8    Q   Is my understanding from your testimony that none

9        of the moves that you made of Cindy and none of the

10       positions that she was not permitted to have had to

11       do with job performance?  Am I wrong about that?

12       Was her job performance, in your view, a factor in

13       any of the decisions that we've been talking about

14       here?

15   A   In all the moves or transfers?

16   Q   Yes.  Let me just go through it really quickly just

17       to make sure we're on the same page.  Was job

18       performance an issue for why she was not given the

19       HIDTA position in Worcester in '02?

20   A   No.  She was not given it because --

21   Q   I don't want to know the reason.  Was job

22       performance an issue there?

23   A   No.

24   Q   Was job performance an issue for why she was moved

```
                                                    Page 157
 1      to Worcester in '02?

 2   A  No.

 3   Q  Was job performance an issue for why she was put on

 4      a rotation back and forth between Boston and

 5      Worcester?

 6   A  No.

 7   Q  Was job performance an issue for why she was

 8      transferred back to Boston court operations in

 9      February of '03?

10   A  No.

11   Q  Was job performance an issue for why she did not

12      get the warrant coordinator position in January of

13      '02?

14   A  No.  You're talking about job performance being

15      bad?

16   Q  Right.

17   A  No.

18   Q  There was no bad job performance at issue?

19   A  No.

20   Q  Was job performance an issue for why the 082

21      received a job position in Worcester in '03?

22   A  No.  He came out of the academy and went to

23      Worcester, right.

24   Q  Was job performance an issue for why Cindy did not
```

Page 158

1    get to move over to the warrant investigation unit
2    over the course of '03?
3  A  No.
4  Q  Was job performance an issue for why Cindy did not
5    get any of the warrant coordinator positions that
6    opened up in '03?
7  A  No.
8  Q  Was job performance an issue for why Cindy did not
9    get the acting court supervisor position when it
10   was opened up?
11 A  No.
12 Q  Was job performance an issue for why Cindy was
13   moved back to Worcester in the fall of '03?
14 A  No.
15 Q  Was job performance an issue for why Cindy was
16   moved to Boston and Worcester when she was on
17   limited duty or light duty?
18 A  No.
19 Q  Was job performance an issue when she ended up
20   spending all of her time here or most of her time
21   here in the control room while she was on limited
22   duty?
23 A  No.  I just want to -- If you want to know exactly
24   Cindy's job performance to know exactly what her

Page 159

1    day-in and day-out duties are, I couldn't tell you

2    personally because I don't ever see the deputies;

3    it would be the supervisors.  But I never received

4    e-mails to say, you know, Cindy did this or Cindy

5    didn't do that, so I'm saying no.

6  Q  And also, to your knowledge, each of these

7    decisions that were made, the reason that the

8    Marshal Service is saying they made these various

9    decisions has to do with a number of different

10   factors that you're bringing in, one is that the

11   082 went directly, another has to do with location,

12   another has to do with seniority.  None of them

13   have to do with job performance, correct?

14 A  Right.

15 Q  Another was giving everyone an equal chance,

16   opportunity.  Nothing had to do with Cindy's job

17   performance as your reason for why Cindy didn't get

18   this positions and why she got moved back and

19   forth?

20 A  Right.

21 Q  So, the testimony that Ruth May and Dan Spellocy

22   would have to offer and a number of these other

23   people have to offer would be about job performance

24   but not about any of the transfers back and forth

Page 173

1   A   When Cindy was in the warrant squad, they said she

2       had done a good a job, she was out there making

3       arrests.  And then I heard bad things too, but --

4   Q   My question right now is, did you ever follow up on

5       any good things you heard?

6   A   Yeah.  She made great arrests when she was on the

7       warrant squad and everything else and she's done

8       things that I'm not happy about, but I never

9       investigated those either.  Other things that I

10      heard, I didn't get into it.  But the fact of the

11      matter is, right, she does a good job.  The rating

12      system here at the Marshal Service is either pass

13      or fail, it doesn't get into all the nitty gritty

14      where they didn't do this or if they were late an

15      hour here or if they did that.  She's been out on

16      the street, she made good arrests, she works out to

17      stay in shape, which is great and I think all my

18      deputies should do that because they're out on the

19      street and their life's in jeopardy out there.

20      She's a tough girl.  I think she's done a great job

21      out there.  All the stuff that's happened here is

22      -- I sent her to Worcester because she wanted to

23      go.  I would've never sent Cindy to Worcester if

24      she didn't want to go.  She could've stayed in the

Page 174

1    warrant squad, and that's why I don't understand

2    why this is all happening, but it's happening.  I

3    think she still does good work.  Nobody's perfect,

4    but she still absolutely will excel in the Marshal

5    Service.

6              **MS. TALWANI:**  Let's suspend the

7    deposition here.  We'll finish it when we get the

8    rest of the documents.

9                          *

10                         *

11                         *

12    (Whereupon, the deposition suspended at 3:29 p.m.)