# EXHIBIT S

# Commonwealth of Massachusetts

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYNTHIA DECAIRE,<br>                    Plaintiff<br><br>VS<br><br>JOHN D. ASHCROFT, in his office<br>position as Attorney General of the<br>United States,<br>                    Defendant | VOLUME I<br><br>CIVIL ACTION NO.<br>10593WGY |

DEPOSITION of **DAVID B. TAYLOR**, a Witness called by

Counsel on behalf of the **Plaintiff**, taken pursuant to the applicable

provisions of the Federal Rules of Civil Procedure, before Joanne

Whalen, a Professional Court Reporter and Notary Public in and for

the Commonwealth of Massachusetts, at the Law Office of Segal,

Roitman & Coleman, 11 Beacon Street, Suite 500, Boston,

Massachusetts, on Tuesday, February 15, 2005, commencing at 1:33

p.m.

*Accurate Reporting Services*
*36 West Street*
*Whitman, MA  02382*
*(781) 447-9520*

Page 4

**P R O C E E D I N G S**

*

**DAVID TAYLOR**, first being duly sworn, on

oath, was questioned and testified as follows:

**DIRECT EXAMINATION**

(By Ms. Talwani)

Q    State your name for the record, please?

A    David B. Taylor, T-a-y-l-o-r.

Q    By whom are you employed?

A    I'm a Justice, United States Marshal Service.

Q    When did you begin your employment with the

     Marshal Service?

A    1985.

Q    Can you just briefly summarize the positions

     you've held with the Marshal Service?  Start at

     the beginning.

A    Plain old deputy.  Let's see, I was in L.A.  I

     was a deputy.  My next duty station was the

     breaker service.  My next duty station was

     Newark, New Jersey as a deputy.  I had a lot of

     NASAF responsibilities there.  I came to Boston

     in -- I believe it was the fall of '89, plain

     old deputy.  Opened the Worcester office the

     fall of '95 whereas a deputy in charge of that

1      office until, I want to say, 2000 when I was

2      assigned to the New England HIDTA Fugitive Task

3      Force and I ran the task force as a Central

4      Division till the fall of 2002 when I got

5      promoted to judicial security inspector for the

6      District of Massachusetts.  But I was -- my

7      office was back in Boston.  I was there and

8      then into acting assistant chief deputy.  I

9      believe it was the latter part of April of

10     2003.  And got a permanent promotion in January

11     2004, Assistant Chief Deputy U.S. Marshal and

12     I'm still there.

13  Q  When the Worcester office opened in the fall of

14     '95, how many deputies were assigned to the

15     Worcester office?

16  A  Actually, I was solo until like January of '96

17     or it could have been the spring and then Kevin

18     Wahl came out and then a few weeks later Sue

19     Williams came out, so there was three of us.

20  Q  Am I correct that initially the supervision of

21     the Worcester office was by a supervisor

22     assigned to both -- assigned responsibilities

23     for both Springfield and Worcester, is that

24     correct?

1   A   Yes.

2   Q   At some point there were acting supervisors

3       appointed, --

4   A   Yes.

5   Q   -- is that correct?

6   A   Yeah.

7   Q   Am I correct that Sue Williams was an acting

8       supervisor?

9   A   Yes.

10  Q   And after Sue Williams, --

11  A   Cindy.

12  Q   -- Cindy DeCaire?

13  A   Yes.

14  Q   At the time that Cindy DeCaire was the acting

15      supervisor of the Worcester office, were you

16      still a --

17  A   Task force member, yes.

18  Q   Let me just back up a minute.  Your answer is

19      what I was trying to figure out and I

20      appreciate that.  But in order for our record

21      to be clear I need to finish my question before

22      you answer it.

23  A   All right.

24  Q   So let me try again.  At what point did you

Page 47

1    Q   And Deputy DeCaire would have been included in

2          that group?

3    A   Yeah.

4    Q   You probably said something about the different

5          individuals who were possible candidates,

6          correct?

7    A   Yeah, sure.

8    Q   Do you recall what you would have or what you

9          did say about Deputy DeCaire?

10   A   I don't.

11   Q   Can you think of any reason as you sit here now

12         that you would have said don't move Deputy

13         DeCaire over to warrants?

14   A   No.

15   Q   Can you think of any reason as you sit here now

16         where you would have said Deputy Kimball is a

17         better choice than Deputy DeCaire for that

18         position?

19   A   No.  Again, pretty much all equal, you know.

20   Q   Around April 21st Supervisory Deputy Doherty

21         was leaving his position as court operations

22         supervisor.

23   A   2002?

24   Q   2003.

1   A   2003?

2   Q   There was going to then be an acting court

3        supervisor --

4   A   Yeah.

5   Q   -- court operations supervisor?  Were you

6        involved in giving any recommendations about

7        who should be -- who the acting --

8   A   Yes.

9   Q   -- court supervisor --

10   A   Yes.

11   Q   -- court operations supervisor should be?

12   A   Yeah.

13   Q   Who did you recommend?

14   A   Again, I put forward a few names.

15   Q   Did they include Cindy DeCaire?

16   A   No.

17   Q   Who did they include?

18   A   I suggested, yeah, Annette Lawlor, Alison

19        Hodgkins.  I think those were the two I

20        recommended.

21   Q   Why those two?

22   A   To my knowledge neither one of them had ever

23        had the opportunity and they were both -- had

24        both been on the job -- they were senior,

Page 49

1    senior deputies.

2    Q    Do you know whether Deputy Lawlor had any

3         interest in the position?

4    A    I learned later that she didn't.  She did not

5         have any interest.

6    Q    Were you asked your opinion about Deputy

7         DeCaire for the position?

8    A    Yes.

9    Q    Who asked you your opinion?

10   A    I think it was the chief and the marshal.  I

11        think they both asked me my opinion.

12   Q    And here we're talking about Acting Chief

13        Dimmitt?

14   A    Yeah, just for the record.  Dimmitt was a

15        chief.  He is a chief.  He was brought in as a

16        chief from another district, so he wasn't

17        really an acting chief.  He was acting chief

18        for the District of --

19   Q    Yeah, he was.

20   A    -- Massachusetts.

21   Q    His Massachusetts' title was acting chief.  His

22        Marshal Service title was chief?

23   A    Yes.

24   Q    Dave Dimmitt?

Page 50

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | So you were asked by both the marshal and by |
| 3 | | Chief Dimmitt -- |
| 4 | A | Yeah. |
| 5 | Q | -- about Deputy DeCaire? |
| 6 | A | Only as in okay, these are the deputies that we |
| 7 | | can consider for this.  What's your opinion and |
| 8 | | why? |
| 9 | Q | What did you say about Deputy DeCaire? |
| 10 | A | I said she already had an acting supervisory |
| 11 | | job, so in fairness to other senior deputies, |
| 12 | | my opinion would be to give somebody else a |
| 13 | | piece of the pie. |
| 14 | Q | This was a 120 day position, correct? |
| 15 | A | Yes. |
| 16 | Q | And Alison Hodgkins got the position? |
| 17 | A | Yes. |
| 18 | Q | At the time had Alison Hodgkins filed an EEO |
| 19 | | complaint as well? |
| 20 | A | I heard that she had, previous administration, |
| 21 | | and it was ongoing, I guess.  I don't know. |
| 22 | Q | Is there any reason you recommended women only? |
| 23 | A | No. |
| 24 | Q | When Alison Hodgkins was promoted to the acting |

Page 51

1          supervisor job, the position of warrant

2          coordinator opened up, correct?

3     A    Yes.

4     Q    Were you asked your -- for input into the

5          decision or for your recommendation --

6     A    Yes.

7     Q    -- on the decision of who should be the warrant

8          coordinator?

9     A    Yes.

10    Q    Who did you recommend?

11    A    Paul Sugrue.

12    Q    Were you asked your opinion about whether

13         Deputy DeCaire should be placed in that

14         position?

15    A    Yes.

16    Q    What was your response?

17    A    Again, it was very similar to the other one.

18         And my recommendation was Paul Sugrue, to give

19         him an opportunity that he hadn't had before

20         and I thought he'd be a good -- you know, a

21         good step, showing some management

22         responsibilities.

23    Q    Had Deputy Sugrue applied for the position --

24    A    I don't know.

Page 52

1  Q    -- or asked about the position?

2  A    I don't know.  I've read after that that he

3       didn't solicit it nor want it, but he didn't

4       refuse it.

5  Q    You say you read it, is that in reading Deputy

6       DeCaire's complaint?

7  A    Yeah.

8  Q    Did you review that before coming in today?

9  A    Yes.

10  Q   What else did you review, what other documents?

11  A   I think that was it.

12  Q   Did you review your own affidavit --

13  A   No.

14  Q   -- to the EEO?

15  A   No.  Probably should have.

16  Q   You'll get a chance to see it.  When the 120

17       days were up on the acting court supervisor

18       position, --

19  A   Yeah.

20  Q   In the past, when 120 day periods had been up,

21       subsequent 120 day assignments have been given,

22       --

23  A   Right.

24  Q   -- right?  For example, in Worcester Sue

Page 53

1        Williams had it for 120 days and then Deputy

2        DeCaire had it for 120 days, correct?

3    A   Yeah.

4    Q   In this case, was Cindy DeCaire considered for

5        the acting court operations position at the end

6        of that first 120 days that Annette Lawlor --

7        I'm sorry -- that Alison Hodgkins was in the

8        position?

9    A   I don't think anyone was.

10   Q   Why not?

11   A   I'm pretty sure, and I think the chief would be

12       much clearer on this than me, but I think we

13       learned that headquarters wasn't going to back

14       fill Walter Doherty's job, I think.   I think

15       we lost a supervisor's job somewhere along the

16       line.

17   Q   But do you know when you lost a supervisor's

18       job?

19   A   That's what I'm not clear on.

20   Q   At the end of the 120 days, what happened to

21       Alison Hodgkins' position?

22   A   She stayed doing it, but she wasn't getting

23       paid.

24   Q   But they didn't do a selection like they did in

Page 63

1   A   Jeff's would be handling more of the problem

2       areas dealing with the institutions, the

3       lawyers.  Where Paul's was more court

4       operations part of it, making sure they were --

5       the schedule was done, you know, deputies

6       assigned, courts assigned, you know, who's

7       covering what, guards brought in.

8   Q   So you're saying that Paul Sugrue was

9       responsible for --

10  A   No, Paul Dunne.

11  Q   I'm sorry.  Paul Dunne was responsible for the

12      day-to-day assignments of the court operations

13      deputies?

14  A   That's my recollection, yeah.

15  Q   There was a position -- another position that

16      opened up in October of 2003, a warrant

17      coordinator position.  Did you give any

18      recommendations or have any input into that

19      position?

20  A   Let's see, in October, I probably did.  Yeah, I

21      probably, you know, gave some names.

22  Q   Was Deputy DeCaire included in the names that

23      you gave?

24  A   I don't know.  If she was still in Boston, --

Page 64

1    Q    September of --

2    A    -- she would have been.  If she was in

3         Worcester, she wouldn't have been.

4    Q    September 29, 2003.

5    A    Was she still in Boston?

6    Q    Yes.

7    A    Then I'm sure her name was in the mix.

8    Q    Do you know, again, any reason why she should

9         not have been appointed to the warrant

10        coordinator position at that point?

11   A    No.  Again, unless --  As I've previously

12        stated, in an effort to give everybody an

13        opportunity, you know, a bite out of the pie,

14        you know, somebody else might have got it

15        instead of her.

16   Q    Is that the reason Kevin Donahue was selected?

17   A    I was going to say, I think Kevin Donahue was

18        selected to that, yeah.

19   Q    Now, at the time where was Kevin working?

20   A    I'm not sure.

21   Q    Your statement that if she had been in

22        Worcester, she wouldn't have been considered

23        for it.  Why?

24   A    It's like a separate entity of itself.  You

1      know, unless he had wanted to be considered for

2      it, you know?

3    Q   Well, if she had put herself in for it,

4      actually given her name in to be considered?

5    A   Yeah, then she would have been considered.

6    Q   But you --

7    A   I mean, I would have considered it, you know?

8    Q   But no matter how many times she puts her name

9      in, it's your position that because she'd done

10     it once before, someone else should have the

11     position?

12    A   Only if they're of equal, you know,

13     capabilities or whatever.  If --

14    Q   So until everybody who's equal to her gets a

15     chance, she doesn't get to be warrant

16     coordinator again?

17    A   I think that's fair.

18    Q   And equal is defined how, seniority?

19    A   No, not necessarily.

20    Q   Abilities?

21    A   Abilities.  Definitely ability, sure.  And if

22     somebody doesn't want it and they so state they

23     don't want it, then, you know, why would you

24     give it to them.  I mean, I wouldn't give it to

Page 66

1   them.  Maybe somebody else would, but I

2   wouldn't.

3  Q   Now, when this court reorganization occurred

4      with the supervisors, did you have a problem

5      with the fact that Deputy DeCaire was in court

6      operations and her fiance was one of the

7      supervisors of court operations?

8  A   Problem, no.  Concern, yes.

9  Q   Why no problem, why yes concern?

10 A   Just looking at it from other deputies'

11     perspectives.  If the person I'm living with

12     I'm supervising, that's not fair to the other

13     deputies.  If that person's going to get a

14     shake because of a situation, I don't think

15     it's fair.  I'm not sure what time frame you're

16     talking about.

17 Q   Before she got married.  After Jeff Bohn gets

18     assigned to court operations supervisor, but

19     before she gets married.

20 A   Yeah.

21 Q   Paul Dunne --

22 A   Yeah.

23 Q   -- is supervising there as well?

24 A   Right.

Page 67

1    Q    Did you view there to be a problem given that

2         they were living together and that Jeff was one

3         of the two supervisors in court operations?

4    A    Again, I was concerned with it.  You know, and

5         that's why Paul Dunne was her supervisor.  We

6         broke it down into assigning -- trying to

7         assign equal amount of evaluations to each

8         supervisor and I don't believe Cindy -- I'm

9         ninety-nine percent certain that Cindy was

10        assigned to Paul Dunne.

11            MS. COTTRELL:  We're within five minutes

12        of 3:00.

13            MS. TALWANI:  Okay, we're not within five

14        minutes of being done, I'm afraid.

15   A    Those stack of papers for me?

16   Q    But you can see, out of all of these I only

17        pulled one.

18   A    That's a good sign.

19   Q    When did you learn that Cindy DeCaire and Jeff

20        Bohn had gotten married?

21   A    After the wedding.

22   Q    You weren't invited?

23   A    No.  It was right down the street from my

24        house, too.  I could have got them a better

Page 68

1      deal at the place they got it if they had

2      spoken up.  It was after.

3   Q  Were you involved in the --

4   A  I don't know what date it was.

5   Q  Were you involved in the decision to move

6      Deputy DeCaire out of court operations or out

7      of the Boston court operations?

8   A  Yeah, I was privy to it.  I don't know how much

9      input I had.

10  Q  Who discussed it with you?

11  A  The chief.

12  Q  Did the chief discuss with you the options that

13     the Marshal Service had in how to handle this

14     problem?

15  A  I believe we went over different areas.  Again,

16     --

17  Q  Did the chief discuss with you the possibility

18     of moving Cindy back to warrants?

19  A  I don't remember.  He could have.

20  Q  Did you have an opinion about Cindy going back

21     to warrants?

22  A  Again, you know, I'd throw different options

23     out.  You know, we can do this, we can do this,

24     we can this, we can do --  You know, it wasn't

Page 69

1          my decision.

2     Q    But that was one of the options, wasn't it?

3     A    I imagine it was.  I don't have any clear

4          recollection of it.  But, you know, just from

5          the operation --

6     Q    Other than the possibility that there was a bar

7          on somehow Cindy going back to warrants as a

8          punishment for something, there was no reason

9          for her not to be able to go to warrants, was

10         there?

11    A    No.

12              **MS. TALWANI:**  Good enough place to stop.

13         Off the record.

14                              *

15                              *

16    (Whereupon, the deposition suspended at 2:58 p.m.)

17

# Commonwealth of Massachusetts

COPY

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

VOLUME II
EXHIBITS 2-7

CYNTHIA A. DECAIRE,
                    Plaintiff                Civil Action
                                             No. 04-10593WGY
VS.

JOHN D. ASHCROFT, in his official position
as Attorney General of the United States,
                    Defendant
*************************************

DEPOSITION of **DAVID TAYLOR**,  a Witness called

by Counsel on behalf of the **Plaintiff**, pursuant to the applicable

Massachusetts Rules of Civil Procedure, before Karen T. McAllister,

a Professional Court Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the Law Offices of Segal, Roitman

and Coleman, 11 Beacon Street, Suite 500, Boston, Massachusetts, on

Tuesday, February 17, 2005, commencing at 10:06 A.M.

*Accurate Reporting Services*
*36 West Street*
*Whitman, MA  02382*
*(781) 447-9520*

**APPEARANCES**:

Indira Talwani
Attorney at Law
Segal, Roitman & Coleman
11 Beacon Street
Suite 500
Boston, MA  02108
REPRESENTING THE PLAINTIFF

Barbara D. Cottrell
Assistant U.S. Attorney
Northern District of New York
445 Broadway
Room 218
Albany, NY  12207
REPRESENTING THE DEFENDANT

Page 8

1    that one.  They chose me for that one, and they

2    chose Jeff for the other one.

3  Q  They chose you, so the record is clear, for the

4    J.S.I. position and they chose Jeff Bohn for the

5    HIDTA position?

6  A  Yes.

7  Q  You became the acting assistant chief on April

8    28, 2003, correct?

9  A  I know it was late April.  If you're telling me

10   that date, I'm good with that.

11 Q  It was a one hundred and twenty day appointment,

12   correct?

13 A  Yes.

14 Q  And that during that time there was a search for

15   the assistant chief, correct?  Or it was open for

16   applications for the assistant chief position,

17   correct?

18 A  I don't know when they opened it.

19 Q  Do you know when you put in your package for that

20   promotion?

21 A  Not off the top -- no.  As soon as I could I put

22   in for it.  As soon as it came out I put in for

23   it.

24 Q  Am I correct that there was an initial list that

Page 9

1    did not include you?

2  A  Not that I'm aware of.

3  Q  A hundred and twenty days would have ended at

4     August 2003.  Do you know what your status was

5     between August of 2003 and October of 2003 when

6     you were put in the position as not to exceed one

7     year?

8  A  I'm not following the question.

9  Q  Did you remain acting assistant chief, even

10    though the hundred and twenty days had expired

11    and the new notice, putting you in for the

12    position not to exceed one year, hadn't yet come

13    out?

14  A  I didn't have a break, so whenever the time was.

15  Q  You said at some point on Tuesday that you had

16    reviewed Deputy DeCaire's complaint in this case,

17    correct?

18  A  I believe so, yes.

19  Q  Is that the complaint that was filed in court?

20  A  If I can see it I could tell you.

21              (Pause)

22        **MS. TALWANI:**  I don't have this,

23    haven't made extra copies yet.  If you don't

24    mind, we can wait until the break on marking the

Page 10

1    First Amended Complaint and Demand for Jury Trial

2    as exhibit two?

3         **MS. COTTRELL:**  Not a problem.

4    Q    (by Ms. Talwani)  I'm going to show you a

5    document entitled First Amended Complaint and

6    Demand for Jury Trial.  Is this the document you

7    reviewed?

8              (Witness views document)

9    A    I don't think so.  What I was reading, I don't

10   think was that long.

11   Q    I will show you another document, which we will

12   mark at the break as exhibit three, which is

13   entitled Complaint and Demand for Jury Trial.

14             (Witness views document)

15   A    I think it was this one.

16   Q    Who provided you with that complaint?  How did it

17   come to be that you were reviewing that

18   complaint?

19   A    Somebody gave it to me somewhere along the line,

20   but I don't --  I can't remember.

21   Q    You don't know who gave it to you?

22   A    No.

23   Q    And you don't know when you saw it.

24             Do you know when you saw it?

1    A    When I saw it or when I reviewed it?

2    Q    Well, let's start first with when you first

3         saw it.

4    A    Oh, I don't know the date, no.

5    Q    Do you know the month?

6    A    No.

7    Q    Season?

8    A    A while ago.  No, I don't know.

9    Q    And you don't know who gave it to you?

10   A    No.  You don't want me to guess.  I'd be

11        guessing.

12   Q    I don't want you to guess.  But if there's two or

13        three people and it could have been one of those

14        three only, then I'd like that information.

15   A    I think it might have been the chief.

16   Q    The chief, we're now talking about Chief Fallon

17        --

18   A    Yes.

19   Q    Or Chief Dimmitt?

20   A    Fallon.

21   Q    What was the context, the reason of why he gave

22        you that complaint?

23   A    Well, I think because my name was in it.

24   Q    Did you review it at that time?

Page 12

1    A    I read it.

2    Q    Did you discuss it with Chief Fallon at that

3         time?

4    A    I'm sure I did.

5    Q    What do you remember discussing about it with

6         Chief Fallon?

7    A    I'd have to read the thing, go through it.

8         Whatever I read pertaining to me I would have

9         discussed with him, I'm sure.

10   Q    Did you discuss with him parts that did not

11        specifically refer to you?

12   A    I could have.

13   Q    Was this when the complaint was initially

14        received by the marshals' office, to your

15        knowledge?

16   A    I don't know.

17   Q    I'm going to ask you to look again at the

18        complaint, and just tell me what parts you

19        discussed with Chief Fallon.

20   A    I don't know if it was at that time or since

21        then, but the chief at one time did ask me if the

22        marshal had asked me who I recommended or who --

23        to take my spot in the HIDTA Task Force, and I

24        said no.

Page 13

1   Q   Anything else?

2   A   I think he asked me about --  I think I remember

3       having conversation about the rotation of people

4       to help support Boston on different days.

5   Q   What did you tell the chief about that rotation?

6   A   I said they all could do it, but as a logistical

7       matter if they had somebody in Springfield, if

8       they needed help in Springfield, Deputy Wahl

9       lived halfway between Worcester and Springfield

10      and it would make more sense to send him there.

11  Q   Did you discuss with Chief Fallon what the

12      particular need was in January of 2003 at Court

13      Operations?

14  A   No, I don't think I did.

15  Q   Did you discuss with Chief Fallon any practice,

16      either before or after, about supporting Court

17      Operations by using deputies from the

18      investigative unit in Boston?

19  A   Yeah, we do use them.  So, you know, I don't know

20      if we --  I think we were already using them.

21      Number thirty-three there, about me and the

22      marshal and Tom Bezanson meeting; and I said I

23      didn't have any recollection, specifically, of

24      that.

Page 14

1  Q   Just to be clear.  Your testimony from yesterday
2      was that you were meeting with --
3  A   I was there at this --
4  Q   You were meeting with the marshal to introduce
5      him to judges in Worcester and Springfield during
6      that time period, and so you could well have been
7      at that meeting?
8  A   Right.  Right.
9  Q   But you don't remember anything that was said at
10     the meeting?
11 A   Yeah, I don't have any recollection of
12     specifically going there for discussing no longer
13     to rotate the two women to Boston.
14 Q   Do you have any recollection, just to be clear,
15     maybe not of going there, because you said to me
16     that if you had been there you wouldn't have met
17     the marshal there; but do you have any
18     recollection of that meeting with Tom Bezanson
19     and the marshal in Worcester?
20 A   I remember being with -- in the Worcester office
21     the same time Tom and the marshal were there.
22     Specific as to that discussion, no.  But I'm not
23     saying it didn't happen.  It very well could
24     have.

Page 15

1    (Witness views document)

2    A    I think that's -- I only saw my name mentioned

3         in there once, so I'm pretty sure that was all we

4         did.

5    Q    Did the chief discuss with you Cindy DeCaire's

6         allegation that she had sent an E-mail to you to

7         be considered for the position of acting

8         supervisor Court Operations in August of 2003?

9    A    She sent me an E-mail?

10   Q    Let me show you the allegation, paragraph forty-

11        six in her amended complaint, and ask whether did

12        the chief discuss that allegation with you?

13   A    I know I did forward the E-mail.

14   Q    Do you recall any discussion with Chief Fallon

15        about that?

16   A    I think I asked him -- just asked him if he had

17        received it; you know, made sure he got it.

18   Q    I believe you testified on Tuesday that you did

19        approach Lawlor about the position and that she

20        expressed no interest in it, correct?

21   A    Yeah.

22   Q    Other than that complaint, were there any other

23        documents that you were asked to review or given

24        to review by anyone in this case?

Page 16

1   A   I believe there were, but you asked me the other

2       day if I reviewed anything coming over here and

3       that's the only one I looked at.

4   Q   But during the course of any investigation --

5   A   Yeah, I think there were others, yeah.

6   Q   What other documents were you asked to review?

7       For example, have you reviewed Cindy DeCaire's

8       affidavit in the E.E.O. proceeding?

9   A   I'm thinking I did, and it's not a guess, I'm

10      pretty sure.  Anything that I've received I think

11      the chief would have given to me, because I had,

12      you know, a need to know.

13  Q   Do you have a file of the documents that you've

14      received in this case?

15  A   I don't know if you'd call it a file.  I have a

16      -- you know, in my drawer I've got a couple of

17      documents, yeah.

18              **MS. TALWANI:**  Can we get copies of

19      these?

20              **MS. COTTRELL:**  Do you know what's

21      included in that file?

22              **THE WITNESS:**  No.

23              **MS. TALWANI:**  Anything that he received

24      relating to this, other than an attorney-client

Page 31

1    A    I'm sure I did.  I'm sure I did, especially if he

2         had asked specific questions on, you know, any

3         issue, I'd give him my opinion.

4    Q    Did you discuss with Chief Dimmitt Cindy

5         DeCaire's grievance or E.E.O. complaint?

6    A    Again, I have no specific recollection of it, but

7         if he asked me anything about it, I'd tell him

8         what I knew about it at the time.  But, I heard

9         over the years even that, you know, she had filed

10        stuff, but I never had any direct knowledge of

11        that.  How would I know what she filed.

12   Q    You heard over the years that she had filed what

13        stuff?

14   A    Other E.E.O. complaints.  But, like I said, I've

15        heard it, but I didn't know what --  I had no

16        firsthand knowledge whether she did or didn't.

17   Q    Did you pass on to Chief Dimmitt anything that

18        you had that was not firsthand?

19   A    He'd asked me if I'd heard anything other than --

20        you know, I said sure I would.  I don't know if

21        he did or not, I'm just saying.

22   Q    Do you know, as you sit here today, whether, in

23        fact, Cindy DeCaire had filed prior E.E.O.

24        complaints or not?

Page 42

1      separate out which of the supervisors was

2      responsible for which of the deputies, correct?

3    A   Correct.

4    Q   And Sue Williams reported to Supervisor Deputy

5      Dunne?

6    A   Right.

7    Q   You learned at some point that Deputy DeCaire was

8      pregnant and was requesting light duty, correct?

9    A   Yes.

10   Q   How did you learn that?

11   A   I believe she told somebody.  I don't know if she

12     told me directly or...

13   Q   What was your reaction to her request for light

14     duty?

15   A   Fine, let's see what we can find her.

16   Q   Had you in your position as acting assistant

17     chief at that time, had you dealt with limited

18     duty requests?

19   A   I don't know if I did before or after.  I'm not

20     sure.

21   Q   What other experiences have you had with limited

22     duty requests besides Deputy DeCaire's?

23   A   Just being in districts where they do them.

24   Q   As the assistant chief, have you been involved in

Page 43

1              limited duty requests other than Deputy

2              DeCaire's?

3    A    Yes.

4    Q    Who else's?

5    A    I think Gary Oliveira had a short one.

6    Q    What's Gary Oliveira's position?

7    A    He's an 082.

8    Q    When was his limited duty?

9    A    I believe his was after hers, a short period of

10             time, a fracture to the hand or a hand injury.

11   Q    Do you recall what his limited duty assignment

12             was?

13   A    I believe he was on the Ops desk.

14   Q    Operations desk?

15   A    Yeah.

16   Q    What's that?

17   A    It's the --  It helps the operations supervisor,

18             basically answering phones.

19   Q    Where was Gary Oliveira assigned at the time?

20   A    To operations.

21   Q    Because as an 082, he couldn't be assigned to

22             investigations?

23   A    Right.

24   Q    Other than Gary Oliveira, have you dealt with any

Page 44

1      other requests for limited duty while you've been

2      assistant chief?

3   A  I might have, but I'm drawing a blank on a name.

4   Q  During your experience, not as a supervisor but

5      just as a deputy, what's your experience at the

6      Marshals Service with people needing limited

7      duty?

8   A  It's been my experience in all the districts I've

9      been in, if -- you know, you take care of your

10     own, you know.  Instead of seeing somebody go out

11     and have to use all their sick leave or annual

12     leave or leave without pay, you try to find them

13     some light duty.

14  Q  What type of light duty work have you seen

15     deputies take on usually?

16  A  All different stuff from -- depending on the

17     injury, or what the thing is, they could be doing

18     everything from answering phones to working and

19     monitoring the cameras, the closed circuit TVs,

20     serving process.  Basically a duty that wouldn't

21     put them in harm's way, but based on whatever

22     their injury is.

23  Q  In Boston there's a number of different tasks

24     that would fit that description, correct?

Page 45

1    A    Yeah.

2    Q    Including in warrants?

3    A    I suppose you could do computer checks and stuff

4         like that.  Obviously, you wouldn't be able to go

5         out on the street.

6    Q    But you can do computer checks and you can do

7         phone inquiries that you need to do?

8    A    You could, sure.

9    Q    You used the expression that in your experience

10        what would be done is that you would try to,

11        quote, take care of your own, correct?

12   A    Right.

13   Q    And you would try to find light duty, so that

14        people would not have to use up their sick time,

15        correct?

16   A    Right.

17   Q    Was that your reaction to handling Deputy

18        DeCaire's request for limited duty?

19   A    Yes.

20   Q    And did you know that she had had limited duty

21        when she had been pregnant with her first child

22        at the Marshals Service?

23   A    Yes.

24   Q    And you knew that the Marshals Service had been

Page 46

1    able to accommodate it?

2    A    Yes.

3              **MS. TALWANI:**    Could you mark this as

4    the next exhibit.

5                        (Whereupon, the below-described

6                        10/28/03 dated E-mail was marked

7                        Plaintiff's Exhibit No. 6.)

8    Q    (by Ms. Talwani)    Is this an E-mail you sent?

9    A    Yeah.

10   Q    I'm showing you a document marked as Exhibit Six?

11   A    Yeah.

12   Q    You write in the E-mail, "We can't bring her back

13   to Boston, because of the supervisory issue"?

14   A    Right.

15   Q    Why couldn't you bring her back to Boston once?

16   A    Well, we did bring her back to Boston.  And by

17   putting her in the assignment we did put her in,

18   we saved guard money and $200.00 a day.  So, it

19   was actually helping the district and helping

20   her.

21   Q    You wrote here that you can't bring her back to

22   Boston on light duty because of the supervisory

23   issue.

24   A    Right.

Page 47

1   Q   Why did you write that?

2   A   Because her -- I don't know if he was her husband

3       at the time or -- I'm assuming he was, --

4   Q   He was her husband at the time she moved to

5       Worcester, correct, that's why you moved her to

6       Worcester?

7   A   Right.

8   Q   So, at this time he was her husband.

9   A   Okay.  We didn't want him supervising her.

10  Q   But there was no other limitation for any other

11      job that she had; so long as he wasn't

12      supervising her there was no problem with her

13      going back to Boston, correct?

14  A   Right.  Right.

15  Q   So, even though you wrote here that she cannot

16      come here, we cannot bring her back to Boston,

17      that turned out not to be correct?

18  A   Well, I thought you meant to the Ops.  Yeah.

19  Q   Well, you also brought her back to Boston

20      Operations, didn't you?

21  A   But we reassigned a supervisor to handle that

22      instead of him.

23  Q   So, you didn't have to reassign, because you had

24      already been doing assignments where one

Page 48

1    supervisor would handle one group of deputies and

2    one supervisor would handle another group of

3    deputies, correct?

4  A    Right.  But where she was working in the C.B.C.,

5    we had to take that out of Jeff's jurisdiction

6    and put it into Paul Dunne's.

7              (Whereupon, the below-described

8              11/15/03 dated E-mail was marked

9              Plaintiff's Exhibit No. 7.)

10  Q    (by Ms. Talwani)  I'm showing you a document the

11    court reporter has marked as Exhibit Seven.  Is

12    this your document?

13  A    Yes.

14  Q    Your E-mail?

15  A    Yeah.

16  Q    Who is Jim Mulhern?

17  A    He's the site supervisor for M.V.M. who is in

18    charge of the C.S.O.s.  M.V.M. is a company that

19    the Marshals Service contracts with for the

20    C.S.O.s' court security officers.

21  Q    Did you make the decision that effective on that

22    date a C.S.O. would be assigned to the control

23    center?

24  A    Yes.

Page 49

1    Q    Is that the same as the control room?

2    A    Yes.

3    Q    Why did you make that decision?

4    A    I believe that the issue wasn't -- There was

5         already a C.S.O. there. We just changed the

6         time. It wasn't -- I'm pretty sure we weren't

7         creating a new slot. We were just changing the

8         times.

9    Q    From what was the change in time?

10   A    I'm thinking it might have been from instead of

11        8:30, start at 0745, if my memory serves me

12        right.

13   Q    So, you had a court security officer assigned for

14        most hours to the control room?

15   A    C.B.C., yeah.

16   Q    Am I correct that the person in the control room

17        has to stay there until all prisoners have left

18        the courthouse?

19   A    Yes.

20   Q    So, you may have been playing with the time at

21        the beginning, but the end time, even though it

22        says 1700 here, it would actually be until all

23        prisoners are gone?

24   A    Not necessarily.

Page 50

1    Q    Why?

2    A    Because we could have a deputy in there after

3         5:00 P.M.

4    Q    Prior to this memo going out, the control room

5         was staffed by a C.S.O. for the bulk of the day,

6         and extra time at the end might be covered by a

7         deputy, correct?

8    A    Yes, but probably two C.S.O.s, not just one.

9    Q    Why?

10   A    I forget how many cameras and monitors there are,

11        and for monitoring purposes it'd be difficult for

12        one person to do it.

13   Q    What did the two C.S.O.s do normally if one of

14        them has to leave the room to go to the bathroom?

15   A    One will take over for, you know, three, four,

16        five minutes if somebody has to --  They do do

17        their own relief.  You know, they'll send

18        somebody in and one guy will leave.

19   Q    When Deputy DeCaire was assigned to Boston for

20        her limited duty work, what was her assignment?

21   A    C.B.C..

22   Q    So, she replaced one of the two C.S.O.s?

23   A    Actually, she was there to train one of the

24        C.S.O.s.  We took advantage of it, because she

Page 51

knew how to do all that, to have her train the

C.S.O.s.  Or what we were trying to do is get

just a small number of C.S.O.s, but that would be

their assignment.  Again, they work for M.V.M.

But what our wish was, to have six or eight guys

that know it inside and out.  Not to be putting a

different guy in there who doesn't know what he's

doing, you know, every other day, because there's

probably fifty of them that are assigned to

Boston.  So, we took advantage of the situation,

and Cindy was to train them.

Q    While she was training them, would there be two

     C.S.O.s assigned to her?

A    I'm guessing.  I'm pretty sure that there was.

Q    So, explain to me how you were going to save

     money, because that was what you said first?

A    Guard money is what we were saving.  See, we

     used to assign somebody in there, Marshals

     Service personnel or a guard full-time.

Q    In addition to the C.S.O.?

A    Along with a C.S.O..  But what we were trying to

     do is get the C.S.O.s to do it under -- I don't

     know how to explain this, under --  C.S.O.s can't

     control prisoners, which they don't.  But that

Page 52

1    the C.B.C. also monitors the cellblock area, but

2    the Ops desk take monitors to monitor the

3    cellblock area also.  So, what we were trying to

4    do, and which we have since done, is the C.S.O.s

5    cover the C.B.C..

6  Q    Before Cindy went there, what was the staffing of

7       the control center?

8  A    One guard, one C.S.O., I believe.

9  Q    When did you move to two C.S.O.s?

10 A    Since we've got them all trained.

11 Q    Since some point in?

12 A    I would say after Cindy came back.  After she was

13       no longer on light duty.

14 Q    So, let me try to divide this time up, so I

15       understand.

16       Before Cindy was put on light duty, you had

17       one guard and one C.S.O. in the control room?

18 A    Right.

19 Q    Was the guard in the control room or would the

20       guard be available to the C.S.O.?

21 A    No, that was his assignment.

22 Q    When Cindy came in, what was the assignment in

23       the control room?  Not where you were trying to

24       get to, but what was the assignment in the

Page 53

1    control room?

2  A   At least one C.S.O. and her.

3  Q   So, she substituted for the guard, not for the

4      C.S.O.?

5  A   Correct.

6  Q   The reason that she couldn't leave the room

7      without having another deputy take her place was

8      because the C.S.O. can't control the prisoners,

9      is that correct?

10  A   Not necessarily.

11  Q   Why is it that you have to have a guard there or

12      a deputy in addition to a C.S.O.?

13  A   When we had a guard and a C.S.O. there, --  I

14      don't know how to explain this.  We didn't have

15      the monitors.  I remember when the monitors -- I

16      don't know when they were, but I remember when

17      the monitors got put in where the operations area

18      could see the supervisor who's usually at the

19      desk, or the person assigned could see it.

20  Q   Could see the cellblock?

21  A   Yeah, and everything that was going on.  Let's

22      say this is -- this is the room (demonstrating).

23      The operations desk is about here and the

24      monitors are hanging from the ceiling here

Page 54

1    (demonstrating).  This is the squad bay, this is

2    where you'd probably have, I'm going to say,

3    twenty desks in here, twenty cubicles

4    (indicating).  Could be off.  The control room

5    that we're talking about is right over here, it's

6    a room off it (indicating).  The door was open

7    most of the time.  I mean, you --  It's in the

8    realm of possibility that this supervisor,

9    whoever's here, could also control that area as

10    far as monitoring it, as well as knowing

11    everything that's going on via the monitors in

12    the cellblock.

13   Q   I don't mean to belabor the point, but I don't

14       understand.  So, I'm going to ask you again.

15   A   All right.  Go ahead.

16   Q   Prior to Cindy being assigned limited duty work,

17       the control room would normally have in it one

18       guard and one C.S.O., correct?

19   A   Yes.  Yes.  I think at one time they even had,

20       before I came to Boston, they might have had two

21       guards in there, or a deputy and a guard, from

22       what I remember from being in Boston.

23   Q   The responsibilities in the C.B.C., in the

24       control center, prior to the time when Cindy

Page 55

1    DeCaire was assigned there, was what?  What did

2    those people do?

3  A   They monitored all the courtrooms, the cellblock,

4    the interview rooms.  They would hit the control

5    buttons for the elevators, the prisoner

6    elevators, to bring the elevators up to somebody

7    who called them up; to bring prisoners down, up

8    and down, through all the corridors.  The alarms

9    from all the courtrooms come into the C.B.C..

10   Cameras that are monitoring the perimeter of the

11   whole building come into the C.B.C..

12  Q   Can you explain to me again why you couldn't have

13   two C.S.O.s and no guards doing that work?

14  A   C.S.O.s aren't supposed to handle prisoners.

15   It's a gray area on whether or not monitoring and

16   pushing the button that unlocks the door on the

17   cellblock to go to the corridor, or whatever, is

18   considered handling prisoners.

19  Q   So, they didn't have any physical contact with

20   the prisoners?

21  A   Right.

22  Q   But it was still considered handling prisoners

23   that was outside of the work that could be

24   assigned to them?

Page 56

1  A   That's the gray area, correct.

2  Q   The guards are also contract employees or are

3      Marshals Service employees or government

4      employees?

5  A   The guards, usually in Boston, are Plymouth

6      County Sheriffs or retired deputies.  But they're

7      contracted directly by the Marshals Service.

8  Q   So, it's another contract?

9  A   It is.  But they're considered for purposes --

10     you know, they're the same as a deputy, because

11     they can handle prisoners.

12 Q   When Cindy requested limited duty, were you given

13     a list of the restrictions that she had?

14 A   I believe so.

15 Q   And were you aware of one of the restrictions

16     being excessive heat?

17 A   If you're representing that, I'll agree with you.

18     I can't remember what was on the list.

19 Q   Do you remember anything about the temperature of

20     the control room?

21 A   I know it fluctuated.

22 Q   Including being quite hot?

23 A   Yeah.

24 Q   Now, you said that the C.S.O.s are not supposed

Page 57

1    to handle prisoners.  What happened if a guard, --

2    - again the time period before Cindy DeCaire got

3    there, what happened if a guard needed to leave

4    the room?

5  A  He got relief.

6  Q  And who would relieve him?

7  A  Either another guard or a deputy.

8  Q  Because a C.S.O. couldn't be alone in the room,

9    essentially?

10 A  Supposedly not.

11 Q  Did it happen often that they would be alone?

12 A  It could have.  I don't know.  It very well could

13   have.

14 Q  You mentioned that there may have been some other

15   arrangements prior to the time that you were the

16   acting assistant chief.  But certainly during the

17   time that you were the acting assistant chief,

18   had any deputies been assigned as a full day

19   position to the control room?

20 A  I'm not sure as on a full day, but I know they

21   had been beginning of the day and end of the day.

22 Q  Relieving people?

23 A  Yes, fill, you know, or starting maybe an hour

24   and a half in there.

1   Q   And on the end of the day the reason for that is

2       because, again, the deputy or guard needs to be

3       there until the last prisoner is out of the

4       courts?

5   A   And the C.S.O.s, their shift is over.

6   Q   So, they're gone?

7   A   They're gone, yeah.  I know deputies did it.  You

8       asked me about me as assistant chief.  I know

9       prior to that point, I know deputies had been

10      assigned as, you know, that was their duty.  I

11      don't know if it was a week at a time, a day at a

12      time or what, but I know they were in there.

13  Q   What time period are we talking about?

14  A   Up until pretty recently, I think.  Up until --

15      till they had enough guards, that they were

16      putting guards in there.  We had enough guard

17      money, we could put guards in there.  Then when

18      our budget got cut with the guard money, you had

19      to revamp what you were doing.

20  Q   Was this primarily 082s?

21  A   I believe it was.  But, I know -- seems to me --

22      Again, I was in Worcester.  It seems to me when

23      they were first doing it, the -- everybody was

24      doing it.  All the deputies were assigned to it.

Page 59

1    Q    On a rotating basis?

2    A    I think so, yeah.  Yeah.

3    Q    Did anyone have it as a permanent assignment?

4    A    I don't believe so.

5    Q    At some point they started moving to using more

6         082s?

7    A    Yeah.  It might have been more of a training, so

8         I didn't know it.

9    Q    How is a deputy or the guard in the control room

10        supposed to get relief when they needed to leave?

11   A    The schedule.  I don't know about a bathroom

12        break, but the lunch breaks and all that, they

13        were scheduled.

14   Q    What about bathroom breaks?

15   A    I think they just stuck their head out and said,

16        "Hey, can somebody watch this for a minute."

17   Q    Do you recall that there was a problem with this

18        issue regarding bathroom breaks for Deputy

19        DeCaire when she was placed in there?

20   A    I do.

21   Q    Do you have children?

22   A    Yes, I do.

23   Q    Are you familiar with the issue in pregnancy that

24        the uterus sits on the bladder and requires more

Page 60

1      frequent urination?

2   A   I've heard that people that are pregnant have to

3      go to the bathroom a lot, yes.

4   Q   So, you knew that when you assigned Deputy

5      DeCaire to the control room?

6   A   Sure.  Absolutely.

7   Q   Were you aware of Deputy DeCaire's complaints

8      that she was not getting relief to go to the

9      bathroom when she needed to?

10  A   I was aware that there was a complaint, but what

11     I wasn't aware of is that she wasn't getting

12     relief.

13  Q   So, you think her complaints were just made up?

14  A   I think if she wanted to go to the bathroom, she

15     could go to the bathroom and somebody would

16     relieve her.

17  Q   So, why do you think she made a complaint?

18  A   I have no idea.

19  Q   So, you think that it was just a false statement

20     by her?

21  A   All I know is I remember having the discussion

22     saying if Cindy needs relief, -- and the

23     supervisor told me, I told her just to tell me

24     and we'd get relief, I mean.

Page 61

1    Q    Do you have any facts to support that, in fact,

2         she was getting the relief as she needed it?

3         Other than your asking that it happen that way,

4         do you have any fact to support that it was, in

5         fact, happening that way?

6    A    I don't recall ever hearing anything about --

7         other than one time, after the fact when she was

8         told to go back in there from the supervisor that

9         said, you know, she was to go the bathroom and

10        she stayed out for another, I don't know how long

11        it was, you know.  But, I know the supervisor

12        told her --  Well, I was told by the supervisor,

13        "Cindy, if you've got to step out for a while,

14        step out.  If you have to stand up, stand up.

15        Sit down, do whatever.  You know, make it

16        comfortable on you."

17   Q    So, you were told that there was no problem by

18        the supervisor; and, therefore, based on that, it

19        is your belief that Cindy DeCaire's complaint

20        that she wasn't getting relief was false?

21   A    I don't know if I'd word it like that.

22   Q    What's wrong?

23   A    Well, it was never --  I heard about it once, you

24        know.

Page 62

1   Q    So, what you're saying is you only know of one

2        complaint that Deputy DeCaire made about not

3        getting relief for the bathroom?

4   A    I don't even know if it was a formal complaint or

5        anything, but I remember hearing about it once

6        being an issue.

7   Q    And that was an issue because Alison Hodgkins was

8        concerned that she hadn't gone back to the room?

9   A    Two different -- two different things.

10  Q    So, you heard on one occasion that Deputy DeCaire

11       had a concern about not being able to get

12       bathroom breaks?

13  A    Right.

14  Q    And you made sure, from your point of view, that

15       the matter was addressed by directing her

16       supervisor that she was to be allowed to have

17       breaks?

18  A    Absolutely.

19  Q    Do you know whether, in fact, Deputy DeCaire was

20       relieved as she needed, or do you simply know "I

21       didn't hear anything more"?

22  A    I believe she was.

23  Q    And you're base --

24  A    Because I didn't hear anything more.

Page 65

1   Q   That training is a different training than the

2       training you were talking about a few minutes ago

3       about the control room?

4   A   Yes.  Yes.

5   Q   Tell me again about the control room training,

6       who was she supposed to be training?

7   A   The C.S.O.s that were going to be working in the

8       control room.

9   Q   So that if I understand your testimony, there

10      were two purposes to assign Cindy during her

11      limited duty to the control room.  One was to

12      save money on the guards, and the other was to

13      train the C.S.O.s?

14  A   Yes, in the use of the control room.

15  Q   Wouldn't there be E-mails about that if that was

16      a purpose of her assignment?

17  A   Not necessarily.

18  Q   You wouldn't have told anybody that she was

19      supposed to be doing that?

20  A   I think she knew that's what she was doing.

21  Q   Did you send an E-mail out to the chief to tell

22      him that Cindy had or hadn't trained C.S.O.s?

23  A   No.

24  Q   Did you send --

Page 66

1    A    I don't think I did.  If you've got it, I did.

2         If you didn't, I probably didn't.

3    Q    Can you recall any documentation that you did

4         about this training of the C.S.O.s?

5    A    I can't recall, no.

6    Q    What's the current staffing of the control room

7         since --

8    A    Two C.S.O.s.

9    Q    -- Cindy DeCaire left?

10   A    Two  C.S.O.s.

11   Q    And why is there no longer a guard or a deputy?

12   A    There's no guards, because there was no money for

13        guards in there.

14   Q    How is the gray area being handled?

15   A    The supervisor or the operational person is

16        monitoring the cellblock area, as well as the

17        cellblock itself is being monitored by Marshals

18        Service personnel.

19   Q    So, there's been a change in technology since --

20   A    Since Cindy did it?

21   Q    At some point?

22   A    No.

23   Q    Well, a change in technology at some point, so

24        that a deputy was no longer needed there?

Page 67

1    A    You can make the argument it's still a gray area.

2         But our position is that the prisoners are being

3         physically controlled by deputies, they're being

4         monitored by U.S.M.S. personnel.  So, what the

5         C.S.O.s and the C.B.C. are doing are at the

6         direction of the deputy.

7    Q    Was this a decision that was made in the

8         marshals' office or at the Marshals Service, I

9         think was the way it was now going to be

10        configured?

11   A    In the District of Massachusetts, yes.

12   Q    And who made that decision?

13   A    The chief, the marshal; myself, my input from the

14        J.S.I. side of it.

15   Q    When was the decision made?

16   A    It would have been right around the time during

17        and after Cindy's light duty in there.

18   Q    When Cindy was not there on light duty, she was

19        only there three days a week, --

20   A    Yeah.

21   Q    On the Monday and Friday who was covering it?

22   A    I'm not sure.  I can't tell you right now.

23   Q    Do you know if it was guards or whether it was

24        two C.S.O.s?

Page 68

1  A  I don't think it would be guards.  I think it

2     probably would have been deputies, but you'd have

3     to --  I'm not sure.  Somebody else's assignment.

4  Q  When was the decision made that you no longer

5     needed a guard or a deputy in there?

6  A  After the light duty was up and the training,

7     informal or whatever, was accomplished.

8  Q  When was the video equipment put in place so that

9     the operations' supervisor could monitor the

10    prisoners also?

11 A  I don't know the exact date.

12 Q  Give me a year.

13 A  I don't know, but it was prior --  That equipment

14    was in prior to Cindy's light duty thing in

15    there, I know that.  But, I don't know when it

16    went up.

17 Q  When did you stop using guards in the control

18    room?

19 A  When Cindy went on light duty.

20 Q  So, up until her request for light duty, you had

21    guards in there five days a week?

22 A  I believe so.  I believe so.  Not a hundred

23    percent sure, but...

24 Q  What records would show that?

Page 69

1    A    Either the guards' --  I'm not sure where they

2          were assigned.  I'm not sure.  There has to be

3          some, but I'm not sure where they'd be.  It would

4          be the old -- possibly the old court assignment

5          sheets.

6    Q    What are the court assignment sheets?

7    A    It's a court schedule of all the judges, all

8          their courts for the day.  And on it deputies

9          assign -- guards are assigned to what courts

10         they're going to cover, and usually at the bottom

11         of that the supervisors usually write on there

12         cellblock; you know, who's in the cellblock, you

13         know, one guard, one deputy, you know, so and so.

14         Or C.B.C. relief, you know, it's written on

15         there.  Can I say something on a question you

16         asked me a while back, or not?

17    Q    Sure.

18    A    On the OSHA one we switched -- it was hindsight,

19         but after we realized that Jeff was supervising

20         her and after this, that's when we switched

21         supervisors.  Again, just to keep it so nobody

22         would come back and say hey, she's getting

23         special preference from her husband.

24    Q    After he made the complaint?

Page 70

1   A   Yeah, that's when it came to light that, you
2        know...
3   Q   You didn't know before that, that he was
4        supervising her there?
5   A   Well, if you look on one of these here it tells
6        you the breakdown, and he had the C.B.C..  I
7        believe it's this one here (indicating).  But,
8        you know, when you make all these special
9        allowances --  Yeah, on this one here he was in
10        charge of the command center.
11   Q   So, she was assigned, even though she had to
12        leave --
13   A   That was an oversight.
14   Q   She had to leave the building by noon, no one
15        took care to make sure that for the two-month
16        period that she came back, before he was moved
17        off the assignment, that he was supervising her
18        in the C.B.C.?
19   A   Right.  Like I said, it was an oversight.
20   Q   And it was only noticed when he filed the OSHA
21        complaint?
22   A   Came to light.
23   Q   During the time that Deputy DeCaire was assigned
24        to the control room, she had to stay in the

Page 71

1          control room until the last prisoner had left the

2          courts, correct, however long that is?

3     A    I'm not sure on that.  I'm not sure at all on

4          that.

5     Q    Who would know?

6     A    Again, the operations supervisor would know.

7     Q    Was it your view that Cindy DeCaire should have

8          been thankful for being permitted to have light

9          duty work?

10    A    I can only speak to myself.  If I was injured and

11         they were giving me light duty, I'd be thankful.

12         That's, I know -- that's me.

13    Q    My question is, whether it was your view, I'm

14         asking just about you, but was it your opinion

15         that Cindy DeCaire was behaving in an ungrateful

16         manner about the light duty assignment?

17    A    I have no opinion on how she was behaving.

18    Q    Can you tell me whether you've had any

19         discussions that you have not already told me

20         about with Chief Fallon about Deputy DeCaire's

21         complaint?

22    A    Nothing I can recall.

23    Q    Did you discuss Deputy Williams' complaints with

24         Chief Fallon?