# EXHIBIT T

1 - 71

IN THE UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

CYNTHIA A. DeCAIRE,                )
                                   )
          Plaintiff,               )
                                   )
-v-                                ) CIVIL ACTION NO.
                                   ) 10593-WGY
JOHN D. ASHCROFT, in his personal)
capacity as Attorney General of    )
the United States of America,      )
                                   )
          Defendant.               )

THE ORAL DEPOSITION OF CYNTHIA DeCAIRE, held

pursuant to Notice, and the applicable provisions of the

Federal Rules of Civil Procedure, before Carol Summers, a

Court Reporter and Notary Public, within and for the

Commonwealth of Massachusetts, at the offices of the

United States Attorney, 1 Courthouse Way, Suite 9200,

Boston, Massachusetts, on Wednesday, March 16, 2005,

commencing at 9:43 a.m.

ORIGINAL

PRESENT:


    On Behalf of the Plaintiff:

    INDIRA TALWANI, ESQ.
    Segal, Roitman & Coleman
    11 Beacon Street, Suite 500
    Boston, MA  02108
    (617) 742-0208


    On Behalf of the Defendant:

    BARBARA D. COTTRELL
    Assistant U.S. Attorney
    Northern District of New York
    James T. Foley U.S. Courthouse
    445 Broadway, Room 231
    Albany, NY  12207
    (518) 431-0247

# C O N T E N T S

WITNESS:                                        EXAMINATION

Cynthia A. DeCaire

        By Ms. Barbara D. Cottrell                    5

        By Ms. Indira Talwani                        65


EXHIBITS: DESCRIPTION                            IDENTIFIED

None.

## S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED TO, by and between the parties and their respective attorneys, that all objections, except as to the form of the questions, shall be reserved until the time of trial; that the filing of the deposition be waived; and, that the witness may read and sign the deposition, under pains and penalties of perjury, without a Notary Public being present.

P R O C E E D I N G S

(9:43 p.m.)

MS. COTTRELL:  You've been through the drill, so you know if I ask a question that makes no sense to you, let me know and I'll phrase it another way.

THE WITNESS:  Okay.

MS. COTTRELL:  Would you state your name for the record, please?

THE WITNESS:  My name is Cynthia DeCaire.

MS. COTTRELL:  And how are you employed?

THE WITNESS:  By the US Marshals Service, the Department of Justice.

MS. COTTRELL:  How long have you been employed by the marshal service?

COURT REPORTER:  Do you want me to swear her in?

MS. COTTRELL:  Oh, I'm sorry.

Whereupon,

CYNTHIA A. DECAIRE

was called as a witness and, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. COTTRELL:

Q    How long have you been employed by the marshal service?

A    Since 1991 -- June of 1991.

*APEX Reporting*
(617) 426-3077

1    Q    And when you came on board with the marshal

2    service, where were you first assigned?

3    A    To Boston, Massachusetts.

4    Q    Is Boston a main office with sub-offices?

5    A    Correct.

6    Q    And during your assignment in June of 1991, were

7    you assigned to Boston or to one of the sub-offices?

8    A    To Boston, the Boston office.

9    Q    And at that time, in June 1991, what were your

10   duties and responsibilities, please?

11   A    I was assigned to court operations when I first

12   came on, and I did prisoner transportation and I served

13   process.  I did not work investigations right away when I

14   first came on the job.

15   Q    Subsequent to June 1991, did you work in an office

16   outside of Boston or in another district?

17   A    No.

18   Q    So you've always been assigned to Boston,

19   specifically, and not to a sub-office?

20   A    There was a time when I was an acting supervisor

21   in the Worcester office.

22   Q    And when was that?

23   A    And that was in June to October, I believe, of

24   2001.

25   Q    How did that assignment come about?

1      A    I had asked Chief Bane to consider me for that

2   position.

3      Q    In June of 1991 when you first started with the

4   Marshal Service in Boston, where were you residing?

5      A    I believe I was in Boylston, Massachusetts.

6      Q    And did there come a time when you left Boylston

7   for another location?

8      A    Yes.

9      Q    And when was that?

10      A    I would say, well, I guess I was maybe there for a

11   year and then I moved to Framingham.

12      Q    When did you move to Framingham?

13      A    I'm -  I'm guessing, I would say around 1992.

14   Sometime in the year 1992.

15      Q    And did you move after that?

16      A    Yes.

17      Q    And where did you move after that?

18      A    I think I was probably there for probably a year.

19   In 1993 I moved to Essex, Massachusetts, where I lived for

20    - it was a -  excuse me, a winter rental, I remember that.

21   It was just a short-term rental.  And after that term was

22   up, I moved to Magnolia, Massachusetts.

23      Q    And was that also in 1993?

24      A    It was either 1993 or 1994, the winter rental --

25   I'm not sure of the exact date, but it was during the

1  winter.  And then after that was up, I moved to Magnolia.

2         Q     And after Magnolia?

3         A     After Magnolia, I moved to Wenham, Massachusetts.

4         Q     Wenham?

5         A     Yep.

6         Q     Would you spell that for me?

7         A     W-E-N-H-A-M.

8         Q     Okay.

9         A     I lived there for, I think, I lived there up until

10 1996, approximately 1996.  And then I bought my first house

11 in Groveland, Massachusetts.

12        Q     In 1996?

13        A     I believe it was 1996.

14        Q     And do you still live there?

15        A     No, I do not.

16        Q     Okay.  After Groveland?

17        A     After Groveland?  1999, I believe, we purchased a

18 house in Northborough, Massachusetts.

19        Q     Are there houses after that or are you still  -

20        A     Oh, yeah.

21        Q     Okay.

22        A     We sold that house.  I moved for a short period of

23 time, I would say for two to three months to Charlton.  And

24 then I purchased my own residence in Sutton, Massachusetts.

25        Q     And when was Sutton, Massachusetts?

1     A    2000, I believe.  The year 2000, 2001, I moved to

2  Sutton.  I stayed in Sutton - well, actually, I'm sorry, it

3  was 2000 because I purchased my next residence in 2001.

4     Q    Okay.

5     A    Which is in Westborough.  And I'm still in

6  Westborough.

7     Q    In the same house?

8     A    Yes.

9     Q    During the time that you were acting supervisor in

10  Worcester, was that a temporary appointment?

11     A    Yes.

12     Q    One of the -  what was it -  a hundred eighty day?

13     A    I think it was a hundred and twenty days.

14     Q    A hundred and twenty day?  And what duties did you

15  perform at that point?

16     A    As a supervisor in the Worcester office, I oversaw

17  daily operations, court hearings, bringing -  producing

18  prisoners into court, assigning other deputies to different

19  tasks, whether it be court operations, investigations,

20  prisoner transportation.  I was in charge of security of the

21  courthouse itself.  And the fugitive program.

22     Q    Were you also doing investigations at this time?

23     A    Well prior to that, I was in the -  assigned to

24  the investigative unit in Boston.

25     Q    Okay.

1     A     But when I was assigned to Worcester, I would

2     participate in investigations.  Yes.

3     Q     Let me work back to Boston for a moment.

4             During the time period after June '91 when you

5     were assigned to Boston, during the time you were in Boston

6     up until you took the acting supervisor's position, what

7     different units were you assigned to within the Boston

8     office?

9     A     I was assigned to the fugitive investigative unit.

10    I was assigned to the asset seizure forfeiture unit.  And I

11    was assigned to the FBI violent fugitive task force.

12    Q     And how did these assignments come about?

13    A     They would just tell me, this is where you're

14    assigned for this duration of time or for this period of

15    time.  It wasn't something that you applied for or anything

16    like that.  It was an assignment given to me by management.

17    Q     At the time that you came to the Boston office in

18    June of 1991, who did management, if you will, consist of?

19    A     At that time?

20    Q     At that time in your sphere.  I don't need to know

21    every  -

22    A     Above?  Okay.

23    Q     -- level of manager.

24    A     Okay.  My direct supervisors were Paul Dunne --

25    Q     Okay.

1    A    -- Alan O'Brian and Steven Stafford.  Those were

2    my direct supervisors.

3    Q    And who was the Marshal at that time?

4    A    When I first came it was Bob Guiney.  And after

5    Bob Guiney was Nancy McGillivray.

6    Q    After October 2001, what was your next assignment

7    with the marshal service?

8    A    I returned back to the fugitive investigative unit

9    in Boston.

10    Q    Now, during the time period between coming on duty

11    in 1991 and taking the assignment in Worcester, was there an

12    occasion -- or were there occasions when you would be

13    detailed to either the Worcester or Springfield office for

14    various  -

15    A    I was never -  well, I wouldn't call it detailed

16    there, but I did work cases out of the Worcester office.  I

17    never really -- maybe once or twice, worked in Springfield.

18    But there were times where I had cases in the Worcester area

19    and would report in and out of the Worcester office.

20    Q    How frequent was that?

21    A    There was a time when I was there for several

22    months, working out of that office.  And then sporadically

23    here and there, if they needed help with cases or if I may

24    be assigned a, you know, it's called a collateral lead when

25    another office sends a case up, I might be assigned that

1    case and it is in the Worcester area.

2        Q    Were you employed prior to coming on board with

3    the Marshal Service?

4        A    Did I have employment?  Yes.

5        Q    And what did you do?

6        A    I worked for the Department of Correction -  the

7    Massachusetts Department of Correction.

8        Q    And how long were you there?

9        A    I was there for approximately a year.

10       Q    And during your time -  well, did you work prior

11   to the Department of Corrections?

12       A    Yeah, I had -  I wouldn't say career jobs, but I

13   waitressed.  I did some waitressing.  I worked in loss

14   prevention for TJ Maxx Company for several years.

15       Q    And during your time with the Massachusetts

16   Department of Corrections or with the US Marshal Service,

17   excepting for the moment the present grievances that led to

18   the complaint that we're dealing with here?

19       A    Yes?

20       Q    Did you have occasion to file any other grievances

21   or EEO related complaints?

22       A    I did file an informal EEO grievance.

23       Q    And when was that?

24       A    That was in, I would say, 2000, in the year 2000.

25   It could -- quite possibly could have been 2001.  I'm not

1    sure of the exact...

2        Q    And what was the nature of that complaint?  That

3    was the US Marshal Service?

4        A    The US Marshal Service.

5        Q    What was the nature of that grievance?

6        A    I filed a grievance against my supervisor in the

7    warrant investigative unit.

8        Q    And who was the supervisor?

9        A    Tony Visalli.

10       Q    And the nature of the complaint?

11       A    The nature of the complaint was discrimination.

12   Do you want me to tell you what happened?

13       Q    Yes, please?

14       A    Okay.  There was to be a DEA roundup over the

15   weekend, I believe it may have been on a Friday and he was

16   talking about the roundup that was going to happen over the

17   weekend.  He was having this conversation openly in the

18   squad room, in the warrant squad room.  And he was looking

19   for volunteers to work for the weekend, work the roundup.  I

20   volunteered for the roundup and he told me that the DEA

21   didn't want any women -- "girls," I think he specifically

22   said, to participate in the roundup.

23            I asked him what he meant by that, and he said

24   that these are really bad guys and they just wanted the

25   heavy-hitters to go and they didn't want any women.  The

1    conversation kind of went on for a little bit about the

2    nature of how bad these guys were and, thanks anyway, but I

3    was not to participate.  And I filed a complaint.

4         Q    And you filed that complaint with?

5         A    With the US Marshal Service EEO.

6         Q    Did you report this to any of your supervisors or

7    Deputy Visalli's supervisors?

8         A    I don't recall --

9              MS. TALWANI:  Objection as to time frame.  Are you

10   talking about before filing the EEO complaint?

11             BY MS. COTTRELL:

12        Q    Before filing the EEO grievance?

13        A    Before I filed it, no.  I don't believe I did.

14        Q    And what was the resolution?

15        A    It was informal.  I didn't really know a lot about

16   the process and I just had sent an email to the EEO person

17   at the time.  And he sent an email back saying that he

18   received it.  And then Paul Durette, who was Tony Visalli's

19   supervisor, the assistant chief, called me into the office

20   and I'm not really sure how he had found out about it, but

21   he asked if we could talk about it.

22             And I said, "Sure."  And we talked about it.  And

23   he asked me if we could, you know, bring Tony in, sit down,

24   talk about this, try and resolve this.  And that's what we

25   did.  He brought Tony in and we talked about the way I had

1    been treated and - and it was, it was a little bit more

2    than I guess just that incident, it had been the cases that

3    he had been assigning to me at time too.  He'd been giving

4    me kind of the easy, non-violent type of cases.

5           So we discussed that and this incident and he said

6    that he would, you know, it was wrong what he did and he

7    apologized and let's try to move on.  And that's what we

8    did.

9       Q    Okay.  And aside from that informal EEO grievance,

10   any other filings or --

11      A    No.

12      Q    -- complaints, during your time with the Marshal

13   Service or with the Massachusetts Department of Corrections?

14           MS. TALWANI:  My clarification is any other

15   filings by Deputy DeCaire or any other  -

16           MS. COTTRELL:  By Deputy DeCaire?

17           MS. TALWANI:  Okay.

18           THE WITNESS:  No.

19           BY MS. COTTRELL:

20      Q    After you returned to the fugitive squad in 2001,

21   what was your next assignment?

22      A    I remained in the fugitive unit.  I, at some

23   point, became a team leader of the fugitive unit and I don't

24   know the exact date, but I remained there.

25      Q    Now, at some point you were transferred from the

1  fugitive unit?

2      A    Correct.

3      Q    And when was that?

4      A    That was in September of 2002.

5      Q    And how did that come about?

6      A    Marshal Dichio transferred me there.

7      Q    Where was, "there"?

8      A    To Worcester, sorry.

9      Q    And what is your understanding of how that

10 transfer came about?

11     A    My understanding is that Marshal Dichio thought it

12 was the best place for me to be and so he transferred me

13 there.

14     Q    After you reported to Worcester -  well, did you

15 report to Worcester in September 2002?

16     A    Yes, I did.

17     Q    And after you reported there in September, how

18 long did you remain in the Worcester office?

19     A    Until February of 2003.

20     Q    While you were in the Worcester office, what

21 duties and responsibilities did you have?

22     A    Court operations, which consisted of bringing

23 defendants into court, transporting defendants back and

24 forth to court, processing prisoners, serving process.  I

25 don't believe I had any investigative cases assigned to me

17

1    at that time.

2        Q    And after February 2003?

3        A    I was assigned to Boston.

4        Q    And what is your understanding of how that

5    assignment came about?

6        A    That's where Marshal Dichio wanted me to be at

7    that time.  There was an email that was put out that I would

8    be replacing an O82 deputy, Jamie Viador.

9        Q    And have you remained in Boston since February

10   2003?

11       A    No.

12       Q    When was your next reassignment?

13       A    October 2003.

14       Q    What was that reassignment?

15       A    To Worcester.

16       Q    And did you assume the duties that you had been

17   performing on your previous  -

18       A    Yes.

19       Q    -- tour in Worcester?

20       A    Yes.

21       Q    How long did that last?

22       A    November 2003.

23       Q    And you were reassigned at that point?

24       A    To Worcester, Springfield, and Boston.

25       Q    And that lasted for how long?

18

1      A    I don't believe it ever took - that was what I

2  was told that I was to do, but I don't - that never

3  happened, I never went to all three offices.

4         Then I was assigned, you know, during that same

5  time, it changed to Worcester and Boston.  And that lasted

6  until, I think, January of 2004.  And then I was to just

7  Boston.

8      Q    And do you remain in Boston?

9      A    Until --

10     Q    You remained in Boston until when?

11     A    Until sometime in March in that same year.  And

12  then I went out on maternity leave.

13     Q    How long were you out?

14     A    I returned in September of '04 to Worcester.

15     Q    At the time that you went out on maternity leave

16  in March of '04, was it your understanding that you would be

17  returning to Worcester when you came back on duty or was

18  that an open issue?

19     A    It was an open issue.  I wasn't sure.

20     Q    And after September '04 - did you actually return

21  to Worcester?

22     A    Yes.

23     Q    And after September '04?

24     A    I've been in Worcester ever since.

25     Q    Okay.  Now, are the assignments we discussed your

19

1  duty station for record or where you were physically working

2  or is it one and the same?

3          MS. TALWANI:  Objection.

4          THE WITNESS:  I don't know.  Sorry.

5          MS. TALWANI:  Go ahead.

6          THE WITNESS:  I don't know.

7          BY MS. COTTRELL:

8      Q    Did you receive an SF-50 for any of these

9  reassignments?

10         MS. TALWANI:  Are you talking about through the

11  discovery process or --

12         MS. COTTRELL:  No.

13         MS. TALWANI:  -- in the normal course of business?

14         MS. COTTRELL:  In the normal course of her

15  business?

16         THE WITNESS:  No.

17         BY MS. COTTRELL:

18     Q    So the assignments that we're talking about is

19  where you were physically located  -

20     A    Correct.

21     Q    -- during those periods of time?

22     A    Correct.

23     Q    Okay.  Now after your experience with Deputy

24  Visalli was resolved, when did you next feel that you were

25  the subject of discrimination?

1    A    In 2003 -- near 2003, when I was put on the

2  rotation to rotate back and forth to...

3    Q    Okay.  And what caused you to feel that that was

4  discrimination as opposed to just the normal course of duty

5  assignments?

6    A    It was, I guess a totality of the circumstances

7  that happened prior to that.  And it was that Sue Williams

8  and I -  the two women in the office, were the ones to be

9  chosen for that assignment, and the males were left out of

10  that assignment.

11    Q    Did you discuss that with any of your supervisors?

12    A    I -- at the time, I was told to do it.  I did

13  discuss it with Supervisor Bezanson.

14    Q    Who told you to discuss it with Supervisor

15  Bezanson?

16    A    Who told me to discuss it?  Nobody.

17    Q    Oh, okay.  I misheard you then, I'm sorry.  And

18  what was the -  did you have a conversation with him?

19    A    Yes.

20    Q    What was the substance of that conversation?

21    A    It wasn't alone -  I was not alone with him at the

22  time, it was when he had told Sue Williams and myself that

23  we were going to Boston.  So, present was Sue Williams,

24  myself, and Kevin Wahl.  And during this, you know, mixed

25  conversation, I told him I thought it was wrong that just

1    Sue and I had to do this.

2        Q    Did you suggest to him that it might be gender

3    based?

4        A    Yes.

5        Q    And what was his response?

6        A    He said that it was management's decision and that

7    we should just keep quiet and go.  And hopefully it wouldn't

8    last very long he said.

9        Q    When did this 2003 rotation begin?

10       A    It began in -  sometime in January, towards the

11   end of January.

12       Q    After your conversation -- the joint conversation

13   with Supervisor Bezanson, did you raise the issue with any

14   other management staff?

15            MS. TALWANI:  At any time?

16            BY MS. COTTRELL:

17       Q    Well, approximate to the rotation?

18       A    During the rotation, no.  When I got transferred

19   back because the rotation never really took place, at least

20   on my part  -

21       Q    Okay.

22       A    -- so after the conversation I had with Tom, I had

23   called in sick the following day and I was on vacation for a

24   week, so.  And that was the end of the rotation, so during

25   that time, no.

1    Q    So the rotation was only to last for a  -

2    A    The rotation was to go on until -- I don't know

3 when, but it didn't end up working that way.

4    Q    How long did the rotation period turn out to be?

5    A    When I came back from vacation, I was transferred

6 to Boston, so it never -  I think Sue went for a week and

7 then that was it.

8    Q    Now in February 2003, you went to Boston, correct?

9    A    Correct.

10    Q    And where were you assigned at that point?

11    A    I was assigned to court operations.

12    Q    And what did you do there?

13    A    I went to court, brought -  produced prisoners to

14 the court, some transportation -  some prisoner

15 transportation.  That was the majority of my work was to go

16 back and forth to court.

17    Q    And at the time that you were in court operations

18 in February 2003, how many other deputies were working in

19 court operations as well?

20    A    Maybe 1811 deputies?  Or  -

21    Q    Well, you can break it down for me.

22    A    Okay.  I would say maybe three, I'm approximating,

23 maybe three 1811 deputies, and the rest were O82 deputies.

24 And I would say -  I'm not even sure, maybe ten to fifteen,

25 somewhere in that.

1    Q    And who supervised court operations at that time?

2    A    Walter Doherty.

3    Q    Now did there come a time when you put in a bid

4  for a supervisory position?

5    A    For acting?

6    Q    An acting position or a permanent position?

7    A    Can you give me a time frame?  You mean after

8  that?

9    Q    Well  -

10    A    Or in general?

11    Q    -- in general, during your career with the Marshal

12  Service in Boston --

13    A    Right.

14    Q    -- have you had occasion to make known that you

15  were interested in a supervisory position?

16    A    Yes.

17    Q    And the first position that you obtained was the

18  acting position in Worcester, correct?

19    A    Correct.

20    Q    After that, when did you next  -

21    A    I applied for a supervisor's position in the

22  District of New Hampshire.

23    Q    When was that?

24    A    It was -  I would say 2001.

25    Q    And was that for a particular squad or a

1    particular  -

2        A    No.  They only have one supervisor in the District

3    of New Hampshire.

4        Q    And did you interview for that position?

5        A    No I did not.

6        Q    And after that position, did you apply for other

7    supervisory?

8        A    I applied for the electronic surveillance unit

9    which is not a supervisor, but it's a promotional --

10        Q    Okay.

11        A    -- a promotional position.

12        Q    When was that?

13        A    I believe, maybe the end of 2-  I'm sorry, maybe

14    the end of 2002, towards the beginning of 2003.

15        Q    And what was the result of that application?

16        A    I had made the top five and that was it.  They

17    didn't have an interview process at that time and I was not

18    selected for that.

19        Q    And was that in the District of Massachusetts?

20        A    Correct.

21        Q    Who was selected for that position?

22        A    Tony Visalli.

23        Q    And after the electronics supervisor position?

24            MS. TALWANI:  I think it was electronic

25    surveillance supervisor.

1          MS. COTTRELL:  Surveillance.

2          THE WITNESS:  I applied for acting positions.

3          BY MS. COTTRELL:

4      Q    Okay.  And those are the one hundred twenty day

5  appointments?

6      A    Correct.

7      Q    And which ones did you apply for?

8      A    I applied for the acting supervisor of court

9  operations when Walter Doherty left and that was in early

10  2003, spring of 2003.  Do you want me to keep going?

11     Q    Yes, please.

12     A    Okay.  I applied for a warrant coordinator

13  position, same time frame, spring of 2003.  I then applied

14  - asked to be considered, for acting supervisor of court

15  operations, again, in August or September of 2003.  And I

16  applied for the position of judicial security inspector in,

17  I believe it was December of 2004 or January 2005.  I

18  believe that's it.

19     Q    With regard to the one hundred twenty day

20  appointments, and specifically the four that we just -- that

21  you just mentioned  -

22     A    Yes.

23          MS. TALWANI:  Assumes --

24          MS. COTTRELL:  Court operations, warrant

25  coordinator, court operations, judicial security.

1    MS. TALWANI:  Warrant coordinator wasn't a hundred
2   and twenty day position  -
3    THE WITNESS:  No.
4    MS. TALWANI:  -- and the judicial security wasn't
5   a hundred and twenty day position  -
6    THE WITNESS:  Correct.
7    MS. TALWANI:  -- only the two acting supervisors.
8    MS. COTTRELL:  Okay.  Well this leads me into the
9   question.
10    BY MS. COTTRELL:
11    Q    You mentioned with regard to the second court
12   operations position that you asked to be considered?
13    A    Correct.
14    Q    In other instances, you say you applied.  Would
15   you go through the process of applying for each of these
16   positions, what you were required to do?
17    A    Sure.  The acting positions, you're not required
18   to really do anything but inquire or ask to be considered.
19   And that's what I did for those positions for the acting
20   supervisor's position.  And the same for the warrant
21   coordinator, I asked to be considered for that position.
22   It's not a hundred and twenty day position, it's just a
23   different position in the office.
24    The electronic surveillance unit, the supervisor
25   position in New Hampshire, and the judicial security

1    inspector, those were merit promotion, permanent promotion

2    opportunities that you apply for.  And that's through

3    headquarters where you submit different applications to be

4    considered for those positions.

5        Q    So is it - well, are the merit promotion

6    positions selected out of headquarters or out of the

7    district?

8            MS. TALWANI:  Objection, go on and answer.

9        A    I'm not really sure.  I think it might be a

10   combination of both, and it depends on if the position is a

11   headquarters position or if it is a position that is

12   governed, so to speak, by the district, if you're in their

13   chain of command.

14       Q    Okay.

15       A    It's still unclear to me how it actually happens.

16       Q    With regard to the one hundred twenty day

17   temporary promotions that you asked to be considered for, do

18   you know whether you were considered for those positions?

19       A    No I don't.

20       Q    Who was selected for the court operations

21   position?

22       A    The first one?  Allison --

23       Q    The first one, I'm sorry.

24       A    Allison Hodgkins.

25       Q    Who was selected for the second?

1      A    Allison Hodgkins.

2      Q    With regard to the one hundred twenty day
3  appointments, are these paid positions -- is there an
4  increase in pay involved?

5      A    Sometimes there is and sometimes there is not.

6      Q    And do you know whether there was an increase in
7  pay involved with either or both of the one hundred day
8  court operations positions that you expressed interest in?

9      A    No I do not.

10     Q    Do you know whether there was an increase in pay
11 with regard to the warrant coordinator position that you
12 applied for in the spring of 2003?

13     A    No there is not.

14     Q    During the time that you made application for or
15 expressed interest in these various positions in 2003, the
16 court operations position both times and the warrant
17 coordinator's position, did you speak with your supervisor
18 regarding your interest in the position?

19     A    I don't recall.  I know that the second time I
20 probably did not, because I would be kind of competing with
21 her for the position because she was   -

22     Q    And "her" being Allison Hodgkins?

23     A    Right.  Because she was acting at the time, so it
24 wouldn't have been something I would have done.  I may
25 spoken to Walter Doherty about it before he left, I don't

1    recall.  But when he left, I didn't have a supervisor.  So I

2    emailed up the -  kind of up the chain of command at the

3    time, to express my interest in it because the supervisor

4    had already gone, I believe, at that time he was gone.

5        Q    So then when you emailed up the chain of command,

6    specifically do you recall who you emailed?

7        A    I believe I -  well, I believe the first time it

8    was Dave Dimmitt, who was the acting chief at the time.

9    And, well -- and maybe I addressed it to Dave Taylor and

10   cc'd it to Dave Dimmitt.

11       Q    Okay.

12       A    I know that I  -

13       Q    What was Dave Taylor's position?  I'm sorry.

14       A    He was the acting assistant chief at that time, I

15   believe, during the first one.  I think.  I'm not positive.

16       Q    On a day to day basis during 2003, what

17   interaction, if any, would you have with either Dave Taylor

18   or Dave Dimmitt?

19       A    Not much because I would be in court.  I wouldn't

20   be in the office for any long duration of time.

21       Q    You said a little earlier that you first started

22   feeling that there may be some gender bias when males were

23   left out of the January 2003 rotation.  Were there other

24   instances or other experiences that contributed to your

25   conclusion that you were being discriminated against?

30

1    A    Yes.

2    Q    And specifically what were they?

3    A    The conversations that I had with Marshal Dichio.

4    Q    Do you recall how many conversations you had with

5  the marshal?

6    A    That made me feel that he was -  total

7  conversations or that made me feel  -

8    Q    Total conversations.

9    A    -- like I -

10    Q    Total conversations, we'll start there.

11    A    Total conversations?  I've only maybe had three or

12  four conversations with Marshal Dichio.

13    Q    And of that three or four total conversations, how

14  many of them left you feeling that  -

15    A    There were two that --

16    Q    -- there was bias?

17    A    There were two that made me feel that there may be

18  some bias.

19    Q    What was the first one?

20    A    The first one was my very first conversation that

21  I had with him, what he called our one-on-one interviews

22  when he first came on in late August of 2002.

23    Q    And did you meet with him in August of 2002?

24    A    I believe it was late August of 2002, yes.

25    Q    And what was the substance of that conversation?

*APEX Reporting*
(617) 426-3077

1   A   The marshal introduced himself to me, told me a

2   little bit about his background in law enforcement. And

3   then he questioned me about - questioned me how long I had

4   been on the job, and then he had a list of deputies or a

5   list of people which included - which consisted of deputy

6   US Marshals. And he went down and he asked me my opinion of

7   some of them.

8        And then he asked me why I did not - if I ever

9   wanted to be in the Worcester office, why I did not want to

10  be at the - why I did not want to be in the Worcester

11  office. And I explained to him how it - how the Worcester

12  office came to be, and who had been there, and kind of the

13  chronology of who had come and gone from the Worcester

14  office. And explained to him the importance of my position

15  here in Boston and how I had ascertained that position.

16       And Marshal Dichio kept on asking me why. He

17  could not understand why I would not prefer to be in the

18  Worcester office, closer to my family. He went on to

19  question me about money, if it was a money issue, if I was

20  making more money here in Boston, would I lose money if I

21  went to Worcester.

22       I explained to him that, no, unless it was a

23  promotion, that there is no money involved. He still

24  couldn't understand why I would not want to be there. And I

25  explained to him the difference in the positions that I held

1    here and the positions that there were in the Worcester

2    office.

3        Q    Specifically, what did you tell him about the

4    Worcester office?  How it came to be?

5        A    I had told him that the Worcester office opened up

6    -- I probably gave him an approximation because I don't

7    remember to this day exactly when it did open, I think it

8    was maybe 1993, 1994, somewhere around there where the

9    Worcester office actually opened.

10            And that Dave Taylor was sent out there because

11   it, you know, there wasn't an active court yet, they were

12   still in the progress of -  process, excuse me, of getting

13   it up and running.

14            And then Kevin Wahl was assigned out there shortly

15   thereafter to help Dave.  And then they asked if anybody was

16   interested in going out to the Worcester office.  And I did

17   express my interest that I would be interested in going to

18   the Worcester office.  And  -

19       Q    When was that?

20       A    That was in 1994, 1995.  And Sue Williams was

21   selected to go at the time, they told me it was based on

22   seniority.  So she went.  And then -- excuse me, then I

23   believe Leo Rosetti was assigned there sometime in 2000

24   maybe.  And I believe that that was for punishment that he

25   was assigned there.

1      Q     What leads you to believe that?

2      A     General talk around the office.  Everybody knew of

3   the incident that occurred that caused him to be assigned

4   there.  I have no evidence of it, but that was just what

5   everybody had said it was -  he was there to be separated

6   from another deputy.

7          And then Steve McKierney was sent out there,

8   again, I believed it was for a punishment based on incidents

9   that had happened in the office at the time.  And I did not

10  have  - he asked me what the incidents were and I didn't

11  really know.  I knew that it was conversations that were

12  heard or not heard, incidents that had happened that I

13  wasn't involved in.  I didn't really have much knowledge of.

14         And that's what I explained to him was the

15  breakdown of the Worcester office as far as, you know, who

16  was assigned there at what points in time.

17         And -- I forgot what your question was?

18     Q     Well, you've answered it.

19     A     Okay.

20     Q     In your experience, what is it about the Worcester

21  office that would constitute punishment to be assigned

22  there?

23     A     I think it was a distance for them to travel.  I

24  think that was probably the number one factor was the

25  distance.  And my personal opinion?

1      Q      Yes.

2      A      It's boring.  I think it was more the commute that

3  they would have endure that it would be considered

4  punishment.

5      Q      How did the first conversation with the marshal

6  end?  Did he give any indication of what he was going to do

7  or any changes he was going to make?

8      A      Yeah, he really truly believed that I should be in

9  the Worcester office and that's pretty much where it ended.

10  I attempted to explain to him the difference in my position

11  and the positions that are out there.

12      Q      And the position you were in at the time was what?

13      A      I was the team leader of the investigative unit.

14      Q      And what was the second conversation that you

15  mentioned?

16      A      The second conversation -- he had called me into

17  his office after he had assigned Mark Lewis to the HIDTA

18  task force in the Worcester office.  And he was upset that I

19  was upset and that other people in the office were upset.

20  And he kind of accused me of upsetting the office.  And I

21  tried to explain to him that it had nothing to do with me,

22  the reason why everybody was upset, whether I was interested

23  in that position or not, people were going to be upset over

24  his selection.

25              And he told me that he still intended on putting

1    me in Worcester and that I was going to be assigned to court

2    operations.  And I told him that I did not want to go, I

3    wished to just be left alone, to stay where I was, I did not

4    want to go.  He told me I would make him look like a fool if

5    I didn't go.  He needed somebody to go out there because he

6    wanted to bring Steve McKierney back here.

7           And he said to me that if I remained here he could

8    not guarantee me that I would remain in the position that

9    I'm in.  And he said, so you might as well just go to court

10   in Worcester, or you're going to end up in court in Boston

11   anyway.  And I said, fine.

12       Q    How did you interpret his statement that he would

13   look like a fool if you weren't assigned to Worcester?

14       A    I interpreted it that he thought that he looked

15   like a fool already and he did.  And I think he  -

16       Q    Based on?

17       A    Based on the decision that he made to send Mark

18   Lewis to the investigative position.  There was kind of an

19   uproar in the office about it.

20       Q    Did you have occasion to discuss the marshal's

21   comments to you during either of these conversations with

22   anyone else on the management staff?

23       A    In management?

24       Q    Yes.

25       A    I - yeah.  I discussed -  I know right after I

1   left his office, the second conversation, I went into my

2   supervisor's office, Tony Visalli, and Jeff Bohn was in

3   there, and discussed with the two of them what the marshal

4   had just told me.

5        Q    What about the first conversation?

6        A    In management, right after it happened -- yes I

7   did.  Not -  I'm sorry, not -  maybe a few days after I

8   talked to him, I talked to Paul Durette about it.

9        Q    And what was the substance of that conversation?

10       A    Paul had called me into his office after he

11  learned that the marshal had intended to send me to

12  Worcester.  And Paul questioned me why I had never come to

13  him with this issue and I told him that I did not   -

14       Q    What issue was that?

15       A    -- going to Worcester.  How come I didn't ask him

16  if I wanted to go to the Worcester office.

17            And I explained to Paul that I did not ask the

18  marshal to go to the Worcester office.  That he insisted

19  that I go there.  And I said to Paul, can you bring the

20  marshal in here right now so we can discuss this?  I kind of

21  felt like Paul didn't believe me when we were talking.  And

22  I said to him, let's, you know, please if you don't believe,

23  call the marshal in here right now.  I did not ask for this.

24            Paul was a little upset that I did not go through

25  my chain of command at the time.  And I explained to him,

1    again, that I did not ask for this, this is something that

2    Marshal Dichio approached me with.  And I explained to him

3    the nature of our conversation - the one-on-one

4    conversation that we had and what we talked about.

5        Q    Did you ever approach the chief deputy about

6    either conversation?

7        A    Yes, I believe I did.  I don't - he may have

8    approached me.  I don't think I sought him out.

9        Q    And that would have been Chief Dimmitt?

10        A    No, that would have been Tim Bane, Chief Bane.

11        Q    Chief Bane?  And this was the first conversation?

12        A    I don't know if I discussed the first conversation

13    with Chief Bane.  I know I talked to Assistant Chief Durette

14    about it, but not Chief Bane.

15        Q    What did you discuss with Chief Bane then about

16    the second conversation?

17        A    I think it was the - may have been the intent to

18    send me out there.  It might have been that I talked to

19    Chief Bane in-between the first conversation.  I really

20    can't recall.  I know that I had conversations with him

21    about the marshal's intent, or it might have been after the

22    second conversation, I'm not really sure.

23        Q    Did you ever express to Chief Bane your feeling

24    that you were being discriminated against?

25        A    Yes.  And that wasn't to mainly do with the

1   conversations, that was to do with the transfer itself, when

2   it happened.

3          Q    To Worcester?

4          A    Yeah, because it wasn't the way it -  the way it

5   happened was, that I recall, was that I was on the street  -

6   well, I had the conversation with Paul Durette.  And then I

7   believe I was on the street working maybe a day or two after

8   that, and I was called by -  I don't even remember who, and

9   I was told that I was being transferred.

10          And then maybe the following day I was told, no,

11   you're not being transferred.  And I believe at that time  -

12   during that time, the investigative position had opened up

13   in the Worcester office and I had expressed my interest in

14   that investigative position.

15          And that's when I had explained to the -  and when

16   I was told that, no you're not going to -  you're not going

17   to get the -  you're not going to be considered for that,

18   you're not going to get that, that is when I expressed my

19   opinion that they were taking a sexist view on who would be

20   selected for that position.

21          Q    How long after your very first conversation with

22   the marshal did the conversation about the Lewis assignment

23   take place?

24          A    You mean the time span between the first and

25   second conversations?

1      Q    Yes.  Well, there were three total -- three or

2  four total conversations, so I want to be specific  -

3      A    Okay.

4      Q    -- between the very first conversation with the

5  marshal --

6      A    That I had with the marshal, okay.

7      Q    -- and your conversation where you spoke of the

8  Lewis transfer?

9      A    Okay, what is the time in-between that?

10      Q    In-between those two conversations?

11          MS. TALWANI:  And you're talking now the

12  conversation about the Lewis transfer that she had with the

13  marshal or the conversation  -

14          MS. COTTRELL:  With the marshal?

15          MS. TALWANI:  -- about the Lewis transfer with

16  Bane?

17          MS. COTTRELL:  With the marshal?

18          THE WITNESS:  I have to guess.  Maybe a week?

19          BY MS. COTTRELL:

20      Q    And how long after the Lewis transfer conversation

21  with the marshal did the warrant coordinator position come

22  open?

23      A    Oh, how much time?

24      Q    Right.

25      A    Well, that conversation about the Lewis transfer

1    happened in late 2002, and the warrant coordinator position

2    opened up in April of 2003, I believe.

3        Q    And at this point, you were willing to go back to

4    Worcester?

5            MS. TALWANI:  At which point?

6            BY MS. COTTRELL:

7        Q    In April 2003, when the warrant coordinator

8    position opened up?

9        A    That position was in Boston.  And I was in Boston.

10       Q    After the warrant coordinator - well, after April

11   2003, when was the next time you expressed interest in a

12   position?

13       A    That would be the acting supervisor again of court

14   operations.  And I think I may have missed one in-between

15   our first conversation, there was another warrant

16   coordinator that opened up in, I believe it was August or

17   September of 2003.  That position opened up again and I

18   requested that.  I think I left that out when you very first

19   asked me what I had asked for.

20       Q    And that warrant coordinator position was in

21   Boston?

22       A    That was in Boston, in August to September of

23   2003.

24       Q    Who did you speak to about the acting supervisor's

25   position in court operations?

1      A     I emailed, I believe, again, up the chain of

2   command, Dave Taylor, who was the assistant chief.  And I

3   think Dimmitt was gone then, I think it was Chief Fallon who

4   I cc'd.  Again, Allison being my supervisor at the time, I

5   didn't speak to her about it.

6      Q     And at the time you expressed your interest in

7   that position, did you express to either Dave Taylor or

8   Chief Fallon your feelings regarding potential

9   discrimination?

10      A     No.

11      Q     Aside from the marshal, who else in your

12   estimation has behaved towards you in a discriminatory

13   manner?

14      A     In a discriminatory manner?

15      Q     Right.

16      A     Nobody.

17      Q     Who, within the office after January 2003, have

18   you discussed your assessment that you were being treated in

19   a discriminatory manner with?

20      A     Jeff Bohn.

21      Q     And that's your husband?

22      A     Correct.

23      Q     Who else?

24      A     Sue Williams.

25      Q     Anyone else?

1    A    I don't think so.

2    Q    In October 2003, you had a change of duty station?

3    A    Yes.

4    Q    And how did that come about?

5    A    I was transferred from the Boston office to the

6    Worcester office.  And my supervisor, Paul Dunne, advised me

7    of the transfer.

8    Q    And what were you told about the transfer?

9    A    I was told that it was because Jeff Bohn and

10   myself had been married the previous weekend.  And that now

11   they needed to separate us.  And I was told to pack up my

12   belongings and be out of the office before noon.

13   Q    And who advised you of that?

14   A    Paul Dunne.

15   Q    Aside from Paul Dunne, did you discuss the

16   transfer with anyone else in management or the reasons for

17   the transfer?

18   A    Tom Bezanson, who would be my  - the supervisor

19   that I would be reporting to.

20   Q    And when did you discuss it with him?

21   A    When I got there.

22   Q    When you got there?

23   A    When I got to the Worcester office.

24   Q    And what was the substance of that conversation?

25   A    I asked him if my transfer was permanent.

1       Q       And what were you advised?

2       A       It was what I made of it.

3       Q       Did Bezanson say anything else about the reason

4    for the transfer?

5       A       Not that I recall.

6       Q       And in your estimation, was there another reason

7    for the transfer?  Other than the fact that you and Bohn  -

8       A       I don't know.

9       Q       -- needed to be separated?

10      A       I don't know.

11      Q       Am I correct that that lasted for about a month

12   before you were transferred again?

13      A       Correct.

14      Q       And how did the November reassignments come about?

15      A       I advised my supervisor that I was pregnant.

16      Q       And your supervisor at the time?

17      A       Tom Bezanson.  And that I wanted to go on limited

18   duty.

19      Q       And once you advised Bezanson that you wanted

20   limited duty, were you granted limited duty?

21      A       Yes.

22      Q       Or placed on limited duty status?

23      A       Yeah.  He asked me to get a doctor's note.

24   There's a form that we have to fill out for limited duty.

25   And he asked me to have my doctor fill out that form.

1    Q    And what sort of limited duty assignments were you

2    given to perform?

3    A    At that time?

4    Q    Yes.

5    A    I believe he gave me process.  I think I might

6    have done some filing things and worked the monitors.  It

7    wasn't a long period of time that I was there on the office

8    on limited duty.

9    Q    And at some point in time, your limited duty

10    station changed?

11    A    Yeah, it was several days -- I can't remember the,

12    I believe it to be several days after I advised him that,

13    you know, that I was pregnant, that then it changed.  The

14    chief had sent a letter for me to sign off on that I would

15    be assigned to three different offices for the duration of

16    my limited duty.

17    Q    And did the chief give you a reason for that?

18    A    He gave me a letter that stated his reasoning for

19    it.  I believe that had stated it in the letter.

20    Q    And what was your understanding of why three

21    offices were being utilized rather than one?

22    A    My understanding?  I didn't really understand -  I

23    didn't understand why it was.  That was just where he wanted

24    me -  that was what my assignment was to be.  I really

25    didn't have an understanding of it.  Other than I would work

1    in the control room in Boston when I was assigned to Boston,

2    there was no specific understanding to me why.

3         Q    Now how long did you spend in the control room at

4    Boston?

5         A    Initially?

6         Q    Well, we'll start with initially?

7         A    Initially I was in the control room in Boston I

8    think three days a week.

9         Q    And at some point did that schedule change?

10        A    It changed to five days a week.

11        Q    And when was that?

12        A    That was in -- I think, it was January of 2004.

13        Q    And what were you told about the reason for that

14   change?

15        A    I had a conversation with Tom Bezanson, my

16   supervisor at the time, that he was upset that I had

17   responded to the chief on an email and I did not cc: him.

18   And it was a telephone  -

19        Q    Responded to the chief on an email?

20        A    Right.

21        Q    What was that?

22        A    The chief had asked me to update him on the

23   automated external defibrillator program, what was happening

24   with the program.  And I responded to him how it was

25   difficult for me to get the resources that I needed to get

1    up to speed on this program.

2            I needed to get equipment and stuff out of the

3    Worcester office and bring it to the Boston office and that

4    I did not have a phone or an extension to receive phone

5    calls and communications, a computer and so on and so forth,

6    to get this program where it should be.  And I was giving

7    him the reasons why, which I just stated.

8        Q    Okay.  And as a result of that email you had a

9    talk with Deputy Bezanson?

10       A    Correct.  He called me on the phone and was upset

11   that I did not cc: him this email.  And told me that I had

12   broken his rules and what do I have to say for myself.  I

13   explained to Tom that I simply didn't see the big deal.  The

14   chief had emailed me directly and I had emailed the chief

15   back directly and I did not see what his major issue was

16   with that.

17           He was yelling at me that that's not a reason, he

18   wanted a reason right now why it was done, and I told him

19   that I did not want to discuss it with him any further, he

20   was acting inappropriately.  And he told me from this point

21   on that I was to stay in Boston five days a week in the

22   control room.  And that I was not allowed in the Worcester

23   office unless it was before or after hours if I needed to

24   get anything out of the office.  And then he also sent me an

25   email stating similar things.

1       Q      How long were you five days a week in the control

2   room?

3       A      Until I left in March.

4       Q      So we're talking approximately?

5       A      Three months.

6       Q      Now to your knowledge, did Bezanson speak with the

7   marshal about his decision to leave you five days a week in

8   the control room?

9       A      I don't know.

10      Q      At the time you were in the control room, did you

11  have a Boston supervisor, a Boston point of contact?

12      A      Yes.

13      Q      Who was that?

14      A      Jeff Bohn and Paul Dunne.

15      Q      Did you discuss Bezanson's decision with either of

16  those individuals?

17      A      I think I actually had three supervisors, Allison

18  Hodgkins was a supervisor too.  In the beginning it was Jeff

19  Bohn  -

20          MS. TALWANI:  Okay, and I'm going to -  well, go

21  ahead.

22          THE WITNESS:  Do you want me to explain to you the

23  three supervisors that I had?

24          MS. COTTRELL:  Sure.

25          THE WITNESS:  In the beginning it was Jeff Bohn.

1    Then it switched to Paul Dunne.  And then Paul Dunne moved

2    to investigations and Allison was my supervisor in the

3    control room.  At that point?

4            BY MS. COTTRELL:

5        Q    Well, at the point of your discussion with Deputy

6    Bezanson, who was your supervisor?

7        A    Allison Hodgkins.

8        Q    And did you discuss your discussions with Bezanson

9    with Allison?

10       A    Yes.

11       Q    And what was the substance of that discussion?

12       A    I believe I discussed it with Allison and Dave

13   Taylor at the same time because I was very upset about the

14   way Tom had treated me.  And if you have a problem with a

15   supervisor, you're supposed to go up your chain of command

16   to the assistant chief and that's what I did.  But I

17   believe, also, I think he had called Allison in to discuss

18   it.

19           And Dave Taylor said pretty much, it's your word

20   against his and he said the conversation didn't happen that

21   way.  And I said, nonetheless, I'm here five days a week.

22   And he said, yes.  And I was concerned about why it had

23   changed again.  And at that time, I think Dave had told

24   Allison, try to give her the time that she needs to get this

25   automated defibrillator program - the whole thing that

1    initiated it, going.

2            And I discussed, I believe, it was during that

3    conversation that I discussed lack of breaks, relief, that

4    sort of thing in the control room itself, how it was a

5    problem.

6        Q    And how was that resolved?

7        A    It wasn't.

8        Q    Did you ever have conversations with Allison

9    Hodgkins about your suspicions that you were being treated

10   in a sexist manner?

11       A    When?  Can I ask you that?

12       Q    Well -  sure.  After January 2003?

13       A    I may have.  I remember having a conversation with

14   her in the control room about unfair treatment.  In

15   particular, that I was assigned now   I was assigned to the

16   Worcester office but I was coming in to work in the Boston

17   office.  And yet when other deputies came in from the

18   Worcester office to work in the Boston office, they were

19   told to come in late, leave early, accommodate themselves

20   because they were coming in to help out in the Boston

21   office.

22           And I didn't feel that it was right.  That wasn't

23   for everybody, just for them.  I thought I was being held to

24   a different set of rules.  And Sue Williams was present at

25   that conversation too, I believe.  But in particular, my EEO

50

1    activity dealing with Marshal Dichio?  No.  I think I had

2    told her at that point though that I felt I was being

3    retaliated against for filing a complaint.  But I never got

4    into the nature of the complaint.

5         Q    Specifically, well, let me start -  when did you

6    file your first EEO complaint?

7         A    On Marshal Dichio?

8         Q    Yes.

9         A    I filed a grievance in January.  And then I

10   filed -- I was told that I was filing it the wrong way and,

11   I believe, still in January, the end of January, that I

12   filed the EEO complaint.

13        Q    Of 2003?

14        A    Of 2003, correct.  I wasn't really sure how to go

15   about it and I think I filed it the wrong way initially.  I

16   filed it with the wrong department.

17        Q    When did you first feel that you were being

18   retaliated against by the marshal?

19        A    When I was told to permanently go back to Boston

20   in February of 2003.

21        Q    And what other retaliatory acts did the marshal

22   take against you?

23        A    That I'm aware of?

24        Q    Um-hm?

25        A    I believe the conversation that he had with Joe

*APEX Reporting*
(617) 426-3077

1  Cummings where he threatened me that I was not going to go

2  anywhere and so on was a retaliatory statement.  I believe

3  the nature of all my comings and goings and transfers to be

4  retaliatory.  The denial of any opportunities to further my

5  career or promote are retaliatory.  The assignments that

6  he's given me, I believe have been retaliatory.

7      Q    Which assignments?

8      A    The assignments in court operations, his first

9  assignment of me to court operations in the Boston office I

10  believe was retaliatory.

11      Q    In what way?

12      A    He was denying me the opportunity to do anything

13  else once I was in there.  My supervisor at the time, Walter

14  Doherty, told me that he was watching me, wanted to know

15  where I was.  I think he put me in there to keep an eye on

16  me.

17      Q    You think he -  who is "he?"

18      A    Marshal Dichio.

19      Q    Okay.

20      A    I believe he's retaliated against my husband to

21  get to me.

22      Q    Let's stick with the assignments for the moment.

23      A    Okay.

24      Q    Outside of not being promoted to temporary

25  supervisory positions, are there other aspects of the court

52

1   operations position or what you are assigned to do within

2   court operations that you feel to be retaliatory?

3       A    No.   I think it would be the lack of opportunity

4   to do anything else.

5       Q    And is that caused by the non-selection for

6   promotion?

7       A    Not only promotion, but to work -  to do anything

8   else, to work investigations, to work out of the warrant

9   unit, to work -  to serve -  work out of the asset seizure

10  unit, to work any other aspect of our job, which is not

11  necessarily a promotion.

12          MS. TALWANI:  At a good point, if we could take a

13  short break?

14          MS. COTTRELL:  This works for me.  You?

15          MS. TALWANI:  Okay.  Ten minutes, five minutes?

16          MS. COTTRELL:  Off the record.

17          (Off the Record.)

18          BY MS. COTTRELL:

19      Q    You mentioned a few minutes ago, that it was your

20  assessment that the marshal has retaliated against your

21  husband because of your having filed a grievance and a

22  complaint.   In what manner do you feel that the marshal has

23  retaliated against your husband?

24      A    In the nature of his assignments.

25      Q    Specifically what?

*APEX Reporting*
(617) 426-3077

1    A    Well, he removed him from the HIDTA task force,

2    and then gave him the assignment of supervising no one.

3    When he became sick, the marshal would perform tests on him,

4    which my husband believed he was just taunting him.  It's

5    the daily treatment that he receives oftentimes, via the

6    marshal, that no other supervisor, to his knowledge, is

7    treated in the same manner.

8    Q    When you say "via the marshal," what do you mean

9    specifically?

10    A    He will be told, the marshal wants this right now,

11    he's upset with you.  Can you get me this right now, the

12    marshal thinks you're slighting him.  The marshal would call

13    him, and he was in charge of the attendance, and it was like

14    an ongoing issue, where's Cindy?  You didn't put her in the

15    attendance correctly.

16          He was focused on myself and where I was and Jeff

17    was in charge of -  it was Jeff's problem, or Jeff's fault

18    that I was incorrectly put on the attendance.  He just

19    seemed to be focusing on the two of us.  You know, it was

20    basically held under a microscope, I guess, is the best way

21    to describe it.

22    Q    Any other specific means of retaliation?

23    A    Well in regards to my, you know, when I said,

24    moving back and forth, being transferred, the transfers

25    themselves, the nature of the transfers themselves, how I

1    was forced to move, you know, within hours I was to pack up

2    my belongings and go.  It was humiliating.  Nobody else in

3    the office ever had to do that.

4            Nobody in the office ever had to do those

5    transfers themselves, but even if you were transferred from

6    one section of the office to the other, you had a week or

7    whatever you needed to do to move your belongings.  Where

8    I'm moving from office to office and I'm given hours to do

9    so.

10       Q    And is it your opinion that that's at the

11   direction of the marshal?

12       A    Yes.

13       Q    Anything else?

14       A    No.

15       Q    During Dave Dimmitt's assignment as acting chief

16   in Boston, what was the nature of your interaction with him

17   on a daily basis?

18       A    On a daily basis -- again, very limited.  I was

19   assigned to court and I spent the majority of my time back

20   and forth in court.  I might see him briefly in the morning,

21   maybe getting a coffee.  Occasionally he would walk through

22   the squad room, say hello to everybody, good morning, how's

23   everybody doing?  And that was basically it.

24       Q    Did you have occasion to discuss your concerns

25   with Acting Chief Dimmitt?

1    A    My concerns about?   Anything?

2    Q    About the manner in which you were being treated?

3    A    No.   I did once ask him about the transfer of

4  manpower issue and that was the only conversation that I had

5  with him.

6    Q    And what was the substance of that conversation?

7    A    Well it was -  he had called a court operation

8  meeting, and had gone through a number of things at that

9  meeting and was addressing manpower issues.  How we had

10  gotten all these new people in and we were getting more.

11  And I asked him if I would be returning -  if it was his

12  intention to return me to Worcester, because I was brought

13  back to Worcester, so they told me for manpower reasons.

14        And would I be going back because they replaced

15  the manpower?  And I think he asked me -  he may have asked

16  me, is that what you want?  And I said, I just want to know

17  what they intend to do.  And he got really upset and said,

18  this is not the time or place to discuss this and I will

19  bring this to the marshal and we'll discuss it further.  And

20  that was it.

21    Q    Do you recall during the meeting that you were

22  just referencing Acting Chief Dimmitt saying in sum or

23  substance not to take on the marshal service?

24    A    Yes.

25    Q    And what was your understanding of that statement?

1    In what context was it made?

2        A    Well, I believe, he at first talked about your

3    reputation in the marshal service and he had talked about

4    the merit promotion process and how it's really your

5    reputation that will get you promoted -- and that's when he,

6    -  it was a very odd conversation, he had talked about that.

7            And he had talked about how he was not happy or

8    did not agree with the way things happened when this marshal

9    came on, the bad publicity that he received, it wasn't fair

10   to this marshal and it didn't matter who the marshal was,

11   that you had to be loyal to the chair no matter who sat in

12   it.

13           And that was when he said, you know, you can't

14   take on the marshal service.  It's been here long before you

15   were here and it will be here long after you're here.  And

16   you can't take on the marshal, the only one that -- he was

17   appointed by the president and the only one that can change

18   that is the president.  How did I interpret that?

19       Q    Um-hm?

20       A    Don't take on the marshal or the marshal service

21   because you're going to ruin your reputation.  I couldn't

22   see anybody else in that meeting that he would be speaking

23   to but me.

24       Q    And were there any further conversations with

25   Acting Chief Dimmitt?

**APEX Reporting**
(617) 426-3077

1     A    No.

2     Q    In 2003, on a daily basis, who within the office

3  would have the best opportunity to evaluate your

4  performance?

5         MS. TALWANI:  Objection.  Go ahead.

6     A    During the whole year?

7     Q    Well, if it changed during the course of the year,

8  you can tell me that.

9     A    Okay.  Let me just think for a minute where I was

10  at what point in the year 2003.  In the beginning of 2003, I

11  was assigned to Worcester, so it would be Tom Bezanson.

12  Well, I guess I was only there for a month in 2003, January.

13  And then Walter Doherty was my supervisor.

14         And then Allison Hodgkins was my acting

15  supervisor, probably until maybe August, I'm guessing.  And

16  then Paul Dunne was my supervisor until October.  And then

17  Tom Bezanson would be my supervisor again in Worcester.  So

18  it's hard to say one particular person.

19     Q    When you made application for the merit promotions

20  that -  one of which would have resulted in transfer to New

21  Hampshire in the electronic surveillance -  no, the judicial

22  security inspector's position?

23     A    Yes.

24     Q    And the electronic surveillance position?

25     A    Yes.

1      Q    What paperwork were you required to complete for

2  those promotions?

3      A    Well you would have -- prior to that, needed to

4  have filed a merit promotion package, and you would also

5  need a test score, you would have to take the merit

6  promotion exam.  They would already have that.  To apply for

7  those particular positions, you would need to fill out -- I

8  don't even think it's a form anymore, I think you just -

9  oh, actually there is.  There is a form to say where you

10 were assigned at what time, what your assignments kind of

11 have been, almost kind of like the chronology that we went

12 through.  I was here this year, there this year, that sort

13 of thing.

14         MS. TALWANI:  I'm just going to put an objection

15 on the record that these documents which relate to her

16 employment, are documents that the Marshal Service should

17 have produced.  And that the Marshal Service is in violation

18 of the court's order in having not produced prior to this

19 deposition.

20         THE WITNESS:  I think, I answered it.

21         BY MS. COTTRELL:

22     Q    An exam, promotion packet, chronology of

23 assignment?

24     A    Right.  And then you would just -  when a position

25 came up, you would just send an email to be considered for

1    merit promotion number such-and-such, where the position is

2    located, and that's pretty much it.

3              I think you also, at one point, needed to hand in

4    your last evaluation and possibly a fit assessment.  That

5    might have changed.  But I do remember having -  for a few

6    of them, having to submit a current fit assessment.

7         Q    And then with the one hundred twenty day positions

8    -

9         A    Yes?

10        Q    -- no paperwork other than an expression of

11   interest was required, am I correct?

12        A    Correct.

13        Q    Do you know who was involved in the selection of

14   individuals to fill the one hundred twenty day assignments

15   that you applied for?

16        A    No I do not.

17        Q    Do you know what the selecting individuals would

18   consider in making that one hundred twenty day assignment?

19             MS. TALWANI:  Objection.  Are you asking about in

20   general or for these particular positions?

21             MS. COTTRELL:  In general?

22             THE WITNESS:  I don't know.

23             MS. COTTRELL:  Okay.  Do you mind if we take a

24   lunch break now?

25             MS. TALWANI:  No, perfect.

60

1          (Whereupon, a luncheon recess was held from 11:45

2   a.m., to 12:30 p.m.)

3                A F T E R N O O N   S E S S I O N

4          BY MS. COTTRELL:

5      Q    What would you consider to be the last retaliatory

6   act performed by the marshal toward you?

7      A    I would say the nature of my transfer -  well,

8   it's hard to say.  The last retaliatory act I guess would be

9   my denial of coming back to work part-time.

10     Q    And when did you make that request?

11     A    I made that request at some point when I was on

12  maternity leave, probably halfway through my maternity

13  leave, I believe.

14     Q    And you went out on maternity leave?

15     A    I went out on maternity leave in March of '04.

16     Q    And came back in September?

17     A    And came back in September of '04.

18     Q    So is it fair to say perhaps July/August time

19  frame?

20     A    Yes.

21     Q    And what was the action on that request?

22     A    It was denied.

23     Q    And who communicated the denial to you?

24     A    Chief Fallon sent me a letter.

25     Q    And did he give you any explanation for the denial

*APEX Reporting*
(617) 426-3077

1  or any reason for the denial?

2      A    I can't recall specifically if it was worded in

3  his letter, what the reason was specifically.  He might have

4  said due to manpower or the schedule -  the busy schedule,

5  something of that nature.

6      Q    In your complaint, you make a request for

7  compensatory damages.  What is it you feel you should be

8  compensated for?

9      A    I feel I should be compensated for positions that

10  I have been denied.  Any future opportunities that I may

11  have in the marshal service.

12      Q    I don't understand what you're saying?

13      A    Because I've been denied so many opportunities and

14  have only been allowed to work in court operations, it's

15  damaged my merit promotion opportunities.

16      Q    In what way has it damaged your merit promotion

17  opportunities?

18      A    Because again, as I explained to you before, we

19  have to submit a package with your experience, your

20  accomplishments, your assignments, where, you know,

21  particular assignments that you've had.

22          And since Marshal Dichio came on, I don't have

23  anything to add into my package.  I have no way of competing

24  with other people who have had the opportunities to do

25  different things.

1      Q    Since you returned from maternity leave, have you

2  applied for other temporary or permanent promotions?

3      A    Yes.

4      Q    And that would be the judicial security inspector

5  position?

6      A    Correct.

7      Q    Do you know where you ranked  -

8      A    No.

9      Q    -- among the applicants for that position?

10     A    No I do not.

11     Q    When you put together your packet for a merit

12  promotion, are you required to submit any forms of

13  endorsement or recommendation?

14     A    Yes.

15     Q    And did you submit that paperwork with your

16  judicial security promotion packet?

17     A    I'm sorry, when you originally submit your merit

18  promotion package, which isn't at the time that you apply

19  for the position, there's a time frame every few years where

20  you submit your merit promotion package, and then you apply

21  for these positions.  You don't have to keep submitting your

22  package  -

23     Q    Okay  -

24     A    -- they already have it.

25     Q    I got it.

1       A    And then they kind of pull it and compare it to

2    everybody else's.

3          So at the time that I submitted that package, your

4    supervisor goes over it and they give  - then they give you

5    an evaluation.  And so that is the evaluation that goes with

6    your merit promotion package.

7          Then when you apply for merit promotion positions,

8    it used to be that they asked for a current evaluation, and

9    I don't believe they ask for that anymore -  for a current

10   evaluation.  So those are the only, I guess,

11   recommendations.

12      Q    All right.  So do you recall who your

13   recommendations or endorsements would have been from  -

14      A    When I submitted --

15      Q    -- on file?

16      A    -- my last merit promotion package, on file would

17   have been Tom Bezanson.

18      Q    Since you returned from maternity leave, have any

19   temporary one hundred twenty day assignments been filled  -

20   supervisory one hundred twenty day assignments been  -

21      A    No, not that I'm aware of.  No.

22      Q    Okay.  Let me just -  since you returned from

23   maternity leave, have you had occasion to have interaction

24   with the marshal?

25      A    I don't believe so.  Maybe just in passing if I'm

64

1  in - assigned to Boston, I might run into him.  But I

2  haven't had any conversations or anything of -  anything but

3  hello with him.

4          MS. COTTRELL:  That's it.

5          MS. TALWANI:  Let me just check on a few things.

6          THE WITNESS:  Could I correct something through

7  her?

8          MS. COTTRELL:  Yeah.

9          THE WITNESS:  Okay.  I had left something out that

10  you had asked me.

11          MS. TALWANI:  Do you have a correction, Cindy,

12  that you want to make?

13          THE WITNESS:  Yes I do.

14          MS. TALWANI:  Okay, what's that?

15          THE WITNESS:  When Ms. Cottrell asked me about  -

16  we went down the list of all the positions that I had

17  applied for, I believe that I had left one out.  And it was

18  the actual -  we had talked about the acting supervisor

19  positions?  Then that acting actually turned into a, I

20  believe, a supervisor's position and which I applied for

21  that.

22          BY MS. COTTRELL:

23     Q    That would be the position that Ms. Hodgkins

24  filled?

25     A    Correct.

1    Q    And that would be the second run through of that

2    position?

3              MS. TALWANI:  Well the first run through was  -

4              MS. COTTRELL:  A one hundred twenty day.

5              MS. TALWANI:  Acting.

6              THE WITNESS:  Acting.

7              MS. TALWANI:  Then there was a second hundred and

8    twenty day period, and then there was an actual position.

9              THE WITNESS:  Position that opened up.

10             MS. COTTRELL:  Okay.

11             THE WITNESS:  And I applied for that.  And I only

12   remembered applying for that because, at that point, you had

13   to submit a fit assessment and I remember that I was

14   pregnant at that time.  And there was a question as to how I

15   was supposed to submit that, so -  I did leave that out.

16             BY MS. COTTRELL:

17    Q    When was that?

18    A    Well I was pregnant.  I want to say it was -  it

19   opened up maybe December of '03.  I'm not certain of that

20   exact date.

21             MS. COTTRELL:  Okay.

22                      CROSS EXAMINATION

23             BY MS. TALWANI:

24    Q    With regard to other EEO complaints, other than

25   the EEO complaint involved in this case and the informal

1    complaint regarding Tony Visalli that Barbara Cottrell asked

2    you about, were there any other EEO proceedings in which you

3    have been involved even if you did not file the complaint?

4        A    Yes.

5        Q    Can you tell me what those were?

6        A    I believe shortly after I came on to this job,

7    that another female in the office, Kathy Spellacey, had

8    filed a complaint against the chief.  And I was interviewed

9    in conjunction with her complaint, had he ever treated me in

10   a different manner, so on and so forth.  And so I was

11   interviewed in connection with that.

12       Q    Any complaint?

13            MS. COTTRELL:  Who was the chief?  I'm sorry.

14            THE WITNESS:  The chief was Tom Nixon.

15            BY MS. TALWANI:

16       Q    And other than that were you involved in any other

17   EEO complaints?

18       A    Yes.

19       Q    And what other one?

20       A    A pretrial services officer had filed a complaint

21   on a deputy in our office in the early nineties.  His name

22   was Roger Bryant, and she had heard that he had treated me

23   in a sexist fashion.  And I don't know how, but I ended up

24   being interviewed as to his treatment of me in the office.

25   And I don't want to say testified, but I was interviewed

**APEX Reporting**
(617) 426-3077

1  about his treatment towards me.

2      Q    Okay.  But in both of those circumstances you did

3  not file your own complaint?

4      A    No.  I was - no.

5      Q    You were asked by Attorney Cottrell about whether

6  you spoke to your supervisor about the rotation in January,

7  and I believe you testified about -- that during that week

8  you did not talk to any other supervisors.  When you

9  returned after that week, did you talk to any supervisors?

10     A    Yes.

11     Q    Who did you talk to?

12     A    I talked to Walter Doherty and Paul Durette.

13     Q    And do you remember the gist of your conversations

14  with Walter Doherty and Paul Durette?

15     A    I talked to Walter, I asked him if he knew that

16  this was going to happen, that I was going to be

17  transferred, and he had no knowledge of the transfer.  He

18  seemed to feel bad for me, he gave me his car -  he offered

19  me his government car because he didn't think it was right

20  how they transferred me.

21          And I then talked to Paul Durette about the

22  transfer and -  because he put out the email saying I was

23  replacing an O82, Jamie Viador.  And I asked him -  I

24  expressed how that humiliated me amongst my peers, and he

25  told me he was directed to put that email out.

1      And I expressed to him my concern of retaliation

2  from Marshal Dichio, I was concerned that he may have

3  transferred me permanently.  That was the term that was

4  used, that I was being transferred permanently -  was

5  because I had filed a EEO complaint and I, at that time, was

6  not sure if Marshal Dichio was aware that I had filed this

7  complaint against him.

8      And during that conversation, Paul Durette told me

9  that he had, in fact, told him that that while I was on

10  vacation, he had a conversation with Sue, and Sue told him

11  that we had filed a complaint and he then went and told

12  Marshal Dichio that we had filed a complaint against him.

13  And just pretty much spoke to him about my  - that I was

14  unhappy about how I was being treated.

15      Q    To your knowledge, has anyone been selected for

16  the judicial security inspector position that you applied

17  for in December of 2004?

18      A    No.

19          MS. TALWANI:  Okay.  That's all I have.

20          (Whereupon, at 1:10 p.m., the above matter was

21  concluded.)

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS    )
                                 )  SS.
COUNTY OF SUFFOLK                )

      I, Carol Summers, a Court Reporter and Notary Public, within and for the Commonwealth of Massachusetts, do hereby certify that there came before me on this 16th day of March, 2005, the person hereinbefore named, who was by me duly sworn to tell the truth, the whole truth, and nothing but the truth, concerning and touching the matter in controversy in this cause; that she was thereupon examined upon her oath, and her examination reduced to typewriting, under my direction, and that this deposition transcript is a true and accurate record of the testimony given by the witness.

      I further certify that I am not related to any of the parties hereto or their counsel, and that I am in no way interested in the outcome of said cause.

      Dated at Boston, Massachusetts, this 29th day of March, 2005.

Carol Summers
NOTARY PUBLIC
My Commission Expires:
March 31, 2006

*APEX Reporting*
(617) 426-3077