1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - x

CYNTHIA A. DeCAIRE,                    :

      Plaintiff,                    :

    v.                                 : C.A. NO. 10593WG4

JOHN D. ASHCROFT, IN HIS           :

OFFICIAL POSITION AS ATTORNEY :

GENERAL OF THE UNITED STATES, :

      Defendant.                    :

- - - - - - - - - - - - - - - x

Washington, D.C.

Friday, January 28, 2005

DEPOSITION OF:

PAUL DURETTE

called for examination by counsel for the Plaintiff,

pursuant to notice, taken at the law offices of Sherman,

Dunn, Cohen, Leifer & Yellig, 1125 15th Street, N.W.,

Suite 801, Washington, D.C., commencing at 12:31 p.m.,

before Maureen S. Bennie, a Notary Public in and for the

District of Columbia, when were present on behalf of the

respective parties:

4

P R O C E E D I N G S

1

2 Whereupon,

PAUL DURETTE

3

4 was called for examination, and, after being duly sworn by

5 the Notary Public, was examined and testified as follows:

6 EXAMINATION BY COUNSEL FOR PLAINTIFF

7 BY MS. TALWANI:

8 Q    If you could state your name and address for the

9 record, please.

10 A    Paul Durette.  Do you want my work address or --

11 Q    Work address is fine.

12 A    1800 F Street, Northwest, Washington, D.C.

13 20405.

14 Q    And by whom are you currently employed?

15 A    Department of Homeland Security, Federal

16 Protective Service.

17 Q    And how long have you been employed there?

18 A    Since April of 2003.

19 Q    And where were you employed immediately prior to

20 the position with the Department of Homeland Security?

21 A    U.S. Marshals Service in Boston, Massachusetts.

22 Q    Have you ever had your deposition taken before?

5

1    A    Yes.

2    Q    So you understand I'm going to be asking

3    questions, she is going to be taking them down.  Anything

4    you don't understand, let me know.

5    A    Right.  Okay.

6    Q    How long were you employed by the Marshals

7    Service?

8    A    Thirteen years.

9    Q    And what were your duty stations over those 13

10   years?

11   A    I started out in Washington, D.C. from 1990 to

12   1992, transferred to Vermont in 1992, stayed there until

13   1997, came back to Arlington at headquarters -- both of

14   those positions were as a Deputy U.S. Marshal -- promoted

15   in 1997 to a position at headquarters in Arlington,

16   remained there about a year and a half and went to Boston,

17   promoted again to a position in Boston as a supervisor and

18   stayed there until I left.  I arrived in Boston in 1999,

19   May, I believe it was, '99.

20   Q    And how many different U.S. Marshals did you

21   work for over your 13 years?

22   A    Five.

6

1    Q    Can you just --

2    A    Oh, wait a minute.  Six.

3    Q    Can you give me the names?

4    A    First one was Ron Hein, Washington D.C. Superior

5    Court.  The second one was Todd Dillard, D.C. Superior

6    Court, Chris Hansen in Burlington, Vermont.  And then when

7    I went to headquarters, I actually worked for an assistant

8    director, not a marshal, and his name is Gene Coon.  And

9    then when I went to Boston, I worked for Nancy McGillbray,

10    and then Marshal Anthony Dichio.

11    Q    And were your promotions through the competitive

12    merit promotion process?

13    A    Yes, they were.

14    Q    And how many times were you promoted through

15    that process?

16    A    I guess it was three times in the Marshals

17    Service and the fourth time when I left.

18    Q    And just briefly for us lay people, can you

19    describe the merit promotion process?

20    A    The process at the time was three phases.

21    There's a test which was administered once every two

22    years.  There's an experience package, which is a very

7

1    detailed package of your experience prior to -- they have

2    gone from an open season to you apply with a merit

3    promotion package for each announcement, so it has gone

4    back and forth between an open season and an actual

5    application every time you apply for a particular

6    promotion.  I'm not sure what they are using today, if

7    they are using the open season again or if it's that

8    once-a-year submission of a package.  That's the second

9    phase.  And then the third is for GS-13s, it was

10   interviews, for GS-14s, there was an all-day assessment

11   center of your skills and for GS-15s, it was an interview

12   again.

13        Q    And am I correct that through this process, you

14   are then ranked into a top group?

15        A    Correct.  Top five.  It's occasionally top six

16   if necessary or a less competitive list, and it goes then

17   to -- the list is compiled by the human resources division

18   at headquarters.  It then goes to the selecting official

19   for recommendation.  The recommendation then goes back --

20   I'm sorry.  The recommending official, not the selecting

21   official.  I think the director is always the selecting

22   official.

8

1          The recommendation goes to the career board.

2    The career board then issues their recommendation and then

3    the director gets both those recommendations and makes the

4    final selection.

5          Q    And so that merit promotion process, you went

6    through the process and you were the final person selected

7    within the Marshals Service three times for a promotion;

8    is that correct?

9          A    Correct.

10          Q    And then when you left and went to the

11    Department of Homeland Security, that was also a

12    promotion?

13          A    That was a promotion, right.

14          Q    And what is your current grade level?

15          A    GS-15.

16          Q    And do you have a national security clearance?

17          A    Yes, I do.

18          Q    And what level clearance is that?

19          A    Top secret, specialized, compartmentalized, SCI.

20          Q    And are those given out lately?

21          A    Have them been some given out?

22          Q    Let me withdraw the question.

10

1  time.

2          Do you recall when you were there where her duty

3  station was?

4      A    It was Boston.

5      Q    Okay.  And did you have occasion to work with

6  her in Boston prior to her temporary assignment in

7  Worcester, her acting assignment in Worcester?

8      A    Did I work with her prior to the acting

9  assignment?  Yes.

10     Q    And what was your opinion of her work

11 performance at that time?

12     A    Good.  She was productive.

13     Q    And are you aware that she then held an acting

14 position in Worcester?

15     A    Acting supervisor, yes.

16     Q    Do you know how it came to be that she was

17 selected for that position?

18     A    Acting?  We didn't always have a supervisor

19 position in Worcester when I was there.  I believe a

20 couple years after I was there, the decision was made to

21 attempt to get a supervisory position there, and as the

22 process was going -- they were trying to get the position

11

1    announced, we wanted to put somebody there acting.

2         My recollection is she approached me saying that

3    she was interested in doing that.  I'm all in favor of

4    people getting that opportunity to do that and rotated as

5    necessary and recommended to the chief, Tim Bane.  I think

6    we put her out there.  She resided, from what I remember,

7    fairly close to Worcester, and I thought she deserved an

8    opportunity to do it.  It was, I think, a 120-day

9    assignment, and so they did it.

10        Those are not competitive on the 120-day

11   assignments.

12        Q    Okay.  I was going to ask you that as a

13   follow-up question, so let me just ask that, to make sure

14   that the record is clear.

15        We were discussing earlier the merit promotion

16   process.

17        A    Right.

18        Q    Am I correct that the acting assignments don't

19   follow that full process?

20        A    Not for the 120-day assignments, right.

21        Q    Okay.  And --

22        A    You can only do it once per year.

12

1    Q    Let me get these details in.

2        These short acting positions that don't have to

3    go through the merit selection process have a set

4    duration, correct?

5    A    Correct.

6    Q    And that duration is 120 days?

7    A    Correct, or less.

8    Q    And when you were referring earlier to the

9    experience package that you would use in promotion -- in a

10   bid for a position, what role, if any, does an acting

11   position play in that promotion package?

12   A    There actually are points or there are credits

13   given.  I can't specifically say there are points awarded,

14   but I was on the rating panel for supervisory positions

15   for the Marshals Service headquarters, and at that time

16   the panels that met went through the applications and

17   rated the experience packages based on some benchmarks

18   that had been established by headquarters.

19       As you went through as a rater, as you went

20   through the package, you checked off the benchmarks that

21   applied that the deputies would meet.  Or, obviously, if

22   they are promoting for a chief's position, there's

13

1  different benchmarks, but the same process.  As they meet

2  the benchmarks, you check them off.  You would get awarded

3  -- say for instance you had five checks on the highest

4  benchmarks that are three levels, generally -- I don't

5  remember what they were, but there was essentially three

6  levels in each category.  There were five categories in

7  each experience package, typically by program area.

8        I believe there was fully successful, where that

9  was more or less the minimum experience, somebody that has

10  met it but they are not necessarily outstanding or have

11  done a lot of it.  The next level was met the criteria,

12  has done it, but maybe has not managed it or led a team,

13  so it's more of a -- you almost get to the point where if

14  you are getting the highest level, you perform duties

15  similar to what a supervisor is doing.

16        So in order to get a 30-point score on a

17  package, you have to have a lot of team leadership.  You

18  could be a task force leader, you could have acting roles.

19  And one of the benchmarks -- I don't want to give out any

20  Marshals Service secrets, but -- that was not given out to

21  the deputies.  But one of the benchmarks is, in fact, an

22  acting role.  In fact, they have it -- if you have done it

14

1    for, I believe it was, 60 to 90 days, it would be a lower

2    level benchmark.  If you have done it 120 days or more or

3    more than once, it would be a higher level benchmark.  So

4    it's very valuable to have that experience as you move up

5    into the promotional ranks.

6        Q    And are you familiar with Deputy DeCaire's

7    experience, how she performed in her position as the

8    acting supervisor at the Worcester substation?

9        A    It was my opinion that she performed

10   extraordinarily well.  There had been a lot of problems --

11   I don't want to say that there were complaint problems.

12   There were issues, security issues, physical security

13   issues, procedural issues, which she documented and

14   forwarded to me.  And a lot of them were very legitimate

15   concerns that, in my opinion, had been ignored in the

16   past.

17            In fact, I went to Worcester to see what some of

18   those issues were, and it was a little disturbing to me

19   that those things had gone either unanswered or fixed by

20   either the previous supervisor, who was not full time

21   there -- it was a supervisor that handled both offices,

22   and he was in Springfield -- or even the senior deputies

15

1  who were there.

2          My recollection is I submitted her for a cash

3  award.  I can't honestly say for sure that I did, but

4  that's my recollection, is that I did recommend her for an

5  award for her performance out there.

6      Q    Were there any individuals who, to your

7  knowledge, may have been less happy with Deputy DeCaire's

8  role as the acting supervisor?

9      A    They never told me they were unhappy.  I only

10  heard it essentially from rumor or probably from Cindy

11  that people were unhappy with her presence there, at least

12  one or two of them.

13      Q    Do you know which people she indicated to you

14  were unhappy with her presence?

15      A    My recollection is Leo Rosetti, Kevin Wahl, and

16  I can't -- I can't say Dave Taylor for sure, but -- you

17  know, there was a unique setup out there prior to her

18  arrival, so it -- Taylor was doing warrants, was not

19  necessarily working in the office, and he was assigned --

20  I believe at that time he was assigned to HIDTA, so it was

21  not a direct report to the supervisor.  It was more or

22  less a direct report to the HIDTA task force supervisor.

16

1      Q     Did Deputy DeCaire institute or enforce

2  procedures that had not been in place prior to her arrival

3  there?

4      A     Yes.

5      Q     And was that contrary to what at least Leo

6  Rosetti and Kevin Wahl had been -- the work environment

7  that they had been working in?

8      A     Yes.

9      Q     And also the same may be true in part as to Dave

10 Taylor; is that correct?

11     A     Yeah.  My recollection is that Dave did not

12 report to her.  I believe Tony Visalli was overseeing

13 HIDTA at that time.  If I had the dates I could tell you,

14 but I don't recall for sure.  That's my recollection, that

15 Taylor was assigned to HIDTA, reporting directly to --

16 Tony Visalli was the supervisor in Boston.

17     Q     Do you recall exactly when Deputy DeCaire was

18 the acting supervisor of the Worcester substation?

19     A     No, not by date.

20         MS. TALWANI:  Can you mark this as the first

21 exhibit?

22                    (Whereupon, Durette Exhibit No. 1

MISTY KLAPPER AND ASSOCIATES        (703) 780-9559

18

1    job.  I was very pleased with her, obviously, or I would

2    not have recommended her for an award.  If I remember

3    correctly, it was a fairly good award.  So, yeah, she did

4    an outstanding job.  I can say at least that much.

5              MS. TALWANI:  Let's go off the record for one

6    minute.

7              (Whereupon, there was a brief discussion off the

8    record.)

9                        (Whereupon, Durette Exhibit No. 2

10                       was marked for identification.)

11             BY MS. TALWANI:

12        Q    I am showing you a group of documents that the

13   court reporter has marked as Exhibit 2, and I will

14   represent to you that these are numbers that were produced

15   to us by the Marshals Service from Deputy DeCaire's

16   personnel file.

17        A    Okay.

18        Q    And if you could just tell me generally, are you

19   familiar with a notification of personnel action form?

20        A    Yes.

21        Q    And what is the purpose of the notification of

22   personnel action form?

23

1    Q    I see.  Okay.  They may happen automatically?

2    A    Correct.  Well, not automatically.  They still

3  have to be submitted, but generally it's automatic if you

4  meet that standard.

5    Q    Can you tell from this top one, 165, who would

6  have submitted this?

7    A    No.

8    Q    Fair enough.  Okay.

9         When you were at the Marshals Service in the

10  District of Massachusetts, at some point did Anthony

11  Dichio become the U.S. Marshal?

12   A    Yes, he did.

13   Q    Do you recall when that was?

14   A    August 2002.

15   Q    And am I correct that at the time that he became

16  the Marshal, the person directly under him was Tim Bane?

17   A    Correct.

18   Q    And the person directly under Tim Bane was you?

19   A    Correct.

20   Q    Do you recall that first fall, the fall of 2002,

21  anything about the staffing levels in Boston court

22  operations?

24

1      A    We had always -- my time there, we had

2  consistently been short staffed.

3      Q    And that was an issue at the time when Anthony

4  Dichio became Marshal?

5      A    Yeah.  It was like that my entire tenure there,

6  yes.

7      Q    Okay.  Do you recall that a position -- am I

8  right that at the time Anthony Dichio became the Marshal,

9  Dave Taylor was in the HIDTA position in the Worcester

10 substation?

11     A    That would be correct.

12     Q    And did Dave Taylor subsequently move to another

13 position?

14     A    Yes.

15     Q    And did the HIDTA position in Worcester then

16 become open?

17     A    Yes, it did.

18     Q    And did you have any knowledge of any deputy

19 marshals expressing interest in that position?

20     A    I do know Cindy did.  I recall her asking me.  I

21 don't recall other people requesting it.  I mean, there

22 may have been some interest.  None of the people that I

MISTY KLAPPER AND ASSOCIATES        (703) 780-9559

25

1    would have considered had an extensive amount of

2    experience from the other team that may have lived in that

3    area.   I don't recall if any of the deputies in Worcester

4    had expressed a desire.   I don't recall.

5        Q    Okay.   I'm actually going to back up a minute.

6        MS. TALWANI:   If we could mark this as Exhibit

7    3.

8                        (Whereupon, Durette Exhibit No. 3

9                        was marked for identification.)

10       BY MS. TALWANI:

11       Q    I will represent to you this is another document

12   that was produced to us.   Can you tell me, do you recall

13   this e-mail?

14       A    Yeah.   In reading it, it refreshes my

15   recollection.

16       Q    And what was the issue that you were addressing

17   in this e-mail?

18       A    I think -- my recollection of it is that we had

19   initially had team leaders assigned to smaller team

20   leaders, as opposed to -- I had a team leader set up in

21   warrants and team leaders set up on the court calendars.   And

22   rather than the supervisor having to meet every day, we

26

1   would leave it up to the deputies, the senior deputies,

2   the 12s on both teams, to -- particularly on the warrants

3   squad to check with the operations desk every day to see

4   if they needed any backfill for the court assignments,

5   because oftentimes -- when I say we were short-handed, we

6   were short-handed, but we never did not accomplish our

7   mission.  We would take from some other assignment,

8   particularly the warrants squad or judicial security, and

9   move it over to court in order to fill the court.  The

10  jail runs came first.  Jail runs were not typically an

11  issue, but the court assignments were.  So the deputies in

12  the warrants squad teams would frequently backfill, and

13  every week they would switch teams.

14          So if Cindy's team was up for one week, it would

15  be up to her to go check with the ops desk to see if they

16  needed assignments for the next day.  If it was Paul

17  Sugrue's team -- I believe Paul was one of the team

18  leaders -- it would be his week to check, and they would

19  go back and forth from week to week.

20      Q    Okay.  So to make sure I understand this, let me

21  just ask you briefly:

22          The responsibilities -- when you are referring

MISTY KLAPPER AND ASSOCIATES          (703) 780-9559

27

1  here to court assignments, what exactly are you referring

2  to?

3       A     Deputies being with prisoners in the U.S.

4  District Court, producing a prisoner in the court

5  proceedings.

6       Q     So if there is a criminal trial, regardless of

7  how short staffed you are, there has got to be a deputy

8  there, correct?

9       A     Correct.

10      Q     And there were occasions when you were short

11 staffed and you needed a deputy in the courts and so that

12 would be filled -- you are using the word backfilled, but

13 that position would be attended to by somebody who was

14 normally in warrants?

15      A     Warrants or judicial security, right, from

16 another team of the teams that we had.

17      Q     From Boston or from Worcester?

18      A     Not often from Worcester, unless it was -- if we

19 really got -- I mean, I wouldn't say we didn't do it from

20 Worcester.  There were times when we would have Worcester

21 pick up prisoners, bring them in from the west and bring

22 them into Boston.  If we really had some -- like a lot of

28

1    prisoners coming into one court and we needed some

2    assistance, I mean, we would have -- I'm certain that

3    there were days when we would have nobody in Worcester and

4    everybody in Boston.  We've even had people come in from

5    Springfield on occasion, but it wasn't the norm.

6        Q    So the norm was to get the help you needed from

7    another part of Boston operations?

8        A    Right.

9        Q    And you were mentioning Cindy DeCaire's role as

10   the team leader at this time.  Do you know when she became

11   the team leader?

12       A    No, not by date.

13       Q    And do you know what the responsibilities of the

14   team leaders were?

15       A    Essentially to mentor some of the newer deputies

16   who needed to learn the basic skills, give the supervisor

17   a little more management responsibility, versus the

18   day-to-day oversight on some routine matters that a deputy

19   should know how to do.  I did it for the purposes of

20   allowing the team leaders, the 12s, to gain that

21   experience I explained earlier without -- because you

22   can't make everybody an acting supervisor, but acting as a

1    team leader is extremely invaluable.

2          In fact, before I promoted to supervisor when I

3    went to headquarters, we never had supervisors in my

4    district office, and I gained that experience from being

5    in charge of a team of deputies.  I just think that that

6    experience was very necessary for a senior deputy in order

7    for them to have a good experience package to promote.

8          Q    And did you have a role in selecting Deputy

9    DeCaire to be a team leader?

10         A    I think it was probably a collective decision.

11   I wouldn't say I was the only one involved in that

12   discussion.  I'm certain that I would have had Tony

13   Visalli and the chief involved in that decision.

14         Q    And the chief, again, is Tim Bane?

15         A    Yes.

16         Q    To your knowledge, was Tim Bane critical of

17   Deputy DeCaire's work as the acting supervisor in

18   Worcester?

19         A    Not that I recall.

20         Q    And how many team leaders were there in the

21   warrants unit?

22         A    I believe we started out with three, and then we

30

1    may have dropped that down to two.  Initially when it

2    started out, I think we had three, three teams of three

3    deputies and one team leader each.  I believe we backed

4    that down, maybe, to two teams, four people.  I can't

5    honestly say, but it was about that.  It was two or three.

6    Q    And your recollection is that when Anthony

7    Dichio became the Marshal, it was Paul Sugrue and Cindy

8    DeCaire who were the team leaders?

9    A    That's my recollection, yeah.

10   Q    Okay.  And so this exhibit that I was showing

11   you which was marked as Exhibit 3 had to do with the

12   question of how those court assignments would be filled

13   from the Boston office, the procedure for that happening,

14   correct?

15   A    Right.

16   Q    And it underscores again that there is a

17   shortage in court operations at this point, August '02,

18   correct?

19   A    Yes.

20   Q    Okay.  The HIDTA position opened in the

21   Worcester office.  Do you recall whether Deputy DeCaire

22   expressed her interest in the position to you verbally or

31

1 in writing?

2   A I wouldn't say she didn't send it in writing.  I

3 don't remember it being in writing.  I do know she did

4 express it verbally, because I remember having a

5 conversation with her telling her that I wouldn't assign

6 her to it.

7   MS. TALWANI:  Can you have that one marked as

8 the next exhibit?

9      (Whereupon, Durette Exhibit No. 4

10      was marked for identification.)

11   BY MS. TALWANI:

12   Q Take a minute to read that.

13   A Okay.

14   Q Do you recall seeing the document we have marked

15 as Exhibit 4 before?

16   A Yes.

17   Q And does this refresh your recollection that

18 Deputy DeCaire did also express her interest to you in

19 writing?

20   A Yes.

21   Q Looking at the large paragraph starting with the

22 most recent --

32

1      A      Okay.

2      Q      -- do you have any disagreement with her

3   characterizations of her work experience?

4      A      As far as the date there, that whole --

5      Q      Going all the way down, actually.

6      A      I don't dispute that.  I would agree with that.

7      Q      Did you have a discussion with anyone else

8   besides Deputy DeCaire about the filling of this position?

9      A      The chief, Tim Bane.

10     Q      Anyone else?

11     A      Tony Visalli.

12     Q      And that would be Supervisory Deputy --

13     A      Deputy U.S. Marshal.

14     Q      -- Tony Visalli.

15     A      And Jeff Bohn.

16     Q      Who at the time was Acting Supervisory or

17  Supervisory Deputy U.S. Marshal?

18     A      I believe he was acting supervisory.  He had

19  been at least a team leader.  Whether it was officially on

20  the 120-day detail, he was running the HIDTA task force.

21     Q      And did you come up with a recommendation about

22  the HIDTA position listed?

33

1    A    Yes.

2    Q    And what was your recommendation?

3    A    Not to fill it.

4    Q    And what was the basis of that?  How did you get

5    to that decision for that recommendation?

6    A    After talking with Supervisory Deputy Visalli

7    and Jeff Bohn -- we had discussed it -- it was our opinion

8    that we would work it by having the task force agent out

9    there work with the other deputies, as well as the HIDTA

10    agents and HIDTA deputies assigned to the Boston office,

11    and that we did not feel, based on the short staffing,

12    that we should fill it at that time.

13    Q    And did you put this recommendation in writing?

14    A    Yes.

15    Q    And do you recall in what form?

16    A    I sent an e-mail to the chief.

17                    (Whereupon, Durette Exhibit No. 5

18                    was marked for identification.)

19    BY MS. TALWANI:

20    Q    I am showing you a document the court reporter

21    has marked as Exhibit 5.  Is this the e-mail that you sent

22    to Chief Bane?

1    A    Yes.

2    Q    And does this express the recommendation that

3    you -- does this accurately express the recommendation

4    that you made to Chief Bane?

5    A    Yes.

6    Q    To your knowledge, what did Chief Bane do with

7    this recommendation?

8    A    He discussed it with the Marshal.  He told me he

9    discussed it with the Marshal.

10    Q    And do you have any knowledge as to what action

11    the Marshal decided to take?

12    A    Yes.  He reassigned another deputy.

13    Q    And were you involved in the decision to select

14    the other deputy?

15    A    No.

16    Q    And did you receive notice that the selection

17    had been made?

18    A    Yes.

19    Q    And do you remember who you received notice

20    from?

21    A    I'm certain it would have been from the chief.

22    Q    And that other deputy was Mark Lewis, correct?

1      A     Correct.

2      Q     Did you have an opinion as to the decision to

3  fill the position at all?  You made a recommendation.

4      A     Yes.

5      Q     Did you still feel after your recommendation

6  that that was the correct recommendation or did you have

7  any opinion as to -- any different opinion as to whether,

8  yes, it should have been filled?

9      A     My opinion is the same as what was in that

10  recommendation, that we should not have filled it at that

11  time.

12      Q     Given that it was filled, did you have an

13  opinion about the appropriateness of having Deputy U.S.

14  Marshal Lewis fill that position?

15      A     Did I have an opinion on that?  Yes.

16      Q     And what was or is your opinion on that?

17      A     That he lacked the experience to be, number one,

18  assigned to that detail.  He was still a fairly new

19  deputy, my recollection, about maybe three years on the

20  job.  There's task force agents, and the deputies assigned

21  to those positions frequently interact with state and

22  local officers.  In fact, they have to train state and

36

1  local officers on how to apprehend fugitives and if we

2  were going to put somebody in there, that it be somebody

3  with more experience.  They are also essentially

4  overseeing some of those state and local task force agents

5  if needed, because there was a Marshals Service task

6  force.  It was managed by the Marshals Service.

7      Q    And am I correct that your opinion was not

8  solicited by the Marshal?

9      A    Correct.

10      Q    Do you recall whether you received any feedback

11  from any of the employees of the Marshals Service after

12  that appointment was announced?

13      A    Yes, I did.

14      Q    And who did you receive feedback from?

15      A    I remember Paul Sugrue.  A lot of people

16  probably complained to me verbally and I -- it could have

17  essentially been anybody that was on the warrants squad at

18  that point in time that could have been selected but

19  wasn't.

20      Q    And what were the complaints?

21      A    Pretty much as I expressed, that it was not the

22  right thing to do, put in a junior deputy without giving a

37

1    senior deputy an opportunity to at least apply or -- there

2    wasn't an application or a formal process, but at least

3    have an opportunity.

4            Regardless, it would still remain my opinion,

5    and I believe that of Tony Visalli, that we not fill it at

6    all.

7        Q    Do you recall receiving written comments from

8    Supervisory Deputy -- or Acting Supervisory Deputy Bohn?

9        A    I don't recall.

10                        (Whereupon, Durette Exhibit No. 6

11                        was marked for identification.)

12        BY MS. TALWANI:

13        Q    Does this refresh your recollection?

14        A    Yes.

15        Q    And did you receive this e-mail from Jeff Bohn?

16        A    I did.

17        Q    Was the issue still open for discussion with the

18    chief and the Marshal?

19        A    Not as far as I knew, no.

20        Q    He suggests at the end that you also speak to

21    Supervisory Deputy U.S. Marshal Visalli about morale

22    problems.  Did you have an opportunity to do that?

1      A     That's right.   The Boston HIDTA task force,

2   yeah, supervisor.   There's the general supervisor for

3   warrants and the HIDTA supervisor.

4      Q     By the way, did you have an opinion of the job

5   that Jeff Bohn was doing as the supervisor of the HIDTA

6   task force?

7      A     Jeff did an outstanding job.   Jeff was probably

8   the best producer in general warrants prior to becoming an

9   acting supervisor, which is why we gave him the

10  opportunity to be an acting supervisor.   He worked the

11  highest profile cases, had the most extensive knowledge.

12  Between him and Tony Visalli, they were both very high

13  producers, working the most significant cases that we had

14  in the district.

15      Jeff had a very good relationship, if not a

16  great relationship, with the state and local officers and

17  agents even prior to HIDTA, and during his tenure as the

18  acting supervisor for HIDTA, it had been acknowledged as

19  the best-run HIDTA task force of all the New England HIDTA

20  task forces by the executive director of New England

21  HIDTA.

22      Q     Okay.   To your knowledge, did Marshal Dichio