40

1    eventually move Deputy DeCaire out to Worcester?

2        A    Yes, he did.

3        Q    Were you involved in that decision?

4        A    I remember having discussions with the Marshal

5    and the chief.  I was not involved in the decision, no.

6        Q    Am I correct that the decision was made and you

7    and the chief were informed of it by the Marshal?

8        A    Yes.

9        Q    And was there a disagreement about the decision

10   that was made?

11       A    Yes.

12       Q    And what was the basis of that disagreement?

13       A    My recollection was that --

14            MS. COTTRELL:  Well, first, who was that

15   disagreement --

16            BY MS. TALWANI:

17       Q    Who had a disagreement about the decision to

18   effect the transfer of Deputy DeCaire to Worcester?

19       A    I don't know if I actually or even if Chief Bane

20   actually opposed moving Cindy.  It was more we opposed

21   moving the other deputy to Boston.

22       Q    And the other guy was Deputy McKearney; is that

41

1    correct?

2       A    McKearney.

3       Q    And what was your concern about moving Deputy

4    McKearney back to Boston?

5       A    He had previously been a disciplinary problem

6    for us.  He was moved out there essentially for

7    disciplinary reasons, creating some problems in the squad

8    room in the Boston office, and it was our opinion that he

9    needed to remain there.

10      Q    And did you have an opinion about putting him in

11   warrants in Boston specifically?

12      A    Yes.

13      Q    And what was the concern about that?

14      A    I actually recommended removing him from

15   warrants.

16      Q    And did you and Chief Bane express this opinion

17   to the Marshal?

18      A    Verbally during meetings, yes.

19      Q    And when you had the conversations with the

20   Marshal, was that before or after he had made a decision

21   to effect that transfer, to your knowledge?

22      A    I don't recall if the decision came before -- I

42

1   know that he had gone to Worcester and met with McKearney.

2   Whether or not he had decided to make that move yet, I'm

3   not positive, but he came back and said I'm doing this or

4   he said this is what I want to do.  But at some point in

5   time we had that discussion, and the chief and I opposed

6   McKearney coming back to Boston.

7       Q    And did the Marshal agree with your concerns or

8   did he have any other reaction to it?

9       A    No.  He eventually made that move.

10      Q    Against your --

11      A    Yes.

12      Q    Against the opinions that you and Chief Bane

13  expressed?

14      A    Yes.

15      Q    Okay.  Am I right that you were out on Family

16  Medical Leave Act from December 4th through December 23rd

17  of 2002?

18      A    Yes.

19      Q    And during some portion of that time, Chief Bane

20  was also out on leave, correct?

21      A    What was the ending date?

22      Q    23rd.

43

1      A    I don't recall.  I wasn't there.

2      Q    Do you recall that there was a time when Paul

3  Sugrue was the acting chief in December of 2002?

4      A    Paul Dunne.

5      Q    I'm sorry.  Paul Dunne.

6      A    Paul Dunne.

7      Q    Do you recall that?

8      A    No, but he would have probably been the one --

9  had the chief been out and I not be there, Dunne would

10  have been acting.

11     Q    In January of 2003, did you receive a phone call

12  from Sue Williams?

13     A    Yes.

14     Q    And do you recall what that phone call was

15  about?

16     A    It was about -- I am sure that I talked to Sue a

17  couple of times in the month, but there was one which led

18  to a conversation with the Marshal.  She had been told by

19  her supervisor that she had been denied a training

20  opportunity, Women in Federal Law Enforcement training,

21  which was going to happen over the summer of that same

22  year, 2003.

44

1    Q    And why was she calling you?

2    A    Because it had been denied or she had been told

3    that it had been denied by her supervisor.  She was told

4    by her supervisor that the Marshal had denied it.

5    Q    And did you recommend that she take any course

6    of action?

7    A    I suggested that she send me -- or appeal it to

8    the Marshal.  Since I did not confer with the Marshal on

9    that decision, that if he made that decision, she would

10   have to appeal it to him, but she could cc me and then I

11   would talk to him when I returned.

12   Q    And do you recall that you made a trip to

13   Florida in January as well for four days?

14   A    On business?

15   Q    Interviewing?

16   A    Yes.

17   Q    At this point in time, January 2003, was there

18   to your knowledge any different issue regarding the level

19   of staffing in the Boston court operations than

20   previously?  Was there some change then in January?

21   A    It was not unusually different from any other

22   time, if at all, to my knowledge.  I mean, I can't tell

45

1   you without seeing the numbers how many were where in each

2   place, but essentially after being short staffed for a

3   long time, you get used to covering one way or another.

4   We get our mission accomplished.  We are going to find the

5   people to do the job, period.

6       Q    Are you aware that a decision was made in

7   January -- or was put into effect in January -- I don't

8   know when it was made.  Are you aware that a decision was

9   put into effect in January to rotate Sue Williams and

10  Cynthia DeCaire from Worcester to Boston?

11      A    I remember that.

12      Q    Were you involved in making that decision?

13      A    I don't believe so.

14      Q    Did you know that that decision was going to be

15  put into effect before you left the office for Florida?

16      A    I don't know if that decision had been made

17  before I left.  I can't recall.

18      Q    Do you recall when you learned of the decision?

19      A    I want to say it was before, because the issue

20  about the WIFLE conference, the training conference -- my

21  recollection is that before I left to go to the panel

22  interviews is when I talked to Sue, and that I told her

46

1    that since I would only be gone for two or three days that

2    she could send it while I was gone and that I would talk

3    to the Marshal upon my return.

4            But I do know that when I came back and talked

5    to the Marshal that I had also -- I did have a

6    conversation about -- it had to have happened before that,

7    because part of my conversation about the WIFLE conference

8    led to the point where I had advised him that I had been

9    -- I had either been told or I had heard, and I think I

10   had been told, that both DeCaire and Williams were going

11   to file an EEO complaint based on this transfer.

12       Q    Do you have any recollection about where Sue

13   Williams was working the day you returned from the WIFLE

14   conference?

15       A    She was in Boston.

16       Q    And do you recall whether you spoke to Sue

17   Williams that morning before or after you spoke to the

18   Marshal?

19           MS. COTTRELL:  Is this the day that you returned

20   from the interviews?

21           THE WITNESS:  Yes.

22           MS. COTTRELL:  I think you said WIFLE

MISTY KLAPPER AND ASSOCIATES          (703) 780-9559

47

1    conference.  I just wanted the record to reflect --

2              MS. TALWANI:  I'm sorry.  I did.  I apologize.

3    Thank you.  Let's go back and strike that and correct it.

4              If you could read back that question and replace

5    WIFLE conference with the interview.

6              (Whereupon, the previous question was read back

7    by the court reporter.)

8              BY MS. TALWANI:

9      Q    Just proceed from there.  Do you know where Sue

10   Williams was working the day you returned from the

11   interviews?

12      A    She was in Boston.

13      Q    And did you have an opportunity to speak with

14   her?

15      A    I believe I did before.  I definitely know I did

16   after speaking to the Marshal.

17      Q    And do you know if you did before you spoke to

18   the Marshal?

19      A    I can't say for sure.

20      Q    When you went to speak to the Marshal, tell us

21   about that conversation.

22      A    I just went in because I had just come back and

48

1  typically would meet with him, you know, just to pop in

2  and say good morning and let him know that I was there if

3  he wanted to meet to discuss anything and that he had

4  received Sue's e-mail that I had received as well, and he

5  said -- he just asked me what my thoughts were.

6         I explained to him that I thought that as

7  managers, we are required to support those types of

8  programs for several reasons.  Number one, they are

9  sanctioned by headquarters.  Number two, it's career

10 development opportunities and that if, in fact, he was

11 denying it based on the fact that we were short staffed,

12 we weren't short staffed in Worcester.  And that

13 particular training course was in the summertime -- my

14 recollection is August -- and that typically the judges

15 weren't there in August in Worcester, and that it was my

16 recommendation that he let her go.

17        I also asked why he didn't consult with me prior

18 to making that decision.  I didn't know why he would have

19 made it without talking to me about staffing levels, but

20 he acknowledged that he should have and that I could go

21 and tell her that she could go.

22    Q    And what, if anything, did you discuss with the

49

1    Marshal about the EEO complaint or grievance filed by Sue

2    Williams and Cindy DeCaire?

3        A    I just let him know that that was more reason

4    why he needed to let her go, because it was just going to

5    make matters worse as far as the previous EEO complaint.

6        Q    And what did he direct you to do?

7        A    He told me to go tell her.

8        Q    To go tell her --

9        A    Tell her that she could go to the training.

10       Q    Any other comments that he made that you might

11   remember?

12       A    Not that I can recall.  There were some other

13   issues after the fact as far as notification to Sue.

14       Q    Okay.  Did you subsequently go and attempt to

15   deliver this message to Sue?

16       A    I did.

17       Q    And what happened?

18       A    She was in the squad room in the court

19   operations area.  I saw her through the window and just

20   waved her over to come and see me.  Something happened

21   from the Marshal's office en route to my office that I

22   ended up getting sidetracked -- probably the warrants

50

1    squad -- that I didn't come back there right away and

2    didn't see her right off the bat.  Obviously, several

3    minutes had passed, maybe a half an hour, and when she

4    came over, I just said I talked to the Marshal and he said

5    that you can go to the WIFLE conference.  She says oh, I

6    already know.

7        Q    Did she tell you how she knew?

8        A    She said that prior to me flagging her down in

9    the court operations area that Dave Taylor had been sent

10   to bring her down to the Marshal's office and that the

11   Marshal told her himself.

12           MS. TALWANI:  If you could mark this as the next

13   exhibit.

14                          (Whereupon, Durette Exhibit No. 7

15                          was marked for identification.)

16           BY MS. TALWANI:

17       Q    Just so the record is complete, is this the

18   e-mail that you received from Sue Williams about the

19   training conference?

20       A    Yes.

21       Q    What were you told by the chief or the Marshal

22   or any other management personnel about how this rotation

51

1  from Worcester was supposed to work?

2      A    I believe it was every week.  One week Cindy

3  would come in and another week Sue would come in.  I can't

4  remember if it was a week or two weeks, but they split it

5  up.

6      Q    Do you recall sending out an e-mail regarding

7  the rotation and how it should work?

8      A    I don't.

9                    (Whereupon, Durette Exhibit No. 8

10                   was marked for identification.)

11     BY MS. TALWANI:

12     Q    I'm showing you a document that's been marked as

13 Exhibit 8.  Do you recall this?

14     A    Yes.

15     Q    And do you know why you sent this?  Do you

16 remember why you sent this?

17     A    I guess there was many times that they may not

18 have needed them, so we didn't make them travel.

19     Q    Okay.  To your knowledge, did this rotation

20 scheme -- well, back up a minute.

21          Do you have any information or any knowledge as

22 to how the decision was made that Cindy and Sue would be

52

1    the ones who would do this rotational role?

2        A    I can't remember how the decision was made, but

3    I believe what decision was made was that Cindy and Sue

4    would travel to Boston and Kevin Wahl would travel to

5    Springfield.

6        Q    And do you know who made the decision?

7        A    Not off the top of my head, no.

8        Q    And am I correct that at this point in January,

9    Tim Bane was no longer employed with the District of

10   Massachusetts?

11       A    Correct.

12       Q    So in January of '03, you were the second

13   highest person in that office, correct?

14       A    Formally, no, but by default, yes.

15       Q    Well, there was no chief --

16       A    There was no chief.

17       Q    -- and you were the next person --

18       A    Correct.

19       Q    -- but you had no role in the decision?

20       A    Not that I recall.

21       Q    And as you sit here today, do you have any

22   knowledge of who was involved in the decision?

53

1    A    No.  Not ever having actual knowledge, no.

2    Q    Do you have any second-hand information as to

3   who it was?

4    A    No.  It would be speculation.

5    Q    What's that?

6    A    It would be speculation.

7    Q    Fair enough.

8         Do you know that at some point the rotation

9   stopped?

10    A    Yes.

11    Q    And do you know who was involved in making the

12   decision -- in the decision to stop the rotation?

13    A    I can tell you I was not.  I don't know.

14    Q    And do you know why the rotation was stopped?

15    A    My recollection of the events is that one of the

16   082 deputies, which is a newer deputy, had left or was

17   leaving and that the Marshal wanted her -- it was a female

18   deputy -- wanted her replaced and that we assign Cindy to

19   backfill that position in Boston.

20    Q    Did he tell you why Cindy would be the correct

21   person to backfill that position?

22    A    No, he didn't.

54

1    Q    Did he ask your opinion as to who should be

2  backfilling that position?

3    A    No.

4    Q    Did you have an opinion as to whether Cindy was

5  the appropriate person to backfill the 082 position?

6    A    Sitting here today, I mean, I could give you my

7  opinion.  I don't recall being asked my opinion back then,

8  so I would not have made that decision, but --

9    Q    Right.  And I'm asking you sitting here today,

10  based on your knowledge, whether you would have, had

11  anyone asked you what your opinion would have been --

12    A    No.  I would have assigned a junior deputy based

13  on seniority and the fact that there were no disciplinary

14  issues with Cindy to my knowledge.  So I would not have

15  put a 13-year veteran in a position of a deputy that had

16  two years on the job unless there are other issues with

17  that particular deputy, if they were a nonproducer, that

18  type of thing, because we did have some of those.  But we

19  had several junior deputies on the warrants squad that

20  would have been first on my list to go back and backfill

21  the 082.

22    Q    So if you had been asked, you would have

MISTY KLAPPER AND ASSOCIATES            (703) 780-9559

55

1  recommended that somebody else would have moved from

2  warrants to the 082 to fill it and, if necessary, Cindy

3  could have come back to warrants if that --

4          MS. COTTRELL:  I am going to object to the

5  question.  He just testified that he has an opinion as he

6  sits here today.  He has not testified that he had any

7  opinion at the time.

8          MS. TALWANI:  Let me reframe the question, then.

9          BY MS. TALWANI:

10     Q    Although you were not asked, did you have an

11  opinion at the time that -- well, let me back up.

12          How did you learn of the decision to move Cindy

13  to the position that was being vacated by the 082?

14     A    I assume that the Marshal told me.

15     Q    And do you recall whether you had an opinion

16  when you learned of that decision?

17     A    I'm sure I did.

18     Q    And do you recall what that opinion was at the

19  time?

20     A    No.

21     Q    Fair enough.  Did you have an opportunity to

22  discuss the assignment with Deputy DeCaire?

MISTY KLAPPER AND ASSOCIATES          (703) 780-9559

56

1    A    After it started, I know I did.

2    Q    And do you recall that you announced the

3    assignment to the Marshals Service?

4    A    My recollection is I think the Marshal had told

5    me to send an e-mail reassigning Cindy to Boston.

6    Q    Okay.

7                        (Whereupon, Durette Exhibit No. 9

8                        was marked for identification.)

9                BY MS. TALWANI:

10   Q    Do you recognize Exhibit 9?

11   A    Yes.

12   Q    Is this the e-mail that you sent?

13   A    Yes.

14   Q    Based on this e-mail, do you know when you were

15   directed by the Marshal to send the e-mail?  Or not even

16   based on this e-mail.  Do you recall when you were

17   directed by the Marshal to send an e-mail?

18   A    I would say it was probably that day or the day

19   before.  Probably that day.

20   Q    Okay.  And did you have a conversation with

21   Cindy DeCaire?  I believe you said you didn't know if it

22   was before or after, but --

57

1    A    (Witness nodding.)

2    Q    Yes?

3    A    Yes.

4    Q    Do you recall where that conversation took

5    place?

6    A    The time I recall was after, and she was in

7    Boston and we had -- we had monthly supervisory meetings,

8    staff meetings with the Marshal, and when she was there,

9    she was there too.  We had an all -- typically it would

10    take us through noon, maybe a little later, and so I was

11    tied up all morning in that particular staff meeting.

12    I came out and -- I was just doing work catching

13    up from the morning, and sometime that afternoon Cindy

14    came in to see me and essentially just asked why this was

15    happening.  I said I don't know what to tell you, I was

16    not involved in that decision.  I just suggested -- I

17    encouraged her to keep a good attitude and do her job, and

18    if she had to grieve it, there was a formal process to

19    grieve it, but again, I was not involved in the decision,

20    so I couldn't -- I couldn't actually say why it was being

21    done and didn't have an opportunity to provide a comment.

22    Q    And did you have a conversation with the Marshal

58

thereafter?

    A    The next morning.

    Q    And did that conversation concern Cindy DeCaire?

    A    Yes.

    Q    Okay.  Tell me about that conversation.

    A    First thing the following morning after my conversation with Cindy, the Marshal came in.  He had not been scheduled to be in.  He was going to some training.

    But he appeared in my office, shut the door and said I thought I asked you yesterday if you would talk to Cindy about an EEO complaint.  And my response was you didn't ask me that, we were in a meeting all morning and I didn't see you in the afternoon, and that she came in mid to late afternoon and you were gone for the day.  And he said I asked you yesterday if you had talked to her and I said you didn't ask me that.  And I said but regardless, I did.  And he said all right, well, what did she say, what was your conversation about.  I said she essentially asked me why she was being reassigned to a position that had been held by a junior level deputy and I said I don't know, I was not involved in that conversation, exactly like I just said.

59

1        I explained my conversation with Cindy to him

2   essentially as I just told you, and his response to me was

3   well, I don't care about those EEO complaints anyway,

4   something along that line.  That wasn't a direct quote,

5   but something along the line of I don't care about that

6   complaint, but if you are questioned about this, I expect

7   that you will support the Marshal.  And I said if I'm

8   asked questions under oath, I will tell the truth, and

9   that that may not necessarily be the best thing for him

10  since I was not consulted on this decision, and that if

11  the investigators ask me, I will have to tell them the

12  truth.  And he walked out.

13        Q    At the time that this happened, there was no

14  chief in Boston, correct?

15        A    Correct.

16        Q    And was there an acting chief?

17        A    Was there one?

18        Q    At that time.

19        A    No.

20        Q    And did you have any subsequent conversations

21  with the Marshal regarding the acting chief position?

22        A    Subsequent?

MISTY KLAPPER AND ASSOCIATES         (703) 780-9559

61

1    that conversation or the next conversation I had with him

2    about the same issue, he had spoken to headquarters and

3    said that he didn't need to appoint an acting chief.

4        Q    And then at some point after that you learned

5    that he did appoint an acting chief?

6        A    Immediately following that conversation about

7    Cindy coming to me asking me about the transfer to Boston.

8        Q    I am going to digress for a minute on an issue

9    relating to the HIDTA task force and Supervisor Bohn.

10        Did you receive a report of an issue between a

11    task force member and a deputy from the HIDTA task force?

12        A    Yes.

13        Q    And did the incident occur while you were on

14    FMLA leave?

15        A    Yes, it did.

16        Q    And when you came back from the FMLA leave, what

17    did you learn?

18        A    I actually came back for one day, Christmas Eve

19    or the 23rd, right -- I just -- my father died and I went

20    and got through the funeral.  I came back for one day to

21    catch up prior to the holidays because I was already

22    scheduled for leave after the holidays, so I wanted to

MISTY KLAPPER AND ASSOCIATES        (703) 780-9559

1       A     Sometime, I would say within hours after --

2    right about the time when I saw Jeff after the Marshal had

3    met -- my recollection is right after the Marshal came out

4    of the meeting with Lieutenant Horton, the Marshal

5    approached Jeff in the warrants squad and said, you know,

6    we want this thing to just go away -- which we all did; we

7    wanted them to work it out -- make this thing go away.  We

8    don't write reports, the State Police, and we don't

9    document things like this.  That was what was Kevin

10   Donahue was directed to do, and they had told me -- Jeff

11   had told me that the Marshal had told him to destroy the

12   reports, shred the reports.

13       Q     So Jeff told you that the Marshal told him to

14   destroy the reports?

15       A     Correct.

16       Q     And what did you direct Jeff to do?

17       A     I directed him not to shred the reports.  I said

18   if you have got a problem with keeping them because you

19   didn't want the Marshal to be on him about it, that he

20   could give them to me.

21       Q     And did he give them to you?

22       A     I got copies -- I believe I may have already

66

1  gotten copies of Kevin's report anyway.

2      Q    After the conversation in February when you had

3  the conversation with the Marshal and after that you

4  learned that there was going to be a new acting chief, am

5  I correct that Acting Chief Dimmit arrived at the Boston

6  office?

7      A    Yes.

8      Q    And do you recall a meeting that Chief Dimmit

9  had with -- well, strike that.

10      Before we go there, when Chief Dimmit arrived,

11  did you have an opportunity to confer with Chief Dimmit

12  about issues that were ongoing at the Marshals Service?

13      A    I am sure I did.  It wasn't -- not the first

14  moment that he arrived, no.

15      Q    Were you the one who would have received the

16  formal notice from the office about the EEO complaints

17  that had been filed by -- the EEO complaint that had been

18  filed by Deputy DeCaire?

19      A    I believe the Marshal had been the person that

20  received it.

21      Q    Were you in the loop in terms of responding to

22  the EEO --

67

1    A    Typically, yes.

2    Q    And in this particular case with Cindy DeCaire?

3    A    I didn't do any responses about her particular

4    case, no.

5    Q    And did Acting Chief Dimmit discuss Deputy

6    DeCaire's complaint with you when he arrived?

7    A    Not that I can recall.  I have no specific

8    recollection.

9    Q    Did you attend a meeting that Chief Dimmit held

10    with all of the deputies, including some new 082s?

11    A    No.

12    Q    Okay.  I won't ask you about that one.

13        Was there a -- let me just ask the question

14    broadly.  Did you have any occasion to have any further --

15    did you have any conversations with Acting Chief Dimmit

16    about Cindy DeCaire's case or situation prior to your

17    leaving the Marshals Service?

18    A    Not that I can recall.

19    Q    And do you recall another incident involving the

20    HIDTA task force and Darlene DeCaire that arose --

21    A    Yes.

22    Q    And can you tell me briefly what that issue was?