1  contentious, the way I understand, but that there was some
2  discussion about why she wasn't there, that they had all
3  said they wanted to act as a team and that she should be
4  there as part of the team.  I can't honestly say what
5  Jeff's exact words were to Lewis, but essentially that she
6  should be participating like everybody else.
7      Q    And did Jeff report to you any feedback he had
8  received from Lieutenant Horton?
9      A    Yes.
10     Q    What did he tell you that Lieutenant Horton had
11 said to him?
12     A    Shortly after the meeting, Lieutenant Horton --
13 my recollection is he left a voice mail for Jeff.  I think
14 Jeff did eventually talk to him and said I heard you were
15 dissing me at the meeting, and if I hear you mention my
16 name again, we are going to meet and it won't be fun.
17     Q    And did you have any conversations about this
18 with Chief Dimmit?
19     A    After Jeff had told me that, I thought that it
20 was very inappropriate for a State Police lieutenant -- I
21 mean, you know, obviously, if it, in fact, was true,
22 somebody should have looked into it or at least called.  I

1  told Dimmit, and his point was well, we'll let the Marshal
2  use his contacts to follow up on that. I insisted that
3  he, you know, request at least an apology or have somebody
4  inquire whether that call was actually made.
5      Q   Why did you think an apology was needed?
6      A   If it was, in fact, true what Lieutenant Horton
7  said, it's inappropriate, in my opinion, for a State
8  Police lieutenant to be essentially threatening, you know,
9  a supervisory deputy U.S. marshal. I don't know why he
10 would have done that, but that certainly, if it was true,
11 would have been inappropriate for him to do.
12     Q   And do you have an understanding of what the
13 outcome of this whole incident was?
14     A   I don't have an understanding of what happened
15 with Lieutenant Horton. I don't think anything did. I
16 know that Jeff met with Dimmit for several hours into the
17 evening that evening and Jeff was upset about the meeting
18 and the lack of what would be done about it. I don't
19 remember it was the next day, but it was shortly
20 thereafter that he was removed as supervisor from the
21 HIDTA task force.
22     Q   Jeff was removed as the supervisor of the HIDTA

1  task force?

2  A   Correct.

3  Q   Can you briefly describe what happened with your
4  position after Acting Chief Dimmit arrived in the Boston
5  office?

6  A   My position was still there.

7  Q   Your role in that position.

8  A   My role in that position was diminished to the
9  point where I had no responsibilities.

10 Q   And what happened to your supervisory
11 responsibilities?

12 A   I didn't have any.

13 Q   How were those taken away?

14 A   At a staff meeting, essentially -- Chief Dimmit
15 held the meeting -- I believe the Marshal was there -- and
16 said we are going to have a little bit of a
17 reorganization, that there would be one warrants squad
18 supervisor overseeing senior team leaders and also a team
19 leader -- a warrant coordinator and a team leader for
20 HIDTA, judicial security with two GS-13s in judicial
21 security and two deputies.  They were going to split up
22 those responsibilities.

1  Jeff Bohn was moving -- or I believe he already
2  was in general operations or prisoner operations, like
3  JPATs, justice prisoners, setting up the long trips for
4  the prisoners, cellblock operations, and that I would be
5  special projects or essentially just working just for
6  Chief Dimmit.
7   Q    And did you ever question Chief Dimmit about the
8  removal of your supervisory responsibilities?
9   A    Regularly I did.
10  Q    And what was his response to you?
11  A    Essentially the response was just do your time,
12  try to find another job. I made it known I would be
13  looking for another job. I had requested a transfer from
14  headquarters. I had actually been selected for another
15  position, but it was subsequently canceled. So they knew
16  that I was trying to leave. I had just asked for a
17  lateral back to headquarters to get out of the Marshal's
18  way. I clearly was not wanted there.
19       Shortly before I left, within a couple of weeks,
20  Dimmit came into my office -- I actually was on another
21  trip for -- I believe I was on a rating panel, as I
22  mentioned before, one of those rating panels. I came back

1  Monday morning. Dimmit came into my office and said the
2  Marshal wants you to move out of your office and into a
3  cubicle which is overlooking the squad room. It was right
4  adjacent to the administrative officer's office, and to
5  remove everything from my office into that cubicle. I
6  said what's going on, Dave, why is he doing this, and he's
7  not telling -- Dave's response was he's not telling me, it
8  ruined my weekend, you know, I asked him not to do this,
9  but he said it was his decision to do.
10     Q    So it's your understanding from your
11  conversation with Chief Dimmit the decision regarding your
12  position would be made by the Marshal, not by the chief;
13  is that correct?
14     A    That's what he told me.
15     Q    And so you were, in title, the third ranking
16  officer, but you were in a cubicle outside in the common
17  area?
18     A    It's in the administrative section of the
19  office.
20     Q    Who got your office?
21     A    Dave Taylor.
22     Q    And did you at some point prepare a document

1  that to the Marshals Service?

2  A    No. No, I was not.

3  Q    Were you contacted by anyone at the Marshals
4  Service with regard to Cindy DeCaire's EEO complaints at
5  any time?

6  A    Not that I recall. Let me go back to that
7  previous question. I believe I was asked -- I don't
8  remember if it was generically. There was an Internal
9  Affairs investigation regarding the shredding incident, if
10 I remember correctly, and then I --

11 Q    And when you are saying the shredding incident,
12 you are referring to what?

13 A    The Donahue/DeCaire -- the Darlene DeCaire
14 incident.

15 Q    The incident where Jeff Bohn was asked to get
16 rid of the report?

17 A    Correct. I received a call last -- about a year
18 ago from Internal Affairs, and I believe -- my
19 recollection is they generically asked me have you a filed
20 a complaint, and I told them no, that I had one prepared,
21 and they asked me for a copy and I wouldn't give it to
22 them.

1  through back then to actually compete or review their
2  packages, but I was selected.  We weren't interviewed.
3     Q    I'm sorry?
4     A    We were not interviewed.
5     Q    During the time that Deputy DeCaire was an
6  acting supervisor in the Worcester office, what was your
7  position at that time?
8     A    What was the date?  Can I ask what the dates
9  were?
10    Q    That would have been June 3, 2001.
11    A    I believe I was the acting assistant chief.
12    Q    And as the acting assistant chief, were you the
13  direct supervisor of Deputy DeCaire --
14    A    Yes.
15    Q    -- at that time?
16    A    Yes.
17    Q    During that period were you working out of the
18  Boston office --
19    A    Yes.
20    Q    -- or the Worcester office?
21    A    Boston.
22    Q    And were you also responsible for supervising

1  other supervisors, lower level supervisors at that time?

2  A   In the Springfield office, the Worcester office
3  and four or five supervisors in Boston.

4  Q   Do you recall whether -- with regard to the
5  creation of the acting supervisor's position in Worcester,
6  was a panel held for that or was it an informal process --

7  A   For the acting?

8  Q   For the 120-day assignment.

9  A   No.  There was no need.

10 Q   And why is that?

11 A   You don't have to do it.  There is no
12 requirement.  To do a 120-day detail, you can just be
13 appointed.  We did it all the time.

14 Q   So it's a very much informal process?

15 A   Correct, because it is a temporary promotion.
16 They don't exceed the 120 days.  You can't exceed the 120
17 days and you can appoint anybody to it, by regulation, for
18 120 days.  If you do beyond that, then it needs to be
19 announced competitively, which is how I was in the acting
20 role.  I actually served for a year acting, but I had to
21 compete for that acting position.

22 Q   And with regard to the 120-day positions, who

92

# CERTIFICATE OF DEPONENT

I, Paul Durette, do hereby certify that I have read the foregoing pages, 4 through 91, inclusive, which contain a correct transcript of the answers given by me to the questions propounded to me herein, except for changes, if any, duly noted on the enclosed errata sheet.

_____
WITNESS

Sworn and subscribed to before me this 24th day of February, 2005.

My commission expires:

Andrea Jackson
Notary Public, District of Columbia
My Commission Expires 02-28-2009

Notary Public: _____

MISTY KLAPPER AND ASSOCIATES                    (703) 780-9559

CASE: DeCaire v. Ashcroft

DEPOSITION OF: Paul Durette

TAKEN: Friday, January 28, 2005

| PAGE | LINE | ERROR | CORRECTION | REASON |
|---|---|---|---|---|
| 6 | 7 | | Add John Roville, Burlington, Vermont after Chris Hansen. | Also worked for him as DUSM |
| 6 | 9 | McGillibray | McGillivray | spelling |
| ~~not~~ 8 | 21 | them | they | grammar |
| 22 | 10 | mcGillibray | mcGillivray | spelling |
| 58 | 10 | would talk | had talked | grammar |
| 68 | 7 | the | if they needed help | ~~sp~~ typo |
| 70 | 19 | missing word | remember "if" it was | missing word |


WITNESS

MISTY KLAPPER AND ASSOCIATES        (703) 780-9559

# CERTIFICATE OF NOTARY

I, MAUREEN S. BENNIE, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me stenographically and thereafter reduced to typewriting by me; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Maureen A. Bennie*
Maureen S. Bennie
Notary Public in and for
the District of Columbia

My Commission Expires:

2/14/08