# Commonwealth of Massachusetts

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EXHIBITS 1-36

CYNTHIA A. DECAIRE,
                    Plaintiff                    Civil Action
                                                 No. 04-10593WGY
VS.

JOHN D. ASHCROFT, in his official position
as Attorney General of the United States,
                    Defendant
**********************************

DEPOSITION of **WILLIAM J. RYAN,** a Witness called

by Counsel on behalf of the **Plaintiff**, pursuant to the applicable

Massachusetts Rules of Civil Procedure, before Karen T. McAllister,

a Professional Court Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the Law Offices of Segal, Roitman

and Coleman, 11 Beacon Street, Suite 500, Boston, Massachusetts, on

Tuesday, March 22, 2005, commencing at 9:59 A.M.

*Accurate Reporting Services*
*36 West Street*
*Whitman, MA 02382*
*(781) 447-9520*

Page 5

1      **S T I P U L A T I O N S**

2              It is hereby stipulated and agreed by

3      and between Counsel that the deposition

4      transcript be read within 30 days, or shall be

5      deemed signed under the pains and penalties of

6      perjury.

7              It is further stipulated that all

8      objections, except as to the form of the

9      question, and motions to strike be reserved until

10     the time of trial.

11

12             **WILLIAM J. RYAN**, first having been duly

13     sworn, on oath, was questioned and testified as

14     follows:

15

16             **DIRECT EXAMINATION**

17     (By Ms. Talwani)

18     Q    State your name for the record, please.

19     A    William Ryan.

20     Q    Mr. Ryan, by whom are you employed?

21     A    United States Marshals Service.

22     Q    How long have you been employed by the United

23          States Marshals Service?

24     A    Since December of '91, all in Boston.

Page 6

1   Q   When you started with the United States Marshals

2         Service, what position did you hold?

3   A   Accountable property specialist.

4   Q   How long were you in that position?

5   A   Approximately, six years.

6   Q   Did you assume another position after that?

7   A   Correct.

8   Q   What position is that?

9   A   Currently administrative officer.

10   Q   Can you tell me what your duties are as the

11        administrative officer?

12   A   I'm responsible for the district budget, finance,

13        human resources, personnel, accountable property

14        procurement; civil, criminal process; seized

15        assets.

16            **MS. TALWANI:**  Off the record one

17        minute, please.

18              (Off the record)

19            **MS. TALWANI:**  Back on the record.

20   Q   (by Ms. Talwani)  Any other responsibilities?

21   A   No.  Those are it, primarily.

22   Q   Is it fair to say that you have significant

23        record keeping responsibilities for the district?

24   A   I would say so.

Page 18

```
 1        information kept?

 2    A   If I get it, it would be in their personnel file.

 3    Q   And would that be in the form of an SF-50, or

 4        would it be in some other form?

 5    A   No.  It would just be a memo, typically, from the

 6        marshal or chief to -- it could go right to

 7        general counsel.  It could go to someone in H.R.

 8        Sometimes they don't necessarily come to me.

 9    Q   Is it your understanding that there is a more

10        complete file kept at headquarters for employees?

11    A   That's my understanding, yes.  I don't know

12        exactly what that consists of and what that

13        entails.  I've never seen one.  The official one

14        would be in headquarters, but I don't know the

15        difference.

16    Q   When you say you don't know the difference, --

17    A   Well, between mine and theirs, what one would

18        have.

19    Q   On the occasions that you've heard that somebody

20        was disciplined, during the time that you were in

21        the position as the administrative officer, did

22        you receive some hard copy document of that

23        discipline to put in the individual's personnel

24        file?
```

Page 27

1    A    Yes.  I'm sorry.

2    Q    And you are the point person for the WorkLife

3          Program at the district?

4    A    Yes.

5    Q    Did you take any steps to advise anyone in your

6          chain of command about this inappropriate E-mail

7          regarding the subject of a WorkLife request,

8          which is an area that you're responsible for?

9    A    No, I didn't.  I don't recall doing anything

10         about it.

11    Q    Why not?

12    A    I don't know.

13    Q    It would have been appropriate for you to notify

14         someone in your chain of command about this

15         inappropriate E-mail, wouldn't it have?

16    A    Perhaps.

17    Q    Was this just such a common occurrence that you

18         got E-mails like this, that it wasn't anything

19         worth noting?

20    A    It's not common, no.

21    Q    Was it out of the ordinary?

22    A    Oh, yeah.

23    Q    But you didn't do anything about it?

24    A    No.

Page 28

1    Q    And the reason you didn't do anything about it is

2         what?

3    A    I don't really have an answer.  I don't know why

4         I didn't.

5    Q    Do you understand your role as the administrative

6         officer to be to support the marshal in all

7         circumstances?

8    A    That could be one of the roles I would think.

9    Q    Would that include distorting records to support

10        the marshal?

11   A    No.

12   Q    Would it include burying events under the carpet

13        to support the marshal?

14   A    No.

15   Q    If you're confronted with a circumstance where

16        something is inappropriate, but might not look

17        good to the persons in positions of control, what

18        steps do you take, if any?

19   A    That could vary.  I mean, unless I knew of a

20        specific situation.  I mean, I may or may not

21        bring it to the attention of someone.  It doesn't

22        happen that often, so...

23   Q    Have you ever called Jeff Bohn a cult leader?

24   A    No.

Page 29

1    Q    Have you ever called him a bad role model?

2              **MS. COTTRELL:**  Again I'm going to

3         object on relevance grounds.  But you can answer.

4    A    A bad role model?

5    Q    Yes.

6    A    I don't recall saying that, no.

7    Q    If an individual were to testify that you had

8         said to them that Jeff Bohn was a cult leader, or

9         that Jeff Bohn was a bad role model, would that

10        individual be lying?

11   A    Possibly not.

12   Q    You may have called Jeff Bohn a cult leader?

13   A    Very, very possible.

14   Q    I'm going to ask you about your search for

15        documents in this case.

16              At some point, were you asked by Chief

17        Fallon to look for documents?

18   A    Yes.

19   Q    Can you recall how you were asked?

20   A    By an E-mail, I believe.

21   Q    Do you recall what you were asked for?

22   A    Any and all documents that could pertain to Cindy

23        DeCaire, I believe, and I don't know the exact

24        words.

Page 45

1          Five again, please.

2     A    Mm-mm.

3     Q    And you look at the request under paragraph six.

4          Not the instructions, but if you turn to page

5          three, please.  It requests documents relating to

6          Mark Lewis' qualifications for the position at

7          issue.  Did you produce those documents to

8          anybody?

9     A    No.

10    Q    Has anyone ever discussed with you producing

11         documents relating to Mark Lewis' qualifications

12         for that position?

13    A    If they had asked me.  I don't have any.

14    Q    To your knowledge, there are no documents

15         relating to Mark Lewis' qualifications for the

16         HIDTA position in your official files in the

17         district?

18    A    As far as I know, yes.

19    Q    If you look at paragraph seven, have you provided

20         all documents concerning the transfer of Deputy

21         Marshal McKearney from Worcester, from Worcester

22         to Boston?

23    A    I'm not aware of any documents.

24    Q    Well, there would be an SF-50 at least?

Page 47

1    Marshal Dichio arrived?

2            **MS. COTTRELL:**  Boston to Worcester and

3    Worcester to Boston?

4            **MS. TALWANI:**  Yes.

5    Q    (by Ms. Talwani)  Would you turn to paragraph

6    eight.  It's looking for documents concerning a

7    purported manpower shortage.  Do you have any

8    documents relating to any alleged shortage of

9    manpower?

10   A    Not that I can recall, no.

11   Q    Paragraph nine is looking for the documents

12   concerning the January 2003 decision to rotate

13   Deputy DeCaire and Deputy Williams.  Do you know

14   of any of those documents?

15   A    No, I'm not aware of any.

16   Q    Was an SF-52 prepared in connection with that

17   rotation?

18   A    No.

19   Q    What do you know about that rotation?

20   A    Basically, my understanding is that we in Boston

21   needed one person from Worcester on a daily

22   basis.  How that worked, it went basically around

23   me.  That's my only understanding of it.

24   Q    Well, do you understand whether Deputy DeCaire or

Page 52

1    A    Yes.  If that's what I said, that's -- yes.

2    Q    If the records showing where people worked, which

3         I believe you have for purposes of pay, show that

4         Deputy Williams only worked for a week in Boston

5         at the time, those records would be incorrect,

6         because you wouldn't be testifying falsely?

7    A    I didn't understand your question, I'm sorry.

8    Q    If I were to produce some other records showing

9         where Deputy Williams was for those days, and

10        those records said that she was only a week in

11        Boston, you would say to me that those records

12        must be false because I, Bill Ryan, am testifying

13        truthfully under oath here, correct?

14   A    To the best of my knowledge, yes.

15   Q    If you look at paragraph fifteen of Exhibit Five,

16        do you have any documents concerning Deputy

17        Marshal Kimball's qualifications for the position

18        in the warrants unit?

19   A    No.

20   Q    And to your knowledge, no such documents exist?

21   A    That's correct.

22   Q    Paragraph seventeen of this same exhibit, do you

23        have any documents relating to the qualifications

24        of any candidates for the court operations

Page 53

1  supervisor position?

2  A  Now, is this -- I don't recall this -- when this

3  was.  So, is this a position that was filled by a

4  current supervisor, or was this an opening for a

5  supervisor position?

6  **MS. TALWANI:**  Off the record for a

7  minute.

8  (Off the record)

9  Q  (by Ms. Talwani)  When you received the E-mail

10  from Chief Fallon with the request attached to

11  it, did you ask him what these things were asking

12  about?

13  A  I don't recall asking him, no.  No.

14  Q  The allegation in paragraph forty-two of the

15  amended complaint, which is being referred here,

16  says, "On April 21, 2003, Plaintiff DeCaire

17  learned that Supervisory Deputy Marshal Doherty

18  was leaving his position as court operations

19  supervisor.  In the past when a supervisory

20  position opened up, notice was given that the

21  position would be filled with an acting

22  supervisor.  In this case, however, no such

23  notice was given.  Deputy U.S. Marshal DeCaire,

24  nonetheless, expressed interest in the court

Page 54

1    operations supervisor position on April 21 by E-

2    mail to Marshal Dichio and Chief Deputy Marshal

3    Dimmitt.  Neither Marshal Dichio nor Chief Deputy

4    Marshal Dimmitt responded to her E-mail, and no

5    one in management discussed the soon to be vacant

6    position with her."  So it's the April 2003

7    position.

8    A    Okay, so it's a -- it's an anticipated vacancy,

9         which I wouldn't have anything at all.

10   Q    The position was filled ultimately by Alison

11        Hodgkins.

12   A    Okay.

13   Q    Are you aware of any documents that you may have

14        regarding the qualifications for Alison Hodgkins

15        for the position of court operations supervisor?

16   A    No.  No, I don't.  I don't have any.

17   Q    Would you have copies of discipline that Alison

18        Hodgkins has received at the U.S. Marshals

19        Service?

20   A    I don't know.  I may or may not.  Sometimes

21        they'd come to me and sometimes they wouldn't, so

22        I'd have to check.

23   Q    Do you have an understanding as to whether

24        discipline is considered in determining whether

Page 56

1    issues?

2    A    Not that I can recall.

3    Q    Do you know whether the U.S. Marshals Service has

4         a written policy concerning discrimination?

5    A    Oh, I'm sure they do, yes.

6    Q    Have you ever received any training regarding

7         that?

8    A    Not that I can recall.

9    Q    Do you know if the U.S. Marshals Service has a

10        policy on affirmative action?

11   A    Yes.

12   Q    Have you ever received any training regarding

13        that?

14   A    No, not that I can recall.

15   Q    Do you know if the U.S. Marshals Service has any

16        written policy on retaliation?

17   A    Yes, I do know.

18   Q    And do they?

19   A    Yes.

20   Q    Do you know where that could be found?

21   A    Intranet.

22            MS. TALWANI:  Could that be produced to

23   us, please?  We have not received anything on

24   retaliation, I don't believe.

Page 57

1          **MS. COTTRELL:**  I'll check.

2      Q    (by Ms. Talwani)  Have you received any training

3           on retaliation?

4      A    No.

5      Q    Have you ever looked at a promotion package?

6      A    I may have seen one or two of them.

7      Q    Do you know whether discipline --

8      A    Promotion to the 1811 grade twelve package,

9           that's the only one I ever recall seeing.

10     Q    Do you know in that situation whether there's any

11          discussion of discipline included in those forms?

12     A    I don't know.

13     Q    Don't remember?

14     A    No.

15     Q    Do you recall anything at all about Steve

16          McKearney's promotion?

17     A    I believe I have the paperwork on that.

18     Q    Was there a delay in that promotion going

19          through?

20     A    Yes.

21     Q    Do you recall why?

22     A    I don't know.

23     Q    And you don't know, even though you have the

24          paperwork?

Page 58

1    A    I had the paperwork on the promotion once it was

2         affirmed and approved.  The reason for the delay,

3         I do not know, nor do I have any documents.

4    Q    Do you have any documents relating to discipline

5         for Steve McKearney?

6    A    No, I don't believe so.

7    Q    Turn to paragraph eighteen, it relates to Paul

8         Sugrue's qualifications for the warrant

9         coordinator position.  Do you have any documents

10        relating to Paul Sugrue's qualifications?

11   A    No.  No, I'm not aware of any.

12   Q    I believe we've asked this under the prior

13        question, but just to make sure my record is

14        complete, under paragraph nineteen, it's asking

15        for qualifications for Alison Hodgkins for the

16        position of acting supervisor.  Are you aware of

17        any documents that you have that relate to her

18        qualifications for that position?

19   A    I'm not aware of any.

20   Q    As you sit here, you don't know whether there was

21        any discipline in Alison Hodgkins' file at the

22        time that she was being considered for acting

23        supervisor?

24   A    That's correct, I do not know.

Page 59

1    Q    But if there was discipline in the file, you

2         would have received that discipline in order to

3         file it, because that's your job there, correct?

4    A    If I received the documents, yes.

5    Q    But you don't remember as you sit here?

6    A    I don't believe I received, no.

7    Q    Paragraph twenty asks for documents relating to

8         Kevin Donahue's qualifications for warrant

9         coordinator position.  Again, your testimony as

10        the head person for H.R. in the district, that

11        there are no documents that you would have

12        control over relating to Kevin Donahue's

13        qualifications for that position?

14    A    That's correct.

15    Q    How about documents concerning assignments given

16        to deputy marshals while on limited duty?

17    A    I believe I should have them, yes.

18    Q    And Cindy DeCaire isn't the only person that's

19        ever been on limited duty, right?

20    A    That's correct.

21               **MS. TALWANI:**  Can we have the documents

22        relating to the assignment or assignments given

23        to deputy U.S. marshals while on limited duties,

24        please?

Page 65

1  A    I don't have any understanding of the seniority

2       policy.  I have no idea how it works and what

3       role it plays or anything.

4  Q    Who would know the district, isn't it your job?

5  A    With regards to anything?  I mean...

6  Q    In regard to anything?

7  A    I was led from -- led to believe from Chief Bane

8       that seniority was not a factor in making

9       decisions.

10 Q    Is that your understanding under Marshal Dichio?

11 A    Well, it's always --  Yeah.  I mean, I've never

12      inquired as to if it's changed or not, but that

13      was always -- been my understanding was that

14      seniority was not a determining factor, or a

15      factor even in most cases.

16 Q    Do you have any understanding as to why Sue

17      Williams is currently working in Boston instead

18      of Worcester?

19 A    No, I don't have any idea.

20 Q    So, you don't know what seniority means in the

21      Marshals Service?

22 A    I do not.

23 Q    I believe you used the expression E.O.D.  What

24      does E.O.D. stand for?

Page 66

1  A    Entry on duty.

2  Q    Who, if anyone, has ever told you how to

3       calculate entry on duty dates?

4  A    I've never calculated them.

5  Q    If someone asks for an E.O.D. date, how would you

6       figure that out?

7  A    I would go to their SF-50.

8  Q    Okay, there's nothing on the SF-50 that says

9       E.O.D.  We went through that.

10  A    Correct.

11  Q    So, who, if anyone, has told you that the E.O.D.

12       date is the date on the SF-50?

13  A    I think I just always assumed it.  I don't recall

14       anyone telling me that.

15  Q    Have you ever had a discussion with anyone about

16       what E.O.D. date means?

17  A    I don't recall discussing it with anyone.

18  Q    Have you ever reviewed the agreement between the

19       United States Marshals Service and the American

20       Federation of Government Employees, International

21       Counsel of U.S. Marshals Service Locals C-210?

22  A    No.

23  Q    Do you know if that document exists?

24  A    I'm not familiar with it.

Page 67

1        **MS. TALWANI:**  Mark this.

2              (Whereupon, the below-described

3              1996 Master Agreement was marked

4              Plaintiff's Exhibit No. 13.)

5    Q    (by Ms. Talwani)  I'm just showing you a document

6         entitled 1996 Master Agreement.  Have you ever

7         seen this document before?

8    A    No.

9    Q    Are you aware of any such contract relating to

10        the terms and conditions of employment at the

11        Marshals Service?

12   A    I'm not aware.

13   Q    On the second page of this document, which I will

14        represent to you was produced to me by the

15        Marshals Service, at the top under section five,

16        could you read that?

17   A    "The parties recognize that seniority plays an

18        important part in employment and assignment on

19        all details, P.C. trips, and other temporary

20        assignments.  When making assignments among

21        qualified personnel, absent specific management

22        designation as to who the deputy in charge of the

23        assignment will be, the senior person will serve

24        as deputy in charge of the assignment."

Page 68

1   Q    Is that news to you?

2   A    Yes.

3   Q    If you look at article thirty-three, which is on

4         page four of this document, it refers to filling

5         operational vacancies, consideration under

6         section three, "Consideration of applicants will

7         be under the following priority basis.  A is

8         grade level.  B is date of application.  C is

9         length of service in present district.  D is

10        length of service in the U.S. Marshals Service."

11        Again, that's news to you?

12  A    Yes.

13  Q    On Page seven of eleven, section four, paragraph

14        five, definition of seniority, U.S. Marshals

15        Service, D.O.J. Service, Federal Service.  Is

16        that news to you?

17  A    Yes.

18  Q    Same thing, page eight of eleven, it's paragraph

19        five, article thirty-seven, definition of

20        seniority here U.S. Marshals Service, D.O.J. and

21        Federal Service, that's news to you?

22  A    Yes.

23  Q    So, it's your understanding that seniority played

24        no part in anything at the Marshals Service?

Page 72

1    signs, and I never really -- I don't think I've

2    ever used a radio.  My understanding is that they

3    were given out by seniority basis as a convenient

4    way of assigning numbers only.  I never --  I

5    never refer to the numbers.  I've never used

6    them.  I've never referred to them in any way.

7    Q   And as you sit here today, you don't know whether

8        it is seniority within the district or seniority

9        within the Marshals Service?

10   A   I don't know.  No, I've never been involved in

11       assigning them.  I've never...

12   Q   Okay.  But the call number assignment is one

13       place that seniority is --

14   A   I guess, yes.  Yes.

15                   (Whereupon, the below-described

16                   Personnel List was marked

17                   Plaintiff's Exhibit No. 16.)

18   Q   (by Ms. Talwani)  I'm showing you a document

19       marked as Exhibit Sixteen.  Do you recognize this

20       document?

21   A   I've seen this document.

22   Q   Do you know who produced it?

23   A   I believe Alison Hodgkins did.

24   Q   Do you know when she produced it?

Page 73

1   A   Fairly recently is my understanding.  I've just

2       seen it recently.  I can't say when she produced

3       it.

4   Q   Do you know why she produced it?

5   A   No.  No.

6   Q   Have you ever discussed this document with her?

7   A   I believe I did.  And I think when I first saw

8       it, which was probably a week or two ago, I asked

9       her what brought this all on, and she -- her

10      comment to me was that Assistant Chief Taylor

11      requested it for his own records.

12  Q   Was that conversation with Alison just a meeting

13      between the two of you, or were there others

14      there?

15  A   I believe so, yes.

16  Q   Do you know what you were talking to Alison

17      Hodgkins about at the time?

18  A   Well, this was the only thing I can recall

19      talking to her about.

20  Q   Did you go over the list with her?

21  A   You mean, verifying all dates and all?  I don't

22      --

23  Q   Discussing the list with her at all and, you

24      know, specifics?

Page 74

1    A    That, no.  Not in specifics, no.

2    Q    In general, other than what you've just testified

3         to?

4    A    No.  I was just curious as to how it happened

5         that she produced a list like this, and how she

6         got the information.

7    Q    How did she get the information?

8    A    I'm not sure.  I don't recall what she said as to

9         how she got it.  She may have said headquarters.

10        I don't recall.

11   Q    Did you ask her what she meant by any of these

12        columns?

13   A    Well, I just -- I just assumed what they meant.

14        I didn't ask her exactly what she meant.

15   Q    What did she mean here by E.O.D.?

16             MS. COTTRELL:  I object to the

17        question.  You're asking him to speculate.  Go

18        ahead and answer.

19             MS. TALWANI:  I'm asking him what he

20        assumed she meant by E.O.D.

21   A    Entry on duty with the Marshals Service, I

22        believe, is my understanding.

23   Q    Okay.  So, entry on duty could mean with the

24        Marshals Service, correct?