Page 75

1   A   Yes.

2   Q   E.O.D. could mean entry on duty with the Marshals

3       Service?

4   A   Correct.

5   Q   What else could it mean?  What else could E.O.D.

6       stand for, if not entry on duty with the Marshals

7       Service?

8   A   Well, that's my only understanding is entry on

9       duty.

10  Q   Entry on duty of what?

11  A   With the Marshals Service.

12  Q   I believe your earlier testimony was that E.O.D.

13      included prior service?

14  A   Well, on the SF-50, it's not referred to E.O.D.

15      I've always just referred to it as E.O.D.

16  Q   But you were wrong.  The date on the SF-50 has

17      nothing to do with entry on duty.

18  A   Okay, maybe I was, yes.  Maybe I misunderstood.

19      I wasn't being intentionally wrong.

20  Q   Exhibit Sixteen, to your knowledge, is the

21      correct use of the Marshals Services' terminology

22      that E.O.D. has to do with entry of duty in the

23      Marshals Service, and that prior service date is

24      the date for the other information which shows up

Page 76

1           on the SF-50?

2    A      Correct.

3                      (Whereupon, the below-described

4                      E-mails were marked Plaintiff's

5                      Exhibit No. 17.)

6    Q      (by Ms. Talwani)  I'm showing you a document

7           that's been marked as Exhibit Seventeen.  It's

8           two E-mails, if you could look at those.

9                 (Witness views document)

10   Q      (by Ms. Talwani)  Do you recognize the two E-

11          mails that have been marked as Exhibit Seventeen?

12   A      I honestly don't recall them.

13   Q      Do you recall that in the course of the

14          investigation of Deputy DeCaire's E.E.O.

15          complaint that you were asked to give a list of

16          E.O.D. dates for the 1811s?

17   A      I honestly don't remember this.  I honestly did

18          it, obviously, but I don't recall it.

19   Q      As you sit here today, do you have any reason to

20          believe that the information that you provided to

21          Joann Grady during the E.E.O. investigation was

22          correct?

23   A      Are you asking me if these dates are correct?

24   Q      I'm asking you if these dates are E.O.D. dates?

Page 77

1   A   Yes.  Yes, they are E.O.D. dates.

2   Q   Let's put this list next to Exhibit Sixteen.  You

3       have Jeff Cristo's E.O.D. date as 4/11/83, and

4       Alison Hodgkins has it as 3/86.  Who's right?

5   A   I'm not sure who's right.

6   Q   Well, isn't it true that Alison Hodgkins was

7       giving E.O.D. dates, but you were giving prior

8       service dates?

9   A   I --  Possibly, I guess, yes.

10   Q   Well, isn't that what this list is?  Why don't

11       you just look down the list and compare it to

12       Alison Hodgkins, and you'll see that these are

13       the dates that include the prior service date.

14       Take a minute.

15   A   Okay.

16             (Pause)

17   A   Yes, they do.

18   Q   So, when Joann Grady asked you for entry on duty

19       dates, you provided her with prior service dates?

20   A   Correct.

21   Q   Did you discuss the dates that you were providing

22       to Joann Grady with anyone at the Marshals

23       Service?

24   A   I don't recall.  I don't believe I did.  I don't

Page 78

1     recall.

2   Q   Do you recall any discussions you had with anyone

3     at the Marshals Service about Cindy DeCaire's

4     complaint at any time?

5   A   I don't recall, no.

6   Q   Did anyone ever question you on the dates that

7     you had provided to Joann Grady?

8   A   I don't recall.  No, I don't think so.

9          (Whereupon, the below-described

10         1811s List Document was marked

11         Plaintiff's Exhibit No. 18.)

12  Q   (by Ms. Talwani)  I'm showing you a document that

13     the court reporter has marked as Exhibit

14     Eighteen.  Do you recall this document, or do you

15     recognize this document?

16  A   I recognize that's my writing.  I don't recall

17     this document.

18  Q   Could you look at the second page.  Do you

19     recognize this document?

20  A   No, I don't recall seeing this.

21  Q   But that's your writing on the first page?

22  A   That's my writing just up where it says with

23     E.O.D.s.  I don't believe I did this.  This is

24     not my writing with the dates.

Page 79

1  Q  Do you recognize whose writing it is?

2  A  No, I don't.

3  Q  As you sit here, if you compare this list to your

4     list again and to Supervisory Deputy Hodgkins'

5     list, these aren't E.O.D. dates, these are

6     service dates, correct?

7  A  Yes, that's what it appears.

8  Q  And the second page reflects that distinction for

9     the four individuals involved there, correct?

10 A  Correct.  I don't --  I don't ever remember

11    seeing this before, though, this second page.

12               (Whereupon, the below-described

13               Defendant's Response was marked

14               Plaintiff's No. 19.)

15 Q  (by Ms. Talwani)  I'm showing you a document

16    that's been marked as Exhibit Nineteen, and I

17    will represent to you that although it says

18    Plaintiff's First Request for Admissions, this is

19    Defendant's Response to Plaintiff's First Request

20    for Admissions.

21            **MS. TALWANI:**  Can we stipulate to that?

22            **MS. COTTRELL:**  Yes.

23            **MS. TALWANI:**  Thank you.

24 Q  (by Ms. Talwani)  If you look at question seven,

Page 80

1          Deputy Cynthia DeCaire has greater seniority with

2          the Marshals Service than Scott Kimball.  Do you

3          want to reference Exhibit Sixteen, prepared by

4          Alison Hodgkins, can you tell me who has greater

5          seniority with the Marshals Service, Scott

6          Kimball or Cindy DeCaire?

7     A    It appears Cindy DeCaire does, yes.

8     Q    So, the answer denying this thing is an error, is

9          that correct?

10    A    Yes.

11              MS. TALWANI:  Go off the record for a

12         minute.

13                   (Off the record)

14    Q    (by Ms. Talwani)  Do you have any understanding

15         as to how deputies are assigned to the different

16         locations, Boston, Worcester or Springfield?

17    A    Not really.  I mean, there's different ways it

18         can happen.  Sometimes when a vacancy

19         announcement is put out, published, it specifies

20         the office.  But other than that, no, I don't --

21         don't know how it happens.

22    Q    Do you have any way to tell when individuals were

23         hired, what vacancy announcement that hiring

24         corresponded to?

Page 82

```
 1              exam, 082s, and I believe when we were given the

 2              clearance to hire or to select X number of

 3              people, -- let's say, for example, we may have

 4              had four vacancies, but they're going to

 5              authorize us to fill one or two slots at that

 6              particular time, from the class.  Typically,

 7              there's a class is forty-eight.  The marshal may

 8              be asked what location these vacancies are going

 9              to fill based on our needs.

10     Q        And so, am I correct that at the time Sean

11              Weddeke was hired, there were three vacancies

12              filled?

13     A        That's possible.  I can't recall.

14     Q        But it is your recollection that one of the

15              vacancies was listed as a Worcester vacancy?

16     A        Correct.

17     Q        Am I correct that each deputy has an assigned

18              location?

19     A        Yes.

20     Q        And they may, for a particular individual

21              assignment, work out of a different office, but

22              would still have a permanent assignment to one

23              office, correct?

24     A        Correct.
```

Page 83

1   Q   When that permanent assignment changes, there's

2       paperwork involved?

3   A   Yes.

4   Q   Tell me about that paperwork?

5   A   If someone were to be reassigned from one office

6       to another in the district, there would be a 52

7       generated.  That's a 52 by me.  And then I would

8       forward it onto the chief or marshal for

9       approval, and I would fax it down to the

10      headquarters.

11  Q   Again, the SF-50 would be kept in the SF-52 --

12      I'm sorry, SF-52 would be kept in the SF-52 file?

13  A   Yes, once I get it back from headquarters,

14      correct.

15  Q   Were you the A.O. when the Worcester office

16      opened?

17  A   No.  No.

18  Q   Do you have any recollection as to how it came to

19      be that Dave Taylor was assigned to Worcester?

20  A   No.  No, I don't have any recollection at all.

21  Q   Do you have any recollection about Tom Bezanson

22      becoming the supervisory deputy in Worcester?

23  A   That was an announced position for Worcester, is

24      my understanding from my recollection, and he was

Page 84

1      selected by the marshal and chief in the

2      district.

3    Q    Through the merit promotion procedure?

4    A    Correct.

5    Q    Do you have any recollection of how Sue Williams

6         came to be out in Worcester originally?  I

7         shouldn't say originally.  How Sue Williams came

8         to be out in Worcester?

9    A    No.  Very seldom was I involved in any

10        reassignment discussions.

11   Q    Do you have any recollection as to how it came to

12        be that Leo Rosette was assigned to Worcester for

13        a period of time?

14   A    That was -- my understanding was due to

15        disciplinary reasons, of which I have no

16        documentation for.

17   Q    Would there have been an SF-52 for Leo Rosette's

18        transfer to Worcester?

19   A    I believe so.

20   Q    Would that have included the disciplinary reasons

21        or --

22   A    No.  No.

23   Q    Did the disciplinary reasons that Leo Rosette was

24        transferred out to Worcester have to do with a

Page 85

1        situation where one deputy threatened another

2        deputy?

3    A   That's my understanding.

4    Q   It would have to do with Leo Rosette's lack of

5        candor about the events that happened?

6    A   (No response.)

7    Q   Was he the threatening deputy, the deputy

8        that made the threats?

9    A   That's my understanding.

10   Q   Do you have any recollection how it came to be

11       that Steve McKearney moved out to Worcester and

12       Leo Rosette moved back to Boston?

13   A   I believe that was also a disciplinary matter,

14       which I was not directly involved with.

15   Q   Do you know whether there are any disciplinary

16       documents?

17   A   I don't recall seeing them.

18   Q   Again, there would have been an SF-52 relating to

19       both Leo Rosette's transfer out --

20   A   If I was asked to do one, yes.

21                        (Whereupon, the below-described

22                        Operations Personnel was marked

23                        Plaintiff's Exhibit No. 20.)

24   Q   (by Ms. Talwani)  I'm showing you a document the

Page 86

1    court reporter has marked as Exhibit Twenty.  Do

2    you recognize this document?

3  A    I believe this is what I did up, upon request of

4    the chief and perhaps a discussion with Barbara.

5    I don't recall exactly who I discussed it with.

6    But, I believe I did this of all operational

7    personnel who could have and should have been in

8    the district during the time frame requested.

9  Q    Again, you have a column that's E.O.D., but that

10    really should be service date, not E.O.D. date,

11    correct?

12  A    Yes.

13  Q    Turning to the second page, Mark Lewis was

14    transferred; you have here, moved from Boston to

15    Worcester in September 2002, correct?

16  A    Yes.

17  Q    Do you recall where you got the information

18    that's placed here for Mark Lewis?

19  A    I would have either got it from a 52 or from a

20    SF-50 in his file.

21  Q    Do you recall the reason that Mark Lewis was

22    transferred to Worcester?

23  A    I don't recall.

24  Q    If you turn to the first page of Exhibit Twenty,

Page 87

1   Steve McKearney, the date you have moving from

2   Worcester to Boston is in March 2003.  Do you

3   recall where you got that date from?

4   A   Once again, I don't recall specifically this

5   situation.  It would have been either the SF-52

6   or the SF-50.

7   Q   Do you recall the reason that Deputy McKearney

8   moved to Boston?

9   A   No, I don't.

10  Q   Just so I'm clear.  In your experience, prior to

11  Marshal Dichio assuming the position of marshal,

12  so under the prior administration, am I correct

13  that the Worcester assignments, as far as you

14  know, were either made on the basis of a bid in

15  for the position either as a transfer or as a

16  promotion, or as discipline, that those were the

17  two reasons that people moved to Worcester?

18  A   You could say that.  I don't honestly know.

19  Q   Well, do you have any knowledge of any facts to

20  the contrary?  Because we just went through and I

21  believe you testified that you knew that Tom

22  Bezanson moved in there because he was awarded a

23  posted job, --

24  A   Correct.

Page 88

1    Q    And that Steve McKearney and Leo Rosette moved

2         there for disciplinary reasons, and I'm just

3         wondering whether you have any knowledge as to

4         any facts contrary to what my understanding is?

5    A    Well, I don't know why Deputy Lewis was moved out

6         there.

7    Q    I'm sorry, for Steve McKearney, did you say you

8         had any understanding as to why he moved back to

9         Boston?

10   A    I don't have any understanding, no.

11   Q    Sue Williams moved from Worcester to Boston,

12        according to your chart, in October 2003.  Do you

13        recall where you got this information from?

14   A    Probably from an SF-52.

15   Q    Do you know the reason that Sue Williams moved to

16        Worcester?

17   A    I believe it had to do --

18   Q    I'm sorry.  Moved to Boston?

19   A    I believe it had to do with manpower in Boston.

20   Q    Any other reason?

21   A    Not that I know of.

22   Q    Do you recall why it was Sue Williams who was

23        selected to move to Boston?

24   A    I don't know.

Page 105

 1           eventually, was it all Boston, I believe?  That's

 2           my best recollection right now.

 3      Q    Okay.  So, just to be clear.  Under the location

 4           assigned for every other entry you have a

 5           location, except for Cindy DeCaire, under the

 6           limited duty --

 7      A    Well, there were different locations.

 8      Q    It was because there were at least two different

 9           locations involved and that it changed over the

10           time period of the limited duty, correct?

11      A    Correct.

12      Q    Then the next item down, the L.W.O.P is when she

13           was on leave, is that correct?

14      A    Correct.

15      Q    And then when she returned she was assigned to

16           Worcester, is that correct?

17      A    Yes.

18      Q    Are you familiar with any policies that the

19           Marshals Service has about light duty work?

20      A    I don't know of a written policy that I'm aware

21           of.  I'm sure there must be something, but I

22           can't recall it off the top of my head what it

23           would be.

24      Q    Are you the point person for light duty work at

Page 125

1  A    Well, she didn't understand the request, only

2       because, as I said before, it was to work out of

3       the Worcester office, but it was labeled

4       telecommuting, even though it does specify here

5       very clearly what the request was.  It was kind

6       of an oxymoron.  She did say that it was more or

7       less up to the district, and that if the district

8       can accommodate it, it was okay with

9       headquarters.  That's the best of my knowledge --

10      best of my recollection.

11 Q    She said it was up to the district?

12 A    As far as I can --  Yeah, as far as I can recall,

13      if the workload was in the Worcester office that

14      required her work.

15 Q    What happened next after you had that discussion

16      with her?  You went back and talked to Chief

17      Fallon about it?

18 A    Yes.  Oh, I know I did talk to him, right.

19 Q    What was your discussion with Chief Fallon?

20 A    Basically, what Mary Jo said.

21 Q    That it was up to the district?

22 A    As much as I can recall, yes.

23 Q    So, then did Chief Fallon make the decision that

24      there was no work available?

Page 126

1    A    With the marshal perhaps, yes, to best of my

2         knowledge.

3    Q    So, he didn't make it right there with you?

4    A    Oh, no.  No.

5    Q    He went back and talked to the marshal, to your

6         knowledge?

7    A    Correct.  And he might have talked to the

8         assistant chief.  I honestly don't recall who he

9         could have spoken to.  He might have called maybe

10        other districts even.  I don't -- I honestly

11        don't know.

12   Q    And he, then, came back to you and said we're

13        going to deny it?

14   A    Correct.

15   Q    And then you went back to Mary Jo Britt and said,

16        okay, how do I word this if we're going to deny

17        it?

18   A    I could have, yeah.  I honestly don't recall too

19        much.

20                      (Whereupon, the below-described

21                      2/23/04 Letter was marked

22                      Plaintiff's Exhibit No. 26.)

23   Q    (by Ms. Talwani)  I'm showing you a document

24        we've marked as Exhibit Twenty-Six.  Have you

Page 136

1          couple months ago, maybe.

2     Q    Did you find any documents?

3     A    No.

4     Q    Do you typically delete E-mails that you receive?

5     A    Well, after I don't need them, yeah.

6     Q    When you send E-mails, do you keep a copy in your

7          sent box?

8     A    Yeah, as long as I need to.

9     Q    And then do you go through them and delete those

10         also?

11    A    I usually try to.

12    Q    So, as you sit here today, you have no

13         recollection as to why you were specifically

14         asking about the leave time taken by Deputies

15         DeCaire and Williams at that time period?

16    A    I honestly can't recall.

17    Q    Just to give you a time period to try and refresh

18         your recollection, in the fall of 2002, Deputy

19         DeCaire moved to Worcester, and during this

20         period of time until the third week of January

21         they were both in Worcester, and the third week

22         in January for a week until February 3 was the

23         rotation assignment.  Does that refresh your

24         recollection as to why you were asking for this?

Page 137

1   A   Unless I was doing it on behalf of the chief or

2        someone else, I honestly can't recall.

3   Q   But you may have been doing this on behalf of

4        someone else?

5   A   Yes.

6   Q   So, typically, just in terms of how the chain of

7        command works, if the marshal, the chief or the

8        assistant chief needed certain information such

9        as attendance, performance evaluations,

10       disciplinary records, those types of things that

11       we've talked about that would be kept under

12       personnel things, they would make that request to

13       you, is that correct?

14   A   Correct.

15   Q   And if you didn't have that information directly

16       there, such as the attendance sheets, you would,

17       then, ask the person's supervisor, is that

18       correct?

19   A   Correct.

20   Q   Is it fair to say that that's most likely the

21       scenario here is that either the assistant chief,

22       the chief or the marshal asked you for this --

23   A   It's very possible.  I honestly can't recall

24       the circumstances.

Page 138

1  Q    Okay.  Well, as you sit here, there's no reason

2       why you independently would have needed that

3       information?

4  A    Not that I can think of.

5  Q    There's no forms that you would particularly

6       be needing that you would need that for?

7  A    No.  No.

8  Q    And since this request was going to their

9       supervisor, is it correct that the only people

10      who could have asked you to get this information

11      would have been the assistant chief, the chief or

12      the marshal, correct?

13 A    Yes.

14 Q    Now, at the time of the marshal, Marshal Dichio,

15      there was no chief and the assistant chief was

16      Paul Durette.  Does that refresh your

17      recollection as to who would have been likely to

18      make the request?

19 A    No.

20 Q    Was Paul Durette making any requests for this

21      kind of information at the end of his tenure?

22 A    It doesn't --  I wouldn't think so, but I don't

23      know.

24 Q    Because at the time, Paul Durette wasn't

Page 139

1    functioning and doing too much of the role of an

2    assistant chief anymore, correct?

3  A    Correct.

4  Q    So, it's fair to conclude this was information

5    requested by the marshal, isn't it?

6  A    I honestly don't recall.  I don't want to say

7    that for sure, but it's possible.

8  Q    And there's no other scenarios you can think of

9    as you sit here, correct?

10  A    I don't remember, I honestly don't.

11                    (Whereupon, the below-described

12                    Time Report Document was marked

13                    Plaintiff's Exhibit No. 32.)

14  Q    (by Ms. Talwani)  I show you a document marked as

15    Exhibit Thirty-Two.  Who is Ruth in this

16    document?

17  A    Ruth is the administrative employee in Worcester?

18  Q    And who's Stacy?

19  A    Stacy is an administrative employee in Boston who

20    does the time sheets in Boston.  Ruth does them

21    for Worcester and Springfield.

22  Q    Can you tell me what this document is that's

23    attached to the fax cover sheet?

24  A    Well, it's Cindy's work hours.  I'm not sure what

Page 143

1      your recollection?

2   A   No.  No, it doesn't.

3   Q   Reviewing a deputy's timecard like this is not

4      something that would be typically in your job

5      duty?

6   A   No.

7   Q   So, this would have been responsive to a

8      particular request you received, correct?

9   A   Oh, I would think so, yeah.

10  Q   And again, Tom Bezanson was the supervisor, so he

11      wouldn't have been the one requesting it,

12      correct, he's the one that just filled it out?

13  A   Correct.

14  Q   So, it would have been either the assistant

15      chief, the chief or the marshal, correct?

16  A   Yes, if --  Yeah.

17                  (Whereupon, the below-described

18                  Affidavit was marked Plaintiff's

19                  Exhibit No. 34.)

20  Q   (by Ms. Talwani)  I'm showing you a document

21      that's been marked as Exhibit Thirty-Four.  Have

22      you seen this before?

23  A   Yes.

24  Q   Can you tell me what this document is?

Page 152

1    what the deal is?" And I'll see if I have it, and

2    then I'll call down to headquarters, see if they

3    have it.  Sometimes the processing could take six

4    to eight weeks before the employee could get

5    anything back acknowledging them.  But, no, it's

6    more or less, I rely on the employee because

7    they've been times when fit coordinators somehow

8    between the chief and he gives it back to them

9    they don't get it back to me or whatever.  It

10   happens.  But it doesn't happen that often. But

11   typically, the awards are generated by the

12   respective supervisors, regardless of the type of

13   award.

14   Q    And along those lines, you spoke of operations'

15        issues and administrative issues, and how you're

16        more geared towards to administrative issues.

17        Would you explain the distinction between

18        operational and administrative matters?

19   A    Operational would involve, probably eighty

20        percent of the personnel in the district, because

21        that's what most of the positions are.  Deputy

22        U.S. Marshal 1811s, Supervisory Deputy U.S.

23        Marshals are all operational as well as

24        Springfield and Worcester.  You know, with

Page 153

1      regards to seniority, for example, I was reading

2      some of those things, and to lead a trial or

3      JPATs or trips are done by seniority, which I

4      didn't have any knowledge of.  Cellblock, all

5      operational.  The operations desk, operational.

6      So, I mean, like I said, there's approximately

7      forty-three people in the district, I believe,

8      and all but eight are operational.

9   Q   And the other eight, then, are administrative?

10  A   Correct.

11  Q   What is the focus of those other eight

12     individuals?

13  A   They have all different assigned tasks and they

14     all report to me, the administrative officer.

15     Could be seized assets.  It could be civil

16     criminal process.  It could be procurement.  It

17     could be health and safety.  Could be accountable

18     property, it's a big area.  Could be timecard.

19     Those things.  Any paperwork I guess you could

20     say, and sometimes certain administrative

21     employees could venture into an operational.  For

22     example, prisoner transport and prisoner

23     assignments and keeping track of prisoners.  They

24     do sometimes have to interact with operational

Page 164

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.


I, Karen T. McAllister, a Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify:

That **WILLIAM J. RYAN**, the Witness whose testimony is hereinbefore set forth, was duly sworn by me; that his/her testimony thereupon given was recorded by me and transcribed by me; and that such deposition is a true record of the testimony given by said witness, to the best of my knowledge, skill and ability.

IN WITNESS WHEREOF: I hereunto set my hand and notarial seal this 28th day of March, 2005.

Karen T. McAllister
Notary Public

My Commission Expir
March 6, 2009