Yahoo! Mail - cdecaire2000@yahoo.com
Page 1 of 10
Case 1:04-cv-10593-EFH   Document 30-50   Filed 04/16/2005   Page 1 of 16

**YAHOO! Mail** ✉

Print - Close Window



STATE: MASSACHUSETTS   DATE: June 18, 2004

PLACE: BOSTON

PRIVACY ACT INFORMATION

The Privacy Act of 1974 (PL 93-579) requires Federal Agencies to give individuals who are asked to furnish personal information about themselves, the following facts.

AUTHORITY: The Equal Employment Opportunity Commissions' Federal Sector Equal Employment Opportunity Rules and Regulations authorizes Investigators to administer oaths, and take written statements under the penalty of perjury: 29 CFR 1614.108.

PRINCIPAL PURPOSES: Affidavits are used to provide necessary information for the resolution and/or adjudication of discrimination complaints by federal employees or applicants for employment.

ROUTINE USES: This affidavit will be used by the Justice Department and possibly other federal agencies and/or the Federal Judiciary. It may also be used to execute statutory requirements of the Freedom of Information Act.

VOLUNTARY DISCLOSURE: The personal information you provide is entirely voluntary, therefore you may decline without penalty to provide the information being requested.

NO CONFIDENTIALITY

I understand that the statement I am giving is not to be confidential and that it may be shown to the interested parties. My name is Cynthia A. DeCaire I am employed by the U.S. Department of Justice, United States Marshals Service, and I am assigned to the District of Massachusetts, One Courthouse Way, Suite 500, Boston, MA. My job title and position grade is Deputy United States Marshal (DUSM), GS-1811-12, and my immediate supervisor's name is Thomas Bezanson, Supervisory Deputy United States Marshal (SDUSM). My race, national origin, and sex are Caucasian American female.

EXHIBIT 12

Page 2 of 16
Yahoo Mail - cdecaire2000@yahoo.com
Case 1:04-cv-10593-EFH   Document 30-50   Filed 04/16/2005   Page 2 of 16

Note: The issues accepted for investigation are: Whether the Complainant (Cynthia A. DeCaire) was subjected to sex female), and reprisal discrimination when:

**(1)** On October 14, 2003, she was reassigned from the District of Massachusetts Boston Office to the Worcester Office.

**(2)** On November 20, 2003, while on limited duty she was assigned to work in the Control Room.

**(3)** She was repeatedly transferred between the Boston and Worcester Offices.

**(4)** She was threatened with the loss of limited duty status.

**(5)** On September 23, 2003, she was not considered for the position of Acting Supervisor of Court Operations.

**(6)** On September 29, 2003, she was not considered for the position of Warrant Coordinator.

Note: I have not been privy to anyone's affidavit. I am responding to the questions posed by the EEO Investigator.

Question-1: What is the name of each U.S. Marshals Service official or officials that you believe discriminated against you? On what basis i.e., sex, and/or reprisal?

Answer: I believe that I was discriminated against on the basis of sex and/or reprisal by the U.S. Marshals Service. It is my belief that such discrimination occurred at the direction of, or with the knowledge of, United States Marshal Anthony Dichio, and that various subordinates of Marshal Dichio, including Chief Deputy Marshal William Fallon, Assistant Chief Deputy David Taylor, Supervisory Deputy Thomas Bezanson and Supervisory Deputy Alison Hodgkins, may also have engaged in reprisal activity at Marshal Dichio's direction.

Question-2: You have alleged that on October 14, 2003, you were reassigned from the District of Massachusetts Boston Office to the Worcester Office. (A) Who reassigned you? (B) Explain why you should not have been reassigned? (C) What did your supervisor tell you with regards to why you were selected for reassignment? (D) Had you been reassigned to Worcester before? If so, when and under what circumstances? (E) Had you requested to be reassigned to Worcester, if so, when?

Answer:

(A&C) On October 14, 2003, at approximately 09:30 a.m., I was asked by Supervisor Paul Dunne to come to his office. SDUSM Dunne then told me that I was being transferred to the Worcester office and should pack up my belongings and be out there by noon. I asked why I was being transferred again, and SDUSM Dunne advised me the transfer was due to the conflict of SDUSM Bohn and myself being married the past weekend. Dunne also advised me at this time that DUSM Williams would be taking my place in Boston. I asked SDUSM Dunne

why I had to be transferred again, and why he could not supervise me. Dunne had no answers to my questions, only that he had just found out about these transfers five minutes ago. I explained to SDUSM Dunne why I thought this transfer was unnecessary and how the constant transfers created childcare issues for me. Dunne told me this was coming from above him, and there was nothing I could do about it. I also explained to Dunne the hardship this was going to cause DUSM Williams who was in the process of building a house 30 miles west of the Worcester office. I asked Dunne why it was always DUSM Williams and myself being transferred and no one else. SDUSM Dunne told me DUSM Williams' selection was based on seniority.

(B) This particular transfer would be my fourth of six transfer's since USM Dichio took office in August of 2002. No other DUSM's other than DUSM Williams and myself have had to worry about when and what our next transfer will be.

The transfer to Worcester could have been avoided by placing me in numerous other positions in the Boston office where I would not be under SDUSM Bohn's direct supervision. Management could have easily assigned me to the warrant unit where I used to be a Team Leader until USM Dichio transferred me. Management previously used seniority as an excuse to transfer me, but yet I am senior to 90% of the DUSM's assigned to the warrant unit.

Management has known that SDUSM Bohn and I have had a relationship and have lived together since 2001. After learning of my initial complaint and then moving me to the Court Operations unit in Boston in January 2003, management also removed SDUSM Bohn from his position on the HIDTA task force and placed him in the Court Operations unit in Boston as well. Eventually, management assigned SDUSM Bohn to supervise Court Operations part of the day, and as a result, I was under USDM Bohn's direct supervision. Moreover, after the October 14, 2003, transfer to Worcester, management subsequently moved me to the control room in Boston, where I was again placed under SDUSM Bohn's supervision.

Throughout the United States Marshal Service there are numerous married couples assigned to the same office. Furthermore there are many Supervisors with relationships, including marriage, assigned to the same offices. (D&E) My prior requests and transfers are detailed in my first affidavit.

Question-3: Were you permanently assigned to the Worcester office as of October 14, 2003, or were you required to report to the Worcester or other offices as needed?

Answer: When I arrived in the Worcester office on October 14, 2003, I met with SDUSM Bezanson. After discussing my concerns regarding the transfers of DUSM Williams and myself, I asked him if my transfer was permanent. SDUSM Bezanson told me he believed my transfer was "what I made of it". I told SDUSM Bezanson I needed to know the status of my transfer, and he told me he would go up the chain of command to find out.

I asked SDUSM Bezanson again after this conversation if he found out my status and whether I had an SF50. SDUSM Bezanson said he still did not know, and I informed him again I needed to know because I had documents to complete which asked for my duty station. SDUSM Bezanson told me he would ask ACDUSM David Taylor.

On November 14, 2003 I received notice that I was assigned to light duty and that my assignments while on light duty were in the Worcester office on Mondays and Fridays, the

Boston office control room on Tuesdays and Thursdays, and Springfield on Fridays. During a three way conversation with Chief Fallon and SDUSM Bezanson regarding my new light duty assignments, I asked Chief Fallon what my permanent duty station was. After I repeated the question several times, Chief Fallon answered me angrily that "your duty station is Worcester Cyndy OK".

After I complained about the working conditions in the Boston control room, I was assigned there almost full-time until I went on leave for the birth of my child.

Question-4: Prior to your reassignment or transfer to Worcester, was the Boston office your duty station? If so, how long was you assigned to the Boston office?

Answer: My prior assignments and my understanding as to whether they were permanent or temporary are detailed in my earlier affidavit.

Throughout the transfers that have occurred since Marshal Dichio took office, I have never been provided with an SF50.

Question-5: Why was your sex, and reprisal a factor in being reassigned to Worcester and being repeatedly reassigned between Worcester and Boston?

Answer: I believe sex and reprisal to be the only contributing factors concerning my transfers for a number of reasons. First and foremost, nobody in the District of Massachusetts has ever been transferred from office to office under any administration at any time like I have been.

The nature of my transfers is troubling in many ways. I have been made to endure numerous transfers in a short period of time without any notice. I have been given as little as two hours to move my belongings from Boston to Worcester, which is over an hour drive. It is common practice for management to give Deputies a week to move from one section of the office to another, but yet my transfers are always immediate and without notice. Normally, when Deputies are reassigned from one position to another, management puts out an e-mail informing the office of their change. That has not occurred with respect to these transfers.

I believe that management's constant selection to transfer just DUSM Williams and myself is based on retaliation and sexual discrimination. We are senior Criminal Investigator's assigned to the District of Massachusetts and management has a pool of over 20 Criminal Investigators and 8 series 082 deputies to choose from, but yet no one but DUSM Williams and myself are made to endure transfers. DUSM Williams and myself have also been assigned to Court Operations, which is a non-investigative unit. Again there is a Junior 082 Deputy, which at the time of our last transfer had six months on the job and should have been selected to perform court duties in Boston. It is my understanding that the 082 assigned to Worcester (Sean Weddeke) performs numerous investigative duties, while DUSM Williams and myself are assigned to perform non-investigative work.

Management has used seniority and experience as excuses for transferring me or keeping me out of investigative positions. I was a senior Team leader in the investigative warrant unit in the Boston office until USM Dichio's arrival. USM Dichio has removed me from that unit and transferred me back and forth, and assigned me to non-investigative positions since that time. My junior male counterparts and members of my former Team have remained in their positions without the threat of reassignment or transfer. It should be noted there are no

females DUSMs assigned to the investigative warrant unit.

Question-6: What USMS policy, procedure or practice is at issue with regards to your reassignment(s)?

Answer: It is my understanding that the Equal Opportunity laws and policies of the United States Marshals Service mandate that gender and retaliation not be used in a discriminatory manner in assigning duties. It is also my understanding that the practice at the United States Marshals Service has been: (1) to give deputies advance notice when they are reassigned from one position to another; (2) to announce the reassignment informing the office of the change; (3) to keep deputies advised as to whether assignments are temporary or permanent; (4) to utilize form SF50's in connection with permanent transfers; and (5) to use Marshal service seniority in connection with transfers and assignments.

Question-7: You have alleged that on November 20, 2003, while on limited duty you were assigned to work in the Control Room. (A) Who assigned you to work the Control Room, and explain whether it was the Boston Office Control Room? (B) How long did you work the Control Room, i.e., an hour, a day, week, etc? (C) Explain why you should not have given this assignment? (D) What did your supervisor tell you with regards to why you were assigned to work the Control Room? (E) Did you tell your supervisor or other manager why you should not be assigned to the Control Room, if so, whom did you tell, when, and what was their response?

Answer: On November 14, 2003 I received a letter from Chief Fallon regarding my limited duty due to pregnancy. This letter stated that I would be reassigned yet again, this time to three different offices to commence on the following Monday. I told SDUSM Bezanson that this would create a difficult situation regarding my childcare etc. On this same day, SDUSM Bezanson and I had a two way conversation with Chief Fallon. During this conversation the Chief insisted I sign the Letter, I explained to him the hardship this would create in traveling to three offices different days of the week, the Chief again insisted I sign the letter and threatened if I did not I would have to use sick leave for my pregnancy and also that if I did not I will be assigned full time to the Boston control room. I informed the Chief of my concerns and that I wanted to speak to my attorney, Chief Fallon told me my attorney has nothing to do with it. I told him I wanted to invoke my FMLA rights because I could not manage the schedule he insisted I had to follow with again no notice. The Chief then hung up and an hour later called back and informed SDUSM Bezanson that I could not use my FMLA. I informed SDUSM Bezanson that I would be taking sick leave until I could rearrange my child care schedule for the third or fourth time. SDUSM Bezanson agreed that would be the best thing to do.

I returned to the Boston office, as Chief Fallon scheduled, on November 20. I was told by SDUSM Dunne that I was to work in the control room in Boston on Tuesday's, Wednesday's and Thursday's, eliminating Wednesday's in Springfield. I explained to SDUSM Dunne that not only did this transfer create personal problems but that I was concerned over being scheduled in the control room. I brought to SDUSM Dunne's attention the health hazards that were known to exist in the control room, along with the unknown risks of being pregnant in the control room. I also put my concerns in writing via e-mail to SDUSM Dunne with a cc to ACDUSM Taylor. SDUSM Dunne said he would check it out but until then I would be in the control room, SDUSM Dunne also asked me what else I could do. I explained to SDUSM

Dunne, the functions I performed when I was on limited duty with my first pregnancy. SDUSM Dunne told me he would try to get me out of the control room by serving business process. I was provided with e-mails from DUSM Donaher to HQ's officials regarding health hazards and concerns over the conditions in the control room (see attached e-mails).

(B) I was scheduled in the Boston control room on Tuesdays, Wednesdays and Thursdays for 8-10 hours a day. After several weeks it became routine for SDUSM Bezanson to e-mail me on Thursday afternoons and tell me I was not needed in Worcester and to stay in Boston on Friday and sometimes Mondays. This being said, the minimum time in the control room was three days a week 8-10 hours a day to five days a week 8-10 hours a day.

On January 22, 2004 after responding to a request of information by Chief Fallon via e-mail, I received a phone call from SDUSM Bezanson. SDUSM Bezanson called demanding a reason why I e-mailed the Chief and did not cc him a copy. After trying to explain to SDUSM Bezanson this was a request from the Chief who called me directly, I was accused of violating "his rules". SDUSM Bezanson was very argumentative and finally told me until further notice I was assigned to the Boston control room full time. SDUSM Bezanson further informed me that if I need anything out of the Worcester office I can get it before or after hours, and that I should be completing my collateral AED duties on LEAP time (before or after hours). Bezanson's conduct was very hostile and demeaning, I complained to ACDUSM Taylor in person and also put my concerns in writing to him via e-mail (see attached e-mails). Needless to say at this time, I was assigned full time to the control room five days a week 8-10 hours a day.

( C )& (E) Shortly after informing SDUSM Bezanson that I was pregnant, he repeatedly kept telling me he would try to find work for me in the Worcester office so I would not end up back in the Boston Office. SDUSM Bezanson was also initially concerned that I end up in the Boston Control room. I asked SDUSM Bezanson how that could happen, considering I had just been transferred from Boston in order to separate SDUSM Bohn and myself. If SDUSM Bezanson's concerns came true, I would be under SDUSM Bohn's direct Supervision, negating the necessity for my last transfer. I also informed SDUSM Bezanson and Chief Fallon that re -assigning me again with no notice as usual would cause me difficulties with my childcare arrangements. Chief Fallon did he want to discuss this matter. In fact he threatened. he was doing me a favor by not making me go out on sick leave and that if I did not sign his letter I would be assigned full time to the Boston control room. Sure enough I was assigned to the control room.

After being re-assigned to the Boston control room I raised my concerns to my new Supervisor SDUSM Paul Dunne. I advise him verbally and in writing. SDUSM Dunne told me he would look into the issues, but I never received a response.

The control room is routinely assigned to guards and Court Security Officers. 1811 Criminal Investigator Deputies are not assigned to this position. As stated above the control room has been an area of concern to employees for over a year due to hazardous conditions. I am an 1811 criminal Investigator Deputy with thirteen years experience I believe I had much to offer the District of Massachusetts while I am on light duty status. USMS policy and procedures governing pregnant woman list numerous functions which I could have performed in the Worcester office. While pregnant in the Worcester office, I was given not given any assignments and was left with virtually nothing to do, although there was plenty of work available.

I watched SDUSM Bezanson assign business process, vehicle maintenance, investigative research and other tasks which I also could have performed efficiently. I have been pregnant in the District of Massachusetts in the past and was allowed to perform all of the listed duties without the threat of being transferred or made to use sick leave.

I brought up my concerns about the lack of bathroom breaks and relief in the control room to my Supervisor Allison Hodgkins, who agreed it was an undesirable place for me to be. SDUSM Hodgkins asked me what else I could do, I informed her and provided her with a list of the other duties I could perform. Ultimately I was not allowed to perform any of these duties in the Worcester or Boston offices.

Question-8: Why was your sex, and reprisal a factor in being assigned to work the Control Room?

Answer: I believe reprisal and sexual discrimination to be the only factors why I was reassigned to work the control room.

The assignment to the control room makes little sense in light of management's recent transfer of me to Worcester to avoid SDUSM Bohn's supervision of me. Although I was told SDUSM Dunne would be my Supervisor, SDUSM Bohn was in charge of the control room and SDUSM Dunne was often out of the office which made SDUSM Bohn my direct Supervisor. .

Shortly after being assigned three days a week to the control room it became full time. I was often given a few hours notice on where to report each day. On January 15, 2004 , at 2:30 pm, I received a phone call from SDUSM Bezanson. SDUSM Bezanson informed me that Ruth (Worcester secretary) would be in the following day, so there is no need for me, I should stay in Boston. I advised SDUSM Bezanson that I had advance sick leave which he approved for that day for a Doctor's appointment. I advised SDUSM Bezanson that my appointment was in Worcester. SDUSM Bezanson stated "oh well looks like you will have to take more sick leave".

This conversation was troubling to me and also supports my belief that my assignments are retaliatory. I subsequently explained to SDUSM Dunne that I had the appointment in Worcester, had had the leave approved, and was being forced to take additional sick leave time because of the reassignment. SDUSM Dunne said he would ask ACDUSM Taylor if I could serve process which would alleviate me having to take more sick leave. SDUSM Dunne was in ACDUSM Taylor's office for over an hour before he came out and told me I could serve process and then head to Worcester for my appointment. Usually a Supervisor does not have to ask permission to assign their personnel, in fact that is their number one function. I believe SDUSM Dunne was afraid to let me out of the office or out of the control room, because that is where he was told to put me.

Around this same time, SDUSM Dunne called me in his office to address my hours. SDUSM Dunne said that I was being watched and that "higher management" was concerned that several times I have been a few minutes late, and that I should be getting here an hour or so early to get my LEAP time (Law Enforcement availability pay). SDUSM Dunne said it was not

fair to the other employees that I did not come in early. I asked SDUSM Dunne who this was coming from, knowing I was often times the last employee to leave at night. Being assigned to the control room I would have to stay until the last prisoner left the building, and my fellow employees were well aware of this fact. SDUSM Dunne said he knew I was late a couple of times and that I notified him, and that this was not his style of management "it was coming from above". I made SDUSM Dunne aware of the fact that when he. and ACDUSM Taylor. Chief Fallon and Marshal Dichio were long gone at night. I was often times the last one to leave. I had also made SDUSM Dunne aware of the fact that my repeated transfers have caused me to loose my daycare spots, making it difficult for me to get there hours early in the morning. SDUSM Dunne told me that he was not aware that I stayed late. and that he would pass that on to the higher ups.

I also asked SDUSM Dunne if I was still assigned to the Worcester office. knowing that if the other male Worcester Deputies are assigned to Boston they are allowed and encouraged to come in late and leave early because of their commute. SDUSM Dunne said he thought so, but could not keep track.

Again it is obvious I am treated differently than my fellow male Worcester co-workers who are only given assignments in Boston here and there and are allowed to be in at 10:00 and out by 4:00. I on the other hand must arrive hours early and stay hours late with no regard to where I am assigned at the time.

On January 20, 2004 SDUSM Bohn and my new Supervisor SDUSM Hodgkins had a meeting with ACDUSM Taylor. During this meeting ACDUSM Taylor advised SDUSMs Bohn & Hodgkins that the only thing I can do is work in the control room. ACDUSM Taylor also advised them that if Worcester DUSMs are needed for court, that they should make sure to get them out early. They should take into consideration their commute times.

This meeting confirmed the fact I am being treated differently and that ACDUSM Taylor did not want me out of that control room. I met with SDUSM Hodgkins after this meeting in the control room in the presence of DUSM Williams and a court security officer. SDUSM Bohn had already informed me of his meeting with ACDUSM Taylor and I questioned SDUSM Hodgkins why I was being treated differently. SDUSM Hodgkins confirmed the information stated during the meeting, and I told her I was concerned over being treated differently and I believed it to be retaliation. SDUSM Hodgkins told me she was not told anything about my EEO complaint (although she was aware of it), and that the only person she was told to leave alone was DUSM Annette Lawlor. SDUSM Hodgkins stated that whenever my EEO complaint comes up with management she just walks away. SDUSM Hodgkins told me I was better off working for her in Boston than for "Tom" in Worcester. SDUSM Hodgkins told me she felt bad for me having to work in the control room, and asked what else I could do. Again, I informed and provided SDUSM Hodgkins with a list, but was not given any other assignments.

Until this time I was assigned to the control room with two court security officers. The court security officers and I would relieve each other for lunch, breaks and bathroom visits. This was the routine I was told to follow by Paul Dunne. Shortly after SDUSM Hodgkins became the Supervisor, I was told I could not leave the control room without permission for any reason including the bathroom. I must get another DUSM to replace me. I told SDUSM Hodgkins it was torturous to make a pregnant woman search for relief for the bathroom, this had never been done to anyone before. Although I would normally comply and search for relief, on a few occasions when I simply had to go without waiting for relief, I was

reprimanded t by SDUSM Hodgkins, many times in front of my co-workers. The conditions for me got so bad that my fellow co-workers would occasionally come on their own into the control room to relieve me, only to be reprimanded themselves by SDUSM Hodgkins for being there without permission. This is well beyond any prior common practice for the control room until I was assigned. After complaining to SDUSM Hodgkins about my treatment, she began to assign in writing on the court docket specific DUSMs to relieve me. A majority of the time the DUSMs assigned to my relief where purposely given all day assignments and often times not even in the office at all. Again, my fellow co-workers would feel bad and try to relive me if they had down time, only to be continually reprimanded by SDUSM Hodgkins.

Question-9: You have alleged that you were repeatedly transferred between the Boston and Worcester Offices. (A) Explain what you mean by being "repeatedly transferred." For example, were you assigned to Worcester, but told to report to Boston instead of Worcester? If so, when were you told to report to each, and who made the assignments? (B) Explain why you should not have been repeatedly transferred or told to report to one of the two offices? (C) What did your supervisor tell you with regards to why you were selected to report as you indicate? (D) Did you complain, if so, to whom, and when, and what was the response to your complaint?

Answer: Much of this question has been answered above. These transfers follow the several different transfers described in my first Affidavit.

1. October 14, 2003 Boston to Worcester

SDUSM Dunne tells me I am being transferred to Worcester, giving me the reason SDUSM Bohn and I need to be separated due to our marriage. I explain to SDUSM Dunne the complications this will cause me. SDUSM Dunne tells me there is nothing I can do about it. SDUSM Dunne also notifies me I must be in Worcester by noon. I ask SDUSM Dunne why this has to happen so soon and why it has to happen at all. SDUSM Dunne has no answers only that he is "the messenger". This is the least amount of time ever given for a transfer. I arrived in Worcester, the office is rearranged and I am given an old desk and computer that I cannot log onto. I complain to SDUSM Bezanson again about my repeated transfers, I also ask him if this transfer is permanent. SDUSM Bezanson states he believes this transfer is what I make of it. I advise him I need to know my permanent duty station, he says he will go up the chain of command to find out. I ask SDUSM Bezanson several more times after this, he still does not know but says he will ask ACDUSM Taylor. I am never told what my status is until a phone conversation in November when I am transferred/ re-assigned again. Chief Fallon angrily tells me my duty station is Worcester. This is unfair treatment, my fellow male co-workers know what their permanent duty station is, and they are not threatened that there duty station is "what they make of it".

2. November 14, 2003, reassigned/transferred Worcester to Boston, Springfield and Worcester

This transfer is after I advised management I am pregnant and request limited duty. Chief Fallon insists I sign his letter dated November 13, 2003, or else I will be transferred full time to the Boston control room. I advise Chief Fallon I do not agree with the reassignments/ transfers nor do I want to sign his letter. I tell SDUSM Bezanson and Chief Fallon this schedule will be impossible to manage.

After taking several days of sick leave I advised SDUSM Bezanson telephonically from my residence that I will sign the letter and return to work, but that I do not agree with it. SDUSM Bezanson advises me that management is doing me a favor by giving me limited duty and that they could take it away at any time, he also states that my husband SDUSM Bohn should be aware of this also. This statement is troubling for several reasons. I have been pregnant while employed by the USMS before, and was never threatened with the loss of employment for a period of time nor was I threatened that limited duty was "a favor".

3.  November 20, 2003, reassignment/transfer Worcester. Springfield, Boston to Worcester & Boston

I report to Boston on my scheduled day, and I am told by SDUSM Dunne that I am now assigned to Boston Tuesdays, Wednesdays, and Thursdays. SDUSM Dunne tells me I am to work in the control room in Boston. I ask Dunne for a computer so I have access to e-mails. DOJ intranet etc. I also asked for a desk mailbox and phone. I asked several members of management repeatedly for equipment to perform my duties. I was given nothing. SDUSM Bezanson is upset that I ask for equipment, and tells me to get what I need out of the Worcester office before or after business hours . Again no other employees in Boston or Worcester are expected to perform all of their collateral duties before or after business hours.

4. January 21, 2003, Worcester & Boston to Full time Boston

After receiving a offensive phone call from SDUSM Bezanson. I am told nastily that I should stay in Boston full time. SDUSM Bezanson literally banishes me from the Worcester office during business hours. I am told verbally and in writing to get my belongings during LEAP time. (See attached e-mail from SDUSM Bezanson to me & e-mail from myself to ACDUSM Taylor regarding Bezansons conversation). I complain to ACDUSM Taylor that this treatment is not fair and has created a hostile unproductive work environment. I am given a collateral duty to perform, but I am not allowed out of the control room to accomplish this task. I believe this was managements attempt to make me fail at an assignment, but I continually tried to comply even though I was met with resistance.

Question-10: You have alleged that you were threatened with the loss of limited duty status. (A) Who threatened you, and when? (B) Specifically, what was said to you and what was the context of the conversation? (C) Did you complain about being threatened, if so, to whom. and when, and what was the response to your complaint?

Answer: On November 14, 2003, SDUSM Bezanson asked me to his office. SDUSM Bezanson handed me a letter from Chief Fallon dated November 13, 2003. SDUSM Bezanson told me I needed to sign this letter, after reading it told SDUSM Bezanson I did not agree with it and did not want to sign it until I thought about it and whether I could do it. SDUSM Bezanson was apologetic and said he thought he could avoid this and keep me in Worcester all the time, SDUSM Bezanson also asked "when is this going to stop". Later this same day, SDUSM Bezanson said he was told to bring me to his office to have a two way conversation with Chief Fallon. Chief Fallon angrily asked me why I would not sign the letter. I told Chief Fallon that the constant transfer/reassignments were causing turmoil in my life and I did not think I could manage such an unbalanced schedule. Chief Fallon threatened me and said that he did not have to give me light duty, also he could make me use my sick time for

the duration of my pregnancy. I told Chief Fallon I had been pregnant before and did not receive such treatment. Chief Fallon then threatened that if I did not sign his letter, I would be assigned full time to the Boston control room. I told Chief Fallon I wished to invoke my FMLA because I would not be able to sign his letter and rearrange my daughter's care for the 6th time without any notice. I also told Chief Fallon I wished to discuss this with my attorney because I had already filed a complaint on my treatment by management and I believed this to be continued retaliation. Chief Fallon said decisions are not made by attorneys and said he wanted any answer right now. IChief Fallon called back later as I was typing my leave slip and told SDUSM Bezanson to tell me that I could not use my FMLA. I told SDUSM Bezanson I would use sick time until I could figure out my chidcare. SDUSM Bezanson told me he thought this was the best thing to do.

On November 19, 2003 I called SDUSM Bezanson from my residence and informed him I did not agree with the letter but I would sign it so I would not have to waste all my sick time. SDUSM Bezanson's temperament had changed from that of a consoler in the office, to threatening reminding me that they did not have to accomodate me or Jeff (my husband SDUSM Bohn) and that to make sure Jeff knows, that our limited duty could be taken away at any time. I told SDUSM Bezanson I was familiar with the policies and procedures governing pregnant employees, and that it states that after six months of pregnancy duty status will be limited duty Since telling management I was pregnant they have taken an offensive approach even going so far as to deny my work life request to work in the Worcester office the last two week s of my pregnancy. Not only did they deny my request, but they denied my Husband's (SDUSM Bohn), when he requested to work in Worcester the last two weeks of my pregnancy. SDUSM Bezanson received his request and emailed all his friends making fun of SDUSM Bohn's request and stating in his e-mail "this is ridiculous, it never ends why is this guy still here This should confirm managements intent to continue retaliating and threatening myself and SDUSM Bohn. Ultimately the management I am complaining to is the management that has joined in on the retaliation.

Question-11: You have alleged that on September 23, 2003, you were not considered for the position of Acting Supervisor of Court Operations. Who was the assigning official? Who was given the assignment, and how long did the assignment last?

Answer: On August 21, 2003, I e-mailed AACDUSM Taylor my interest in being considered for the position of Acting Supervisor of Court Operations. This position was given to another Deputy whose 120 days as Acting had expired. AACDUSM Taylor said via e-mail he would forward my request. No one in management including AACDUSM Taylor spoke to me further regarding my request. On September 23, 2003, I believe the ongoing retaliation against me was proven when AACDUSM Taylor requested a meeting with DUSM Annette Lawlor. At this meeting AACDUSM Taylor asked DUSM Lawlor if she would be interested in being appointed as the Acting Supervisor for court operations. DUSM Lawlor explained to AACDUSM Taylor she had no interest in management or progressing into management. DUSM Lawlor informed DUSM Donahue and myself of her conversation with AACDUSM Taylor and her disgust to have anything to do with management in this office. Not only did AACDUSM Taylor not discuss this position with me, he sought out another Deputy who did not even express interest and offered her the position.

In USM Dichios affidavit, question #9 USM Dichio's reason for selecting DUSM Hodgkins was that she had topped the last three promotional lists.

I have also topped the promotional list, and DUSM Lawlor has not even completed a promotional package, nor does she apply for promotional positions.

Ultimately when management's offer was denied by DUSM Lawlor, they eliminated the position and gave it to SDUSM Bohn & SDUSM Dunne to share

Question-12: Explain why you should have been given that Court Operations Supervisor assignment as opposed to the DUSM who was assigned? What did management tell you with regards to why you were not given the assignment, and whom in management shared this information with you? Why was your sex, and reprisal a factor in this matter?

Answer: Another DUSM was not assigned to this position, after ACDUSM Taylor offered it to DUSM Lawlor who declined, the position was split between two Supervisors.

Not only should I have been offered this position, ACDUSM Taylor should have treated me like my fellow co-workers, and had a discussion with me.

DUSM Lawlor has not submitted a promotional package, not only have I completed and submitted one, but I have placed at the top five for the last announced GS-13 promotion.

I am also senior by GS grade than DUSM Lawlor, and I have also been assigned to Operational desk and performed all of its functions successfully.

Question-13: You have alleged that on September 29, 2003, you were not considered for the position of Warrant Coordinator. (A) Explain what your assignment was prior to September 29, 2003, and whether you were working warrants or assigned to the Warrants Squad? (B) Why do you believe you should have been assigned as Warrant Coordinator on September 29, 2003? (C) What did management tell you with regards to why you were not assigned, and who shared this information with you? (D) Also, clarify whether you are referring to being assigned to the Warrant Squad or administrative duties therein?

Answer: On September 29, 2003 I was assigned to the court operation unit, where I have been assigned since my transfer from Worcester to Boston in February 2003. Prior that I was assigned as a Team Leader in the Warrant unit where I was assigned for over four years.

I requested to be the warrant coordinator in April of 2003, as noted in my prior EEO complaint. This position was developed in early 2003, and was non existent for the 13 years I have been in the District of Massachusetts. The supposed reason for my non selection in April of 2003 was that I was not assigned to the warrant unit at the time the position opened up.

Question 11 in USM Dichios affidavit , he states "warrant coordinator is a DUSM currently assigned to the investigations unit"

DUSM Kevin Donahue and myself are assigned to and perform the same functions in the

Court Operation unit. I am over four years senior to DUSM Donahue, and I was a former Team Leader in the warrant unit, where I worked with DUSM Donahue. DUSM Donahue was not, nor did he express any interest in being a warrant coordinator.

I found out second hand on September 29, 2003 from a Boston Police Detective (Steven Ridge), that he was told that Kevin Donahue was going to be the next warrant coordinator.

On this same day, I had a conversation with DUSM Donahue who was unaware of this information. DUSM Donahue reiterated previous statements he made, regarding the fact that he did not want this position nor did he ask anyone for it. Later this same day DUSM Donahue, a court Deputy, was assigned the new warrant coordinator.

I am alleging that DUSM Donahue should not have been selected, because he had no interest nor did express interest in holding this position. DUSM Donahue has not completed a promotional package because he has no interest in becoming a member of management and is vocal about this fact.

On the other hand, I have held the position as Team Leader of the warrant squad successfully. I have repeatedly asked for acting management positions. I have applied for several GS-13 Supervisory positions in the District. I have completed a promotional package. I have asked to be a warrant coordinator in the past. I am senior to DUSM Donahue.

(d) I am referring to being assigned to the Warrant Squad, not administrative, I was not on limited duty at this time.

Question-14: (A) Who was assigned Warrants Coordinator on September 29, 2003? (B) Are you alleging that the employee assigned to should not have been assigned? If so, why not? (C) Why was sex and/or reprisal a factor in this matter?

Answer: See Answers to question 13.

Question-15: Had you served as Warrant Coordinator before September 29, 2003? If so, when and under what circumstances?

Answer: As stated in my previous EEO complaint, I have never served as Warrant Coordinator. This position was developed after USM Dichio removed me from my position as Team Leader. Prior to Warrant Coordinator position being created, however, the highest rank under Supervisor was Team Leader, and I held that position successfully.

Question-16: When were you hired by the U.S. Marshals Service, and what was your position at the time of your hire, and where was your duty station? Where is your current permanent duty station?

Answer: I was hired by the USMS in June of 1991, my position was Deputy US Marshal and I was assigned the duty station of Boston, Massachusetts.

I do not know what the USMS considers as my permanent duty station at this time.

Question-17: What remedies are you seeking in order to resolve this complaint?

Answer: I wish my future with the U.S. Marshals Service to be taken out of Marshal Dichio's hands. I am requesting what I believe to be the only remedy in this matter, specifically that I be transferred to a position (at the same grade level or higher) within the District of Massachusetts that reports to Headquarters and not to the Marshal. I also request compensatory damages for the adverse working conditions I have had to endure, and I request payment of my attorneys' fees in connection with this EEO complaint.

Question-18: Do you have any witnesses that you recommend be interviewed? If so, please give me their names, work location, and a brief overview of what germane facts they can be expected to attest.

Answer: DUSM Annette Lawlor, Boston , Ma.

DUSM Lawlor can attest to the fact that ACDUSM Taylor offered her the position of Acting Supervisor of Court Operations. DUSM Lawlor can attest to the fact that she did not ask for this position nor does she aspire to become a member of management. DUSM Lawlor can also attest to the unfair treatment and hostile environment I have been forced to tolerate while I was assigned to the control room in Boston.

DUSM Kevin Donahue, Boston Ma.

DUSM Donahue can attest to the fact that he never asked to be considered as a warrant coordinator, nor does he aspire to become a member of management, nor has he completed a promotional package, nor has he applied for supervisory positions. DUSM Donahue can attest to the fact we were both Court Deputies, that I was senior to him, and that he was selected for the position without being assigned to the warrant squad. DUSM Donahue can attest to the unfair treatment and hostile work environment I have been forced to tolerate when I was assigned to the control room in Boston.

DUSM Susan Williams, Boston, Ma.

DUSM Williams can attest to the fact that on October 14, 2003 she was called into SDUSM Bezanson's office and questioned about attending my wedding. After interrogating Williams about my wedding, SDUSM Bezanson told her she was transferred to Boston. DUSM Williams was also given hours to comply with this transfer. DUSM Williams like myself was not given her computer files, voice mail or a mailbox. DUSM Williams can also attest to the hostile work place environment and unfair treatment I have had to endure. DUSM Williams can also attest to the facts that she believes show that she is a victim of retaliation and discrimination regarding my EEO complaint.

DUSM John Wickham, Boston, Ma.

DUSM Wickham can attest to the unfair treatment and hostile work environment I have been forced to tolerate. DUSM Wickham can attest to the fact that he had a conversation with SDUSM Hodgkins in which she refers to herself as managements "escape goat" in dealing with my unfair treatment. DUSM Wickham can attest to the control room rules of bathroom breaks etc. I was forced to follow.

SDUSM Jeffrey Bohn, Boston Ma.

SDUSM Bohn can attest to the treatment I received in the Boston office, in particular the control room, which he supervised. SDUSM Bohn can attest to the fact he was told by ACDUSM Taylor to treat the Worcester male Deputies differently than me, and that the only function I was to perform was the control room. SDUSM Bohn can attest to the hazardous conditions of the control room and the treatment I was forced to endure. SDUSM Bohn can attest to the fact that USM Dichio is obsessed with my whereabouts and continuously would call him to correct my status on the duty roster, but was not concerned with anyone else.

SDUSM Bohn can attest to the hostile working conditions he has been forced to tolerate since I filed my initial EEO complaint. SDUSM Bohn can attest to the fact that he is a direct victim of USM Dichio's retaliation regarding my complaint. SDUSM Bohn can attest to the fact that SDUSM Bezanson sent an email that he mistakenly received, suggesting management is trying to get rid of him.

SDUSM Bohn can attest to the treatment I received while assigned to the control room. and how it is different now that I am not there.

SDUSM Bezanson, Worcester, Ma.

SDUSM Bezanson can testify to the fact that when I was assigned to Worcester in October 2003, he was not immediately notified as to whether the assignment was permanent or temporary.

DUSM Gary Olivera

DUSM Olivera would attest to the hostile work environment and unfair treatment I have been forced to tolerate. DUSM Olivera can attest to the conditions of the Control Room and my treatment regarding bathroom breaks etc.

DUSM Joseph Norton

DUSM Norton can attest to the manner in which I had to transfer on October 14, 2003. DUSM Norton witnessed me hurriedly packing up my belongings to get out of the office and how humiliating it was. DUSM Norton witnessed SDUSM Hodgkins call me a "fucking Liar" in the squad room when I went to get a coffee.

Court Security Officer Dick Savart

Officer Savart can attest to the conditions I was forced to tolerate while assigned in the control room.

Court Security Officer John Delaeo

Officer Delaeo can attest to the conditions I was forced to tolerate while assigned in the control room.

Question-19: Is there anything else that you would like to add to this statement?

Answer:  Not at this time.

I have read the above statement, consisting of pages, and swear or affirm that it is true and complete to the best of my knowledge, information and belief.


*Cynthia A. DeCaire*

Cynthia A. DeCaire, Affiant

Sworn to or affirmed before me

this day of June, 2004


NOTARY

MASSACHUSETTS
...GOOD
Subscribed and sworn to before me
this  19  day of  June  18  2004

Notary Public

My commission expires 7/11/08