# Commonwealth of Massachusetts

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYNTHIA A. DECAIRE,<br>      Plaintiff<br><br>VS.<br><br>JOHN D. ASHCROFT, in his official<br>position as Attorney General<br>of the United States,<br>      Defendant | Volume I<br><br>Exhibits 1-6<br><br>Docket No.<br>04-10593WGY |

DEPOSITION of **ANTHONY DICHIO**, a Witness called by Counsel on behalf of the **Plaintiff**, pursuant to the Massachusetts Rules of Civil Procedure, before Leanne L. Murphy, a Certified Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law Office of Segal, Roitman & Coleman, 11 Beacon Street, Boston, Massachusetts, on Tuesday, October 26, 2004, commencing at 11:01 a.m.

*Accurate Reporting Services*
36 West Street
Whitman, MA 02382
(781) 447-9520

Page 26

1  **MS. TALWANI:** You can mark these as the
2  first two exhibits.
3             (The below-described job
4             descriptions were marked Exhibit
5             Numbers 1 and 2.)
6  Q   I'm showing you a document that the court reporter
7      has marked as Exhibit 1. Have you seen this
8      document before?
9             (Witness views document)
10 A   I believe it was in my packet on my desk when I
11     arrived at the Marshal Service at the time from Tim
12     Bane.
13 Q   Am I correct that this is the job description for
14     the criminal investigator 1811 position?
15 A   That's what it says.
16 Q   Is that your understanding also?
17 A   That's my understanding.
18 Q   I'm going to show you a document that's been marked
19     as Exhibit 2 by the court reporter.
20            (Witness views document)
21 Q   Have you seen Exhibit 2 before?
22 A   I've seen it.
23 Q   The same thing, was it in the packet of material
24     from Tim Bane?

| | | |
|---|---|---|
| 1 | A | I believe it was in the packet from Tim Bane. |
| 2 | Q | Is it your understanding that this is the 082 job |
| 3 | | description? |
| 4 | A | It's my understanding. I can't -- you know, I |
| 5 | | don't know if it's current, but it's my |
| 6 | | understanding. |
| 7 | Q | Have you received any different job descriptions |
| 8 | | other than the ones that would've been in your |
| 9 | | original packet? |
| 10 | A | The job descriptions of 082s, 1811s and DEOs, |
| 11 | | that's all the job descriptions I have, that I'm |
| 12 | | aware of. |
| 13 | Q | What I've shown as Exhibit 1 and 2, to the best of |
| 14 | | your knowledge, were working -- |
| 15 | A | My deputies. |
| 16 | Q | -- job descriptions for your deputies? |
| 17 | A | Yes. |
| 18 | Q | When you started at the Marshal Service, were you |
| 19 | | given information by anyone about the promotion |
| 20 | | process at the Marshal Service? |
| 21 | A | When I arrived there, I was told -- on my desk was |
| 22 | | a piece of paper with the top five. If anybody's |
| 23 | | going for a promotion here in the Marshal Service, |
| 24 | | they take their exam -- I don't follow the process. |

1  A   Right.
2  Q   If someone is deemed by headquarters to not be
3      within the top five, you're not allowed to give
4      them the position, correct?
5  A   Right.  It could be six or seven or somewhere
6      around there.  It doesn't always have to be five,
7      there may be six or seven on it.  It's not etched
8      in stone, the top five.  Usually it's the top five,
9      but they may have -- somebody might do a lateral
10     over and they'd throw that person on.
11 Q   Let me rephrase the question and make sure I
12     understand it.  I appreciate that clarification.
13         You receive a list from headquarters
14     which tends to be five people but could be a couple
15     more?
16 A   Yeah, it could be a few more.
17 Q   And your job is to select one of those people from
18     the list and then send that recommendation back to
19     headquarters?
20 A   My job is to rank that list from one to whatever it
21     may be, eight, five, and so the person who is
22     number one is my pick, but that doesn't necessarily
23     happen.  They will go through it and one may be my
24     pick but might say they put in for Florida, say, so

Page 30

1  they may get also a call for Florida, so it may not
2  happen for them, then I have to go to number two.
3  They will say: Well, Marshal, you didn't get one,
4  you have number two.
5  Q  Do you have the option of ranking, for example, out
6     of a top five one, two and three and basically
7     saying no to four and five?
8  A  No, you're supposed to put -- write all of them
9     down.  So, even if I didn't want somebody, that
10    person would be number five, say.
11 Q  You said that when you arrived there were these
12    essentially packages on your desk for Tony Visalli
13    and --
14 A  I think it was Tony --
15 Q  -- Jeff Bohn?
16 A  I'm trying to think.  When I came here, there was
17    so much at the time, but there was a packet for
18    promotions and I'm trying to think.  I think it was
19    Tony's and then Jeff Bohn -- I'm trying to think of
20    names that were in there, like Dave Taylor, Alison
21    was on the first one, Alison was on the second one.
22    There were, yeah, a couple of different things.
23 Q  Was Dave Taylor on one of those two lists?
24 A  Dave Taylor was on the HIDTA list.  Dave Taylor was

| | | |
|---|---|---|
| 1 | A | Well, acting assignments, you try to do on a fair |
| 2 | | basis. When the positions came up and Dave Dimmit, |
| 3 | | who was my acting chief at the time and made |
| 4 | | recommendations when Walter got promoted, he made |
| 5 | | recommendations on certain deputies to take that |
| 6 | | position, and I went with that recommendation. |
| 7 | Q | Are there any limits on how long someone can be in |
| 8 | | an acting position? |
| 9 | A | A hundred and twenty days. |
| 10 | Q | Where does that limit come from? |
| 11 | A | It comes from headquarters. I can't quote the |
| 12 | | policy, but they can do it up to a year. It's like |
| 13 | | up to a year, they have 120 days. We try to do 120 |
| 14 | | days and then give somebody else an opportunity to |
| 15 | | be fair to do that position and then change over. |
| 16 | Q | If I understand, headquarters can take a year to |
| 17 | | fill a position on a permanent -- |
| 18 | A | No. I don't know what headquarters can do, how |
| 19 | | long it can take to fill a position. That's up to |
| 20 | | headquarters if they have the money. I don't know. |
| 21 | | I have no idea on that. |
| 22 | Q | What you know is you can fill a position for 120 |
| 23 | | days with one person? |
| 24 | A | A hundred and twenty days, but there is something |

| | | |
|---|---|---|
| 1 | | marshals who are assigned as a regular assignment |
| 2 | | to warrant investigations, correct? |
| 3 | A | I said yes. |
| 4 | Q | And that group of deputy U.S. marshals who are |
| 5 | | assigned as a regular basis to warrant |
| 6 | | investigations in Boston includes only 1811s, |
| 7 | | correct? |
| 8 | A | 1811s in the warrant squad. |
| 9 | Q | And then you have a separate unit, court |
| 10 | | operations, that has a group of deputy U.S. |
| 11 | | marshals assigned as well, correct? |
| 12 | A | Yes. |
| 13 | Q | And those deputy U.S. marshals include both 1811s |
| 14 | | and 082s, correct? |
| 15 | A | Yes. |
| 16 | Q | For each of those assignments there would be a |
| 17 | | piece of paper that would say this person is |
| 18 | | assigned to court operations? |
| 19 | A | To the best of my knowledge, no.  If they're |
| 20 | | assigned to Boson, the piece of paper says they're |
| 21 | | assigned to Boston, that's it. |
| 22 | Q | Or Worcester? |
| 23 | A | Right, or Springfield; that's the piece of paper. |
| 24 | Q | When you began your employment in August 2002, what |

    steps did you take to get to know the work records of the new group of people you were supervising?

A   When I arrived in Boston in August of '02 -- August 6th of '02, I didn't ask for any of their work records. When I came there, there were a lot of internal problems and morale and everything else. I wasn't concerned what this person was doing. I wasn't taking Chief Bane's recommendation that this one's a good worker, this one's a bad worker. I told the chief that I want to start with a clean slate, everybody here is on the same page, I don't want to know about their background, I don't want to know who was bad, who was good. I have to see it for myself, so I have to make those decisions. So, I ended up having one-on-one meetings with a lot of the deputies in the office to introduce myself to them, where I came from, what my goals were and from there. That's how I determined how I was going to make changes, and part of those changes were going to start out to be fair. I came from the state police and seniority was a big factor with the state police. So, to be fair, I told the chief that I'm going to start out here -- you know, seniority, locality on how things -- I

Page 43

1  have to start moving people around and how I'm
2  going to make my decisions, not based on if this
3  was the best investigator and this was the worst
4  investigator because I had to come in there and I
5  had to make decisions on my own, I had to see for
6  myself. Everybody was on the same page and I
7  started from there on one-on-one interviews.
8  Q  So, you took no information from Chief Bane or
9  Assistant Chief Durette about the work histories of
10 your subordinates?
11 A  They made recommendations when it was time to
12 change things and they'd recommend this one, they
13 would recommend not to transfer this one. And I
14 told them, you know, certain things and I'm going
15 to do this because I need to see for myself.
16 Whether you agree with me or disagree with me, I
17 had to see for myself if it works or if it doesn't
18 work. If it doesn't work, then the person's put
19 back into another operation.
20 Q  And you didn't read through any personnel files to
21 find out what commendations people had received or
22 what their prior experience was?
23 A  Did I read through the whole personnel file on each
24 individual deputy? No, I didn't.

```
 1   Q   Did you read through any part of any personnel file
 2       as part of your initial getting to know people?
 3   A   The only thing that I had on their evaluations is
 4       like a pass or fail, that everybody passed.  You
 5       know, that's what I saw when they get evaluated and
 6       that's what I looked at.  I didn't pull any files
 7       on who made this arrest or who did this, who did
 8       that, no.
 9   Q   You then scheduled these one-on-one initial
10       interviews, correct?
11   A   I had one-on-one interviews.
12   Q   And you had those with each of the deputies and
13       supervisory deputies?
14   A   At different times, different dates.
15   Q   But you had one with each of them?
16   A   Yes.
17   Q   Do you recall having an interview with Cynthia
18       DeCaire?
19   A   Yes.
20   Q   Do you recall when that was?
21   A   Yes.
22   Q   When was that?
23   A   August 26th.
24   Q   How do you remember the date?
```

Page 84

1  Q  And the timing, am I correct that that's end of
2     August, beginning of September of 2002?
3  A  Yes, that was -- it was after Cindy and I talked.
4     August 26th is when Cindy and I talked, so this
5     came -- it was after that and before Cindy was
6     transferred the 30th.
7  Q  Do you remember whether you received any
8     recommendation from Tim Bane or Paul Durette or
9     anyone else about what should be done with that
10    position?
11 A  I received -- Tim Bane forwarded me an e-mail that
12    was discussed between Paul Durette, Jeff Bohn and
13    Cindy DeCaire -- Jeff Bohn, Tony Visalli and Paul
14    Durette.
15 Q  What was their position?
16 A  Their recommendation was that they wanted to keep
17    it vacant.  I disagreed with it.
18 Q  Do you recall the reason why they wanted to keep it
19    vacant?
20 A  I don't recall the reason why.  I mean, it was in
21    an e-mail.
22 Q  Do you recall that there was a manpower shortage in
23    Boston at the time?
24 A  There's a manpower shortage since day one.

1  Q  But you had people who may have made phone calls
2     and that was your preferred means of people
3     contacting you, correct?
4  A  Nobody made phone calls to me.
5  Q  Sue Williams, Kevin Wahl?
6  A  No, I said they may have said something that they
7     were interested when I was out there, but nobody
8     that I talked to stressed that they wanted to go to
9     HIDTA.  When I went out to Worcester and I talked
10    to them in meetings, I don't have anything like
11    that.  Everybody was happy in Worcester, they
12    wanted to stay there, and that was it.  There was
13    no issue.
14 Q  But even if they were happy in Worcester, isn't it
15    possible that within Worcester they would've
16    preferred doing the HIDTA position and then their
17    position could've been filled by Kevin Wahl?  Did
18    you consider that?
19 A  You mean their position would've been filled by
20    Mark Lewis, you mean?
21 Q  I mean by Mark Lewis.
22 A  I didn't look at it that way, not at all.  It never
23    crossed my mind that I would've put somebody else
24    in HIDTA.  I was looking at taking this kid out

```
 1         from Boston and put him over here; that was the
 2         opening there.  No, I never thought to send Sue or
 3         Kevin there, no.
 4    Q    Is that because in your mind the one position and
 5         the other are interchangeable?
 6    A    The HIDTA?
 7    Q    Yes.
 8    A    No, they're not interchangeable.
 9    Q    Is one --
10    A    The HIDTA -- as I find out after I'm there, the
11         HIDTA is -- everybody wants to be in HIDTA, as I
12         find out now.
13    Q    So, you didn't know that at the time?
14    A    No.
15    Q    So, you had no awareness that people viewed that as
16         a preferable job?
17    A    No, I didn't know that at all until I started
18         getting e-mails that say, you know, HIDTA -- after
19         I did this transfer then, yes, Cindy was upset, a
20         lot of people in the office were upset, and I never
21         knew that HIDTA was like called -- is like the
22         elite team, I guess.  I didn't know that,
23         absolutely not.
24    Q    But you know that now?
```

Page 98

# CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.

    I, LEANNE L. MURPHY, a Certified Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify:

    That ANTHONY DICHIO, the Witness whose testimony is hereinbefore set forth, was duly sworn by me; that his/her testimony thereupon given was recorded by me and transcribed by me; and that such deposition is a true record of the testimony given by said Witness, to the best of my knowledge, skill and ability.

    IN WITNESS WHEREOF, I hereunto set my hand and notarial seal this 15th day of November 2004.

                                     _____
                                     Leanne L. Murphy, CVR
                                     Notary Public

                                     My Commission Expires
                                     May 12, 2011