# AFFIDAVIT

STATE: MASSACHUSETTS
PLACE: BOSTON

DATE: October 29, 2002

## PRIVACY ACT INFORMATION

The Privacy Act of 1974 (PL 93-579) requires Federal Agencies to give individuals who are asked to furnish personal information about themselves, the following facts.
AUTHORITY: The Equal Employment Opportunity Commissions' Federal Sector Equal Employment Opportunity Rules and Regulations authorizes Investigators to administer oaths, and take written statements under the penalty of perjury: 29 CFR 1614.108.
PRINCIPAL PURPOSES: Affidavits are used to provide necessary information for the resolution and/or adjudication of discrimination complaints by federal employees or applicants for employment.
ROUTINE USES: This affidavit will be used by the Justice Department and possibly other federal agencies and/or the Federal Judiciary. It may also be used to execute statutory requirements of the Freedom of Information Act.
VOLUNTARY DISCLOSURE: The personal information you provide is entirely voluntary, therefore you may decline without penalty to provide the information being requested.

## NO CONFIDENTIALITY

I understand that the statement I am giving is not to be confidential and that it may be shown to the interested parties.

My name is Paul Durette. I am employed by the U.S. Department of Justice, United States Marshals Service, and I am assigned to the District of Massachusetts, One Courthouse Way, Suite 500, Boston, MA. My job title and position grade is Assistant Chief Deputy United States Marshal (A/CDUSM), GS-1811-14, and my immediate supervisor's name is Timothy Bane, Chief Deputy United States Marshal (CDUSM). My race, national origin, and sex is Caucasian American male. I am 38 years old and my date of birth is June 6, 1964.

Note: The issues accepted for investigation are: Whether the Complainant (Alison L. Hodgkins) was subjected to sex (Female), age (42), and reprisal discrimination (participation in prior EEO activity) when: (1) On November 21, 2001, her Fitness Assessment Summary was submitted to the Chief Deputy U.S. Marshal for signature. He signed it on December 3, 2002. A second Fitness Assessment Summary was submitted

Page 1 of 16 Pages 

Affiant's Initials: 

# AFFIDAVIT

on the same date due to an error on the original copy. Complainant alleges that by not receiving this form she was prohibited from applying for merit promotion opportunities.

(2) On December 12, 2001, Complainant was not allowed to work at the Operations Desk. This action restricts her from performing certain assignments and interferes with her promotional opportunities. This hindered her from applying for merit promotion opportunities.

(3) On January 23, 2002, Complainant was by-passed for an in-district assignment, this resulted in her not receiving overtime and not being allowed to perform her duties as a Deputy U.S. Marshal.

(4) On March 25, 2002, operational assignments by teams were altered in the District of Massachusetts, which resulted in Complainant not being allowed to work warrants.

(5) On April 22, 2002, Complainant received an acceptable annual performance evaluation. However, she alleges a continued pattern of retaliation when her supervisor was instructed by upper management to counsel her about her sick leave usage although they were aware of the reason for her sick leave usage.

(6) On September 5, 2002, Complainant learned that she was not selected for the position of Supervisory Deputy U.S. Marshal, GS-1811-13, Merit Promotion Announcement Number 01-082.

(7) Complainant learned that she was not selected for the position of Supervisory Deputy U.S. Marshal, GS-1811-13, Merit Promotion Announcement Number 02-087.

NOTE: The questions herein are being posed by the Investigator. The affiant has not been privy to anyone's statement in these proceedings.

Question-1: Ms. Hodgkins states in her complaint that there were two FIT Assessment forms signed relating to her FIT test, on the same day. She advises that she did not receive the second signed form, thus she was prohibited from applying for merit promotion opportunities. Were you her general supervisor during this period. If so, explain why Ms. Hodgkins did not receive the second signed Fit Assessment? When did she receive the first and second signed Fit Assessment forms? What are the differences between two forms?

Answer: I was not her general supervisor at that time. However, on July 22, 2002, I became aware that there was a missing or incorrect FIT Assessment form in DUSM

Page _2_ of _16_ Pages                                                            Affiant's Initials: _PH_

# AFFIDAVIT

Hodgkin's training file. On that date, CDUSM Bane received a phone call from Ms. Beverly Beasley of the Equal Employment Office at USMS HQ regarding a FIT Assessment Summary dated in November 2001, for DUSM Hodgkins. I was present in CDUSM Bane's office when he received the call from Ms. Beasley. Ms. Beasley inquired if we had a copy of the USM-521, to which I advised CDUSM Bane that there was one in the file. I recalled that there was a copy because in February 2002, CDUSM Bane received a phone call from Mr. Tom Mulhern, Chief of Labor Relations in the Human Resources Division at USMS HQ regarding an alleged grievance filed by DUSM Hodgkins. Although no copy of the grievance was forwarded to CDUSM Bane, Mr. Mulhern outlined the issues raised by DUSM Hodgkins. One of the issues was the documentation of her previous FIT Assessment Summary. At that time, I entered the training file for DUSM Hodgkins and discovered a USM-521 signed by FIT Coordinator Kevin Roche on November 21, 2001, and CDUSM Bane on December 3, 2001.

During the time of DUSM Hodgkin's FIT Assessment in November 2001, DUSM Roche forwarded to me a revised copy of DUSM Hodgkin's FIT Assessment as he had made mis-classifications on the raw score and category sections of the sit-up and 1.5 mile run portions of the assessment. I forwarded the revised USM-521 to CDUSM Bane, who signed it and returned it to me. As with all other signed USM-521's, I placed the signed copy of the USM-521 in DUSM Roche's in-box in the mail room. DUSM Roche then files the original in the DUSM's training file. Several days later, DUSM Roche inquired if I had

Page 3 of 16 Pages                                            Affiant's Initials: _____

# AFFIDAVIT

forwarded the revised form to CDUSM Bane for signature, to which I responded to him that I did and then placed it back in DUSM Roche's in-box. DUSM Roche advised me that he never got the signed copy. I advised him to look around again and if he could not find it, to provide me with another copy. DUSM Roche then gave me another copy to sign and I hand-delivered that copy to CDUSM Bane which he signed in my presence and I again delivered it to DUSM Roche's in-box.

On July 22, 2002, following CDUSM Bane's call from Ms. Beasley, and assuming that the form located in Ms. Hodgkin's training file was the revised form, I retrieved the USM-521 and then contacted Ms. Beasley and inquired if that is the copy she was seeking. She advised me that she believed that the copy I had in my possession was the un-revised form. I then contacted DUSM Kevin Roche and inquired which form was correct. He notified me that the copy in the file was not the revised form, and that he never got the signed revised form back, but did not notify me that he never received it. I asked him for a copy of the revised form and he immediately retrieved a copy from his computer and provided it to me. The only differences were that the raw score in the sit up event changed from 20 to 22, but remained in the "fair" category; and the raw score in the 1.5 mile run remained at 15:42, but was corrected to be in the "good" category.

While speaking with Ms. Beasley, I explained our procedures for the handling of FIT Assessment forms and advised her that a few others have been misplaced recently, but those matters are quickly resolved because the participants request a copy, and if one is

# AFFIDAVIT

not located in the file, the FIT Coordinator completes another form and forwards it to me.

On July 23, 2002, I provided CDUSM Bane with another copy of the revised USM-521 dated November 21, 2001, which he signed in my presence, noting that it was a re-signing of the document due to lost copies of previous forms. I immediately faxed a copy to Ms. Beasley, handed two copies to DUSM Roche (one for his records, one for DUSM Hodgkins) and placed the original in DUSM Hodgkin's training file.

Question-2: Did Ms. Hodgkins complain to you about not receiving the second signed form? What reason did you or the FIT Coordinator give her for not providing her with the second form after it was signed? Was her sex, age, and/or reprisal a factor in this matter?

Answer: After the second revised form was signed by CDUSM Bane in December 2001, I never heard from DUSM Hodgkins or DUSM Roche that the USM-521 was still missing, nor that the copy in the file was incorrect and I assumed that the USM-521 located in her training file was the accurate form.

The lost USM-521 was not intentional, nor was it based on sex, age or reprisal. If anything, it was a lack of communication.

Question-3: Are DUSMs' required to submit a FIT Assessment with their application for merit promotion?

Answer: DUSM's who apply for merit promotion vacancies *via fax* submit the USM-521 at

Page 5 of 16 Pages                                      Affiant's Initials: ___

# AFFIDAVIT

the time of application, along with several other forms. DUSM's who apply *via e-mail*, do not forward the USM-521. The supervisor submits a follow up e-mail to the Merit Promotion staff advising that the candidate has a current FIT Assessment and Performance Appraisal. I have frequently worked with the Human Resources Division, Merit Promotion staff as a rating panel member for GS-13 applications. It is my experience from serving on those panels that if any portion of an application is missing or has not been forwarded, the Merit Promotion staff will contact the candidate or his/her supervisor to obtain a copy, even after the closing date. In DUSM Hodgkins case, she was provided with a copy of the original, signed FIT Assessment by DUSM Roche. Correct or incorrect, she had the copy which could be forwarded with an application package as it contained all appropriate signatures, and the rating categories of the revised form would not affect any portion of DUSM Hodgkin's application for promotion.

Moreover, the lack of appropriate signatures has never stopped her from applying for jobs in the past. In July 2001, Ms. Hodgkins applied for a supervisory vacancy in the District of Massachusetts using a self-witnessed FIT Assessment and made the best qualified list for that vacancy. She forwarded that FIT Assessment form despite the fact that her supervisor, SDUSM Doherty, told her that she could not witness her own FIT Assessment. On July 10, 2001, I also advised her that her July 3, 2001, FIT Assessment was invalid because she could not witness her own FIT Assessment.

During the time of Ms. Hodgkin's November 2001, FIT Assessment there were no

Page __6__ of __16__ Pages                                                                 Affiant's Initials: PRD

## AFFIDAVIT

vacancies in the Boston area and, to my knowledge, DUSM Hodgkins has not applied for any vacancies outside of the Boston area.

Question-4: Ms. Hodgkins has alleged that on December 12, 2001, she was not allowed to work at the Operations Desk. Who was assigned to the desk on that date? Explain why Ms. Hodgkins was not assigned?

Answer: I am aware that DUSM Joe Saccardo was assigned to the Operations Desk on that date. During that time period, DUSM Saccardo was serving a six month tour on the Desk. I am not familiar with any circumstances that would have indicated a need to have someone fill in for DUSM Saccardo on that date. Typically, when the DUSM assigned to the Operations Desk is on leave, the Supervisor for Operations Support, simply assigns another senior DUSM to the Desk.

Question-5: Did her supervisor make the assignment to the Operations Desk or did you? Did Ms. Hodgkins inquire at the time about not being allowed to work the desk, if so, what did you tell her with regards to why she was not assigned?

Answer: I have no familiarity with a change in the DUSM assigned to the Operations Desk on that date. Ms. Hodgkins did not inquire of me about why she was not allowed to work the desk.

## AFFIDAVIT

Question-6: Had Ms. Hodgkins been assigned to work the desk before or after this December 12, 2001? If so, when and under what circumstances?

Answer: From August 1999 to February 2000, DUSM Hodgkins served as the Assistant Supervisor assigned to the Operations Desk. Since her assignment in 1999/2000, DUSM Hodgkins has frequently filled in at the Operations Desk on a intermittent basis during the absence of the Assistant Supervisor.

Question-7: Were other DUSMs assigned to work the Operations Desk on December 12, 2001, if so, why? If so, name the other deputies, and the hours they worked the desk? Was Ms. Hodgkins sex, age, and reprisal a factor in this matter?

Answer: DUSM Saccardo was assigned to the Operations Desk on that date. The normal hours are 7:30 a.m.- 5:00 p.m.

Question-8: Ms. Hodgkins has alleged that on January 23, 2002, she was by-passed for an in-district assignment scheduled for January 27, 2002. She allege that this constituted disparate treatment. It appears from the Counselor's Report the assignment involved assisting a Court Security Inspector. The assignment was to pick up Justice Breyer. Explain why Ms. Hodgkins was not selected for this assignment? Who was assigned to this detail? Why were they chosen?

Answer: I did not make this assignment and I believe that SDUSM Walter Doherty made

Page  8  of  16  Pages                                            Affiant's Initials: PH

# AFFIDAVIT

the assignment. However, I would support his decision not to assign DUSM Hodgkins to any future Justice Breyer detail. In May 2000, DUSM Hodgkins failed to pick-up Justice Breyer at Logan Airport and then provided several incomplete and inaccurate statements to CDUSM Bane regarding the failed pick-up. In addition to stating that she arrived late for the pick-up after driving to a coffee shop to get coffee, DUSM Hodgkins stated that she was unfamiliar with Justice Breyer's description. At the time of giving her the assignment, the supervisor who gave her the assignment provided DUSM Hodgkins with a large photograph of Justice Breyer. Moreover, DUSM Hodgkins never notified district management of the failed pick-up and did not contact Justice Breyer's residence to confirm that he had arrived safely. Following Alternative Dispute Resolution proceedings, DUSM Hodgkins was issued a Letter of Reprimand for Careless Workmanship. My recollection is that USM McGillivray received a call from then Deputy Director Michael Ramone about the failed pick-up and wanted an explanation as to why Justice Breyer was not pick-up at the airport, and why the USMS never contacted him to confirm his safe arrival at his residence.

With regards to her not receiving overtime on the January 2002, I am not familiar with the particular assignment, so I am not certain that overtime was authorized. However, DUSM Hodgkin's claim that she has been denied overtime, statistics for 2001 indicate that she was the 7th highest overtime earner among all 1811 DUSM's in the district; putting her in the top 28% of the district.

Page 9 of 16 Pages                                      Affiant's Initials: PH

# AFFIDAVIT

Question-9: Did Ms. Hodgkins inquire of you regarding why she was not assigned to the Justice Breyer detail? If so, what did you tell her with regards to why she was not given the assignment.

Answer: DUSM Hodgkins did not inquire of me as to why she was not assigned.

Question-10: Ms. Hodgkins has alleged that on March 25, 2002, operational assignments by teams were altered in the District of Massachusetts, which resulted in her not being allowed to work warrants. What was Ms. Hodgkins' assignments prior to March 25, 2002? Was she assigned warrants before or after March 25, 2002?

Answer: She is assigned to the Court Operations and Operations Support Team. She serves process, conducts seizures, and she frequently works on misdemeanor warrants when not on court assignments and/or jail runs. Deputy U.S. Marshals perform a diverse and varying number of missions. Included in their job description are duties such as court support, judicial protection, prisoner handling, fugitive and threat investigations, and witness security. Throughout the United States, particularly in large districts, DUSMs are assigned to many of these functions for years without rotation. Additionally, specialty personnel, such as Witness Security and Court Security Inspectors, Enforcement Specialists, ESU technicians, OCDETF Inspectors, NASAF Coordinators, and Task Force Coordinators remain in those assignments for several years without rotation or transfer.

Page 10 of 16 Pages                           Affiant's Initials: ___

# AFFIDAVIT

The Code of Federal Regulation authorizes agencies the discretion of where to assign employees so that the needs of the agency are accomplished in the safest, most efficient, effective and professional manner. There are several DUSMs in this district who do not perform felony fugitive investigations and do that without complaint.

To my knowledge, DUSM Hodgkins continues to work misdemeanor warrant cases. Prior to June 2000, she was assigned to work felony fugitives on a rotational basis, one month out of every three months.

Question-11: Who was assigned to work warrants after March 25, 2002?

Answer: DUSMs Eric Kotchian, Chris McEnaney, Joseph Saccardo, Paul Sugrue, Cynthia Decaire, Donald Freeman, Mark Lewis and Kevin Roche.

Question-12: Who was assigned to the Warrant Squad after March 25, 2002 through the present?

Answer: DUSM Chris McEnaney, Joseph Saccardo, Paul Sugrue, Donald Freeman, Stephen McKearney and Kevin Roche. DUSM Kotchian resigned from the USMS, and in September 2002, DUSM Decaire was transferred from Boston to the Worcester Office, DUSM Lewis was assigned to the HIDTA Fugitive Task Force in Worcester, and DUSM McKearney was transferred to the Boston Office from Worcester.

Page 11 of 16 Pages                              Affiant's Initials:

# AFFIDAVIT

**Question-13:** Ms. Hodgkins alleged that on April 22, 2002, she received an acceptable annual performance evaluation. However, her supervisor was instructed by upper management to counsel her about her sick leave usage although they were aware of the reason for her sick leave usage. Did you instruct her supervisor to counsel her on her sick leave usage, if so, why? Explain her sick leave usage up to that point?

**Answer:** I did instruct SDUSM Doherty to counsel her regarding her sick leave usage. At the time that myself and the supervisors were completing performance appraisals, I reviewed the leave use chart of all operational employees for patterns of abuse. A copy of the leave use chart is included in the personnel file of each employee. My review of DUSM Hodgkin's file indicated that during the rating period of April 1, 2001 to March 31, 2002, she used 13 full sick days, with 8 of those sick days being used on either a Monday or a Friday. In addition, she had used 16 partial sick days. It should be stressed that although SDUSM Doherty did counsel DUSM Hodgkins to make her aware of the potential pattern of leave abuse, no written admonishment or record of that counseling is noted in her personnel file. As managers, it is our responsibility to try to keep employees from getting into situations which may lead to disciplinary actions. Accordingly, we try to bring matters such as poor performance, tardiness and leave abuse to the employee's attention before it becomes a problem. That was done in this case.

# AFFIDAVIT

Question-14: Ms. Hodgkins states that you were aware of the reasons for her sick leave usage. Were you aware of the reasons for her sick leave usage, if so how long had this reason been operative, i.e., one five, seven months?

Answer: I was aware that DUSM Hodgkins obtained a medical diagnosis for a back injury in July 2001, which required her to attend physical therapy. Her Physical Therapist cleared her for light workouts on August 30, 2001. Other than that time period, I am unaware of other medical conditions which would necessitate the use of 13 full sick days during the rating period. A review of the leave chart indicates that only two of the full sick days were used during the months of July and August when her therapy was taking place. Numerous partial days were used during that time.

Question-15: What are the practices and/or procedures for sick leave usage such as Ms. Hodgkins'? Did she follow the established procedures or practices?

Answer: If an employee is going to be on extended sick leave (more than three days) or if they are injured on the job, we require a doctor's note advising of the diagnosis, prognosis, and recommendation for duty status. DUSM Hodgkins was not out for more than three days, but did obtain a doctor's note. When an employee calls in sick for a day at a time, the employee contacts their supervisor and the Operations Desk to advise that they will be out sick on a particular day. As far as I know, she followed that procedure during the rest of the sick days during the rating period.

Page 13 of 16 Pages                                              Affiant's Initials: [initials]

# AFFIDAVIT

Question-16:    Ms. Hodgkins alleges that she was not selected for the position of Supervisory Deputy U.S. Marshal, GS-1811-13, under Merit Promotion Announcement Numbers 01-082 and 02-087, because of her sex (Female), age, and reprisal? Explain the reason for her non-selection?

Answer:    The U.S. Marshal or Assistant Director (for Headquarters positions) make recommendations to the Career Board. The Career Board then makes a recommendation to the Director. The Director of the USMS is the selecting official for all promotions.

Question-17:    Did Ms. Hodgkins make both list of eligibles that were certified back to the District for consideration?

Answer:    I am aware that DUSM Hodgkins was on the list of qualified candidates for both positions.

Question-18:    Were interviews conducted? If so, was she interviewed? Were other candidates interviewed, if so, whom and when? Who was on the Interview Panel? Who was the selecting official?

Answer:    During 2002, the Director of the USMS approved changes to the Merit Promotion process and one of those changes was the elimination of the structured interviews for GS-13 vacancies. Accordingly, interviews were not conducted for 01-082 or 02-087. The Director of the USMS is the selecting official.

Page 14 of 16 Pages                                            Affiant's Initials: ___

# AFFIDAVIT

Question-19:   Who was selected for the Supervisory U.S. Deputy Marshal position under MPA #01-082? Give their name, sex, and approximate age? Why was this candidate selected instead of Ms. Hodgkins?

Answer: Anthony Visalli, male, 40 years old. I assume SDUSM Visalli was selected by the Director because he was the best available candidate on that list.

Question-20:   Who was selected for the Supervisory U.S. Deputy Marshal position under MPA #02-087? Give their name, sex, and approximate age? Why was this candidate selected instead of Ms. Hodgkins?

Answer: Jeffrey Bohn, male, 33 years old. I assume SDUSM Bohn was selected by the Director because he was the best available candidate on that list.

Question-21:   When were you hired by the U.S. Marshals Service? How long have you been assigned to the District of Massachusetts?

Answer:   June 17, 1990. I have been assigned to the District of Massachusetts since May 1999.

Question-22:   Do you have any witnesses that you recommend be interviewed? If so, please give me their names, work location, and a brief overview of what germane facts they can be expected to attest.

Answer:   No.

Page 15 of 16 Pages                                   Affiant's Initials: ___

# AFFIDAVIT

**Question-23:** Is there anything else that you would like to add to this statement?

**Answer:** It should be noted that DUSM Hodgkins has limited her applications for promotion to the Boston Office of the USMS. There has been an abundance of opportunities for promotion within the Service over the past year. In September 2002, the Director announced the selection of more than 120 merit promotions nationwide. To my knowledge, DUSM Hodgkins applied for two of those vacancies, both in Boston, giving her a less than 2% chance of being promoted from vacancies announced within the past year and a half. The USMS is a national organization and, as such, it is often necessary for candidates to look beyond their current duty stations if it is their desire to be promoted. I have served in four duty stations and have moved twice for promotions.

I have read the above statement, consisting of 16 pages, and swear or affirm that it is true and complete to the best of my knowledge, information and belief.

_____
Paul Durette, Affiant

Sworn to or affirmed before me
on this 29th day of October, 2002

_____
Eugene Clark, EEO Contract Investigator

Page 16 of 16 Pages                                           Affiant's Initials: ___