AFFIDAVIT

STATE OF MASSACHUSETTS
COUNTY OF SUFFOLK

I, Timothy Bane (male; no prior EEO) Chief Deputy U.S. Marshal, GS-15, Boston District, U.S. Marshals Service, DOJ, make the following statement freely and voluntarily to Peter M. Schilling, who has identified himself to me as a Contract EEO Investigator for the following federal agency: US Marshals Service investigating a complaint of discrimination filed by Alison Hodgkins, knowing that this statement may be used in evidence. I understand that this statement is not confidential, and that it may be shown to the interested parties, those with a legal right to know. I hereby solemnly swear/affirm:

1. How long have you been in your current position?

1. I have been the Chief Deputy in Boston for seven years and 3 months.

2. Who is your current first and second level supervisor?

2. My first level supervisor is U.S. Marshal Nancy McGillivray. My second level

supervisor is Donald Gambatesa, Deputy Director of the Marshal Service.

3. On October 30, 2001, did you know about any EEO complaint filed by Deputy

Hodgkins prior to the issue we are talking about today?

3. Yes.

4. Were you the manager responsible for taking Ms. Hodgkins off a detail at the Airport

on October 30, 2001? Why did you make that decision. ?

4. It was my decision to take her off the detail at the airport. This was a very high profile

detail. It started 24 hours after the terrorist attacks in New York and Washington. There

was a huge amount of controversy around security provided at the Airport by the state

agency responsible for running Logan, which is MASSPORT. The detail had been going

on for seven or eight weeks by October 30, 2001. At this point, Logan Airport was the

EXHIBIT

only airport in the country where there was still a U.S. Marshals Service presence. After September 11, 2001, the Boston office responded to Logan Airport, at the request of President Bush with 110 personnel from different federal agencies under Marshal Service supervision to provide an enhanced and visible federal physical presence. Every deputy in the district worked the detail at some point in September. Some deputies worked over 50 straight days. The Marshals Service plan for Logan was to gradually reduce the size of our security force at the Airport. Starting around the 1st of November of 2001, we planned on reducing the detail at Logan Airport to 12 employees. We were to stay there through November 28, 2001, and then withdraw completely. Our schedule withdrawal was originally planned for late October but the Service was extended through November 28, 2001 after Acting Governor Jane Swift made a request to the Attorney General of the United States that we extend our assignment.

The plan for this final phase of our detail was for two 12-hour shifts, five people each shift, and one person acting as the shift supervisor. There would be one Deputy Marshal from Boston acting as the supervisor of the five out of district deputies. There would be one Marshal in each terminal as a rover. Amongst the many duties of the person acting as the shift supervisor would be to drive the transportation van delivering detail personnel back and forth from the federal courthouse. Prior to November the shift supervisor was not involved in the actual transportation of personnel. Due to security and logistical consideration parking the van at the airport was not feasible. Marshal McGilivray had a conversation with the Deputy Director earlier that week, about where our detail staffing levels would be for the last month of the assignment. He approved the district's plan to go to five and five with one supervisor on each shift.

I approved that one local Deputy would supervise on each shift. All the other deputies were from out of the state. The Boston deputy would be familiar with the city and the airport. Sometime either Monday or Tuesday during the last week in October, Scott Kimball, the deputy-in-charge of the detail, was to brief me on the upcoming assignments, who was working where, and who was doing what. This briefing took place on October 30, 2001, I believe. He told me the Supervisors for the Airport would be Hodgkins and Saccardo, for the new rotation, beginning on November 3rd. I told him that I did not want him to assign Ms. Hodgkins as one of the supervisors. I did not share my reasoning with Mr. Kimball, or give him any background about Ms. Hodgkins. He left the room. Acting Assistant Chief Paul Durette was in my office at the time. I told Mr. Durette that I did not want Deputy Hodgkins serving as a shift supervisor. We had just gone through two years of problems with Ms. Hodgkins. There were incidents that I discussed in my prior affidavit that weighed on my mind. I did not feel comfortable with her being in this role based on her past performance. I did not believe that putting her in an assignment like this would be in the best interest of the Marshals Service. The detail was a high profile assignment and the Service and the district had done well up until that point in time. I did not want anything to impact on the impression we had made at the Airport, which was overall positive. My basic philosophy is that some people need to be supervised, and they cannot supervise other people. I did not hear of any problems with Ms. Hodgkins' performance while she was assigned to work the detail at Logan Airport in a non-supervisory role, between September 12, and October 30, 2001. However, I think Ms. Hodgkins is someone who needs to be supervised, and is not someone who can supervise others at this point in her career.

I gave direction to Mr. Kimball and then Mr. Durette that Ms. Hodgkins not work the Airport assignment. She would be assigned to other duties. It is important to note that Mr. Kimball did not have authority to make permanent assignments for any particular work duties. That is my call. But he can make daily assignments using his judgment, which are subject to my approval. Mr. Kimball's making that assignment was no right of passage for him or Ms. Hodgkins. He makes assignments on the spot because someone has to, but those judgments are subject to my review.

In the past Ms. Hodgkins may have worked on the Operations Desk, but that is not a supervisory assignment. In fact, I removed her from that assignment because of the problems we had. I don't have a memory of her supervising assignments during the course of her work assignments, but it may have been possible. She is a senior Deputy, and from time to time will have responsibilities that require her to take charge of situations. That is different than acting in a supervisory capacity. Further, my judgments about her role at Logan Airport relate directly back to the incident with Supreme Court Justice Breyer. In that case, she had an assignment that while routine, had high visibility and a significant level of responsibility. It required independent action and sound judgment, given the fact of who she was responsible for meeting at the Airport. She mishandled it and brought embarrassment to the Marshals Service. And then she lied about it both orally and in writing. She received disciplinary action for her actions in that matter. My experience with Ms. Hodgkins was one that did not engender confidence. It was exactly the opposite. I did not have confidence in her, or putting her in charge of something. Adding to this the high profile nature of this assignment, and I concluded that I needed someone I could have confidence in during the final month of the Airport detail.

In my e-mail back to Ms. Hodgkins regarding my decision with this assignment, I mentioned that I had given guidance to the supervisors not to put her in a supervisor role on assignments in the District. In that regard, I do not believe I sat down with all the supervisors to specifically inform them that Ms. Hodgkins was not to act in a supervisory capacity, or send out an e-mail or memo. In general, her duties are such that she does not act as a supervisor. She is assigned to work under a first level supervisor. If and when situations came up where I was not comfortable with the set of work duties assigned to Ms. Hodgkins, I would deal with them on a case by case basis, with the individual supervisor.

This is part of my overall job responsibilities. I would do the same thing in situations where I did have confidence in the employee getting the assignment, but felt that someone else would better handle the duties at that point in time.

An example of this is something that took place within the last two weeks. Supervisor Walter Doherty told me about the security that would be assigned to bring the accused terrorist who had the explosives in his shoes, from the jail to the court. He told me who was going to be in charge. I told him after I thought about it, that I wanted him to head up that assignment. I wanted a supervisor of rank in charge. It was nothing against the deputy that he was proposing to lead it. I thought the assignment would go better with Supervisor Doherty being there. Numerous times over the course of being in this job, and in my eleven years as a supervisor prior to coming to Boston, I have had to make decisions about personnel. That is what I get paid for and I consider it an important aspect of my duties.

I find Ms. Hodgkin's case unique. It is very infrequently that I have had people working for me that I've had this low level of confidence in.

5. Did your decision to remove Ms. Hodgkins from this detail have anything to do with either her gender, or with the fact that she had filed a prior EEO complaint that was in the process of being investigated in October 2001?

5. No. Not at all. I think that it is interesting to note that she was replaced by another female deputy, Annette Lawler for this Logan Airport supervisory assignment. Two weeks later, two other female deputies were assigned these same supervisory duties, Susan Williams, and Cindy DeCaire.

I HAVE READ THE ABOVE STATEMENT CONSISTING OF _6_ PAGES AND IT IS TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE. I UNDERSTAND THAT THIS STATEMENT IS NOT CONFIDENTIAL, AND THAT IT MAY BE SHOWN TO THE INTERESTED PARTIES.

Timothy Bane

Subscribed and sworn/affirmed to me

at Boston, MA  on this _____

day of January 2002

Witness or Notary

PRIVACY ACT NOTICE TO EEO COMPLAINT INTERVIEW WITNESSES
( OTHER THAN COMPLAINANT)
FOR DISCRIMINATION COMPLAINT INVESTIGATIONS

## GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974; for individuals supplying information in a system of records.

## AUTHORITY

The authority to collect the information requested by affidavit, statement or other type of testimony is derived from one or more of the following:

Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613.216;  Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478 as amended.

## PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the equal employment opportunity (EEO) complaint of discrimination and/or reprisal.  This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the EEO complaint of discrimination and/or reprisal. The information may also be discussed to any agency of the Federal Government having a working relationship with regard to EEO Commission activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

## EFFECTS OF NONDISCLOSURE

Disclosure of the information sought is voluntary; however, failure to furnish the information will result in a direction by the head of the agency or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you up to and including removal. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into contracts, or termination of an existing contract.

_____          _____
Signature of Interviewer                     Signature of Witness

Date:                                             Place:

AFFIDAVIT

STATE OF MASSACHUSETTS
COUNTY OF SUFFOLK

I, Timothy Bane (male; no prior EEO activity), Chief Deputy U.S. Marshal, GS-15, Boston District, U.S. Marshals Service, DOJ, make the following statement freely and voluntarily to Peter M. Schilling, who has identified himself to me as a Contract EEO Investigator for the following federal agency: DOJ investigating a complaint of discrimination filed by Timothy Bane knowing that this statement may be used in evidence. I understand that this statement is not confidential, and that it may be shown to the interested parties, those with a legal right to know. I hereby solemnly swear/affirm:

1. How long have you been in your current position as Chief Deputy U.S. Marshal, GS-15, in the Boston District?

1. I will have been in my position for seven years this coming November, 2001.

2. Who is your current first level supervisor, and what is their title and grade?

2. My current first level supervisor is the U.S. Marshal Nancy McGillivray.

3. Who is your current second level supervisor, and what is their title and grade?

3. My current second level supervisor is the Deputy Director of the Marshals Service Donald Gambatesa.

4. What is your current work relationship with Alison Hodgkins?

4. I am her third level supervisor.

5. How are Quality Step Increases awarded in the Boston District?

5. Up until the last fiscal year, we were limited by Headquarters to giving Quality Step Increases (QSIs)to no more than 10 percent of non-supervisory employees. That has subsequently been changed as we shifted to a decentralized budget system. Over the time period in question regarding awards of Quality Step Increases, we would have been

limited to providing 4 QSIs. The Investigator has told me that Ms. Hodgkins claims she learned she was denied a Quality Step Increase in either February or March of 2000. I think her timing is off.

We determined QSI awards in the Boston District at the same time that performance appraisals and other performance awards are being determined, which would be in May and June 2000. The year ends on March 31 for the purposes of Performance Evaluations. Sometime in the middle of May, the supervisors get together as a group to make determinations of awards. I tell them how much money is available. They know when they are making their decisions about awards the limits that we work with. The supervisors will make a recommendation as a group. I am the one who makes the decision. I will discuss my decision with the Marshal, but I am the one making the judgment on these awards. QSIs are highly sought after by employees, because they stay in the employee's records, and are valuable when in terms of consideration for promotion. 6. Ms. Hoffman asserts that the three male employees who worked on the Operations Desk before her all got QSIs for their work on the Operations Desk. Was this the case?

6. Three male employees did get QSIs. But they did not get the awards specifically for serving on the Operations Desk. regard to giving these awards, some employees think that because they did one thing well, like working on the Operations Desk, they should get a QSI. Now, it is possible for an award to be given for a single aspect of an employee's work. However, whether or not that is the case in a given year depends on other factors. I want to consider the entire package of the employee, and what is going on

in the workplace at the time of the awards. Our mission here in the Boston District is

multi-faceted. Our Deputy Marshals have responsibilities in more than just one work area. I also

want to factor in how the award will impact the office as a whole. I consider the impact

on morale, and the perception that is given by giving the particular individual an award.

In regard to Ms. Hodgkins' consideration for a QSI in the late spring of 2000, my

recollection of the situation is as follows. Paul Dunne, her first level supervisor at the

time, mentioned during the course of the meeting of supervisors that he was hearing from

Ms. Hodgkins that she thought she should get an QSI award. I told him that was not

going to happen. There are three reasons why I made that decision.

First, Ms. Hodgkins does things well. However, she is also an aggressive, opinionated

person. Her attitude is that her way is the best way. I was the one who created the

Operations Desk position. It is not a position that has any supervisory responsibility.

There have been seven or eight people in the job since I created it. She was the most

troubling of those employees. Typically, I don't hear anything about the functioning of

that desk. When she was there, not a week went by when I did not hear about it. She was

causing conflict with her supervisor Jim Dolan. She was redirecting resources according

to her judgment. Ms. Hodgkins questioned everything, and wanted to be in other

people's business. The function of that job is to make sure the courts function smoothly.

I was very much aware that there were ongoing issues with her work performance while

she was on the Ops Desk. I wanted to let the supervisors and Assistant Chief handle the

situation. Eventually, I made the decision to stop her tenure on the Operations Desk.

Secondly, during the time that Ms. Hodgkins worked on the Operations Desk, she gave

responses to questions I posed that were evasive and misleading. She tried to cover for

people. Her attitude and behavior while on the Desk was that our policy was to make the

operations desk user friendly for our personnel. But that is not the purpose or policy of

the Operations Desk. How the work impacts on our personnel is a consideration, but the

primary focus has to be on how we serve the needs of our clients within the courthouse.

Her actions on the Operations Desk did not reflect this underlying concern for our clients,

and at times impacted them adversely.

On July 1, 1999, we had a serious incident between two employees in the courthouse. The

employees were Frank Dawson and Leo Rosette. Ms. Hodgkins was present during this

conflict. There was verbal conflict between the employees, and threats of physical

intimidation. The Head of our Internal Affairs Office stated that this was the largest

purposeful conspiracy to cover up information that he had seen. I investigated the situation

for six months. Mr. Rosette was transferred to another location. Alison was asked to

make statements. They were purposefully vague and brief. She was stonewalling and

blocking the investigation. She gave a statement to the Internal Affairs Office that she

was on the phone when the incident took place. We had the phone records. She lied. In

my judgment, she ranks right below the person who did not cooperate at all in the

investigation. She was less than honest with the facts that related to her. She received an

admonishment on December 31, 1999 for how she responded to questions during this

investigation.

Lastly, on May 5, 2000, Ms. Hodgkins was given an assignment to pick up Supreme

Court Justice Bryer from Logan Airport. He travels back and forth from Washington to

Boston. She was to provide security. It was a Friday night. She did not pick up the

Justice. And she did not tell us that she missed him until Monday morning. She got there,

but he was gone. The Supreme Court police called and told us that the Justice arrived and

nobody was there to meet him, so he took a cab home. Fifty-eight hours elapsed

between the time Ms. Hodgkins was to pick up the Justice and when she informed her

supervisor.

She was asked to make a statement about the situation. It was vague and limited. I asked

the supervisor to go back and ask more questions. And her responses contradicted the

first statement. Sometime later, we got a call from the Assistant Director of the Marshals

Service to the Marshal here in Boston. He wanted to know what was going on with the

Bryer pick up. He said he had information that the Deputy was out getting coffee. I sat

down with her after I got this information. She said that she did not know what the

Justice looked like. I told her that she got a package on him with a picture. When

confronted with this, she said she did not know what his mannerisms were. She said she

had arrived at the airport, and then went out to Bell Circle in Revere, five miles away

from the airport, to Dunkin Donuts to get coffee. I sent the whole investigation to

Internal Affairs, and asked to initiate disciplinary action for making misleading

statements. I proposed a Letter of Reprimand. The matter went into the Alternative

Dispute Resolution Process in February of 2001. At the time that the supervisors got

together in May of 2000 to make determinations regarding QSIs, this whole issue with

Justice Bryer was still going on.

7. When did you learn of the December 19, 2000 incident involving Ms. Hodgkins and

Frank Dawson?

7. I was informed sometime during the winter of 2001 through Jim Dolan. He told me

that from his review of the situation, there were different versions of what went on. He

told me that he knew these two employees had trouble getting along, and that he was

going to work with the situation to try and resolve it.   At some point in time Mr. Dolan

could not make progress, so he asked Paul Durette, his first level supervisor, to handle the

situation.  I became aware this summer that Ms. Hodgkins had filed an EEO complaint,

and became directly involved after I got a call from Beverly Beasely. I asked Paul Durette

to speak with both parties.  No other employee had raised a complaint that Mr. Dawson

had created a hostile work environment.  Paul's judgment was that this was a personality

clash between the two of them going back to the Rosette incident. It was clear that she

harbored hard feelings towards Mr. Dawson. At one point she made a statement to the

effect that she was surprised that Mr. Dawson did not jump over his desk and hit Mr.

Rosette, when the two of them had their conflict.

8. Did you take any action or make any decision to discriminate against Alison Hodgkins

on the basis of either her sex or reprisal for prior EEO activity?

8. No.

9. When did you make the proposal for disciplinary action against Ms. Hodgkins relating

to her the Bryer pick up assignment, and her subsequent statements about that

assignment?

9.   July 14, 2000. Headquarters proposed a letter of Reprimand to DVSM Hodgkins on Sept 8, 2000

10. Has Ms. Hodgkins received disciplinary action, and if so what? When was this

imposed?

10. *Following completion of ADR in February 29, 2001 Dvsm Hodgkins Received a Letter of Reprimand on April 4, 2001*

11. Please provide one or two specific examples of actions Ms. Hodgkins took while on

the Operations Desk that adversely impacted your clients.

11. *Dvsm Hodgkins failed to order up a prisoner that was on trial Reubey delaying the trial while the court waited for the arrival of the prisoner. Dvsm Hodgkins would change Assignments or equipment assignments without consulting with the supervisor which required that the supervisor change their plans, taking personnel + equipment from other assignments, delay, work left undone while she directed her vessels of the operations*

I HAVE READ THE ABOVE STATEMENT CONSISTING OF 7 PAGES AND IT IS

TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE.  I UNDERSTAND

THAT THIS STATEMENT IS NOT CONFIDENTIAL, AND THAT IT MAY BE

SHOWN TO THE INTERESTED PARTIES.

Timothy Bane

Subscribed and sworn/affirmed to me

at _____ MA on this __

day of October  2001

Witness or Notary