# Commonwealth of Massachusetts

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYNTHIA DECAIRE,<br>　　　　　　　Plaintiff<br><br>VS.<br><br>JOHN D. ASHCROFT, in his official position as Attorney General of the United States,<br>　　　　　　　Defendant | Docket No.<br>C.A. 10593WGY |

DEPOSITION of **DAVID M. DIMMITT**, a Witness called by Counsel on behalf of the **Plaintiff**, pursuant to the Massachusetts Rules of Civil Procedure, before Nancy J. Stone, a Certified Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of Segal, Roitman & Coleman, 11 Beacon Street, Boston, Massachusetts, on Friday, February 18, 2005 commencing at 10:07 a.m.

*Accurate Reporting Services*
36 West Street
Whitman, MA 02382
(781) 447-9520

Page 55

1  appointed, with a Marshal that had been with the
2  state police and may not have held a managerial
3  role. And it became clear to me in order to
4  hopefully make progress and to make the district a
5  nonhostile work environment it was incumbent on me
6  to remove him from the chain of command with the
7  supervisors and put him to work directly for me
8  doing some work in other program areas.

Q  Is it your testimony that the Marshal had no involvement in that decision?

A  No, he would have been the one that ultimately made that decision probably based on a recommendation from me.

Q  Probably or in fact?

A  I know I recommended that Paul Durette be removed from the immediate chain and be assigned to work special projects that I would assign him.

Q  Did you recommend that he move out of his office and into a cubicle?

A  (No response).

Q  Let me frame the questions so it's clear on the record. Did you recommend to Marshal Dichio that Paul Durette be moved out of his office and into a cubicle?

| | | |
|---|---|---|
| 1 | A | I think Marshal Dichio broached the topic and I |
| 2 | | made a -- probably a couple phone calls and then |
| 3 | | didn't not recommend that. I don't believe I |
| 4 | | recommended that, no, I believe it was his idea |
| 5 | | and I did not disagree with it based on the |
| 6 | | circumstances. |
| 7 | Q | If your Marshal in your district recommended to |
| 8 | | you to move a manager out of their office and into |
| 9 | | a cubicle do you think that was an appropriate |
| 10 | | thing to do? |
| 11 | A | It would -- Based on the circumstances that |
| 12 | | generated this relocation of office space it would |
| 13 | | probably be a logical action, yes. |
| 14 | Q | And in this specific case what was the |
| 15 | | circumstance that generated the decision to move |
| 16 | | him out of his office and into a cubicle? |
| 17 | A | The circumstance -- It wasn't necessarily into a |
| 18 | | cubicle. He ended up in a cubicle. It was to |
| 19 | | move him out into a space where he could -- his |
| 20 | | actions during the day could better be observed by |
| 21 | | myself, the Marshal. |
| 22 | Q | You couldn't see him in his cubicle, could you? |
| 23 | A | Yes. |
| 24 | Q | I think he would disagree. |

Q   Could you tell me where his cubicle was located compared to your office?

A   Right in the front of the -- the -- Near the squad room in the administrative area immediately outside his former office.

Q   And you could see that desk from your office?

A   I didn't spend -- From my office if I sat in my office could I see Paul Durette? No.

Q   From the Marshal's office could he see Paul Durette?

A   No.

Q   You understood that Paul Durette had a high level security clearance?

A   I don't know what Paul Durette's security clearance was. Some chiefs have top-secret, some don't. I don't know what his was.

Q   What were you concerned that he was doing in his office?

A   I believe it was the day that we invaded Iraq. I don't remember what day but I recall going into his office and discussing what was going to occur during the day -- Small talk, talked about the war. I made a comment about it looks like we are at war and he said, "Yes, but not like the war

Page 58

we're going to have here." And initially I thought that meant -- dealt with terrorism, domestic. Walked back to my office and at some point gave that statement a second thought and went back and asked him: Your statement about the war in Iraq won't match -- won't even -- I don't remember his exact words, but the war here will make the war in Iraq look small. And I said, "What did you mean by that?" He told me that he had been informed -- and I don't recall who, I don't recall if it was Deputy DeCaire, there had been a meeting between him and someone in regards to another EEO grievance. What did it deal with? That he was aware of where the Marshal had reportedly had a conversation with a police officer in the basement, had -- had made disparaging comments about Deputy DeCaire, and Paul Durette knew this. Paul Durette chose not to advise me until I went back and asked him to explain to me what he meant. And he did, and he explained to me what had occurred or what had allegedly occurred in the basement.

It was at that point that my trust for Paul Durette was eliminated. It was at that point it

Page 59

became clear to me that Paul Durette's obsession with the removal of this Marshal or maybe other Marshals was stronger than his desire to make the district a healthy place to work. I decided he couldn't be trusted.

I went back and I don't remember if the Marshal was in, I believe he was, and asked him if he was aware of this issue, asked him if -- if he had any knowledge of this allegation, advised him how I had come to find out about this, and I believe that's when he wanted Paul Durette moved out of his office. I may have suggested the secretary's desk between our two offices or the Marshal may have and I -- At some point the desk between the two offices in this district, that was a possible spot. I decided that wouldn't be appropriate that we would just relocate him out to a cubicle to where if there were any meetings occurring that the rest of -- with employees that the rest of district management wasn't informed of we would at least have an opportunity to see them.

Q    What did the Marshal Dichio say to you about his conversation with the police officer?

A    He denied it.

Page 60

| | | |
|---|---|---|
| 1 | Q | Denied that he had a conversation or denied that |
| 2 | | that was the substance of the conversation? |
| 3 | A | At a minimum denied it was the substance of the |
| 4 | | conversation. I don't know whether he said he met |
| 5 | | this -- saw this guy in the garage or not but -- |
| 6 | | which I suppose he could have but when I brought |
| 7 | | up the specific topic of the conversation he |
| 8 | | denied it. |
| 9 | Q | How soon after the conversation in the basement, |
| 10 | | the time from when that allegedly had occurred to |
| 11 | | the time there was this meeting in Paul Durette's |
| 12 | | office? |
| 13 | A | Can you ask that again. |
| 14 | Q | You said Paul Durette had a meeting with someone |
| 15 | | in his office and it wasn't with the police |
| 16 | | officer, I take it, or was it? |
| 17 | A | I don't know who Paul Durette had met with |
| 18 | | specifically. During my conversation with him |
| 19 | | regarding his statement as to, "The war in Iraq |
| 20 | | will be small compared to the war here," when I |
| 21 | | went back to discuss that with him he had |
| 22 | | indicated that he had met with someone that had |
| 23 | | told him this had occurred. I don't know if |
| 24 | | Deputy DeCaire met with him. I don't know if it |

Page 61

was the police officer that was in the garage. I don't know if it was a supervisor -- at the time I didn't know if it was a supervisor. I didn't know if it was another deputy. I didn't know who he had met with, but he had met with someone. This issue had been raised. It was an issue I believed should have been immediately brought to my attention so it could be dealt with and not left to fester.

Q   Was your issue with trust that you questioned his decision about informing you of it or did you think he was making the statement up?

A   No, I did not think he was making the statement up. I respect Paul Durette, to this day I still respect to Paul Durette. He's an extremely qualified law enforcement officer. I believed what he was telling me in regards to what he knew was true. What disappointed me was that he didn't see fit to let me know that he had a conversation with someone in regards to this allegation.

Q   And in your dealings with him both before and after that have you had any reason to believe that the things that he did tell you were truthful or untruthful?

|   |   |   |
|---|---|---|
| 1 |   | relations with -- with the various jails, doing |
| 2 |   | some of the paperwork associated with the jail |
| 3 |   | program here.  I know one of the first things that |
| 4 |   | he started doing was purging the -- our IGAs, our |
| 5 |   | intergovernmental agreement files, and making them |
| 6 |   | more up to date. |
| 7 | Q | Would there be any documentation of what his |
| 8 |   | assignments or his duties were supposed to be in |
| 9 |   | the reassignment? |
| 10 | A | Yes, there was a list because the position hadn't, |
| 11 |   | in fact, existed. |
| 12 | Q | I'm sorry, did you say had not or had? |
| 13 | A | No, the position, as I recall, --  Prior to my |
| 14 |   | arrival there was an actual supervisor in charge |
| 15 |   | of this area.  I believe a supervisor retired and |
| 16 |   | those duties in addition to the court operations |
| 17 |   | supervisor's duties were placed with the court |
| 18 |   | operations supervisor.  When I got here one |
| 19 |   | supervisor was doing both programs; prior to my |
| 20 |   | arrival, and I don't know how prior, there had |
| 21 |   | been a supervisor in charge of each area and there |
| 22 |   | was a job description that outlined what it would |
| 23 |   | do.  I don't think I reinvented the wheel.  I |
| 24 |   | would have given that to Supervisory Deputy Bohn. |

Page 73

| | | |
|---|---|---|
| 1 | Q | And is it your testimony then that he had no responsibilities overlapping with court operations? |
| 4 | A | While I was here he did not, no. |
| 5 | Q | Was it your recommendation that Paul Durette's government-owned vehicle be swapped with one with more miles? |
| 8 | A | At some point after reviewing the district's motor vehicle fleet what investigations had versus what others had I did recommend Paul Durette taking a smaller vehicle, one similar to what I drove, and turning over the -- I think it was an Expedition or an Explorer to warrants to be as an investigative vehicle versus a managerial vehicle. |
| 15 | Q | Did you review the use of all managerial vehicles or only Paul Durette's? |
| 17 | A | I looked at all vehicles, mileage, type of vehicle. I know there was a serviceability vehicle issue in general in district. There were a number -- at least one or two vehicles that were not -- I don't believe were reliable in the investigative side and I did a switch-out. I exchanged a Lumina that was assigned to investigations with the SUV he was driving. |

Page 74

| | | |
|---|---|---|
| 1 | Q | So, was Paul Durette and whoever he swapped with the only people that had their vehicles changed at that time? |
| 4 | A | There may have been others, I don't recall, because it was an issue at the time when I did recommend the switch. It was an issue with Paul. I explained to Paul this isn't anything other than a managerial decision. You're better suited for the Lumina, as am I, versus an SUV that could be used out on the street for investigative operations. |
| 12 | Q | Did you question the Marshal's use of an SUV? |
| 13 | A | No, it's not my spot to question the Marshal's use of a vehicle. It stops with me and goes down. |
| 15 | Q | And you also asked Paul Durette for his keys to the office, why did you do that? |
| 17 | A | I believe the Marshal had asked me to do that. |
| 18 | Q | So that one wasn't your recommendation but you concurred with it like all the others? |
| 20 | A | I don't believe I recommended taking the keys, no. I think it was -- I don't think it was all the keys. There were some keys taken from him, I don't remember which ones to be honest with you. |
| 24 | Q | I'm trying to figure out your role in it. |

Page 75

1  A   I probably went and asked him for his keys.
2  Q   You were just doing the Marshal's bidding there;
3      you weren't involved in asking him for his keys in
4      addition to anything else?
5  A   No, I was the one that went and asked him for his
6      keys.
7  Q   Did you make the decision?
8  A   I don't believe so, no.
9  Q   Did you recommend to the Marshal that he do this?
10 A   I don't believe so in this case, no.
11 Q   And just so I'm clear here, when Deputy Kimball
12     was moved to warrants I understand your testimony
13     about all the good things that Deputy Kimball had
14     done but my question is whether you considered
15     Deputy DeCaire for that position?
16 A   I know other names were included.  I'm sure Deputy
17     DeCaire's name came up.  It wasn't just move
18     Kimball over.  It was a discussion.  There's an
19     opening -- and I don't even remember why there was
20     an opening.  There were number of names discussed.
21     It may have been between --  It would have been
22     through various 1811s that weren't already
23     assigned over there.  I do recall recommending
24     Scott Kimball.

Page 80

      discussed all the potential people moving over there. I didn't generate an e-mail I don't think.

Q  Did you have any notes?

A  No.

Q  So, you just went by memory over this list of names of people?

A  Well, there weren't that many. I knew the 1811s who were in court operations. I believe Scott Kimball had been there quite some time, I don't recall, I know it was at least three or four months, I don't recall, and I recommended him.

Q  When you had the conversation with Paul Durette what period of time transpired between when Paul Durette told you about the statements that had allegedly taken place in the basement of the garage and when Paul Durette was removed from his office?

A  A day. It could have been the same day. I don't remember what day of the week it was but it could have been -- I recall it happening quite quickly. And if it was a Friday it may have happened on a Monday, but I think it might have been the same day. I don't specifically recall.

Page 89

       personnel action, good for your promotion package. I recommended Allison initially based on, one, she hadn't been an acting supervisor. Two, it originally was going to be one that generated an actual personnel action and it would be payment and a record of doing the position of a supervisor. She hadn't done one so I recommended her.

Q  Money obviously is money but the record of it would have been useful for a promotion package?

A  Yes. If there's a documented record it's more likely to get points if you have documentation versus I was an acting supervisor for three months but never got paid or didn't get an upgrade.

Q  And who was involved in the decision on filling that position?

A  I believe it was just the Marshal and I.

Q  Were you the assigning official or the Marshal?

A  I think normally the Marshal was the actual assigning official. I know I recommended her and unless the Marshal disagreed with it would have notified her and assigned her.

Q  And in this case the Marshal agreed with it?

A  Yes.

1       first place and not Paul Durette?

2  A   The Marshal may have -- may have been the first
3       one to broach it. I know I also talked to Paul
4       Durette about it. In what order I don't recall.

5  Q   And after you learned that there was this incident
6       you made an inquiry about whether it was
7       appropriate to do anything about it given the time
8       line, correct?

9  A   Either Paul Durette and the Marshal or the Marshal
10      and Paul Durette, I had discussions with them
11      about this, and them wanting some sort of action
12      taken. Because the time frame I made phone calls.
13      If it's something that happens as -- and I am the
14      chief or I am the supervisor or I am this person's
15      supervisor and I find out about it then I -- I
16      take whatever action is necessary. Something that
17      -- that happened months before I got there, I
18      thought, that comes to my attention when I come to
19      this office -- I made phone calls to ascertain
20      what would be the -- the proper action for me to
21      take and I was advised to leave well enough alone
22      unless there's something documented in this regard
23      and there never was.

24  Q   Your experience with Paul Durette, did he tend to

Page 99

|   |   |   |
|---|---|---|
| 1 |   | follow procedure in that same manner that if |
| 2 |   | something was brought to his attention he would |
| 3 |   | look into it and follow up? |
| 4 | A | Yes, I think he would. |
| 5 | Q | Again, was this Paul Durette initiating that |
| 6 |   | something be looked into two years later or was |
| 7 |   | this coming from the Marshal? |
| 8 | A | Well, I don't think it was two years and I recall |
| 9 |   | speaking with Paul Durette and Marshal Dichio. I |
| 10 |   | don't recall what order. I know nothing had been |
| 11 |   | done, to my knowledge nothing had been documented. |
| 12 |   | I don't know. I recall talking to Paul Durette, |
| 13 |   | Marshal Dichio, I may have talked to Dave Taylor. |
| 14 |   | I think I spoke to Tom Bezanson, I don't recall. |
| 15 |   | There were a number of managerial level people |
| 16 |   | that I ended up broaching this with. |
| 17 | Q | Tom Bezanson wasn't out there when Deputy DeCaire |
| 18 |   | was an acting supervisor, was he, because he's the |
| 19 |   | supervisor so he wouldn't have been the supervisor |
| 20 |   | when she was the acting supervisor? |
| 21 | A | No. |
| 22 | Q | And Dave Taylor had been out there as HIDTA person |
| 23 |   | but not as Deputy DeCaire's supervisor at the |
| 24 |   | time, correct? |