Page 100

1   A    To the best of my knowledge, correct.

2   Q    Did you ask Deputy DeCaire what had happened with

3        regard to that incident?

4   A    No, because it was a non-incident as far as I was

5        concerned.  I had no documentation.  I -- I

6        questioned the motives for it coming up upon my

7        arrival versus earlier.  I didn't necessarily

8        fully trust anyone when it came to personnel

9        issues in this district.  A lot of times I would

10       call headquarters, let them know what I was up

11       against, and ask them for assistance in regards to

12       a decision I may or may not have to make.

13  Q    I understand why you didn't put any discipline in

14       her file my question is a little different though.

15       I want to get you out to your appointment so if

16       you don't mind -- an issue was raised with you,

17       regardless of whatever Paul Durette thought of the

18       issue, you would agree with me that this is an

19       issue that gave the Marshal some concern?

20  A    Yes.

21  Q    And my question to you is did you give Deputy

22       DeCaire any opportunity to know that

23       this allegation was out there to understand

24       whether she had an explanation or a denial or a

Page 101

1  counteropinion or anything that would give you

2  information with regard to this allegation that

3  was being made by the Marshal about an incident

4  that had occurred before he was there.  It's a yes

5  or no question, did you talk with her?

6  A   No.

7  Q   And as you sit here today do you actually have any

8      knowledge as to what exactly happened?

9  A   No.

10 Q   Do you know the date that was involved in the

11     incident?

12 A   No.

13 Q   Do you know whether that date was September 11,

14     2001?

15 A   No.

16 Q   So, now, the reason this information came up was

17     that I was asking you about conversations you had

18     with the Marshal and you raised this issue; you

19     brought it in under the heading of attendance, and

20     then you said that it had to do with e-mails going

21     out.

22        Was the attendance issue there that Deputy

23     DeCaire should have been in the office and instead

24     was having someone look in her e-mails, is that

Page 102

1    the connection with the attendance?

2    A    Yes.  As I understood the original question you

3    had asked if the Marshal had discussed Cyndy

4    DeCaire's performance as an acting supervisor in

5    Worcester prior to me getting there.  The answer

6    was yes, that was one I remember.

7    Q    Do you remember anything else that the Marshal

8    said to you about Deputy DeCaire's performance as

9    the acting supervisor in Worcester?

10   A    No.

11   Q    And as you understood this allegation, even though

12   you couldn't do anything about it, am I correct

13   that that's a pretty serious allegation?

14   A    Yes.

15   Q    And it would, if true, affect your judgment about

16   Cyndy DeCaire's performance or reliability or

17   trustworthiness if she wasn't going into the

18   office and was, in fact, having her administrative

19   assistant get into her e-mail for her?

20   A    Yes, if I knew it were true it would impact my

21   opinion of anyone, yes.

22   Q    And from the time you heard this in the District

23   of Massachusetts until the time you left you had

24   no reason to believe it wasn't true?

Page 103

1   A   I did have reason in my own mind to believe it may

2       not have been true or there may have been other

3       circumstances based on Cyndy's performance and

4       attendance while I was the chief deputy in the

5       district.  I never knew of anything similar to

6       occur that I saw while I was there that would lead

7       me to believe there may not have been underlying

8       circumstances to whatever that incident was.

9   Q   And were you aware that she had, in fact, received

10      a superior accomplishment award or some similar

11      award during her time as an acting supervisor

12      there?

13  A   I believe I was aware of that, yes.

14  Q   Deputy DeCaire requested that she be considered

15      for the warrant coordinator position that was made

16      vacant when Allison Hodgkins became the acting

17      supervisor, correct?

18  A   Yes.

19  Q   Was she considered for that position?

20  A   Yes, discussed not -- not recommended by me and

21      the Marshal didn't disagree with my

22      recommendation.  I had recommended --  I don't

23      remember the fellow's name, Sugrue, based on

24      conversations I'd had with him during my tenure

Page 104

1   there immediately prior to making a decision as to

2   who might go in as the warrant or HIDTA

3   coordinator, I don't remember which it was.

4   Q   Did he say he wanted to be the warrant

5   coordinator, Paul Sugrue?

6   A   In my discussions with him he did, yes.

7   Q   Any other reason why the selection was made of

8   Paul Sugrue?

9   A   He had expressed to me that he had an interest in

10   being a supervisor in the Marshals Service.  I

11   thought this would be a perfect opportunity for

12   him to see if that's what he really wanted to do.

13   There are a lot of people that think they want to

14   be supervisors and once they get the job find out

15   that they don't want to be supervisors.  I recall

16   that being part of my decision to recommend him.

17   Q   And was the warrant coordinator position as you

18   understood it another thing that would matter in a

19   promotion package?

20   A   Yes, if an individual wrote it up appropriately it

21   would benefit you, I would imagine, yes.

22   Q   I'm going to back up a couple questions.  I had

23   started asking you about the conversations that

24   you had with the Marshal about Deputy DeCaire and

Page 105

1    I started out by asking you about anything that

2    was discussed regarding her acting supervisor

3    position in Worcester. I'm going to follow that

4    up by asking you if you had any conversations with

5    the Marshal about her performance in the time

6    period from when the Marshal arrived until the

7    time period in which you arrived?

8  A    The discussions about Deputy DeCaire under those

9    time frames predominately dealt with the -- the

10    confusion of wanting to go to Worcester, not

11    wanting to be in Worcester, coming back to Boston,

12    wanting to be HIDTA in Worcester but couldn't be

13    HIDTA in Worcester because Jeff Bohn was the HIDTA

14    supervisor. I remember numerous conversations

15    along those lines with the Marshal in regards to

16    Deputy DeCaire probably most generated by me

17    trying to figure out what the heck was going on.

18  Q    Was it the Marshal's view that he had tried to

19    make things better for Deputy DeCaire?

20  A    That was my impression, yes.

21  Q    And it was the Marshal's view that after he had

22    tried to make things better for Deputy DeCaire she

23    had, essentially, caused a fuss?

24  A    He knew he didn't -- He could not explain to me

Page 106

1    when I asked about Deputy DeCaire's assignment to

2    Worcester, then the rotation.  He explained to me

3    the rotation and why the rotation was needed.  I

4    could understand that.  He explained to me that

5    Deputy DeCaire asked him to go -- wanted to be in

6    Worcester; he assigned her to Worcester.  After

7    getting assigned to Worcester in general ops

8    instead of HIDTA there was some unhappiness there

9    --  Started the rotation with Sue Williams and

10   Deputy DeCaire because of where they lived.  I

11   don't know where they lived it's just how it was

12   explained to me -- closer to Boston.  And then at

13   some point they lost someone else, someone went on

14   military leave.  I don't recall that there was --

15   The decision that was made prior to me getting

16   there that would just bring Cyndy back to Boston

17   to do court operations there because that's where

18   there was a need and that's what happened.  I

19   don't ever recall discussing her performance

20   specifically other than it was fine.  There was no

21   problems with Cyndy's performance to my knowledge

22   -- brought to my knowledge in court operations.

23   She was doing a fine job as far as I know.

24   Q    Let me try to make sure I've got that.  The only

Page 107

1    conversations that you can recall having with the

2    Marshal about Cyndy's performance in the time

3    period from when he arrived until when you arrived

4    either were that her performance was fine or had

5    to do with her movement to Worcester and her

6    dissatisfaction about what had happened there,

7    correct?

8    A    Yes.

9    Q    And as you sat there then and as you sit here now

10   the whole thing about what happened with the

11   movements to Worcester and the dissatisfaction

12   about it didn't make much sense to you, correct?

13   A    No, it doesn't.

14   Q    But you did not find out if there was a different

15   explanation from Deputy DeCaire about what was

16   going on, correct?

17   A    Correct.

18   Q    And you operated with the assumption that what the

19   Marshal had said was correct; namely, that he had

20   tried to accommodate her and that she had

21   complained about it?

22   A    Yes.

23   Q    When did you leave the district?

24   A    In July.  I ended up staying longer.  In July some

Page 108

1       time.

2    Q  Did you have any communications with the new

3       chief, Fallon, about the EEO matter?

4    A  I'm guessing that I did.  I don't know

5       specifically.  I would probably have briefed him

6       on it when he got here.

7    Q  Do you recall any information or do you know any

8       information you would have provided to him about

9       this whole matter during that transition that you

10      have not provided here?

11   A  Not that I recall but if you can be specific.  I

12      don't believe I went into as much detail with him

13      as I've had to go into here.

14   Q  I'm just trying to find out if there's anything

15      specifically that you remember relaying to Chief

16      Fallon about this whole matter?

17   A  I don't recall.  I don't recall relaying anything

18      but I probably did.

19   Q  Finally, the time periods that I've asked you

20      about that the Marshal spoke with you about

21      predated you arriving so let me ask you the

22      question just to make sure we got everything.

23          Did the Marshal talk to you about Cyndy's

24      work performance during that same time period when

Page 113

1      (Whereupon, the below-described
2      Affidavit was marked Plaintiff's
3      Exhibit No. 2.)
4  Q   (by Ms. Talwani)  I'm showing a document that the
5      court reporter has marked as Exhibit Two, do you
6      recognize this document?
7          (Witness views document)
8  A   This is the document that the EEO contract
9      investigators -- an affidavit they took from me.
10 Q   If you look at page eight of 12 under question
11     number six regarding Allison Hodgkins' assignment
12     it states there you were the assigning official?
13 A   Which paragraph, I'm sorry?
14 Q   The answer to question six.
15     The Marshal was the assigning official,
16     correct?
17 A   In my experience normally the Marshal would do the
18     actual assigning.
19 Q   This is your affidavit so I just want to make sure
20     that that was --
21 A   I don't think I said Chief Deputy Dave Dimmitt was
22     the assigning official.  If this investigator
23     asked me did you give Allison the assignment I
24     would have said yes.  I was the recommending

Page 114

1   official and probably would have told Allison:

2   You've been assigned to do this job.

3   Q   Under question seven it says (as read:)  Attempts

4       by Chief Dimmitt to engage in a dialogue with

5       Ms. DeCaire that would allow for healthy

6       discussion regarding any matter continues to meet

7       with negative results.

8   A   Yes.

9   Q   What efforts did you make to engage in a dialogue

10      with Deputy DeCaire?

11  A   Prior to that staff meeting I spoke of earlier I

12      was able to --  I moved through the office.  I

13      didn't stay in my office I moved through talking

14      to people discussing -- open door.  Prior to that

15      one staff meeting I was able to go to Cyndy

16      DeCaire's cubicle and have open free discussions.

17      Subsequent to the meeting where I didn't address

18      the assignment issue her behavior towards me --

19      her demeanor took a 180.  It was more cold

20      shoulder, don't bother me.  She'd do a greeting

21      but any attempts that I would make as I went to

22      her cubicle would be met with one sentence replies

23      and:  I'm busy.  Not necessarily quote, quote, I'm

24      busy, but I wasn't able to have discussions with

Page 120

1    that addressed those substantive questions?

2  A  No.

3  Q  On question eight which related to the warrant

4    coordinator position, --

5  A  What page is that?

6  Q  Eight of 12.

7       Again in the middle of that paragraph the EEO

8    person wrote it as Chief Dimmitt was the assigning

9    official but, again, you were the recommending

10   official and the Marshal was the assigning

11   official?

12 A  I would describe myself as the recommending

13   official, yes.

14 Q  And in question 12 it refers to an allegation

15   about taking on the Marshals Service and changing

16   the attitudes.

17 A  Yes.

18 Q  Putting aside the specific wording, "Take on the

19   Marshals Service," did you have a discussion at

20   that meeting with court operations about attitude

21   and working with the Marshals Service?

22 A  Yes.

23 Q  Can you describe what you said in that regard in

24   your words?

Page 123

conjunction with this particular police officer's
saying he is going to remove Brockton from it.
After that I didn't hear a lot of what was said.

        **MS. TALWANI:** That's all I have.

        **MS. COTTRELL:** I'll keep it short.


        <u>CROSS EXAMINATION</u>

(By Ms. Cottrell)

Q   Once you arrived in Boston and you met the
Marshal, would you describe your day-to-day
interrelationship with the Marshal?

A   The Marshal would arrive; we would have a sitdown
briefing. A lot of the day-to-day stuff involved
the judges, meetings with the judges, maybe
meetings with other police agencies. A lot of it
initially dealt with the EEO stuff here in front
of us. I mean, it was -- it was just your general
management district performance discussions. He
was easy to speak to; he listened well. Sometimes
he took the recommendations and sometimes he
considered them and didn't take my
recommendations. My impression on the day-to-day
he just wanted to make this a better place both
operationally and environment-wise, that's all I

Page 129

district from a supervisory side where I put Jeff
Bohn in the prisoner ops area and left Tony
Vasilli to handle both HIDTA and investigations,
warrants.

      **MS. COTTRELL:**  That's all I have.

      **MS. TALWANI:**  I'll ask you a follow-up
question.

## REDIRECT EXAMINATION

(By Ms. Talwani)

Q   Do you know what the time period was between when
Paul Durette found out the information about this
allegation and when he told you about it?

A   I don't.  At the time he told me it was my
impression that it was within a day or two.  I
don't recall what it ended up being but I recall
it was something he had found out within five days
of him telling me.  It could have been the day
before, I don't recall.

Q   Or the same day?

A   It could have been, yes.

Q   At the time that Paul Durette and you had this
conversation he had already been removed from all
responsibilities supervising supervisory personnel

Page 130

1   in the office?

2   A   Yes.

3   Q   And, in fact, at that point isn't it true that

4       essentially what was happening at that point is he

5       was being permitted to hold a position at his old

6       salary and grade while he looked for work

7       elsewhere?

8   A   No.  He was removed from the chain of command

9       after the HIDTA incident after he indicated to me

10      -- after Jeff Bohn indicated to me when I told

11      Jeff Bohn, "You don't have the authority to make

12      those kinds of decisions and those kinds of

13      statements."  That's when he had told me that the

14      assistant chief was aware of what he was going to

15      do in that meeting and had approved it, authorized

16      it.  I had subsequent conversations with Paul

17      Durette, assistant chief, in regards to

18      conversations and advice he gave Jeff Bohn and he

19      essentially agreed that that's what he had done to

20      Jeff.  And it was at that point that I asked the

21      Marshal that Paul Durette be removed from the

22      chain, that supervisors come straight to me, and

23      I'll assign Paul Durette program projects to do.

24      I was extremely concerned as to what advice

Page 131

1  Assistant Chief Deputy Durette might give someone
2  in the chain of command in regards to the ultimate
3  outcome. I had concerns.
4  Q  But I'm simply trying to figure out a little bit
5  on the timing and maybe another way to describe it
6  is sort of the nature of his status. Once you had
7  those concerns isn't it correct that although Paul
8  Durette held the title of assistant chief his
9  duties were not the normal duties of an assistant
10  chief because he was no longer in the chain of
11  command and his duties at that point were simply
12  duties that you would give him in that, in
13  essence, what was happening was he was in a
14  temporary status while everyone was waiting for
15  him to find another job?
16  A  Yes, but there are chief -- assistant chief deputy
17  positions that deal specifically with program area
18  projects, needs, and districts. Not always is an
19  assistant chief in the direct chain of command of
20  a supervisor to a chief to a Marshal. It depends
21  on how a district decides to mold their -- their
22  organization.
23  Q  His situation prior to this incident with his
24  having learned about what happened, the allegation

Page 137

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

I, Nancy J. Stone, a Certified Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify:

That **DAVID DIMMITT**, the Witness whose testimony is hereinbefore set forth, was duly sworn by me; that his/her testimony thereupon given was recorded by me and transcribed by me; and that such deposition is a true record of the testimony given by said witness, to the best of my knowledge, skill and ability.

IN WITNESS WHEREOF, I hereunto set my hand and notarial seal this 24th day of February, 2005.

Nancy J. Stone, CVR
Notary Public

My Commission Expires
March 3, 2011