# Commonwealth of Massachusetts

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYNTHIA DECAIRE,<br>Plaintiff<br><br>VS<br><br>JOHN D. ASHCROFT, in his office position as Attorney General of the United States,<br>Defendant | VOLUME I<br><br>CIVIL ACTION NO.<br>10593WGY |

DEPOSITION of **DAVID B. TAYLOR**, a Witness called by Counsel on behalf of the **Plaintiff**, taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Joanne Whalen, a Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law Office of Segal, Roitman & Coleman, 11 Beacon Street, Suite 500, Boston, Massachusetts, on Tuesday, February 15, 2005, commencing at 1:33 p.m.

*Accurate Reporting Services*
*36 West Street*
*Whitman, MA 02382*
*(781) 447-9520*

what little history I knew of it. But, you know, Bane had sent him out there for punishment reasons.

Q That's Chief Bane?

A Yeah.

Q To your knowledge, did the marshal go and talk to Chief Bane about it?

A I don't know.

Q Did you think Chief Bane's punishment of McKearney -- Deputy McKearney was inappropriate?

A I did, from what I heard about it. Again, you know, I probably only knew half the story if that. I'm only hearing, you know, one side.

Q So you gave the marshal the half the side of the story you had heard and you don't know whether he did or did not talk with Chief Bane?

A I don't know. You'd have to ask him. I don't know.

Q Do you know in general, in those first few months when the marshal came here to the district, who he was consulting with on issues?

A I don't know who his main person he was consulting with. If he asked me a question,

   you know, I'd give him an answer as best I
   could. You know, I told him numerous times
   call headquarters, pick up the phone and say,
   you know, -- You know, if -- You know, my
   advice to him was if when the chief was
   leaving, because the chief had announced he was
   leaving, I said call headquarters and get
   another chief up here. You know, get somebody
   at least for the interim because the process
   takes quite a while when they open up a job,
   people put in for it, career board meets,
   etcetera, etcetera. I said it takes a while,
   but headquarters will send up a chief on an
   interim basis. I said call them and tell them
   you need a chief.

Q  Why did you recommend that instead of that he
   have an acting chief?

A  For the size of the district and what I knew
   about it, you know, it's fairly complicated.
   So my recommendation was get somebody in here
   that is a chief that knows the job because
   that's the person that really runs the
   district, the chief.

A  Was Chief Bane running the district those first

Q Okay, I don't want you to guess. I just want to know what you know. We can all guess.
A All right. No, I don't know.
Q Now, do you have any understanding about the -- about whether there was a manpower shortage in the Boston office?
A Yes.
Q Am I correct that there was a manpower shortage throughout the fall of 2002?
A I'm not sure. Again, I was the judicial security inspector then, so I wasn't part of management.
Q Were you involved in the marshal's decision to start a rotation to bring deputies from Worcester into Boston to address the manpower shortage?
A What was the time frame?
Q To my knowledge, the time frame is January 2003.
A Again, I wasn't -- At that time I was a judicial security inspector, so I didn't -- I wasn't an acting assistant chief until I think the end of April.
Q But did he just ask you? Did he talk to you

about it?

A He might have, but again, it would have just been an opinion on my part.

Q I'm trying to figure out what information was there, whether it was official or informal or whatever. So did you have a conversation with the marshal about this subject?

A I could have. I don't -- I can't say that I remember it, but I very well could have.

Q Did you have any conversations with the marshal in the fall of 2002 about Deputy DeCaire?

A Again, I could have. Nothing's jumping out at me.

Q Did you hear that people were unhappy about the assignment of Mark Lewis to the HIDTA position?

A Yes.

Q Did you hear that Deputy DeCaire was complaining about that assignment?

A Yes.

Q Did you discuss with the marshal the notion that Deputy DeCaire may be responsible for the discontent?

A I think I remember hearing about that. I don't think I brought it up, but I think I remember

hearing about that.

Q And having a conversation with the marshal about it?

A Could have. Could have.

Q Do you know if there were any specific reasons to change the staffing and start this rotation, any specific changes in the manpower in Boston?

A Good question. Before I answer your question. When you say rotation, what do you mean?

Q It is my understanding that in January 2003 the marshal directed that on a week by week basis two deputies from Worcester would take turns coming to Boston, --

A Okay.

Q -- that rotation.

A Okay.

Q And it is my understanding that the reason given for the rotation was the manpower shortage. My question to you is do you know of any changes in the manpower staffing that may have given rise to this directive?

A In January of 2003? I don't know if it would be -- And again, I was the judicial security inspector. But I'm just going to go on

A I don't believe so.
Q -- simply report to Boston?
A No, I don't believe so.
Q Did the marshal discuss it with you before taking that action?
A I don't know. I don't know. I don't know. He might have said something about it after it was done. It depends what time frame. Prior to me actually being the acting assistant chief, if somebody asked me for my opinion or my thought or how has it been done in the past or whatever, I'd tell him. If they didn't ask me I assume they didn't want my opinion and I didn't give it to them.
Q I completely understand that. My question is simply did they ask you?
A I have no recollection of it.
Q Do you have any recollection of discussing with the marshal the question of Sue Williams attending a training for women law-enforcement?
A Yes.
Q What do you remember about that?
A I remember him asking me how is it done and I said different training opportunities come up,

people put in for it and when the time comes, you know, they either go if you can -- if the budget is such and, you know, timing's good or, you know, they can't go. But training -- And again, this is my opinion is you try to give it equally to -- you know, to all deputies because it's a plus. I mean, it's a good management motivator. It's a good management tool.

Q Do you know what action the marshal then took on Deputy DeCaire's request?

**MS. COTTRELL:** Excuse me. Deputy Williams, was it?

Q I'm sorry, Deputy Williams' request. Thank you.

A I know historically what happened, but I don't know if I knew at the time. I know what happened, but I don't think I was, you know, privy to it going in.

Q And you only had one conversation with him about it?

A I probably had more than one after he changed his mind and, you know -- And again, you know, he'd ask questions and I'd tell him what I knew from past experience or the way it had been

done, you know, how I'd been treated for eighteen years or seventeen years or whatever it was. This is how it's done, you know? I mean, there's ninety-four districts. They almost do it ninety-four different ways. But, you know, it'd be fair and equitable. This is how I'd do it.

Q Was the decision to remove Jeff Bohn from the HIDTA Task Force, did the marshal discuss that decision with you before making that decision?

A No.

Q Did he ask for your opinion about that before --

A I don't think he did.

Q -- he made that decision?

A No.

Q Let me back up. Did you know that Deputy DeCaire had been interested in the HIDTA position in Worcester?

A Yes.

Q Did you have an opinion as to whether she should or should not be in that position at the time?

A I had one, yeah.

Q Did his position then change?

A Yeah, at some point in time. I believe it was under Chief Fallon they decided -- And I would have been acting at this point, so I actually had some input on this one -- to more or less divvy up the court -- combine the court ops and the court support -- operation support into one and having two supervisors doing -- sharing the duties and this, that and the other thing.

Q I'm going to get there, but that was helpful. In April of 2003 you became the acting assistant chief deputy, correct?

A Yeah.

Q Now, it's been my understanding from prior depositions that most acting positions are for a -- some acting positions are for a 120 day duration?

A Yeah.

Q Was this a 120 day position?

A It was initially 120 days.

Q What happened at the end of the 120 days?

A They opened it up where you can put not to exceed a year and you have to put in a -- basically a two page resume stating what you've

your case where it was a not to exceed a year?

A No.

Q They just kept her in the 120 -- even though it was a 120 day position?

A Yeah, and I don't know how much longer it went. I'm not sure.

Q Were you aware of an incident that occurred in September of 2003 when Cindy DeCaire fainted?

A Yes.

Q What do you know about that incident?

A I learned of it. They were at a funeral for -- I forget who it was. They were at a funeral and --

Q You weren't there?

A No, I wasn't there. I was in my office. But I got a call saying that Cindy had fainted. They had taken her to the hospital in an ambulance. I called Jeff Bohn, her then fiance, on his cell phone, basically just to find out if everybody's all right. And he gave me that yeah, she fainted. We're going to the hospital, whatever. I said keep me posted. If you need anything, let me know. That's how I found out about that.

A I think the District of Massachusetts, to my recollection and from memories for all these years, is if you're more than three days you have to produce a doctor's note saying yeah, he's fine.

Q But if you're less than three days, do you know of any situations?

A Service-wide I do. I can't give you any examples, but --

Q District?

A Perhaps could have been that. I don't know. I'd be guessing.

Q Don't want guessing. Was there some particular reason why this was being pursued as to what was going on?

A What do you mean?

Q Well, I've got memos here from Alison Hodgkins documenting every minute of her phone calls with Deputy DeCaire and Bohn and so forth. Is there some reason this was an event that was requiring immediate intervention by the Marshal Service?

A I don't know. There was a lot of, if you will, paranoia going around.

Q Paranoia about what?

A Just everybody was watching everybody, you know?

Q But about what?

A I don't know.

Q Had somebody heard some comment about Deputy DeCaire being pregnant?

A When she --

Q Fainted?

A -- fainted? No.

Q Did people think she was faking it?

A I would assume she wasn't. She went to the hospital in an ambulance, you know? You know, in discussions I'm sure it got brought up hey, maybe she's pregnant.

**MS. TALWANI:** Mark this, please.

(Whereupon, the below-described E-mail was marked Plaintiff's Exhibit No. 1.)

Q I'm showing you a document marked as Exhibit One. Do you recognize this?

A Yeah.

Q At the bottom it's cc to D. Taylor. What were you cc-ing it to?

# C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

I, Joanne Whalen, a Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify:

That David Taylor, the witness whose testimony is hereinbefore set forth, was duly sworn by me; that his testimony thereupon given was recorded by me and transcribed by me; and that such deposition is a true record of the testimony given by said witness, to the best of my knowledge, skill and ability.

IN WITNESS WHEREOF: I hereunto set my hand and notarial seal this 3rd day of March, 2005.

Joanne Whalen
Joanne Whalen
Notary Public

My Commission Expires
December 13, 2007