# Commonwealth of Massachusetts

### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

VOLUME II
EXHIBITS 2-7

CYNTHIA A. DECAIRE,
                Plaintiff

Civil Action
No. 04-10593WGY

VS.

JOHN D. ASHCROFT, in his official position
as Attorney General of the United States,
                Defendant
*************************************

DEPOSITION of **DAVID TAYLOR**, a Witness called

by Counsel on behalf of the **Plaintiff**, pursuant to the applicable

Massachusetts Rules of Civil Procedure, before Karen T. McAllister,

a Professional Court Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the Law Offices of Segal, Roitman

and Coleman, 11 Beacon Street, Suite 500, Boston, Massachusetts, on

Tuesday, February 17, 2005, commencing at 10:06 A.M.

*Accurate Reporting Services*
*36 West Street*
*Whitman, MA  02382*
*(781) 447-9520*

Page 9

1   did not include you?

2  A   Not that I'm aware of.

3  Q   A hundred and twenty days would have ended at

4      August 2003.  Do you know what your status was

5      between August of 2003 and October of 2003 when

6      you were put in the position as not to exceed one

7      year?

8  A   I'm not following the question.

9  Q   Did you remain acting assistant chief, even

10      though the hundred and twenty days had expired

11      and the new notice, putting you in for the

12      position not to exceed one year, hadn't yet come

13      out?

14  A   I didn't have a break, so whenever the time was.

15  Q   You said at some point on Tuesday that you had

16      reviewed Deputy DeCaire's complaint in this case,

17      correct?

18  A   I believe so, yes.

19  Q   Is that the complaint that was filed in court?

20  A   If I can see it I could tell you.

21                  (Pause)

22          MS. TALWANI:  I don't have this,

23      haven't made extra copies yet.  If you don't

24      mind, we can wait until the break on marking the

Page 13

1    Q    Anything else?

2    A    I think he asked me about --  I think I remember

3         having conversation about the rotation of people

4         to help support Boston on different days.

5    Q    What did you tell the chief about that rotation?

6    A    I said they all could do it, but as a logistical

7         matter if they had somebody in Springfield, if

8         they needed help in Springfield, Deputy Wahl

9         lived halfway between Worcester and Springfield

10        and it would make more sense to send him there.

11   Q    Did you discuss with Chief Fallon what the

12        particular need was in January of 2003 at Court

13        Operations?

14   A    No, I don't think I did.

15   Q    Did you discuss with Chief Fallon any practice,

16        either before or after, about supporting Court

17        Operations by using deputies from the

18        investigative unit in Boston?

19   A    Yeah, we do use them.  So, you know, I don't know

20        if we --  I think we were already using them.

21        Number thirty-three there, about me and the

22        marshal and Tom Bezanson meeting; and I said I

23        didn't have any recollection, specifically, of

24        that.

Page 14

1   Q   Just to be clear.  Your testimony from yesterday

2        was that you were meeting with --

3   A   I was there at this --

4   Q   You were meeting with the marshal to introduce

5        him to judges in Worcester and Springfield during

6        that time period, and so you could well have been

7        at that meeting?

8   A   Right.  Right.

9   Q   But you don't remember anything that was said at

10       the meeting?

11   A   Yeah, I don't have any recollection of

12       specifically going there for discussing no longer

13       to rotate the two women to Boston.

14   Q   Do you have any recollection, just to be clear,

15       maybe not of going there, because you said to me

16       that if you had been there you wouldn't have met

17       the marshal there; but do you have any

18       recollection of that meeting with Tom Bezanson

19       and the marshal in Worcester?

20   A   I remember being with -- in the Worcester office

21       the same time Tom and the marshal were there.

22       Specific as to that discussion, no.  But I'm not

23       saying it didn't happen.  It very well could

24       have.

Page 15

(Witness views document)

1

2  A    I think that's --  I only saw my name mentioned

3       in there once, so I'm pretty sure that was all we

4       did.

5  Q    Did the chief discuss with you Cindy DeCaire's

6       allegation that she had sent an E-mail to you to

7       be considered for the position of acting

8       supervisor Court Operations in August of 2003?

9  A    She sent me an E-mail?

10 Q    Let me show you the allegation, paragraph forty-

11      six in her amended complaint, and ask whether did

12      the chief discuss that allegation with you?

13 A    I know I did forward the E-mail.

14 Q    Do you recall any discussion with Chief Fallon

15      about that?

16 A    I think I asked him -- just asked him if he had

17      received it; you know, made sure he got it.

18 Q    I believe you testified on Tuesday that you did

19      approach Lawlor about the position and that she

20      expressed no interest in it, correct?

21 A    Yeah.

22 Q    Other than that complaint, were there any other

23      documents that you were asked to review or given

24      to review by anyone in this case?

Page 16

1   A    I believe there were, but you asked me the other

2        day if I reviewed anything coming over here and

3        that's the only one I looked at.

4   Q    But during the course of any investigation --

5   A    Yeah, I think there were others, yeah.

6   Q    What other documents were you asked to review?

7        For example, have you reviewed Cindy DeCaire's

8        affidavit in the E.E.O. proceeding?

9   A    I'm thinking I did, and it's not a guess, I'm

10       pretty sure.  Anything that I've received I think

11       the chief would have given to me, because I had,

12       you know, a need to know.

13  Q    Do you have a file of the documents that you've

14       received in this case?

15  A    I don't know if you'd call it a file.  I have a

16       -- you know, in my drawer I've got a couple of

17       documents, yeah.

18            MS. TALWANI:  Can we get copies of

19       these?

20            MS. COTTRELL:  Do you know what's

21       included in that file?

22            THE WITNESS:  No.

23            MS. TALWANI:  Anything that he received

24       relating to this, other than an attorney-client

Page 17

1    communication, I think I'm entitled to.

2            MS. COTTRELL:  Would you pull those out

3    now, review them and do what needs to be done.

4            THE WITNESS:  Fine.

5            MS. TALWANI:  Thank you.

6    Q    (by Ms. Talwani)  I'm going to go back for a

7    minute to Cindy DeCaire's original transfer to

8    Worcester in the fall of 2002.

9            Did you ever hear anyone claim that Marshal

10   Dichio had given her a choice to stay in Boston

11   Court Operations at that time, but she chose

12   Worcester?

13   A    I thought she requested Worcester, but --  I

14   mean, I don't know where I'm coming up with that,

15   but that was my understanding.

16   Q    You have no direct information as to what she

17   asked for?

18   A    Right.

19   Q    And you have no secondhand knowledge of anything,

20   other than having heard that she had requested

21   Worcester?

22   A    Right.  I think at that time I was the J.S.I.,

23   so...

24   Q    I'm actually asking you anything you've heard at

Page 26

1    assignment?

2    A    Yes, there were two deputies assigned at that

3    time, Smythers and Christo.  They do report in to

4    the warrant supervisor, but they're actually

5    assigned to the F.B.I. and you never see them.

6    They're with the F.B.I.

7    Q    Then at this point, January 27, it appears that

8    Jeff Christo left the F.B.I. Joint Terrorism Task

9    Force assignment and was assigned to the Court

10   Operations team?

11   A    I don't think so.  I think --  Oh, I guess he was

12   Court Operations.  I don't remember him going

13   back to Court Ops, but I'm sure this is accurate.

14   Q    Okay.  You testified on Tuesday about a

15   conversation you had with the marshal in which

16   you discussed with him contacting headquarters

17   about getting an acting chief, correct?

18   A    Getting a chief, yeah.  Getting somebody that was

19   already a chief to come to Massachusetts.

20   Q    Was it your suggestion that a particular person

21   come, or was it your suggestion that they get

22   somebody who was serving in a chief's position

23   somewhere --

24   A    Yes.

Page 27

1    Q    And come here as an acting chief here?

2    A    Okay.

3    Q    Yes?

4    A    Well, yes, to get a chief to come here and be the

5         chief, the interim chief, I guess.  I'm hung up

6         on the word acting chief, because it was -- they

7         did send the chief and he was a chief.

8    Q    I want to try and just not worry about the titles

9         for a minute, or the title of the position here.

10   A    Yeah.

11   Q    What I'm trying to get at is what your

12        recommendation was.

13   A    Okay.  My recommendation was to contact

14        headquarters to tell them you need a chief, you

15        need somebody that knows how to run a -- an

16        office.  That's what you need.  And from past

17        history, my career in the Marshals Service, I

18        knew that they do do this on occasion.  So, I was

19        just passing that information on to them.

20   Q    Asked them to send you someone from another

21        district who has experience as a chief?

22   A    Exactly.

23   Q    Where did this conversation take place?

24   A    Probably his office.

Page 36

1    know who said what, who did what.  I can only

2    represent, you know, what I knew.

3    Q    I'm just asking you what you told Chief Dimmitt.

4    A    Yeah, I'm trying to remember.  That was a long

5    time ago.  If he solicited, you know, my opinion

6    of Sergeant DeCaire, she's an outstanding law

7    enforcement officer, and I'm sure I would have

8    told him that.

9    Q    And if he would have solicited your opinion about

10   Jeff Bohn, what would you have said?

11   A    I would have said, you know, he was a good --  I

12   don't know how he was as a supervisor.  As a

13   deputy investigator, he was a good investigator.

14   Q    Do you know why Paul Durette was moved out of his

15   office and into a cubicle?

16   A    No.

17   Q    Did anyone discuss with you that that had

18   happened?

19   A    Well, I knew it happened.

20   Q    Did anyone discuss with you why that had

21   happened?

22   A    No.  I knew it happened, I mean, and everybody

23   knew it happened.  I had no knowledge.  I'm sure,

24   you know, different things afterwards, you know,

Page 37

1   again the story -- you hear different stuff,

2   but...

3   Q   It is my understanding from testimony in this

4       case and from allegations in this case that there

5       was a meeting held by Dave Dimmitt with the Court

6       Operations unit and U082s and detention officers.

7       Would you have attended that meeting?

8   A   I don't think so.

9   Q   It's my understanding that there was a meeting at

10      the Brockton Police Department that was attended

11      by Marshal Dichio and Chief Dimmitt about the

12      HIDTA Task Force.  Did you attend that meeting?

13  A   No.

14  Q   I finally got back to October of 2003.

15          When the decision was made to assign Deputy

16      DeCaire back to Worcester in October of 2003, who

17      was involved in making that decision?

18  A   Who made the decision, it --

19  Q   Who was involved?  Not just who made it, but who

20      had any input or involvement in the discussions?

21  A   Myself, the chief and, obviously, the marshal.

22  Q   Did the three of you get together on the morning

23      that you found out that she had, in fact, gotten

24      married on the weekend?

Page 38

1  A    I don't know if we got together or not.  I'm

2       assuming that we probably were all together at

3       one point in time that morning.  We usually are,

4       you know.

5  Q    Who made the decision that Deputy DeCaire had to

6       be out of the Boston office by noon?

7  A    Again, I would be going on an assumption here.

8       I'd say the chief.

9  Q    Do you know what the rationale was why she had to

10      be out by noon?

11 A    I'd be guessing.

12 Q    At this point I'd like any possible reasons that

13      you could think of in your experience as to why

14      it would be that she would have to be out by

15      noon?

16          MS. COTTRELL:  Object to the form of

17      the question.  You're asking him to speculate.

18 A    Being fair and equitable to everybody involved,

19      if you're -- again, if I'm a deputy, a plain old

20      deputy, and somebody's wife's working for them,

21      then I might not be getting a fair shake.  So,

22      the sooner you can...

23 Q    I believe you testified on Tuesday that when Jeff

24      Bohn was reassigned to supervise Court

Page 39

1          Operations, you made sure that Deputy DeCaire

2          would be directly supervised by Paul Dunne.

3     A    Yes.

4     Q    And everyone knew at this point that everybody in

5          the marshals' office knew that Deputy DeCaire and

6          Supervisor Deputy Bohn were living together?

7     A    Right.

8     Q    So, you had avoided the direct supervision

9          already, because you were concerned about that?

10    A    Did I pass, yeah.

11    Q    And then she got married?

12    A    Yeah.

13    Q    And then she had to leave the office by noon, is

14         that right?

15    A    Yeah.

16    Q    Do you know any reason that explains why she had

17         to leave by noon?

18    A    No.

19                        (Pause)

20    Q    (by Ms. Talwani)  I want to back up a minute to

21         the fainting incident.  Did you and Deputy

22         DeCaire and Alison Hodgkins at some point have a

23         conversation about the status of Deputy DeCaire's

24         CA1 form?

Page 43

1    limited duty requests other than Deputy

2    DeCaire's?

3    A    Yes.

4    Q    Who else's?

5    A    I think Gary Oliveira had a short one.

6    Q    What's Gary Oliveira's position?

7    A    He's an 082.

8    Q    When was his limited duty?

9    A    I believe his was after hers, a short period of

10    time, a fracture to the hand or a hand injury.

11    Q    Do you recall what his limited duty assignment

12    was?

13    A    I believe he was on the Ops desk.

14    Q    Operations desk?

15    A    Yeah.

16    Q    What's that?

17    A    It's the --  It helps the operations supervisor,

18    basically answering phones.

19    Q    Where was Gary Oliveira assigned at the time?

20    A    To operations.

21    Q    Because as an 082, he couldn't be assigned to

22    investigations?

23    A    Right.

24    Q    Other than Gary Oliveira, have you dealt with any

Page 44

1    other requests for limited duty while you've been

2    assistant chief?

3  A  I might have, but I'm drawing a blank on a name.

4  Q  During your experience, not as a supervisor but

5    just as a deputy, what's your experience at the

6    Marshals Service with people needing limited

7    duty?

8  A  It's been my experience in all the districts I've

9    been in, if -- you know, you take care of your

10   own, you know.  Instead of seeing somebody go out

11   and have to use all their sick leave or annual

12   leave or leave without pay, you try to find them

13   some light duty.

14 Q  What type of light duty work have you seen

15   deputies take on usually?

16 A  All different stuff from -- depending on the

17   injury, or what the thing is, they could be doing

18   everything from answering phones to working and

19   monitoring the cameras, the closed circuit TVs,

20   serving process.  Basically a duty that wouldn't

21   put them in harm's way, but based on whatever

22   their injury is.

23 Q  In Boston there's a number of different tasks

24   that would fit that description, correct?

Page 45

1    A    Yeah.

2    Q    Including in warrants?

3    A    I suppose you could do computer checks and stuff

4         like that.  Obviously, you wouldn't be able to go

5         out on the street.

6    Q    But you can do computer checks and you can do

7         phone inquiries that you need to do?

8    A    You could, sure.

9    Q    You used the expression that in your experience

10        what would be done is that you would try to,

11        quote, take care of your own, correct?

12   A    Right.

13   Q    And you would try to find light duty, so that

14        people would not have to use up their sick time,

15        correct?

16   A    Right.

17   Q    Was that your reaction to handling Deputy

18        DeCaire's request for limited duty?

19   A    Yes.

20   Q    And did you know that she had had limited duty

21        when she had been pregnant with her first child

22        at the Marshals Service?

23   A    Yes.

24   Q    And you knew that the Marshals Service had been

Page 46

1    able to accommodate it?

2    A    Yes.

3            MS. TALWANI:  Could you mark this as

4    the next exhibit.

5            (Whereupon, the below-described

6            10/28/03 dated E-mail was marked

7            Plaintiff's Exhibit No. 6.)

8    Q    (by Ms. Talwani)   Is this an E-mail you sent?

9    A    Yeah.

10   Q    I'm showing you a document marked as Exhibit Six?

11   A    Yeah.

12   Q    You write in the E-mail, "We can't bring her back

13       to Boston, because of the supervisory issue"?

14   A    Right.

15   Q    Why couldn't you bring her back to Boston once?

16   A    Well, we did bring her back to Boston.  And by

17       putting her in the assignment we did put her in,

18       we saved guard money and $200.00 a day.  So, it

19       was actually helping the district and helping

20       her.

21   Q    You wrote here that you can't bring her back to

22       Boston on light duty because of the supervisory

23       issue.

24   A    Right.

Page 47

1   Q   Why did you write that?

2   A   Because her -- I don't know if he was her husband

3       at the time or -- I'm assuming he was, --

4   Q   He was her husband at the time she moved to

5       Worcester, correct, that's why you moved her to

6       Worcester?

7   A   Right.

8   Q   So, at this time he was her husband.

9   A   Okay.  We didn't want him supervising her.

10  Q   But there was no other limitation for any other

11      job that she had; so long as he wasn't

12      supervising her there was no problem with her

13      going back to Boston, correct?

14  A   Right.  Right.

15  Q   So, even though you wrote here that she cannot

16      come here, we cannot bring her back to Boston,

17      that turned out not to be correct?

18  A   Well, I thought you meant to the Ops.  Yeah.

19  Q   Well, you also brought her back to Boston

20      Operations, didn't you?

21  A   But we reassigned a supervisor to handle that

22      instead of him.

23  Q   So, you didn't have to reassign, because you had

24      already been doing assignments where one

Page 48

1    supervisor would handle one group of deputies and

2    one supervisor would handle another group of

3    deputies, correct?

4  A  Right.  But where she was working in the C.B.C.,

5    we had to take that out of Jeff's jurisdiction

6    and put it into Paul Dunne's.

7                    (Whereupon, the below-described

8                    11/15/03 dated E-mail was marked

9                    Plaintiff's Exhibit No. 7.)

10 Q  (by Ms. Talwani)  I'm showing you a document the

11   court reporter has marked as Exhibit Seven.  Is

12   this your document?

13 A  Yes.

14 Q  Your E-mail?

15 A  Yeah.

16 Q  Who is Jim Mulhern?

17 A  He's the site supervisor for M.V.M. who is in

18   charge of the C.S.O.s.  M.V.M. is a company that

19   the Marshals Service contracts with for the

20   C.S.O.s' court security officers.

21 Q  Did you make the decision that effective on that

22   date a C.S.O. would be assigned to the control

23   center?

24 A  Yes.

Page 60

1      frequent urination?

2   A   I've heard that people that are pregnant have to

3      go to the bathroom a lot, yes.

4   Q   So, you knew that when you assigned Deputy

5      DeCaire to the control room?

6   A   Sure.  Absolutely.

7   Q   Were you aware of Deputy DeCaire's complaints

8      that she was not getting relief to go to the

9      bathroom when she needed to?

10  A   I was aware that there was a complaint, but what

11     I wasn't aware of is that she wasn't getting

12     relief.

13  Q   So, you think her complaints were just made up?

14  A   I think if she wanted to go to the bathroom, she

15     could go to the bathroom and somebody would

16     relieve her.

17  Q   So, why do you think she made a complaint?

18  A   I have no idea.

19  Q   So, you think that it was just a false statement

20     by her?

21  A   All I know is I remember having the discussion

22     saying if Cindy needs relief, -- and the

23     supervisor told me, I told her just to tell me

24     and we'd get relief, I mean.

Page 61

1   Q   Do you have any facts to support that, in fact,

2       she was getting the relief as she needed it?

3       Other than your asking that it happen that way,

4       do you have any fact to support that it was, in

5       fact, happening that way?

6   A   I don't recall ever hearing anything about --

7       other than one time, after the fact when she was

8       told to go back in there from the supervisor that

9       said, you know, she was to go the bathroom and

10      she stayed out for another, I don't know how long

11      it was, you know.  But, I know the supervisor

12      told her --  Well, I was told by the supervisor,

13      "Cindy, if you've got to step out for a while,

14      step out.  If you have to stand up, stand up.

15      Sit down, do whatever.  You know, make it

16      comfortable on you."

17  Q   So, you were told that there was no problem by

18      the supervisor; and, therefore, based on that, it

19      is your belief that Cindy DeCaire's complaint

20      that she wasn't getting relief was false?

21  A   I don't know if I'd word it like that.

22  Q   What's wrong?

23  A   Well, it was never --  I heard about it once, you

24      know.

Page 62

1    Q    So, what you're saying is you only know of one

2         complaint that Deputy DeCaire made about not

3         getting relief for the bathroom?

4    A    I don't even know if it was a formal complaint or

5         anything, but I remember hearing about it once

6         being an issue.

7    Q    And that was an issue because Alison Hodgkins was

8         concerned that she hadn't gone back to the room?

9    A    Two different -- two different things.

10   Q    So, you heard on one occasion that Deputy DeCaire

11        had a concern about not being able to get

12        bathroom breaks?

13   A    Right.

14   Q    And you made sure, from your point of view, that

15        the matter was addressed by directing her

16        supervisor that she was to be allowed to have

17        breaks?

18   A    Absolutely.

19   Q    Do you know whether, in fact, Deputy DeCaire was

20        relieved as she needed, or do you simply know "I

21        didn't hear anything more"?

22   A    I believe she was.

23   Q    And you're base --

24   A    Because I didn't hear anything more.

Page 63

1    Q    Okay.  But you have no knowledge, other than

2          that?

3    A    I have no knowledge that it wasn't.

4    Q    Did you learn at some point that OSHA had been

5          contacted about the --

6    A    Yes.

7    Q    -- control room?

8    A    Yes.

9    Q    What action did you take when you found that out?

10    A    I advised the chief.

11    Q    Did you have a conversation with Jeff Bohn?

12    A    After the fact.

13    Q    And what did you say to Jeff Bohn?

14    A    I said, "Jeff," I said, "anybody can contact OSHA

15          whenever they want to.  But as a courtesy, you

16          could have asked me.  I would have made a few

17          phone calls.  You know, given me the heads up."

18          That was it.

19    Q    Well, you spoke to him about having placed the

20          district, in your view, in an embarrassing

21          situation, even though he had a right to contact

22          OSHA?

23    A    Oh, he absolutely did.

24    Q    You also responded by, then, having him removed

Page 64

 1             from any supervisory role of the control room?

 2    A    Right.  Not because of that, but...

 3    Q    Well, but time-wise that's when it happened,

 4             correct?

 5    A    Yeah.  Oh, I believe it was, yeah.

 6    Q    That until he made the OSHA complaint, you didn't

 7             see any problem with the supervisor's

 8             responsibilities?

 9    A    No.

10    Q    What was the CPR/AED program?

11    A    It's the CPR, the defibrillator.  It's come into

12             existence the last few years.  It's where -- it's

13             supposed to be a foolproof machine, if somebody

14             goes down you can hitch them up and get them

15             revived, prior to, you know, waiting on the EMTs

16             to get there.  Marshals Service requires

17             everybody to have the training it.  We have one

18             that's -- I think we have --  The courthouse has

19             some also, and it's optional whether the C.S.O.s

20             want to train on it or not.  But Cindy and Kevin

21             Neal are -- they're collaborative duties, that

22             program.

23    Q    To train people on it?

24    A    Yes.

Page 65

1  Q   That training is a different training than the
2      training you were talking about a few minutes ago
3      about the control room?
4  A   Yes.  Yes.
5  Q   Tell me again about the control room training,
6      who was she supposed to be training?
7  A   The C.S.O.s that were going to be working in the
8      control room.
9  Q   So that if I understand your testimony, there
10     were two purposes to assign Cindy during her
11     limited duty to the control room.  One was to
12     save money on the guards, and the other was to
13     train the C.S.O.s?
14 A   Yes, in the use of the control room.
15 Q   Wouldn't there be E-mails about that if that was
16     a purpose of her assignment?
17 A   Not necessarily.
18 Q   You wouldn't have told anybody that she was
19     supposed to be doing that?
20 A   I think she knew that's what she was doing.
21 Q   Did you send an E-mail out to the chief to tell
22     him that Cindy had or hadn't trained C.S.O.s?
23 A   No.
24 Q   Did you send --

Page 66

1  A    I don't think I did.  If you've got it, I did.

2       If you didn't, I probably didn't.

3  Q    Can you recall any documentation that you did

4       about this training of the C.S.O.s?

5  A    I can't recall, no.

6  Q    What's the current staffing of the control room

7       since --

8  A    Two C.S.O.s.

9  Q    -- Cindy DeCaire left?

10 A    Two  C.S.O.s.

11 Q    And why is there no longer a guard or a deputy?

12 A    There's no guards, because there was no money for

13      guards in there.

14 Q    How is the gray area being handled?

15 A    The supervisor or the operational person is

16      monitoring the cellblock area, as well as the

17      cellblock itself is being monitored by Marshals

18      Service personnel.

19 Q    So, there's been a change in technology since --

20 A    Since Cindy did it?

21 Q    At some point?

22 A    No.

23 Q    Well, a change in technology at some point, so

24      that a deputy was no longer needed there?

Page 67

1   A   You can make the argument it's still a gray area.

2       But our position is that the prisoners are being

3       physically controlled by deputies, they're being

4       monitored by U.S.M.S. personnel.  So, what the

5       C.S.O.s and the C.B.C. are doing are at the

6       direction of the deputy.

7   Q   Was this a decision that was made in the

8       marshals' office or at the Marshals Service, I

9       think was the way it was now going to be

10      configured?

11  A   In the District of Massachusetts, yes.

12  Q   And who made that decision?

13  A   The chief, the marshal; myself, my input from the

14      J.S.I. side of it.

15  Q   When was the decision made?

16  A   It would have been right around the time during

17      and after Cindy's light duty in there.

18  Q   When Cindy was not there on light duty, she was

19      only there three days a week, --

20  A   Yeah.

21  Q   On the Monday and Friday who was covering it?

22  A   I'm not sure.  I can't tell you right now.

23  Q   Do you know if it was guards or whether it was

24      two C.S.O.s?

Page 68

1  A   I don't think it would be guards.  I think it

2      probably would have been deputies, but you'd have

3      to --  I'm not sure.  Somebody else's assignment.

4  Q   When was the decision made that you no longer

5      needed a guard or a deputy in there?

6  A   After the light duty was up and the training,

7      informal or whatever, was accomplished.

8  Q   When was the video equipment put in place so that

9      the operations' supervisor could monitor the

10     prisoners also?

11 A   I don't know the exact date.

12 Q   Give me a year.

13 A   I don't know, but it was prior --  That equipment

14     was in prior to Cindy's light duty thing in

15     there, I know that.  But, I don't know when it

16     went up.

17 Q   When did you stop using guards in the control

18     room?

19 A   When Cindy went on light duty.

20 Q   So, up until her request for light duty, you had

21     guards in there five days a week?

22 A   I believe so.  I believe so.  Not a hundred

23     percent sure, but...

24 Q   What records would show that?

Page 69

| | | |
|---|---|---|
| 1 | A | Either the guards' --  I'm not sure where they |
| 2 | | were assigned.  I'm not sure.  There has to be |
| 3 | | some, but I'm not sure where they'd be.  It would |
| 4 | | be the old -- possibly the old court assignment |
| 5 | | sheets. |
| 6 | Q | What are the court assignment sheets? |
| 7 | A | It's a court schedule of all the judges, all |
| 8 | | their courts for the day.  And on it deputies |
| 9 | | assign -- guards are assigned to what courts |
| 10 | | they're going to cover, and usually at the bottom |
| 11 | | of that the supervisors usually write on there |
| 12 | | cellblock; you know, who's in the cellblock, you |
| 13 | | know, one guard, one deputy, you know, so and so. |
| 14 | | Or C.B.C. relief, you know, it's written on |
| 15 | | there.  Can I say something on a question you |
| 16 | | asked me a while back, or not? |
| 17 | Q | Sure. |
| 18 | A | On the OSHA one we switched -- it was hindsight, |
| 19 | | but after we realized that Jeff was supervising |
| 20 | | her and after this, that's when we switched |
| 21 | | supervisors.  Again, just to keep it so nobody |
| 22 | | would come back and say hey, she's getting |
| 23 | | special preference from her husband. |
| 24 | Q | After he made the complaint? |

Page 70

```
 1    A    Yeah, that's when it came to light that, you
 2         know...
 3    Q    You didn't know before that, that he was
 4         supervising her there?
 5    A    Well, if you look on one of these here it tells
 6         you the breakdown, and he had the C.B.C..  I
 7         believe it's this one here (indicating).  But,
 8         you know, when you make all these special
 9         allowances --  Yeah, on this one here he was in
10         charge of the command center.
11    Q    So, she was assigned, even though she had to
12         leave --
13    A    That was an oversight.
14    Q    She had to leave the building by noon, no one
15         took care to make sure that for the two-month
16         period that she came back, before he was moved
17         off the assignment, that he was supervising her
18         in the C.B.C.?
19    A    Right.  Like I said, it was an oversight.
20    Q    And it was only noticed when he filed the OSHA
21         complaint?
22    A    Came to light.
23    Q    During the time that Deputy DeCaire was assigned
24         to the control room, she had to stay in the
```

Page 82

1        Tom Bezanson for sending that E-mail?

2    A   I don't believe so.

3    Q   You would have been in the loop if there had been

4        discipline to Tom Bezanson?

5    A   I would have thought so, yeah.

6    Q   I'm going to show you a document that's been

7        marked as Exhibit Two to Tom Bezanson's

8        deposition.  Have you seen that E-mail before?

9    A   Yeah.

10   Q   Do you know whether there were any repercussions

11       to Tom Bezanson for having sent that?

12   A   I believe Tom apologized to Jeff.

13   Q   Did you have any involvement in Cindy DeCaire's

14       request for the WorkLife program?

15   A   General discussion.

16   Q   Did you have any opinion about whether she could

17       have any accommodation with the WorkLife program?

18   A   I'm sure I had some thoughts on it, but I don't

19       think it was anything one way or the other.

20   Q   Did you have any opinion about her request to

21       return to work part-time?

22   A   No.

23   Q   Do you know any reason why she couldn't have been

24       permitted to return to work part-time?

# E R R A T A    S H E E T

Deposition of:  **DAVID TAYLOR**          February 17, 2005

Re:  DOCKET NUMBER:  04-10593WGY

| Page Number | Line Number | Depo. Reads | Correction | Reason |
|---|---|---|---|---|
| 37 | 6 | U082s | 082s | |
| 64 | 21 | COLLABORATIVE | COLLATERAL | |
| 67 | 5 | AND THE CBC | IN THE CBC | |
| 71 | 10 | TO MYSELF | FOR MYSELF | |
| 14 | 16 | WOULDN'T | WOULD | |

Page 87

COMMONWEALTH OF MASSACHUSETTS

I, **DAVID TAYLOR**, have read the foregoing transcript of testimony given in the deposition held on February 17, 2005, and say that it is true and correct to the best of my knowledge, information and belief.

**David Taylor**

Signed this ___22___ day of ___MARCH___ , 2005, under the pains and penalties of perjury.

Page 88

## C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.

I, Karen T. McAllister, a Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify:

That **DAVID TAYLOR**, the Witness whose testimony is hereinbefore set forth, was duly sworn by me; that his/her testimony thereupon given was recorded by me and transcribed by me; and that such deposition is a true record of the testimony given by said witness, to the best of my knowledge, skill and ability.

IN WITNESS WHEREOF: I hereunto set my hand and notarial seal this 1st day of March, 2005.

_____
Karen T. McAllister
Notary Public

My Commission Expires
March 6, 2009