# Commonwealth of Massachusetts

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYNTHIA A. DECAIRE,<br>            Plaintiff<br><br>VS.<br><br>JOHN D. ASHCROFT, in his official<br>position as Attorney General<br>of the United States,<br>            Defendant | Volume I<br><br>Exhibits 1-13<br><br>Docket No.<br>04-10593WGY |

DEPOSITION of **ALISON L. HODGKINS,** a Witness

called by Counsel on behalf of the **Plaintiff,** pursuant

to the Federal Rules of Civil Procedure, before Leanne

L. Murphy, a Certified Court Reporter and Notary Public

in and for the Commonwealth of Massachusetts, at the

Law Office of Segal, Roitman & Coleman, 11 Beacon

Street, Boston, Massachusetts, on Wednesday, March 23,

2005, commencing at 11:51 a.m.

**Accurate Reporting Services**
36 West Street
Whitman, MA 02382
(781) 447-9520

1       wasn't anything new in that office either.

2   Q   What wasn't new?

3   A   The arguments, the banter.  Past management let it

4       happen and it came to a head.

5   Q   Was Leo Rosette transferred out to Worcester as

6       discipline for that incident?

7   A   He was transferred out to Worcester.  I don't know

8       if that was discipline for that.

9   Q   Were you disciplined subsequently in connection

10      with an incident involving Supreme Court Justice

11      Prior?

12  A   Yes.

13  Q   Can you tell me what occurred on that occasion?

14  A   I received a letter of caution and I requested that

15      certain information be brought forward to show that

16      I had done things the way I had said I had done

17      them, and they refused.  I had called in

18      headquarters for the alternative dispute resolution

19      process to begin to try to resolve the matter and

20      find a happy medium.  In all of the time it took

21      legally and allowed time frames, by the time the

22      letter was actually finally issued to me it was

23      over, it had met the -- I think it's a six-month

24      window.  So, the letter was the discipline.

Page 14

1    Q   And you received the letter despite the alternative

2         dispute resolution and all the legal procedures and

3         so forth?

4    A   Correct.

5    Q   The incident there involved your failing to pick up

6         Justice Prior at Logan Airport, correct?

7    A   Correct.

8    Q   After not picking up Justice Prior at Logan Airport

9         you did not report to anyone that you had failed to

10        pick him up until someone approached you, correct?

11   A   No, I reported it as soon as I got back to the

12        office.

13   Q   Who did you report it to?

14   A   Tom Bezanson, I believe.

15   Q   Was Tom Bezanson your supervisor at the time?

16   A   He was the one in charge of that section, yes.

17   Q   What did you report to Tom Bezanson?

18   A   That the flight had come in early and I had missed

19        Justice Prior and I was also on the wrong level of

20        the airport.  Normally if you pick somebody up at

21        the airport, you go to where the flights are

22        arriving.  This district picks up on a level where

23        the flights are departing; I would imagine because

24        there's less people traffic at that point.  I

Page 15

1    wasn't told to do so, I didn't know it, and I was

2    at the other level.

3    Q    Did you take any steps to ensure that Justice Prior

4         had made it home safely?

5    A    No.

6    Q    Did you claim at some point that you didn't know

7         what Justice Prior looked like?

8    A    Taken out of context, yeah.

9    Q    Please explain.

10   A    I didn't know how tall he was, how heavy he was or

11        wasn't.  I had a photograph, it wasn't a very good

12        one, but it was a photograph of him, and I was told

13        that he looked just like Henry Oremburger.  There

14        were two inspectors in the office that I used to

15        confuse with each other, Henry Oremburger and

16        Dennis Wilcox, so he could've looked like either of

17        the two.  It didn't matter, I had the photo.  I

18        didn't see Justice Prior there.

19   Q    But you weren't there at the same time that the

20        flight was letting out anyway?

21   A    I waited.  I didn't leave that airport until I was

22        sure that there was no one else getting baggage,

23        wandering around.  I wasn't going to leave that

24        spot because I didn't want to miss the justice if

1      he was there.  I didn't know he was gone until I

2      received a call from the supreme court police.  I

3      don't know if that's their correct title.  I had

4      received a call and that was when I found out that

5      he had taken a cab home.  So, my efforts in

6      remaining there until I was sure that he was safely

7      gone were kind of futile, but I didn't know that.

8   Q  What steps had you taken to make sure you were

9      there at the time that the flight arrived?

10  A  The flight came in early.  I had gone there.  When

11     I got there, there was a ton of traffic.  I didn't

12     have a place to pull the car over, so I went out of

13     the airport and then came back.

14  Q  And went out and got a cup of coffee?

15  A  Yeah.

16  Q  How far did you go to get the cup of coffee?

17  A  A couple of miles.  It's not too far.  It's right

18     down the road.

19  Q  Despite the ADR, you received a discipline in

20     connection with this incident, correct?  You were

21     disciplined for this?

22  A  I don't know what you mean by discipline.

23  Q  Well, you received a written reprimand about this,

24     correct, a written letter about this?

1   A  Yes.

2   Q  And the letter accused you not only of failing to

3       pick up Justice Prior but of not telling the truth

4       about what had happened, correct?

5   A  No.

6   Q  What did it accuse you of?

7   A  It instructed me to write my reports more

8       thoroughly rather than when somebody asks me for a

9       brief summary, that I should give a full report

10      from beginning to end.  So, I no longer give brief

11      memos when somebody asks me for one.  That's what

12      started this.  That's exactly what I gave, and I

13      was instructed to be more clear and more thorough

14      in my report writing, if I remember correctly.  And

15      in all the things that were on there, not one

16      person gave me any instructions nor did they assist

17      me in any way to correct whatever was allegedly

18      wrong with what I had done.  However, there are now

19      -- from that date there are now two deputies on the

20      Justice Prior details.  When I went, I was told it

21      was simply to drive him from the airport to home;

22      it was not a protection detail of any sort.  So,

23      the level that I saw things at was -- I was

24      mistaken.

1   Q   Do you recall when this incident occurred?

2   A   May of I don't know what.  Matter of fact, I think

3       it was May 15th of -- It was shortly after the

4       incident with Leo and Frank.

5   Q   Were you subsequently taken off a detail at Logan

6       Airport?

7   A   No.

8   Q   Do you recall that there was a detail at Logan

9       Airport that followed after the terrorists attacks

10      on September 11, 2001?

11  A   Yes.

12  Q   Were you subsequently taken off that detail?

13  A   They just didn't reassign me to it.  So,

14      technically I was taken off, but they were simply

15      not reassigning me to it.

16  Q   Were you given a reason?

17  A   No.  Because the chief said so.  Sorry, that was a

18      reason.

19  Q   At some point did you serve as the assistant

20      supervisor for court operations?

21  A   Yes.

22  Q   Were you removed from that position?

23  A   No.  What do you mean removed?

24  Q   Taken off of it.

Page 19

1   A   No.

2   Q   What happened?  After you were the assistant

3       supervisor for court operations did you continue in

4       that position until you became the supervisory

5       deputy?

6   A   I'm not following this.  That's a rotated position.

7       Is that the one you're talking about?

8   Q   It is the position of assistant supervisor for

9       court operations that you held at one point.  Your

10      testimony is you were simply rotated off?

11  A   Yes, and then I was assigned to it for quite some

12     time.  You're talking about the operations desk?

13  Q   Yes.

14  A   Okay.

15  Q   Were you at some point taken off the operations

16     desk?

17  A   I was rotated out when my time was up.

18  Q   Did you seek the supervisor position in Worcester?

19  A   No.

20  Q   Did you request assignment as the acting supervisor

21     in Worcester?

22  A   No.

23  Q   Have you ever filed an EEO complaint?

24  A   Yes.

Page 21

1      paying closer attention to what upper management

2      was doing to me.

3    Q  Was it your view that they were treating you

4      differently because you were a woman?

5    A  Yes.

6              **MS. COTTRELL**:  Can you clarify who is

7      they, please?

8    Q  Who was upper management at the time?

9    A  Nancy McGillvray, Timothy Bane, Paul Durette.

10   Q  Was it your contention that they were treating you

11     differently because of your gender?

12   A  Yes.

13   Q  Were there any specific examples that you had of

14     where you were being treated differently because of

15     your gender?

16   A  Yes, and this may be the initial part of my EEO,

17     come to think of it.  The operations desk is a

18     rotated position.  Anybody who was interested in

19     becoming a supervisor, that was the place for them

20     to be assigned so that they'd be exposed to as many

21     facets of the job as possible.  In Boston it's kind

22     of a position between two supervisors, so you do

23     both of their jobs.  The male deputies who had held

24     that position have gotten quality step increases.

Page 22

1  When I was offered the position I was told that not

2  only was it the best position to be in with my

3  career going so well and that I would be a

4  supervisor in no time but this would be a way to

5  hone my skills and make the transition easier, and

6  I didn't get that QSI.

7 Q Were you told you would get the QSI?

8 A I was told that was what happens.  I can't give you

9  a quote, but the other deputies have all gotten

10  awards for their work on the ops desk.  I took the

11  ops desk one step further; I didn't just sit there

12  and work it and answer phones and work on a

13  computer.  I made up a standard operating

14  procedure, I set it up so that any deputy can work

15  up there, not just whoever was assigned, so that it

16  would empower the whole office.  So, any deputy

17  coming through could go up there and not go up

18  there blindly but would have something to turn to

19  when they had questions rather than feeling

20  helpless in some situations.

21 Q When you didn't get the quality step increase, did

22  you protest that?

23 A I asked about it.

24 Q What were you told?

Page 23

1    A    That I wasn't going to get one, and that was that.

2    Q    Did you ever learn the reason that the

3         administration contended that they did not want to

4         give you that?

5    A    I don't know what you mean.

6    Q    Did you ever learn what they said the reason was

7         for why you didn't get the step increase?

8    A    I don't even recall.

9    Q    And that was part of your EEO complaint?

10   A    I'm sure it was.

11   Q    Anything else?

12   A    No.

13   Q    Did you ever apply for a supervisory deputy

14        position prior to the one that you currently hold?

15   A    Yes.

16   Q    On how many occasions?

17   A    Five maybe.

18   Q    And you were denied each time?

19   A    I wasn't denied; I just didn't get it.

20   Q    Did you protest the fact that you didn't get it any

21        of those five times; for example, by filing an EEO

22        complaint?

23   A    Probably.  I really don't recall.

24   Q    You don't recall that you filed an EEO complaint

Page 29

1    Q    I don't want you to guess.

2    A    No, I don't know without looking at the file.

3    Q    And you did settle it before you were made the

4         supervisor?

5    A    I don't recall if it was settled before I got the

6         supervisor's position or after, quite frankly.  I

7         just know the two weren't connected.  The

8         supervisor's position was not part of the

9         settlement.

10   Q    I understand your position about what's connected

11        or not.  I'm just asking you dates.

12   A    I don't know.  What was important to me was --

13   Q    There's no question pending right now.

14   A    Sorry.

15   Q    Where were you working at the time that you were

16        assigned the warrant coordinator position?

17   A    Boston.

18   Q    Where?

19   A    The warrant squad.

20   Q    Where in Boston were you working immediately prior

21        to being assigned the warrant coordinator position?

22   A    Court operations.

23   Q    What warrant experience did you have at the time

24        that you were assigned the warrant coordinator

1    position?

2    A    Thirteen years of experience prior to coming to

3         Boston working as the acting supervisor in the

4         warrant squad in Pittsburgh.  We didn't have a

5         warrant coordinator, but I was assigned to the

6         warrant squad several times; worked fugitive

7         operations; worked FIST operations; and was

8         assigned to a three-month fugitive operation, which

9         actually I was assigned here in Boston; warrant

10        fugitive task force; received awards in Pittsburgh,

11        including the Marshal Service.

12   Q    What period of time were you in Pittsburgh?

13   A    Physically in Pittsburgh from March of '85, but

14        came on the job in November of '84.

15   Q    I'm sorry?

16   A    Came on the job in November of '84.  I was in the

17        academy, so I was only technically in Pittsburgh at

18        the time.  I didn't physically arrive in Pittsburgh

19        until March.  So, March of '84 to --

20   Q    March of '85?

21   A    Of '85, yes, to the middle of July 1997 when I

22        transferred to Boston.

23   Q    How long were you an acting supervisor in

24        Pittsburgh?

1    A    It was various times.  It wasn't for like a

2         three-month period or anything like that; it was

3         whenever the warrant supervisor was out or if he

4         was on the street and I was assisting him.

5    Q    You said you received awards when you were in

6         Pittsburgh from the Marshal Service.  What type of

7         awards did you receive?

8    A    Special achievement awards.  I forget what the

9         actual titles are of them, but that's basically

10        what they are, special achievement awards.

11   Q    Between July 1997 and September of 2002 did you

12        serve as an acting supervisor at any time?

13   A    That's what the ops desk is considered.  I did six

14        months there.  At any time either -- if the two

15        supervisors in courts ops and ops support were

16        away, then I was the acting supervisor, if they

17        were on vacation or if they were at training.

18        Sometimes they sent out an e-mail saying so,

19        sometimes they didn't; they just told me.

20   Q    How long were you on the ops desk?

21   A    It was a six-month period.

22   Q    Other than that six-month period, did you have any

23        other periods when you were an acting supervisor

24        between July '97 and September 2002?

Page 33

1  to get people more experience and open up the

2  office, change the old stagnated atmosphere.

3  Q  Do you recall when you began as warrant

4  coordinator?

5  A  Sometime after I said it sounds like a great idea

6  and that I would be interested in it, but I can't

7  give you -- I'm thinking November of 2003.  Again,

8  without looking at my -- I have a chronology of

9  things for myself and without looking at it, I

10  couldn't tell you offhand when it was.  I do

11  remember being assigned to it without really an

12  option.

13  Q  When did you become a supervisory deputy?

14  A  Promotional or acting?

15  Q  Promotional.

16  A  January 9, 2004.

17  Q  Immediately before that you were a deputy, your

18  acting supervisory position had ended and you went

19  back to being a deputy, correct?  Obviously you

20  were a deputy, but your acting supervisory position

21  had ended prior to your becoming the supervisor?

22  A  Yes.

23  Q  How long were you an acting supervisor?

24  A  Until they told me I couldn't be there anymore.

1    I'd say about six months.

2  Q  How long were you a warrant coordinator?

3  A  Long enough to create the position, set it up and

4     move out.  One month, I think.

5  Q  You became a warrant coordinator at some point in

6     2003, correct?

7  A  Yeah, I believe so.

8  Q  Had you ever served as a team leader in warrants

9     before becoming the warrant coordinator?

10 A  No.

11 Q  At some point you were made the acting supervisor

12    for court operations, correct?

13 A  Yes.

14 Q  How did it come about that you were selected for

15    that position?

16 A  I don't know.

17 Q  Did you ask to be selected?

18 A  I didn't have to ask.  Everybody in that office

19    knew what I wanted to do.  I needed experience.

20 Q  My question isn't what people knew.  My question is

21    just did you ask?  Did you send an e-mail to

22    somebody, did you go to somebody and say I'd like

23    to be considered for this?

24 A  I don't recall.

Page 36

1   A   Yes.

2   Q   And becoming an acting supervisor is a way to get

3       experience that would be relevant to your promotion

4       package?

5   A   Not to mine.  Can you restate that?

6   Q   Well, let me ask it this way.  Becoming an active

7       supervisor gave you experience which could be

8       helpful in your selection for becoming a

9       supervisor, correct?

10  A   I don't know that.

11  Q   Well, if you wanted to be a supervisor, why would

12      it be obvious to everyone you would also want to be

13      an acting supervisor?

14  A   Because I was doing everything I could to put my

15      career back on track.

16  Q   And is becoming an acting supervisor something to

17      put your career back on track?

18  A   I thought so.

19  Q   Why?

20  A   Because I would be able to get the experience that

21      years ago I was told I needed.

22  Q   You said before things went downhill.  Did

23      something particular happen or a particular time

24      when things went downhill?

Page 42

1    specifically decided on the call signs based on

2    these.  I don't know if it's prior service date or

3    EOD date.  There seems to be some confusion as to

4    people who had come into the service, left and came

5    back to the Marshal Service, and how that date

6    factored in as far as -- if you want to call it, as

7    you just did, seniority.

8   Q   Who told you to make this chart?

9   A   Dave Taylor asked for it.

10  Q   What information did he ask you for?

11  A   He just asked for names, titles, grades, and

12      Marshal Service entry date.  So, I interpreted that

13      to mean the date that a person actually came into

14      the Marshal Service regardless of what agency they

15      were with.  It didn't have anything to do with this

16      stuff, but it was -- but that was what I understood

17      him to mean.  He just said it kind of quick.

18  Q   And then you also included the prior service date?

19  A   Right.

20  Q   Did you do that on your own?

21  A   Yeah.

22  Q   That wasn't one of the things he asked you for?  I

23      just asked you what he asked you for and you listed

24      the first four columns.  Did he also ask you for

Page 43

1    the fifth column?

2  A  I don't think so.

3  Q  So, you just did that on your own?

4  A  Yes.  Those are legitimate dates, so I felt they

5     had to be there.  I chose to put that there.

6  Q  I'm not challenging you.  I'm just trying to find

7     out what he asked you for, that's all.

8  A  Marshal Service entry dates.

9  Q  And your understanding of the Marshal Service entry

10    dates is column 4?

11 A  Yes.

12 Q  Do you know why Sue Williams was transferred back

13    to Boston rather than Kevin Wahl?

14 A  No.

15 Q  Are you the person responsible for making the list

16    of deputies for on-call duty weeks?

17 A  Yes.

18 Q  What's the order of deputies to do on-call time?

19 A  Alphabetically.  It's done alphabetically.  It's

20    changed a few times, but now it's -- you have one

21    week for duty.

22 Q  If you can't do your duty week a particular week,

23    what happens?

24 A  Now?

Page 51

1    agreement about which week they were swapping?

2  A   I told Sue Williams specifically that if she had

3      worked it out with Deputy DeCaire and they agreed

4      on it, that I'd go for it, that I wasn't just going

5      to -- I wanted to make sure the days were covered

6      because I didn't want to revisit it again.

7  Q   It's your testimony that when you put Sue Williams

8      on the sheet, she confirmed to you that she had

9      Deputy DeCaire's agreement to work her Christmas

10     week?

11 A   Yes, if I'm picturing the list correctly.  The

12     confusion was Deputy Williams being less than --

13     Deputy Williams being manipulative in this instance

14     and it almost backfired on Deputy DeCaire, which is

15     not what I wanted to happen.  I believed one thing

16     and it is not what was happening.  Deputy DeCaire

17     didn't do anything wrong here, nor did I want

18     something like that to happen to her.

19 Q   Am I correct that when you assumed the position of

20     acting supervisor, Deputy DeCaire was at that time

21     assigned to court operations in Boston?

22 A   Say it again.

23 Q   When you were the acting supervisor, Deputy DeCaire

24     was assigned to court operations?

Page 52

1   A   I don't recall if that was her duty assignment.

2   Q   At some point in time did you supervise Deputy

3       DeCaire?

4   A   Yes.

5   Q   Do you recall whether you were Deputy DeCaire's

6       supervisor when she fainted?

7   A   I believe I was.

8   Q   And at that time you were an acting supervisor,

9       correct?

10   A   I don't recall what my position was at the time.

11   Q   How did you learn of that incident when she

12       fainted?

13   A   I don't recall.

14   Q   Was it from Dave Taylor?

15   A   I actually think it was banter in the office

16       originally and I think I asked him if she was okay.

17   Q   What was the banter in the office?

18   A   That Cyndy had gotten taken away in an ambulance.

19   Q   Let me just ask you about what you recall of her

20       work performance prior to that time as her

21       supervisor.

22   A   She was at an acceptable level.

23   Q   When you learned about the fainting incident and

24       you had a discussion with Dave Taylor, do you

Page 65

1    A    Yes.

2    Q    Who did?

3    A    Paul Dunne and Dave Taylor.

4    Q    What did they tell you?

5    A    That Cyndy was on limited duty; that even though we

6         don't have limited duty, they're putting her in

7         there instead of paying a guard and there would be

8         justifiable work for her because there wasn't a lot

9         of work in Worcester; that she was actually a

10        Worcester deputy.  I don't know at what point that

11        was.  So, on the days that she is in Boston she was

12        to report to me and if there was work in Worcester

13        or if Ruth, the admin officer, was out, that Cyndy

14        would report there; that she couldn't handle

15        prisoners.  I don't recall what else, but that was

16        basically it.

17   Q    How many years, 25 years?

18   A    Close.  Twenty.

19   Q    During the 20 years that you have been in the

20        Marshal Service have you known any women to be

21        pregnant and continue working as a deputy marshal

22        other than this incident where Deputy DeCaire was

23        assigned to the control room?

24   A    Yes.

Page 67

1      two deputies --

2   Q   Job share?

3   A   That's it.  Thank you.  And the other time, I think

4       she was just part-time and there was a period where

5       she was actually on family medical leave or

6       whatever, so she didn't come in at all, but she

7       could work from home if she wanted to.

8   Q   Do you recall the assignments Deputy DeCaire had

9       during her first pregnancy?

10  A   The only stuff I am aware of is the control room.

11      I tried to assign her to some writs and that got

12      stopped because sometimes when you go to a house to

13      serve process the person could be hostile and that

14      would put her in a bad position, so they didn't do

15      that anymore.

16  Q   With her first pregnancy -- not the second one, but

17      her first pregnancy -- do you know what job duties

18      she had?

19  A   Not a clue.

20  Q   Do you know whether she did these writs at that

21      time?

22  A   I have no idea.  I wasn't here.

23  Q   When you said that you attempted to do that but it

24      was stopped, who stopped you?

Page 68

A   Dave Taylor.  It was a safety issue.

        **MS. COTTRELL:**  I need to stop for just a
second, if that's okay.

        **MS. TALWANI:**  Off the record.

        (Off the record)

Q   I believe you said that part of your understanding
of this limited duty assignment was that she was
still a Worcester deputy, was that your
understanding?

A   I believe so.

Q   Do you know who her supervisor or supervisors were
then during the period of time that she was on
limited duty?

A   If I have my time frames correct, as a Worcester
deputy it was Tom Bezanson, except when she was in
Boston, which would be me.

Q   When she was in Boston you were her supervisor and
when she was in Worcester Tom Bezanson was her
supervisor?

A   Correct.

Q   From the time that you came in as the supervisory
deputy?

A   Correct.

Q   Prior to that it was whatever it was before you

Page 76

1   referring to.

2   Q   When you were made the supervisor, weren't you

3       initially on probation as a supervisor?

4   A   Yeah, everybody is.

5   Q   So, during the period that you were on probation it

6       was pretty important to you that you would complete

7       your probation, wasn't it?

8   A   For renewals, yes.

9   Q   So, in your first hour as a supervisor, one of the

10      things that you thought was important to do was to

11      make sure that Cyndy wasn't wandering around as if

12      she had free rein, wasn't it?

13  A   Cyndy or anyone else.

14  Q   Well, there was no one else assigned to the control

15      room, was there?

16  A   Yeah, sure there were.  She didn't come in until

17      8:30.  She either used leave or was expected to

18      stay late or whatever, you know, for the leave pay.

19      If I remember correctly, there were 082 deputies

20      assigned -- I don't know if it was Monday through

21      Friday or Monday through Thursday at this point --

22      at seven o'clock, and then she would come in and

23      relieve them, and that was her post.  So, sometimes

24      she was in Worcester or couldn't come to Boston for

1    room deputy for the rest of her career.  This isn't

2    about Cyndy specifically; this is an overall issue

3    from when Dave and Jeff and I were all talking

4    about it.  There was an ongoing issue about Cyndy

5    not staying in the control room and what was the

6    big deal about her being in there, and this was the

7    explanation we got, there needs to be a deputy in

8    there overseeing the CSOs.  At this time this was

9    Cyndy's assignment.  So, of course, in that

10    respect, we're talking about Cyndy, but that's not

11    what this sentence -- this paragraph, I mean -- the

12    only part that pertains to Cyndy is the part where,

13    once again, at the last possible minute she tells

14    me she's leaving and now I've got to scramble to

15    find somebody to replace her.  I don't care if

16    she's got to leave, if she's got something to do,

17    fine, but I need to know.  I'm not a mind reader.

18    That sentence there has to do with Cyndy.  If I had

19    known she was leaving, I'd have talked to her

20    one-on-one like we were supposed to.  So, that

21    sentence, yeah, absolutely that's about Cyndy, but

22    the rest of it is about the position in general.

23  Q  Did you follow Chief Fallon's directive and give

24    her a break schedule?

Page 81

1      remember that incident?

2   A   That isn't what I said.

3   Q   Do you remember that incident?

4   A   I remember her taking off, yeah.

5   Q   What did you do about it?

6   A   What do you mean?

7   Q   You said you remember her taking off, but I don't

8      have the story right.  So, what's the story?

9   A   Pretty simple.  If I remember the situation

10      correctly, I needed her to do something, it was

11      either to go to court or give someone a break,

12      couldn't find her, and I called her on the Nextel.

13      She didn't answer at first, I called again -- I

14      think it was only twice -- she answered and I asked

15      her where she was at, she said she was getting

16      coffee, and I said you're such a liar or something.

17      She was with Kevin Donahue.  I don't recall telling

18      her to get back to the office.

19   Q   I'm misunderstanding here.

20   A   She was getting coffee.

21   Q   And you just called her up and said she was a liar?

22   A   You heard what I said.

23   Q   Is that what you said?

24   A   That's what I said.

Page 84

1    to get the fuck back to the office, the only thing

2    you're disagreeing with me there is the use of the

3    word fuck?

4  A  I wouldn't have said that on the Nextel.

5  Q  But you did say in the squad room "fucking liar"?

6  A  We went through this before, Cyndy and I. I don't

7    recall if that's what I said or if I said you're

8    such a liar. But if that's what the other deputy

9    who was there -- I know who that was -- if that's

10   what he heard, then I'm okay with that. I was

11   angry.

12 Q  And the other deputy who heard you say that to

13   Cyndy was somebody who was a new 082 working with

14   Cyndy?

15 A  What do you mean working with Cyndy?

16 Q  Was a new 082 in the office who heard you say that

17   about Cyndy?

18 A  I don't know if he was new or not. I know who it

19   was. Yeah, he was a new deputy, relatively,

20   compared to the rest of us, sure.

21 Q  I'm still confused. What was it that she had said

22   that made you mutter liar?

23 A  It wasn't what she said; it's where she was. She

24   wasn't in the building, she wasn't accessible, I

Page 85

1    didn't have a clue where she was.

2  Q  But you called her and you asked her and she said

3     she was getting coffee, and then you said she was a

4     lair.  Are you saying that she was lying about

5     getting coffee, or that's just how you refer to

6     her, as a liar, or do you sometimes refer to her as

7     a character from Gilligan's Island?

8  A  A what?

9  Q  Never mind.

10 A  A what?  I'm serious.  A what?

11 Q  Did you apologize to Kevin Roche about this

12    incident?

13 A  I apologized to Joe Norton about this incident.

14 Q  Did you apologize to Kevin Roche about this

15    incident?

16 A  I apologized to Joe Norton because it was in front

17    of Joe Norton.  I was angry and it was

18    inappropriate and it wasn't fair that -- It was one

19    of my first learning experiences of zip it.

20 Q  It wasn't fair to who?

21 A  It wasn't fair to Cyndy, first of all, and --

22 Q  Did you apologize to her?

23 A  Yes, Cyndy and I spoke.  Joe Norton immediately

24    because he was right there.

Page 87

1    Q   And that if possible, to try to get them out early

2        because of the additional commute time?

3    A   I don't recall that conversation.

4    Q   Isn't it true that when Worcester deputies are

5        assigned to courts in Boston they're permitted to

6        arrive late because of the additional commute or

7        leave early because of the additional commute?

8    A   We've done that.

9    Q   And you don't recall that Dave Taylor told you in

10       that meeting on the 20th of January that that was

11       appropriate?

12    A   No, I don't recall it being part of that

13       conversation.

14    Q   But it could've been, correct?

15    A   Sure.

16    Q   In fact, you've done that, allowed Worcester

17       deputies assigned to courts to leave early as

18       needed and come late?

19    A   If I could.  Usually it doesn't happen.

20    Q   But when you can, you do?

21    A   Sure.

22    Q   But that was not done for Deputy DeCaire, correct?

23    A   She always had leave.  If I tried to cut her out

24       early, she sat around and didn't leave.  There were

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.

I, LEANNE L. MURPHY, a Certified Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify:

That ALISON L. HODGKINS, the Witness whose testimony is hereinbefore set forth, was duly sworn by me; that his/her testimony thereupon given was recorded by me and transcribed by me; and that such deposition is a true record of the testimony given by said Witness, to the best of my knowledge, skill and ability.

IN WITNESS WHEREOF, I hereunto set my hand and notarial seal this 13th day of April 2005.

Leanne L. Murphy, CVR
Notary Public

My Commission Expires
May 12, 2011