# Commonwealth of Massachusetts

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Volume II
Exhibits 16-22

CYNTHIA DECAIRE,
                Plaintiff

VS.

JOHN D. ASHCROFT, in his official position as Attorney General of the United States,
                Defendant

Docket No.
C.A. 10593WGY

CONTINUED DEPOSITION of **ALISON HODGKINS**, a Witness called by Counsel on behalf of the **Plaintiff**, pursuant to the Massachusetts Rules of Civil Procedure, before Nancy J. Stone, a Certified Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of Segal, Roitman & Coleman, 11 Beacon Street, Boston, Massachusetts and the Moakley Federal Courthouse, 1 Courthouse Way, Boston, Massachusetts on Thursday, March 24, 2005 commencing at 11:22 a.m.

*Accurate Reporting Services*
36 West Street
Whitman, MA 02382
(781) 447-9520

Page 6

1  requirement.
2       MS. TALWANI: Off the record for a
3  minute.
4            (Off the record)
5  Q  (by Ms. Talwani) The date in this document, it
6     refers to a November 2001 fitness assessment and
7     then says that it was signed in December 2002, is
8     that a mistake, should it have been 2001?
9  A  Say that again.
10 Q  (As read:) On November 2001 her fitness
11    assessment summary was submitted to the Chief
12    Deputy US Marshal for signature; he signed it on
13    December 3, 2002?
14 A  No, that's correct.
15 Q  The second allegation (as read:) On December 12,
16    2001 the complainant was not allowed to work at
17    the operations desk. This action restricts her
18    from performing certain assignments and interferes
19    with her promotional opportunities. This hindered
20    her for applying for merit promotion
21    opportunities.
22         Is that allegation one that you made?
23 A  Sounds -- Sounds right.
24 Q  And I asked you yesterday about being removed from

Page 7

```
 1            the operations desk and you said that you were not
 2            removed but is it your position that you were
 3            prohibited from working at the operations desk at
 4            some point?
 5       A    Yes.
 6       Q    Then it says (as read:)  On January 23, 2002 the
 7            complainant was bypassed for an in-district
 8            assignment.  This resulted in her not receiving
 9            overtime and not being allowed to perform her
10            duties as a Deputy US Marshal.
11            Did you make that allegation?
12       A    Yes.
13       Q    (As read:)  On March 25, 2002 operational
14            assignments by teams were altered in the District
15            of Massachusetts which resulted in complainant not
16            being allowed to work warrants.
17            Did you make that allegation?
18       A    Yes.
19       Q    (As read:)  On April 22, 2002 complainant received
20            an acceptable annual performance evaluation;
21            however, she alleges a continued pattern of
22            retaliation when her supervisor was instructed by
23            upper management to counsel her about her sick
24            leave usage although they were aware of the reason
```

| | | |
|---|---|---|
| 1 | A | The deputies are the initial level and as you step |
| 2 | | up you'd have a supervisory deputy. You may have |
| 3 | | supervisory deputies with specific sections or |
| 4 | | specialty areas. There was a changeover of status |
| 5 | | and title and at some point they were known as |
| 6 | | inspectors. And then from there you go up to -- |
| 7 | | in most districts the chief deputy, in some |
| 8 | | districts there is an assistant chief deputy. We |
| 9 | | just got the chief deputy a few years back -- |
| 10 | | assistant chief deputy a few years back. From the |
| 11 | | chief deputy there isn't anybody else on the chain |
| 12 | | as far as marshals go -- deputy marshals. |
| 13 | Q | So, within this chain of command as a Deputy US |
| 14 | | Marshal were you expected to report to a |
| 15 | | supervisory deputy rather than to an assistant |
| 16 | | chief or a chief? |
| 17 | | **MS. TALWANI:** Objection. |
| 18 | A | Yes. |
| 19 | Q | At some point during your assignment to Boston I |
| 20 | | believe you testified that you were assigned to be |
| 21 | | a warrant coordinator, is that correct? |
| 22 | A | Yes. |
| 23 | Q | Would you explain how that came about, please? |
| 24 | A | I don't know. I didn't have anything to do with |

Page 73

```
 1              through but it hasn't worked that way. I don't
 2              have any idea why, but it's not been filtered out
 3              among the other deputies it's kind of been one
 4              person.
 5       Q      Let me direct your attention to Marshal Dichio's
 6              arrival in August of 2002.
 7                   Did you have occasion to meet with him when
 8              he arrived?
 9       A      Yes.
10       Q      Do you recall when that was?
11       A      He had been here for a while.
12       Q      And when you say a while, are you talking weeks or
13              months?
14       A      I don't really recall. I just know he had been
15              here and begun to establish himself and try to
16              fight his way through the haze.
17       Q      What occasioned your meeting with the Marshal?
18       A      I'm sorry, what was that?
19       Q      How did your meeting with the Marshal come about?
20       A      He had set up one-on-one meetings with everybody.
21              I don't know if he ever did that, but he was
22              trying to meet with each of us just to kind of get
23              an idea of who we were and where we wanted to go
24              with our careers and that was basically it. If
```

   1  on you. So, either be comfortable with it or know
   2  that they're going to do the right thing. That's
   3  how I see Dave Dimmitt.
   4  Q  At some point during your time in Boston you had
   5     the opportunity to become both an acting
   6     supervisor and a supervisor, is that correct?
   7  A  Yes.
   8  Q  Do you recall when you first became an acting
   9     supervisor?
  10  A  No.
  11  Q  Was it during the tenure of Marshal McGilvray or
  12     Marshal Dichio, if you recall?
  13  A  The official acting supervisor position which
  14     became the ops desk in general and court ops was
  15     -- if that's the one you mean was while Marshal
  16     Dichio was here. The unofficial side of it, the
  17     ops desk, which was the -- We all refer to it as
  18     the assistant supervisor. The title of that got
  19     changed at some point and it simply was the -- it
  20     was the acting/assistant supervisor and then it
  21     got changed somewhere to just be the ops desk
  22     deputy and I think -- I know for a fact it was
  23     right about the time that I was asking. I
  24     suggested to Chief Bane that we have headquarters

Page 82

1 come in and evaluate the position because perhaps
2 it was a position that deserved higher pay but
3 then everything changed.
4 Q  And during the course of your supervision you
5    testified that you've had occasion to supervise
6    Deputy DeCaire, is that correct?
7 A  Yes.
8 Q  How many occasions or at how many different times
9    have you had occasion to supervise her?
10 A  I don't really recall that because everything has
11    kind of gone from being on the ops desk and then
12    being in warrants, judicial security, the ops desk
13    as acting supervisor and then judicial security
14    and then getting promoted that I don't have the
15    time frame straight, do you know what I mean.  I
16    know she's been around.  I know there's been many
17    times and I know for a fact that when she was here
18    on light duty it was my responsibility to oversee
19    her.  I was who she was supposed to report to.
20 Q  Had you had occasion to supervise her prior to her
21    going on light duty?
22 A  Yes.
23 Q  Do you recall what position you were in at that
24    time?

Page 117

1  Q   Did he ask you about your marital status?
2  A   No.
3  Q   Did you tell him about your marital status?
4  A   Yes.
5  Q   And you told him about what brought you home?
6  A   Yes.
7  Q   What was that?
8  A   Time to leave Pittsburgh.
9  Q   Personal reason or work reasons?
10 A   Personal reasons, not job-related at all.
11 Q   You shared those with him?
12 A   Yes.
13 Q   And in terms of your experience, in what kind of
14     detail did you tell him about your work
15     experience?
16 A   I don't recall. I'm sure I told him about being
17     on a task force or...
18 Q   Did you tell him you had been the acting
19     supervisor for the court operations position?
20 A   What did you mean?
21 Q   The assistant supervisor -- Sorry, acting
22     supervisor at desk, did you tell him about that?
23 A   I told him about working the operations desk, if
24     that's what you mean.

Page 121

1  Q   When you were asked by Attorney Cottrell about
2      your position as an acting supervisor she asked
3      you under which Marshal and you described two
4      different things, one was the court operations or
5      the operations desk under Marshal Dichio and then
6      you referred to an unofficial side which was as
7      the assistant supervisor, do you recall that?
8  A   Correct.
9  Q   In your view as assistant supervisor was that a
10     position that had supervisory responsibilities?
11 A   Yes.
12 Q   And that in your view, in fact, should have been
13     formalized as a position, that's what you said
14     about having it evaluated, correct?
15 A   Yes.
16 Q   And how long were you in that position?
17 A   Six months at one point, six months at another,
18     and then any time it was needed to be covered just
19     when that person was off.
20 Q   But as an assignment that was more than simply a
21     fill-in for a day it was two six-month stints, is
22     that correct?
23 A   I believe so.
24 Q   And in your experience did other acting supervisor

found a way to -- as other districts do to have the court security officer but the court security officers can't control the doors to the secure area, the cell block doors that are all electronic. They can't let doors open and close where prisoners can come and go through. They can do the attorneys rooms and they can do the doorways within certain secure areas around the elevators and things like that on command of a deputy. So, we, the office in general, putting our heads together and looking up the information found a way to work it that way.

Q   So that would be having one deputy and one CSO?
A   Correct.
Q   You had had two 082s at that point or just prior to that?
A   We had.
Q   Then when you to one CSO it was one CSO and one 082?
A   I believe so -- a guard. We used guards, too. We had used guards. As a matter of fact, one of those guards is a retired deputy.
Q   So a guard could be there. It didn't have to be a deputy it had to be either a deputy or a guard?

Page 142

1  there. When I was acting I don't think that was
2  one of those periods where the CSOs were in there
3  yet. I think we were still in the phases of
4  trying to get them in there.
5  Q  082s and guards?
6  A  Yes.
7  Q  Now, as supervisor how you were staffing the
8     control room?
9  A  I had nothing to do with it any more.
10 Q  Who staffs the control room?
11 A  Supervisor Bohn. We haven't had to staff that for
12    a while. When they finally -- I was still doing
13    court operations when they finally -- they, upper
14    management, finally with judicial security and --
15    I can't remember now. The company that hires and
16    fires the CSOs, when they finally worked it out
17    with them somehow that the CSOs would be in there
18    we're still overseeing it by paying attention to
19    it, to monitoring it.
20 Q  But it's no longer a direct duty job of the
21    deputies, it's not something that you're normally
22    assigning a deputy to?
23 A  Not any more.
24 Q  Normally now it's a CSOs?

Page 143

1  A    Yes, now that they're trained. I mean, that was a
2       tough thing, too, they all had to be trained.
3       **MS. TALWANI:** I'm done.
4                                *
5                                *
6  (Whereupon, the deposition concluded at 4:57 p.m.)

Page 146

# C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

I, Nancy J. Stone, a Certified Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify:

That **ALISON HODGKINS**, the Witness whose testimony is hereinbefore set forth, was duly sworn by me; that his/her testimony thereupon given was recorded by me and transcribed by me; and that such deposition is a true record of the testimony given by said witness, to the best of my knowledge, skill and ability.

IN WITNESS WHEREOF, I hereunto set my hand and notarial seal this 26th day of March, 2005.

Nancy J. Stone, CVR
Notary Public

My Commission Expires
March 3, 2011