**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
_____

**CYNTHIA A. DeCAIRE,**
                                         **Plaintiff,**
        **v.**                                              **Civ. Action No. 04-10593WGY**

**ALBERTO R. GONZALES, in his official**
**position as Attorney General of the**
**United States,**
                                         **Defendant.**


-------------------------------------------------------

### DEFENDANT'S POST-TRIAL MEMORANDUM

        Defendant incorporates herein by reference the arguments advanced by Defendant on

July 27, 2005, during closing arguments.

        In her amended complaint, Plaintiff Cynthia A. DeCaire alleged nine specific bases in

support of her claim that she was discriminated against based upon her gender and retaliated

against for filing an EEO complaint.  Defendant's Post-trial Memorandum will set forth a

timetable of relevant events and Defendant's proposed findings of fact and conclusions of law

with regard to each of the individual claims set forth in Plaintiff's amended complaint.

**Timetable Events:**

        1.  On August 6, 2002, Anthony Dichio was sworn in as United States Marshal for the

District of Massachusetts.  Dichio, Vol. VI, p. 89.  Statement of Agreed Upon Facts.

        2.  The USM met with then Chief Deputy Timothy Bain on the first Saturday in August,

2002.  During this meeting, Chief Bain confirmed to the USM that he planned to leave the

District, either through promotion to Washington, D.C., or retirement.  Bain, Vol. II, p. 87.

        3.  On August 26, 2002, USM Dichio had an introductory meeting with Plaintiff during

2

which Plaintiff expressed her desire to be transferred to the Worcester office to be closer to her

family.  Bain, Vol. II, pp. 88-89; Dichio, Vol. VI, pp. 90-92.[1]

4.  In subsequent discussions with the USM, Chief Bain opposed moving Plaintiff to

Worcester, and particularly objected to returning DUSM Stephen McKearney from Worcester to

Boston in order to accomplish Plaintiff's transfer. Bain, Vol. II, pp. 86-87, 88-89, 98-99; Dichio,

Vol. VI, p. 93.  The USM wanted DUSM McKearney reassigned to Boston because he lived in

the Boston area and it would be a more efficient use of USMS resources.  Dichio, Vol. VI, pp.

93-95.

5.  After failing to persuade the USM to keep Plaintiff in Boston, Chief Bain spoke with

Plaintiff, who accepted the offered transfer to Worcester general operations, although Chief Bain

was of the opinion that Plaintiff wanted to be assigned to Worcester on the HIDTA task force.

Bain, Vol. II, pp.85-86, 90.  At the time Plaintiff accepted the general operations position, the

Worcester HIDTA position was not available.  Bain, Vol. II, p. 90; Dichio, Vol. VI, p. 96.

6.  On September 5, 2002, the Worcester HIDTA position was announced.  Dichio, Vol.

---

[1]  Interestingly, Plaintiff's own witness contradicts Plaintiff's trial testimony that she
didn't want to go to Worcester, preferred the position she had, and that the USM was somehow
inexplicably  fixated on sending her to Worcester despite her protests.  DeCaire, Vol. I, pp. 45-
49, 59-60.

VI, p. 96.  On September 9, 2002, Plaintiff emailed the USM that she was interested in the position.  DUSMs Susan Williams and Mark Lewis also expressed interest in the position. Statement of Agreed Upon Facts.

7.  On September 16, 2002, Chief Bain was advised by email that some supervisors within the office were of the opinion that the Worcester HIDTA position should not be filled. Exhibit 8.  In subsequent conversations with the USM, the USM advised Chief Bain that he wanted to assign DUSM Mark Lewis to the Worcester HIDTA position.  The USM had spoken with Lewis, and thought he could do the job.  Bain, Vol. II, p. 92.  At the time he selected DUSM Lewis for the position, he had not been advised that the position was considered a plum assignment by the deputies.  Dichio, Vol. VII, pp. 53-55.  The USM based his assignment on DUSM Lewis' residence, Berlin, MA, which was closer to Worcester than Boston.  Dichio, Vol. VI, p. 97, Vol. VII, p. 51.  In a move unpopular within the Boston office, DUSM Lewis was transferred to the Worcester HIDTA position on September 17, 2002.  Exhibit 64, 65;  Dichio, Vol. VI, pp. 97-98.  On or about that same date, the USM met with Plaintiff and advised her that he did not consider her for the Worcester HIDTA position because of her relationship with DUSM Jeffrey Bohn, the Boston HIDTA Coordinator, who would be responsible to supervise the Worcester HIDTA position.  Dichio, Vol. VI, pp. 97-98, Vol. VII, p. 48.  The USM thereafter gave Plaintiff the option to remain in Boston warrants rather than transfer to Worcester court operations, but Plaintiff indicated that she wished to go to Worcester.  Dichio, Vol. VI, pp. 98-99, Vol. VII, pp. 58-59.

8.  On September 25, 2002, Plaintiff was reassigned to court operations in the Worcester office, effective September 30, 2002,  in accordance with her stated preference to work in Worcester.  Dichio, Vol. VI, p. 96.  DUSM Stephen McKearney was reassigned to the Boston

4

warrants position vacated by Plaintiff.  Statement of Agreed Upon Facts.

9.  Chief Bain physically departed the District on December 13, 2002.  Bain, Vol. II, p.

100.

**I.  As to Plaintiff's allegation that she was discriminated against when USMS management assigned her to weekly rotations in Worcester and Boston in or around January 2003 (Count I).**

<u>**Proposed Findings of Fact:**</u>

In January 2003, the USMS within the District of Massachusetts suffered from a shortage

of manpower in the Boston office, particularly in court operations.  Dichio, Vol. VIII, p. 62;

Statement of Agreed Upon Facts.  The pending departure of 082 DUSM Jamie Viator on or

about February 4, 2003, created an additional vacancy in Boston court operations.  Dichio, Vol.

VIII, p. 70.  At the time, the Worcester office consisted of SDUSM Bezanson, DUSMs Wahl,

Williams, DeCaire and Lewis.   To address the shortage, the USM directed that the two junior

deputies assigned to Worcester court operations be temporarily assigned to Boston court

operations in a weekly rotation.  Dichio, Vol VIII, p. 62. Then-SDUSM David Taylor, with

whom the USM regularly consulted after his arrival in the district (Taylor, Vol IV, p. 73; Dichio,

Vol. VII, p. 9), participated in discussions regarding the manner in which the rotation would be

conducted.  Vol II, p. 122. At the time, Assistant Chief Durette was on leave attending to urgent

family matters.  Dichio, Vol. VII, p. 66.   SDUSM Taylor recommended that Deputy Wahl, who

lived halfway between Springfield and Worcester, cover the Springfield office as needed.

SDUSM Taylor did not recommend that DUSM Lewis be considered for the rotation as he held a

HIDTA position.  Taylor, Vol. II, pp. 123-24.  Traditionally, HIDTA personnel were not used on

5

a rotational basis.  Durette, Vol. IV, pp. 21-22[2].   Accordingly, Plaintiff and DUSM Susan

Williams were scheduled for the temporary rotation to Boston court operations.  Taylor, Vol II,

p. 22; Dichio, Vol VII, p. 62.  DUSM Wahl was assigned coverage of the Springfield office.

Dichio, Vol. VII, p. 64; Statement of Agreed Upon Facts.

Whether the determination to rotate the two junior court operations deputies was based

on geography or seniority, the outcome was the same - Plaintiff and DUSM Williams were the

two junior deputies in Worcester court operations and resided closer to Boston than DUSM

Wahl.

January 23, 2003, was the first day of the weekly rotation.  Dichio, Vol. VII, p. 63.

Plaintiff took sick and annual leave during the period from January 23, 2003, until February 4,

2003, and never participated in the rotation.

**Proposed Conclusions of Law:**

1.  While Plaintiff's scheduled rotation from Worcester to Boston may have been

inconvenient, it did not significantly alter Plaintiff's job responsibilities and did not constitute an

adverse action, particularly as Plaintiff never participated in the rotation.

2.  The decision to rotate Plaintiff to Boston court operations in January 2003 was based

upon the staffing requirements of the Boston office, the work to be performed, seniority within

court operations, and the proximity of the residences of the DUSMs considered for rotation to

the Boston office.  Plaintiff was the junior deputy assigned to Worcester court operations and

lived closer to Boston than DUSM Wahl.  There is absolutely no evidence that Plaintiff's

scheduled rotation from Worcester to Boston was gender based.  There is substantial evidence

---

[2]  Plaintiff's witness.

that the temporary rotation was legitimately intended to address increased staffing shortages in Boston court operations.

**II.  As to Plaintiff's Allegation that she was further discriminated against (Count I) and retaliated against after she pursued EEO action (Count II), in that USMS management transferred her to Court Operations in Boston in or around February 2003.**

<u>**Proposed Findings of Fact**</u>**:**

After Plaintiff called in sick on January 23, 2003, the first day of her rotation to Boston, management staff reconsidered the method of staffing the court operations vacancy due to the additional scheduling required to arrange coverage for DUSMs rotating from Worcester to Boston when the originally assigned DUSM unexpectedly took leave and the resulting confusion.  Dichio, Vol. VII, pp. 65, 72.  Accordingly, the USM directed that the junior court operations deputy in Worcester be reassigned to augment Boston court operations on a daily, non-rotational basis to better ensure continuous coverage of the position.  At the time, Plaintiff was the junior court operations deputy assigned in the Worcester office.  On January 30, 2003, Plaintiff, who was returning from leave, was directed to report to the Worcester office on February 3, 2003.  There, Plaintiff was advised that on February 4, 2003, she would be reassigned to Boston court operations.  Dichio, Vol. VII, p. 68.   The USM advised Plaintiff that the reassignment was temporary, and that she would return to Worcester.  Dichio, Vo. VII, p. 69.

Court operations functions are routinely performed by DUSMs in either 082 or 1811 status.  Dimmitt, Vol. IV, pp. 88-89; Fallon, Vol. VI, p. 10.

<u>**Proposed Conclusions of Law**</u>**:**

1.  Plaintiff's February 4, 2003, reassignment to Boston court operations does not constitute an adverse employment action.  Plaintiff was temporarily returned to the duty station

7

to which she had been assigned prior to USM Dichio's arrival in the District to perform duties routinely performed by 1811 deputies. A transfer that involves no significant changes in an employee's conditions of employment, even though the employee views the transfers either positively or negatively does not of itself render the denial or receipt of the transfer an adverse employment action. Title VII discrimination claims should be limited to a materially adverse change in the terms and conditions of employment which must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. *See*, *Craven v. Texas Department of Criminal Justice Division, et. al*., 151 F.Supp.2d 757, 767-68 (N.D. Tex. 2001); *Sanchez v. Denver Public Schools*, 164 F.3d 527, 532 n.6 (10th Cir. 1998)(longer commute and insignificant alteration in job responsibilities); *see also Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1448-49 (11th Cir. 1998)(Americans with Disabilities Act case); *Kindred v. Northome/Indus. Sch. Dist. No. 363*, 154 F.3d 801, 802-04 (8th Cir. 1998)(assigning bus driver to longer school bus route without increase in pay), *cert. denied*, 525 U.S. 1109 (1999); *Harlston v. McDonnell Douglas Corp*., 37 F.3d 379, 382 (8th Cir. 1994)(different duties and more stressful job, but no reduction in title, salary, or benefits; "[c]hanges in duties or working conditions that cause no materially significant disadvantage, such as Harlston's reassignment, are insufficient to establish the adverse conduct required to make a *prima facie* case;"); *Smith v. Schering-Plough Health Care Products, Inc*., 6 F.Supp. 2d 631, 734 (W.D. Tenn. 1997) (plaintiff conceded that transfer was not a demotion, and that he suffered no emotional injuries, serious stress, or ruined reputation); *Joiner v. Ohio Dep't of Transp.*, 949 F.Supp. 562, 567 (S.D. Ohio 1996)(no "loss of

prestige or an objectively demeaning change of working conditions"; new title and "the loss of opportunity for overtime and the loss of supervisory responsibility" insufficient to constitute adverse employment action).

Here, Plaintiff's perception that she was being slighted simply because her reassignment was prompted by the departure of an 082 deputy is simply not sufficient grounds to support a finding that assignment to the position constituted an adverse action.

2.  There is no credible evidence that Plaintiff's reassignment to Boston court operations was gender based or retaliatory in nature.  The evidence shows that Plaintiff's assignment within Boston court operations was legitimately designed to alleviate staff shortages in Boston, that Plaintiff was selected solely because she was the junior court operations deputy in Worcester, and the rotation experience of January 23d demonstrated that  continued rotation of personnel from Worcester was impractical.

**Timeline Events:**

1.  On February 3, 2003, the USM received an email advising him that Plaintiff had filed an EEO complaint.  Dichio, Vol. VII, pp. 72.

2.  On February 5, 2003, SDUSM Thomas Bezanson forwarded to the USM a document purportedly summarizing Plaintiff's EEO complaint.  Statement of Agreed Upon Facts.

3.  On February 5, 2003, the USM contacted USMS headquarters to make a second request for assignment of an Acting Chief Deputy.  Dichio, Vol. VII, pp. 77-78.

4.  On February 6, 2003, the USM met with Assistant Chief Durette who asked to become the District's Acting Chief Deputy.  The USM indicated that the requested assignment would not be possible.  Dichio, Vol. VII, p. 81.

**III.  As to Plaintiff's Allegation that she was further discriminated against (Count I) and**

**retaliated against after she pursued EEO action (Count II), in that USMS management
kept her in Court Operations in Boston after additional employees were added to the unit.**

**Proposed Findings of Fact:**

On February 17, 2003, Chief Deputy U.S. Marshal David Dimmitt arrived in the District
of Massachusetts to serve as Chief Deputy for a 120 day period.  Dimmitt, Vol. IV, pp 79-81.
Chief Dimmitt has served as Chief Deputy U.S. Marshal for the Northern District of New York
for four years, and was selected by USMS Headquarters for the assignment.  Dimmitt, Vol. IV,
pp. 79, 81.  Upon arrival in the District of Massachusetts, Chief Dimmitt felt it best to leave
everyone where they were assigned until the permanent Chief arrived so that the USM and the
permanent Chief could determine any changes to the allocation of manpower, and so advised the
USM.  Dimmitt, Vol. IV, pp. 109-110, 118, 124, Vol. V, p. 20-21, 23.  After Chief Dimmitt
arrived in the District, the USM reduced his level of involvement in day to day operations, acting
instead on the recommendations of Chief Dimmitt regarding these matters.  Dichio, Vol. VII, pp.
86-87, 99.  Chief Dimmitt assigned Plaintiff and another DUSM  "cold cases" to investigate
while assigned to Boston court operations.  Chief Dimmitt assigned these cases in an effort to
boost the morale of the deputies and to further the course of cases not being investigated by the
warrant division.  Dimmitt, Vol. IV, pp. 87-88.  The assignment of such cases to 1811 deputies is
a normal course of action for Chief Dimmitt.  Dimmitt, Vol. IV, p. 88, Vol. V, pp. 44-45.

**Proposed Conclusions of Law:**

1.  The decision to retain Plaintiff in Boston court operations after the assignment of
additional DUSMs to the District was based upon valid operational considerations.  Chief
Dimmitt's determination to defer transfer decisions until the arrival of the permanent Chief was a
legitimate exercise of discretion, and was not directed at Plaintiff.  During Chief Dimmitt's

tenure, Plaintiff remained assigned to a position for which she is trained and which falls within

the duties commonly performed by 1811 series DUSMs.  Chief Dimmitt assigned Plaintiff "cold

cases" for investigation in Plaintiff's best interest and to further the mission of the USMS.  No

adverse action was taken against Plaintiff.

2.  There is absolutely nothing in the record from which Chief Dimmitt's determination

to defer transfer decisions within the District of Massachusetts until the arrival of the permanent

Chief Deputy can be held to have been gender based or an act of retaliation against Plaintiff..

**IV.  As to Plaintiff's Allegation that she was further discriminated against (Count I) and
retaliated against after she pursued EEO action (Count II), in that USMS management
failed to move her to the Boston Warrants unit when an opening occurred there in or
around March, 2003.**

**Proposed Findings of Fact:**

On April 23, 2003, Plaintiff expressed interest in being considered for assignment as

Boston warrant coordinator to CDUSM Dimmitt.  Dimmitt, Vol. IV, pp. 100-01.  Plaintiff also

advised Acting Assistant Chief Taylor of her interest in the position.  Taylor, Vol. II, p. 117.

The warrant coordinator assignment is a within-district collateral duty, and not a supervisory

duty.  Dimmitt, Vol, IV, p. 107-08, Vol. V, p. 20; Fallon, Vol. V, pp. 115-16; Dichio, Vol. VII,

p. 12.  Acting Assistant Chief Taylor was involved in discussions regarding the staffing of the

position.  Taylor, Vol. II, pp. 117-18, Vol. IV, p. 55.  Plaintiff was considered for the position

along with other DUSMs.  The USM gave no indication to Chief Dimmitt that Plaintiff would

not be considered by him to fill the position.  Dimmitt, Vol. IV, pp. 99-100.  Acting Assistant

Chief Taylor recommended DUSM Paul Sugrue for the position, to give him an opportunity that

he hadn't had.  Taylor, Vol. II, p. 118.  Chief Dimmitt also recommended DUSM Sugrue

because he though he would be the best person for it based on his experience.  Dimmitt, Vol. IV,

p. 100.  Chief Dimmitt had had discussions with DUSM Sugrue about his desire to become a

Grade 13 supervisor.  Dimmitt, Vol. IV, p. 100, Vol. V, pp. 54-55.

The USM endorsed Chief Dimmitt's recommendation to fill the warrant coordinator

position with DUSM Sugrue.  Dichio, Vol. VII, pp. 11-12, 84.  On April 28, 2003, DUSM

Sugrue was assigned as warrant coordinator.

**Proposed Conclusions of Law:**

1. USMS management did not take adverse action against Plaintiff in selecting DUSM

Sugrue for the warrant coordinator assignment for which Plaintiff applied in April 2003.

Plaintiff was considered for the position, but already had an acting supervisory position in

Worcester to her credit.  Chief Dimmitt's recommendation to the USM that DUSM Sugrue be

assigned the position was legitimately intended to ensure equal opportunity for development and

advancement to all DUSMs who desired supervisory experience.  Plaintiff suffered no more by

her non-selection than any other DUSM considered but not selected for the temporary

assignment.

2. There is no credible evidence that the recommendations of Chief Dimmitt and Acting

Assistant Chief Taylor to assign DUSM Sugrue as warrant coordinator and the acceptance of

those recommendations by USM Dichio involved Plaintiff's protected status as a female or were

based upon any retaliatory animus.  Although the rationale articulated by Chief Dimmitt and

Acting Assistant Chief Taylor for their recommendation of DUSM Sugrue differed, its is clear

from the record that their recommendations were directed toward providing DUSM Sugrue a

new opportunity and not toward denying an opportunity to Plaintiff.  Their recommendations

were reasonably accepted by the USM, who relied on their judgment.  The credible evidence

indicates that the appointment was legitimately intended to maximize supervisory opportunities

12

by spreading them out among DUSMs who had not yet had supervisory experience, and was

based upon DUSM Sugrue's qualifications for the assignment.

**V.  As to Plaintiff's Allegation that she was further discriminated against (Count I) and retaliated against after she pursued EEO action (Count II), in that USMS management refused to assign her to the Warrant Coordinator position in or around April 2003.**

**Proposed Findings of Fact:**

On April 21, 2003, Plaintiff expressed her interest in being considered for the position of

Acting Supervisor of Boston court operations.  Taylor, Vol. II, pp. 113; Dimmitt.

This position was a temporary position, not to exceed 120 days.  Taylor, Vol. II, pp. 118-19.

Acting Assistant Chief Taylor asked DUSMs Annette Lawlor and Alison Hodgkins whether they

were interested in the position as well.  Lawlor was not, but Hodgkins expressed interest.

Taylor, Vol. II, p. 114.  Acting Assistant Chief Taylor communicated this information to Chief

Dimmitt.  *Id*.  In discussions with Chief Dimmitt and the USM, Acting Assistant Chief Taylor

expressed his opinion that the position should be given to a DUSM who had not yet had the

opportunity to function in a supervisory capacity.  Taylor, Vol. II, p. 116.  The interest of

Plaintiff and DUSM Hodgkins in the position was also expressed.  Taylor, Vol. II, pp. 115, 116.

A number of DUSMs were considered for the position, including Plaintiff.  Dimmitt, Vol.

IV, pp. 98-99, Vol. V, p. 57.  Chief Dimmitt recommended DUSM Hodgkins, who had not had

an acting supervisor position in the District of Massachusetts.  Dimmitt, Vol. IV, pp. 98, 99, Vol.

V, p. 55.  It was decided that the most fair situation would be to allow DUSM Hodgkins to have

an acting supervisory experience within the District of Massachusetts.  Dimmitt, Vol. IV, p. 99,

Vol V, pp. 41-43.  The USM never indicated to Chief Dimmitt that he would not consider

Plaintiff to fill the position.  *Id*.  The USM was aware that DUSM Hodgkins had placed among

the top five candidates for merit promotion on two or three occasions, and felt that she had the

talent to function in the position. Dichio, Vol. VII, p. 11. The USM endorsed Chief Dimmitt's recommendation. *Id*. The selection of DUSM Hodgkins to fill this position did not affect Plaintiff in any manner different than other deputies considered but not selected for the position. Dimmitt, Vol. V, p. 57. On April 28, 2003, DUSM Alison Hodgkins was selected to fill the position as Acting Supervisor of Boston court operations.

**Proposed Conclusions of Law:**

1. USMS management did not take adverse action against Plaintiff in selecting DUSM Hodgkins for the Acting Supervisor of court operations position for which Plaintiff applied in April 2003. Plaintiff was considered for the position, but already had an acting supervisory position in Worcester to her credit. The fact that Plaintiff had already held such a position legitimately factored into the Marshal's determination to accept the recommendations of his management staff, intended to ensure equal opportunity for development and advancement to all DUSMs who desired supervisory experience. Plaintiff suffered no more by her non-selection than any other DUSM considered but not selected for the temporary assignment.

2. There is no credible evidence that the recommendations of Chief Dimmitt and Acting Assistant Chief Taylor to assign DUSM Hodgkins as Acting Supervisor of court operations and the acceptance of those recommendations by USM Dichio involved Plaintiff's protected status as a female or were based upon any retaliatory animus. It is clear from the record that their recommendations were directed toward providing DUSM Hodgkins a new opportunity for which she was clearly qualified, and not toward denying an opportunity to Plaintiff. Their recommendations were reasonably accepted by the USM, who placed great reliance on their judgment. The credible evidence indicates that the appointment was legitimately intended to

maximize supervisory opportunities within the District of Massachusetts, and was based upon

DUSM Hodgkins' qualifications for the position and her lack of a previous opportunity within

the District.

**VI.  As to Plaintiff's Allegation that she was further discriminated against (Count I) and retaliated against after she pursued EEO action (Count II), in that USMS management denied her an appointment to the Acting Court Operations Supervisor position in or around September 2003.**

**Proposed Findings of Fact:**

Chief Deputy William Fallon, a seventeen year veteran of the USMS, arrived in the

District of Massachusetts on July 13, 2003.  Fallon, Vol. V, p. 107, 110.  Upon his arrival in the

District, the USM relied on Chief Fallon for the conduct of day to day operations much as he had

Chief Dimmitt.  Dichio, Vol. VII, p. 25.  Chief Fallon had not had discussions regarding

individual USMS staff before he arrived in the District.  Fallon, Vol. V, p. 112.  Prior to his

arrival in the District, Chief Fallon did learn that the USMS in the District of Massachusetts

faced a reduction of manpower and funding.  Fallon, Vol. V, p. 112.  Chief Fallon was aware

that the District would lose a permanent supervisory position once SDUSM Walter Doherty

vacated his position.  Fallon, Vol. V, p. 114.  Accordingly, the compensated Acting Supervisor

of court operations position then filled by DUSM Hodgkins would no longer be authorized, and

a new 120 day assignment for the position was not offered.  Fallon, Vol. V, pp. 114-15.  Chief

Fallon held DUSM Hodgkins over in the position as an unpaid supervisor for approximately one

month while he solidified supervisory changes within the office.  _Id_.  Approximately six weeks

after his arrival, Chief Fallon received an email from Plaintiff, indicating interest in DUSM

Hodgkins' position.  Fallon, Vol. V, pp. 113-14.

15

**Proposed Conclusions of Law:**

1.  The USMS management decision to allow DUSM Hodgkins to continue to perform the duties of Acting Supervisor of court operations in an unpaid status from on or about August 28, 2003 until on or about October 3, 2003, approximately one month later, cannot be characterized as an adverse action against Plaintiff.  Chief Fallon, who had been in the District for approximately one month when DUSM Hodgkins' temporary appointment expired, and who was in the process of making supervisory changes within the District, exercised reasonable discretion in not seeking to replace DUSM Hodgkins with another DUSM for what would be an uncompensated, short term position at the end of DUSM Hodgkin's 120 day assignment.

2.  There is no credible evidence that the continuation of DUSM Hodgkins as Acting Supervisor of court operations for approximately one month after her 120 day compensated assignment ended was intended as gender based discrimination or as retaliation against Plaintiff. Chief Fallon had been in the District for approximately one month, and had limited knowledge of Plaintiff's EEO complaints.

**VII.  As to Plaintiff's Allegation that she was further discriminated against (Count I) and retaliated against after she pursued EEO action (Count II), in that USMS management transferred her to Worcester in October 2003.**

**Proposed Findings of Fact:**

Approximately 90 days into his tenure, on October 3, 2003, Chief Fallon announced a number of supervisory and collateral duty assignments.  DUSM Bohn was promoted after merit selection to supervisory status and was assigned as a court operations supervisor.  DUSM Sugrue continued his collateral duty assignment as warrant coordinator, based largely upon the recommendation of Anthony Visalli, the warrant supervisor.  Fallon, Vol. V, pp. 116-17. Plaintiff had been considered for the assignment, and no adverse information was communicated

16

to Chief Fallon regarding Plaintiff. Fallon, Vol. V, p. 118. Plaintiff had significant collateral

duties (Fallon, Vol. V, pp. 119-20), and had been authorized to perform a modeling assignment

for an equipment publication after clearance by Headquarters. Fallon, Vol. V, pp. 120-21. On

October 10, 2003, Plaintiff married SDUSM Bohn. Because Plaintiff, assigned to court

operations, was in a position to be supervised by her spouse, Chief Fallon consulted with USMS

legal counsel regarding the issue. Thereafter, Plaintiff was transferred to Worcester on October

14, 2003, in order to forestall any potential conflict or appearance of impropriety. Taylor, Vol.

II, p. 54; Fallon, Vol. V, pp. 128-29; Vol. VI, pp. 29-30, 46-49; Bezanson, Vol. VI, pp. 78-79.

The USM agreed with the decision to transfer Plaintiff to Worcester. Dichio, Vol. VII, pp. 26,

89.

**Proposed Conclusions of Law:**

1.  Chief Fallon exercised appropriate discretion in consulting USMS legal counsel with

regard to the impact of Plaintiff's marriage to SDUSM Bohn and the potential appearance of

impropriety if both deputies remained in Boston once SDUSM Bohn attained permanent

supervisory status. Plaintiff's subsequent transfer to Worcester was not an adverse action

directed at Plaintiff, but was an appropriate action directed to address the potential conflict

created as a result of her marriage to SDUSM Bohn.

2.  There is no credible evidence in the record from which it may be concluded that

Plaintiff's transfer to Worcester on October 14, 2003, was gender based or retaliatory in nature.

**VIII.  As to Plaintiff's Allegation that she was further discriminated against (Count I) and retaliated against after she pursued EEO action (Count II), in that USMS management assigned her multiple duty stations in November 2003.**

**Proposed Findings of Fact:**

At the end of October, 2003, Chief Fallon was made aware that Plaintiff was pregnant.

Fallon, Vol. V, p. 121.  Plaintiff requested light duty status on October 28, 2003; her duty assignments were therefore subject to a number of restrictions, to include the carrying of a firearm.  Fallon, Vol. V, p. 122.  After inquiry, USMS management determined that there was insufficient light duty work to keep Plaintiff occupied in Worcester, and undertook efforts to find sufficient work for Plaintiff to perform under light duty restrictions to retain her in duty status. Bezanson, Vol. VI, pp. 80-81; Fallon, Vol. V, pp. 122-27, 131-36.

On November 13, 2003, Plaintiff was presented with a limited duty letter, assigning her to the Worcester office on Mondays and Fridays, Boston on Tuesdays and Thursdays, and Springfield on Wednesdays.  On November 24, 2003, Chief Fallon modified the limited duty letter to exclude work in the Springfield office.  Plaintiff was assigned to Boston on Tuesdays, Wednesdays and Thursdays.   As budgetary considerations increased the need to limit spending on guards in Boston, Plaintiff was primarily assigned to the Boston Control Room, resulting in a significant cost savings to the District.  Fallon, Vol. V, pp. 124-26.  Dichio, Vol. VII, p. 90. SDUSM Bohn's responsibilities were changed so as not to include supervision of the Control Room.  Fallon, Vol. V, p. 127.

**Proposed Conclusions of Law:**

1.  Plaintiff agreed to the limited duty plan that established a rotation between the Worcester and Boston offices.  Plaintiff's ultimate assignment to the Boston control room was a result of a lack of limited duty work in Worcester and the recognition by USMS management that substantial cost savings could be realized by Plaintiff's assignment to the control room. Plaintiff's assignment achieved a legitimate operational purpose, and did not constitute an adverse action.

2.  Plaintiff's assignment to the Boston control room to accommodate her light duty

request was not based upon unlawful gender discrimination, nor was it retaliatory in nature.

**IX.  As to Plaintiff's Allegation that she was further discriminated against (Count I) and retaliated against after she pursued EEO action (Count II), in that USMS management assigned her to the control room in the Federal Courthouse in Boston in November 2003, requiring her to work with limited or no breaks.**

**Proposed Findings of Fact:**

An OSHA investigation into the environmental condition of the Boston control room resulted in recommendations, but in no adverse findings.  Fallon, Vol. V, pp. 130-31, Vol. VI, p. 15; Taylor, Vol. IV, p. 46.  DUSMs Wickham and Roche, who have had limited duty assignments within the District, were not similarly situated to Plaintiff in terms of physical condition, physical restrictions, or the operational and budgetary considerations that were considered in the formulation of their limited duty assignments.  Fallon, Vol. V, p. 133.  The District no longer has a need to utilize deputies in the control room.  Fallon, Vol. V, p. 131. During her tour in the control room, Plaintiff was covered for breaks during her control room duties in the same manner as anyone else assigned to the Control Room.

**Proposed Conclusion of Law:**

Plaintiff's assignment to the Boston Control Room was not an adverse action, but a reasonable accommodation to Plaintiff's need for limited duty work during her pregnancy, and the operational needs of the USMS.  There is no credible evidence from which it may be concluded that the assignment was made as a result of unlawful animus or retaliatory intent.

CONCLUSION

Williams v. Westwood One Radio Networks, Inc., 107 F.3d 869 (4th Cir. 1996), is an unpublished decision that I cite herein not for any precedential value, but for its particularly apt language in characterizing cases such as the one currently before the Court:

This is the very type of case that, "everyday threatens to undermine, rather than advance, the laudable objectives of the anti-discrimination laws", <u>Blistein v. St. John's College</u>, 74 F.3d 1459, 1473 (4th Cir. 1996), by causing the public to view Title VII as nothing more than what is at issue here - a disgruntled employee trying to exact retribution from her employer for the daily difficulties *every person* encounters at work on a regular basis in some form or another. [Emphasis in the original].

Throughout these proceedings, Plaintiff has attempted to bolster her allegations with attempts to constructively amend her amended complaint, and the bootstrapping of issues involving other deputies, particularly DUSMs Williams and Bohn, that have nothing to do with her allegations as to the manner in which she, personally, has been discriminated against based upon her gender by the USMS. Had this case been tried before a jury, the jury would likely have been instructed that Plaintiff's subjective beliefs alone are insufficient to sustain a cause of action. The sole suggestion of retaliatory intent on the part of the USM comes from Detective Cummings, who is close enough to Plaintiff's husband that he exhibited extreme unprofessionalism in unilaterally removing the Brockton Police Department from the HIDTA task force after DUSM Bohn's removal. His subsequent actions indicate that his testimony should be examined with great care. The USM denies Detective Cummings' allegations regarding the content of their conversation. Even if one were to assume, *arguendo*, that a conversation such as that reported by Detective Cummings did take place, there is absolutely no indication that those career managers with whom the USM interacted on a daily basis, instrumental participants in each of the decisions complained of by Plaintiff in her amended complaint, were ever given any indication by the USM that he did not want Plaintiff to succeed in her career with the USMS. A review of the record in this matter reveals absolutely no evidence of any sort of gender bias in the management decisions cited by Plaintiff in her amended complaint.

20

Accordingly, it is respectfully requested that judgment be entered in favor of the

Defendant, and that the Court undertake judicial resolution of this matter at the earliest possible

date.

> Respectfully submitted
>  GLENN T. SUDDABY
> UNITED STATES ATTORNEY
> NORTHERN DISTRICT OF NEW YORK
>
> BY:  _____/s/_____
>
>
> BARBARA D. COTTRELL
> Assistant U.S. Attorney
> Bar Roll No. 101411
>
> 218 James T. Foley U.S Courthouse
>  445 Broadway
>  Albany, New York 12207
>  (518)431-0247

Dated: September 1, 2005

<u>CERTIFICATION</u>

I hereby certify that a true copy of the above document was served upon Plaintiff's attorney of record, Indira Talwani, Esq., Segal, Roitman & Coleman, 11 Beacon Street, Suite 500, Boston, Massachusetts 02108, by ECF filing, on September 1, 2005.

> _____/s/_____
>  BARBARA D. COTTRELL
>  Assistant U.S. Attorney
>  Bar Roll # 101411 (NDNY)

21