# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

───────────────────────────────────────

CYNTHIA A. DECAIRE,

               Plaintiff

               vs.

ALBERTO R. GONZALES, in his official position as
Attorney General of the United States.

               Defendant

───────────────────────────────────────

C.A. No. 04-10593WGY

# PROPOSED FINDINGS OF FACT AND CONCLUSIONS
# OF LAW BY PLAINTIFF CYNTHIA A. DECAIRE

I.    FINDINGS OF FACT……………………………………………………1.

A.    Background Facts Regarding Plaintiff's Career With the United States
      Marshals Service…………………………………..........................................1.

B.    Events and Assignments Affecting Deputy DeCaire and Others During
      Marshal Dichio's Tenure……………………………….........................4.

      1.  Fall 2002…………………………………………………………4.

          a) Marshal Dichio's One-on-One Interview with Deputy
             DeCaire……………………………………………………4.

          b) The Communications Following the One-on-One
             Interview……………………………………………………5.

          c) The Filling of the Worcester HIDTA Position.............................8.

          d) Marshal Dichio's Second Meeting With Deputy
             DeCaire……………………………………………......................9.

          e) Marshal Dichio's Transfer of Deputy DeCaire from the Warrants
             Investigation Unit in Boston to General Operations in
             Worcester……………………………………………………..10.

      2.  January and February 2003………………………………………10.

          a) Marshal Dichio's Directive to Shred Incident
             Reports……………………………………………………...10.

          b) Marshal Dichio's Denial of Deputy Williams Request for
             Training……………………………………………………11.

          c) Marshal Dichio's Directive that Deputies DeCaire and Williams
             Rotate Between the Boston and Worcester
             Offices……………………………………………………11.

          d) The Discrimination Complaint Initiated By Deputies Williams and
             DeCaire and Related Communications…………………………..12.

          e) Deputy DeCaire's Assignment Immediately After Initiating the
             Discrimination Complaint………………………………………14.

       **f)** **Further Activity Relating to the EEO Complaint and Marshal Dichio's Second Request for a New Chief**…………………………………………………**15.**

       **g)** **Marshal Dichio's Statements to Brockton Detective Cummings**……………………………………………………**18.**

    **3.** **March through July 2003**……………………………………**.................22.**

       **a)** **Supervisory Deputy Bohn and Assistant Chief Durette's Removal from their Supervisory Roles**........................................................**22.**

    **4.** **Deputy DeCaire's Assignment Remained Constant Despite Numerous Other Changes in the Office**……………………**........................................27.**

    **5.** **Further EEO Activity and Acting Chief Dimmitt's Statements to Supervisory Deputy Bohn Regarding Marshal Dichio's Intent** ……..**29.**

**C.** **August 2003 Through June 2005**……………………………………………**31.**

    **1.** **Chief Fallon's Limited Attempt to Familiarize Himself With Deputy DeCaire's Complaint**……………………………………………**31.**

    **2.** **The Acting Supervisory Position**……………………………………**31.**

    **3.** **The Announcement of a Rotation Schedule for Warrant and Task Force Assignments** ………………………………………………**32.**

    **4.** **Deputy DeCaire's Assignments to Worcester and Deputy Williams' Assignment to Court Operations in Boston** …………………….**..33.**

    **5.** **Deputies DeCaire and Williams' Assignments While Deputy DeCaire is on Light Duty** ……………………………………………………**34.**

    **6.** **Assignments Following Deputy DeCaire's Return from Maternity Leave**………………………………………………………**38.**

**D.** **Additional Facts Related to the Rationales for the Various Employment Actions**………………………………………………………**39.**

    **1.** **Work Performance**…………………………………………**39.**

    **2.** **Manpower**…………………………………………………**.39.**

    **3.** **Experience, Seniority and Locality**……………………………**41.**

    **4.** **Equal Opportunity**………………………………………**...42.**

5.  Deputy DeCaire's Relationship with Supervisory Deputy Bohn……………………………………………………...............43.

6.  Pregnancy…………………………………………………...............43.

7.  Attitude………………………………………………………..44.

E.  The Roles of District Managers in the Employment Actions at Issue…………………………………………………………………45.

1.  Fall 2002 …………………………………………………45.

2.  Mid-December 2002 through Mid-February 2003 ……………………47.

   a)  The Decision to Deny the Training Opportunity………………47.

   b)  The Worcester – Boston Rotation of Deputies Williams and DeCaire ………………………………………………..47.

   c)  The Transfer of Deputy DeCaire to Court Operations in Boston………………………………………………………49.

3.  Mid-February through Mid-June 2003 ………………………………50.

   a)  Marshal Dichio Continued to Exercise the Critical Role in Personnel Related Matters………………………………..51.

   b)  Acting Chief Dimmitt's Meeting with Court Opperations Deputies…………………………………………………52.

   c)  Acting Chief Dimmitt Did Not Attempt to Make Any Informed Decision Regarding the Appropriate Assignment for Deputy DeCaire………………………………………………..52.

   d)  The Filling of the Acting Supervisor Position……………………54.

   e)  The Filling of the Warrant Coordinator Position………………56.

4.  August 2003 to the Present…………………………………………...57.

   a)  The Acting Supervisor Position ………………………………57.

   b)   Deputy DeCaire's Assignment to Worcester and Deputy Williams' Assignment to Court Operations in Boston ……..57.

   c)   Limited Duty Assignment…………….………………………58.

F.  Deputy DeCaire's Attempts at Merit Based Promotions…………………58.

II. CONCLUSIONS OF LAW...................................................................................59.

    A.       Deputy DeCaire has Suffered a Series of Materially Adverse Employment
           Action....................................................................................................60.

    B.       Discrimination and/or Retaliation Has Been a Motivating Factor in These
           Employment Actions................................................................................63.

          1.   Deputy DeCaire Has Opposed Defendant's Unlawful Employment
              Practice and Has Participated in EEO Proceedings...........................63.

          2.   The Record Establishes Direct Evidence of Retaliation.....................64.

          3.   The Record Also Establishes Indirect Evidence of Retaliation............64.

               a)  Further Evidence of Retaliation.........................................65.

               b)  The Record Establishes Indirect Evidence of Gender
                   Discrimination...................................................................67.

          4.   The Record Concerning the Treatment of Assistant Chief Durette,
              Supervisory Deputy Bohn, and Deputy Williams Provides Additional
              Circumstantial Evidence of Discrimination and Retaliation...............68.

    C.       Defendant Has Failed to Meet His Burden of Showing That the Marshals
           Service Would Have Reached the Same Decisions in the Absence of
           Discrimination........................................................................................69.

          1.   Defendant Cannot Establish that Actions Were Taken For the Various
              Other Reasons Offered By Defendant.................................................69.

               a)  Manpower..........................................................................69.

               b)  Experience, Seniority and Locality...................................70.

               c)  Equal Opportunity.............................................................73.

               d)  Deputy DeCaire's Relationship With Supervisory Deputy
                   Bohn...................................................................................75.

               e)  Pregnancy..........................................................................76.

           2.   Defendant Cannot Avoid Liability On the Theory That Marshal Dichio
              Was Entitled to Follow the Recommendations of His Chief or Assistant
              Chief Deputy.......................................................................................77.

               a)  Many of the Decisions Were Made by Marshal Dichio Without
                   Recommendations from His Managers...............................77.

      b)   **To the Extent that the Managers Made Recommendations, The Were Made in the Context of a System of Loyalty Towards the Marshal……………………………………………………78.**

      c)   **To the Extent that the Managers Made Recommendations Based Upon Their Independent View That Deputy DeCaire was a Complainer or Did Not Have an Appropriate Attitude, the Managers Have Themselves Engaged In Prohibited Retaliation……………………………………………………79.**

**III.    THE COURT SHOULD GRANT EQUITABLE RELIEF…………………81.**

**IV.    CONCLUSION………………………………………………………………..83.**

Plaintiff Cynthia A. DeCaire submits the following proposed findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a):

## I.    FINDINGS OF FACT

### A.    Background Facts Regarding Plaintiff's Career With the United States Marshals Service

Cynthia DeCaire began her employment with the United States Marshals Service in June 1991.  Plaintiff and Defendant's Amended Agreed-Upon Statement of Facts ("Agreed-Upon Facts"), ¶ 7.  Throughout her tenure at the Marshals Service, Deputy DeCaire has pursued assignments to advance her career.  Agreed-Upon Facts, ¶ 8.

Deputy DeCaire began as an 082 in Court Operations, where she produced prisoners to the court.  Transcript of Proceedings, Jury Waived Trial ("TR"), Vol. 1, at 25 (DeCaire Testimony).  The 082 position is the entry-level Deputy United States Marshal position.  Agreed-Upon Facts"), ¶ 1.[1]  After participating in a three year deputy development program, she was promoted in 1993 to a more advanced position of Criminal Investigator Deputy United States Marshal, position 1811, grade 11.  Agreed-Upon Facts, ¶¶ 2, 9; TR, Vol. 1, at 25-26 (DeCaire Testimony).[2]  At that time, the Warrant Investigation unit was a small unit with additional staff rotating in for several months at a time (TR, Vol. 1. at 26-27 (DeCaire Testimony)), and Deputy DeCaire was added to this rotation and assigned an active caseload of

---

[1] According to the job description for that position, "the 082 Deputy United States Marshal works under the close supervision of a higher graded United States Marshals Service law enforcement employee."  Trial Exhibit ("Ex.") 1; see also Agreed-Upon Facts, ¶ 1  (Trial Exhibit 1 is the job description for the 082 position).  The major duties of the position are "assist[ing] with in-district movement of prisoners and detainess," "execut[ing] limited civil and criminal process," "assist[ing] higher graded USMS law enforcement personnel in providing in-court security in criminal and civil proceedings," "guard[ing] sequestered juries," and "conduct[ing] . . . body searches of prisoners and persons who are under arrest."  Ex. 1.

[2] The position is higher paid, with a 25% pay differential built in.  TR, Vol. 2, at 80 (Bane Testimony).

federal fugitive cases to investigate in an attempt to arrest fugitives.  TR, Vol. 1, at 26-27

(DeCaire Testimony).   In 1995, Deputy DeCaire was assigned to the FBI violent fugitive task

force (Agreed-Upon Facts, ¶ 10; TR, Vol. 1, at 26 (DeCaire Testimony)), and in December 1996,

Deputy DeCaire was promoted to Senior Criminal Investigator Deputy United States Marshal,

position 1811, grade 12, and was assigned to Court Operations, with rotations to the Warrants

Investigation unit.  Agreed-Upon Facts, ¶ 11; TR, Vol. 1, at 28 (DeCaire Testimony).   The

Senior Criminal Investigator Deputy United States Marshal 1811, grade 12,  position, is a

promotional position, more advanced than the grade 11 position.  Agreed-Upon Facts, ¶ 3.[3]

When a larger, permanent Warrants Investigation unit was created in 1999, Deputy DeCaire was

assigned to that unit.  Agreed-Upon Facts, ¶ 12; TR, Vol. 1, at 29 (DeCaire Testimony).

From June 3, 2001, through September 23, 2001, Deputy Marshal DeCaire became an

Acting Supervisory Criminal Investigator in the Worcester sub-office on a temporary assignment

not to exceed 120 days.  Agreed-Upon Facts, ¶ 13; TR, Vol. 1, at 30-31 (DeCaire Testimony).

---

[3] The major duties of the grade 12 position consist of "investigative duties" and "law
enforcement functions."  Ex. 2, document attached to Notification of Personnel Action, at 1, 3;
see also Agreed-Upon Facts, ¶ 3 (document is job description for the 1811, grade 12 position).
The document provides further with regard to Investigative Duties that "[t]he incumbent spends
the majority of time on investigative activities," including: "Warrant investigations which
involve determination of the identity and location of Federal and international (Interpol)
fugitives"; "Court Security investigations which involve investigations of threats and allegations
endangering the integrity of the judicial process and/or involving the lives and safety of Federal
judges, court officials, jurors," and others; and "General Criminal/ Civil investigations . . . ."
Ex. 2.  The document provides further with regard to Law Enforcement Functions that, "[a]s a
secondary function," the incumbent may lead, coordinate and provide guidance to lower level
investigators in performance of . . . complex law enforcement activities," including:
"perform[ing] protective assignments"; "plan[ning] and direct[ing] the activities of District
personnel, carrying out court security assignments for the full range of trials, hearings, and
arraignments encountered in a District office"; "enfor[cing] the full range of civil and criminal
process cases, including the most complex cases"; "[p]articipat[ing] in the enforcement of major
or high profile injunctions or other assignments involving … activities disruptive to the safe and
efficient operation of the judicial system;" and "serv[ing] as team leader on a variety of
assignments, including protective details"; "perform[ing] . . . in-district and out-of-district
special assignments."  Ex. 2.

Deputy DeCaire received a Superior Accomplishment Award for her work in this position. Agreed-Upon Facts, ¶ 14.

Plaintiff returned to the Boston office, where she was assigned the position of Team Leader, Warrants Investigations.   Agreed-Upon Facts, ¶ 15.  In that position, she supervised between four and six deputies on the street regarding their fugitive investigative related activites. TR, Vol. 1, at 41 (DeCaire Testimony).

From the start of her career in 1991 until Anthony Dichio began his term as United States Marshal, Deputy DeCaire had a successful career with the United States Marshals' Service. Agreed-Upon Facts, ¶ 8.  She also was very well-regarded by her superiors.  See TR, Vol. 2, at 12-13 (McGillivray Testimony) (Former Marshal Nancy McGillivray found Deputy DeCaire a very polished professional, a team player, and somebody that she could put in a leadership position without reserve); TR, Vol. 2, at 72, 83-84, 86 (Bane Testimony) (Former Chief Deputy Timothy Bane was pleased with her performance in Worcester as an Acting Supervisor, and found her to be excellent deputy in the Boston office); TR, Vol. 4, at 14 (Durette Testimony) (Former Assistant Chief Deputy Paul Durrette considered Deputy DeCaire a good deputy). Moreover, although the Marshals Service, over the years, has been a traditional male preserve (TR, Vol. 2, at 8-9 (judicial notice)), Deputy DeCaire never sought special treatment in her assignments on the basis of her gender.  TR, Vol. 2, at 13 (McGillivray Testimony); See also TR, vol. 4, at 25 (Durette Testimony) (Deputy DeCaire's typical demeanor was to remain professional and not vocalize personal concerns).

**B.    Events and Assignments Affecting Deputy DeCaire and Others During Marshal Dichio's Tenure**

    **1.    Fall 2002**

        **a)  Marshal Dichio's One-on-One Interview with Deputy DeCaire**

Shortly after he took office in August 2002, Marshal Dichio conducted a one-on-one interview with Deputy DeCaire.   In this conversation, Marshal Dichio broached the question of Deputy DeCaire transferring to Worcester in order to be close to her family and was informed that Deputy DeCaire's career was important to her and that she wanted to work in investigations (either in the Warrants Investigations unit or if the position came open, in the HIDTA position in Worcester).  TR, Vol. 1, at 45-46 (DeCaire Testimony) (when Deputy DeCaire explained her preference for her position in the Warrant Investigation unit, and that she had worked hard to become a team leader in that unit, Marshal Dichio responded by insisting that family should come first, and should be the most important thing); id. at 46 (Marshal Dichio asked her personal questions about her marital and parental status and financial arrangements with her ex-husband, and refused to listen to her discussions about the positions, training and experience she had had).[4]  At the end of the interview, he asked Deputy DeCaire about any personal relationships he should know about, and she informed him that she was living with Jeffrey Bohn, who at the time was an Acting Supervisor, and that Darlene DeCaire, a State Trooper who was a member of the HIDTA Task Force, had been related by a marriage to her uncle.  TR. Vol. 1, at 46-48, 52 (DeCaire Testimony).  Trial Ex. 77.

Marshal Dichio has provided a very different account of this meeting. He claims that Deputy DeCaire stated that she had been trying to get back to the Worcester office for eleven

---

[4] Similarly, in her one-on-one interview, Deputy Susan Williams was interrupted by Marshal Dichio when she attempted to describe her professional experience, and he asked her instead if she had children, and if she was receiving child support.  TR, Vol. 5, at 69 (Williams Testimony).

years, that Chief Bane and Assistant Chief Durette had never been fair to her, and that she lived

out in the Charlton, Mass. area.  TR, Vol. 6, at 92; Trial Ex. 72, Affidavit of Anthony Dichio,

June 5, 2003.  It is undisputed, however, that throughout Deputy DeCaire's tenure at the United

States Marshals' Service, she has pursued assignments to advance her career.  Agreed-Upon

Facts, ¶ 8.   Moreover, at no time since 1996 had she sought a position in general operations in

Worcester.  TR, Vol. 1, at 29-30, 36-37, 45-48 (DeCaire Testimony);  TR, Vol. 2, at 86 (Bane

Testimony);  see also DeCaire Testimony (after her 2001 assignment as Acting Supervisor in

Worcester, Assistant Chief Durette advised her that it would be a waste of her training to work in

the Worcester office given her talent in investigations, and based on that advice, she returned to

the Warrants Investigations unit in Boston).   Accordingly, the contention that she told Marshal

Dichio that she had been trying to get to Worcester for years is not credible.[5]  Similarly, in light

of her undisputed "successful career" prior to Marshal Dichio's arrival (Agreed-Upon Facts, ¶ 8),

and specifically, her assignments during Chief Bane and Assistant Chief Durette's tenure to the

FBI violent fugitive task force, to the Warrant Investigations unit, to the Worcester Acting

Supervisor position, and to the position of Team Leader of Warrants Investigations, along with

Marshal McGillivray's testimony that Deputy DeCaire did not seek special treatment, Marshal

Dichio's testimony that Deputy DeCaire claimed in an initial interview that Chief Bane and

Assistant Chief Durette were unfair is wholly unbelievable.

### b)  The Communications Following the One-on-One Interview

Immediately after the one-on-one interview and consistent with Deputy DeCaire's

description of the event, Marshal Dichio informed Chief Bane that he wanted to transfer Deputy

---

[5] Indeed, even the assertion that she claimed to live in the Charlton area is not credible, as Deputy
DeCaire has lived in Westboro since 2001.  TR, Vol. 7, at 40-42 (Dichio Testimony); TR, Vol. 1,
at 34-35 (DeCaire Testimony).

DeCaire to Worcester and that he felt that mothers should be near their children.   TR, Vol. 2, at 89 (Bane Testimony).   Marshal Dichio also asserted to Chief Bane that Deputy DeCaire had asked to go to Worcester.   TR, Vol. 2, at 89 (Bane Testimony); TR, Vol. 6, at 92 (Dichio Testimony).   As set forth above, this last assertion was false.   Chief Bane passed it on to Assistant Chief Durette, who promptly asked Deputy DeCaire why, if she had wanted to transfer to Worcester, she had never raised it with him or Chief Bane.   TR, Vol. 1, at 47 (DeCaire Testimony).   Deputy DeCaire explained to Assistant Chief Durette that she had <u>not</u> requested the transfer to Worcester, and that it was the Marshal who was pushing the transfer.   TR, Vol. 1, at 48 (DeCaire Testimony).

Marshal Dichio has claimed that Chief Bane informed him that things had not worked out with Deputy DeCaire in Worcester.   TR, Vol. 6, at 95 (Dichio Testimony); TR, Vol. 7, at 44, 58 (Dichio Testimony).   Again this testimony is not credible.   Chief Bane testified that he did not make any such statement to Marshal Dichio and that he did not have any concerns about her performance or ability to perform any position out in Worcester.   TR, Vol. 2, at 84, 87 (Bane Testimony).   There also is nothing in the record to provide any motive or reason for Chief Bane to have made that statement to Marshal Dichio, since he was more than satisfied with Deputy DeCaire's performance in Worcester, as he documented contemporaneously in a recommendation that she be awarded a Superior Accomplishment Award.   Trial Ex. 75.[6]

---

[6] According to the recommendation, Deputy DeCaire  "was instrumental in formulating and implementing a number of significant changes that resulted in a safer and more efficient operation"; through her "knowledge of USMS policies and procedures, combined with her experience in fugitive investigations," she "rejuvenate[d] the fugitive program in that office"; she "conducted . . . field training to [Deputy United States Marshals] and other Task Force Agents"; she "display[ed] an ability to work promptly and courteously with internal and external customers;" she "Ex[ed] a willingness to work extra hours to locate fugitives and assist other agencies during enforcement activities"; "[Deputy] Decaire's dedication and contribution to the USMA serves as an example to all employees" and "[h]er confidence, courtesy and professional

Marshal Dichio's meeting with Chief Bane ended with a directive that Deputy DeCaire be transferred to Worcester.  TR, Vol. 6, at 92 (Dichio Testimony).

When Chief Bane informed Deputy DeCaire that she was being transferred to Worcester, she told him that she hoped that she would get Dave Taylor's position on the HIDTA Task Forcewhen it opened up.  TR, Vol. 1, at 50, 52 (DeCaire Testimony); see also TR, Vol. 2, at 90 (Bane Testimony) (Chief Bane believed that Deputy DeCaire was not interested in the Worcester general operations position in the long run); id. at 85-86 (It was Chief Bane's understanding that Deputy DeCaire wanted to be in Worcester, but only working on the HIDTA task force and not in operations).   Chief Bane informed Deputy DeCaire that she would not be considered for the HIDTA Task Force position because he and Marshal Dichio did not want "two DeCaires" out on the street together.  TR, Vol. 1, at 51 (DeCaire Testimony).[7]

Deputy Kevin Wahl was advised that he would be transferred to Boston to take Deputy DeCaire's position, and he objected to Marshal Dichio.  TR, Vol. 6, a 93 (Dichio Testimony).  The transfers were placed on hold.

Chief Bane followed up with an e-mail to Deputy DeCaire, in which he again referenced his concerns about her being placed in a fugitive investigation position in Worcester.  Trial Ex. 4 (E-mail from Chief Bane to Deputy DeCaire).  Deputy DeCaire responded by e-mail, with a

demeanor projects an extraordinary image of the Marshals Service to the Courts, other law enforcement agencies and the public"); see also TR, Vol. 2, at 83-84 (Bane Testimony) (Chief Bane agreed with the narrative justification for the incentive award).

[7] When Marshal Dichio spoke to Chief Bane about transferring Deputy DeCaire to Worcester, Chief Bane discussed concerns he had with Deputy DeCaire moving to the soon-to-be open HIDTA position in Worcester (namely, that Deputy DeCaire was related by marriage to a state trooper assigned to the HIDTA task force in Worcester).  TR, Vol. 2 at 86-87 (Bane Testimony).  Marshal Dichio claims that Chief Bane also raised the concern that if Deputy DeCaire were assigned to the HIDTA position, she would have to report to Supervisory Deputy Bohn.  See Revised Response to Ex. 77.   This concern may well have been raised by others, but was not raised by Chief Bane.  TR, Vol. 2, at 86-87 (Bane Testimony).

- 7 -

copy to Marshal Dichio, objecting to management's view that she could not be considered for "investigations," i.e., the HIDTA position, because of Darlene DeCaire's position on the task force. Trial Ex. 5.

### c)  The Filling of the Worcester HIDTA Position

On September 5, 2002, Dave Taylor was appointed Judicial Security Inspector, creating an opening on the HIDTA task force in Worcester. TR, Vol. 7, at 47 (Dichio Testimony); TR, Vol. 2, at 112 (Taylor Testimony); TR, Vol. 6, at 96 (Dichio Testimony). Deputy DeCaire expressed her interest in the position formally. Agreed-Upon Facts, ¶ 21; TR, Vol. 1, at 54-55; see also Trial Ex. 6 (September 6, 2002, e-mail from Deputy DeCaire to Assistant Chief Paul Durette with a copy to Marshal Dichio regarding her qualifications for the HIDTA position). Marshal Dichio wrote back to Deputy DeCaire on September 9, 2003, noting her "impressive career and the qualities it takes to be a leader, and stating that he "will take all that into consideration." Ex. 7; see also TR, Vol. 1, at 56. Despite this communication, he did not consider her for the position. TR, Vol. 7, at 58 (Dichio Testimony).

Deputies Susan Williams and Mark Lewis also expressed interest in the position. Agreed-Upon Facts, ¶ 21. At the time, Deputy Williams had been on the job approximately three times as long as Mark Lewis. Corrected Trial Ex. 3 (Deputy Williams started with the Marshals Service in 1990 and Deputy Lewis started with the Marshals Service in 1998).[8]

---

[8] Marshal Dichio testified at trial that Deputy Kevin Wahl also expressed an interest in the position when he met with Deputy Wahl for his one-on-one interview on September 12th. TR, Vol. 7 (Dichio Testimony). This claim is not credible, however, since the one-on-one interviews of the Worcester deputies did not occur until after the HIDTA task force position was filled. See Ex. 9 (9/17/02 e-mail announcing the assignment of Deputy Lewis to the HIDTA position); Supplemental Exhibit, attached as Exhibit A to Plaintiff's Motion to Supplement Record, at 7 (Marshal Dichio met with Deputy Wahl for a one-on-one interview on September 26, 2002).

Assistant Chief Durette, Supervisory Deputy Bohn (the HIDTA Supervisor) and Supervisory Deputy Visalli (who was in charge of the Warrants Investigation unit at the time), recommended that the HIDTA position in Worcester not be filled until the new 082's arrived in the District.  Trial Ex. 8; TR, Vol. 4, at 14-15 ) (Durette Testimony).

On September 17, 2002, Marshal Dichio appointed Deputy Lewis to the HIDTA position. TR, Vol. 6, at 97 (Dichio Testimony).

### d)  Marshal Dichio's Second Meeting With Deputy DeCaire

After Marshal Dichio filled the HIDTA position, he called Deputy DeCaire into his office.  TR, Vol. 1, at 59 (DeCaire Testimony).   Marshal Dichio blamed her for the discontent in the office about the selection of Mark Lewis for the HIDTA position.   TR, Vol. 1, at 59 (DeCaire Testimony).  He then told her that she was going to Worcester to work in the courts. TR, Vol. 1, at 59 (DeCaire Testimony).   Deputy DeCaire stated that she did not want to go to Worcester, that she just wanted to be left alone.   TR, Vol. 1, at 60 (DeCaire Testimony). Marshal Dichio responded that if she didn't go to Worcester willingly, it would make him look like a fool and that she should go because she might just end up on courts anyway.   Id.  Given the probability that she would end up in Court Operations if she remained in Boston, Deputy DeCaire accepted Marshal Dichio's decision that she go to Worcester.    Id.

Marshal Dichio's version of this conversation again differs from Deputy DeCaire. According to Marshal Dichio, he gave her the choice of remaining in the Warrants Investigations unit or of moving to Court Operations in Worcester and made no mention that she could end up in Court Operations in Boston.  TR, Vol. 6, at 98 (Dichio Testimony).  He claimed that Deputy DeCaire chose Worcester to be closer to her daughter.  TR, Vol. 6, at 99 (Dichio Testimony).  As set forth above, however, at no time after 1994 did Deputy DeCaire seek a position in Worcester

other than as Acting Supervisor or on the HIDTA Task Force, and this testimony again is not credible.

### e) Marshal Dichio's Transfer of Deputy DeCaire from the Warrants Investigation Unit in Boston to General Operations in Worcester

On September 30, 2002, Deputy Marshal DeCaire was reassigned to the Worcester Office. Agreed-Upon Facts, ¶ 23. At the same time, Deputy McKearney was transferred to Deputy Marshal DeCaire's position in the Warrants Investigations unit. Agreed-Upon Facts, ¶ 24. Changes in permanent duty stations should be accompanied by a Form SF 50 in the records of the USMS. Agreed-Upon Facts, ¶ 4. No Form SF50 issued, however, at the time of this transfer for either Deputy McKearney or Deputy DeCaire. Agreed-Upon Facts, ¶ 25; see also Corrected Ex. 3 (no SF50 issued for transfer for Deputy DeCaire; SF50 issued in March 2003 for September 2002 transfer of Deputy McKearney).

### 2. January and February 2003

### a) Marshal Dichio's Directive to Shred Incident Reports

In early January 2003, Marshal Dichio became personally involved in dealing with personnel issues that Supervisory Deputy Bohn was dealing with on the HIDTA Task Force. TR, Vol. 2, at 31 (Bohn Testimony). The incident involved a dispute between two members of the task force, (a deputy marshal and Trooper DeCaire). TR, Vol. 2, at 32 (Bohn Testimony). Marshal Dichio first directed Supervisory Deputy Bohn to deal with the problem, and he suggested that Supervisory Deputy Bohn set up a meeting with the involved parties. TR, Vol. 2, at 33 (Bohn Testimony). On the morning of the meeting, however, Marshal Dichio directed Supervisory Deputy Bohn that he needed to make this thing go away. TR, Vol. 2, at 33 (Bohn Testimony). He directed Supervisory Deputy Bohn to shred the incident reports filed by the deputy, and explained to Supervisory Deputy Bohn, that it is different in the Mass. State Police,

that "we don't write things down because then what somebody said is in writing."  TR, Vol. 2, at

33 (Bohn Testimony).

### b)  Marshal Dichio's Denial of Deputy Williams Request for Training

On January 14, Marshal Dichio directed Supervisory Deputy Tom Bezanson to inform

Deputy Williams that she could not attend a Women in Federal Law Enforcement training

conference sponsored by the International Association of Women Policing as she had requested.

TR, Vol. 5, at 73-74 (Williams Testimony); TR, Vol. 7, at 66 (Dichio Testimony); see also Trial

Ex. 56 (Marshal Dichio's  notes from 2003 Standard Diary for January 14, 2003).  On January

21, 2003, Deputy Williams appealed the decision to Marshal Dichio, with a copy to Assistant

Chief Durette.  TR, Vol. 5, at 74 (Williams Testimony) Trial Ex. 67 (e-mail from Deputy

DeCaire to Marshal Dichio); TR, Vol. 4, at 18 (Durette Testimony).

### c)  Marshal Dichio's Directive that Deputies DeCaire and Williams Rotate Between the Boston and Worcester Offices

On January 22, 2003, late in the afternoon, Supervisory Deputy Bezanson informed

Deputies DeCaire and Williams that they would be rotating to Boston on a weekly basis, that

Deputy DeCaire would start the next day (January 23, 2003), and that the next work day (January

24, 2003), when Deputy DeCaire was on pre-approved leave, Deputy Williams would begin her

rotation.   Agreed-Upon Facts, ¶ 29; TR, Vol. 1, at 62-63 (DeCaire Testimony); see also TR, Vol

5, at 75 (Williams Testimony).[9]   The rotation as ordered by Marshal Dichio was on a weekly

basis, not on an as needed basis.  See Agreed-Upon Facts, ¶¶ 27, 29, 33 (weekly rotation was

_____

[9] Deputy Williams recalled that Deputy DeCaire was required to work in Boston the day after the
meeting, and that she was required to work in Boston the following workday.  TR., Vol. 5, at 75,
77 (Williams).  She mistakenly placed the meeting on Thursday, rather than Wednesday,
however, and her first day of work as Monday rather than Friday.  Id.  The Agreed-Upon Facts,
however, place the meeting with Supervisory Deputy Bezanson on January 22, 2003 (a
Wednesday), and Deputy William's first day of work on January 24, 2003 (a Friday).  Agreed-
Upon Facts, ¶ 29.

changed to an as needed rotation by Assistant Chief Durette on January 24); see also Trial Ex. 11 (e-mail from Supervisory Deputy Bezanson directing that if the Deputy assigned to Boston called in sick, she would have to make up that day in Boston).

When Deputy Williams asked why Deputy Wahl was not going to Boston, Supervisory Deputy Bezanson responded that he was not included in the rotation. TR, Vol. 1, at 63 (DeCaire Testimony). Instead, he would support the Springfield office, not as part of a rotation, but on an as needed assignment. Agreed-Upon Facts, ¶ 29. After notifying the deputies of the rotational assignment, Supervisory Deputy Bezanson spoke to Deputy Williams alone. TR, Vol. 5, at 76 (Williams Testimony). He told her that he too had once been transferred as punishment when he was in Miami, that she should lay low, go to Boston and just do her job. TR, Vol. 5, at 77 (Williams Testimony).

### d) The Discrimination Complaint Initiated By Deputies Williams and DeCaire and Related Communications

On January 23, 2003, Deputy DeCaire and Deputy Williams initiated EEO counseling. Agreed-Upon Facts, ¶ 32; TR, Vol. 1, at 64 (DeCaire Testimony); see also TR, Vol. 5, at 78 (Williams Testimony).

The following day, Friday, January 24, 2003, Deputy Williams reported to duty in Boston. TR, Vol. 4, at 20 (Durette Testimony). Assistant Chief Durette spoke with Deputy Williams that morning in the Boston office. TR, Vol. 4, at 19-20 (Durette Testimony); TR, Vol 5, at 79 (Williams Testimony). Deputy Williams informed Assistant Chief Durette of the new rotation and also that she and Deputy DeCaire had initated EEO counseling. TR, Vol. 4, at 19-20 (Durette Testimony); TR, Vol. 5, at 79 (Williams Testimony).

Later that same day, Assistant Chief Durette spoke with Marshal Dichio about Deputy Williams' request to attend the conference. TR, Vol. 4, at 20 (Durette Testimony); TR, Vol. 7, at

66 (Dichio Testimony) (substance, but not date, of the conversation).  Assistant Chief Durette

advised Marshal Dichio that the office was not short-staffed in Worcester, and he urged him to

permit Deputy Williams to attend the conference.  TR, Vol. 4, at 20 (Durette Testimony).

Assistant Chief Durette explained the importance of training opportunities for career

enhancement, and that they needed to support activities such as Women in Law Enforcement for

equal employment opportunity reasons.  TR, Vol. 4, at 20 (Durette Testimony).  Assistant Chief

Durette also informed Marshal Dichio that Deputy DeCaire and Deputy Williams had initiated

EEO counseling, and that denying the request would add fuel to the fire.  TR, Vol. 4, at 20

(Durette Testimony).  Marshal Dichio responded that the training would be approved, and that

that should "make one go away."  TR, Vol. 4, at 20 (Durette Testimony).[10]

    Later that day, Judicial Security Inspector Dave Taylor told Deputy Williams that

Marshal Dichio wanted to speak to her in his office.  TR, Vol. 5, at 79 (Williams Testimony).

Marshal Dichio told her that her training was approved.  TR, Vol. 5, at 80 (Williams Testimony).

---

[10] Marshal Dichio's denies that he and Assistant Chief Durette discussed the EEO complaint at
all at this time.  TR, Vol. 7, at 77 (Dichio Testimony).  Assistant Chief Durette's testimony
should be credited, however.  First, there is no reason that he would not have provided this
information to Marshal Dichio.  It is undisputed that he was aware of the EEO complaint by the
time of his meeting with Marshal Dichio and that he wanted to persuade Marshal Dichio to allow
Deputy Williams to attend the training.  TR, Vol. 4, at 17-18 (Durette Testimony) (Assistant
Chief Durette recommended to Deputy Williams that she could appeal the Marshal's decision to
deny the training); TR, Vol. 5, at 74 (Williams Testimony) (same).  Raising the EEO complaint
would have furthered his argument.   He also would know that Marshal Dichio would have the
information shortly in any case so that there was no reason to withhold the information.  Second,
while it is undisputed that Assistant Chief Durette was treated poorly by Marshal Dichio, if he
had been trying to harm Marshal Dichio, he would not have urged that Deputy Williams be
permitted to attend the training and would have left Marshal Dichio with two EEO complaints.
Finally, it is undisputed that he has an unblemished record of government service, including
thirteen years with the Marshals Service under six different United States Marshals and an
Assistant Director, and that he left the Marshals Service with a merit promotion to a grade 15
position in the Federal Protective Service of the Department of Homeland Security.  TR, Vol. 4,
at 8-10 (Durette Testimony).  Given this impeccable record, there is simply no reason to believe
that he would lie under oath.

Marshal Dichio also informed her that there were three 082s in the academy class, and as soon as they graduated things would go back to normal and Deputy Williams would be transferred back to Worcester.  TR, Vol. 5, at 80 (Williams Testimony). [11]

### e) Deputy DeCaire's Assignment Immediately After Initiating the Discrimination Complaint

The following Monday, January 27, 2003, Marshal Dichio informed Assistant Chief Durette that Deputy DeCaire was to be transferred to the position vacated by an 082 Deputy in Court Operations in Boston.   TR, Vol. 4, at 22 (Durette Testimony).[12]   Upon her return from a pre-approved leave, Supervisory Deputy Bezanson informed Deputy DeCaire that she was to replace Deputy Jaime Viator in Court Operations.  TR, Vol. 1, at 68 (DeCaire Testimony); see also Agreed-Upon Facts, ¶ 39 (effective February 4, 2003, Plaintiff was reassigned to Boston to fill a position in Court Operations).

The transfer was announced on February 3, 2003, and effective February 4, 2003. Agreed-Upon Facts, ¶¶ 38, 43; see also TR, Vol. 1, at 69 (DeCaire Testimony); TR, Vol. 4, at 23 (Durette Testimony); Trial Ex. 13 (E-mail announcement).  Deputy DeCaire was directed to

---

[11]  The Court can infer from Marshal Dichio's comment on January 24 to Deputy Williams about the rotation ending that he was aware of her unhappiness about the rotation.  That awareness would have come from Assistant Chief Durette's report on the initiation of the EEO complaint. Marshal Dichio has no recollection of this conversation with Deputy Williams and asserts that he had the discussion about returning soon to Worcester with Deputy DeCaire, not Deputy Williams.  TR, Vol. 7, at 4, 67, 69 (Dichio Testimony).  Deputy DeCaire was not in Boston until February 4, 2003, however, and Marshal Dichio, who was advised by the Marshals Service that once he received the EEO complaints, not to talk to the involved parties, had by then, received the complaints.  TR, Vol. 7, at 6 (Dichio Testimony) (stating that he adhered to that instruction). Again Deputy DeCaire and Deputy Williams' testimony, rather than that of Marshal Dichio, should be credited.

[12]  Marshal Dichio directed Assistant Chief Durette to notify Deputy DeCaire by e-mail.  TR, Vol. 4, at 22-23 (Durette Testimony).  Deputy DeCaire was on leave, and Assistant Chief Durette did not think that it was appropriate to advise her of this transfer by e-mail.  TR, Vol. 4, at 23 (Durette Testimony).  He obtained permission from Marshal Dichio to wait and have the message delivered personally by Supervisory Deputy Bezanson upon her return.  TR, Vol. 4, at 23 (Durette Testimony).

leave her government car in Worcester, and to make her own way to Boston the next day. Agreed-Upon Facts, ¶ 42; see also TR, Vol. 1, at 68 (DeCaire Testimony).   No SF50 was issued for this reassignment.   Agreed-Upon Facts, ¶ 41.

On February 4, 2003, Deputy DeCaire reported to Court Operations in Boston, where she was assigned to Deputy Viator's desk.  TR, Vol. 1, at 69-70 (DeCaire Testimony); Testimony of Paul Durette.   In her new assignment, her duties were the same type that she performed when she began with the District in 1991.  TR, Vol. 1, at 122 (DeCaire Testimony).  Deputy Williams assignment to Boston ended at the same time.  TR, Vol. 5, at 82 (Williams Testimony).

When Deputy Donald Freeman, who was assigned to the Warrants Investigation unit, learned from the e-mail announcement that Deputy DeCaire was being transferred to Boston, he offered to Marshal Dichio that he would switch assignments to courts to allow a senior person to work warrants.  TR, Vol. 2, at 108 (Freeman Testimony).   That offer was rejected by Marshal Dichio.  Id.

### f)  Further Activity Relating to the EEO Complaint and Marshal Dichio's Second Request for a New Chief

On the evening of February 3, 2003, at 8:55 p.m., Robert Wesley, an EEO investigator, sent an e-mail to Marshal Dichio, summarizing Deputy Decaire's EEO complaint, and seeking a response from Marshal Dichio.  Trial Ex. 77.   Marshal Dichio probably did not open this e-mail until the following morning.  TR, Vol. 7, at 5 (Dichio Testimony).

On the morning on February 4, Assistant Chief Durette was in a staff meeting with Marshal Dichio.  TR, Vol. 4, at 24 (Durette Testimony).  Late in the afternoon, after the meeting was over and Marshal Dichio had left for the day, Deputy DeCaire spoke directly to Assistant Chief Durette about her EEO complaint.  Testimony of Cynthia DeCaire; TR, Vol. 4, at 24-25 (Durette Testimony).   She asked why she had been transferred to Court Operations and he

replied that he did not know, he had not been consulted, and he did not know the Marshal's reasoning.  TR, Vol. 4, at 24-25 (Durette Testimony).   He advised her that she could add the issue to the EEO complaint she had already filed, but that she should not take it personally, and to remain professional.  TR, Vol. 4, at 25 (Durette Testimony).

On the morning of February 5, 2003, a day that Marshal Dichio was scheduled for a training course in Reading, he arrived early in the office, entered Assistant Chief Durette's office, closed the door, and confronted Assistant Chief Durette about conversation with Deputy DeCaire the day before.  TR, Vol. 4, at 25-26 (Durette Testimony).  Assistant Chief Durette explained that Deputy DeCaire had come to see him after Marshal Dichio had left for the day, and he relayed the substance of the conversation.  TR, Vol. 4, at 26 (Durette Testimony). Testimony of Paul Durette.  Marshal Dichio responded that if Assistant Chief Durette is asked questions about this matter, Marshal Dichio expected Assistant Chief Durette to support him. TR, Vol. 4, at 26 (Durette Testimony).   Assistant Chief Durette responded that if asked by questions under oath he would testify truthfully, that the fact that Marshal Dichio did not consult with him may be a problem, but that they would have to wait until the investigators asked the questions.  TR, Vol. 4, at 27 (Durette Testimony).

Marshal Dichio does not deny that he had a conversation with Assistant Chief Durette on February 5, 2003, regarding Deputy DeCaire's EEO complaint.  TR, Vol. 7, at 6 (Dichio Testimony).  He claims, however, that the conversation was entirely different, and that, having just learned of the EEO complaint, he simply asked Assistant Chief Durette if he had known about the complaint.  TR, Vol. 7, at 6 (Dimmitt Testimony).  Again, this testimony is not credible.  First, as set forth above, Marshal Dichio had been advised of the complaint by Assistant Chief Durette on January 24.  Second, his story rests on his having received just

- 16 -

received the EEO complaint, but in fact, it was sent on the evening of February 3, and thus, would have been seen at the latest during the prior business day.

Immediately after his conversation with Assistant Chief Durette, Marshal Dichio contacted Marshals Service headquarters, making a second request for an acting chief. TR, Vol. 7, at 7 (Dichio Testimony); see also Trial Ex. 56 (Marshal Dichio's notes for January 14, 2003 concerning the request for new chief)[13]. He made this request for a new acting chief at this point because of the EEO Complaint and Assistant Chief Durette. TR, Vol. 7, at 77 (Dichio Testimony); Trial Ex. 57 (Marshal Dichio's notes) He was told by Headquarters that he would be sent a chief deputy for 120 days. TR, Vol. 7, at 78 (Dichio Testimony).

Also on February 5, 2003, Supervisor Bezanson began coordinating his response with that of Marshal Dichio and Judicial Security Officer Taylor. See Agreed-Upon Facts, ¶ 44 (Supervisory Bezanson forwarded to Marshal Dichio and Judicial Security Officer Taylor his copy of the EEO complaint summary from the EEO counselor); Trial Ex. 14 (Supervisory Deputy Bezanson told the Marshal that he would send his reply to the Marshal first, before forwarding it to the EEO counselor); see also Agreed-Upon Facts, ¶ 45 (On February 6, 2003, Supervisory Deputy Bezanson forwarded his response to the EEO complaint to Marshal Dichio, Judicial Security Officer Taylor and Supervisory Deputy Paul Dunne). At the time, Paul Dunne was assigned to judicial security, and neither he nor Dave Taylor were in Deputy DeCaire's chain of command. TR, Vol. 4, at 28 (Durette Testimony). Assistant Chief Durette was provided neither the EEO complaint summary nor Supervisory Deputy Bezanson's response, and had no involvement in the coordination of a defense. TR, Vol. 4, at 27 (Durette Testimony).

---

[13] See also TR, Vol. 4 at 110 (Dimmitt Testimony) (he was contacted in late January for a temporary duty addignment in Massachusetts because of a "lack of trust" between Marshal Dichio and Assistant Chief Durette.

Between February 3 and February 11, 2003, Marshal Dichio drafted his response to the EEO complaint, and forwarded the final version to the EEO office.[14]  In the final response, Marshal Dichio claimed that he had contemporaneous notes of the meeting with Deputy DeCaire in August, 2002, including the statements that she had been trying to get back to the Worcester office for a long time to be closer to her daughter and that Chief Deputy Bane and Assistant Chief Durette had never been fair to her.  TR, Vol. 6, at 92; Trial Ex. 72, Affidavit of Anthony Dichio, June 5, 2003.   Marshal Dichio's claim that these statements were included in his contemporaneous notes is false.  TR, Vol. 5, at 108; Trial Ex. 71 (Dichio's August 26, 2003 Notes).[15]

On February 14, 2003, Deputy DeCaire was issued a Notice of Right to File a Discrimination Complaint.  Agreed-Upon Facts, ¶ 46.

On February 19, 2003, the EEO Counseling report was submitted.  Agreed-Upon Facts, ¶ 48.

### g)  Marshal Dichio's Statements to Brockton Detective Cummings

On February 25, 2003, in the parking garage in the basement of the Federal Courthouse, while walking to their cars, Marshal Dichio had a conversation with Brockton Police Detective Joseph Cummings, Jr..  TR, Vol. 3, at 4-5, 14 (Cummings Testimony); TR, Vol. 7, at 19 (Dichio Testimony); TR, Vol. 6, at 61-62 (Fallon testifying that garage exit records show that on February 25, 2003, Dichio and Detective Cummings left the garage within two minutes of each other).

---

[14] These documents, submitted on Court's order as Response to Ex. 77 and Supplemental Response to Ex. 77 were not produced during discovery.

[15] As set forth above, the alleged statements themselves are also not credible.  See supra, at 4-5.

At the time of the conversation, Supervisory Deputy Bohn was the Supervisor of the HIDTA Task Force and Detective Cummings was a Task Force member.  TR, Vol. 3 at 4-5 (Cummings Testimony), and Marshal Dichio asked Detective Cummings how Supervisory Deputy Bohn was doing as the Supervisor of the HIDTA task force.  TR, Vol. 3, at 14 (Cummings Testimony).  Detective Cummings gave positive feedback, and at that point, Marshal Dichio brought up a complaint that Deputy DeCaire had filed against him.  TR, Vol. 3, at 14-15 (Cummings Testimony).  Marshal Dichio then stated to Detective Cummings that Deputy DeCaire was vicious, that as long as he was here, she was going nowhere, and that she was going to get hers.  TR, Vol. 3, at 15 (Cummings Testimony).

Marshal Dichio denies the substance (but not the fact) of this conversation.  TR, Vol. 7, at 20 (Dichio Testimony).  Once again, Marshal Dichio should not be credited.

First, Marshal Dichio and Detective Cummings had the type of relationship in which such a comment could have been made.  Although Detective Cummings and Marshal Dichio had had few personal encounters, Detective Cummings was acquainted with two state troopers, through whom, during the contentious period prior to Marshal Dichio's confirmation by the United States Senate, he had confidentially relayed information to Marshal Dichio concerning the situation in the Marshals Services' office where Detective Cummings had his office.  TR, Vol. 3, at 9 (Cummings Testimony).  Detective Cummings conveyed to Marshal Dichio through the state troopers his report on the inner turmoil within the office about the new Marshal coming in and the old Marshal leaving, and the division of factions within the office.  TR, Vol. 3, at 11 (Cummings Testimony).  The information he provided included which employees could be trusted, and which employees were backing the new Marshal and which employees were backing the old Marshal.  TR, Vol. 3, at 10-12 (Cummings Testimony); see also TR, Vol. 7, at 19 (Dichio

- 19 -

Testimony) (Detective Cummings reached out to Marshal Dichio through state police personnel

to let him know Detective Cummings' support); TR, Vol. 7, at 36-37 (Dichio Testimony)

(Marshal Dichio learned of a petition inside the Marshals Service that related to his nomination

from Detective Cummings).   Upon his arrival at the District, Marshal Dichio had thanked

Detective Cummings for the information that he had passed on, and he gave Detective

Cummings tokens from the Marshals Service.  TR, Vol. 3, at 13, 25 (Cummings Testimony); TR,

Vol. 7, at 18 (Dichio Testimony) (Marshal Dichio thanked Detective Cummings for his support

and gave him a Marshals Service mug).  He also asked Detective Cummings again his opinion of

Supervisory Deputy Bohn and the HIDTA Task Force, and personally thanked Cummings for his

information and support.  TR, vol. 3, at 13 (Cummings Testimony).

Second, Marshal Dichio's attempt to distance himself from Detective Cummings – as

someone he had very little knowledge of – is belied both by Marshal Dichio's letter of that same

day in which he praised Detective Cummings to Detective Cummings' Chief of Police (Ex. 16),

and the fact that when Marshal Dichio learned that Detective Cummings had quit the task force,

he personally called Detective Cummings about his decision to leave.  TR, Vol. 3, at 19

(Cummings Testimony); TR, Vol. 7, at 20 (Dichio Testimony).

Third, there is no evidence to support the Defendant's contention that Detective

Cummings would lie under oath.  Detective Cummings viewed Supervisory Deputy Bohn as

both a loyal soldier and an excellent investigator from the Task Force, and Supervisory Deputy

Visalli as someone who could not be trusted, and he had told this to Marshal Dichio before he

even took office.  TR, Vol. 3, at 6, 11 (Cummings).  That Detective Cummings was loyal to

Supervisory Deputy Bohn and would not work for Supervisory Deputy Visalli (TR, Vol. 3, at 11,

23 (Cummings Testimony)) explains his withdrawal from the Task Force, his lack of cooperation

in returning the Marshal Services property and even his willingness to come forward regarding the confidential communication with Marshal Dichio in the basement of the Courthouse. It does not provide a motive to lie under oath.

Nor had Detective Cummings himself been personally harmed by the actions in such a way that might give him a motive to lie. Detective Cummings removed himself from the task force, and was able to rejoin the HIDTA Task Force on the FBI side just months later. TR, Vol. 3, at 17-20, 23 (Cummings Testimony).

Defendant attacks Detective Cummings credibility on the ground that he did not respond to requests to return his government vehicle and telephone to Boston when he left the task force, that he locked two sets of keys inside the car, that he left the car with no gas, and that he erased the memory of the cell phone. Defendant's allegations may be exaggerated,[16] though it is undisputed that Detective Cummings took no steps to assist the Marshals Service in the transition of property. This absence of cooperation, however, does not itself lead to any inference that Detective Cummings would also lie under oath.

As a law enforcement officer with eleven years experience with the Brockton Police Department, serving in his position at the pleasure of his Chief of Police (TR., Vol. 3, at 4), Detective Cummings had far too much to lose, and nothing to gain, by lying. In contrast,

---

[16] The vehicle was not left "completely out of gas" as Defendant contended, and though the gas gauge was low, the vehicle contained sufficient gas for it to be driven to a station for a fill-up. TR, Vol. 4, at 103 (Dimmitt Testimony); TR, Vol. 5, at 26 (Dimmitt Testimony). There is a factual dispute as to whether Detective Cummings left one or two sets of keys locked inside the car. He testified that he left only his own set of keys locked inside the car, and that a spare set is kept in the Marshals Services' office. TR, Vol. 3, at 25 (Cummings Testimony). Chief Dimmitt claims that he was unable to find an extra set of keys for the vehicle at the office, and he and Marshal Dichio claim that both sets of keys were locked inside the car. TR, Vol. 4, at 102 (Dimmitt Testimony); TR, Vol. 7, at 23 (Dichio Testimony). Defendant offers no evidence, however, as to how or why Detective Cummings would have had the second set of keys. Finally, as Detective Cummings freely admitted, he did erase the numbers he had stored on the cell phone before returning it. TR, Vol. 3, at 25-26 (Cummings Testimony).

Marshal Dichio has lied repeatedly under oath in these proceedings on various matters  (such as the claim that he had detailed notes of his interview with Deputy DeCaire, the claim that Deputy Wahl had asked to be considered for the Worcester HIDTA position, and the claim that Chief Bane told him that Deputy DeCaire had not worked out in Worcester), giving no reason to believe that he would not lie on this matter as well.

### 3.  March through July 2003

#### a)  Supervisory Deputy Bohn and Assistant Chief Durette's Removal from their Supervisory Roles

Shortly after the conversation in the basement of the Courthouse, Supervisory Deputy Bohn subsequently held a regularly scheduled HIDTA Task Force meeting, in which two Worcester HIDTA Task Force members, Trooper Darlene DeCaire and Deputy Lewis, were criticized.  TR, Vol. 2, at 38 (Bohn Testimony) (Supervisory Deputy Bohn was informed that Trooper Darlene DeCaire's name was on arrest reports that she had not shown up for); TR, Vol. 7, at 106 (Ridge Testimony) (other task force members had a disagreement with Deputy Mark Lewis asserting that he did not pull his weight).  At some point, either during or after the meeting, the statement reportedly was made by Supervisory Deputy Bohn that either Trooper DeCaire and Deputy Lewis had to leave the task force or that Supervisory Deputy Bohn would quit.  TR, Vol. 7, at 107 (Ridge Testimony).

Both sides of this dispute were upset and sought redress.  Supervisory Deputy Bohn received a comment from a state police Lieutenant, and reported it to Assistant Chief Durette. TR, Vol. 4, at 28 (Durette Testimony).  Assistant Chief Durette spoke to Acting Chief Dimmitt, who stated that he would let the Marshal know, and have the Marshal use his contacts in the state police to resolve the matter.  TR, Vol. 4, at 29 (Durette Testimony); cf. TR, Vol. 4, at 92

(Dimmitt Testimony) (Acting Chief Dimmitt stated that Assistant Chief Durette informed him of an "incident" in the meeting).

In the meantime, Judicial Security Inspector Dave Taylor, who has not on the Task Force, and not in the chain of command of Supervisory Deputy Bohn or any of the deputies on the Task Foce, apparently had learned that Supervisory Deputy Bohn had allegedly made the statement regarding the task force, and reported that to Acting Chief Dimmitt.  TR, Vol. 4, at 92 (Dimmitt Testimony); TR, Vol. 5, at 10 (Dimmitt Testimony).  Acting Chief Dimmitt probably also spoke to Marshal Dichio about the incident before speaking with Supervisory Deputy Bohn.  TR, Vol. 5, at 10 (Dimmitt Testimony).

Acting Chief Durette met with Supervisory Deputy Bohn later that afternoon.  At the meeting, Supervisory Deputy Bohn told Acting Chief Dimmitt that he had been experiencing ongoing issues with a HIDTA task force member, Darlene DeCaire, and that he had learned earlier that day that her name was on arrests reports that she had not shown up for.  TR, Vol. 2, at 38 (Bohn Testimony); TR, Vol. 4, at 92 (Dimmitt Testimony) (Supervisory Deputy Bohn made accusations in regards to the work performance of the Worcester HIDTA task force members).[17] Supervisory Deputy Bohn also discussed with Acting Chief Dimmitt the directive from Marshal Dichio to shred documents, and showed him his own notes about the conversation with the Marshal.  Id. at 38-39.  Supervisory Deputy Bohn also alerted Acting Chief Dimmitt that he believed that he was being treated unfairly because of Deputy DeCaire's EEO Complaint.  Id. at 39.  He gave two examples, the first, that the Marshal would no longer acknowledge him the

---

[17] Acting Chief Dimmitt's recollection is that Supervisory Deputy Bohn was complaining about the quality and number of arrests in Worcester.  TR, Vol. 5, at 11(Dimmitt Testimony).  He does not recall any allegation that Darlene Decaire had not put her signature on arrests that she had not made.  TR, Vol, 5, at 11 (Dimmitt Testimony).  Given Acting Chief Dimmitt's overall poor recollection of the events at issue, and Supervisory Deputy Bohn's greater familiarity with the particular issue, Supervisory Deputy Bohn's testimony should be credited.

same way he had prior to the filing of the complaint, and the second was the issue of Leo Rosette attending the HIDTA committee meeting.  Id.

   After Supervisory Deputy Bohn detailed his concerns about being treated differently because of Deputy DeCaire's EEO Complaint, Acting Chief Dimmitt stated that he had heard that Supervisory Deputy Bohn had berated the task force agent in the meeting and that he had stated that either she goes or Supervisory Deputy Bohn goes.   TR, Vol. 2, at 40 (Bohn Testimony).  He asked Supervisory Deputy Bohn if he really wanted to leave the task force, and Supervisory Deputy Bohn responded, that no, he had the best job in the Marshals Service.  TR, Vol. 2, at 40 (Bohn Testimony).  Acting Chief Dimmitt stated that he was going to talk to the Marshal, but that it may not be the end of this.  TR, Vol. 2, at 40 (Bohn Testimony); TR, Vol. 4, at 93 (Dimmitt Testimony) (Acting Chief Dimmitt was going to wait to make a recommendation until he had gone to Worcester to investigate the allegations).  Acting Chief Dimmitt informed Marshal Dichio that he wanted to determine if Supervisory Deputy Bohn's allegations were true before making a recommendation.  TR, Vol. 4, at 93 (Dimmitt Testimony).  Acting Chief Dimmitt concedes that it is possible that Marshal Dichio wanted Supervisory Deputy Bohn removed from his position prior to Acting Chief Dimmitt completing his review.  TR, Vol. 5, at 19 (Dimmitt Testimony).  Acting Chief Dimmitt went to Worcester, where he reviewed the number of arrests, and solicited the opinion of Supervisory Deputy Bezanson of Mark Lewis and Darlene DeCaire.  TR, Vol. 4, at 93 (Dimmitt Testimony); TR, Vol. 5, at 11.  Supervisory Deputy Bezanson was not in the chain of command at the time for the HIDTA task force members assigned to Worcester.  TR, Vol. 5, at 12 (Dimmitt Testimony).  Acting Chief Dimmitt did not make any attempt to determine whether Darlene DeCaire had falsely signed the arrest forms or not.  TR, Vol. 5, at 11 (Dimmitt Testimony).   He then recommended to Marshal Dichio

- 24

that Supervisory Deputy Bohn be removed from the Task Force and assigned to another area of the office. TR, Vol. 4, at 93 (Dimmitt Testimony).

Acting Chief Dimmitt called Supervisory Deputy Bohn to his office the following week. TR, Vol. 2, at 41 (Bohn Testimony). At this meeting, Acting Chief Dimmitt informed him that he had made a new "plumbing chart," that there is some overlap, and that Supervisory Deputy Bohn was to move his office, turn his car in, and that he would be in charge of managing special projects and a few other small tasks. Id. The new position included no responsibilities supervising any other employees, even though Supervisory Deputy Bohn's merit promotion had been to a supervisory position." TR, Vol. 2, at 42 (Bohn Testimony); see also TR, Vol. 5, at 14 (Dimmitt Testimony) (in Acting Chief Dimmitt's experience, Supervising Deputies supervise employees, and not just programs); but see TR, Vol. 5, at 16 (Dimmitt Testimony) (the position included the supervision of employees' in the performance of their collateral duties).. The position was not one that had existed at the time of Acting Chief Dimmitt's arrival in the District. TR, Vol. 5, at 13 (Dimmitt Testimony). Supervisory Deputy Bohn asked Acting Chief Dimmitt how long he had studied the investigative section of this office, and Acting Chief Dimmitt replied, "two days." Id. Supervisory Deputy Bohn asked him how long he had actually looked at HIDTA and Acting Chief Dimmitt responded that he did not even know what HIDTA stands for, that it does not matter. Id. Supervisory Deputy Bohn stated to Acting Chief Dimmitt that he believed that this was occurring because of Deputy DeCaire's EEO Complaint. TR, Vol. 2, at 41 (Bohn Testimony).

Around March 19, 2003, Deputy Decaire informed Assistant Chief Durette that she had been told of the conversation between Marshal Dichio and Detective Cummings in the Courthouse garage a few weeks earlier. TR, Vol. 4, at 31-32 (Durette Testimony). At his next

opportunity to speak with Assistant Chief Durette (which occurred within a day or two), during a casual conversation, Assistant Chief Durette reported the incident to Acting Chief Dimmitt. TR, Vol. 4, at 32 (Durette Testimony). Acting Chief Dimmitt sought no additional details from Assistant Chief Durette. TR, Vol. 4, at 32 (Durette Testimony). He left Assistant Chief Durette's office, but then returned, and recommended that on Assistant Chief Durette's upcoming trip to headquarters that he try to find a job down there. TR, Vol. 4, at 33 (Durette Testimony).

Acting Chief Dimmitt contends that the conversation began somewhat differently, that Assistant Chief Durette first brought up the subject by making a comment about the "war we are going to see here" and then did not willingly tell Acting Chief Dimmitt what he was talking about until Acting Chief Dimmitt pleaded that it was incumbent that he learn if something was amiss. TR, Vol. 4, at 104 (Dimmitt Testimony). Acting Chief Dimmitt's contention makes little sense, however, for if Assistant Chief Durette had not wanted to tell Acting Chief Dimmitt about the conversation, there would have been no reason for him to mention anything at all. In any event, Acting Chief Dimmitt concedes that Assistant Chief Durette did inform him of the information that Assistant Chief Durette had received about the conversation in the basement between Marshal Dichio and the Brockton officer about Deputy DeCaire. TR, Vol. 4, at 104 (Dimmitt Testimony). In addition, Assistant Chief Durette advised him that a further EEO complaint would be filed based on what the Marshal had said in the basement. TR, Vol. 4, at 106 (Dimmitt Testimony).

Acting Chief Dimmitt informed Marshal Dichio of the allegation, and Marshal Dichio denied the substance of the conversation with Detective Cummings. TR at 105 (Dimmitt

Testimony).  Marshal Dichio did not, however, deny that he had had a conversation with

Detective Cummings at that time and in that location.  TR, Vol. 5, at 23 (Dimmitt Testimony).

On March 31, 2003, when Assistant Chief Durette returned from Washington, Acting

Chief Dimmitt informed Assistant Chief Durette that he was being moved to a cubicle in the

administrative section of the office so that the Marshal could keep an eye on him.  TR, Vol. 4, at

33-34 (Durette Testimony); see also TR, Vol 4, at 105-06 (Dimmitt Testimony) (Assistant Chief

Durette was moved to this location to better keep track of him, and to ensure that he could not

have any closed door meetings with employees").   Assistant Chief Durette was required to give

up his lower mileage car in return for an older vehicle.   TR, Vol. 4, at 34 (Durette Testimony).

He was given no explanation for either action.  TR, Vol. 4, at 34 (Durette Testimony).  A week

later, Acting Chief Dimmitt informed Assistant Chief Durette that he had to turn in his keys to

the office.  TR, Vol. 4, at 35 (Durette Testimony).

### 4.  Deputy DeCaire's Assignment Remained Constant Despite Numerous Other Changes in the Office

In March 2003, the District received three new 082s from the Academy.  Agreed-Upon

Facts, ¶ 50; see also Corrected Ex. 3 (Deputies Kevin Neal and Joe Norton are assigned to

Boston beginning March 10, 2003; Deputy Sean Weddecke is assigned to Worcester beginning

March 31, 2003).   Deputy DeCaire continued to be assigned to Court Operations.  Agreed-Upon

Facts, ¶ 50.

On March 17, 2003, Deputy Marshal Scott Kimball, who had less seniority than Deputy

Marshal DeCaire, was transferred from Court Operations to the Warrant Investigations unit.

Agreed-Upon Facts, ¶ 51.  Deputy DeCaire continued to be assigned to Court Operations.

In April 2003, the District received another 082 Deputy, but Deputy Marshal DeCaire continued to be assigned to Court Operations.   Corrected Trial Ex. 3 (Deputy Sean Bianchi is assigned to Boston beginning April 22, 2003).

In April 2003, an Acting Supervisory Deputy United States Marshal position became open.  Agreed-Upon Facts, ¶ 53.   The position was not announced for competitive selection. Agreed-Upon Facts, ¶ 53.

Deputy DeCaire expressed her interest in being considered for a position as an Acting Supervisor in Court Operations to Chief Dimmitt and Marshal Dichio.  Agreed-Upon Facts, ¶ 54; Trial Ex. 17; see also TR, Vol. 1, at 75-76 (DeCaire Testimony); TR, Vol. 4, at 100 (Dimmitt Testimony).  The position was given to Deputy Alison Hodgkins.  Agreed-Upon Facts, ¶ 58. Deputy DeCaire received no response to her inquiry.

On April 23, 2003, Deputy DeCaire expressed her interest in being considered for a position as Warrant Coordinator to Chief Dimmitt and USM Dichio.   Agreed-Upon Facts, ¶ 57; Trial Ex. 18; see also TR, Vol. 1, at 76 (DeCaire Testimony); TR, Vol. 4, at 101 (Dimmitt Testimony).    Deputy Paul Sugrue was assigned to the position.  Agreed-Upon Facts, ¶ 58. Deputy DeCaire received no reply.

Deputy DeCaire's job duties remained the same, producing prisoners for court proceedings.  TR, Vol. 1, at 77 (DeCaire Testimony).  She also was assigned a few cold cases to investigate, directly by Chief Dimmit, rather than through her supervisor, and was assigned on a rotating basis to the operation desks, while also being assigned to courts.  TR, Vol. 1, at 77-78 (DeCaire Testimony); TR, Vol. 4, at 87 (Dimmitt Testimony) (Acting Chief Dimmitt gave her cold cases to investigate while they were assigned to court operations in their down time); TR,

Vol. 5, at 45 (Dimmitt Testimony) (conceding that typically he would give such assignments through a supervisor).

### 5. Further EEO Activity and Acting Chief Dimmitt's Statements to Supervisory Deputy Bohn Regarding Marshal Dichio's Intent

By June 5, 2003, Marshal Dichio was aware that Brockton Detective Cummings had come forward with the allegation about the basement garage conversation.   Stipulation, TR, Vol. 2, at 46.  Between June 5 and June 18, the EEO investigator followed up on Brockton Detective Cummings' allegation.  Trial Ex. 62.

On June 11, 2003, Supervisory Deputy Bohn attended a training in Lowell.  TR, Vol. 2, at 42 (Bohn Testimony).  He had his phone turned off, but during the break, he played his phone messages.  Id. at 43 (Bohn Testimony).   The first message, from Acting Chief Dimmitt stated that he did not know who approved him to attend the training, and that Supervisory Deputy Bohn needed to return right away.   Id.  (Bohn Testimony).   The second message was also from Acting Chief Dimmitt, telling Supervisory Deputy Bohn "to get [his] ass back to this office."   Id. (Bohn Testimony).[18]  Supervisory Deputy Bohn called Acting Chief Dimmitt, who again told him to get his ass back to the office.  TR, Vol. 2, at 43 (Bohn Testimony).  Supervisory Deputy Bohn stated that he had carpooled to the training, and would leave someone without a ride if he left.  Id.  (Bohn Testimony).   Acting Chief Dimmitt responded that he should get his ass in the next day, and that there was "going to be heat over this."   Id. (Bohn Testimony).

The next morning, which was Acting Chief Dimmitt's last day of work in the District, Supervisory Deputy Bohn went to see Acting Chief Dimmitt.  TR, Vol. 2, at 43, 49 (Bohn

---

[18] A tape of the messages were played during trial, Acting Chief Dimmitt identified the voice as his, and the messages were admitted as evidence.  TR, Vol. 5, at 53, 58, 61.  The messages were not transcribed by the Court Reporter, however, and accordingly, Plaintiff requests that the record be augmented to include a transcript of the recordings.

Testimony).  Acting Chief Dimmitt was slouched back in this chair and he had his hands over his

temples.  Id. at 44.  Supervisory Deputy Bohn asked if there was some confusion about his

attending the training, and that he had told Acting Chief Dimmitt about the training a few days

earlier.  Id.  Acting Chief Dimmitt responded that Supervisory Deputy Bohn was correct, that he

remembered when he got back to the hotel the night before.  Id.  He then went on to say that

Supervisory Deputy Bohn had "to be very careful," that he was still on probation, and that he

was "being watched."  Id.[19]  Supervisory Deputy Bohn stated that he had e-mails that showed

that he was approved for the training, and Acting Chief Dimmitt responded that this was good,

that Marshal Dichio had discussed with him different options for punishment and had told him to

write Supervisory Deputy Bohn "up big" over the training incident, and that now he did not have

to do it.  Id.  Supervisory Deputy Bohn asked Acting Chief Dimmitt why the Marshal continued

to target him, and Acting Chief Dimmitt responded that "it's probably because of some old and

some new."  TR, Vol. 2, at 45 (Bohn Testimony).  He said that a lot of things had happened the

day before that contributed to this.  Id.  Supervisory Deputy Bohn stated again that this was all

because of Deputy DeCaire's complaint.  TR, Vol. 2, at 48 (Bohn Testimony).

    Acting Chief Dimmitt's testimony regarding this incident is not credible.  He testified at

trial that he remembered the June training incident, because it had been "brought up during

depositions."  TR, Vol. 4, at 95 (Dimmitt Testimony).  He described a series of very mild

conversation, where the Marshal asked where Supervisory Deputy Bohn was, Acting Chief

Dimmitt called Supervisory Deputy Bohn, Supervisory Deputy Bohn returned the call and

---

[19] The probation reference was probably not to disciplinary probation, but to probation based on
his relatively recent appointment to the position.  Acting Chief Dimmitt repeated the statement
that Deputy Bohn "was on probation" in Court, while explaining why he had not wanted to given
Deputy Bohn formal written discipline.  TR, Vol. 5, at 56 (Dimmitt Testimony); see also TR,
Vol. 7, at 13 (Dichio Testimony) (Supervisory Deputy Bohn was on probation as a supervisor).

explained that he had been approved for training, Acting Chief Dimmitt recalled that he had approved the training, and went back and explained to Marshal Dichio.  TR, Vol. 4, at 95 (Dimmitt Testimony).   He then denied the substance of the conversation detailed above.  TR, Vol. 4, at 96-97.

On cross-examination, he conceded that when the issue had been brought up during the investigation of Supervisory Deputy Bohn's case, he had had no independent memory of it, and that he only had any knowledge of the event on his preparation for testimony the day before. TR, Vol. 5, at 46 (Dimmitt Testimony).  He conceded further that he had no independent memory of the phone message or messages that he had left for Supervisory Deputy Bohn.  TR, Vol. 5, at 47 (Dimmitt Testimony).   He did recall that Supervisory Deputy Bohn had told him that he had been approved for the meeting, but he could not recall any details of that conversation.  TR, Vol. 5, at 50 (Dimmitt Testimony).  Finally, Acting Chief Dimmitt conceded that when he had testified on direct examination as to all the things he denied having said, he was simply surmising that he would not have said something like that, but in fact had no independent recollection of the phone calls or meeting with Jeff Bohn at all, and could not actually deny anything that happened at that meeting.  TR, Vol. 5, at 51-52 (Dimmitt Testimony).

   C.   **August 2003 to the Present**

   1.  **Chief Fallon's Limited Attempt to Familiarize Himself With Deputy DeCaire's Complaint**

It is Chief Fallon's understanding that once an EEO complaint is being investigated, he should not be addressing it.  TR, Vol. 6, at 36 (Fallon Testimony).

   2.  **The Acting Supervisory Position**

Acting Supervisory Deputy Marshal positions that are not announced for competitive selection may not to exceed 120 days.  Agreed-Upon Facts, ¶ 62; TR, vol. 2, at 119 (Taylor

Testimony) (Positions may be filled on an acting basis for more than 120 days, and up to a year, but in such an event, deputies must be permitted to compete for it). On August 21, 2003, after Deputy Hodgkins had been in the 120 day Acting Supervisory position for approximately 120 days, Deputy DeCaire asked in an e-mail directed to Acting Assistant Chief Taylor that she be considered for the Acting Position. Agreed-Upon Facts, ¶ 60; Ex. 19 (noting in her request that it had been 120 days since her prior request); see also TR, Vol. 1, at 79 (DeCaire Testimony).

Acting Assistant Chief Taylor forwarded the request to Chief Fallon, and informed Deputy DeCaire by e-mail that he had forwarded the request. Agreed-Upon Facts, ¶ 60; Trial Ex. 20; TR, Vol. 2, at 113. Deputy DeCaire never received any further response.

Acting Assistant Chief Taylor then promptly sought out a different female deputy, Annette Lawlor to see if she would be interested in the position. Agreed-Upon Facts, ¶ 64. She declined. Agreed-Upon Facts, ¶ 64.

The Acting Supervisory position had not been funded because the District had lost the Supervisory position vacated by Supervisory Deputy Doherty. Rather than giving Deputy DeCaire the option of assuming the responsibilities on an unpaid basis (as Deputy Hodgkins had) so that Deputy DeCaire could build her promotional package, Defendant permitted Deputy Hodgkins to remain in the Acting position until October, when the position was eliminated.

### 3. The Announcement of a Rotation Schedule for Warrant and Task Force Assignments

On September 12, 2003, Chief Fallon announced his intention to develop a rotation schedule for all warrant and task force assignments. Agreed-Upon Facts, ¶ 65; see also Trial Ex. 21.

On October 3, 2003, DUSM Kevin Donahue was assigned to the Warrant Coordinator position. Agreed-Upon Facts, ¶ 66. This assignment also was effective October 14, 2003.

- 32

Agreed-Upon Facts, ¶ 66.  At the time of his appointment, Kevin Donahue, who had less

seniority than Plaintiff, had been assigned to Court Operations.   Agreed-Upon Facts, ¶ 67.

### 4.   Deputy DeCaire's Assignments to Worcester and Deputy Williams' Assignment to Court Operations in Boston

On October 3, 2003, Defendant also announced the assignment of Supervisory Deputy

Bohn as a Court Operations Supervisor, effective October 14, 2003.  Agreed-Upon Facts, ¶ 66.

On October 10, 2003, Deputy DeCaire married Supervisory Deputy Jeff Bohn.  Agreed-Upon

Facts, ¶ 68.

On the morning of October 14, 2003, Deputy Marshal DeCaire was moved out of Court

Operations in Boston.  Agreed-Upon Facts, ¶ 69.   Despite Chief Fallon's announcement that he

was developing a rotation schedule for all warrant and task force assignments, Deputy DeCaire's

new assignment was neither to the Warrants Investigation unit nor to the HIDTA Task Force

position in Worcester.  TR, Vol. 1, at 84 (DeCaire Testimony).  Instead, she was transferred to

General Operations in Worcester.  Agreed-Upon Facts, ¶ 69.  On the same date, Deputy

Williams was transferred back to Boston to replace Deputy DeCaire.  TR, Vol. 5, at 83-84

(Williams Testimony).

Deputies are normally given days or even weeks for moves (including even moves within

an office), and the moves are accompanied by a notice to all the staff in the district.  See e.g.

Agreed-Upon Facts, ¶ 21 (Deputy Marshal Lewis was given three work days from the time of the

announcement of his transfer to the Worcester HIDTA position before the assignment began and

a notice of the transfer was given to all staff); Agreed-Upon Facts, ¶ 26 (Deputies DeCaire and

McKearney were given three work days notice before they switched offices and a notice of the

transfer was issued to all staff); Trial Ex. 22 (notice to staff announcing on October 3, 2003,

assignment changes within the Boston office effective October 14, 2003).   In contrast, Deputy

DeCaire was required to pack up and report to the Worcester office by noon that same day. Agreed-Upon Facts, ¶ 72; see also TR, Vol. 1, at 85 (DeCaire Testimony) (Supervisory Deputy Dunne called Deputy DeCaire into his office around 9:00 in the morning, and informed her of the transfer and that she needed to be in Worcester by noon). No general e-mail was sent to other staff announcing the move. Agreed-Upon Facts, ¶¶ 72.

When Deputy DeCaire arrived in Worcester and asked Supervisory Deputy Bezanson whether the transfer to Worcester was permanent, he responded that it was "what [she] made of it." Agreed-Upon Facts, ¶ 73.

Between that date and November 13, 2003, Deputy Marshal DeCaire continued to perform work in the Worcester sub-station, including serving process, warrant investigation work and administrative work. Agreed-Upon Facts, ¶ 76.

### 5. Deputies DeCaire and Williams' Assignments While Deputy DeCaire is on Light Duty

In late October 2003, when Deputy DeCaire requested limited duty because she was pregnant, Supervisory Deputy Bezanson mentioned the possibility of her ending up working in the Control Room in Boston. Agreed-Upon Facts, ¶ 76. Deputy DeCaire responded to Supervisory Deputy Bezanson that she did not know how that could happen since she had just been given a couple of hours' notice to get out of the Boston office because of her relationship with Supervisory Deputy Bohn. TR, Vol. 1, at 90 (DeCaire Testimony).

On November 13, 2003, Chief Fallon issued a directive to Supervisory Deputies Bezanson (the Worcester supervisor), Dunne (one of the Boston supervisors) and Dan Spellaci (the Springfield supervisor), assigning Deputy DeCaire to the three offices, and directing the supervisors to assign Deputy DeCaire sufficient work, and in Boston, to assign her to the control room. Trial Ex. 26. This e-mails was copied to Marshal Dichio and Acting Assistant Chief

Taylor.  Trial Ex. 26.  At the time, the control room was under the direct supervision of

Supervisory Deputy Bohn.  Agreed-Upon Facts, ¶ 79; <u>see</u> <u>also</u> Trial Ex. 23.

Deputy Marshal DeCaire was advised of the assignments on November 14, 2004.

Agreed-Upon Facts, ¶ 77.    Deputy DeCaire objected to the assignment, and then attempted to

contact the Marshals Services' EEO office.  TR, vol. 1, at 91 (DeCaire Testimony).  She received

no response from the EEO office.  TR., vol. 1, at 91 (DeCaire Testimony).

Chief Fallon told Deputy DeCaire that they were doing her a favor granting her limited

duty, that they did not have to give her limited duty, and that if she did not agree to the letter, she

could end up in the control room in Boston full-time five days a week.  TR, Vol. 1, at 92.

When Deputy Marshal DeCaire objected further to the assignment, Chief Fallon stated that she

would have to use her sick leave for her pregnancy.   Agreed-Upon Facts, ¶  77.

Plaintiff went out on sick leave for a number of days.  Agreed-Upon Facts, ¶ 77.  While

she was out, Supervisory Deputy Bezanson called her at home and said to her, words to the

effect of "you do realize that the office doesn't have to give you limited duty" and that she

should also make Jeff aware of the fact, "that the office can take away your limited duty at any

time."  TR, Vol. 1, at 93 (DeCaire Testimony).   At the time, Supervisory Deputy Bohn was also

on limited duty status.  TR, Vol. 1, at 94 (DeCaire Testimony).

Deputy DeCaire reported on November 20, 2004, to the Boston Control Room, and

signed the limited duty letter.  Agreed-Upon Facts, ¶  77.   She was told by Supervisory Deputy

Paul Dunne that the Springfield assignment had been eliminated, and she was to work in Boston

Tuesdays, Wednesdays and Thursdays.  Agreed-Upon Facts, ¶ 77-78.   On November 24, 2003,

the limited duty letter was modified to exclude work in the Springfield Office, and she signed the

modified letter.  Agreed-Upon Facts, ¶  78; Ex. 28.

On her first day in Boston, Deputy DeCaire was given process to serve, but after that her assignment the entire time she was in Boston was in the Control Room. TR, Vol.1, at 96; see also Agreed-Upon Facts, ¶ 78 (It was contemplated that while in Boston, Plaintiff would be assigned to the Control Room).

Deputy DeCaire raised concerns that she had about the issue of "possible side effects the electronical equipment may have on a developing baby." Agreed-Upon Facts, ¶ 78. She raised this issue by e-mail to Supervisory Deputy Dunne on November 24, 2003, with a copy to Acting Assistant Chief Taylor, who in turn forwarded the e-mail to Chief Fallon. Ex. 29, 30. Deputy DeCaire received no response to her e-mail or her concerns. TR, Vol. 1, at 97 (DeCaire Testimony). Supervisory Deputy Bohn then filed an OSHA complaint concerning the conditions in the Control Room. Agreed-Upon Facts, ¶ 79; see also Ex. 32 (e-mail from Steve Donaher advising Acting Assistant Chief Taylor on December 10, 2003, that Supervisory Deputy Bohn was filing an OSHA complaint); Trial Ex. 34 (December 11, 2003, memorandum from Supervisory Deputy Bohn to Assistant Chief for Central Courthouse Management Joe Buonocore advising him of the OSHA complaint). He was promptly removed from supervising the control room. Agreed-Upon Facts, ¶ 79 (stating that the reassignment occurred that same day); Ex. 33 (December 11, 2003, e-mail from Acting Assistant Chief Taylor to Marshal Dichio and Chief Fallon regarding both Supervisory Deputy Bohn's responsibility for the control room and Deputy DeCaire's sick leave) Ex. 35 (December 12, 2003, e-mail from Acting Assistant Chief Taylor to Chief Fallon with copy to Marshal Dichio detailing his conversation with Supervisory Deputy Bohn regarding the OSHA complaint); Ex. 36 (e-mail from Acting Assistant Chief Taylor to Supervisory Deputies Bohn and Dunne, with copies to Chief Fallon, Supervisory Deputy Bezanson and others, indicating the change in supervisory responsibilities for the control

room).   To Deputy Decaire's knowledge, no action was taken during the time that she was assigned to the control room to address these concerns.[20]

Supervisory Deputy Marshal Dunne asked Deputy Marshal DeCaire what other tasks she could do, and she explained the functions she had performed when she was on limited duty during her first pregnancy.  Agreed-Upon Facts, ¶ 82.  Supervisory Deputy Marshal Dunne stated that he would try to get her out of the control room by serving business process.  Agreed-Upon Facts, ¶ 82.  She was not permitted to perform these additional functions in either Boston or Worcester.   Agreed-Upon Facts, ¶ 82.

Deputy DeCaire's assignment was suppose to include two days in Worcester, during which she was to be permitted to attend to her collateral duties. On many occasions, however, Supervisory Deputy Bezanson called Deputy DeCaire and informed her that she was not needed in Worcester on her assigned day, and to stay in Boston.  TR, Vol. 1, at 101-02 (DeCaire Testimony).   Deputy DeCaire was unable to attend to her collateral duties while she was assigned to the Control Room.  TR, Vol. 1, at 102-04 (DeCaire Testimony).

On January 20, 2004, Chief Fallon issued his formal rotation policy for the warrant investigations unit and for Task Force positions.  Agreed-Upon Facts, ¶ 87; Trial Ex. 39.  Neither Deputy DeCaire nor Deputy Williams was given a task force or investigative assignment.   Trial Ex. 39.  Deputy Lewis remained as the Worcester HIDTA Task Force member.  Trial Ex. 39.

On January 21, 2004, when Supervisory Deputy Bezanson got angry at Deputy DeCaire for communicating with Chief Fallon regarding her collateral duties without copying him, he punished her by not permitting her to work in Worcester the two days that had previously been

---

[20] The District had a long standing project for several years to install a cooling unit in the Control Room, and that cooling unit was finally installed in June or July 2004.   TR, Vol. 6, at 13-14 (Fallon Testimony).

agreed to.   See Agreed Upon Facts, ¶ 84 (On January 21, 2004, Supervisory Deputy Bezanson advised Deputy DeCaire that she would be working in the Boston office until further notice); TR., vol. 1, at 104-05 (DeCaire Testimony) (This directive was made over the phone, while Supervisory Deputy Bezanson yelling at Deputy DeCaire for not including him in the e-mail to Chief Fallon).

Supervisory Deputy Hodgkins in turn limited Deputy DeCaire's ability to take bathroom breaks while she was assigned to the Control Room, and admonished her when she could not comply with Supervisory Deputy Hodgkins' limitations.  TR, Vol. 1, at 100 (DeCaire Testimony) (Deputy Decaire was not permitted to be relieved in the control room by a Court Security Officer, and could only be relieved by an assigned replacement; on many occasions, her assigned relief was not available when she needed to be relieved); TR, Vol. 1, at 101 (DeCaire Testimony) (if she left without relief, she would be verbally reprimanded by Supervisory Deputy Hodgkins, and if another deputy who was not assigned as her relief nonetheless relieved her, he or she would be verbally reprimanded)

In March 2004, Deputy DeCaire began her maternity leave.  TR, Vol. 1, at 111 (DeCaire Testimony).

### 6.  Assignments Following Deputy DeCaire's Return from Maternity Leave

Deputy DeCaire returned to her full-time position in September 2004, and has been assigned to general operations in Worcester since that time.  TR, Vol. 1, at 112.  She has had the opportunity to handle just a couple of warrant investigations and one weeklong investigations assignment to which the entire office was assigned, but other than that, has not been given any other warrant investigation work.

The January 20, 2004, rotation policy was amended on July 20, 2004.  Agreed-Upon Facts, ¶ 87.  Both the original and amended policy specify that assignments, including the

Worcester HIDTA assignment, will be evaluated in six months with the possibility of a rotation at that time.  Agreed-Upon Facts, ¶ 87.   Since the rotation policy was announced, Deputy DeCaire has not been assigned any warrant or task force position listed in the policy.  TR, Vol. 1, at 114.

Deputy Lewis has remained in the Worcester HIDTA position from September 2002 through the present.  Agreed-Upon Facts, ¶ 88.  Paul Sugrue has remained the Warrant Coordinator since being selected for that position in April 2003.  Agreed-Upon Facts, ¶ 89. Deputy Williams remained assigned to the Boston office from October 2003 until she quit in May 2005.  TR, Vol. 5, at 84 (Williams Testimony).

### D.    Additional Facts Related to the Rationales for the Various Employment Actions

#### 1.   Work Performance

It is undisputed that Deputy DeCaire's work performance throughout the entire period at issue was excellent, and that the adverse decisions at issue were <u>not</u> based on her performance. TR, Vol. 7, at 28 (Dichio Testimony) (Marshal Dichio thinks that Deputy DeCaire is "an excellent deputy" and "a hard worker" and has "done a great job as a deputy"); TR, Vol. 2, at 130 (Taylor Testimony) (Assistant Chief Dave Taylor views Deputy DeCaire as "a very good deputy").

#### 2.   Manpower

A manpower shortage existed in the District, and in particular in Court Operations in Boston, at the time Marshal Dichio took office.  Agreed-Upon Facts, ¶ 19; TR, Vol. 6, at 100 (Dichio Testimony).   Typically, the shortage had been covered on an as-needed basis primarily by the deputies assigned to the Warrants Investigations unit or by hiring guards.  Agreed-Upon Facts, ¶ 20.  In Worcester, the individual assigned to the HIDTA Task Force also covered courts

as needed.   TR, vol. 2, at 124 (Taylor Testimony); <u>see also</u> TR, Vol. 4, at 22 (Durette

Testimony) (members of the HIDTA task force generally did not serve rotational assignments,

but even task force members are assigned to cover courts when needed).   The Worcester office

was not short-staffed (TR, Vol. 4, at 20 (Durette Testimony); TR, Vol. 7, at 62 (Dichio

Testimony)).

   At the time that Deputies Williams and DeCaire were ordered to rotate to Boston, there

were no overall changes in staffing levels in the District.  Testimony of Assistant Chief Durette;

<u>see also</u> Corrected Trial Ex. 3 (showing no deputies leaving the District after Marshal Dichio

took office until Deputy Jaime Viator left in February 2003).[21]  The rotation ended less than two

weeks later without any net increase to the staffing of the Boston office.  <u>See</u> Corrected Trial Ex.

3 (showing 19 deputies assigned to Boston in January 2003, and, with the addition of Deputy

DeCaire and the exclusion of Deputy Viator, 19 deputies assigned to Boston in February 2003).

During the time when Deputies Williams and DeCaire were ordered to rotate to Boston, and

Deputy Wahl was assigned "as needed" Springfield, there was neither a need nor an assignment

to Springfield during this entire time (Agreed-Upon Facts, ¶ 36; <u>see also</u> TR, Vol. 7, at 62

(Dichio Testimony) (there was no shortage of manpower in Springfield),

   After the rotation, Deputy DeCaire's transfer from Worcester to Court Operations in

Boston assignment continued even when the District received four new deputies in March and

April 2003.  Corrected Trial Ex. 3; <u>see also</u> TR, Vol, 4, at 124 (Dimmitt Testimony) (upon his

---

[21] Corrected Trial Ex. 3 gives Deputy Viator's last day of employment as February 26, 2003.
Marshal Dichio contended that she used some vacation time before she left, but he does not
know how much.  TR, Vol. 7, at 70-71 (Dichio)  Since Deputy DeCaire was assigned to fill the
position she was vacating on February 4, 2003, it is reasonable to assume that Deputy Viator
used vacation time between February 4 and February 26, 2003.  There is no evidence in the
record, however, to show that she, or any other deputy assigned to the Boston office, was not
working on January 23, 2003, when the rotation was scheduled to begin.

arrival in the District on February 17, 2003, there were no needs, to Acting Chief Dimmitt's knowledge, of supplementing manpower from Worcester to Boston).

### 3. Experience, Seniority and Locality

The record is undisputed that Deputies Williams and DeCaire were more experienced than Deputy Lewis. See Agreed-Upon Facts, ¶ 21 (Deputy Mark Lewis was less experienced than Deputies DeCaire and Williams); see also TR, Vol. 4, at 15 (Durette Testimony) (Deputies DeCaire and Williams were "head and shoulders" above Deputy Lewis, having a significant amount more experience at that time in their careers); TR, Vol 5, at 70 (Williams Testimony) (Deputy Williams had had experience doing warrant work in Worcester).

Deputy Mark Lewis was the junior deputy in the Worcester office at the time that Deputies DeCaire and Williams were ordered to rotate to Boston, and when Deputy DeCaire was transferred to Boston in February 2003. Agreed-Upon Facts, ¶¶ 28, 40; Corrected Trial Ex. 3.

When Deputy DeCaire was assigned to Court Operations in Boston in February 2003, there were also deputies junior to Deputy DeCaire in the Warrants Investigations unit. Agreed-Upon Facts, ¶ 40; see also TR, Vol. 4, at 23 (Durette Testimony) (Deputy DeCaire, a senior deputy who had been an acting supervisor, did not belong in an 082 position when there were many more junior deputies who should have come first).

After additional deputies arrived in the district, deputies with less seniority were permitted to move to the Warrants Investigations unit while Deputy DeCaire remained in either Court Operations in Boston or General Operations in Worcester. See Agreed-Upon Facts, ¶ 51 (On March 17, 2003, Deputy Scott Kimball, who had less seniority than Deputy DeCaire, was transferred from Court Operations to the Warrant Investigations unit); Agreed-Upon Facts, ¶¶ 66-67 (On October 3, 2003, Deputy Kevin Donahue, who had less seniority than Deputy DeCaire, was transferred from Court Operations to the Warrant Investigations unit); Agreed-

Upon Facts, ¶ 70 (when Deputy DeCaire was moved out of Court Operations in October 2003
because of her relationship with Supervisory Deputy Bohn, there were deputies assigned to the
Warrant Investigations Unit who had less seniority than Deputy DeCaire).

When Deputy Williams was transferred to fill Deputy DeCaire's position in Boston, there
were two Worcester deputies with less seniority than Deputy Williams – Mark Lewis and Sean
Weddecke. Corrected Trial Ex. 3; TR, Vol. 1, at 86 (DeCaire Testimony). At the time of the
transfer, Deputy Williams was building a house west of Worcester in Charlton. TR, Vol. 1, at 87
(DeCaire Testimony).

### 4. Equal Opportunity

At the time that Deputy Hodgkins was selected for the Acting Supervisor position, she
already had more experience than any other deputy – including Deputy DeCaire -- in the district
applying for promotional positions. TR, Vol. 5, at 40-41 (Stipulations) (out of the many deputies
listed on four lists of candidates for promotional opportunities, Deputy Hodgkins was the only
deputy with a score of 30, and no other deputy who applied for promotion from the District had a
score higher than 28, and Deputy Decaire's experience score was a 24); TR, Vol. 4, at 37
(Durette Testimony) (Deputy Hodgkins had received a 30 out of 30 – the highest possible score -
- on the experience portion of her promotional package). At the time of the selection for the
Acting Supervisory position, Marshal Dichio was aware that she had already topped the last two
or three promotional lists based on the ratings of her promotional package. Tr, Vol. 7, at 11
(Dichio Testimony). Deputy Hodgkins was also permitted to remain in the Acting Supervisory
position for more than 120 days.

Deputy Paul Sugrue has been permitted to remain in Warrant Coordinator position for
over two years, except for a 120 day period when he served as Acting Supervisor for
Investigations. Ex. 22.

Deputy Lewis has been permitted to remain in the Worcester HIDTA position for over three years.

Defendant sought out Deputies Hodgkins, Annette Lawlor and Paul Sugrue for the Acting Supervisory and Warrant Coordinator positions and initiated conversations with them about their career development and promotional opportunities. Agreed-Upon Facts, ¶ 56 (In April 2003, Acting Chief Dimmitt sought out a female deputy for the Acting Supervisor position in Court Operations sought by Deputy DeCaire); TR., vol. 4, at 100 (Dimmitt Testimony) (Acting Chief Dimmitt asked Deputy Sugrue if he would consider doing the warrant coordinator position); TR, Vol. 5, at 55 (Dimmitt Testimony) (Acting Chief Dimmitt also discussed with Deputy Sugrue his career development; Acting Chief Dimmitt would discuss with many or most GS-12s that want to be 13s who came to talk to him or that he would go to talk to); Agreed-Upon Facts, ¶ 64 (In September 2003, Assistant Chief Taylor sought out a female deputy for the Acting Supervisory position sought by Deputy DeCaire). In contrast, Defendant did not respond to Deputy DeCaire's requests to be considered for the Acting Supervisory and Warrant Coordinator positions. TR, vol 1, at 76-77 (DeCaire Testimony).

### 5. Deputy DeCaire's Relationship with Supervisory Deputy Bohn

Since March 11, 2003, when Supervisory Deputy Bohn was removed as the HIDTA Task Force Supervisor, he has not supervised the HIDTA Task Force position in Worcester, and that position is now and has been, supervised by the Worcester supervisor. Ex. 54 (July 20, 2004 District Policy Notice).

### 6. Pregnancy

As Chief Fallon noted in his e-mail listing her restrictions, Deputy DeCaire was restricted during her pregnancy from working in "excessive heat." Trial Ex. 26 (Chief Fallon Memo). The control room where she was assigned was excessively hot. TR, Vol.1, at 96, 99 (DeCaire

Testimony) (according to a thermometer placed in the Control Room, the temperature was usually above 85 degrees while Deputy DeCaire was assigned there); see also TR, Vol. 2, at 54 (Bohn Testimony) ("the control room was very hot . . . and it was noisy").

Other deputies assigned light work under Marshal Dichio have not been required to work in the control room.    See e.g. TR, vol. 4, at 76 (Wickham Testimony); TR, Vol 5, at 4-5 (Roche Testimony); see also TR, Vol. 1, at 89 (DeCaire Testimony) (Deputy DeCaire was unaware of any other deputy who had been assigned to the control room while on light duty).  Instead, they have been permitted to perform other functions.  TR, vol. 4, at 76 (Wickham Testimony) (was restricted from carrying a firearm, but could perform administrative functions, such as manning the operations desk, which involves general scheduling, production of prisoners, faxing call-up lists of various jails, and handling phone calls to the operations desk); TR, Vol. 5, at 4-5 (Roche Testimony) (permitted to conduct collateral duties that were nonphysical related such as jail inspections, physical fitness assessments for other deputies, and working the operations desk).

Deputy DeCaire was not permitted to perform functions that she and others had previously performed while pregnant.  Tr., vol. 1, at 28 (DeCaire Testimony) (when Deputy DeCaire was on limited duty when she was pregnant with her first child, she was assigned background investigations in the Warrant Investigation unit, worked in the Asset Seizure and Forfeiture program, and worked along with supervisors on the "front desk").

### 7.  Attitude

Both Acting Chief Dimmitt and Chief Fallon were concerned with employees' attitude and were critical of complainers.  See e.g. TR, Vol. 1, at 72-74 (DeCaire Testimony) (Acting Chief Dimmitt advised deputies in Court Operations in Boston that deputies needed "to be loyal to the chair" and that he was looking for a few individuals to change their attitude"); Trial Ex. 21 (Chief Fallon's e-mail directing employees that there will be no "airing of dirty laundry" to

outsiders and explaining that part of the criteria for assignments to warrant and task force positions will be "attitude").

Deputy DeCaire had a significant number of complaints about her assignments and working conditions. These complaints are all part of the EEO complaint and the litigation, but were also made directly to Chief Fallon and Assistant Chief Taylor. See e.g. TR, Vol. 1, at 92 (DeCaire Testimony) (Deputy DeCaire verbally objected to Chief Fallon about being transferred back to Boston for her Control Room assignment); id. at 97 (Deputy Decaire objected in an e-mail to Supervisory Deputy Dunne and Assistant Chief Taylor to the heat and other safety conditions in the Control Room); id. at 106 (Deputy DeCaire objected in an e-mail to Assistant Chief Taylor and Chief Fallon about Supervisory Bezanson's directive that she could no longer work in Worcester while she was on light duty); see also Ex. 40 (Deputy DeCaire objected in an e-mail to Chief Fallon that she was not being provided any relief for breaks nor to perform any other duties).

### E.    The Roles of District Managers in the Employment Actions at Issue

#### 1.  Fall 2002

During the Fall of 2002, Marshal Dichio's Chief Deputy was Timothy Bane and his Assistant Chief Deputy was Paul Durette. According to Chief Bane, after the first few weeks of Marshal Dichio's term, and for the remainder of the time Chief Bane worked for Marshal Dichio, Marshal Dichio made up his own mind on just about every issue. TR, Vol. 2, at 100 (Bane Testimony).

The undisputed record supports Chief Bane's view. Marshal Dichio states the he "was involved directly in the operation for the first six months" TR, Vol. 7, at 8 (Dichio Testimony). Marshal Dichio concedes specifically that he alone made the decision to select Mark Lewis for the HIDTA position. TR, Vol. 6, at 97 (Dichio Testimony); TR, Vol. 7 (Dichio Testimony), at

54-56; see also Dichio Dep. TR, Volume 1, at 41-44  (Marshal Dichio made his own decisions about moving employees around, rather than seeking or following the recommendations of Chief Bane).   Although he contends that Chief Bane offered no advice on this selection (TR, Vol. 6, at 97 (Dichio Testimony); TR, vol. 7, at 56 (Dichio Testimony)), while Chief Bane contends that he advised Marshal Dichio that Deputy Lewis was not experienced enough and he recommended that Marshal Dichio sit down with Chief Bane, Assistant Chief Durette and Supervisory Deputies Bohn and Visalli and discuss the merits of all available candidates (TR, Vol. 2, at 93 (Bane Testimony)), it is undisputed that Marshal Dichio was not following Chief Bane's recommendation in connection with the HIDTA position.   Marshal Dichio also did not consult with Assistant Chief Durette prior to making the decision to select Mark Lewis for the position. TR, Vol. 4, at 15 (Durette Testimony).

Similarly, the record is undisputed that Marshal Dichio ultimately did not follow any manager's recommendation in connection with the decision to transfer Deputy McKearney to the Warrants Investigations unit and Deputy DeCaire to Worcester.   Marshal Dichio had wanted to transfer Deputy McKearney from Worcester to Boston in August, Chief Bane objected strongly, and initially, at Chief Bane's suggestion, the matter was tabled until Marshal Dichio had his one-on-one interviews in Worcester and had spoken with Deputy McKearney.  TR, Vol. 2, at 91 (Bane Testimony); TR, Vol. 7, at 59 (Dichio Testimony); see also TR, Vol. 2, at 101 (Bane Testimony) (Marshal Dichio wanted to make his own assessment of the staff).   After the one-on-one interviews in Worcester, Marshal Dichio informed Chief Bane that he wanted to go ahead with the transfer of Deputies McKearney and DeCaire.  TR, Vol. 2, at 99 (Bane Testiony).  Chief Bane objected so strongly that he finally told Marshal Dichio that he would not sign the requisite paper work, and that Marshal Dichio would have to sign off himself.  Id.   Marshal Dichio

- 46

consulted with no other managers (see TR, Vol. 4, at 16 (Durette Testimony); TR, Vol. 6, at 71

(Bezanson Testimony), but ultimately went forward with the transfers he wanted. Agreed-Upon

Facts, ¶¶ 23-24; see also TR, Vol. 7, at 58 (Dichio Testimony (Marshal Dichio had made the

decision to proceed with the transfer of Deputy DeCaire).

### 2. Mid-December 2002 through Mid-February 2003

From the middle of December 2002 through the middle of February 2003, there was no

Chief Deputy in the District. TR, Vol. 2, at 100 (Bane Testimony) (Chief Bane left the District

on December 13, 2002, first on vacation, and then, effective January 8, 2003, permanently);

Agreed-Upon Facts, ¶ 47 (Dave Dimmitt filled the position of Chief Deputy on an acting basis

beginning February 17, 2003). Paul Durette continued as the Assistant Chief. TR, Vol. 4, at 16

(Durette Testimony).

#### a) The Decision to Deny the Training Opportunity

Marshal Dichio has conceded that he made the decision to deny Deputy Williams'

request to attend the training conference (TR, Vol. 7, at 65-67 (Dichio Testimony)), and that he

made the decision without consulting Assistant Chief Durette or Deputy Williams' supervisory,

Supervisory Deputy Bezanson. TR, Vol. 4, at 17 (Durette Testimony).

#### b) The Worcester – Boston Rotation of Deputies Williams and DeCaire

Defendant has conceded that Marshal Dichio ordered the rotation of Deputies DeCaire

and Williams. See Agreed-Upon Facts, ¶ 27 (in January 2003, *Marshal Dichio* rotated Deputies

Williams and DeCaire to Boston) (emphasis added); see also TR, Vol., 1, at 61 (DeCaire

Testimony) (Supervisory Deputy Bezanson informed them that he had just received orders from

Marshal Dichio that Deputies Williams and DeCaire would be rotating to Boston on a weekly

basis); see also Revised Response to Trial Ex. 77 (February 2003 e-mail response from Anthony

Dichio to EEO counselor, referring to "my judgment, after much deliberation" on the rotation);

Trial Ex. 72 (June 2003 Dichio Affidavit) (same).[22]

The record also establishes that Marshal Dichio did not consult with either Assistant

Chief Durette, Worcester Supervisory Deputy Bezanson, or Supervisory Deputy Paul Dunne

before making the decision to implement the rotation.  Agreed-Upon Facts, ¶ 27 (Marshal Dichio

did not involve Assistant Chief Durette in the decision); TR, Vol. 6, at 73 (Bezanson Testimony)

(Supervisory Deputy Bezanson was not consulted about the rotation system prior to learning that

it would be placed in effect); Agreed-Upon Facts, ¶ 30 (Supervisory Deputy Bezanson notified

Supervisory Deputy Dunne of the rotation after notifying Deputies DeCaire and Williams); TR,

Vol. 4, at 19 (Assistant Chief Durette learned of the rotation after he returned from out of the

office business).

Dave Taylor, who at the time was the Judicial Security Inspector, testified at trial that he

recommended to "[t]he Marshal and the Chief" to rotate Deputies DeCaire and Williams for a

week at a time and to send Deputy Wahl to Springfield when needed, and that he did not

consider Deputy Lewis in making this recommendation because he was assigned to the HIDTA

position.  TR, Vol. 2, at 122-24 (Taylor Testimony).   Judicial Security Inspector Taylor's

testimony is unreliable, however, since at the time (January 2003), there was no Chief Deputy as

Chief Bane had left, and Acting Chief Dimmitt had not yet arrived.   In any event, Marshal

---

[22] At trial, Marshal Dichio stated that he directed Deputy Supervisory Doherty to reach out to
Worcester and have the two junior deputies in General Operations rotate to Boston.  TR, Vol. 7,
at 3 (Dichio Testimony).   While this allegation is not particularly credible as Supervisory
Deputy Doherty is not even mentioned in either Marshal Dichio's prior accounts (See Revised
Response to Ex. 77;  Ex. 72) or in Supervisory Deputy Bezanson's trial testimony concerning the
directive he received (TR, Vol. 6, at 72-73 (Bezanson Testimony)), it is also irrelevant, since
Marshal Dichio was well aware of the identity of the two junior deputies in General Operations
in Worcester.

Dichio did not claim to have relied on any such recommendations by Judicial Security Inspector Taylor.

### c) The Transfer of Deputy DeCaire to Court Operations in Boston

Marshal Dichio made the decision to have Deputy Marshal DeCaire fill the position vacated by an 082 deputy in Court Operations in Boston.  Agreed-Upon Facts, ¶ 38.   He did not seek Assistant Chief Durette's input into this decision.  Agreed-Upon Facts, ¶ 38; see also TR, Vol. 4, at 22 (Durette Testimony).  Dave Taylor was not involved in the decision-making process for this transfer.  TR, Vol. 2, at 124 (Taylor Testimony).   Supervisory Deputy Bezanson was not involved in the decision-making for this transfer.  TR, Vol. 5, at 75 (Bezanson Testimony). Supervisory Deputy Doherty also was not involved in the decision-making for this transfer.   TR, Vol. 1, at 68 (DeCaire Testimony) (Supervisory Deputy Doherty told Deputy DeCaire when she informed him of the transfer that he knew nothing about it).

Moreover, Marshal Dichio made the decision not to swap assignments between Deputy DeCaire and Deputy Donald Freeman, a deputy with less seniority than Deputy Marshal DeCaire who was assigned to the Warrant Investigations Unit in Boston.  TR, Vol. 2, at 107 (Freeman Testimony); Corrected Trial Ex. 3 (setting forth seniority dates).  Marshal Dichio responded to Deputy Freeman's offer to swap positions, by saying "let me handle the situation."   TR, Vol. 2, at 108 (Freeman Testimony).

### 3.  Mid-February through Mid-June 2003

From February 17, 2003, through June 12, 2003, the position of Chief Deputy United States Marshal was filled by David Dimmitt on an acting basis.   Agreed-Upon Facts, ¶ 47; TR, Vol. 2, at 42-45, 48-49 (Bane Testimony).

### a) Marshal Dichio Continued to Exercise the Critical Role in Personnel Related Matters

Marshal Dichio contends that "[]once Dave Dimmitt arrived . . . he was given full reign with the district" and was advised "to go out and run the district as he saw fit and report back to me."  TR, Vol. 7, at 8 (Dichio Testimony); TR, Vol. 7, at 10 (Dichio Testimony); TR, Vol. 7, at 86 (Dichio Testimony) (asserting that he was not involved in the direct operation from the time Acting Chief Dimmitt arrived).  The record does not support Marshal Dichio's contention.

Acting Chief Dimmitt concedes that when he arrived in the District, Marshal Dichio was "a micro type manager," and "was worried about every little nut and bolt, from parking to where a deputy might be."  TR, Vol. 4, at 109 (Dimmitt Testimony).  Acting Chief Dimmitt states further that he explained to Marshal Dichio on at least one occasion that "there was no need for him to worry about where person A or person B or person C is, that's why we have chiefs, assistant chiefs and supervisors and that we have to trust them to do what they are paid to do." TR, Vol. 4, at 109 (Dimmitt).  He claims that at some point, Marshal Dichio "became less . . . of a micro manager."  TR, Vol. 4, at 109 (Dimmitt Testimony).   But the record shows that Marshal Dichio continued to micromanage personnel matters all the way to the end of Chief Dimmitt's tenure.   See e.g. TR, Vol. 4, at 95 (Dimmitt Testimony) (in June 2003, Marshal Dichio contacted Acting Chief Dimmitt to ask where Supervisory Deputy Bohn was; this question was normal for Marshal Dichio, who would read the daily schedule, see where deputies were suppose to be, and if they were not there, ask Acting Chief Dimmitt where the deputy was); see also  TR, Vol. 2,, at 128 (Taylor Testimony) (from the time that Dave Taylor has become Assistant Chief Deputy (April 28, 2003), he has met probably daily with the Marshal and the Chief Deputy to discuss personnel matters").

The record is uncontroverted that Marshal Dichio was an aggressive decision-maker on numerous other key issues that arose during Acting Chief Dimmitt's 120 day stint, through anything, Acting Chief Dimmitt may have prevented Marshal Dichio from taking even more aggressive actions.  In March 2003, at Marshal Dichio's direction, Acting Chief Dimmit removed Assistant Chief Durette from his office into a cubicle in the administrative section of the office.  Agreed-Upon Facts, ¶ 52.  The idea was Marshal Dichio's, who first suggested placing him at the secretary's desk between Marshal Dichio and Acting Chief Dimmitt's offices. TR, Vol. 4, at 106 (Dimmitt Testimony).   On April 7, 2003, Durette's keys also taken away. This decision was made by Marshal Dichio, and was not based on any recommendation from Acting Chief Dimmitt.  TR, Vol. 4, at 128 (Dimmitt Testimony).

The removal of Jeff Bohn from supervising the HIDTA Task Force also was made by Marshal Dichio.  TR, Vol. 5, at 18 (Dimmitt Testimony).   Thus, when Boston Police Officer Stephen Ridge sought reconsideration of the decision by Chief Dimmitt, Marshal Dichio entered the room, asserted that it was "his call," that he had removed Supervisory Deputy Bohn, and for Officer Ridge to "just live with it."  TR, Vol. 7, at 107 (Ridge Testimony).  Although Chief Dimmitt claims to have recommended the specific action taken here (TR, Vol. 5, at 18 (Dimmitt Testimony)), it appears that, if anything, Acting Chief Dimmitt softened Marshal Dichio's response.  <u>See</u> TR, Vol. 5, at 56 (Dimmitt Testimony) (Acting Chief Dimmitt did not want to discipline Supervisory Deputy Bohn because Supervisory Deputy Bohn "was caught in the mix of this, this whole situation in this district"); <u>see</u> <u>also</u> TR, Vol. 5, at 56-57 (Dimmitt Testimony) (Acting Chief Dimmitt "wanted [Supervisory Deputy Bohn] to get away from where he was and reassign him to another area with the least amount of career damage").

Marshal Dichio also made key personnel assignments, without a supporting recommendation from Acting Chief Dimmitt.   Most notably, Marshal Dichio selected Dave Taylor as his Acting Assistant Chief and Leo Rosette as the Court Security Program Coordinator without any recommendation from his Acting Chief.  TR, Vol. 5, at 29-30 (Dimmitt Testimony).

### b)  Acting Chief Dimmitt's Meeting with Court Operations Deputies

In March 2003, Acting Chief Dimmitt held a meeting with Court Opperations deputies. At the meeting, Deputy DeCaire asked Acting Chief Dimmitt if it was his intention to move her back to the Worcester office because the District had received new 082s.  TR, Vol. 1, at 74 (DeCaire Testimony).  He asked in response, repeatedly, if that was where she wanted to be.  TR, Vol. 1, at 74 (DeCaire Testimony).  She did not want to be in Worcester, and she responded that she was asking what their intention was since she had been transferred because of manpower. TR, Vol. 1, at 75, 130 (DeCaire Testimony).  Acting Chief Dimmitt became very upset, his face turned red, and he stated that this was not the place to talk about this.  TR, Vol. 1, at 75 (DeCaire Testimony).   He said that he would talk to the Marshal and talk to Deputy DeCaire about the matter at a later time.  Id..  He never had any further conversation on the subject with Deputy DeCaire.  Id.

### c)  Acting Chief Dimmitt Did Not Attempt to Make Any Informed Decision Regarding the Appropriate Assignment for Deputy DeCaire

Defendant may seek to justify Marshal Dichio's ongoing assignment of Deputy DeCaire to Court Operations on the ground that Acting Chief Dimmitt did not recommend otherwise. Acting Chief Dimmitt, however, abdicated any role regarding that assignment by refusing to investigate or consider anything about the matter.

Acting Chief Dimmitt was aware of Deputy DeCaire's EEO Complaint prior to his arrival in the District, and may even have been advised about the complaint by Art Roderick from headquarters. TR, Vol. 4, at 112-13. (Dimmitt Testimony). Acting Chief Dimmitt reviewed certain e-mails related to Deputy DeCaire's complaint but has no recollection of ever reviewing her actual complaint. TR, Vol. 4, at 83, 113 (Dimmitt Testimony). He also had some limited discussions with Marshal Dichio about Marshal Dichio's understanding of Deputy DeCaire's complaint. TR, Vol. 4, at 107 (Dimmitt Testimony). It was his understanding that it was Marshal Dichio's position that Deputy DeCaire had asked to go to Worcester, and Acting Chief Dimmitt had no understanding of how she had come to be assigned to Boston. TR, Vol. 4, at 123 (Dimmitt Testimony). Acting Chief Dimmitt had no recollection that Deputy DeCaire's EEO complaint concerned the rotation between Boston and Worcester in January 2003, or the transfer from Worcester to Court Operations in Boston in February 2003. TR, Vol. 4, at 114 (Dimmitt Testimony). He did not know that the transfer was purportedly related to any manpower issues, and he did not know that Marshal Dichio had made statements (which he contended were to Deputy DeCaire and Plaintiff contends were made to Deputy Williams) that the situation would be alleviated once the 082s arrived from the Academy. TR, Vol. 4, at 123 (Dimmitt Testimony).

Acting Chief Dimmitt was advised by Lisa Dickinson of the Marshals Service's EEO Office not to initiate any contact with Deputy DeCaire to resolve the matter, and during his entire tenure in the District, made no attempt to investigate or mediate the dispute. TR, Vol. 4, at 115, 125, 127 (Dimmitt Testimony); see also TR, Vol. 5, at 8 (Lisa Dickinson is a Marshal Service employee).

In response to a question posed about Deputy DeCaire's assignment, Acting Chief Dimmitt testified that he informed Marshal Dichio early on that "it was not [his] goal or intention in coming here to . . . ['] upset the apple cart,'" that he intended "to leave everyone assigned where they're assigned" until the permanent chief was assigned, and that he would "not attempt to go into that area." TR, Vol. 4, at 110 (Dimmitt Testimony). He elaborated that he would not reassign anyone to another office than they were assigned to on their personnel action sheets in their folders during his tenure as temporary chief. TR, Vol. 4, at 84, 87 (Dimmitt Testimony); TR, Vol. 5, at 23 (Dimmitt Testimony) (Acting Chief Dimmitt was going to leave things "as the documents said people should be"); see also TR, Vol. 4, at 117 (Dimmitt Testimony) (Acting Chief Dimmitt reviewed personnel files for SF 50 or SF 52 forms). In fact, however, Acting Chief Dimmitt did change both assignments and paperwork for other deputies,[23] but did not take any steps to become informed about Deputy DeCaire's situation.

### d) The Filling of the Acting Supervisor Position

Marshal Dichio contends that Chief Dimmitt recommended Deputy Hodgkins for the position, and that he simply acted on Chief Dimmitt's recommendation. TR, Vol. 7, at 11 (Dichio Testimony). As Chief Dimmitt has conceded, however, this was not a situation where he went to the Marshal and simply provided a recommendation. TR, Vol. 7, at 11. Instead, Marshal Dichio had far greater involvement in the decision.

---

[23] When Acting Chief Dimmitt arrived in the District, Deputy McKearney's file showed that he was assigned to Worcester, since no SF 50 had been prepared in connection with his transfer to Boston. Agreed-Upon Facts, ¶ 25 (No Form SF 50 was issued at the time); An SF 50 for Deputy McKearney's transfer in March 2003 at time of Acting Chief Dimmitt's review of files. Corrected Trial Ex. 3 (an SF 50 for the 2002 transfer was issued in March 2003); TR, Vol. 4, at 119 (Dimmitt Testimony) (Acting Chief Dimmitt may have initiated an SF 50 for Deputy McKearney so that his assignment would match what had happened). Acting Chief Dimmitt also changed the assignment of an 082 Deputy, Sean Weddecke, whose initial paperwork had him arriving in Boston, and moved him to Boston. TR, Vol. 4, at 123 (Dimmitt Testimony).

Marshal Dichio, along with Acting Chief Dimmitt, were the two recipients of Deputy DeCaire's e-mail seeking the Acting Supervisor position. Trial Ex. 17. Dave Taylor testified that he forwarded Deputy DeCaire's request to Chief Dimmitt. TR, Vol. 2, at 114 (Taylor Testimony). Since Dave Taylor was not yet the Acting Assistant Chief at this point (see Agreed-Upon Facts, ¶ 58), it is fair to presume further that Marshal Dichio forwarded it to him.

Dave Taylor claims that he recommended that someone be given the position for an opportunity to build their package. TR, Vol. 2, at 116 (Taylor Testimony). Dave Taylor cannot remember, however, whether this was a conversation with just the Marshal or with Chief Dimmitt as well. TR, Vol. 2, at 115-16.

Dave Taylor approached two other female deputies, Alison Hodgkins and Annette Lawlor, to determine if they would be interested in the position. TR, Vol. 2, at 114 (Taylor Testimony); see also TR, Vol. 5, at 27 (Dimmitt Testimony). Deputy Lawlor told Dave Taylor that she was not interested, but Deputy Hodgkins stated that she was. Id. Dave Taylor passed this information on to Acting Chief Dimmitt. TR, Vol. 2, at 114-15 (Taylor Testimony); TR, Vol. 5, at 41 (Dimmitt Testimony) (he received the initial suggestion of Deputy Hodgkins from Judicial Security Inspector Taylor or Marshal Dichio).

Acting Chief Dimmitt's knowledge about Deputy Hodgkins' and Deputy DeCaire's relative experience was limited to their personnel folders, which contained information concerning acting supervisory positions, but not much more (TR, Vol. 5, at 42 (Dimmitt Testimony) and what he was told by Dave Taylor or Marshal Dichio. TR, Vol, 5, at 42 (Dimmitt Testimony). He was advised that Deputy DeCaire had had an acting supervisor position and Deputy Hodgkins had not. TR, Vol. 5, at 43 (Dimmitt Testimony).

- 55

Acting Chief Dimmitt discussed who would fill the Acting Supervisor position with Marshal Dichio. TR, Vol. 4, at 97-98 (Dimmitt Testimony); TR, Vol. 5, at 43 (Dimmitt Testimony). Following this discussion, with information passed back and forth, he made his "recommendation" that Alison Hodgkins be given the position. TR, Vol. 4, at 99 (Dimmitt Testimony). Marshal Dichio, who knew that Deputy Hodgkins already had sufficient experience to make the "top five" certification list in the district two or three times, gave Deputy Hodgkins the Acting Position. TR, Vol. 7, at 11, 83 (Dichio Testimony).

### e) The Filling of the Warrant Coordinator Position

Marshal Dichio contends that Acting Chief Dimmitt recommended Paul Sugrue, and he simply agreed with his decision. TR, Vol. 7, at 11 (Dichio Testimony). Again, the story is not so simple.

Once again, Dave Taylor received Deputy DeCaire's e-mail request, presumably from Marshal Dichio, since it had been addressed only to Marshal Dichio and Acting Chief Dimmitt, and Dave Taylor was not yet the Acting Assistant Chief. TR, Vol. 2, at 117 (Taylor Testimony); Trial Ex. 18; Agreed-Upon Facts, ¶ 58.

Assistant Chief Taylor claims that he recommended to both Acting Chief Dimmitt and Marshal Dichio that Deputy Paul Sugrue be given the Warrant Coordinator position to give someone, who had not had an opportunity before, to gain supervisory experience. TR,Vol. 2, at 118 (Taylor Testimony). Acting Chief Dimmitt approached Paul Sugrue about the warrant coordinator position. TR, Vol. 5, at 44 (Dimmitt Testimony). Deputy Sugrue told Acting Chief Dimmitt that he did not want the position. TR, Vol. 5, at 44 (Dimmitt Testimony). Nonetheless, the "recommendation" was made and accepted (TR., Vol. 4, at 100 (Dimmitt Testimony); TR, Vol. 7, at 12 (Dichio)), and Deputy Sugrue was given the position.

### 4.  August 2003 to the Present

On July 15, 2003, William Fallon became Chief Deputy U.S. Marshal for the District of Massachusetts.  Agreed-Upon Facts, ¶ 59.  Since Chief Fallon became Chief, Assistant Chief Taylor has met with Marshal Dichio and Chief Fallon almost daily on personnel matters.  TR, Vol. 2, at 129 (Taylor Testimony).

### a)  The Acting Supervisor Position

Chief Fallon has taken no responsibility for the decision to continue Deputy Hodgkins in the Acting Supervisory position for more than 120 days, asserting that it was not funded, that the position was eliminated and that Assistant Chief Taylor had solicited Deputy Lawler for the position without his knowledge.   Assistant Chief Taylor's actions and the subsequent retention of Deputy Hodgkins in the position in violation of Marshal Service rules, however, were consistent with Marshal Dichio's stated intent – that Deputy DeCaire was going nowhere.

### b)  Deputy DeCaire's Assignment to Worcester and Deputy Williams' Assignment to Court Operations in Boston

Chief Fallon testified that the concern about Deputy DeCaire's assignment to Court Operations began when they were determining the new supervisory structure.  On October 3, 2003, Supervisory Deputy Bohn was made a new Court Operations supervisory, effective October 14, 2003.  Thus, if Chief Bane is credited, from at least October 3, it must have been his intention to transfer Deputy DeCaire out of Court Operations.  Yet the transfer did not occur until October 14, 2003.

Marshal Dichio contends that the decision to transfer Deputy DeCaire was made by Chief Fallon, and that Marshal Dichio does not know the rationale for the decision.  TR, Vol. 7, at 89 (Dichio Testimony).   This assertion is not credible.  Moreover, as Chief Fallon noted, it was Marshal Dichio who directed that the transfer occur the same day.

### c)  Limited Duty Assignment

The record shows that Marshal Dichio was included in the correspondence regarding the limited duty assignment, the OSHA complaint and related matters.

### F.    Deputy DeCaire's Merit Promotion Package

Permanent promotions at the Marshals Service are made through the merit section process.   Deputies submit a promotional package to headquarters detailing their experience.  TR, Vol. 4, at 11 (Durette Testimony).[24]   A promotional package identifies the employee's experience, training, education, awards and physical fitness scores, and together with their exam score and supervisory appraisals, is rated numerically by a merit promotion rating panel.  TR, vol. 2, at 72-73 (Bane Testimony); TR, Vol. 4, at 11 (Durette Testimony).   The panel would assess the package, and give a numerical score for experience.  TR, Vol. 4, at 12 (Durette Testimony); see also TR., vol. 2, at 78 (Bane Testimony) (the numerical rating reflects in part the deputies' experience).  Experience in a position such as an acting supervisory role was an important benchmark that candidates needed to meet.  TR, Vol. 4, at 13 (Durette Testimony).  Other experience in leadership positions, including a warrant coordinator position, is also given credit if it is documented.  TR, Vol. 4, at 14 (Durette Testimony).

For operational positions at the grade 13, 14 and 15 level, the human resources division then certifies the top candidates.  TR., vol. 2, at 74 (Bane Testimony).    Usually the list is limited to the top five, but it can be a few more if the scores are close.  TR., vol. 2, at 75 (Bane Testimony).   In addition, lateral candidates are also added to the group to be considered.  Id. For a district position, the list of top candidates is given to the Marshal, in random or alphabetical order.  TR, Vol. 7, at 82 (Dichio Testimony); TR, Vol. 6, at 18 (Fallon Testimony).

---

[24] Assistant Chief Durette served on the rating panels for GS-13 positions from 1999 until 2003. TR, Vol. 4, at 12 (Durette Testimony).

For a headquarters position, the list goes to the assistant director of the particular program.  TR, Vol. 6, at 20 (Fallon Testimony).  The Marshal ranks the candidates and send the list back to headquarters.  TR, Vol. 7, at 82 (Dichio Testimony).  The Marshals Service career board receives that rating for each of the candidates on the certification list from the Human Resources Division, together with a recommendation from the Marshal for a district position (or from the assistant director for a headquarters position).  TR., vol. 2, at 73, 75 (Bane Testimony).  The career board does not even consider applicants who do not make the short list supplied by the Human Resources Division.  TR., vol. 2, at 76-78 (Bane Testimony).  The career board then makes its own recommendation to the Director of the Marshals Service.  TR., vol. 2, at 73, 75 (Bane Testimony); TR, Vol. 6, at 21 (Fallon Testimony).   The Director makes the final determination on the merit promotions.   TR., vol. 2, at 74 (Bane Testimony).

Deputy DeCaire has completed three promotional packages, one before Marshal Dichio arrived and two after he arrived.  TR, Vol. 1, at 115 (DeCaire Testimony).  Since Marshal Dichio has arrived in the District, she has been unable to add any new experience to her package.  TR, Vol. 1, at 115-16 (DeCaire Testimony).

## II.    CONCLUSIONS OF LAW

For both gender discrimination and unlawful retaliation, a plaintiff must show "that there was differential treatment in an employment action and that the adverse employment decision was caused at least in part by a forbidden bias." Hillstrom v. Best Western TLC Hotel, 354 F.3d 27, 31 (1st Cir.2003).   Under the Supreme Court's decision in  Desert Palace, Inc. v. Costa, 539 U.S. 90, 98-99, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), once the employee proves that discrimination or retaliation was a motivating factor in the action through either direct or circumstantial evidence, "the burden of proof (not merely production) falls on the defendant to show that it would have reached the same decision in the absence of discrimination."   Iwata v.

Intel Corp., 349 F.Supp.2d 135, 143 n.2 (D. Mass. 2004) (explaining Desert Palace).[25]  Here,

Plaintiff has met her burden of showing that Defendant engaged in a series of employment

actions in which discrimination and retaliation were motivating factors.  Defendant has failed to

meet his burden of showing, as to each of these employment actions, that he would have reached

the same decision in the absence of discrimination or retaliation.

### A.    Deputy DeCaire has Suffered a Series of Materially Adverse Employment Action

Determining whether an action is materially adverse necessarily requires instead a case-

by-case inquiry of the specific employment action at issue.  Blackie v. State of Maine, 75 F.3d

716, 725 (1st Cir. 1996); Welsh v. Derwinski, 14 F.3d 85,86 (1st Cir. 1994).  The courts have

attempted, however, to offer some degree of generalization.

> Typically, the employer must either (1) take something of consequence from the
> employee, say, by discharging or demoting her, reducing her salary, or divesting
> her of significant responsibilities, . . . or (2) withhold from the employee an
> accouterment of the employment relationship, say, by failing to follow a
> customary practice of considering her for promotion after a particular period of
> service.

Blackie v. State of Maine, 75 F.3d 716, 725 (1st Cir. 1996) (citing Henson v. King & Spaulding,

416 U.S. 69, 75-76, 104 S.Ct. 2229, 2233-34, 81 L.Ed.2d 59 (1984), Connell v. Bank of Boston,

924 F.2d 1169, 1179 (1st Cir.), cert. denied, 501 U.S. 1218, 111 S.Ct. 2828, 115 L.Ed.2d 997

(1991) and Crady v. Liberty Nat. Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)); see also

---

[25] Desert Palace concerned a claim of discrimination, rather than retaliation, and the
Court's analysis began with statutory language in 42 U.S.C. § 2000e-2(m) which addresses
discrimination claims, but does not mention retaliation claims.  Desert Palace, 539 U.S. at 98–99.
The Supreme Court's analysis, however, continued the statutory language, explaining that
circumstantial and direct evidence should be treated alike, and indeed that "'[c]ircumstantial
evidence is not only sufficient, but may also be more certain, satisfying and persuasive than
direct evidence.'"  Id. at 100 (quoting Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 508,
n.17, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957)).    In any event, in this case, the Defendant agreed
during opening statements that the burden shifting set forth in Desert Palace applied to Plaintiff's
claims, whether proven through direct or circumstantial evidence.

Petitti v. New England Telephone and Telegraph Co., 909 F.2d 28,32 (1st Cir. 1990) (an adverse action is made out where an employment action "disadvantages" persons engaging in protected activity); see also Forsyth v. City of Dallas, Tex., 91 F.3d 769, 774 (5th Cir. 1996), cert. denied 522 U.S. 816, 118 S.Ct. 64, 139 L.Ed.2d 26 (1997) (finding adverse action in § 1983 case alleging retaliatory transfer from Intelligence Unit to night patrol where former position "were more prestigious, had better working hours, and were more interesting . . ." and where "few officers voluntarily transferred from the Intelligence Unit to night patrol and other officers had been transferred as punishment"); Click v. Copeland, 970 F.2d 106, 110 (5th Cir. 1992) (finding adverse action in § 1983 case alleging retaliatory transfer from law enforcement section to jail where "jobs in the jail are not as interesting or prestigious as jobs in the law enforcement section," and "'everybody views a transfer from detention to law enforcement as a promotion'"); Sharp v. City of Houseton, 164 F.3d 923, 933 (5th Cir. 1999) (jury could have considered transfer to be equivalent to a demotion "if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement"); Lulac Council 4433 & 4436 v. City of Galveston, 979 F.Supp. 514, 518- 19 (S.D.Tex.1997) (plaintiffs were transferred to less prestigious positions, which were clearly seen as demotions; other officers typically seek to be transferred out of, rather than into, the department to which plaintiffs were transferred); Torre v. Casio, Inc., 42 F.3d 825, 831 (3d Cir.1994) (A transfer to a dead-end job can constitute an adverse employment action)   Moreover, "under certain circumstances an employer's inaction can operate to deprive an employee of a privilege of employment that an employee had reason to anticipate he would receive; in those situations, the deprivation constitutes an adverse employment action."  Blackie v. State of Maine, 75 F.3d at 726.

Nor need the various incidents be viewed in isolation.  As the District Court for the

Southern District of New York has explained:

> "the accumulation of small reprisals may be aggregated so as to permit consideration of their impact in their totality and to support their being deemed sufficient to constitute adverse employment action sustaining a claim of retaliation for engaging in a protected activity."

Fowler v. New York Transit Authority, 2001 WL 83228, *7 (S.D.N.Y.), quoting Gonzalez v. Police Commissioner William Bratton, 2000 WL 1191558, *15 (S.D.N.Y.).

Thus the First Circuit has explained that adverse material changes include "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations and toleration of harassment by other employees." Gu v. Boston Police Department, 312 F.3d 6, 14 (1st Cir. 2002) (quoting Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998)). The actions at issue here fall easily within this standard.

Here, for over two years, Deputy DeCaire has been denied all of assignments of greater prestige, interest, leadership development, supervisory experience or other career building factors, including any assignments to the Warrants Investigations unit, the HIDTA Task Force, Acting Supervisor positions, or Warrant Coordinator positions, while other employees have been solicited for such positions. She has been relegated to performing work that she previously performed as an entry level deputy. For many of the months she had no permanent duty station and no clear supervisory and most of her transfers between offices (including Fall of 2002 from Boston to Worcester, the January 2003 rotational assignment; the February 2003 assignment to Boston, the November assignment three days a week to Boston, and the January 2004 five day a week assignment to Boston were not accompanied by the usual form SF 50s. Moreover, unlike those of other employees, her assignments between offices for the past two and a half years have not been accompanied by any notice to Marshals Service staff, except for one occasion, in February 2003, when she was given a position replacing an entry-level deputy in Court

Operations.   She also, unlike other employees, has been forced to make these moves with no

notice.  In addition to the loss of prestige and interesting work, and the instability of her worklife,

these assignments have resulted in her inability to increase her experience for purposes of merit

promotion opportunities.  In sum, Deputy DeCaire has suffered a series of adverse employment

actions.

      **B.**     **Discrimination and/or Retaliation Has Been a Motivating Factor in these Employment Actions**

           **1.**   **Deputy DeCaire Has Opposed Defendant's Unlawful Employment Practice and Has Participated in EEO Proceedings**

Under 42 U.S.C, § 2000e-3(a), it is an unlawful employment practice for an employer:

> to discriminate against any of his employees . . . because [the employee] has
> opposed any practice made unlawful employment practice by this subchapter, or
> because he has made a charge, testified, assisted, or participated in any manner in
> an investigation, proceeding, or hearing under this subchapter.

Plaintiff's claim of retaliation are based on both the "participation" and "opposition" clauses.

See First Amended Complaint, ¶ 54.   Under the "participation clause," "'there is nothing in its

wording requiring that the charges be valid, nor even an implied requirement that they be

reasonable.'"  Wyatt v. City of Boston, 35 F.3d 13, 15 (1st Cir. 1994) (per curium) (quoting 3

Arthur Larson & Lex K. Larson, Employment Discrimination § 87.12(b), at 17-95 (1994).   In

contrast, a claim concerning the opposition clause "requires that the employee have a reasonable

belief that the practice the employee is opposing violates Title VII."  Wyatt, 35 F.3d at 15.

Here, Deputy DeCaire claim meets the requirements for both types of claims.   There is no

dispute that on January 23, 2003, she initiated, supplemented and amended EEO complaints, and

she thus meets the requirements of the participation clause.   There is also no dispute that she

opposed the employer's practices, both through the formal EEO process and in communications

to Assistant Chief Taylor and Chief Fallon, and that she had a reasonable belief both that

Marshal Dichio's actions in rotating the two women deputies, and not the men, was a practice violating Title VII, and that the continuing actions to which she was subjected to after opposing Defendant's conduct, including the denial of various opportunities, the repeated transfers that did not follow normal procedures, the assignment to the control room, including the increasing numbers of days per week that she was assigned there, and the limitations on bathroom breaks, were practices violating Title VII.   Accordingly, she meets the requirements of the opposition clause as well.

### 2.   The Record Establishes Direct Evidence of Retaliation

The First Circuit has defined "direct evidence" of discrimination or retaliation as "statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision." Wennik v. Polygram Group Distrib., 304 F.3d 123, 132 (1st Cir.2002); Kirk v. Hitchcock Clinic, 261 F.3d 75, 79 (1st Cir.2001); Febres v. Challenger Caribbean Corp., 214 F.3d 57, 60 (1st Cir.2000).[26]   Here, Marshal Dichio was the ultimate decision-maker on each action.  His statement to Brockton Detective Cummings that Deputy DeCaire had filed a complaint against him and was "vicious" relate directly reflect the alleged animus.  And his promise that as long as he was there, she "would go nowhere" bears squarely on the contested employment decisions denying her all other work assignments.

### 3.   The Record Also Establishes Indirect Evidence of Discrimination and Retaliation

"In assessing discriminatory motive, the court may  . . . consider . . . facts, including 'among other things, "the historical background of the . . . decision"; "[t]he specific sequence of events leading up to the challenged decision"; "[d]epartures from the normal procedural

---

[26] The formal distinction between direct and indirect evidence is no longer of great importance, in light of Desert Palace.  Nonetheless, Plaintiff's evidence meets even the exacting standards for direct evidence.

sequence"; . . ."[any] contemporary statements by members of the decisionmaking body."'"

Hodgens v. General Dynamics Corp., 144 F.3d 151, 168-69 (1st Cir. 1998) (quoting Reno v.

Bossier Parish Sch. Bd., 520 U.S. 471, 117 S.Ct. 1491, 1503, 137 L.Ed.2d 730 (1997) (quoting

Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 267-68, 97 S.Ct. 555, 50

L.Ed.2d 450 (1977)).    Here, the circumstantial evidence in the record establishes that gender

discrimination and retaliation played a motivating part in the employment decisions at issue.

### a)  Further Evidence of Retaliation

"'[A] showing of [adverse action] . . . soon after the employee engages in protected

activity . . . is indirect proof of a causal connection between the [adverse action] . . . and the

activity because it is strongly suggestive of retaliation.'"    Calero-Cerezo v. United States

Department of Justice, 355 F.3d 6, 25 (1st Cir. 2004) (quoting  Oliver v. Digital Equipment

Corp., 846 F.2d 103, 110 (1st Cir. 1988)).  In Calero-Cerezo, the court found a temporal

proximity between the protected conduct and the employment action of approximately one

month to be sufficient to make out a prima facie case of discrimination.   355 F.3d at 26.[27]   Here,

Deputy DeCaire initiated the EEO complaint on January 23, 2003, Marshal Dichio learned of the

complaint the following day, and the first retaliatory action – the transfer to Court Operations in

Boston was decided upon just three days later, on January 27, 2003.  This swift action is strongly

suggestive of retaliation.

Adding the other factors set forth above establishes a retaliatory motive as a motivating

factor in the employment actions.

---

[27] In contrast, three and fourth month periods have been held insufficient.  Id. at 25; see also
Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S.Ct. 1508, 149 L.Ed.2d 509
(2001) (noting that cases that accept mere temporal proximity between an employer's knowledge
of protected activity and an adverse employment action as sufficient evidence of causality to
establish a prima fact case uniformly hod that the temporal proximity must be 'very close'").

Deputy DeCaire had an excellent work record as a deputy and in particular as an investigator, and the District has invested considerable resources in training her to that level and for those skills. Yet for the past two and a half years, she has been excluded from virtually all investigative activity.

Deputy DeCaire is the only deputy who sought out the Acting Supervisory and Warrant Coordinator positions in 2003. Each time, however, Defendant responded by seeking out other employees in order in what can be inferred to have been an attempt to avoid giving the positions to Deputy DeCaire.

Deputy DeCaire is the only deputy who has been assigned to the Control Room while on light duty.

A retaliatory motive can also be inferred from the Defendant's failure to follow normal procedures in connection with the various transfers. Deputies are normally given days or even weeks for moves (including even moves within an office), and the moves are accompanied by a notice to all the staff in the district. See e.g. Agreed-Upon Facts, ¶ 21 (Deputy Marshal Lewis was given three work days from the time of the announcement of his transfer to the Worcester HIDTA position before the assignment began and a notice of the transfer was given to all staff); Agreed-Upon Facts, ¶ 26 (Deputies DeCaire and McKearney were given three work days notice before they switched offices and a notice of the transfer was issued to all staff); Trial Ex. 22 (notice to staff announcing on October 3, 2003, assignment changes within the Boston office effective October 14, 2003). In contrast, in October 2003, Deputy DeCaire was required to pack up and report to the Worcester office by noon that same day. Agreed-Upon Facts, ¶ 72; see also TR, Vol. 1, at 85 (DeCaire Testimony) (Supervisory Deputy Dunne called Deputy DeCaire into his office around 9:00 in the morning, and informed her of the transfer and that she needed to be

in Worcester by noon). Moreover, no general e-mail was sent to other staff announcing this, or any other move since Deputy DeCaire initiated her complaint, with the sole exception of the announcement in February 2003 that she was filling the position of an 082 deputy. Agreed-Upon Facts, ¶ 72.

### b) The Record Establishes Indirect Evidence of Gender Discrimination

The record also establishes that gender discrimination was a motivating factor in the rotation of Deputies DeCaire and Williams to Boston and the decision not to allow either Deputy DeCaire or Williams to work in the HIDTA position in Worcester over these past two years.

First, not only was Deputy Mark Lewis, rather than either of the more experienced and senior women, placed in the HIDTA position in September 2002, but he has been permitted to remain in that position ever since. Moreover, he continues in that position even though Chief Fallon has repeatedly announced a rotation policy for Task Force positions, and has testified that he has no understanding of the basis of Marshal Dichio's selection of Mark Lewis for the position.

Second, the rotation from Worcester to Boston affected only the women, and not the men in the office. Moreover, from the time that the rotation was put into place (January 23, 2003) until Deputy Williams finally quit in May 2005, the two women were never again permitted to work in the Worcester at the same time.

Finally, when he took office, Marshal Dichio expressed his opinion that mothers should work close to home, and he was completely disinterested in the careers of the two female deputies. On this record, Plaintiff has established that gender was a motivating factor in the assignments of these two women.

> **4.** **The Record Concerning the Treatment of Assistant Chief Durette,
> Supervisory Deputy Bohn, and Deputy Williams Provides Additional
> Circumstantial Evidence of Discrimination and Retaliation**

The First Circuit has repeatedly held that an allegation that an employer has

discriminated against another employee is relevant to a discrimination claim. In Cummings v.

Standard Register Co., 265 F.3d 56 (1st Cir. 2001), the First Circuit upheld the district court's

admission of allegations of discrimination by the employer against other employees over an

objection that the allegations were irrelevant. The Court explained:

> The sole issue at trial was whether age was a motivating factor in [the employer's]
> decision to terminate [the plaintiff]. We have recognized that since discrimination
> is often subtle and pervasive, plaintiffs must be able to rely on circumstantial
> evidence to prove discriminatory intent. [Conway v. Electroswitch Corp., 825
> F.2d 593, 597 (1st Cir. 1987)]   To this end, evidence of a discriminatory
> "atmosphere" may sometimes be relevant to showing the corporate state-of-mind
> at the time of the termination. *See id.*   While such evidence does not in itself
> prove a claim of discrimination, *see Ruiz v. Posadas de San Juan Assocs., 124
> F.3d 243, 249-50 (1st Cir. 1997),* "[it] does tend to add 'color' to the employer's
> decisionmaking processes and to the influences behind the actions taken with
> respect to the individual plaintiff." [ ]  Conway, 825 F.2d at 597 (citing Sweeney
> v. Bd. of Trs. of Keene State Coll., 604 F.2d 106, 113 (1st Cir. 1979)); *see*
> Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir.
> 2000).

Id. at 63 (footnote omitted). The Conway court, in turn, explained that "[e]vidence of

institutional state-of-mind may be presented for the consideration of the trier-of-fact because an

employer's willingness to consider impermissible factors such as race, age, sex, national origin,

or religion while engaging in one set of presumably neutral employment decisions . . . might tend

to support an inference that such impermissible considerations may have entered into another

area of ostensibly neutral employment decision." 825 F.2d at 597-98 (upholding against

relevancy challenge trial court's admission of statements by employees who allegedly played no

role in plaintiff's termination, and where, in one case, the statement refers to a different subject

matter with respect to a different employee who worked in a separate department). *See also,*

Bandera v. City of Quincy, 344 F.3d 47 (1st Cir. 2003) (upholding trial court's admission of co-worker's testimony regarding harassment she experienced, where defendant had challenged the testimony as irrelevant or, if relevant, unduly prejudicial due to its graphic nature). Here, Marshal Dichio's willingness to engage in retaliatory actions against Assistant Chief Durette after he states that he would testify truthfully in any EEO proceeding and again after he spoke with the plaintiff concerning further allegations of retaliatory conduct and, against Supervisory Deputy Bohn and Deputy Williams who have initiated their own EEO complaints, support or inference of impermissible considerations.

### C. Defendant Has Failed to Meet His Burden of Showing That the Marshals Service Would Have Reached the Same Decisions in the Absence of Discrimination

#### 1. Defendant Cannot Establish that Actions Were Taken For the Various Other Reasons Offered By Defendant

##### a) Manpower

Marshal Dichio defended his decisions to order the rotation of Deputies DeCaire and Williams to Boston, and to transfer Deputy DeCaire to Court Operations in Boston on the basis of manpower shortage. The record does not support this contention.

In the same period, Marshal Dichio used this identical justification to deny Deputy Williams' request to attend training (see also Ex. 56 (Marshal Dichio's notes from 2003 Standard Diary for January 14, 2003) even though the Worcester office was not short-staffed and the request was for a leave five months later. This fact suggests that Marshal Dichio had simply latched on to that excuse to support decisions he simply felt like making.

Defendant cannot establish that the manpower shortage was the true reason for the rotation here where: (1) there were no changes in staffing levels in the District; (2) the rotation was ordered by Marshal Dichio was on a weekly basis, not on an as needed basis; and (3) the

rotation also ended less than two weeks later without any net increase to the staffing of the Boston office.  See supra, at 40-41.   Finally, it can be inferred from Supervisory Deputy Bezanson's comments to Deputy Williams -- that he too had once been transferred as punishment and that she should "lay low" -- that even Supervisory Deputy Bezanson, who delivered the message regarding the manpower shortage did not believe that that was the true reason.  See supra, at 12.

Defendant also cannot establish that the manpower shortage was the true reason for Deputy DeCaire's assignment from Worcester to Court Operations in Boston since the assignment continued after the arrival in the District of four new deputies in March and April 2003.  See supra, at 41.

### b)  Experience, Seniority and Locality

Even if additional manpower was needed in Court Operations in Boston, this need does not does not explain why Deputies DeCaire and Williams were singled out for the various assignments.   Marshal Dichio has claimed that his guiding principle for moving people around were "seniority, job experience and locality."   TR, Vol. 7, at 30 (Dichio Testimony); Dichio Dep. TR, Volume 1, at 30; see also Revised Response to Trial Ex. 77, at 2 ("all my decisions are based on seniority, job performance and locality").   The record, however, shows that this principle was not adhered too.

With regard to the Worcester HIDTA position, Marshal Dichio did not consider seniority and experience at all.[28]  Both Deputies Williams and DeCaire were more experienced than Deputy Lewis, and had Marshal Dichio applied these criteria, either Deputy Williams, who had

---

[28] According to Chief Fallon, Marshal Dichio explained the decision by stating only that it was his decision and he made it.  Id. at 38. Chief Fallon does not know what Marshal Dichio's reasoning was at the time.  Id.

the greatest seniority, or Deputy DeCaire, who had more experience in investigations, would have been assigned to the HIDTA position.  Deputy Lewis' locality could still have been accommodated by assigning him the remaining position in general operations in Worcester.

At trial, Marshal Dichio claimed that the decision to select Deputies DeCaire and Williams for the rotation was because the women were the two junior deputies in the Worcester office.   TR, Vol. 7, at 3 (Dichio Testimony).   Deputy Mark Lewis, however, was junior to Deputies Williams and DeCaire, and accordingly, he should have been selected if this neutral criteria was used.

Defendant has contended that Deputy Lewis was not considered at all for the rotation by virtue of his assignment to the HIDTA Task Force.  Although he was on the HIDTA Task Force, in the past, the person in that position has supports courts when needed.  See supra at 40.  Moreover, no evidence has been presented of any operational need to keep the Worcester HIDTA position staffed at all in light of manpower problems, and indeed, prior to Mark Lewis' selection of the position, Assistant Chief Durette, Supervisory Deputy Bohn (the HIDTA Supervisor) and Supervisory Deputy Visalli (who was in charge of the Warrants Investigation unit at the time), recommended that the position not be filled until the new 082's arrived in the District.  See supra at 7-8.

Prior to trial, Marshal Dichio contended that all three deputies in Court Operations were involved, not just the two junior deputies, and that Deputy Wahl's assignment to cover Springfield and Deputies DeCaire and Williams' assignment to cover Boston was based on locality, with Deputy Wahl, who lived closer to Springfield, supporting that office.   See Ex. 78 (February 2003 e-mail response from Anthony Dichio to EEO counselor);  Ex. 72 (June 2003 Dichio Affidavit) (same); see also Agreed-Upon Facts, ¶ 29 (DUSM Wahl was not included in

- 71

the Boston rotation, but was designated to assist Springfield, as needed).   Given that the rotation

to Boston was a week to week assignment without regard to specific need in the Courts

(Agreed-Upon Facts, ¶¶ 29, 33), whereas the Springfield assignment was not a rotation, but an as

needed assignment (Agreed-Upon Facts, ¶ 29), and there was neither a need nor an assignment to

Springfield during this entire time (Agreed-Upon Facts, ¶ 36; see also TR, Vol. 7, at 62 (Dichio

Testimony) (there was no shortage of manpower in Springfield), the locality argument is not

credible.  Also, if location was the criteria used, Deputy Lewis, who resided in Berlin, should

have been included in some rotation as well.

   Marshal Dichio has claimed further that Deputy DeCaire was selected to fill the position

vacated by an 082 deputy in Court Operations in February 2003 because she was the junior

deputy.  Again, the record does not support this assertion.  There were deputies junior to Deputy

DeCaire in both the Worcester office and in the Warrants Investigations unit.  See supra, at 41-

42.

   In Worcester, the Deputy with the least seniority was Mark Lewis.  If the assignment had

been based on seniority, Deputy Lewis would have been transferred to Court Operations in

Boston, and Deputy DeCaire or Williams would have been assigned to the Worcester HIDTA

position.

   In Boston, not only were there deputies in the Warrants Investigations unit who were

junior to Deputy DeCaire, but one Deputy, Don Freeman, after learning that Deputy DeCaire

was assigned to the position vacated by the 082, even offered to switch places with her so that

she could return to the Warrants Investigation unit.  Marshal Dichio declined the offer.

Moreover, after additional deputies arrived in the district, deputies with less seniority were

permitted to move and stay in the Warrants Investigations unit while Deputy DeCaire was moved

back and forth between Court Operations in Boston and General Operations in Worcester.  See

supra, at 42.

Defendant also used seniority to explain Deputy DeCaire's swap with Deputy Williams

(rather than another Worcester deputy) when Deputy DeCaire was moved to Worcester after her

marriage.  TR, Vol. 1, at 85, 87 (DeCaire Testimony) (Supervisory Deputy Dunne also told

Deputy Decaire that she would be swapping positions with Deputy Williams because Deputy

Williams had less seniority than anyone else in the Worcester office).  At the time, however,

there were two Worcester deputies with less seniority than Deputy Williams – Mark Lewis, who

was assigned to the HIDTA Task Force in Worcester, and Sean Weddecke.  Corrected Trial Ex.

3; TR, Vol. 1, at 86 (DeCaire Testimony).   Yet neither of these two deputies was transferred to

Court Operations, and Deputy DeCaire was not placed in the HIDTA Task Force position.[29]

### c) Equal Opportunity

Defendant has also contended that Deputy DeCaire was not selected for either the Acting

Supervisor position or the Warrant Coordinator position because she had previously had an

opportunity to serve as Acting Supervisor, and Defendant sought to provide an equal opportunity

for others.  Once again, Defendant has not established that it would have reached the same result

based on the principle it is espousing.

At the time that Deputy Hodgkins was selected for the Acting Supervisor position, she

already had more experience than any other deputy – including Deputy DeCaire -- in the district

applying for promotional positions, and Marshal Dichio was aware that she already had made

two or three certification lists.  See supra, at 40-41.  Had Defendant acted in order to afford an

---

[29] "Locality" also weighed against Defendant's decision to transfer Deputy Williams' to Boston,
since at the time, she was building a house west of Worcester in Charlton.  TR, Vol. 1, at 87
(DeCaire Testimony).

equal opportunity to the deputies, Deputy Decaire, and not Deputy Hodgkins would have been placed in the position.[30]

Deputy Hodgkins was also permitted to remain in the position for more than 120 days. Had Defendant been interested in providing an "equal opportunity" for all, including Deputy DeCaire, it would have allowed Deputy DeCaire to work the additional days (which though less valuable, would still have had some value for Deputy DeCaire's promotional package), rather than leaving Deputy Hodgkins in the position, in violation of Marshals Service rules.

Defendant's contention that Deputy DeCaire was not selected for the warrant coordinator position in order to provide equal opportunity for all is also belied by the fact that Deputy Paul Sugrue has been permitted to remain in that position for over two years, and that he was returned to the Warrant Coordinator position after serving in a 120 day Acting Supervisory position.  See supra at 41.

Defendant is also unable to establish that it was motivated by principles of equal opportunity in light of the fact that Deputy Lewis – the junior, male deputy -- has been permitted to remain in the Worcester HIDTA position for over three years while Deputy DeCaire has been given no opportunity to serve in that position.

Finally, Defendant's demeanor in aiding other employees' careers, while ignoring Deputy DeCaire (see supra, at 41), establishes further that Defendant has not acted in the interest of equal opportunity.

---

[30] A more likely explanation of the selection of Alison Hodgkins (and the solicitation of Depities Hodgkins and Annette Lawlor for the position) is that Defendant was looking to cover-up its retaliatory and discriminatory conduct by selecting a woman for the position.

### d)  Deputy DeCaire's Relationship With Supervisory Deputy Bohn

Defendant has argued that Deputy DeCaire's assignments have also been based on her relationship with Supervisory Deputy Bohn and the need to avoid any impropriety or appearance of impropriety by having an individual supervise another employee with whom he has a personal relationship.  There is no dispute that Supervisory Deputy Bohn should not be Deputy DeCaire's direct supervisor.  But this finding does not justify Defendant's actions.

Supervisory Deputy Bohn has not been the HIDTA supervisor since March 11, 2003. The HIDTA position in Worcester is now supervised by Supervisory Deputy Bezanson. Accordingly, Deputy DeCaire's relationship with Supervisory Deputy Bohn does not explain or justify Defendant's decision not to rotate her into the Worcester HIDTA position at any time after that date.

Nor does the prohibition on direct supervision explain Defendant's actions in October 2003.  It is clear that once Supervisory Deputy Bohn was assigned to Court Operations, Marshal Dichio could no longer force Deputy DeCaire to remain in that unit as he had previously threatened.   But a concurrent decision was made to assign her to General Operations in Worcester, rather than to either the HIDTA position or to the Warrants Investigations unit.

With regard to the Warrants Investigations unit, Defendant argues that Deputy DeCaire should not be assigned to Boston at all because of the relationship.  Assuming, *arguendo*, that this broad rule should be the Marshals Services' policy, Defendant has not established that it was in fact the policy it was following at the time.  Upon her arrival to Worcester, and in response to whether the assignment was permanent, she was advised by Supervisory Deputy Bezanson that the assignment was what she made of it.  Such a comment makes no sense if the policy at the time precluded her assignment to Boston.  And then, just one month later, when she was placed on light duty, she was assigned back to Boston.  Moreover, the assignment was made to a

position under Supervisory Deputy Bohn's direct supervision.  Perhaps this was inadvertent as Defendant contends, but it then illustrates the completely cavalier attitude of the Defendant towards this rule.   See also TR, Vol. 6, at 54 (Fallon Testimony) (stating that he didn't "see how there could be an appearance of favoritism" from the control room assignment").

### e)  Pregnancy

Defendant asserts that Deputy DeCaire's assignment to the control room was the result of her pregnancy.   Deputy DeCaire's need for light duty was the result of her pregnancy, but the Defendant's made the determination to assign her to the control room to perform the light duty. The record shows that this assignment was not a neutral employment decision.

First, the assignment did not even comply with the limitations of Deputy DeCaire's work restrictions because it involved a work environment with excessive heat.  See supra, at __.

Second, other deputies assigned light work under Marshal Dichio have not been required to work in the control room.   See supra, at 44.

Third, Deputy DeCaire was not permitted to perform functions that she and others had previously performed while pregnant.  See supra, at 45.

Finally, Deputy DeCaire's supervisor's own treatment of the control room assignment as a punishment term for Deputy DeCaire also leads to the inference that this assignment was not simply based on her pregnancy.  When she objected to the initial assignment of two days in the control room in Boston, Chief Fallon told Deputy DeCaire that they were doing her a favor granting her limited duty, that they did not have to give her limited duty, and that if she did not agree to the letter, she could end up in the control room in Boston full-time five days a week. TR., vol. 1, at 92 (DeCaire Testimony); see also TR, Vol. 6, at 54 (Fallon Testimony) (stating that he didn't "see how there could be an appearance of favoritism" from the control room assignment").   Later, when Supervisory Deputy Bezanson got angry at Deputy DeCaire for

communicating with Chief Fallon regarding her collateral duties without copying him, he

punished her by not permitting her to work in Worcester the two days that had previously been

agreed to.   See Agreed Upon Facts, ¶ 84 (On January 21, 2004, Supervisory Deputy Bezanson

advised Deputy DeCaire that she would be working in the Boston office until further notice);

TR., vol. 1, at 104-05 (DeCaire Testimony) (This directive was made over the phone, while

Supervisory Deputy Bezanson yelling at Deputy DeCaire for not including him in the e-mail to

Chief Fallon).   Supervisory Deputy Hodgkins in turn limited Deputy DeCaire's ability to take

bathroom breaks, and admonished her when she could not comply with Supervisory Deputy

Hodgkins' limitations.  TR, Vol. 1, at 100 (DeCaire Testimony) (Deputy Decaire was not

pemitted to be relieved in the control room by a Court Security Officer, and could only be

relieved by an assigned replacement; on many occasions, her assigned relief was not available

when she needed to be relieved); TR, Vol. 1, at 101 (DeCaire Testimony) (if she left without

relief, she would be verbally reprimanded by Supervisory Deputy Hodgkins, and if another

deputy who was not assigned as her relief nonetheless relieved her, he or she would be verbally

reprimanded).

### 2. Defendant Cannot Avoid Liability On the Theory That Marshal Dichio Was Entitled to Follow the Recommendations of His Chief or Assistant Chief Deputy

#### a) Many of the Decisions Were Made by Marshal Dichio Without Recommendations from His Managers

As detailed in sections I.E. above (pp. 46-58),  Marshal Dichio micromanaged personnel

issues in the District, and Marshal Dichio clearly made the vast majority of decisions at issue

here on his own.

b) **To the Extent that the Managers Made Recommendations, The Were Made in the Context of a System of Loyalty Towards the Marshal**

Assistant Chief Durette advised Marshal Dichio that he would tell the truth in an EEO investigation, and he was quickly and unceremoniously forced out of his position. While Acting Chief Dimmitt and Chief Fallon may or may not have been aware of those specific details of Marshal Dichio's conversations with Assistant Chief Durette, they must have had a suspicion as to what had happened. They had to have understood that their loyalty to the Marshal was critical to their own survival, and that their job was to protect and defend him, or in Chief Dimmitt's words, to be "loyal to the chair."[31] This they did. On this record, the recommendations of those

---

[31] In Acting Chief Dimmitt's view, deputies owed "loyalty to the chair" of the United States Marshal, and he advised them not to take on the Marshal or the Marshal Service. TR, Vol. 4, at 84-85 (Dimmitt Testimony) (Acting Chief Dimmitt held a meeting with the Court Operations personnel to address issues including attitude, his philosophy, and the importance of deputies' reputation); TR, Vol. 4, at 121-22 (Dimmitt Testimony) ("Loyalty to the chair" is a common term used by Acting Chief Dimmitt, and he would not disagree if someone contended that he had used that term in that meeting); TR, Vol. 1, at 72-74 (DeCaire Testimony) (Acting Chief Dimmitt advised deputies in Court Operations in Boston, including Deputy DeCaire, that Marshals are appointed by the President of the United States, that deputies needed "to be loyal to the chair," that people should not take on the Marshals Service, that the Marshals Service had been here long before the deputies were here, that it would be here long after they were gone, that deputies' reputations were important to her career, and that he was looking for a few individuals to change their attitude; see also TR, Vol. 4, at 96 (Dimmitt Testimony) (Acting Chief Dimmitt probably said to Supervisory Deputy Bohn that Marshals are appointed by Presidents, and that we have to be loyal to the Marshals"); TR, Vol. 2, at 39 (Bohn Testimony) (Acting Chief Dimmitt advised Supervisory Deputy Bohn that it was not worth keeping notes on his conversation with Marshal Dichio in which he was instructed to shred documents; when Supervisory Deputy Bohn informed Acting Chief Dimmitt that he believed that he was being treated unfairly because of Deputy DeCaire's EEO Complaint, giving as examples that the Marshal would no longer acknowledge him the same way he had prior to the filing of the complaint, and that Deputy Leo Rosette had been asked to attend the HIDTA committee meeting, Acting Chief Dimmitt responded that Supervisory Deputy Bohn "was not Teflon coated yet," that "you have to pick battles you can win," and that "you can't win this battle"); TR, Vol. 2, at 43-44, 48-49 (Bohn Testimony) (on his last day in the District, Acting Chief Dimmitt advised Supervisory Deputy Bohn that "we cannot change this system," and that "as bad as these guys are" (pointing across to the Marshal's office), "we have to live with them" that "[s]hort of him doing anything illegal, I have to support that position"); TR, vol. 4, at 96 (Dimmitt Testimony) (Acting Chief Dimmitt conceded that he probably said something to the

managers cannot be viewed as independent judgments and intervening events.

### c) To the Extent that the Managers Made Recommendations Based Upon Their Independent View That Deputy DeCaire was a Complainer or Did Not Have an Appropriate Attitude, the Managers Have Themselves Engaged In Prohibited Retaliation

It is clear from the record that Deputy DeCaire had a significant number of complaints about her assignments and working conditions.  See supra, at 45.  It is also clear from the record that both Acting Chief Dimmitt and Chief Fallon were critical of complainers, and considered employee's attitude a factor in their decisionmaking.  See Supra at 45.[32]

To the extent that Acting Chief Dimmitt and Chief Fallon based their recommendations on their negative view of Deputy DeCaire's complaining, they themselves have engaged in impermissible retaliation because her activity at no time "went beyond the pale of reasonable opposition activity."  Hochstadt v. Worcester Foundation for Experimental Biology, 545 F.2d

---

effect of "we have to live with system and we have to live with these guys" to Supervisory Deputy Bohn).

[32] Indeed, throughout his tenure, Chief Fallon has permitted Supervisors to ridicule employees who have complained of Marshal Dichio's unlawful actions.   See Ex. 37 (12/12/03 E-mail from Supervisory Deputy Bezanson upon learning that Supervisory Deputy Bohn had filed an OSHA, stating "Enough already!!!  Send both of them home.  NO more light duty.  THEY are just going to keep attacking…");  Ex. 47 (2/5/04 E-mail from Supervisory Deputy Hodgkins ridiculing Deputies Williams and DeCaire and Supervisory Deputy Bohn, with Supervisory Deputy Bezanson's reply ("It did not take you long to identify the BS problems, no names needed . . . . keep laughing it's the only way to get through it"); Ex. 46 (2/5/04 E-mail from Supervisory Deputy Bezanson forwarding Supervisory Deputy Hodgkin's e-mail, and noting that "[t]his is a classic and I know you guys will get a laugh . . ."); Ex. 48 (2/6/04 e-mail from Supervisory Deputy Hodgkins to Assistant Chief Taylor entitled "Bohnbarded!!, and stating "How DAR you leave me alone with these Bohnbadiers!!?"); Ex. 51 (3/5/04 E-mail from Supervisory Bezanson forwarding to numerous people Supervisory Deputy Bohn's request to work from Worcester during the last two weeks of Deputy Decaire's pregnancy, with the line "THIS is ridiculous ! ! ! ! ! !  It never ends.  Why is this guy still here???????????"); Ex. 74 (6/7/04 e-mail from Supervisory Deputy Bezanson to Assistant Chief Taylor asking why Supervisory Deputy Bohn was approved for certain skills training and asking "Is this part of his physical therapy . . . .Please make it end").

222, 230 (1st Cir. 1976). In <u>Hochstadt</u>, the court explained that Title VII "clearly does protect an employee against [retaliatory action] for filing complaints in good faith before federal and state agencies and for registering grievances through channels appropriate in the particular employment setting." <u>Id.</u> at 231. The court considered, however, the extent that "on-the-job opposition to alleged discrimination, vociferousness, expressions of hostility to an employer or superior and the like, are protected." <u>Id.</u> It concluded that such instances require courts to balance the purpose of Title VII against an employers' prerogatives in selecting and controlling personnel, using a "rule of reason" applied to the facts, asking the question, "of whether plaintiff went 'too far' in her particular employment setting." <u>Id.</u>

Here, there are no allegations, let alone any evidence, that plaintiff "went too far," in her opposition. She is not accused of engaging in any conduct "deliberately calculated to inflict needless . . . hardship on the employer," or in any "stall-in" or other interference with work, or of committing any "unloyalty" to her office (other than the perceived disloyalty of bringing this complaint), or even of "making constant complaints to colleagues." Compare <u>id.</u> at 232-34 and cases cited therein. Although she has raised a considerable number of complaints, these do not reflect repeated griping about a single action, but rather, her appropriate registering of grievances through appropriate channels in opposition to the myriad retaliatory employment actions she has been forced to endure.

Courts have noted, moreover, that employer's cannot hide retaliatory intent behind such words as "disloyalty" or "loss of trust" unless the reason given can stand independently from the employee's protected activity. See <u>e.g.</u> <u>Equal Employment Opportunity Commission v. Crown Zellerbach Corp.</u>, 720 F.2d 1008, 1114-16 (9th Cir. 1983) (noting that almost every form of "opposition to an unlawful employment practice is in some sense 'disloyal' to the employer,

since it entails a disagreement with the employer's views and a challenge to the employer's policies," and stressing that a retaliation claim can be denied based on such assertion where the employee's protest activities "significantly disrupted the workplace" or "directly hindered his or her job performance"); Jennings v. Tinley Park Community Consolidated Sch. Dist., 796 F.2d 962, 968 (7th Cir. 1986) (following Crown Zellerbach, and rejecting employer's contention that its "loss of trust" in an employee provides a sufficient justification for the adverse action); Paul v. Cohen, 1998 WL 351581, *5 (D. Conn. 1998) (the decisive question is whether a reasonable factfinder could conclude that the reason offered by the government for the adverse employment action "was legitimate, i.e. a result of the plaintiff's disruptive behavior independent from her complaint" of discriminatory conduct"). Here, Defendant can point to no disloyalty or bad attitude that has hindered Deputy DeCaire's performance or disrupted the workplace beyond the protected opposition to unlawful practices.

## III.    THE COURT SHOULD GRANT EQUITABLE RELIEF

The parties have bifurcated this matter, and are seeking the Court's determination on liability, with the issue of damages reserved for a jury trial.

Plaintiff's Amended Complaint also sought equitable relief. In enacting Title VII, "Congress took care to arm the courts with full equitable powers." Albemarle Paper Co., 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). "[W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." Id. (quoting Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946). Where discrimination is concerned, "'the (district) court has not merely the power but the duty to render a decree which will so far a possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'" Id. (quoting Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965)).

First, in order to prevent further harm to Deputy DeCaire's career and to begin to repair the damage that has been done, the Court should order Defendant to cease its retaliatory conduct. For 2 ½ years, Deputy DeCaire has patiently followed the required EEO procedures, and has properly pursued this matter through trial. The retaliatory actions have not abated throughout this time, and on this record, Plaintiff is entitled to an order prohibiting Defendant from engaging in further discriminatory or retaliatory conduct. See Brown v. Trustees of Boston Univ., 891 F.2d 337, 361 (1st Cir.), cert. denied, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990) (upholding portion of injunction protecting plaintiff from further instances of sex discrimination or retaliation).

Second, in fashioning relief for victims of employment discrimination, the aim is "'to make the victims of unlawful discrimination whole" by restoring them, "so far as possible . . . to a position where they would have been were it not for the unlawful discrimination."'" Ford Motor Co. v. E.E.O.C., 458 U.S. 219, 230, 102 S.Ct. 3057, 3064-65, 73 L.Ed.2d 721 (1982) (quoting Albemarle Paper Co., supra, 422 U.S. at 421, 95 S.Ct. at 2373). Thus, in order to attempt to repair the lack of opportunity for experiences of value in her promotional package, and to provide Deputy DeCaire the opportunity to engage again in investigative work, Defendant should be directed to place Deputy DeCaire in the HIDTA Task Force position in the Worcester office. Such an order is appropriate in order to repair the loss to Plaintiff of her promotional potential. See Harrison v. Dole, 643 F.Supp. 794 (D.C. D.C. 1986) (having improperly denied plaintiff a GS-9 position with GS-11 potential, government was requiring to move employee from her current GS-9 position (which had no GS-11 potential) to a different GS-9 position that did have GS-11 potential).

## IV.    CONCLUSION

For all of the foregoing reasons, the Court should find Defendant liable for its actions

gender discrimination and unlawful retaliation towards Deputy DeCaire.  The Court should

enjoin Defendant from further retaliatory and discriminatory conduct against Deputy DeCaire,

and should place her in the HIDTA Task Force position in the Worcester office.  The Court

should also set a date for a trial on damages.

Respectfully submitted,

**CYNTHIA A. DeCAIRE**,

By her attorney,

_____ /s/  Indira Talwani _____
Indira Talwani
**SEGAL, ROITMAN & COLEMAN**
11 Beacon Street
Suite #500
Boston, MA  02108
(617) 742-0208

Dated:  September 1, 2005