UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                             )
CYNTHIA A. DECAIRE           )
                             )
         Plaintiff,          )
                             )
         v.                  )
                             )
ALBERTO R. GONZALES          )   CIVIL ACTION
in his official position as  )   NO. 04-10593-WGY
Attorney General of the      )
United States,               )
                             )
         Defendant.          )
                             )
```

MEMORANDUM AND ORDER

YOUNG, D.J.                          February 23, 2007

## I.    INTRODUCTION AND PRIOR PROCEEDINGS

The plaintiff, Cynthia DeCaire ("DeCaire") filed a complaint against John D. Ashcroft, in his official position as Attorney General of the United States (the "Government") on March 26, 2004 under section 717 of the 1964 Civil Rights Act, as amended, 42 U.S.C. §§ 2000e-16 and 2000e-3, for gender discrimination and retaliation by Anthony Dichio ("Dichio"), the United States Marshal for the District of Massachusetts.  Compl. and Demand for Jury Trial [Doc. No. 1].  The Government filed an Answer on July 7, 2004 [Doc. No. 5].  DeCaire amended her complaint on July 7, 2004.  First Am. Compl. ("Pl.'s First. Am. Compl.") [Doc. No. 6]. The Government filed an amended answer on April 5, 2005 ("Def.'s

Am. Answer") [Doc. No. 25].

On that same day, the Government filed a motion for summary judgment [Doc. No. 26] as to DeCaire's discrimination and retaliation claims.  DeCaire filed a cross-motion for partial summary judgment as to the exhaustion of administrative remedies and the preclusion of any of DeCaire's claims. [Doc. No. 27]. DeCaire filed a memorandum in support of the motion and exhibits, on April 16, 2005 [Doc. Nos. 28-30], and filed additional exhibits on April 25, 2005 [Doc. No. 35].   DeCaire filed an opposition to the Government's summary judgment motion on April 18, 2005 [Doc. No. 31], with the Government filing its own opposition on May 2, 2005 [Doc. No. 37].  The Court allowed DeCaire's motion for partial summary judgment, ruling that the Government waived the defense of exhaustion of administrative remedies by failing to raise it in either its answer or amended answer.  The Court denied the Government's motion on that same day.

On May 12, 2005, in light of the fact that Alberto R. Gonzales had replaced John Ashcroft as Attorney General of the United States, this Court granted the motion to substitute a party. [Doc. No. 36].  The parties filed a joint pretrial memorandum on May 12, 2005 [Doc. No. 38].  Subsequently, various evidentiary and discovery matters came before this Court [Doc. Nos. 42, 43, 46-47, 60-61, 64-65].  Additional and amended

2

"agreed-upon" facts were submitted by DeCaire ("Joint Statement of Facts") [Doc. Nos. 49-50, 56], and trial briefs were filed by the Government [Doc. Nos. 51, 53].

An eight-day jury-waived trial commenced on June 2, 2005.[1] Closing arguments were held on July 27, 2005,[2] at which point the Court took this matter under advisement.  DeCaire subsequently filed Proposed Findings of Fact with this Court. [Doc. No. 75, 77].

## II.  FINDINGS OF FACT

### A.    Agreed-Upon Facts

This Court accepts the following facts filed in the parties' Joint Statement of Facts.  The entry-level position in the United States Marshal's office is the "082" position.  Joint Statement of Facts at ¶ 1.  The Criminal Investigator Deputy United States Marshal position is the "1811" position, which is "more advanced" than "082" status.  Id. ¶¶ 2-3.  Deputies are assigned permanent

---

[1]Dichio filed a motion to intervene on June 1, 2005.  At several sidebar conferences, this Court explained to counsel for the Government that counsel representing Dichio in his individual capacity was to be invited to appear should he so desire, including during closing arguments.  Tr. of 6/2/05 at 3:18-23, 6:2-16; Tr. of 6/14/05 at 137:14-21.  Counsel did not appear.

[2]Given that DeCaire elected to proceed jury-waived, counsel agreed to conduct this bench trial around the Court's jury trial schedule.  Actual trial days were June 2-3, 5, 13-16, 2005 [Doc. Nos. 66-72], with closing arguments held on July 27, 2005 [Doc. No. 76].

duty stations within their district and "may be temporarily detailed to other duty stations inside and outside of the district." Id. ¶¶ 4, 7.

DeCaire has been employed by the United States Marshals' Service since June of 1991. Id. ¶ 7. From June of 1991 to August of 2002, with the exception of one Worcester assignment, her duty station had been Boston. Id. ¶ 17. DeCaire has had an exemplary and "successful career" with the Marshal's service, during which time she has sought career advancement. Id. ¶¶ 8, 14. She began as an 082, id. ¶ 7, and was promoted to an 1811 (Grade 11) position in December 1993. Id. ¶ 9. Three years later, she advanced to a Senior Criminal Investigator Deputy 1811 (Grade 12) position. Id. ¶ 11. DeCaire was assigned to the Warrant Investigations Unit in December 1999, id. ¶ 12, and later became an Acting Supervisory Criminal Investigator in Worcester. Id. ¶ 13. Upon completion of this position, she returned to Boston where she was Team Leader of the Warrant Investigations unit. Id. ¶ 14. Subsequently, she "made the certification list for a promotional position in the Electronic Surveillance unit." Id. ¶ 16.

Dichio was appointed as United States Marshal for the District of Massachusetts by President George Bush and was sworn in on August 6, 2002. Id. ¶ 18. There was, at the time, a "manpower shortage in the District, and in particular, in Court

4

Operations." Id. ¶ 19 (noting that this shortage "was covered on
an as-needed basis primarily by the Warrant Investigations Unit
or by hiring guards.") (internal quotation marks omitted).  A
position with the High Intensity Drug Trafficking Area ("HIDTA")
Task Force became available in September 2002.  DeCaire, along
with deputy Susan Williams ("Williams"), a deputy more senior to
DeCaire, and deputy Mark Lewis ("Lewis"), a deputy junior to
DeCaire, were interested in the position.  Id. ¶ 21.  Deputies
were not happy with, and complained about, the appointment of
Lewis to the Worcester HIDTA position.  Id. ¶ 22.  DeCaire was
reassigned to the Worcester office at the end of that month,  id.
¶ 23, while "Deputy Marshal Steve McKearney - who had originally
been transferred to Worcester for disciplinary reasons prior to
Marshal Dichio's arrival in the District - was transferred to . .
. DeCaire's position in the Warrant Investigations unit."  Id. ¶
24.   Both were given three work days notice of the transfer.
Id.¶ 26.  The Form SF50, normally issued at the time of formal
transfers, was not completed in either of the transfers.   Id. ¶¶
4, 25.

A few months later, in January 2003, Dichio decided to
rotate Williams and DeCaire to Boston, despite the fact that
Lewis was the junior deputy in Worcester and his duty station was
Boston.  Id. ¶¶ 26, 27.  Again, this rotational transfer was not
accompanied by a Form SF50.  Id. ¶ 37.  On the first day of the

rotation, January 23, 2003, DeCaire "called in sick . . . [and] initiated EEO counseling." Id. ¶¶ 31-32. The next day, "Assistant Chief Paul Durette ("Durette") modified Supervisory Deputy [Tom] Bezanson's directive, instructing him that assignments to Boston were to be made only as needed." Id. ¶ 33. The following week, from January 27-31, 2003, DeCaire was on pre-approved leave. Id. ¶ 34. She was told by Bezanson "to report to Worcester instead of Boston on February 3, 2003, and for that reason she did not work in Boston on that day." Id. ¶ 35.

Dichio, without discussing the appointment with Durette, the assistant chief, again without a Form SF50, appointed DeCaire to the Boston 082 Court Operations position. Id. ¶¶ 38, 39, 41. "At the time of this reassignment, there were deputies with less seniority than Deputy Marshal DeCaire assigned to the Worcester office, and to [the] Warrant Investigations Unit in Boston." Id. ¶ 40.

On February 5, 2003 Bezanson forwarded Dichio, Dave Taylor, and Paul Dunne -- DeCaire's supervisor at the time -- information about the EEO complaint filed by DeCaire. Id. ¶¶ 44, 45. On February 14, 2003, DeCaire was granted a "Notice of Right to File a Discrimination Complaint." Id. ¶ 46. On May 11, 2003, Supervisory Deputy Jeff Bohn was removed from his position as head of the HIDTA Task Force. Id. ¶ 49.

DeCaire remained assigned to the Boston Court Operations

despite the arrival of three new 082s from the academy. Id. ¶ 50.
Deputy Marshal Kimball, who had less seniority than did DeCaire,
was transferred from Court Operations to the Warrant
Investigations Unit in mid-March of 2003. Id. ¶ 51. About this
time, Acting Chief Dimmitt removed Assistant Chief Durette from
an office space into an administrative cubicle. Id. ¶ 52. The
following month, the Acting Supervisory Deputy position left
vacant by Walter Doherty's departure "was not announced for
competitive selection." Id. ¶ 53.

Durette left the Marshal's Service in April of 2003. At
about this time, DeCaire indicated her interest in the Acting
Supervisor Court Operations position, for which Dimmitt had
sought out a female deputy. Id. ¶¶ 54-56. Deputy Marshal Alison
Hodgkins was chosen to fill the position. Id. ¶ 58. Other
changes were made in the Marshal's Service at this time: Paul
Sugrue was assigned to the Warrant Coordinator position, David
Taylor ("Taylor") was assigned to be the Acting Assistant Chief
Deputy Marshal, and William Fallon was assigned to be the Chief
Deputy United States Marshal. Id. ¶¶ 58-59. DeCaire asked to be
considered for the Court Operation supervisor position in August
of 2003, and "noted that it had been 120 days since her prior
request." Id. ¶ 61. Though "[a]cting Supervisory Deputy Marshal
positions that are not announced for competitive selection are
designated not to exceed 120 days . . . Deputy Marshal [Allison]

7

Hodgkins was permitted to remain in the Acting Supervisory position for more than 120 days." Id. ¶¶ 62-63. Taylor sought out a female Deputy Marshal to fill the position sought by DeCaire. Another female, Annette Lawlor, indicated she had no interest in the position. Hodgkins remained in the position until the position was eliminated. Id. ¶ 64.

In October 2003, Paul Dunne and Jeff Bohn were assigned as Court Operations Supervisors. Following her marriage to Bohn on October 10, 2003, DeCaire was transferred to Worcester on October 14, 2003. Id. ¶¶ 68-69, 72. There were deputies assigned to the Warrant Investigations Unit who were junior to DeCaire. Id. ¶ 70. A specific example is Deputy Marshal Kevin Donahue, who was assigned as Warrant Coordinator despite the fact that DeCaire had more seniority than he did. Id. ¶¶ 66-67. Bohn did not oversee the Warrant Investigations Unit. Id. ¶ 71. When she inquired as to the nature of the Worcester transfer, Bezanson told her it "was what she made of it". Id. ¶ 73 (internal quotation and alteration marks omitted).

DeCaire, from October 21 to November 12, 2003, took part in a merit promotion announcement. Id. ¶ 75. On October 28, 2003, Bezanson informed Chief Fallon that DeCaire was four months pregnant and, as a result, requesting light duty status. Id. ¶ 74. For two weeks thereafter, DeCaire worked in Worcester and her responsibilities included service of process, warrant

8

investigation, and administrative duties. <u>Id.</u> ¶ 76.  Bezanson
informed DeCaire that he would "try to find work for her in
Worcester so that she would not end up in the Boston control
room." <u>Id.</u>  On November 14, 2003, DeCaire was told that her
light duty would include work in Worcester on Mondays and
Fridays, in the Boston control room on Tuesdays and Thursdays,
and Springfield on Wednesdays. <u>Id.</u> ¶ 77.  DeCaire objected to
the assignment, and also raised the issue of "possible side
effects the electronic[] equipment may have on a developing
baby," but reported for duty when told she would have to go out
on sick leave if she did not wish to complete the duties. <u>Id.</u> ¶¶
77-78.  Thereafter, the Springfield assignment was removed, and
DeCaire was to report to Boston Tuesday, Wednesday, and Thursday.
<u>Id.</u> 78.  Deputy Bohn, who supervised the control room at this
time and who filed an OSHA complaint as to the control room, was
removed from his position on that day. <u>Id.</u> ¶¶ 79-81.
Supervisory Deputy Marshal Dunne asked DeCaire what other work
she was capable of doing, and when she described the functions
she performed during her first maternity leave he indicated he
would attempt to allow her to serve process. <u>Id.</u> ¶ 82.  DeCaire,
however, remained in the control room.

In mid-January 2004, several changes took place in the
Marshals' Service, including the selection of Taylor as Permanent
Assistant Chief Deputy Marshal, Allison Hodgkins's promotion to

supervisory status in Court Operations, and Paul Dunne's assignment to Supervisory Deputy of Warrants.  <u>Id.</u> ¶ 83.  DeCaire was informed that she would continue to serve her light duty in Boston until told otherwise.  <u>Id.</u> ¶ 84.  In late January of 2004, DeCaire applied to be considered for the Department of Justice Worklife program so that she could serve in Worcester during the remainder of her pregnancy.  <u>Id.</u> ¶ 85.  This request was denied in late February.  <u>Id.</u>

The parties stipulate that "[s]ince August 2002, Deputy Marshal DeCaire is the only deputy whose assigned duty station has moved so many times."  <u>Id.</u> ¶ 86.  On July 20, 2004 the assignment policy was amended to provide that "assignments, including the Worcester HIDTA assignment, will be evaluated in six months with the possibility of a rotation at that time."  <u>Id.</u> ¶ 87.  Even with such possibility for rotation, Deputy Lewis continues to serve in the Worcester HIDTA position – a position he has held since September 2002 -  and Paul Sugrue continues to serve as Warrant Coordinator - a position he has held since April 2003. <u>Id.</u> ¶¶ 88-89.

**B.    Findings of Fact Made by the Court**

This case is extraordinarily fact-intensive, the Court's ultimate decision resting on nuanced inferences derived from facts in turn drawn from vigorously disputed evidence. Without indicating any reservation concerning the ultimate result (given

10

the fair preponderance of the evidence standard), this is a close case.

At the outset, the Court makes certain credibility findings that color the factual recitation that follows:

- DeCaire is an exemplary Deputy United States Marshal with a spotless record and, at the time of the trial, thirteen years experience in the District of Massachusetts.  The Court finds her credible in virtually every respect (although it does not draw all her inferences from certain of her experiences).

- In contrast, the credibility of Dichio, the former United States Marshal for the District of Massachusetts, is extremely suspect.

- The Court does not accept as credible the entirety of the testimony of Detective Joseph Cummings.

- The Court finds credible the entirety of the testimony of former United States Marshal Nancy McGillveray.

The Court's ultimate findings are best understood as a timeline, interpolating the facts already agreed upon with those found by the Court.

| June 1991 – September 2002 | DeCaire is hired as a Criminal Investigator Deputy United States Marshall assigned to District of Massachusetts. Boston, MA |
| 1996 - 1998 | DeCaire serves as a Senior Investigator in the FBI Violent Fugitive Task Force. Boston, MA |
| 1999 - 2001 | DeCaire serves as a Permanent Warrant Investigations. Boston, MA |
| June 2001 | DeCaire serves as an Acting Supervisor in Worcester, MA, for which she receives a Superior Accomplishment award. |
| September 2001 | DeCaire serves in the Warrants Investigation Unit, in Boston, MA, as one of two Team Leaders. |

11

| August 2002 | Anthony Dichio is sworn in as U.S. Marshal for the District of Massachusetts. Dichio arrives under something of a cloud, criticized in the press for his lack of executive experience (though he is experienced in executive security) and well aware that the judges of this District had written the President and requested the retention of the former United States Marshal.  Even before his arrival, Dichio was reaching out to deputies in this District to gauge their level of personal support for him. |
|---|---|
| August 2002 | Once installed as Marshal, Dichio promptly undertakes a personnel review of his deputies as this, he believes, is one way  quickly to demonstrate his authority over the office.  Over the objection of Chief Deputy Marshal Timothy Bane, Dichio reassigns Deputy Stephen McKearney from Worcester to Boston. A one-on-one interview (what the Government calls a "conversation"), takes place between Dichio and DeCaire.  During this interview, Dichio asks DeCaire about her marital and parental status, inquiring as to "why she did not want to work in Worcester and be closer to her daughter" and indicating "that her first priority should be being close to home in case her daughter needed her." DeCaire was then a single mother living in Westborough with Jeff Bohn, the Supervisory Deputy of HIDTA. |

| Soon after interview. | An Investigative Position on HIDTA opens up in Worcester, MA. DeCaire emails Dichio her qualifications and interest in the position. Williams, another female deputy, with more experience and then serving in Worcester, also wants to be considered. Mark Lewis, a less senior deputy with no investigative experience is the third applicant.  Although Dichio does not know Lewis personally, Dichio's wife is a friend of the Lewis Family.  Before making the appointment, Dichio seeks Bane's advice. <u>See, e.g.,</u> Tr. of 6/15/05 at 97:14-17 (noting that he discussed Lewis's assignment to Worcester with Tim Bane just prior to the assignment) (Testimony of Marshal Anthony Dichio). Dichio properly has ruled out DeCaire as Bohn would be then be the supervisor of a deputy with whom he had a personal relationship.  Bane, once burned by being overridden with respect to the McKearney transfer, makes no demur when Dichio expresses a preference for Lewis, the least experienced deputy.  Lewis is selected,[3] an appointment that rankles Bohn and many deputies on HIDTA and throughout the Marshal's office. |
|---|---|
| September 3, 2003 | DeCaire sends an email to her then-supervisor, Bane, with a copy to Dichio, and asserts that "the office" is taking a "sexist" view in refusing to permit her to take the investigative position in Worcester. |
| Following the incident | Dichio calls DeCaire into his office, expresses anger that others in the office are questioning his decision to appoint Lewis and blames DeCaire for the opposition in the office. He then says that he is going to transfer DeCaire to the non-investigative position in Worcester, opened up by bringing McKearney back to Boston. |
| September 30, 2002 to January 25, 2003 | DeCaire is assigned to full-time non-investigative position in Worcester. Dichio initially transfers DeCaire not to punish her (that motivation comes later) but due to stereotypical views regarding gender roles and child rearing.  In short, DeCaire's initial transfer is due to gender bias. As DeCaire acknowledges, due to her failure timely to file a complaint with regard to this initial transfer, Dichio's discriminatory act against DeCaire based on her gender may be considered <u>only</u> as it relates to her retaliation claim. |

---

[3]In fairness to Lewis, however he got the job, he apparently has proved a perfectly satisfactory HIDTA deputy.

| January 2003 | Due to a shortage of personnel DeCaire and Williams are assigned to rotate to Boston to help out.  Only DeCaire and Williams (female deputies and single parents who both later filed grievances) are so assigned for Boston Court Operations.  Out of the four available deputies, who normally would all rotate, these two were the only two assigned despite the usual rotation of all deputies. The other two are male employees, one a married parent and the other with no children. |
|---|---|
| January 23, 2003 | DeCaire and Williams file a complaint with the Marshal Services' Labor Relations Office.  In that complaint, DeCaire objects (1.) to Dichio's questioning her about her parental status and personal life during their one-on-one meeting, (2.) to his decision to transfer a junior male employee to the investigative position in Worcester, (3.) to his decision to transfer her from her Team Leader position in the Warrants unit in Boston to the non-leadership, non-investigative position in Worcester, and (4.) to the decision to assign her to the rotational assignment in Court Operations in Boston.[4] |
| January 23, 2003 | DeCaire requests a meeting with and speaks to an EEO counselor regarding her interview with Dichio, the transfer from an investigative to a non-investigative position, and the rotational assignment to court operation in Boston. |
| January 24, 2003 | Williams notifies Assistant Chief Deputy U.S. Marshal Paul Durette that she and DeCaire are filing a grievance and an EEO complaint regarding the treatment they received from Dichio and Bezanson.  Durette told Dichio of such filings and complaints that same day advising him to approve Williams' request to attend the conference, stating that "that will take care of one of them." |
| On or about January 2003 | After Durette spoke with DeCaire about her complaint, Dichio speaks with Durette and makes clear that he expects loyalty from Durette and needs Durette to 'back' him.  Durette indicates he would simply tell the truth. Shortly thereafter Durette is removed from the chain of command, because Dichio concludes Durette cannot be trusted. |

[4]Williams objected to her own one-on-one meeting with Dichio because he denied her permission to attend the International Association of Women Police conference and assigned her the rotational Boston court operations assignment.  First Am. Compl. at 8.

| January 28, 2003 | Dichio and David Taylor travel to the Worcester sub-office and has a meeting with Bezanson telling him no longer to rotate DeCaire and Williams. Instead, DeCaire is to be assigned to Boston operations. |
|---|---|
| Shortly thereafter | Williams drops her complaint and, at a later date, leaves the Marshals' Service. |
| On or about February 3, 2003 | DeCaire is informed that she is being transferred to Court Operations in Boston. She is notified through a district-wide email, indicating that despite her tenure of more than 11 years and the fact that other junior deputies living closer to Boston existed, she would be filling the position vacated by a series 082 Deputy, in other words an entry-level position below the 1811 criminal investigator position she held.<br><br>DeCaire's new supervisor is unaware of her transfer, and DeCaire is told, contrary to customary practice, to leave the government vehicle she had been assigned in Worcester and make her own way home on February 3 and her own way to Boston on February 4. |
| Week of February 24, 2003 | Dichio encounters Brockton Police Detective Joseph Cummings ("Cummings"), a member of the HIDTA force. Cummings, who then considered himself a friend and supporter of Dichio's, inquires about Bohn and the future of the HIDTA task force. Dichio gives an equivocal answer. |
| March 17, 2003 | An opening occurs in the Boston Warrants unit. Dichio knows that DeCaire is interested in the position. Deputy U.S. Marshall Scott Kimball is assigned from court operations to Warrants. Though senior to Kimball, DeCaire remains in court operations. |
| March 17, 2003 | Acting Chief Deputy U.S. Marshal Dimmitt (replacing Bane, who has left) holds a meeting with new entry-level marshals, or 082's. He warns the deputy U.S. Marshals "not to take on the U.S. Marshals' Service." |
| April 21, 2003 | DeCaire finds out that Supervisory Deputy Marshal Walter Doherty is leaving his Court Operations Supervisor position. Usually, notice is given regarding the opening of a position but none is given here. Nevertheless, DeCaire expresses interest to Dichio and Dimmitt. Neither responds to her email or discusses the open position with her. |

| April 23, 2003 | DeCaire follows up to her email and again emails Dichio and Dimmitt, asking them to consider her for the position of Warrant Coordinator if such position becomes available. DeCaire received no response to her request. Nor does she ever receive information as to why she was not chosen. |
|---|---|
| April 28, 2003 | Deputy Marshal Sugrue, who had not indicated an interest in the position, is assigned to the Warrants Coordinator position. |
| August 21, 2003 | By email, DeCaire indicates her interest in the position of Acting Supervisor of Court Operations to Assistant Chief David Taylor. Taylor tells her he will forward her request, but never receives any response. |
| September 23, 2003 | Another female deputy, Alison Hodgkins, who had never expressed interest in the position is approached and asked to fill the position of Acting Supervisor of Court Operations. |
| September 29, 2003 or October 2003 | Deputy United States Marshal Kevin Donahue is assigned to the Warrant Coordinator position, despite the fact he had not indicated interest. |
| October 14, 2003 | Marshals' Service management in the learns that DeCaire has married Bohn.  DeCaire is immediately transferred to the Worcester office, and told to report there within hours. |
| A few days after November 14, 2003 | DeCaire, now pregnant, was warned further that her limited duty status could be revoked. |
| November 20, 2003 | DeCaire, despite being pregnant, is assigned to the control room in the Federal Courthouse in Boston. She complains that the room is "overly heated" "with limited bathroom breaks."  During the time that DeCaire continues to be assigned to the control room, another male Deputy United States Marshal is permitted to continue working in Worcester while on limited duty. |
| March 26, 2004 | DeCaire filed her complaint in the United States District Court. |

## III.  RULINGS OF LAW

### A. Gender Discrimination

Section 2000e-16 provides, in pertinent part:

(a) Discriminatory practices prohibited; employees or applicants for employment subject to coverage.
<u>All personnel actions affecting employees</u> or applicants for employment . . . in executive agencies . . . shall be made <u>free from any discrimination based on</u> race, color, religion, <u>sex</u> or national origin.

42 U.S.C. § 2000e-16, Pub. L. 88-352. (1998) (emphasis added).

In a gender discrimination case, this Court must analyze the facts in light of the burden-shifting framework articulated in the Supreme Court's seminal decision in <u>McDonnell Douglas</u> v. <u>Green</u>, 411 U.S. 792 (1973).  DeCaire must establish a presumption case of gender discrimination by demonstrating: (1.) that she is a member of a protected class, (2.) that an adverse employment decision was taken against her, (3.) that she was otherwise qualified for such position, and (4.) a similarly situated male was treated differently.  <u>Id.</u> at 802.

The burden of going forward then shifts to the Government to rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment action.  <u>Id.</u>; <u>Feliciano de la Cruz</u> v. <u>El Conquistador Resort</u>, 218 F.3d 1, 5 (1st Cir. 2000).

Should the Government do so:

 the presumption of discrimination drops out of the picture, the <u>McDonnell Douglas</u> framework with its presumptions and burdens

disappears, and the sole remaining issue is of discrimination vel
non. . . . Thus, the critical inquiry becomes whether the
aggregate of evidence of pretext and retaliatory animus suffices
to [persuade the fact finder].

Rios v. Rumsfeld, 323 F. Supp. 2d 267, 274 (D.P.R. 2004). In other
words, the presumption of discrimination then "drops from the case."
Hidalgo v. Overseas Condado Ins. Agencies, Inc. 120 F.3d 328, 335 (1st
Cir. 1997) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507
(1993)).

### 1.    The Presumption of Gender Discrimination

Here, DeCaire establishes a presumption of gender discrimination.

Protected Class:  Neither party disputes that DeCaire, as a
female, is a member of a protected class.

"Adverse" Employment Action:  Whether an employment action is
"adverse" is an objective standard and the Government's motive is
irrelevant.  Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 24
(1st Cir. 2002).  The First Circuit has stated, in determining what
constitutes an "adverse" employment action, that:

the employer must either 1) take something of consequence from
the employee, say, by discharging or demoting her, reducing her
salary, or divesting her of significant responsibilities, or 2)
withhold from the employee an accouterment of the employment
responsibility, say, by failing to follow a customary practice of
considering her for a promotion after a particular period of
service.

Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996) (internal citations

18

omitted) (emphasis added).  The First Circuit has also stated that
"demotions, disadvantageous transfers or assignments, refusals to
promote, unwarranted negative job evaluations and toleration of
harassment by other employees" are "adverse" actions as well.  Gu v.
Boston Police Dep't., 312 F.3d 6, 14 (1st Cir. 2002).

The Government's action here constituted an "adverse" employment
actions. DeCaire's duties were substantially altered,  her
investigative duties were taken away from her, she was not granted
promotions given to others, she was repeatedly transferred, was
assigned to a rotation system, and was assigned to what she describes
as an oppressive work environment while on light duty in the Boston
control room.  These actions are sufficient to constitute "adverse
employment actions" against DeCaire for the purposes of giving rise to
a presumption of discrimination.

Qualifications:  It is evident that DeCaire was qualified.
DeCaire's exemplary performance has been stipulated repeatedly by all
parties.

Treatment of Similarly Situated Males:  DeCaire has introduced
persuasive evidence to show that less-experienced males were treated
differently.  For example, in late 2002, Mark Lewis, a less-
experienced male was assigned to the HIDTA investigative position in
Worcester in which DeCaire was interested.  Likewise, in 2003, Deputy
U.S. Marshal Scott Kimball, a male with less seniority and with no
interest in the position, was assigned to the Boston Warrants
position in which DeCaire had expressed interest.  Though this

19

alone is insufficient to establish discriminatory or retaliatory animus, these examples suffice to satisfying the fourth prong of the <u>McDonnell Douglas</u> test.

## 2. The Government's Rebuttal

Once the presumption of discrimination is raised, the burden of going forward shifts to the Government.  The Government must articulate a legitimate, non-discriminatory reason for its adverse employment action.  <u>Feliciano de la Cruz</u>, 218 F.3d at 5. The Government does so here, offering several reasons to demonstrate its transfer and advancement decisions were legitimate and non-discriminatory.  It bids the Court consider:

    (1) the work to be performed;
    (2) seniority;
    (3) locality (the proximity of residences to a particular office);
    (4) fairness to all Deputy Marshals in promotion opportunities;
    (5) assignments comporting with the policy that those in personal relationships not be in superior-subordinate positions;[5]
    (6) DeCaire's request for light duty status during her pregnancy and where such light duty positions were available.

This Court rules the Government has produced sufficient evidence to rebut the presumption and warrant finding a legitimate, non-discriminatory reason for its actions.

In short, the Government defends each of its actions with

---

[5] Here, DeCaire's personal relationship with her now husband, Deputy United States Marshal Jeff Bohn.

20

respect to DeCaire as neutral, on-the-merits administrative
choices.  The evidence it has produced is here sufficient to
rebut any presumption of discrimination which, like the bursting
babble, now vanishes from the case.  Fed. R. Evid. 302.

### 3. Proving Gender Discrimination

The burden to demonstrate discrimination rests on the the
plaintiff.  Provencher v. CVS Pharmacy, Div. of Melville Corp.,
145 F.3d 5, 10 (1st Cir. 1998).  Direct evidence, however,  is
not required to demonstrate discrimination; circumstantial
evidence may be used.  Washington v. Davis, 426 U.S. 229 (1976).
Once the fact-finder believes that prohibited discrimination
played some role in the adverse employment action, the burden of
persuasion shifts to the defendant to convince the fact finder
that the outcome would be the same even without the prohibited
discriminatory motive.  Price Waterhouse v. Hopkins, 490 U.S.
228, 240-245 (1989) And here again, circumstantial evidence of
prohibited discriminatory motive may inform the fact finder.
Desert Palace, Inc. v. Costa, 539 U.S. 90, 92 (2003) (holding
that "direct evidence is not required" in a mixed-motive case
under Title VII of the Civil Rights Act of 1964).

DeCaire has offered evidence that establishes that the
Government's proferred explanations for its behavior are largely
pretext.  Yet DeCaire must do more than simply "undermine the
veracity of the employer's proffered justification; instead, she

must muster proof that enables a factfinder rationally to conclude that the stated reason behind the adverse employment decision is not only a sham, but a sham intended to cover up the proscribed type of discrimination." Szabo v. Trustees of Boston Univ., No. 98-1410, 1998 WL 1085688, at *3 (1st Cir. Dec. 31, 1998) (unpublished opinion)[6] (quoting Dichner v. Liberty Travel, 141 F.3d 24, 30 (1st Cir. 1998)). DeCaire must submit evidence, direct or circumstantial, to demonstrate "evidence of discriminatory animus on the part of the employer." Szabo, 1998 WL 1085688 at *3 (quoting Hidalgo, 120 F.3d at 335, and LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 843 (1st Cir. 1993)).

### 4. Gender Discrimination - Applying the Law to the Facts

Here, there is convincing evidence of gender discrimination sufficient to make this a mixed motive case. Cf. Szabo, 1998 WL 1085688 at *3. Again, this Court finds that Dichio's decision following his initial, personal meeting with DeCaire to transfer her to a non-investigatory position in Worcester while transferring McKearney, a male, to her position, see Joint Statement of Facts ¶ 24, was gender discrimination pure and simple, the result of stereotypical male views of gender roles.

---

[6]For a discussion of the citation to unpublished opinions of the United States Circuit Courts of Appeals for the First Circuit, see this Court's opinion in Enwonwu v. Chertoff, 376 F. Supp. 2d 42, 76 n.27 (D. Mass. 2005).

As even DeCaire acknowledges, however, given the delay in filing her claim on this action, this evidence cannot be used as part of DeCaire's gender discrimination claim; rather, it may only be used to establish retaliatory intent. Tr. of 6/2/05 at 13:4-12 (arguing "we can't win on that as a gender [discrimination] case, but we can certainly use that gender discrimination for the retaliation claim."). The remainder of evidence offered by DeCaire to establish a finding of gender discrimination is unavailing.

This Court is not convinced, based on the evidence before, it that the decision to appoint Mark Lewis to the HIDTA task force position - though both DeCaire and Williams were interested in the HIDTA position - was made with any discriminatory intent. It is true that, as Durette testified, DeCaire and Williams were "head and shoulders" above Lewis in terms of experience and qualifications for the HIDTA task force position. Tr. of 6/14/05 at 15:14-18. This conclusion is reinforced by the professional deputies' general discontent with the appointment. Joint Statement of Facts ¶ 22.

This Court does not find, however, that Lewis was assigned to the position over DeCaire and Williams because he was male. Rather, this Court believes that Dichio's decision was motivated by personal reasons. The Dichios and Lewises were acquaintances. Tr. of 6/15/05 at 38:25-39:11; Tr. of 6/16/05 at

23

98:23-99:9.  This Court believes that Dichio, working in an
environment of unknowns, appointed someone with whom he had a
personal relationship and someone he could, at some level, trust.
Whatever the propriety, or impropriety, of such a decision, this
type of nepotism or favoritism does not amount to gender
discrimination.

Parenthetically, the Court notes that the evidence
concerning Alison Hodgkins ("Hodgkins"), another female deputy in
the District of Massachusetts, does not persuasively advance
DeCaire's claim in any way.  True, Hodgkins was promoted and
given the "opportunity" to advance.  See, e.g., Tr. of 6/2/05 at
76:11-12.  The record shows that Hodgkins had a stellar record,
and that her test scores were higher than DeCaire's.  Tr. at
39:24 (noting Hodgkins score of 30).  See generally Tr. of
6/14/05 at 38:14-45:6 (demonstrating DeCaire's score of 24 was
less than Hodgkins).  Hodgkins' advancement substantiates a
neutral policy of promoting those with high scores and the best
qualifications.  DeCaire fails to demonstrate that gender played
any role in her situation vis a vis Hodgkins.

Other incidents discussed below both in this section and the
section on retaliation, however, resonate with the Court and
demonstrate a compelling picture of discrimination.  At the same
time, as United States Marshal, Dichio possessed the
discretionary prerogatives of management and it is no part of the

24

function of this Court to evaluate Dichio's management decisions,
Sampson v. Murray, 415 U.S. 61, 83 (1974) ( articulating the
"well-established rule that the Government has traditionally been
granted the widest latitude in the dispatch of its own internal
affairs"), so long as they are lawful.

DeCaire argues that only she and Williams were required to
rotate and that they were unfairly transferred, Tr. of 6/2/05 at
86:9-14 (stating that Williams was required to "swap" out even
though she was not the most junior in the Worcester office).
While the rotation of only female deputies gives this Court
reason to pause, Dichio had the rightful managerial discretion to
assign the two deputies into Boston court operations, even though
they may not have been the most junior deputies in Worcester,
since Dichio believed the office was  "shorthanded" in Boston.
Tr. of 6/16/05 at 3:17.  As to DeCaire, however, there was more.
by the time of the rotational assignment, Dichio was embattled
and defensive about the Lewis appointment to HIDTA, an
appointment criticized not only by DeCaire but by Bohn, a
supervisor Dichio took as disloyal and hostile to his management.
Dichio's reciprocal hostility to Bohn (and to anyone close to
him), and soon to Durette, was the principal driver behind
Dichio's subsequent management decisions.  Moreover, that
hostility was tacitly communicated to the rank and file.  Once it
was perceived that Dichio acted from personal pique, the

bureaucracy under his control acted just as such bureaucracies have acted for centuries. Recognizing that the way to advancement was through Dichio, some sought to advance his apparent agenda even without orders (one thinks immediately of the knights of Henry II who murdered Becket), most kept their heads down. Those thought of as Dichio's opponents (whatever their gender) were going nowhere under his tenure.

Dichio's appointment of DeCaire to the Boston 082 Court Operations position, Joint Statement of Facts ¶¶ 38, 39, 41, was likewise driven primarily by the need to marginalize Dichio's opponents. Joint Statement of Facts ¶¶ 38, 39, 41. It may be true that "[a]t the time of this reassignment, there were deputies with less seniority than Deputy Marshal DeCaire assigned to the Worcester office, and to Warrant Investigations Unit in Boston." Id. ¶ 40, but this is not  enough to prove gender discrimination.

### B.  Retaliation

#### 1.  The Law

Section 2000e-16 provides, in pertinent part:

(a) Discriminatory practices prohibited; employees or applicants for employment subject to coverage. <u>All personnel actions affecting employees</u> or applicants for employment . . . in executive agencies . . . shall be made <u>free from any discrimination based on</u> race, color, religion, <u>sex</u> or national origin.

42 U.S.C. § 2000e-16, Pub. L. 88-352. (1998) (emphasis added).

Section 2000e-3 provides, in pertinent part:

> It shall be an <u>unlawful employment practice</u> for an <u>employer</u> to <u>discriminate against any of his employees</u> . . . because he has <u>opposed any practice made an unlawful employment practice</u> by this subchapter[, here § 2000e-16,] or because he has made a <u>charge</u>, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3, Pub. L. 88-352. (1972) (emphasis added).

The law prohibits employers from retaliating against employees who formally oppose potential unlawful employment practices.

> Under Title VII, in order to show a <u>prima facie</u> claim of retaliation the plaintiff must show: [f]irst, protected participation or opposition under Title VII known by the alleged retaliator; second, an employment action or actions disadvantaging persons engaged in protected activities; and third, a causal connection between the first two elements that is a retaliatory motive playing a part in the adverse employment actions.

<u>Petitti</u> v. <u>New England Tel. & Tel. Co.</u>, 909 F.2d 28, 32 (1st Cir. 1990) (citations omitted). <u>See also</u> <u>Randlett</u> v. <u>Shalala</u>, 188 F.3d 857, 862 (1st Cir. 1997) (quoting <u>Fennell</u> v. <u>First Step Designs, Ltd.</u>, 83 F.3d 526, 535 (1st Cir. 1996) (holding a "colorable showing" of the "causal connection" must be made)).

The first two factors required to establish a retaliation claim are easily met in this case. DeCaire filed a formal grievance and complaint against the Marshals Service, a matter well known to her superiors. Further, as described above in the

discussion of the gender discrimination claim, there were sufficient "employment actions" disadvantaging DeCaire following her filing of her complaint - namely, the transfer to Boston court operations, the transfer back to Worcester due to Bohn's subsequent supervisory role, and the light duty assignment to the Boston control room.[7]  Further, DeCaire argues that she was passed over for advancement opportunities for which she was qualified and which were given to deputies with less experience. Pl.'s Proposed Findings of Fact and Conclusions of Law at 58-59. [Doc. No.75].

DeCaire must demonstrate the "<u>existence of a causal connection</u> between her <u>filing</u> [of] the . . . EEO complaints and the <u>subsequent [action.]</u>"  <u>DeNovellis</u> v. <u>Shalala</u>, 135 F.3d 58, 65 (1st Cir. 1998) (deciding an appeal of a ruling on a motion for preliminary injunction) (emphasis added); <u>Randlett</u> v.<u>Shalala</u>, 118 F.3d at 857, 862 (1st Cir. 1997) ("To make out a retaliation claim requires not only an adverse employment action and previously protected conduct, but also a <u>colorable showing that 'a causal connection existed between the protected conduct and the adverse action</u>.'" (quoting <u>Fennell</u>, 83 F.3d at 535) (emphasis added)).  "In other words, the adverse action must have been taken for the <u>purpose</u> of retaliating" and "a plaintiff must point

---

[7]Chronologically, in between the two Boston assignments, DeCaire had been transferred to Worcester when Bohn became supervisor of the Boston court operations.

to <u>some evidence of retaliation</u> by a pertinent decision maker."
<u>Randlett</u>, 118 F.3d at 862 (articulating the requirement in the
summary judgment context) (emphasis added).

Direct evidence of retaliation "normally contemplates . . .
those statements by a decision maker that directly reflect the
alleged animus and bear squarely on the contested employment
action." <u>Melendez-Arroyo</u> v. <u>Cutler-Hammer de P.R. Co.</u>, 273 F.3d
30, 35 (1st Cir. 2001) (emphasis added).  The First Circuit has
stated that "[c]omments which, fairly read, demonstrate that a
decision maker made, or intended to make, employment decisions
based on forbidden criteria constitute direct evidence of
discrimination." <u>Febres</u> v. <u>Challenger Carribbean Corp.</u>, 214 F.3d
57, 61 (1st Cir. 2000).

## 2.  Applying the Law to the Facts

### a.  Dimmitt's Statement

After Bane left as Chief Deputy and the divisiveness within
the Office became ever more apparent, Acting Chief Deputy Dimmit
was sent to Boston to attempt to shore up Dichio's declining
respect and authority.  Dimmitt held a meeting with the new
entry-level Marshals, or 082's, and warned them "not to mess
with" or "not to take on the U.S. Marshals Service."  Tr. of
6/2/05 at 73:23-74:3 (testimony of DeCaire) (emphasis added).
<u>See</u> Tr. of 6/13/05 at 9:25-10:2 (testimony of Dimmitt); while

29

Dimmitt's statement may have been a "warning" of sorts as to expected allegiances to the Marshal within the Marshals' Service, this Court finds that Dimmitt was not warning deputies that they would face retaliatory action if they filed complaints,[8] nor was he indicating that the Marshals' Service was retaliating against DeCaire because she had filed a complaint.  Even in light of Dichio's and the Marshals Service's expectations of "loyalty," and even considering the stunning and puerile marginalization of Durette after he had stated he would "tell the truth," there is insufficient persuasive evidence to demonstrate that Dichio directed senior management to conduct themselves, or treat DeCaire, in a discriminatory manner or to retaliate against her for the filing of her complaint.  The conduct of supervisors toward DeCaire had more to do with trying to please Dichio than any other cause.

### b.    Transfer to Boston Court Operations

DeCaire was transferred to Boston court operations following the filing of her complaint.  Joint Statement of Facts ¶ 50.  The Court does not find this transfer to have been in retaliation for filing her complaint.  Rather, Dichio simply chose to bear down

---

[8]It is in the best interests of the Marshals' Service for employees with grievances to follow the formal protocol for resolution.  See Tr. of 6/15/05 at 31:19-21 (testifying that if "there are problems and [employees] need to deal with those problems through the proper channels, there is never a problem with doing that.") (Testimony of William Fallon).

on DeCaire because he considered her disloyal and hostile to his management decision, and he could.

### c.    Transfer to Boston Control Room

The most persuasive of the alleged retaliatory adverse employment actions is DeCaire's light duty assignment to the oppressive Boston control room.  Tr. of 6/2/05 at 96:4-8 ("It was excessively hot in the control room, and it was excessively hot because they had put a bunch of new equipment into that room and they had never updated the air system and air-conditioning system and the ventilation to deal with all the new equipment that they put in.")  (Testimony of Cynthia DeCaire); id. at 99:17 (stating the temperature of the room was "usually above 85 degrees."); id. at 123:11-12 (indicating she "wasn't allowed to go to the bathroom and leave the control room"); Tr. of 6/3/05 at 54:8-10 ("[T]he control room was very hot on a [steady] basis and it was noisy, and there was a large amount of electronic equipment in there . . .") (testimony of Jeff Bohn).  DeCaire received this assignment while a male was allowed to continue on limited duty in Worcester in a less oppressive environment.

Still DeCaire must offer more than "[m]ere conjecture and unsupported allegations" as these alone "will not suffice" in demonstrating retaliation.  DeNovellis, 135 F.3d at 65 (requiring that a plaintiff "demonstrate the existence of specific facts that would enable a finding that would enable a finding that

31

explanatory reasons offered by the [G]overnment for her proposed transfer were mere pretext for its true motive of retaliation against her.").

DeCaire called former Marshal McGillivray as a witness at trial.[9]  McGillivray helped write the pregnancy policy currently in place during her time as Marshal.  Tr. of 6/3/05 at 9:24-10:1. McGillivray testified to the type of work that could be done by a pregnant deputy:

> A deputy can work any task.  They can work out on the street.  They can work operational issues.  They can work witness protection.  They can work judicial protection. They can work with prisoners.  They can work any task.  But there does come a point when you are obviously showing and you're obviously in a position where it's probably best not to be on the street for, because of your condition.  But at the same time, it does not preclude you from doing all operational functions in-house, which you could also do independent investigations, drive-by, looking at houses, looking at locations, things that do not involve confrontation on a daily basis. So, in-house you certainly could do witness protection, seized assets, research, judicial security, you could perform a myriad of operational duties.

Id. at 10:14-11:3.  McGillivray testified that during her tenure, she attempted to maximize the talents of each of her deputies, even when they were on light duty or had a medical problem.  Id. at 11:12-13, 21:9-10.

Here, the retaliatory action must have been taken for the "purpose of" retaliation.  As the First Circuit has stated,

---

[9]This Court finds the testimony of former United States Marshal Nancy McGillivray credible in its entirety.

"[e]ven if the evidence is read to suggest a degree of personal animosity . . . personal animosity may have many origins <u>other than a desire to retaliate</u>" for the filing of a complaint. <u>DeNovellis</u>, 135 F.3d at 66 (emphasis added).  Realistically, there were certain animosities and loyalties at play here –– particularly given Bohn's history and contemporaneous predicament with the Marshals' Service, DeCaire's personal relationship and alliance with Bohn, and her displeasure with her assignments and being passed over after Dichio's arrival.  While the evidence supports the existence of loyalties within the service; it does not support a claim of retaliation for filing a complaint.

Though the difference may be slight, it is not one only of semantics.  There is a fine line between showing a causal connection demonstrating retaliation <u>for the filing of a formal complaint</u> on the one hand, and, a requirement of loyalty to Dichio and the Marshals' Service on the other.  <u>See</u> <u>Hochstadt</u> v. <u>Worcester Found. for Experimental Biology</u>, 425 F. Supp. 318, 324 (D. Mass.  1976) (Murray, J.), ("An employer remains entitled to loyalty and cooperativeness from employees.  Management prerogatives are to be left undisturbed to the greatest extent possible.  Internal affairs of employers must not be interfered with except to the limited extent that correction is required in discrimination practices.") (internal alterations omitted) <u>aff'd</u> 545 F.2d 222 (1st Cir. 1976).

33

Here, it was DeCaire who requested light duty.  Further, she did have restrictions placed on her - namely, she could not carry a firearm, which limited the duties she could perform.  Tr. of 6/2/05 at 125:8-126:7 (indicating she was also restricted in the amount of weight she could carry).  However or questionable the assignment of a pregnant woman to this type of setting may seem to a rational observer, the Government has "met its burden of articulating a legitimate, non-retaliatory reason" for the action: the assignment was within the range of light duty activities and saved the Government from having to hire external security guards to cover the post.  Fennell, 83 F.3d at 536. Though DeCaire's light duty tasks may have been in an environment more oppressive than others, and while one may question on a personal level the wisdom of placing a pregnant woman in such a setting, this Court rules that the whatever the reason for the assignment –- the need for additional workforce in the Boston control room to obviate the need to hire outside help, the supervisors' general sense of loyalty to the Marshal, or even Dichio's general dislike of DeCaire personally due to her relationship with Bohn -- the transfer was not made to retaliate against DeCaire for filing of a formal complaint.

This Court respects and appreciates former Marshal McGillivray's testimony, particularly her personal experience of "working operation[s] until the day before [she] delivered with

34

both [her] children," Tr. of 6/13/05 at 21:11-12, and that she would have "maximize[d] . . . talents in the use of the deputy" because the Marshals' Service is "manpower short." Id. at 21:9-10.  As the Court stated during the course of trial, however:

> [McGillivray] was not Marshal [at the time DeCaire was assigned to the control room].  And it would seem to me there's prerogatives in the management staff of the Marshals Service.  So, [as to] her assessment of Alison Hodgkins' qualifications, we're not going to have this trial involve management decisions with one Marshal and then other management decisions by another Marshal.  The Marshals get to manage their offices.

Id. at 16:17-24 (ruling that McGillivray could not testify as to Hodgkins's qualifications for a supervisory position)(emphasis supplied).

### d.  Temporal Proximity

"[W]here direct evidence is missing, temporal proximity may provide the necessary nexus" in a retaliation claim.  Ruffino v. State St. Bank & Trust, Co., 908 F. Supp. 1019, 1046 (D. Mass 1995) (Gertner, J.) (finding a "temporal connection sufficient to raise an inference of retaliatory motive" when the "adverse actions taken against [a plaintiff] . . . escalated sharply during and immediately following [her] decision to press her complaints") (emphasis added).  It is true that for more than eleven years before Dichio's advent, DeCaire had demonstrated exemplary and outstanding service. Tr. 8:45.  It is also true that as of September of 2003, DeCaire was transferred more than

any other deputy.  Joint Statement of Facts ¶ 86.  See Tr. of
6/2/05 at 85:24-86:5 (testimony of Cynthia DeCaire); Tr. of
6/30/05 at 14:9-14, 15:1-18 (testimony of Nancy McGillivray).
Yet, while some of the transfers occurred after DeCaire filed her
complaint, several of them -- including the initial transfer to a
non-investigatory position in Worcester -- took place before she
filed her formal complaint.  Additionally, other factors played a
role in her many transfers, including but not limited to the
Marshal's need to avoid the potential conflict arising out of her
personal relationship with Bohn[10] and the service's attempt to
accommodate her request for light duty.  The timing of adverse
actions had, it seems, little or anything to do with her filing
of her complaint, and more to do with Dichio's arrival as Marshal
of the District of Massachusetts.

    DeCaire has not established that the filing of a complaint
was the dominant motive for the alleged retaliatory actions.  See
Tr. of 6/2/05 at 13:25-14:5.  Nor has it been established that
"but for" the filing, the discriminatory actions would not have
taken place.  See Tr. of 6/2/05 at 14:4-5 ("I think that the but

---

    [10]This Court recognizes that Taylor, as he testified, admits
to committing an "oversight" as Bohn would be DeCaire's
supervisor while she was in the control room.  Tr. of 6/14/05 at
133:3 (testimony of David Taylor).  See id. at 132:24-137:2
(testimony of David Taylor); Tr. of 6/3/05 at 53:23-54:5
(testimony of Jeff Bohn).  While this Court finds that Taylor
knew that Bohn would be overseeing DeCaire, it rules that this
did not play a role or demonstrate an intent to engage in
discrimination or retaliation.

for reason has to be the <u>filing of the complaint</u>.") (Opening
Argument of DeCaire)

## IV.   THE LARGER ISSUES

### A. An Analytic Conundrum

Though this Court rules that the Government here has not
directly violated federal law on the merits, its practices, as
illustrated by this case, are incontrovertibly not above
reproach.

As fact-finder in this jury waived case, I have an absolute,
non-delegable duty to tell it like it is.  I have done so.  I
find that, after the initial transfer to Worcester, while DeCaire
continued to be the victim of discrimination at Dichio's hands,
the discrimination was then born out of personal hostility not
gender bias or a need to retaliate.  I find these later events
would have come out much the same had DeCaire been a male deputy.

I recognize full well that in so finding, I may be painting
myself into an analytic corner.  This is not the first time that,
as fact-finder, I have arrived at conclusions in an employment
discrimination case at variance with those sought by both adverse
parties. See <u>Benham</u> v. <u>Lenox Savings Bank</u>, 292 F. 3d 46, 48 (1st
Cir. 2002) (this Court reversed for clear error for rejecting a
gender discrimination claim because no sufficient evidence to
find alternative explanation that bank president "wanted to make

37

an example of her, to demonstrate his power as president of the Lenox Savings Bank"). I have always been curious as to the reasoning in <u>Benham</u> since, while the First Circuit's conclusion that there was no sufficient evidence to warrant this Court's affirmative reasoning must necessarily be accepted, at the least it seems implicit, if nothing more, that this Court as fact-finder was not persuaded that Benham had established gender discrimination, an issue on which she bore the burden of proof.

So here. Only this time I have made the finding explicit and recited the grounds for concluding that Dichio was primarily motivated by personal hostility. Unlike <u>Benham</u>, however, this is a mixed motive case in which Dichio's gender bias was present to some degree. Therefore, it is the Government, under <u>Price Waterhouse</u>, that bears the burden of proving that Dichio and his subordinates would have behaved the same way even absent Dichio's gender stereotyping. What is more, the Government has failed to persuade the Court that its actions were neutral, on-the-merits decisions. Does this compel a verdict for DeCaire? This Court thinks not, finding that the conduct, however discriminatory and reprehensible, was not the result of prohibited gender discrimination.

### B. Professionalism

In 1874 the Cardwell reforms banned the purchase of commissions in the British Army.  Richard Holmes ed., Oxford Companion to Military History 176 (2001).  Imagine that.  The parents of men and women now living could remember when command of British combat troops could be purchased by the highest gentleman bidder.  It brings to mind the sacrifice of the 24th Foot (South Wales Borders) at Islandlwana and, years before, the Charge of the Light Brigade where the French general Bosquet famously remarked "C'est magnifique, nais ce n'est pas la querre" – "It is magnificent, but it is not war."

How quaint and unrealistic it all seems to us with our modernist ahistoric view of the world.  Surely here in America direct command of law enforcement officers in harm's way could never be entrusted to political patronage appointees.  How smug we are — and how wrong.

A vestige of the Jacksonian spoils system, within the United States Marshals' Service the 94 United States Marshals are all direct political patronage appointments.  These are not executive department policy making positions; they are vital law enforcement positions.  As this case demonstrates so well and so sadly, a strong-willed Marshal can operate on the basis of his personal agenda, blighting careers and driving competent deputies

from the service, notwithstanding the best professional efforts of Chief (but subordinate) Deputies such as Bane, Dimmit, and Fallon.  Congress has professionalized (and sheltered from political interference) most federal law enforcement agencies — the Federal Bureau of Investigation, the Drug Enforcement Agency, the Secret Service, the Bureau of Alcohol, Tobacco, and Firearms come to mind.  Until Congress does the same for the Marshals' Service, it will always be considered a second rate political agency in the eyes of the true professionals.  Doubt it?  Consider the outcry that would follow should the Special Agent in Charge of every FBI Field Office revert to a political patronage appointment.  Yet that is status quo within the Marshals' Service.  As Justice Breyer remarked recently in another context, "The ball now lies in Congress' court."  United States v. Booker, 543 U.S. 220, 265 (2005).  Will this shameful episode put the ball in play?  It should.

> In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously.  Our government is the potent, the omnipresent teacher.  For good or for ill, it teaches the whole people by its example . . . If the government becomes a lawbreaker, it breeds contempt for law.

> Olmstead v. United States, 277 U.S. 438, 485 (1928)

> (Brandeis, J., dissenting).

**V.    CONCLUSION**

For the reasons set forth above and having carefully considered the record in its entirety, this Court rules in favor of the Government on the gender discrimination and retaliation claims.  Judgment will enter for the Government.

SO ORDERED.


/s/ William G. Young
_____
WILLIAM G. YOUNG
DISTRICT JUDGE