# United States Court of Appeals
## For the First Circuit

No. 07-1539

CYNTHIA A. DECAIRE,

Plaintiff, Appellant,

v.

MICHAEL B. MUKASEY, ATTORNEY GENERAL,*

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Lynch, and Lipez,
Circuit Judges.

Indira Talwani with whom Segal Roitman was on brief for
appellant.
Stephanie R. Marcus, Attorney, Appellate Staff, Department of
Justice, Civil Division, with whom Peter D. Keisler, Assistant
Attorney General, Glenn T. Suddaby, United States Attorney, William
H. Pease, Assistant United States Attorney, and Marleigh D. Dover,
Attorney, Appellate Staff, Department of Justice, Civil Division
were on brief for appellee.

March 11, 2008

---

* Pursuant to Fed. R. App. P. 43(c)(2), Attorney General
Michael B. Mukasey has been substituted for former Attorney General
Alberto R. Gonzales as the respondent herein.

**LYNCH**, **Circuit Judge**.   Cynthia DeCaire, a Deputy U.S. Marshal, brought suit alleging that Anthony Dichio, then the U.S. Marshal for the District of Massachusetts, discriminated against her on the basis of gender and retaliated against her after she filed complaints with the Equal Employment Opportunity office. After a bench trial, the district court ruled against DeCaire on both claims.   DeCaire v. Gonzales, 474 F. Supp. 2d 241, 260 (D. Mass. 2007).

The district court held that Dichio did discriminate against DeCaire, that she was treated adversely after she complained, and that the government's explanations of neutral reasons were not persuasive.   Id. at 260.   Nonetheless, the court found Dichio's hostility was motivated by his perception that DeCaire was disloyal to him personally, and not by gender animus or retaliation.   Id.   The defense had never posed any such theory of motivation or so interpreted the facts on either claim.   Dichio himself testified to no such motivation, nor did any witness.

DeCaire appealed.   In light of errors in the application of law and the lack of record support for the district court's factual conclusions, we vacate the verdict and remand for a new trial.

I.

On March 26, 2004, DeCaire filed suit in the District of Massachusetts alleging gender discrimination and retaliation under

-2-

42 U.S.C. §§ 2000e-16 and 2000e-3, respectively. Id. at 244. She filed an amended complaint on July 7, 2004.

With respect to discrimination, DeCaire's amended complaint alleged that on account of her gender, she was assigned to weekly rotations in Worcester and Boston in or around January 2003; effectively demoted and transferred to Court Operations in Boston in February 2003; kept in Court Operations in Boston after additional employees were added to that unit; not transferred to the Boston warrants unit when an opening occurred there in or around March 2003; not assigned to the Warrant Coordinator position she sought in or around April 2003; not given the Acting Court Operations Supervisor position she sought in or around September 2003; not assigned to the Warrant Coordinator position she sought in or around September 2003; transferred to Worcester in October 2003; assigned to multiple duty stations in November 2003; assigned to the control room in the Boston federal courthouse in November 2003; and required to work in the control room with limited or no breaks. Am. Compl. ¶ 52.

With respect to retaliation, DeCaire alleged that after Dichio learned of her filing a complaint, she was transferred to a lesser position in Boston Court Operations in or around February 2003; kept in Court Operations after additional employees were added to that unit; not moved to the Boston warrants unit when an opening occurred there in or around March 2003; denied a promotion

-3-

she sought to Court Operations Supervisor in or around April 2003; not assigned to the Warrant Coordinator position she sought in or around April 2003; denied an appointment to the Acting Court Operations Supervisor position she sought in or around September 2003; not assigned to the Warrant Coordinator position she sought in or around September 2003; transferred to Worcester in October 2003; assigned to multiple duty stations in November 2003; assigned to work in the Boston courthouse's control room in November 2003; and required to work in the control room with limited or no breaks. Am. Compl. ¶ 54.

The government filed a motion for summary judgment on both claims, which was denied.[1] DeCaire, 474 F. Supp. 2d at 245.

DeCaire waived her right to a jury trial, and an eight-day bench trial began on June 2, 2005. Id. On February 23, 2007, the district court ruled in favor of the government on both claims. Id. at 241.

A.

At the crux of this case are the district court's ultimate conclusions rejecting the gender discrimination and retaliation claims. DeCaire's appeal argues that these conclusions rest on errors of law and are not supported by the record.

---

[1]    DeCaire filed a cross-motion for partial summary judgment with respect to the defendant's argument she had not exhausted her administrative remedies, which was granted. DeCaire, 474 F. Supp. 2d at 245.

DeCaire argues that there was error in the gender discrimination claim in the court's utilizing a mixed motive analysis, which was raised sua sponte by the court. Even if use of a mixed motive analysis were appropriate, a finding of mixed motive would only constrain remedies. Indeed, DeCaire argues, once the district court found Dichio had engaged in gender discrimination, it was required to find liability.

The district court's conclusion there was no retaliation, DeCaire alleges, is based on four different errors of law. First, the court improperly imported a gender discrimination component into the standard for proof of retaliation. Second, the court imposed a new loyalty defense not recognized under retaliation theory. Finally, the court improperly discounted the close temporal relationship between events and imposed a heightened burden on DeCaire.

DeCaire's final appellate claim is that several of the court's factual conclusions regarding Dichio's motivations are clearly erroneous when measured against the evidence in the case. In particular, she challenges the district court's conclusions that Dichio discriminated and took post-complaint actions against her because he perceived her as disloyal and because of his hostility toward two others, Jeffrey Bohn and Paul Durette.

B.

We turn first to the evidence before the district court, and view the evidence in the light most favorable to the verdict, focusing on the evidence most relevant to the factual conclusions being challenged. Where there are credibility disputes, we credit the district court's conclusions. The district court found that DeCaire was "credible in virtually every respect," and that the credibility of Dichio was "extremely suspect."[2]  Id. at 248.

1.    DeCaire and Susan Williams

DeCaire began her employment with the U.S. Marshals Service in June 1991 in Boston under a different Marshal, as an "082," the entry-level Deputy U.S. Marshal ("DUSM") position. By all accounts, DeCaire's career with the Marshals Service was successful until Dichio's appointment. In December 1993, she was promoted to Criminal Investigator DUSM, position 1811, grade 11. In 1995, she was assigned to the FBI Violent Fugitive Task Force in Boston. In December 1996, DeCaire was promoted to Senior Criminal Investigator DUSM, position 1811, grade 12. In 1999, DeCaire was assigned to the Warrant Investigations Unit in Boston. On June 3, 2001, DeCaire became Acting Supervisory Criminal Investigator in the District's Worcester office, a temporary position.

---

[2]    The district court did not make specific credibility findings with respect to the other people who figure in our description of events.

DeCaire served in her acting supervisory position in Worcester until September 23, 2001. While in that position, she received a Superior Accomplishment Award. After September 23, DeCaire returned to the Boston office, where she served as a Team Leader in the Warrant Investigations Unit.

On August 6, 2002, Anthony Dichio was sworn in as U.S. Marshal for the District of Massachusetts.

By August 2002, DeCaire was romantically involved and living with another DUSM, Jeffrey Bohn, close to Worcester. Their relationship was common knowledge within the office. When Dichio first arrived, Bohn was serving as Acting Supervisor of the New England High Intensity Drug Trafficking Area ("HIDTA") task force. Approximately one month after Dichio's arrival, Bohn was promoted to Supervisor of the HIDTA task force in Boston.

Dichio conducted introductory interviews with all of the DUSMs in the District soon after his arrival. He interviewed DeCaire in late August 2002. At trial on June 2, 2005, DeCaire testified that during her initial interview with Dichio, he asked whether she wanted to be in the Worcester office, which was closer to her home. She replied that while once she had such an interest, she no longer did because she enjoyed her position in the warrant unit in Boston and she had worked hard to get it. He then talked about family and how family should always come first. He asked her marital status and she replied she was divorced. Dichio asked if

-7-

she had any children, and DeCaire responded she had a young
daughter. He also asked where her ex-husband lived and whether he
supported DeCaire; DeCaire replied he did not support her.

Dichio kept returning to why DeCaire did not want to be
in Worcester, which he could not understand. DeCaire replied by
telling Dichio about the importance of her career and that there
were not many opportunities for her in the Worcester office unless
there was an opening on the HIDTA task force there. Dichio also
asked about her personal relationships. She replied that she was
living with Jeffrey Bohn and that her former aunt (by marriage) was
a state trooper who worked on the HIDTA task force in Worcester.

At trial, Dichio presented a different account of his
initial interview with DeCaire. According to Dichio, DeCaire told
him that she wanted to be transferred to Worcester and had been
"trying for eleven years to get to Worcester." Dichio testified
that he told DeCaire that he would transfer her to Worcester and
Steve McKearney, a deputy in the Worcester office, would be moved
to Boston. The district court found DeCaire was credible and
Dichio was not.

Another female, DUSM Susan Williams, who was assigned to
the Worcester office at the time Dichio arrived, testified that
during her initial interview with Dichio, before discussing her
professional experience, he "interrupted me and asked if I had
children. And I said yes, I have two children. And . . . then he

-8-

asked if I was receiving any child support. And I said no. . . . [T]hat was basically the end of the conversation . . . ." Williams testified that her entire conversation with Dichio lasted approximately twenty minutes. By contrast, the conversations that Dichio had with the three male deputies in the Worcester office lasted significantly longer: one took one-and-a-half to two hours, and the other two lasted about an hour each.

The day after DeCaire's interview, her supervisor, Paul Durette, called her into his office, saying he had been told the Marshal intended on transferring DeCaire to Worcester and asking why DeCaire had not come to Durette first to discuss it. She told Durette she had not asked to go to the Worcester office, but the Marshal seemed fixated on sending her there. She asked Durette to call the Marshal into his office to reinforce that she did not want to go to Worcester.

Several days later, DeCaire received a telephone call informing her that she was going to be transferred to Court Operations in Worcester and that she would be replaced in her job in Boston by a transferred male deputy. She received calls from others -- including possibly Dave Taylor, who was at that time on the HIDTA task force in Worcester -- and she told them that she had not asked to go to Worcester, that the Marshal seemed fixated on sending her, and that she did not agree with the Marshal's decision. DeCaire testified that given the Marshal's fixation she

knew Dichio would find a way to send her to Worcester, but she hoped Court Operations in Worcester would not be a long-term assignment because "I was hoping that Dave Taylor, who I knew had been applying for other positions, would get those positions and that I would assume his role in [Worcester on] the HIDTA task force."

While DeCaire was still in Boston, Taylor received a promotion and his position opened on the task force in the Worcester office. DeCaire, Williams,[3] and DUSM Mark Lewis all expressed interest in the job.

DeCaire was informed by Chief Deputy Tim Bane that she was not going to be considered for the position with the HIDTA task force in Worcester because her uncle's former wife, Darlene DeCaire (divorced several years earlier from DeCaire's uncle), was already on the task force in her capacity as a state police officer and "[Bane] and the Marshal did not want two DeCaires out on the street together."

After this conversation with Bane, DeCaire received a phone call from her supervisor and an e-mail from Bane informing her that her transfer to Worcester was off. She sent an e-mail to Bane, copying Dichio, expressing her view about the

_____

[3]    Dichio testified that he does not recall Williams expressing interest in the job, although the government had stipulated as much. Williams testified that she had expressed interest in the job and had relevant experience.

-10-

inappropriateness of her being excluded from consideration for Taylor's former job on grounds of "family" working together. She wrote that she and Darlene DeCaire had worked together in the past and, as to the family connection, the two women had been related only by a marriage that ended in divorce. DeCaire pointed out that the agency had permitted married couples to work together, and stated "I can't help but believe our office is taking a 'sexist view' of the matter."

DeCaire also sent Dichio, with copies to others, an e-mail asking to be considered for the HIDTA task force job and giving her qualifications. Her supervisor, Tony Visalli, informed her he would recommend her for the job. Durette told her that he and other members of the management had recommended the vacancy not be filled.

At trial, Bane testified that there were several reasons he opposed DeCaire's appointment to the HIDTA task force, including the fact that she had the same last name as Darlene DeCaire and that he had "concerns about having too many females in the Worcester office." Bane expressed these concerns, including the one about too many females in the Worcester office, to Dichio.

Dichio selected Lewis, the only male applicant, over the only two other applicants, who were female. Lewis was junior to and less experienced than both DeCaire and Williams. At trial, Dichio testified that he selected Lewis because Lewis lived in

-11-

Berlin, Massachusetts, which is near Worcester. "I sent Mark Lewis over there only because he was from Berlin and there was an opening in Worcester and I wanted to send him home. He was in Boston. I was trying to make sense of where the deputies live and try to have them not commute as far." Of course, DeCaire also lived close to Worcester, which Dichio knew.

Dichio also testified that it was not until after he appointed Lewis that he realized that the Worcester HIDTA task force position was highly desirable. Again, the court found Dichio's credibility highly suspect. In response to a question from the court about whether he knew Lewis prior to becoming Marshal, Dichio stated that his wife and Lewis's brother's wife are acquaintances through their children's football program.

Dichio testified that after he selected Lewis, there was "chitchat in the office with people that were upset about that move." Bane stated that after he sent out a formal e-mail announcing that Lewis would be filling the position, he received negative responses from a number of people, including Bohn, DeCaire, Williams, and DUSM Paul Sugrue. Bane forwarded these e-mails to Dichio (if Dichio was not already an addressee).

After DeCaire e-mailed Bane to express her disappointment with Lewis's selection, she was called into Dichio's office. According to DeCaire, Dichio told her that he was "upset at the way everyone was reacting to his decision." She felt that he was

putting the blame for the negative reactions on her.  He told DeCaire that he was assigning her to work in Court Operations (as opposed to the better job on the HIDTA task force) in Worcester. She responded that she did not want to go.  Dichio told her that "you're going to make me look like a fool if you don't go to Worcester willingly.  So either you go to Worcester or I can't guarantee that you're going to stay in your position here."  Based on Dichio's statements, DeCaire decided to accept his decision that she go to Worcester.

Dichio had a different recollection of this conversation. He testified that he told DeCaire he could not give her the task force position because she was romantically involved with Bohn and so Bohn could not supervise her.  (Later, she was assigned to work under Bohn, whom she had since married.)  Dichio also testified he asked DeCaire whether she still wanted to go to Worcester and work in Court Operations, and she indicated that she would rather go to Worcester than remain in the Boston warrants unit.  Again, based on the district court's credibility finding, we credit DeCaire's version of events.

On September 30, 2002, DeCaire was reassigned to the Worcester office, away from her job with the Warrants Investigations Unit in Boston.  In turn, Steve McKearney, who had been transferred to Worcester for disciplinary reasons prior to

-13-

Dichio's arrival, was transferred to DeCaire's position in the Warrant Investigations Unit in Boston.[4]

In December 2002, Williams requested approval from Supervisory Deputy Tom Bezanson, her direct supervisor, to attend a conference for women in law enforcement that was to be held in San Francisco, California, during the week of Labor Day in 2003. After her request was denied, Williams spoke with Durette, who suggested that Williams resubmit the request to Dichio directly, which she did in January 2003.

On January 22, 2003, DeCaire was called into Bezanson's office and informed that both she and Williams would be rotating to Boston from Worcester on a weekly basis per orders from Dichio. Two male DUSMs in Worcester, Kevin Wahl and Lewis -- who was the junior deputy and whose permanent duty station was still Boston -- were not included in this rotation. Dichio testified that this rotation was necessary to address manpower shortages in Boston. Durette testified that members of the HIDTA task force, like Lewis, were generally excluded from use on a rotation.

On January 23, 2003, after learning of their new and unwanted rotation to Boston, DeCaire and Williams filed complaints with the Equal Employment Opportunity ("EEO") office within the

---

[4] DeCaire did not file a timely claim with the EEO regarding Lewis's selection and her initial transfer to Worcester and did not include this transfer in her complaint. Instead, she presented this as background for her retaliation claim.

Marshals Service. DeCaire's statement included the following allegations: that her introductory interview with Dichio focused on her personal situation rather than her professional accomplishments; that a junior deputy she supervised was chosen for the Worcester HIDTA position even though she was more qualified; and that afterwards, Dichio threatened that if she did not willingly go to Worcester, she would lose her investigative position in Boston. The complaint also stated:

> Clearly, as the two single mothers in the district and the only two females in the Worcester office there are two sets of rules that are being applied. We are not being treated the same way as every other employee. Taking all this information into consideration, we are requesting immediate relief against these duty transfer assignments to the Boston office until this matter is investigated and resolved. It is placing a burden on us and our families, and creating undue stress and a personal hardship. We are also requesting protection against any future actions being taken against us.

This was DeCaire's first EEO complaint.

DeCaire was out on pre-approved leave from January 27 through January 31, 2003. During that week, Bezanson left DeCaire a message on her home answering machine that she should report to Worcester instead of Boston on February 3. Meanwhile, Dichio informed Williams, who was working in Boston that week, that she would be permitted to attend the San Francisco conference and also that she would be transferred back to Worcester very shortly. The

following week, Williams was transferred back to Worcester.  At this point Williams withdrew her EEO complaint.

When DeCaire arrived in Worcester on February 3, Bezanson informed her that he had met with Dichio and Taylor while she was gone and that it was decided she would be permanently transferred to Boston.  On February 4, DeCaire, who had been promoted twice and held a higher position, was transferred to Boston to fill an entry-level 082 position in Court Operations, work of a much lower level. At the time of this reassignment, there were deputies junior to DeCaire in both Worcester and the Warrant Investigations Unit in Boston.

On February 3, Durette sent an e-mail to the office announcing that DeCaire was being moved to Boston to replace DUSM Jaime Viator in Court Operations.  DeCaire testified that this e-mail "humiliated" her because "Jaime Viator was not a criminal investigator, she was an entry level . . . ."  DeCaire testified that the duties she performed in Court Operations were the same as the duties she performed when she first started working for the Marshals Service in 1991, a dozen years earlier.

On February 17, 2003, Assistant Chief Deputy Durette was replaced with Dave Dimmitt.  DeCaire testified that during an introductory meeting with Boston personnel, Dimmitt stated that the deputies needed to be loyal to Dichio and that he was "looking for a few individuals to change their attitude."  DeCaire testified

-16-

that Dimmitt "went on . . . about how people shouldn't take on the Marshals Service, that the Marshals Service has been here long before we were here and it will be here long [after] we're gone." DeCaire had filed her complaint shortly before these comments were made.[5]

At trial, Dimmitt testified that at this meeting he discussed "everything from attitude to leadership" and "probably said attitude is important," but that he did not tell the deputies "not to mess with the Marshals Service."

On February 27, 2003, DeCaire filed a supplemental complaint with the EEO stating that Dichio had retaliated against her after she filed her January 23 complaint by permanently transferring her to an entry-level position in Boston. She also went further and requested disciplinary action against Dichio.[6]

---

[5]      The parties have stipulated that on February 14, 2003, DeCaire was issued a Notice of Right to File a Discrimination Complaint.   On February 19, the EEO Counseling Report was submitted.

[6]      The complaint alleged:

I further believe USM Dichio retaliated against me after he was informed that I filed a complaint. ACDUSM Durette notified USM Dichio on Friday, January 23 that I had filed a complaint the previous day.   On Tuesday January 28, USM Dichio traveled to Worcester and notified SDUSM Bezanson that I would be transferred permanently to Boston.   I was notified when I returned from leave (February 4) that I should pack up my belongings and report to the Boston court Supervisor the following day. It is obvious to me this is a direct form of retaliation, after

-17-

On March 12, 2003, three new entry-level deputies arrived in the District. Despite this, DeCaire, who was more senior and held higher rank, continued to be assigned to an entry-level job in Court Operations. On March 17, DUSM Scott Kimball, who was junior to DeCaire, was transferred out of Court Operations to Warrant Investigations. Nonetheless, DeCaire remained in the entry-level position in Court Operations.

On April 21, 2003, DeCaire expressed to Dimmitt and Dichio her interest in being considered for a position as Acting Supervisor in Court Operations, as opposed to her entry-level position. On April 23, she expressed to them her interest in being considered for a position as Warrant Coordinator. She was selected for neither job. On April 28, DUSM Alison Hodgkins was appointed to the position of Acting Supervisor for Court Operations and DUSM Paul Sugrue was assigned to the position of Warrant Coordinator.

On August 21, 2003, DeCaire expressed her interest in the position of permanent Supervisor of Court Operations. She noted

> finding out about my complaint the original rotation never took place and changed to a permanent reassignment. ACDUSM Durette put out an e-mail that I would be replacing an 082, which further demeaned me. Since USM Dichio has come to our office I have been demoted from a Team Leader in Investigations to replacing an 082.
>
>     In closing, I would like disciplinary action to be taken against USM Dichio. I believe USM Dichio has made decisions based on my sex and parental status, with absolutely no regard to my qualifications and training.

-18-

that it had been 120 days since her prior request, and Acting Supervisor DUSM appointments that are not announced for competitive selection, as here, cannot exceed 120 days. DeCaire did not receive the position. Instead, a woman who had expressed no interest in and did not want the job was solicited to take the job (but did not). Hodgkins then continued in the position until it was eliminated, although her appointment exceeded 120 days.

On October 3, 2003, DUSM Kevin Donohue, who was junior to DeCaire and had been assigned to Court Operations, was assigned to a Warrant Coordinator position, the other position which DeCaire had sought.

At trial, Dichio testified that all of his personnel decisions were based on only three factors: seniority, job performance, and locality. He did not testify that loyalty to him was a basis for any personnel decision.

Dichio also said that after Dimmitt arrived on February 17, 2003, Dimmitt made all of the "decisions in the operation": "After that when things happened in the office, I was given recommendations. I either agreed or disagreed to the transfers here and there." Dimmitt stated that he chose Hodgkins as Acting Supervisor for Court Operations because she had not yet had the opportunity to serve in a formal acting supervisory position. Dichio also specifically testified to his belief in Hodgkins's strong qualifications. Dimmitt indicated that he thought Sugrue

-19-

was the best person for the Warrant Coordinator position based on his experience.

Over Columbus Day weekend in October 2003, DeCaire married Bohn. On the morning of the following Tuesday, October 14, Supervisor Paul Dunne told DeCaire that she was being transferred to Worcester and was required to report there by noon. DeCaire testified that she found this ridiculous and inquired why Dunne, who shared responsibility with Bohn for supervising Court Operations, could not be her supervisor. Dichio testified that the transfer was necessary to avoid a conflict between DeCaire and Bohn now that Bohn was supervising Court Operations, and that it was Chief William Fallon who ultimately made this decision. Fallon testified that DeCaire's transfer was "something [he] was actually working on for quite a while," and it was a coincidence that the transfer occurred immediately after DeCaire and Bohn's wedding.[7]

On October 28, 2003, Bezanson advised Fallon that DeCaire had told him that she was four months pregnant and requesting "light duty" status. Between October 28 and November 13, DeCaire

---

[7]    Williams testified that Bezanson called her into his office first thing on Tuesday morning, October 14, and asked her if DeCaire and Bohn had been married over the weekend. After she answered "possibly," Bezanson asked if she had attended the wedding, to which she responded "maybe." She further testified: "And then his next statement was the chief knows that . . . they got married and effective immediately you're now transferred to Boston to replace Cindy [DeCaire], Cindy's transferred to Worcester. Pack all your stuff and you have to report there by noon that same day."

continued to work in Worcester, and her "light" duties included serving process, warrant investigation work, and administrative work. DeCaire testified that during an earlier pregnancy, she had performed similar light work.

On November 14, DeCaire was informed that she would be assigned to Worcester on only Mondays and Fridays; she would have to travel and work in the control room in Boston (which, as we discuss later, Bohn was then supervising) on Tuesdays and Thursdays, and travel to work in Springfield on Wednesdays. When she objected, Fallon informed her that she would have to use sick leave for her pregnancy if she did not accept the proposed assignment. DeCaire testified that she registered an informal complaint about this assignment with the EEO office but received no response.

On November 20, DeCaire reported to the Boston control room as assigned. DeCaire testified that the control room was excessively hot because there was inadequate ventilation for all of the electronic equipment, and that she was not allowed to leave unless she had another deputy relieve her. She was also concerned about the possible side effects the electronic equipment could have on a developing baby.

Fallon testified that DeCaire was assigned to the control room because of a manpower shortage, and said that putting DeCaire there saved the Marshals Service, which was already strapped for

-21-

money, from having to hire outside guards at a cost of about $200
each per day. Dichio testified that he was not directly involved
in the decision to assign DeCaire to the control room.

On January 5, 2004, DeCaire filed a second formal EEO
complaint alleging ongoing discrimination and retaliation. It
detailed DeCaire's being denied the positions of Acting Supervisor
of Court Operations and Warrant Coordinator, the solicitation of a
woman who did not want the job, her October 14, 2003 transfer to
Worcester after her marriage to Bohn, and her assignment to the
control room.[8] She also noted that another deputy who was on light

_____

[8]    Among her other allegations were these:

This will be my third transfer in a
year, no other DUSM's other than DUSM Williams and
I have had to worry about when and what our next
transfer will be. I have asked for numerous other
positions in the Boston office, and have been
ignored and overlooked for every single one.
There were numerous other alternative positions
that I could have been transferred too, to
alleviate having to displace DUSM Williams and
myself, yet one more time. It is obvious that as
two females in the Boston office we are
dispensable, compared to our junior male
counterparts. It should also be noted, I have
still not received notice of whether or not my
transfer is permanent or not.
. . . .
Starting on November 17, I took sick
leave for three days awaiting a phone call from
EEO, who I e-mailed asking for help.
Again, I feel this is ongoing
retaliation from management, no other Deputy in
the District of Ma. is forced to transfer from
office to office. There are many other Deputies
who go on light duty due to injuries etc., they
are not required to transfer, nor are they

duty because he had had an operation was not required to work in
the control room.

On January 27, 2004, DeCaire submitted a request for
participation in the Department of Justice Worklife program, asking
to work in Worcester for the remainder of her pregnancy.   The
request was denied on February 24.   Dichio testified that he took
no part in this decision.   Dichio did testify that he remembers
receiving a second Worklife request from DeCaire while she was on
maternity leave, requesting to stay out another six months.   Dichio
testified that his response to this request was "absolutely not"
because the office was shorthanded.

_____

threatened that limited duty is a favor, and that
there may not be limited duty for them, and they
may need to take sick leave. I was also pregnant
in the Boston office 5 years ago, and never
received such cruel treatment, nor did I have to
worry about taking sick leave because there was
nothing for me to do. I have spoken to many of my
female co-workers who have had children while
employed by the USMS, and no one has received such
treatment.   I have also been on limited duty in
the Worcester office in the past, for over a two
month duration.

. . . .

I am asking to be assigned limited duty
in a HQ's entity immediately.   I am aware, that
there are limited duty assignments available in
Witness Protection, OCDEFT and Judicial Security.
I feel this is the only place the US Marshal can
not continue with his ongoing efforts to destroy
my career.

-23-

Since August 2002, DeCaire is the only DUSM in the District of Massachusetts whose assigned station has changed so many times.

2.    Bohn

Shortly after DeCaire filed her initial EEO complaint on January 23, 2003, Bohn, who was living with DeCaire, himself suffered adverse actions.  He attributed these to DeCaire's having filed the EEO complaint.

Dichio assigned a lower-ranking, non-supervisory DUSM to attend an upcoming HIDTA committee meeting "dealing with issues that [Bohn] had specifically been dealing with as the task force supervisor."  Bohn went to Paul Durette's office to discuss the issue with him and complained, "I feel like I'm guilty by association here because of Cindy's [DeCaire's EEO] complaint." Bohn later told Dave Dimmitt that he believed he was being treated differently because of DeCaire's EEO complaint: "I brought up a couple of instances.  One was that the Marshal would no longer acknowledge me the same way he had in the halls or in the office prior to the filing of the complaint."

Bohn testified that on March 11, 2003, Dimmitt, who had replaced Durette several weeks before, informed Bohn that he was to move his office and turn his car in and would be in charge of what Bohn described as "managing special projects and a few other menial

-24-

tasks." Bohn "reminded [Dimmitt] that I felt this was because of Cindy's EEO complaint."

Dichio testified that Dimmitt had recommended to him that Bohn be removed from his supervisory role because Bohn had "berated a few deputies" and was "unprofessional" during a HIDTA task force meeting. Dichio said he agreed with Dimmitt. Dimmitt testified that at the HIDTA meeting, Bohn had declared that if Darlene DeCaire (the plaintiff's former aunt by marriage) and Mark Lewis were not removed from the task force, he would leave. Dimmitt said that after this incident, he could have either officially written up Bohn's misconduct or simply attempted to remove Bohn from the situation, and he chose the latter.

Another member of the HIDTA task force, Stephen Ridge of the Boston Police Department, testified that he was "confused" with respect to Bohn's removal from the task force because "Bohn since his inception only grew the task force and . . . several months prior . . . Marshal Dichio was at Boston Police headquarters to give Jeff Bohn an award. And shortly after that, . . . things sort of changed. [The task force] just got better [under Bohn] and [Bohn] seem[ed] to be on the outs for some reason."

Bohn testified that on June 11, 2003, he received telephone messages while at a training outside the office telling him that he had never been approved for the training and to report back to the office immediately. According to Bohn, when he

-25-