returned to the office, Dimmitt admitted that Bohn had in fact sought pre-approval for the training; Dimmitt warned him that he was on probation and "being watched," and said that "things happened yesterday that contributed to [the way Bohn was being treated]." The parties stipulated that around this time, Dichio became aware of allegations regarding a conversation Dichio had with another HIDTA task force member, Joseph Cummings, in which Dichio allegedly said that DeCaire would not be advancing in the Marshals Service as long as he was in charge.

Bohn also testified that during this conversation, Dimmitt warned him that Dichio "told me to get you on your eye." Bohn had been experiencing problems relating to his eye, and these problems apparently were meant to be a basis to "get" Bohn. Bohn also stated that Dichio subsequently would "administer me impromptu eye tests that he would make up on his own."

At trial, Dimmitt denied making any of these statements during this conversation with Bohn.

On October 3, 2003, Bohn and Paul Dunne were appointed Court Operations Supervisors, in which capacity they were in charge of the daily operations of the court and prisoners in Boston. Duties were divided between the two, and Bohn was responsible for the control room, among other things. Dichio testified that he authorized this move because Fallon had told him that "Bohn has

continued to improve" and "it's time for Jeff Bohn to take part in court operations where he would be assigned personnel."

Because Bohn was in charge of the control room, he served as DeCaire's supervisor when she was assigned there in November. DeCaire was by then Bohn's wife. In December 2003, Bohn filed an OSHA complaint regarding conditions in the control room. He was almost immediately relieved from supervisory duties pertaining to the control room. Dave Taylor, who was now Bohn's supervisor, testified that he was unaware of the conflict created by having Bohn supervise the control room where Bohn's wife worked until Bohn filed the OSHA complaint, and he stated that this conflict was the reason that supervisory duties for the control room were removed from Bohn.

At trial in June 2005, Dichio testified that he thought Bohn could be a "great supervisor," and he noted that Bohn "was inexperienced back then, he's learned a lot, and . . . he's back in the warrant squad as supervisor."

3.    Durette

When Dichio arrived, Durette was the Assistant Chief Deputy for the District of Massachusetts. The two appear to have had a strained relationship. Durette attributes at least part of this strain to his refusal to commit himself to comply with Dichio's request that he support Dichio in responding to DeCaire's initial EEO complaint.

-27-

On February 5, 2003, Dichio went into Durette's office to question him about whether Durette had spoken to DeCaire about her January 23 EEO complaint. Durette told Dichio that he had a brief conversation with DeCaire the previous afternoon. Durette testified that Dichio then told him that "if you're asked questions about this I expect that you'll support the Marshal." Durette testified that he responded that he would answer truthfully if he were asked questions under oath.

Dichio testified that on February 5, the same day as his conversation with Durette, he contacted headquarters to request a new acting chief to replace Durette; he said could not trust Durette because Durette "never communicated" with him. He stated that he had also made a request for a replacement for Durette at some point prior to February 5. Headquarters sent Dimmitt as an acting chief on February 17 for a term of 120 days.

Around the beginning of March, Bohn spoke with Durette about concerns he had with Darlene DeCaire's performance on the HIDTA task force. Durette testified that he discussed Bohn's concerns with Dimmitt, who said that he would bring them to Dichio's attention. Around this time, Durette was removed from the chain of command and assigned to special projects.

Durette testified that around March 19, plaintiff DeCaire informed him of the alleged conversation between Dichio and Joseph Cummings, in which Dichio supposedly said that DeCaire would not be

-28-

advancing in the Marshals Service so long as he was in charge. Durette subsequently mentioned the alleged Dichio-Cummings conversation to Dimmitt.[9]   Thereafter, at Dichio's direction, Dimmitt removed Durette from his office and placed him in a cubicle in the administrative section of the office.

By April 21, 2003, Durette left the Marshals Service.

C.

The district court took a view of the facts different from that of either party. It rejected DeCaire's claims that Dichio's behavior toward her was the result of gender discrimination and retaliation for her EEO complaint. However, the court also did not credit the government's neutral, efficiency-based explanations.

The district court initially analyzed the facts in light of the burden-shifting framework articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). DeCaire, 474 F. Supp. 2d at 251.  Under McDonnell Douglas, a plaintiff establishes a presumption of gender discrimination by establishing (1) that she is a member of a protected class; (2) that an adverse employment action was taken against her; (3) that she was otherwise qualified for such position; and (4) that a similarly situated male

_____

[9]    The district court found that Cummings's testimony was not credible in its entirety. DeCaire, 474 F. Supp. 2d at 248. Nonetheless, Cummings's allegation that Dichio told him that DeCaire was going nowhere is relevant for its effects on DeCaire, Dichio, and others in the office.

was treated differently. Id. (citing McDonnell Douglas, 411 U.S. at 802). The district court found that DeCaire established a presumption of gender discrimination by meeting all four of these requirements: she is a member of a protected class; she suffered adverse employment actions because her "duties were substantially altered, her investigative duties were taken away from her, she was not granted promotions given to others, she was repeatedly transferred, was assigned to a rotation system, and was assigned to what she describes as an oppressive work environment while on light duty in the Boston control room"; she was qualified for the positions she did not receive; and she provided evidence that less-experienced men, including Mark Lewis and Scott Kimball, were treated differently. Id. at 251-52.

Once the district court found that DeCaire had established a presumption of discrimination, it shifted the burden to the government to articulate a "legitimate, non-discriminatory reason for its adverse employment action." Id. at 252 (citing Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000)). The district court noted that the government articulated a number of reasons to justify Dichio's treatment of DeCaire, including the nature of the work to be performed, seniority, locality, and fairness. Id. The court held that at this stage the government had produced sufficient reasons

-30-

for its behavior to rebut the presumption of gender discrimination.
Id.

With the presumption of discrimination gone, the district
court noted that the "burden to demonstrate discrimination rests on
the plaintiff." Id. (citing Provencher v. CVS Pharmacy, Div. of
Melville Corp., 145 F.3d 5, 10 (1st Cir. 1998)). It noted that
"[o]nce the fact-finder believes that prohibited discrimination
played some role . . ., the burden of persuasion shifts to the
defendant" to demonstrate that the outcome would have been the same
absent a discriminatory motive. Id. at 253. It also stated that
it was insufficient that DeCaire offer evidence that the
government's explanations for her treatment were pretext, which it
found she had done. Id. She needed additional evidence beyond
pretext to enable "a factfinder rationally to conclude that the
stated reason behind the adverse employment decision is not only a
sham, but a sham intended to cover up the proscribed type of
discrimination." Id. (quoting Szabo v. Trs. of Boston Univ., 1998
WL 1085688, at *3 (1st Cir. Dec. 31, 1998)) (internal quotation
marks omitted). In other words, DeCaire needed to provide direct
or circumstantial evidence of a "discriminatory animus on the part
of the employer." Id. (quoting Szabo, 1998 WL 1085688, at *3)
(internal quotation marks omitted).

In one of several difficult-to-interpret passages, the
district court found there was "convincing evidence of gender

-31-

discrimination sufficient to make this a mixed motive case." Id. (emphasis added). It held that Dichio's initial decision in September 2002 to transfer DeCaire to a lesser position in Worcester was "gender discrimination pure and simple, the result of stereotypical male views of gender roles," but noted that DeCaire's delay from the September 30, 2002 date of transfer to the filing of a complaint on January 23, 2003 meant that the transfer cannot be considered as part of her gender discrimination claim but only to establish retaliatory intent. Id.; see also 29 C.F.R. § 1614.105(a)(1) (aggrieved federal employees who believe they have been discriminated against on the basis of sex must consult an EEO counselor within forty-five days of the alleged discriminatory action). The court concluded this passage by stating that "[t]he remainder of evidence offered by DeCaire to establish a finding of gender discrimination is unavailing." DeCaire, 474 F. Supp. 2d at 253 (emphasis added).

The district court next found that Dichio's promotions of Lewis to the HIDTA task force in September 2002[10] and Hodgkins to the position of Acting Supervisor of Court Operations in April 2003 were not discriminatory. The court found Lewis was selected for a

_____

[10]     Like her initial transfer to Worcester, Dichio's promotion of Lewis was not included in DeCaire's complaint to the district court. At trial DeCaire conceded that she had not made timely claims to the EEO office regarding either event. Nonetheless, both events provide relevant background evidence for the timely claims.

coveted position on the HIDTA task force because the Dichio and Lewis families were "acquaintances," and Dichio wanted to appoint someone he felt he could trust. Id. at 254. No party to the case had advanced this theory. As for the selection of Hodgkins rather than DeCaire, the court found, as the government argued, that Hodgkins was selected as Acting Supervisor of Court Operations because she had a "stellar record" and her "advancement substantiates a neutral policy of promoting those with high scores and the best qualifications." Id.

As for the assigned rotation of DeCaire and Williams from Worcester to Boston in January 2003, the court found that "[w]hile the rotation of only female deputies gives this Court reason to pause, Dichio had the rightful managerial discretion to assign the two deputies into Boston court operations . . . since Dichio believed the office was 'shorthanded' in Boston." Id. However, the court went on to conclude, there were additional motivations at play with respect to DeCaire: "[B]y the time of the rotational assignment, Dichio was embattled and defensive about the Lewis appointment to HIDTA, an appointment criticized not only by DeCaire but by Bohn, a supervisor Dichio took as disloyal and hostile to his management. Dichio's reciprocal hostility to Bohn (and to anyone close to him), and soon to Durette, was the principal driver behind Dichio's subsequent management decisions." Id.

-33-

In analyzing DeCaire's retaliation claim, the district court began by setting forth the statutory basis for DeCaire's claim: that it is illegal for an employer to discriminate against an employee who has "opposed any practice made an unlawful employment practice . . . [or] made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing." Id. at 255 (quoting 42 U.S.C. § 2000e-3(a)) (emphases omitted) (internal quotation marks omitted). The court noted that this circuit has specifically required that under Title VII,

> in order to show a prima facie claim of retaliation the plaintiff must show: [f]irst, protected participation or opposition under Title VII known by the alleged retaliator; second, an employment action or actions disadvantaging persons engaged in protected activities; and third, a causal connection between the first two elements that is a retaliatory motive playing a part in the adverse employment actions.

Id. at 255 (quoting Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 33 (1st Cir. 1990)). The court found that DeCaire met the first two requirements because she filed a formal grievance and complaint with the EEO, which was well-known by her supervisors, and she was disadvantaged by several employment actions. Id.

The court stated that DeCaire could satisfy the third requirement -- showing a causal connection between her EEO complaint and the adverse employment actions -- by providing direct evidence of retaliation, which normally contemplates "those statements by a decision maker that directly reflect the alleged

-34-

animus and bear squarely on the contested employment action."  Id.
at 256 (quoting Melendéz-Arroyo v. Cutler-Hammer de P.R. Co., 273
F.3d 30, 35 (1st Cir. 2001)) (internal quotation marks omitted).

The court found that the comments made by Dimmitt during
his introductory meeting did not constitute warnings that deputies
"would face retaliatory action if they filed complaints, nor was he
indicating that the Marshals[] Service was retaliating against
DeCaire because she had filed a complaint."  Id.

With respect to DeCaire's transfer from Worcester to an
entry-level position in Boston following the filing of her
complaint, the court concluded that "Dichio simply chose to bear
down on DeCaire because he considered her disloyal and hostile to
his management decision, and he could."  Id. at 256-57.

The court stated that the "most persuasive" of DeCaire's
alleged retaliatory actions was her assignment to the Boston
control room during her pregnancy.  Id. at 257.  However, it found
that although "DeCaire's light duty tasks may have been in an
environment more oppressive than others, . . . whatever the reason
for the assignment -- the need for additional workforce in the
Boston control room to obviate the need to hire outside help, the
supervisors' general sense of loyalty to the Marshal, or even
Dichio's general dislike of DeCaire personally due to her
relationship with Bohn -- the transfer was not made to retaliate
against DeCaire for filing of a formal complaint."  Id. at 258.

-35-

Thus, "[w]hile the evidence supports the existence of loyalties within the service[,] it does not support a claim of retaliation for filing a complaint. . . . There is a fine line between showing a casual connection demonstrating retaliation for the filing of a formal complaint on the one hand, and, a requirement of loyalty to Dichio and the Marshals' Service on the other." Id.

The district court explained that temporal proximity can serve as a substitute for direct evidence of a causal connection between a complaint and an adverse employment action. Id. Here, however, it held that "[t]he timing of adverse actions had, it seems, little or anything to do with [DeCaire's] filing of her complaint, and more to do with Dichio's arrival as Marshal." Id. at 259. In particular, the court noted that some of DeCaire's transfers took place before she filed her complaint and that other considerations factored into her transfers, including Dichio's need to separate her and Bohn and to accommodate her light duty status. Id.

The district court concluded that "after the initial transfer to Worcester, while DeCaire continued to be the victim of discrimination at Dichio's hands, the discrimination was then born out of personal hostility[,] not gender bias or a need to retaliate. I find these later events would have come out much the same had DeCaire been a male deputy." Id. Therefore, although the government "has failed to persuade the Court that its actions were

-36-

neutral, on-the-merits decisions," a verdict for DeCaire would not be appropriate because the conduct, "however discriminatory and reprehensible, was not the result of prohibited gender discrimination." Id. at 260.

## II.

We turn to DeCaire's appellate arguments. Both parties have noted, and we agree, that the district court opinion at times seems at odds with itself and is not entirely clear.

## A.

With respect to her gender discrimination claim, DeCaire argues that the district court's statements that Dichio engaged in gender discrimination require that liability be imposed on the government, even if the court also found that this was a mixed motive case.

Under 42 U.S.C. § 2000e-2(m), "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." (Emphasis added.) If other such factors existed, the statute limits the remedies available to the plaintiff. See 42 U.S.C. § 2000e-5(g)(2)(B). In other words, "the employer has a limited affirmative defense that does not absolve it of liability, but restricts the remedies available to a plaintiff." Desert Palace, Inc. v. Costa, 539 U.S. 90, 94 (2003).

DeCaire is correct that to the extent the district court's finding in a mixed motive discrimination case was that there was gender discrimination, such a finding required it to find liability on the part of the government on any timely claim; in such a case, it is plaintiff's remedies, not the employer's liability, that are limited. In such a case the court could, in its discretion, grant declaratory relief, injunctive relief, and attorneys' fees and costs, but could not award damages or issue an order requiring a reinstatement, hiring, promotion, or payment. 42 U.S.C. § 2000e-5(g)(2)(B)(i), (ii). We discuss the import of this later.

The court was also incorrect in its determination that evidence relating to DeCaire's initial transfer could be used only with respect to her retaliation claim. A discriminatory action for which a claim was not timely filed cannot be used as a basis to award relief but can be used as background in support of later claims of gender discrimination. See Nat. R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002) (discrete discriminatory acts are not actionable if time-barred, but an employee can use these prior acts "as background evidence in support of a timely claim").

B.

The district court also enunciated principles at variance with retaliation law. DeCaire argues that it appeared to import a gender discrimination component into retaliation law; specifically,

the district court stated that "later events would have come out much the same had DeCaire been a male deputy." DeCaire, 474 F. Supp. 2d at 259. This is an incorrect statement of the law of retaliation.

Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), states that it is unlawful for an employer to discriminate against an employee because "he has opposed any practice made an unlawful employment practice . . ., or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." The Supreme Court has explained how Title VII's substantive provision differs from this anti-retaliation provision: "The substantive provision seeks to prevent injury to individuals based on who they are, i.e., their status. The anti-retaliation provision seeks to prevent harm to individuals based on what they do, i.e., their conduct." Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2412 (2006). It therefore does not matter for retaliation purposes whether Dichio would have treated a male deputy the same way he treated DeCaire. The relevant question is whether Dichio was retaliating against DeCaire for filing a complaint, not whether he was motivated by gender bias at the time.

Additionally, DeCaire argues that the district court's interpretation of the temporal proximity requirement is incorrect. We agree. This court's rulings do not hold that the existence of

allegedly discriminatory employment actions prior to the filing of a complaint immunizes an employer from a retaliation claim following the complaint. See, e.g., Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25-26 (1st Cir. 2004) (finding sufficient temporal proximity to make prima facie case when adverse employment action occurred in March 1998, formal complaint was filed in May 1998, and a second adverse employment action occurred in June 1998). Instead, our law is that temporal proximity alone can suffice to "meet the relatively light burden of establishing a prima facie case of retaliation." Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 224 (1st Cir. 2007) (finding temporal proximity between June 2002 allegations of discrimination and August 2002 termination sufficient to meet prima facie burden). All of the events described here took place within a period of about one year. In our view, the court may have overlooked the temporal closeness of events by focusing on the fact that Dichio had mistreated DeCaire prior to her complaint.

DeCaire also argues that the district court created a "disloyalty defense." The court discussed a "fine line" between showing a causal connection demonstrating retaliation for the filing of a formal complaint and a requirement of loyalty to Dichio and the Marshals Service. DeCaire, 474 F. Supp. 2d at 258. As a matter of law, the filing of an EEO complaint cannot be an act of

-40-

disloyalty to either the U.S. Marshals Service or the Marshal which
would justify taking adverse actions.

Finally, DeCaire argues that the district court imposed
a heightened burden on her by requiring that she provide evidence
in addition to evidence establishing that the government's
explanations were pretext. DeCaire, 474 F. Supp. 2d at 253.   In
Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000),
the Supreme Court recognized that "it is permissible for the trier
of fact to infer the ultimate fact of discrimination from the
falsity of the employer's discrimination," id. at 147, but doing so
is not required, as "there will be instances where, although the
plaintiff has established a prima facie case and set forth
sufficient evidence to reject the defendant's explanation, no
rational factfinder could conclude that the action was
discriminatory," id. at 148. To the extent the district court said
it required DeCaire to present evidence beyond disproving the
government's arguments as pretext, that was error. See Zapata-
Matos v. Reckitt & Coleman, Inc., 277 F.3d 40, 45 (1st Cir. 2002)
("We have adhered to a case by case weighing. . . . [D]isbelief of
the reason may, along with the prima facie case, on appropriate
facts, permit the trier of fact to conclude that the employer had
discriminated."); see also Ronda-Perez v. Banco Bilbao Vizcaya
Argentaria-P.R., 404 F.3d 42, 44-45 (1st Cir. 2005); Feliciano de
la Cruz, 218 F.3d at 6 (holding that the "same evidence used to

-41-

show pretext can support a finding of discriminatory animus"). It is difficult, however, to tell which principle the court employed.

The court also suggested that only "direct" evidence of retaliation would do to meet plaintiff's ultimate burden and that circumstantial evidence could be considered only if it had a close temporal connection. DeCaire, 474 F. Supp. 2d at 256, 258. Neither of those are correct principles. It is well-established in this circuit that evidence of retaliation can be direct or circumstantial. Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 335 (1st Cir. 2005). In other words, the district court improperly imported a direct evidence requirement into the third step of the McDonnell Douglas framework, which is the very test courts use when a plaintiff does not have direct evidence.

The district court also erroneously suggested that because an employer's action falls within an area of discretion, that is an adequate justification. DeCaire, 474 F. Supp. 2d at 254, 258. Discretion may be exercised in ways which are discriminatory or retaliatory.

### III.

Against this backdrop of legal error, the plaintiff makes a final argument that the record does not support the district court's factual conclusions. DeCaire objects to the district court's "sua sponte finding" that "Dichio may have subjectively viewed DeCaire as disloyal," as well as its conclusion that after

-42-

DeCaire's initial transfer to Worcester, the "principal driver" behind Dichio's management decisions was "hostility to Bohn (and anyone close to him), and soon to Durette." Id. at 254.

We have great concern over the district court's utilization of a theory not advanced by either party to the case. Fairness alone requires that the parties have notice of the theories so that the parties can gear their evidence toward what is at stake. Indeed the entire analytic structure of McDonnell Douglas depends upon clear articulations by both plaintiff and defendant. The employer must articulate a neutral, non-discriminatory reason for the action; plaintiff may show the reason is pretext. The same is true of mixed motive analysis -- that analysis requires clear statements by both sides of the motives which are at issue. Both sides to this litigation were prejudiced by the court's spontaneous introduction of a new theory of justification.

The government tries to salvage the verdict in its favor by saying that even though it did not advance the theory on which the court relied,[11] the explanation has some degree of plausibility in light of the evidence. We reject the argument.

A theory must have a sufficient grounding in the evidence. Otherwise, it is merely speculation. In our view, after

---

[11]    If it had done so, plaintiff would have contested whether the personal loyalty argument was a legitimate defense.

reviewing the facts, we are left with the conviction that the theory on which the court resolved the case is speculation not grounded in the evidence. See Benham v. Lenox Savings Bank, 292 F.3d 46, 48-49 (1st Cir. 2002) (reversing and remanding an employment discrimination case where district court developed an "alternative explanation" argued by neither party and not supported by the record). We review the district court's factual determinations regarding an employer's intent for clear error. Benham, 292 F.3d at 48; Foster v. Dalton, 71 F.3d 52, 55 (1st Cir. 1995). Under this standard, reversal is appropriate only if "after careful evaluation of the evidence, we are left with an abiding conviction that . . . [the court's] findings are simply wrong." Benham, 292 F.3d at 48 (quoting State Police Ass'n v. Comm'r, 125 F.3d 1, 5 (1st Cir. 1997)) (internal quotation marks omitted).

That standard has been met. We mention only some of the evidence which undermines our confidence in the outcome reached by the court.

The record does support the court's findings that Dichio was quite hostile to DeCaire. What is much more problematic is the conclusion that the hostility bore no connection whatsoever to her filing discrimination and retaliation complaints against him and continuing to do so after he made it clear that there would be consequences for her. As we have said, while Dichio may have subjectively perceived DeCaire to be disloyal, the protesting of

-44-

illegal discrimination is protected by law and cannot be a basis for a loyalty test. The record provides little support for a conclusion that DeCaire was somehow otherwise disloyal.

It is clear that DeCaire told Dichio that she did not want to go to Worcester, despite his telling her his views that as a mother she should be there. She also objected to his disqualifying her from the job Lewis received. At that point Dichio told her she could lose her job if she did not go along. This statement on his part very much supports a retaliation claim. It is worth noting that as part of her EEO complaints DeCaire asked that the Marshal be disciplined for his alleged violations of law.

There is also a lack of evidence that Dichio harbored hostility toward Bohn before DeCaire's protests and her EEO complaint. In fact, the evidence points in a different direction. Bohn was promoted to be Supervisor of the HIDTA task force a month after Dichio arrived, and at some point in the fall of 2002 Dichio made a public display of his admiration of Bohn's work at a ceremony at Boston Police Headquarters. The evidence supports (but does not compel) plaintiff's theory that Bohn suffered on account of DeCaire's EEO complaint. Bohn testified that Dichio started treating him differently after the complaint was filed, such as by excluding him from an HIDTA committee meeting and sending a lower-ranking deputy in his place. It was also after the EEO complaint that Dichio removed Bohn from his role as Supervisor of the HIDTA

-45-

task force and gave him a hard time about his attendance at a
training program and gave instructions to "get" Bohn, using his eye
condition as a pretext.

As for Durette, Dichio took actions to remove him from
his position on the very day Dichio told Durette that he expected
Durette to support him in response to DeCaire's complaint and
Durette replied, to the contrary, he would tell the truth.

IV.

In light of the errors of law and our doubts about the
grounding for the court's ultimate conclusions, the verdict cannot
stand.  This leaves the question of the appropriate disposition.

DeCaire argues we should enter judgment in her favor on
two grounds: (1) treating this as a mixed motive case, she is
entitled by the court's finding of discrimination to at least
limited remedies; (2) the evidence compels a verdict in her favor.

We disagree.  As to the first ground, there is sufficient
ambiguity, as both parties acknowledge, about the meaning of the
various statements in the court's opinion that such relief is not
warranted.  As to the second ground, a reasonable factfinder
correctly applying the law could rule in favor of DeCaire, but that
is far from compelled.

We vacate the entry of judgment and remand the case for
further proceedings consistent with this opinion, in accordance

with Local Rule 40.1(K)(1) of the District of Massachusetts.   No
costs are awarded.

So ordered.