# United States Court of Appeals
## For the First Circuit

No. 07-1539

CYNTHIA A. DECAIRE,

Plaintiff, Appellant,

v.

MICHAEL B. MUKASEY, ATTORNEY GENERAL,[*]

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Lynch, and Lipez,
Circuit Judges.

Indira Talwani with whom Segal Roitman was on brief for appellant.
Stephanie R. Marcus, Attorney, Appellate Staff, Department of Justice, Civil Division, with whom Peter D. Keisler, Assistant Attorney General, Glenn T. Suddaby, United States Attorney, William H. Pease, Assistant United States Attorney, and Marleigh D. Dover, Attorney, Appellate Staff, Department of Justice, Civil Division were on brief for appellee.

March 11, 2008

_____

[*]    Pursuant to Fed. R. App. P. 43(c)(2), Attorney General Michael B. Mukasey has been substituted for former Attorney General Alberto R. Gonzales as the respondent herein.

LYNCH, **Circuit Judge**.  Cynthia DeCaire, a Deputy U.S. Marshal, brought suit alleging that Anthony Dichio, then the U.S. Marshal for the District of Massachusetts, discriminated against her on the basis of gender and retaliated against her after she filed complaints with the Equal Employment Opportunity office. After a bench trial, the district court ruled against DeCaire on both claims.  DeCaire v. Gonzales, 474 F. Supp. 2d 241, 260 (D. Mass. 2007).

The district court held that Dichio did discriminate against DeCaire, that she was treated adversely after she complained, and that the government's explanations of neutral reasons were not persuasive.  Id. at 260.  Nonetheless, the court found Dichio's hostility was motivated by his perception that DeCaire was disloyal to him personally, and not by gender animus or retaliation.  Id.  The defense had never posed any such theory of motivation or so interpreted the facts on either claim.  Dichio himself testified to no such motivation, nor did any witness.

DeCaire appealed.  In light of errors in the application of law and the lack of record support for the district court's factual conclusions, we vacate the verdict and remand for a new trial.

I.

On March 26, 2004, DeCaire filed suit in the District of Massachusetts alleging gender discrimination and retaliation under

-2-

42 U.S.C. §§ 2000e-16 and 2000e-3, respectively. <u>Id.</u> at 244.  She filed an amended complaint on July 7, 2004.

With respect to discrimination, DeCaire's amended complaint alleged that on account of her gender, she was assigned to weekly rotations in Worcester and Boston in or around January 2003; effectively demoted and transferred to Court Operations in Boston in February 2003; kept in Court Operations in Boston after additional employees were added to that unit; not transferred to the Boston warrants unit when an opening occurred there in or around March 2003; not assigned to the Warrant Coordinator position she sought in or around April 2003; not given the Acting Court Operations Supervisor position she sought in or around September 2003; not assigned to the Warrant Coordinator position she sought in or around September 2003; transferred to Worcester in October 2003; assigned to multiple duty stations in November 2003; assigned to the control room in the Boston federal courthouse in November 2003; and required to work in the control room with limited or no breaks.  Am. Compl. ¶ 52.

With respect to retaliation, DeCaire alleged that after Dichio learned of her filing a complaint, she was transferred to a lesser position in Boston Court Operations in or around February 2003; kept in Court Operations after additional employees were added to that unit; not moved to the Boston warrants unit when an opening occurred there in or around March 2003; denied a promotion

she sought to Court Operations Supervisor in or around April 2003; not assigned to the Warrant Coordinator position she sought in or around April 2003; denied an appointment to the Acting Court Operations Supervisor position she sought in or around September 2003; not assigned to the Warrant Coordinator position she sought in or around September 2003; transferred to Worcester in October 2003; assigned to multiple duty stations in November 2003; assigned to work in the Boston courthouse's control room in November 2003; and required to work in the control room with limited or no breaks. Am. Compl. ¶ 54.

The government filed a motion for summary judgment on both claims, which was denied.[1] DeCaire, 474 F. Supp. 2d at 245.

DeCaire waived her right to a jury trial, and an eight-day bench trial began on June 2, 2005. Id. On February 23, 2007, the district court ruled in favor of the government on both claims. Id. at 241.

### A.

At the crux of this case are the district court's ultimate conclusions rejecting the gender discrimination and retaliation claims. DeCaire's appeal argues that these conclusions rest on errors of law and are not supported by the record.

---

[1]    DeCaire filed a cross-motion for partial summary judgment with respect to the defendant's argument she had not exhausted her administrative remedies, which was granted. DeCaire, 474 F. Supp. 2d at 245.

DeCaire argues that there was error in the gender discrimination claim in the court's utilizing a mixed motive analysis, which was raised sua sponte by the court. Even if use of a mixed motive analysis were appropriate, a finding of mixed motive would only constrain remedies. Indeed, DeCaire argues, once the district court found Dichio had engaged in gender discrimination, it was required to find liability.

The district court's conclusion there was no retaliation, DeCaire alleges, is based on four different errors of law. First, the court improperly imported a gender discrimination component into the standard for proof of retaliation. Second, the court imposed a new loyalty defense not recognized under retaliation theory. Finally, the court improperly discounted the close temporal relationship between events and imposed a heightened burden on DeCaire.

DeCaire's final appellate claim is that several of the court's factual conclusions regarding Dichio's motivations are clearly erroneous when measured against the evidence in the case. In particular, she challenges the district court's conclusions that Dichio discriminated and took post-complaint actions against her because he perceived her as disloyal and because of his hostility toward two others, Jeffrey Bohn and Paul Durette.

B.

We turn first to the evidence before the district court, and view the evidence in the light most favorable to the verdict, focusing on the evidence most relevant to the factual conclusions being challenged.  Where there are credibility disputes, we credit the district court's conclusions.  The district court found that DeCaire was "credible in virtually every respect," and that the credibility of Dichio was "extremely suspect."[2]  Id. at 248.

1.    DeCaire and Susan Williams

DeCaire began her employment with the U.S. Marshals Service in June 1991 in Boston under a different Marshal, as an "082," the entry-level Deputy U.S. Marshal ("DUSM") position.  By all accounts, DeCaire's career with the Marshals Service was successful until Dichio's appointment.  In December 1993, she was promoted to Criminal Investigator DUSM, position 1811, grade 11. In 1995, she was assigned to the FBI Violent Fugitive Task Force in Boston.  In December 1996, DeCaire was promoted to Senior Criminal Investigator DUSM, position 1811, grade 12.  In 1999, DeCaire was assigned to the Warrant Investigations Unit in Boston.  On June 3, 2001, DeCaire became Acting Supervisory Criminal Investigator in the District's Worcester office, a temporary position.

_____

[2]    The district court did not make specific credibility findings with respect to the other people who figure in our description of events.

-6-

DeCaire served in her acting supervisory position in Worcester until September 23, 2001. While in that position, she received a Superior Accomplishment Award. After September 23, DeCaire returned to the Boston office, where she served as a Team Leader in the Warrant Investigations Unit.

On August 6, 2002, Anthony Dichio was sworn in as U.S. Marshal for the District of Massachusetts.

By August 2002, DeCaire was romantically involved and living with another DUSM, Jeffrey Bohn, close to Worcester. Their relationship was common knowledge within the office. When Dichio first arrived, Bohn was serving as Acting Supervisor of the New England High Intensity Drug Trafficking Area ("HIDTA") task force. Approximately one month after Dichio's arrival, Bohn was promoted to Supervisor of the HIDTA task force in Boston.

Dichio conducted introductory interviews with all of the DUSMs in the District soon after his arrival. He interviewed DeCaire in late August 2002. At trial on June 2, 2005, DeCaire testified that during her initial interview with Dichio, he asked whether she wanted to be in the Worcester office, which was closer to her home. She replied that while once she had such an interest, she no longer did because she enjoyed her position in the warrant unit in Boston and she had worked hard to get it. He then talked about family and how family should always come first. He asked her marital status and she replied she was divorced. Dichio asked if

-7-

she had any children, and DeCaire responded she had a young daughter.  He also asked where her ex-husband lived and whether he supported DeCaire; DeCaire replied he did not support her.

Dichio kept returning to why DeCaire did not want to be in Worcester, which he could not understand.  DeCaire replied by telling Dichio about the importance of her career and that there were not many opportunities for her in the Worcester office unless there was an opening on the HIDTA task force there.  Dichio also asked about her personal relationships.  She replied that she was living with Jeffrey Bohn and that her former aunt (by marriage) was a state trooper who worked on the HIDTA task force in Worcester.

At trial, Dichio presented a different account of his initial interview with DeCaire.  According to Dichio, DeCaire told him that she wanted to be transferred to Worcester and had been "trying for eleven years to get to Worcester."  Dichio testified that he told DeCaire that he would transfer her to Worcester and Steve McKearney, a deputy in the Worcester office, would be moved to Boston.  The district court found DeCaire was credible and Dichio was not.

Another female, DUSM Susan Williams, who was assigned to the Worcester office at the time Dichio arrived, testified that during her initial interview with Dichio, before discussing her professional experience, he "interrupted me and asked if I had children.  And I said yes, I have two children.  And . . . then he

-8-

asked if I was receiving any child support.  And I said no. . . .
[T]hat was basically the end of the conversation . . . ."  Williams
testified that her entire conversation with Dichio lasted
approximately twenty minutes.  By contrast, the conversations that
Dichio had with the three male deputies in the Worcester office
lasted significantly longer: one took one-and-a-half to two hours,
and the other two lasted about an hour each.

        The day after DeCaire's interview, her supervisor, Paul
Durette, called her into his office, saying he had been told the
Marshal intended on transferring DeCaire to Worcester and asking
why DeCaire had not come to Durette first to discuss it.  She told
Durette she had not asked to go to the Worcester office, but the
Marshal seemed fixated on sending her there.  She asked Durette to
call the Marshal into his office to reinforce that she did not want
to go to Worcester.

        Several days later, DeCaire received a telephone call
informing her that she was going to be transferred to Court
Operations in Worcester and that she would be replaced in her job
in Boston by a transferred male deputy.  She received calls from
others -- including possibly Dave Taylor, who was at that time on
the HIDTA task force in Worcester -- and she told them that she had
not asked to go to Worcester, that the Marshal seemed fixated on
sending her, and that she did not agree with the Marshal's
decision.  DeCaire testified that given the Marshal's fixation she

-9-

knew Dichio would find a way to send her to Worcester, but she hoped Court Operations in Worcester would not be a long-term assignment because "I was hoping that Dave Taylor, who I knew had been applying for other positions, would get those positions and that I would assume his role in [Worcester on] the HIDTA task force."

While DeCaire was still in Boston, Taylor received a promotion and his position opened on the task force in the Worcester office.  DeCaire, Williams,[3] and DUSM Mark Lewis all expressed interest in the job.

DeCaire was informed by Chief Deputy Tim Bane that she was not going to be considered for the position with the HIDTA task force in Worcester because her uncle's former wife, Darlene DeCaire (divorced several years earlier from DeCaire's uncle), was already on the task force in her capacity as a state police officer and "[Bane] and the Marshal did not want two DeCaires out on the street together."

After this conversation with Bane, DeCaire received a phone call from her supervisor and an e-mail from Bane informing her that her transfer to Worcester was off.  She sent an e-mail to Bane, copying Dichio, expressing her view about the

---

[3]    Dichio testified that he does not recall Williams expressing interest in the job, although the government had stipulated as much.  Williams testified that she had expressed interest in the job and had relevant experience.

inappropriateness of her being excluded from consideration for Taylor's former job on grounds of "family" working together.  She wrote that she and Darlene DeCaire had worked together in the past and, as to the family connection, the two women had been related only by a marriage that ended in divorce.  DeCaire pointed out that the agency had permitted married couples to work together, and stated "I can't help but believe our office is taking a 'sexist view' of the matter."

DeCaire also sent Dichio, with copies to others, an e-mail asking to be considered for the HIDTA task force job and giving her qualifications.  Her supervisor, Tony Visalli, informed her he would recommend her for the job.  Durette told her that he and other members of the management had recommended the vacancy not be filled.

At trial, Bane testified that there were several reasons he opposed DeCaire's appointment to the HIDTA task force, including the fact that she had the same last name as Darlene DeCaire and that he had "concerns about having too many females in the Worcester office."  Bane expressed these concerns, including the one about too many females in the Worcester office, to Dichio.

Dichio selected Lewis, the only male applicant, over the only two other applicants, who were female.  Lewis was junior to and less experienced than both DeCaire and Williams.  At trial, Dichio testified that he selected Lewis because Lewis lived in

Berlin, Massachusetts, which is near Worcester. "I sent Mark Lewis over there only because he was from Berlin and there was an opening in Worcester and I wanted to send him home. He was in Boston. I was trying to make sense of where the deputies live and try to have them not commute as far." Of course, DeCaire also lived close to Worcester, which Dichio knew.

Dichio also testified that it was not until after he appointed Lewis that he realized that the Worcester HIDTA task force position was highly desirable. Again, the court found Dichio's credibility highly suspect. In response to a question from the court about whether he knew Lewis prior to becoming Marshal, Dichio stated that his wife and Lewis's brother's wife are acquaintances through their children's football program.

Dichio testified that after he selected Lewis, there was "chitchat in the office with people that were upset about that move." Bane stated that after he sent out a formal e-mail announcing that Lewis would be filling the position, he received negative responses from a number of people, including Bohn, DeCaire, Williams, and DUSM Paul Sugrue. Bane forwarded these e-mails to Dichio (if Dichio was not already an addressee).

After DeCaire e-mailed Bane to express her disappointment with Lewis's selection, she was called into Dichio's office. According to DeCaire, Dichio told her that he was "upset at the way everyone was reacting to his decision." She felt that he was

-12-

putting the blame for the negative reactions on her.  He told DeCaire that he was assigning her to work in Court Operations (as opposed to the better job on the HIDTA task force) in Worcester. She responded that she did not want to go.  Dichio told her that "you're going to make me look like a fool if you don't go to Worcester willingly.  So either you go to Worcester or I can't guarantee that you're going to stay in your position here."  Based on Dichio's statements, DeCaire decided to accept his decision that she go to Worcester.

Dichio had a different recollection of this conversation. He testified that he told DeCaire he could not give her the task force position because she was romantically involved with Bohn and so Bohn could not supervise her.  (Later, she was assigned to work under Bohn, whom she had since married.)  Dichio also testified he asked DeCaire whether she still wanted to go to Worcester and work in Court Operations, and she indicated that she would rather go to Worcester than remain in the Boston warrants unit.  Again, based on the district court's credibility finding, we credit DeCaire's version of events.

On September 30, 2002, DeCaire was reassigned to the Worcester office, away from her job with the Warrants Investigations Unit in Boston.  In turn, Steve McKearney, who had been transferred to Worcester for disciplinary reasons prior to

Dichio's arrival, was transferred to DeCaire's position in the Warrant Investigations Unit in Boston.[4]

In December 2002, Williams requested approval from Supervisory Deputy Tom Bezanson, her direct supervisor, to attend a conference for women in law enforcement that was to be held in San Francisco, California, during the week of Labor Day in 2003. After her request was denied, Williams spoke with Durette, who suggested that Williams resubmit the request to Dichio directly, which she did in January 2003.

On January 22, 2003, DeCaire was called into Bezanson's office and informed that both she and Williams would be rotating to Boston from Worcester on a weekly basis per orders from Dichio. Two male DUSMs in Worcester, Kevin Wahl and Lewis -- who was the junior deputy and whose permanent duty station was still Boston -- were not included in this rotation. Dichio testified that this rotation was necessary to address manpower shortages in Boston. Durette testified that members of the HIDTA task force, like Lewis, were generally excluded from use on a rotation.

On January 23, 2003, after learning of their new and unwanted rotation to Boston, DeCaire and Williams filed complaints with the Equal Employment Opportunity ("EEO") office within the

---

[4]    DeCaire did not file a timely claim with the EEO regarding Lewis's selection and her initial transfer to Worcester and did not include this transfer in her complaint. Instead, she presented this as background for her retaliation claim.

Marshals Service.  DeCaire's statement included the following allegations: that her introductory interview with Dichio focused on her personal situation rather than her professional accomplishments; that a junior deputy she supervised was chosen for the Worcester HIDTA position even though she was more qualified; and that afterwards, Dichio threatened that if she did not willingly go to Worcester, she would lose her investigative position in Boston.  The complaint also stated:

> Clearly, as the two single mothers in the district and the only two females in the Worcester office there are two sets of rules that are being applied.  We are not being treated the same way as every other employee. Taking all this information into consideration, we are requesting immediate relief against these duty transfer assignments to the Boston office until this matter is investigated and resolved.  It is placing a burden on us and our families, and creating undue stress and a personal hardship.  We are also requesting protection against any future actions being taken against us.

This was DeCaire's first EEO complaint.

DeCaire was out on pre-approved leave from January 27 through January 31, 2003.  During that week, Bezanson left DeCaire a message on her home answering machine that she should report to Worcester instead of Boston on February 3.  Meanwhile, Dichio informed Williams, who was working in Boston that week, that she would be permitted to attend the San Francisco conference and also that she would be transferred back to Worcester very shortly.  The

following week, Williams was transferred back to Worcester. At this point Williams withdrew her EEO complaint.

When DeCaire arrived in Worcester on February 3, Bezanson informed her that he had met with Dichio and Taylor while she was gone and that it was decided she would be permanently transferred to Boston. On February 4, DeCaire, who had been promoted twice and held a higher position, was transferred to Boston to fill an entry-level 082 position in Court Operations, work of a much lower level. At the time of this reassignment, there were deputies junior to DeCaire in both Worcester and the Warrant Investigations Unit in Boston.

On February 3, Durette sent an e-mail to the office announcing that DeCaire was being moved to Boston to replace DUSM Jaime Viator in Court Operations. DeCaire testified that this e-mail "humiliated" her because "Jaime Viator was not a criminal investigator, she was an entry level . . . ." DeCaire testified that the duties she performed in Court Operations were the same as the duties she performed when she first started working for the Marshals Service in 1991, a dozen years earlier.

On February 17, 2003, Assistant Chief Deputy Durette was replaced with Dave Dimmitt. DeCaire testified that during an introductory meeting with Boston personnel, Dimmitt stated that the deputies needed to be loyal to Dichio and that he was "looking for a few individuals to change their attitude." DeCaire testified

that Dimmitt "went on . . . about how people shouldn't take on the Marshals Service, that the Marshals Service has been here long before we were here and it will be here long [after] we're gone." DeCaire had filed her complaint shortly before these comments were made.[5]

At trial, Dimmitt testified that at this meeting he discussed "everything from attitude to leadership" and "probably said attitude is important," but that he did not tell the deputies "not to mess with the Marshals Service."

On February 27, 2003, DeCaire filed a supplemental complaint with the EEO stating that Dichio had retaliated against her after she filed her January 23 complaint by permanently transferring her to an entry-level position in Boston. She also went further and requested disciplinary action against Dichio.[6]

---

[5]    The parties have stipulated that on February 14, 2003, DeCaire was issued a Notice of Right to File a Discrimination Complaint. On February 19, the EEO Counseling Report was submitted.

[6]    The complaint alleged:

I further believe USM Dichio retaliated against me after he was informed that I filed a complaint. ACDUSM Durette notified USM Dichio on Friday, January 23 that I had filed a complaint the previous day. On Tuesday January 28, USM Dichio traveled to Worcester and notified SDUSM Bezanson that I would be transferred permanently to Boston. I was notified when I returned from leave (February 4) that I should pack up my belongings and report to the Boston court Supervisor the following day. It is obvious to me this is a direct form of retaliation, after

On March 12, 2003, three new entry-level deputies arrived in the District.  Despite this, DeCaire, who was more senior and held higher rank, continued to be assigned to an entry-level job in Court Operations.  On March 17, DUSM Scott Kimball, who was junior to DeCaire, was transferred out of Court Operations to Warrant Investigations.  Nonetheless, DeCaire remained in the entry-level position in Court Operations.

On April 21, 2003, DeCaire expressed to Dimmitt and Dichio her interest in being considered for a position as Acting Supervisor in Court Operations, as opposed to her entry-level position.  On April 23, she expressed to them her interest in being considered for a position as Warrant Coordinator.  She was selected for neither job.  On April 28, DUSM Alison Hodgkins was appointed to the position of Acting Supervisor for Court Operations and DUSM Paul Sugrue was assigned to the position of Warrant Coordinator.

On August 21, 2003, DeCaire expressed her interest in the position of permanent Supervisor of Court Operations.  She noted

---

finding out about my complaint the original rotation never took place and changed to a permanent reassignment. ACDUSM Durette put out an e-mail that I would be replacing an 082, which further demeaned me.  Since USM Dichio has come to our office I have been demoted from a Team Leader in Investigations to replacing an 082.

In closing, I would like disciplinary action to be taken against USM Dichio.  I believe USM Dichio has made decisions based on my sex and parental status, with absolutely no regard to my qualifications and training.

that it had been 120 days since her prior request, and Acting
Supervisor DUSM appointments that are not announced for competitive
selection, as here, cannot exceed 120 days.   DeCaire did not
receive the position.   Instead, a woman who had expressed no
interest in and did not want the job was solicited to take the job
(but did not).   Hodgkins then continued in the position until it
was eliminated, although her appointment exceeded 120 days.

On October 3, 2003, DUSM Kevin Donohue, who was junior to
DeCaire and had been assigned to Court Operations, was assigned to
a Warrant Coordinator position, the other position which DeCaire
had sought.

At trial, Dichio testified that all of his personnel
decisions were based on only three factors: seniority, job
performance, and locality.   He did not testify that loyalty to him
was a basis for any personnel decision.

Dichio also said that after Dimmitt arrived on February
17, 2003, Dimmitt made all of the "decisions in the operation":
"After that when things happened in the office, I was given
recommendations.   I either agreed or disagreed to the transfers
here and there."   Dimmitt stated that he chose Hodgkins as Acting
Supervisor for Court Operations because she had not yet had the
opportunity to serve in a formal acting supervisory position.
Dichio also specifically testified to his belief in Hodgkins's
strong qualifications.   Dimmitt indicated that he thought Sugrue

was the best person for the Warrant Coordinator position based on his experience.

Over Columbus Day weekend in October 2003, DeCaire married Bohn. On the morning of the following Tuesday, October 14, Supervisor Paul Dunne told DeCaire that she was being transferred to Worcester and was required to report there by noon. DeCaire testified that she found this ridiculous and inquired why Dunne, who shared responsibility with Bohn for supervising Court Operations, could not be her supervisor. Dichio testified that the transfer was necessary to avoid a conflict between DeCaire and Bohn now that Bohn was supervising Court Operations, and that it was Chief William Fallon who ultimately made this decision. Fallon testified that DeCaire's transfer was "something [he] was actually working on for quite a while," and it was a coincidence that the transfer occurred immediately after DeCaire and Bohn's wedding.[7]

On October 28, 2003, Bezanson advised Fallon that DeCaire had told him that she was four months pregnant and requesting "light duty" status. Between October 28 and November 13, DeCaire

---

[7]    Williams testified that Bezanson called her into his office first thing on Tuesday morning, October 14, and asked her if DeCaire and Bohn had been married over the weekend. After she answered "possibly," Bezanson asked if she had attended the wedding, to which she responded "maybe." She further testified: "And then his next statement was the chief knows that . . . they got married and effective immediately you're now transferred to Boston to replace Cindy [DeCaire], Cindy's transferred to Worcester. Pack all your stuff and you have to report there by noon that same day."

continued to work in Worcester, and her "light" duties included serving process, warrant investigation work, and administrative work. DeCaire testified that during an earlier pregnancy, she had performed similar light work.

On November 14, DeCaire was informed that she would be assigned to Worcester on only Mondays and Fridays; she would have to travel and work in the control room in Boston (which, as we discuss later, Bohn was then supervising) on Tuesdays and Thursdays, and travel to work in Springfield on Wednesdays. When she objected, Fallon informed her that she would have to use sick leave for her pregnancy if she did not accept the proposed assignment. DeCaire testified that she registered an informal complaint about this assignment with the EEO office but received no response.

On November 20, DeCaire reported to the Boston control room as assigned. DeCaire testified that the control room was excessively hot because there was inadequate ventilation for all of the electronic equipment, and that she was not allowed to leave unless she had another deputy relieve her. She was also concerned about the possible side effects the electronic equipment could have on a developing baby.

Fallon testified that DeCaire was assigned to the control room because of a manpower shortage, and said that putting DeCaire there saved the Marshals Service, which was already strapped for

money, from having to hire outside guards at a cost of about $200 each per day.  Dichio testified that he was not directly involved in the decision to assign DeCaire to the control room.

On January 5, 2004, DeCaire filed a second formal EEO complaint alleging ongoing discrimination and retaliation.  It detailed DeCaire's being denied the positions of Acting Supervisor of Court Operations and Warrant Coordinator, the solicitation of a woman who did not want the job, her October 14, 2003 transfer to Worcester after her marriage to Bohn, and her assignment to the control room.[8]  She also noted that another deputy who was on light

--------

[8]      Among her other allegations were these:

This will be my third transfer in a year, no other DUSM's other than DUSM Williams and I have had to worry about when and what our next transfer will be.  I have asked for numerous other positions in the Boston office, and have been ignored and overlooked for every single one. There were numerous other alternative positions that I could have been transferred too, to alleviate having to displace DUSM Williams and myself, yet one more time.  It is obvious that as two females in the Boston office we are dispensable, compared to our junior male counterparts.  It should also be noted, I have still not received notice of whether or not my transfer is permanent or not.
          . . . .
Starting on November 17, I took sick leave for three days awaiting a phone call from EEO, who I e-mailed asking for help.
Again, I feel this is ongoing retaliation from management, no other Deputy in the District of Ma. is forced to transfer from office to office.  There are many other Deputies who go on light duty due to injuries etc., they are not required to transfer, nor are they

-22-

duty because he had had an operation was not required to work in the control room.

On January 27, 2004, DeCaire submitted a request for participation in the Department of Justice Worklife program, asking to work in Worcester for the remainder of her pregnancy. The request was denied on February 24. Dichio testified that he took no part in this decision. Dichio did testify that he remembers receiving a second Worklife request from DeCaire while she was on maternity leave, requesting to stay out another six months. Dichio testified that his response to this request was "absolutely not" because the office was shorthanded.

---

threatened that limited duty is a favor, and that there may not be limited duty for them, and they may need to take sick leave. I was also pregnant in the Boston office 5 years ago, and never received such cruel treatment, nor did I have to worry about taking sick leave because there was nothing for me to do. I have spoken to many of my female co-workers who have had children while employed by the USMS, and no one has received such treatment. I have also been on limited duty in the Worcester office in the past, for over a two month duration.
. . . .
I am asking to be assigned limited duty in a HQ's entity immediately. I am aware, that there are limited duty assignments available in Witness Protection, OCDEFT and Judicial Security. I feel this is the only place the US Marshal can not continue with his ongoing efforts to destroy my career.

Since August 2002, DeCaire is the only DUSM in the District of Massachusetts whose assigned station has changed so many times.

2.    <u>Bohn</u>

Shortly after DeCaire filed her initial EEO complaint on January 23, 2003, Bohn, who was living with DeCaire, himself suffered adverse actions.  He attributed these to DeCaire's having filed the EEO complaint.

Dichio assigned a lower-ranking, non-supervisory DUSM to attend an upcoming HIDTA committee meeting "dealing with issues that [Bohn] had specifically been dealing with as the task force supervisor."  Bohn went to Paul Durette's office to discuss the issue with him and complained, "I feel like I'm guilty by association here because of Cindy's [DeCaire's EEO] complaint." Bohn later told Dave Dimmitt that he believed he was being treated differently because of DeCaire's EEO complaint: "I brought up a couple of instances.  One was that the Marshal would no longer acknowledge me the same way he had in the halls or in the office prior to the filing of the complaint."

Bohn testified that on March 11, 2003, Dimmitt, who had replaced Durette several weeks before, informed Bohn that he was to move his office and turn his car in and would be in charge of what Bohn described as "managing special projects and a few other menial

tasks." Bohn "reminded [Dimmitt] that I felt this was because of Cindy's EEO complaint."

Dichio testified that Dimmitt had recommended to him that Bohn be removed from his supervisory role because Bohn had "berated a few deputies" and was "unprofessional" during a HIDTA task force meeting. Dichio said he agreed with Dimmitt. Dimmitt testified that at the HIDTA meeting, Bohn had declared that if Darlene DeCaire (the plaintiff's former aunt by marriage) and Mark Lewis were not removed from the task force, he would leave. Dimmitt said that after this incident, he could have either officially written up Bohn's misconduct or simply attempted to remove Bohn from the situation, and he chose the latter.

Another member of the HIDTA task force, Stephen Ridge of the Boston Police Department, testified that he was "confused" with respect to Bohn's removal from the task force because "Bohn since his inception only grew the task force and . . . several months prior . . . Marshal Dichio was at Boston Police headquarters to give Jeff Bohn an award. And shortly after that, . . . things sort of changed. [The task force] just got better [under Bohn] and [Bohn] seem[ed] to be on the outs for some reason."

Bohn testified that on June 11, 2003, he received telephone messages while at a training outside the office telling him that he had never been approved for the training and to report back to the office immediately. According to Bohn, when he

-25-

returned to the office, Dimmitt admitted that Bohn had in fact sought pre-approval for the training; Dimmitt warned him that he was on probation and "being watched," and said that "things happened yesterday that contributed to [the way Bohn was being treated]."  The parties stipulated that around this time, Dichio became aware of allegations regarding a conversation Dichio had with another HIDTA task force member, Joseph Cummings, in which Dichio allegedly said that DeCaire would not be advancing in the Marshals Service as long as he was in charge.

Bohn also testified that during this conversation, Dimmitt warned him that Dichio "told me to get you on your eye." Bohn had been experiencing problems relating to his eye, and these problems apparently were meant to be a basis to "get" Bohn.  Bohn also stated that Dichio subsequently would "administer me impromptu eye tests that he would make up on his own."

At trial, Dimmitt denied making any of these statements during this conversation with Bohn.

On October 3, 2003, Bohn and Paul Dunne were appointed Court Operations Supervisors, in which capacity they were in charge of the daily operations of the court and prisoners in Boston. Duties were divided between the two, and Bohn was responsible for the control room, among other things.  Dichio testified that he authorized this move because Fallon had told him that "Bohn has

continued to improve" and "it's time for Jeff Bohn to take part in court operations where he would be assigned personnel."

Because Bohn was in charge of the control room, he served as DeCaire's supervisor when she was assigned there in November. DeCaire was by then Bohn's wife.  In December 2003, Bohn filed an OSHA complaint regarding conditions in the control room.  He was almost immediately relieved from supervisory duties pertaining to the control room.  Dave Taylor, who was now Bohn's supervisor, testified that he was unaware of the conflict created by having Bohn supervise the control room where Bohn's wife worked until Bohn filed the OSHA complaint, and he stated that this conflict was the reason that supervisory duties for the control room were removed from Bohn.

At trial in June 2005, Dichio testified that he thought Bohn could be a "great supervisor," and he noted that Bohn "was inexperienced back then, he's learned a lot, and . . . he's back in the warrant squad as supervisor."

3.    Durette

When Dichio arrived, Durette was the Assistant Chief Deputy for the District of Massachusetts.  The two appear to have had a strained relationship.  Durette attributes at least part of this strain to his refusal to commit himself to comply with Dichio's request that he support Dichio in responding to DeCaire's initial EEO complaint.

On February 5, 2003, Dichio went into Durette's office to question him about whether Durette had spoken to DeCaire about her January 23 EEO complaint. Durette told Dichio that he had a brief conversation with DeCaire the previous afternoon. Durette testified that Dichio then told him that "if you're asked questions about this I expect that you'll support the Marshal." Durette testified that he responded that he would answer truthfully if he were asked questions under oath.

Dichio testified that on February 5, the same day as his conversation with Durette, he contacted headquarters to request a new acting chief to replace Durette; he said could not trust Durette because Durette "never communicated" with him. He stated that he had also made a request for a replacement for Durette at some point prior to February 5. Headquarters sent Dimmitt as an acting chief on February 17 for a term of 120 days.

Around the beginning of March, Bohn spoke with Durette about concerns he had with Darlene DeCaire's performance on the HIDTA task force. Durette testified that he discussed Bohn's concerns with Dimmitt, who said that he would bring them to Dichio's attention. Around this time, Durette was removed from the chain of command and assigned to special projects.

Durette testified that around March 19, plaintiff DeCaire informed him of the alleged conversation between Dichio and Joseph Cummings, in which Dichio supposedly said that DeCaire would not be

advancing in the Marshals Service so long as he was in charge. Durette subsequently mentioned the alleged Dichio-Cummings conversation to Dimmitt.[9]   Thereafter, at Dichio's direction, Dimmitt removed Durette from his office and placed him in a cubicle in the administrative section of the office.

By April 21, 2003, Durette left the Marshals Service.

C.

The district court took a view of the facts different from that of either party.   It rejected DeCaire's claims that Dichio's behavior toward her was the result of gender discrimination and retaliation for her EEO complaint.   However, the court also did not credit the government's neutral, efficiency-based explanations.

The district court initially analyzed the facts in light of the burden-shifting framework articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).   DeCaire, 474 F. Supp. 2d at 251.   Under McDonnell Douglas, a plaintiff establishes a presumption of gender discrimination by establishing (1) that she is a member of a protected class; (2) that an adverse employment action was taken against her; (3) that she was otherwise qualified for such position; and (4) that a similarly situated male

---

[9]    The district court found that Cummings's testimony was not credible in its entirety.   DeCaire, 474 F. Supp. 2d at 248. Nonetheless, Cummings's allegation that Dichio told him that DeCaire was going nowhere is relevant for its effects on DeCaire, Dichio, and others in the office.

was treated differently.  Id. (citing McDonnell Douglas, 411 U.S. at 802).  The district court found that DeCaire established a presumption of gender discrimination by meeting all four of these requirements: she is a member of a protected class; she suffered adverse employment actions because her "duties were substantially altered, her investigative duties were taken away from her, she was not granted promotions given to others, she was repeatedly transferred, was assigned to a rotation system, and was assigned to what she describes as an oppressive work environment while on light duty in the Boston control room"; she was qualified for the positions she did not receive; and she provided evidence that less-experienced men, including Mark Lewis and Scott Kimball, were treated differently.  Id. at 251-52.

Once the district court found that DeCaire had established a presumption of discrimination, it shifted the burden to the government to articulate a "legitimate, non-discriminatory reason for its adverse employment action."  Id. at 252 (citing Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000)).  The district court noted that the government articulated a number of reasons to justify Dichio's treatment of DeCaire, including the nature of the work to be performed, seniority, locality, and fairness.  Id. The court held that at this stage the government had produced sufficient reasons

for its behavior to rebut the presumption of gender discrimination.
Id.

     With the presumption of discrimination gone, the district
court noted that the "burden to demonstrate discrimination rests on
the plaintiff." Id. (citing Provencher v. CVS Pharmacy, Div. of
Melville Corp., 145 F.3d 5, 10 (1st Cir. 1998)).  It noted that
"[o]nce the fact-finder believes that prohibited discrimination
played some role . . ., the burden of persuasion shifts to the
defendant" to demonstrate that the outcome would have been the same
absent a discriminatory motive. Id. at 253.  It also stated that
it was insufficient that DeCaire offer evidence that the
government's explanations for her treatment were pretext, which it
found she had done. Id.  She needed additional evidence beyond
pretext to enable "a factfinder rationally to conclude that the
stated reason behind the adverse employment decision is not only a
sham, but a sham intended to cover up the proscribed type of
discrimination." Id. (quoting Szabo v. Trs. of Boston Univ., 1998
WL 1085688, at *3 (1st Cir. Dec. 31, 1998)) (internal quotation
marks omitted).  In other words, DeCaire needed to provide direct
or circumstantial evidence of a "discriminatory animus on the part
of the employer." Id. (quoting Szabo, 1998 WL 1085688, at *3)
(internal quotation marks omitted).

     In one of several difficult-to-interpret passages, the
district court found there was "convincing evidence of gender

-31-

discrimination sufficient to make this a mixed motive case." Id. (emphasis added).  It held that Dichio's initial decision in September 2002 to transfer DeCaire to a lesser position in Worcester was "gender discrimination pure and simple, the result of stereotypical male views of gender roles," but noted that DeCaire's delay from the September 30, 2002 date of transfer to the filing of a complaint on January 23, 2003 meant that the transfer cannot be considered as part of her gender discrimination claim but only to establish retaliatory intent.  Id.; see also 29 C.F.R. § 1614.105(a)(1) (aggrieved federal employees who believe they have been discriminated against on the basis of sex must consult an EEO counselor within forty-five days of the alleged discriminatory action).  The court concluded this passage by stating that "[t]he remainder of evidence offered by DeCaire to establish a finding of gender discrimination is unavailing." DeCaire, 474 F. Supp. 2d at 253 (emphasis added).

The district court next found that Dichio's promotions of Lewis to the HIDTA task force in September 2002[10] and Hodgkins to the position of Acting Supervisor of Court Operations in April 2003 were not discriminatory.  The court found Lewis was selected for a

---

[10]   Like her initial transfer to Worcester, Dichio's promotion of Lewis was not included in DeCaire's complaint to the district court.  At trial DeCaire conceded that she had not made timely claims to the EEO office regarding either event. Nonetheless, both events provide relevant background evidence for the timely claims.

coveted position on the HIDTA task force because the Dichio and Lewis families were "acquaintances," and Dichio wanted to appoint someone he felt he could trust.  Id. at 254.  No party to the case had advanced this theory.  As for the selection of Hodgkins rather than DeCaire, the court found, as the government argued, that Hodgkins was selected as Acting Supervisor of Court Operations because she had a "stellar record" and her "advancement substantiates a neutral policy of promoting those with high scores and the best qualifications."  Id.

As for the assigned rotation of DeCaire and Williams from Worcester to Boston in January 2003, the court found that "[w]hile the rotation of only female deputies gives this Court reason to pause, Dichio had the rightful managerial discretion to assign the two deputies into Boston court operations . . . since Dichio believed the office was 'shorthanded' in Boston."  Id.  However, the court went on to conclude, there were additional motivations at play with respect to DeCaire: "[B]y the time of the rotational assignment, Dichio was embattled and defensive about the Lewis appointment to HIDTA, an appointment criticized not only by DeCaire but by Bohn, a supervisor Dichio took as disloyal and hostile to his management.  Dichio's reciprocal hostility to Bohn (and to anyone close to him), and soon to Durette, was the principal driver behind Dichio's subsequent management decisions."  Id.

In analyzing DeCaire's retaliation claim, the district
court began by setting forth the statutory basis for DeCaire's
claim: that it is illegal for an employer to discriminate against
an employee who has "opposed any practice made an unlawful
employment practice . . . [or] made a charge, testified, assisted
or participated in any manner in an investigation, proceeding, or
hearing." Id. at 255 (quoting 42 U.S.C. § 2000e-3(a)) (emphases
omitted) (internal quotation marks omitted). The court noted that
this circuit has specifically required that under Title VII,

> in order to show a prima facie claim of
> retaliation the plaintiff must show: [f]irst,
> protected participation or opposition under Title
> VII known by the alleged retaliator; second, an
> employment action or actions disadvantaging
> persons engaged in protected activities; and
> third, a causal connection between the first two
> elements that is a retaliatory motive playing
> a part in the adverse employment actions.

Id. at 255 (quoting Petitti v. New England Tel. & Tel. Co., 909
F.2d 28, 33 (1st Cir. 1990)). The court found that DeCaire met the
first two requirements because she filed a formal grievance and
complaint with the EEO, which was well-known by her supervisors,
and she was disadvantaged by several employment actions. Id.

The court stated that DeCaire could satisfy the third
requirement -- showing a causal connection between her EEO
complaint and the adverse employment actions -- by providing direct
evidence of retaliation, which normally contemplates "those
statements by a decision maker that directly reflect the alleged

-34-

animus and bear squarely on the contested employment action." Id. at 256 (quoting Meléndez-Arroyo v. Cutler-Hammer de P.R. Co., 273 F.3d 30, 35 (1st Cir. 2001)) (internal quotation marks omitted).

The court found that the comments made by Dimmitt during his introductory meeting did not constitute warnings that deputies "would face retaliatory action if they filed complaints, nor was he indicating that the Marshals[] Service was retaliating against DeCaire because she had filed a complaint." Id.

With respect to DeCaire's transfer from Worcester to an entry-level position in Boston following the filing of her complaint, the court concluded that "Dichio simply chose to bear down on DeCaire because he considered her disloyal and hostile to his management decision, and he could." Id. at 256-57.

The court stated that the "most persuasive" of DeCaire's alleged retaliatory actions was her assignment to the Boston control room during her pregnancy. Id. at 257. However, it found that although "DeCaire's light duty tasks may have been in an environment more oppressive than others, . . . whatever the reason for the assignment -- the need for additional workforce in the Boston control room to obviate the need to hire outside help, the supervisors' general sense of loyalty to the Marshal, or even Dichio's general dislike of DeCaire personally due to her relationship with Bohn -- the transfer was not made to retaliate against DeCaire for filing of a formal complaint." Id. at 258.

Thus, "[w]hile the evidence supports the existence of loyalties within the service[,] it does not support a claim of retaliation for filing a complaint. . . . There is a fine line between showing a casual connection demonstrating retaliation <u>for the filing of a formal complaint</u> on the one hand, and, a requirement of loyalty to Dichio and the Marshals' Service on the other." <u>Id.</u>

The district court explained that temporal proximity can serve as a substitute for direct evidence of a causal connection between a complaint and an adverse employment action. <u>Id.</u> Here, however, it held that "[t]he timing of adverse actions had, it seems, little or anything to do with [DeCaire's] filing of her complaint, and more to do with Dichio's arrival as Marshal." <u>Id.</u> at 259. In particular, the court noted that some of DeCaire's transfers took place before she filed her complaint and that other considerations factored into her transfers, including Dichio's need to separate her and Bohn and to accommodate her light duty status. <u>Id.</u>

The district court concluded that "after the initial transfer to Worcester, while DeCaire continued to be the victim of discrimination at Dichio's hands, the discrimination was then born out of personal hostility[,] not gender bias or a need to retaliate. I find these later events would have come out much the same had DeCaire been a male deputy." <u>Id.</u> Therefore, although the government "has failed to persuade the Court that its actions were

-36-

neutral, on-the-merits decisions," a verdict for DeCaire would not be appropriate because the conduct, "however discriminatory and reprehensible, was not the result of prohibited gender discrimination." Id. at 260.

II.

We turn to DeCaire's appellate arguments.  Both parties have noted, and we agree, that the district court opinion at times seems at odds with itself and is not entirely clear.

A.

With respect to her gender discrimination claim, DeCaire argues that the district court's statements that Dichio engaged in gender discrimination require that liability be imposed on the government, even if the court also found that this was a mixed motive case.

Under 42 U.S.C. § 2000e-2(m), "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." (Emphasis added.)  If other such factors existed, the statute limits the remedies available to the plaintiff.  See 42 U.S.C. § 2000e-5(g)(2)(B).  In other words, "the employer has a limited affirmative defense that does not absolve it of liability, but restricts the remedies available to a plaintiff." Desert Palace, Inc. v. Costa, 539 U.S. 90, 94 (2003).

-37-

DeCaire is correct that to the extent the district court's finding in a mixed motive discrimination case was that there was gender discrimination, such a finding required it to find liability on the part of the government on any timely claim; in such a case, it is plaintiff's remedies, not the employer's liability, that are limited. In such a case the court could, in its discretion, grant declaratory relief, injunctive relief, and attorneys' fees and costs, but could not award damages or issue an order requiring a reinstatement, hiring, promotion, or payment. 42 U.S.C. § 2000e-5(g)(2)(B)(i), (ii). We discuss the import of this later.

The court was also incorrect in its determination that evidence relating to DeCaire's initial transfer could be used only with respect to her retaliation claim. A discriminatory action for which a claim was not timely filed cannot be used as a basis to award relief but can be used as background in support of later claims of gender discrimination. See Nat. R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002) (discrete discriminatory acts are not actionable if time-barred, but an employee can use these prior acts "as background evidence in support of a timely claim").

### B.

The district court also enunciated principles at variance with retaliation law. DeCaire argues that it appeared to import a gender discrimination component into retaliation law; specifically,

the district court stated that "later events would have come out much the same had DeCaire been a male deputy." DeCaire, 474 F. Supp. 2d at 259. This is an incorrect statement of the law of retaliation.

Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), states that it is unlawful for an employer to discriminate against an employee because "he has opposed any practice made an unlawful employment practice . . ., or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." The Supreme Court has explained how Title VII's substantive provision differs from this anti-retaliation provision: "The substantive provision seeks to prevent injury to individuals based on who they are, i.e., their status. The anti-retaliation provision seeks to prevent harm to individuals based on what they do, i.e., their conduct." Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2412 (2006). It therefore does not matter for retaliation purposes whether Dichio would have treated a male deputy the same way he treated DeCaire. The relevant question is whether Dichio was retaliating against DeCaire for filing a complaint, not whether he was motivated by gender bias at the time.

Additionally, DeCaire argues that the district court's interpretation of the temporal proximity requirement is incorrect. We agree. This court's rulings do not hold that the existence of

allegedly discriminatory employment actions prior to the filing of a complaint immunizes an employer from a retaliation claim following the complaint. See, e.g., Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25-26 (1st Cir. 2004) (finding sufficient temporal proximity to make prima facie case when adverse employment action occurred in March 1998, formal complaint was filed in May 1998, and a second adverse employment action occurred in June 1998). Instead, our law is that temporal proximity alone can suffice to "meet the relatively light burden of establishing a prima facie case of retaliation." Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 224 (1st Cir. 2007) (finding temporal proximity between June 2002 allegations of discrimination and August 2002 termination sufficient to meet prima facie burden). All of the events described here took place within a period of about one year. In our view, the court may have overlooked the temporal closeness of events by focusing on the fact that Dichio had mistreated DeCaire prior to her complaint.

DeCaire also argues that the district court created a "disloyalty defense." The court discussed a "fine line" between showing a causal connection demonstrating retaliation for the filing of a formal complaint and a requirement of loyalty to Dichio and the Marshals Service. DeCaire, 474 F. Supp. 2d at 258. As a matter of law, the filing of an EEO complaint cannot be an act of

disloyalty to either the U.S. Marshals Service or the Marshal which would justify taking adverse actions.

Finally, DeCaire argues that the district court imposed a heightened burden on her by requiring that she provide evidence in addition to evidence establishing that the government's explanations were pretext. <u>DeCaire</u>, 474 F. Supp. 2d at 253.  In <u>Reeves</u> v. <u>Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133 (2000), the Supreme Court recognized that "it is <u>permissible</u> for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's discrimination," <u>id.</u> at 147, but doing so is not required, as "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory," <u>id.</u> at 148.  To the extent the district court said it <u>required</u> DeCaire to present evidence beyond disproving the government's arguments as pretext, that was error.  See <u>Zapata-Matos</u> v. <u>Reckitt & Coleman, Inc.</u>, 277 F.3d 40, 45 (1st Cir. 2002) ("We have adhered to a case by case weighing. . . . [D]isbelief of the reason may, along with the prima facie case, on appropriate facts, permit the trier of fact to conclude that the employer had discriminated."); <u>see also Ronda-Perez</u> v. <u>Banco Bilbao Vizcaya Argentaria-P.R.</u>, 404 F.3d 42, 44-45 (1st Cir. 2005); <u>Feliciano de la Cruz</u>, 218 F.3d at 6 (holding that the "same evidence used to

show pretext can support a finding of discriminatory animus"). It is difficult, however, to tell which principle the court employed.

The court also suggested that only "direct" evidence of retaliation would do to meet plaintiff's ultimate burden and that circumstantial evidence could be considered only if it had a close temporal connection. DeCaire, 474 F. Supp. 2d at 256, 258. Neither of those are correct principles. It is well-established in this circuit that evidence of retaliation can be direct or circumstantial. Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 335 (1st Cir. 2005). In other words, the district court improperly imported a direct evidence requirement into the third step of the McDonnell Douglas framework, which is the very test courts use when a plaintiff does not have direct evidence.

The district court also erroneously suggested that because an employer's action falls within an area of discretion, that is an adequate justification. DeCaire, 474 F. Supp. 2d at 254, 258. Discretion may be exercised in ways which are discriminatory or retaliatory.

III.

Against this backdrop of legal error, the plaintiff makes a final argument that the record does not support the district court's factual conclusions. DeCaire objects to the district court's "sua sponte finding" that "Dichio may have subjectively viewed DeCaire as disloyal," as well as its conclusion that after

-42-

DeCaire's initial transfer to Worcester, the "principal driver" behind Dichio's management decisions was "hostility to Bohn (and anyone close to him), and soon to Durette." Id. at 254.

We have great concern over the district court's utilization of a theory not advanced by either party to the case. Fairness alone requires that the parties have notice of the theories so that the parties can gear their evidence toward what is at stake. Indeed the entire analytic structure of McDonnell Douglas depends upon clear articulations by both plaintiff and defendant. The employer must articulate a neutral, non-discriminatory reason for the action; plaintiff may show the reason is pretext. The same is true of mixed motive analysis -- that analysis requires clear statements by both sides of the motives which are at issue. Both sides to this litigation were prejudiced by the court's spontaneous introduction of a new theory of justification.

The government tries to salvage the verdict in its favor by saying that even though it did not advance the theory on which the court relied,[11] the explanation has some degree of plausibility in light of the evidence. We reject the argument.

A theory must have a sufficient grounding in the evidence. Otherwise, it is merely speculation. In our view, after

---

[11]    If it had done so, plaintiff would have contested whether the personal loyalty argument was a legitimate defense.

-43-

reviewing the facts, we are left with the conviction that the theory on which the court resolved the case is speculation not grounded in the evidence.  See Benham v. Lenox Savings Bank, 292 F.3d 46, 48-49 (1st Cir. 2002) (reversing and remanding an employment discrimination case where district court developed an "alternative explanation" argued by neither party and not supported by the record).  We review the district court's factual determinations regarding an employer's intent for clear error. Benham, 292 F.3d at 48; Foster v. Dalton, 71 F.3d 52, 55 (1st Cir. 1995).  Under this standard, reversal is appropriate only if "after careful evaluation of the evidence, we are left with an abiding conviction that . . . [the court's] findings are simply wrong." Benham, 292 F.3d at 48 (quoting State Police Ass'n v. Comm'r, 125 F.3d 1, 5 (1st Cir. 1997)) (internal quotation marks omitted).

That standard has been met.  We mention only some of the evidence which undermines our confidence in the outcome reached by the court.

The record does support the court's findings that Dichio was quite hostile to DeCaire.  What is much more problematic is the conclusion that the hostility bore no connection whatsoever to her filing discrimination and retaliation complaints against him and continuing to do so after he made it clear that there would be consequences for her.  As we have said, while Dichio may have subjectively perceived DeCaire to be disloyal, the protesting of

illegal discrimination is protected by law and cannot be a basis for a loyalty test. The record provides little support for a conclusion that DeCaire was somehow otherwise disloyal.

It is clear that DeCaire told Dichio that she did not want to go to Worcester, despite his telling her his views that as a mother she should be there. She also objected to his disqualifying her from the job Lewis received. At that point Dichio told her she could lose her job if she did not go along. This statement on his part very much supports a retaliation claim. It is worth noting that as part of her EEO complaints DeCaire asked that the Marshal be disciplined for his alleged violations of law.

There is also a lack of evidence that Dichio harbored hostility toward Bohn before DeCaire's protests and her EEO complaint. In fact, the evidence points in a different direction. Bohn was promoted to be Supervisor of the HIDTA task force a month after Dichio arrived, and at some point in the fall of 2002 Dichio made a public display of his admiration of Bohn's work at a ceremony at Boston Police Headquarters. The evidence supports (but does not compel) plaintiff's theory that Bohn suffered on account of DeCaire's EEO complaint. Bohn testified that Dichio started treating him differently after the complaint was filed, such as by excluding him from an HIDTA committee meeting and sending a lower-ranking deputy in his place. It was also after the EEO complaint that Dichio removed Bohn from his role as Supervisor of the HIDTA

task force and gave him a hard time about his attendance at a training program and gave instructions to "get" Bohn, using his eye condition as a pretext.

As for Durette, Dichio took actions to remove him from his position on the very day Dichio told Durette that he expected Durette to support him in response to DeCaire's complaint and Durette replied, to the contrary, he would tell the truth.

IV.

In light of the errors of law and our doubts about the grounding for the court's ultimate conclusions, the verdict cannot stand.  This leaves the question of the appropriate disposition.

DeCaire argues we should enter judgment in her favor on two grounds:  (1) treating this as a mixed motive case, she is entitled by the court's finding of discrimination to at least limited remedies; (2) the evidence compels a verdict in her favor.

We disagree.  As to the first ground, there is sufficient ambiguity, as both parties acknowledge, about the meaning of the various statements in the court's opinion that such relief is not warranted.   As to the second ground, a reasonable factfinder correctly applying the law could rule in favor of DeCaire, but that is far from compelled.

We vacate the entry of judgment and remand the case for further proceedings consistent with this opinion, in accordance

with Local Rule 40.1(K)(1) of the District of Massachusetts.    No
costs are awarded.

       So ordered.