**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
_____

**CYNTHIA A. BOHN,**
                                        **Plaintiff,**
            **v.**                                                   **Civ. Action No. 04-10593EFH**

**MICHAEL MUKASEY, in his official**
**position as Attorney General of the**
**United States,**
                                        **Defendant.**


------------------------------------------------------

## DEFENDANT'S TRIAL MEMORANDUM

**I.      <u>INTRODUCTION</u>**

      This matter involves an amended complaint filed by Cynthia DeCaire, a Deputy United

States Marshal (DUSM) with the United States Marshals Service (USMS), District of

Massachusetts, alleging employment discrimination under Title VII of the Civil Rights Act of

1964 based on her gender (female), and retaliation.  Plaintiff specifically alleges that she was

discriminated against when USMS management assigned her to weekly rotations in Worcester

and Boston in or around January 2003 (Count I), and was further discriminated against (Count I)

and retaliated against after she pursued EEO action (Count II), in that USMS management

transferred her to Court Operations in Boston in or around February 2003, kept her in Court

Operations in Boston after additional employees were added to the unit, failed to move her to the

Boston Warrants unit when an opening occurred there in or around March, 2003, refused to

assign her to the Warrant Coordinator position in or around April 2003, denied her an

appointment to the Acting Court Operations Supervisor position in or around September 2003,

refused to assign her to the Warrant Coordinator position in or around September 2003,

2

transferred her to Worcester in October 2003, assigned her multiple duty stations in November 2003, and assigned her to the control room in the Federal Courthouse in Boston in November 2003, requiring her to work with limited or no breaks.

Plaintiff seeks injunctive relief, back pay, front pay, compensatory damages[1], interest, attorney's fees and costs, and any other relief deemed appropriate by the Court.

## II.    SUMMARY OF ANTICIPATED EVIDENCE

Defendant anticipates that the evidence to be introduced at trial will show that plaintiff was not the victim of gender discrimination or retaliation. Specifically, defendant anticipates the evidence will establish the following:

1. On August 26, 2002, then United States Marshal (USM) Anthony Dichio had a meeting with Plaintiff during which Plaintiff expressed her desire to be transferred to the Worcester office to be closer to her family. Shortly thereafter, Plaintiff was among those considered for assignment to a High Intensity Drug Trafficking Area (HIDTA) position in Worcester. Plaintiff was not selected for the position because of her relationship with DUSM Jeffrey Bohn, then the Boston HIDTA Coordinator, who was responsible for supervision of the Worcester HIDTA position. On September 30, 2002, Plaintiff was reassigned to a Court Operations position in the Worcester office in accordance with her stated preference to work in Worcester. DUSM Stephen McKearney was reassigned to the Boston Warrants position vacated by Plaintiff.

---

[1] The maximum amount of compensatory damages that can be awarded for discrimination in the instant lawsuit is $300,000.00. *See* 42 U.S.C. § 1981a(b)(3)(D). This cap applies to the action as a whole, and not to each individual claim alleged by Plaintiff. *Hudson v. Reno*, 130 F.3d 1193, 1201 (6th Cir. 1997).

3

2.  In January 2003, Plaintiff and DUSM Susan Williams were scheduled for a temporary rotation from Court Operations in the Worcester Office to Court Operations in Boston due to the pending departure of a DUSM from Boston Court Operations. Plaintiff never participated in the rotation. Plaintiff took sick and annual leave during the period from January 21, 2003, until February 4, 2003. The additional scheduling required to arrange coverage for DUSMs rotating from Worcester to Boston when they were in leave status caused USM Dichio to reconsider the method of staffing the Court Operations vacancy. The USM reassigned Plaintiff to Boston to fill the Court Operations position on a permanent basis to better ensure continuous coverage of the position. At the time, plaintiff was the junior deputy assigned to Court Operations in the Worcester office and her residence was closer to Boston than those of the non-supervisory Worcester DUSMs. The decision to reassign Plaintiff to Court Operations in January 2003 was based on the work to be performed, seniority within Court Operations, and the proximity of the residences of the DUSMs considered for reassignment to the Boston office. The decision to retain Plaintiff in Boston Court Operations after the assignment of additional DUSMs to the District was based upon valid operational considerations.

3.  On April 21, 2003, Plaintiff expressed her interest in being considered for the position of Acting Supervisor of Boston Court Operations to Acting Chief Deputy U.S. Marshal David Dimmitt. On April 23, 2003, Plaintiff expressed interest in being considered for a position as Boston Warrant Coordinator to CDUSM Dimmitt. DUSMs Alison Hodgkins and Paul Sugrue also expressed interest in being considered for a supervisory position to CDUSM Dimmitt. On April 28, 2003, DUSM Alison Hodgkins was selected to fill the position as Acting Supervisor of Boston Court Operations. DUSM Paul Sugrue was assigned to the Warrant Coordinator position.

4

Acting Assistant Chief Deputy David Taylor was involved in discussions regarding the filling of both positions. Assistant Chief Taylor considered, but did not recommend Plaintiff, and instead nominated DUSMs Annette Lawlor and Alison Hodgkins. Assistant Chief Taylor offered his opinion to USM Dichio and Chief Dimmitt that Plaintiff had already had an acting supervisory position in Worcester, and in fairness to other senior deputies, another DUSM should be given the same opportunity. Assistant Chief Taylor recommended DUSM Paul Sugrue to fill the warrant coordinator position for the same reason. Chief Dimmitt also considered Plaintiff for the warrant coordinator position, but did not recommend her to USM Dichio, instead recommending Paul Sugrue. USM Dichio considered Plaintiff for the Acting Supervisory Court Operations position, and endorsed the recommendations of Chief Dimmitt and Assistant Chief Taylor that it was most fair to offer the position to someone who had not yet had such an opportunity. USM Dichio did not consider Plaintiff for the acting warrant coordinator position because he wanted the acting warrant coordinator to come from the warrant squad, and Plaintiff was not part of the warrant squad at the time. The Marshal endorsed Chief Dimmitt's recommendation to fill the position with DUSM Sugrue.

4. After DUSM Alison Hodgkins assumed her duties as Acting Supervisor of Court Operations in Boston, the District learned that the underlying permanent GS-13 position would not be replaced. The Acting Supervisor's position became an uncompensated position at the end of the 120 day assignment. DUSM Hodgkins continued to perform the duties of this position without additional pay until October 3, 2003.

5. DUSM Bohn's October 3, 2003 assignment as a Court Operations supervisor raised operational concerns within management due to his involvement with Plaintiff, who was still

5

assigned to Court Operations.  Bohn and Plaintiff in fact, married on October 10, 2003.  On

advice of counsel, Plaintiff was transferred to Worcester on October 14, 2003, in order to

forestall any potential conflict or appearance of impropriety.

6.   After learning of Plaintiff's pregnancy and request for light duty status on October 28,

2003, USMS management determined that there was insufficient light duty work to keep

Plaintiff occupied in Worcester, and undertook efforts to find sufficient work for Plaintiff to

perform under light duty restrictions to retain her in duty status.  On November 13, 2003,

Plaintiff was presented with a limited duty letter, assigning her  to the Worcester office on

Mondays and Fridays, Boston on Tuesdays and Thursdays, and Springfield on Wednesdays.  On

November 24, 2003, the limited duty letter was modified to exclude work in the Springfield

office.  Plaintiff was assigned to Boston on Tuesdays, Wednesdays and Thursdays.  Management

contemplated that while in Boston, Plaintiff would be assigned to the Control Room, which

would provide a significant cost savings to the District, in that they would not be required to hire

as many guards.  Plaintiff would also be responsible to train Court Security Officers (CSOs) for

assignment to the Control Room.  SDUSM Bohn's responsibilities were changed so as not to

include supervision of the Control Room.  The District inquired into Plaintiff's concern about the

effect the environment in the Control Room might have on a developing baby, and was advised

that no health hazard would be presented.  Plaintiff was covered for breaks during her control

room duties in the same manner as anyone else assigned to the Control Room.  Plaintiff

remained assigned to the Boston office due to the workload of that office and because limited

duty assignments were available there.  Plaintiff's January 27, 2004 request to telecommute from

the Worcester office for the remainder of her pregnancy was denied for the same reasons.

6

## III.    APPLICABLE LAW

Where there is no direct evidence of discrimination, Title VII cases are analyzed under the burden-shifting framework established in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817 (1973).  The *McDonnell Douglas* framework requires that plaintiff adduce evidence to support a *prima facie* case of discrimination based on either gender or retaliation. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.  In a gender discrimination case, a *prima facie* case is demonstrated by showing that 1) plaintiff is a member of a protected class; 2) an adverse employment decision was made against her; 3) she was otherwise qualified; and 4) a similarly situated male was treated differently.  *Jacklyn v. Schering-Plough Healthcare Products*, 176 F.3d 921, 928 (6th Cir. 1999).

Plaintiff cannot establish a *prima facie* case in that since August 2002, she has not been deprived by the USMS of something of consequence, i.e., she has not been demoted, divested of any significant responsibilities, nor has she suffered a reduction in salary; although local unpaid supervisory positions have been awarded to other DUSMs, Defendant has considered Plaintiff for local supervisory positions in accordance with its customary practices.  In short, Plaintiff has not suffered any "adverse action" by Defendant.

Once plaintiff establishes a prima facie case, the presumption arises that the employer unlawfully discriminated against the plaintiff. *Che v. Mass. Bay Transp. Auth.,* 342 F.3d 31, 39 (1st Cir.2003);  *Vega v. Kodak Caribbean, Ltd.,* 3 F.3d 476, 478 (1st Cir.1993).  The burden of production, not persuasion, then shifts to the defendant who must rebut the inference of discrimination by articulating some legitimate, non-discriminatory reason for the adverse employment action.  *Feliciano de la Cruz v. El Conquistador Resort,* 218 F.3d 1, 5 (1st

7

Cir.2000). If the employer meets this burden, the inference of unlawful discrimination is waived, and the burden shifts back to the plaintiff to show that the employer's alleged justification is a mere pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 805, 93 S.Ct. 1817.        The evidence at trial will establish that Plaintiff's September 2002 assignment from Boston to Worcester resulted from her own request for reassignment and accordingly, did not constitute an adverse action, nor was it a result of any gender or retaliatory animus directed toward Plaintiff.

While Plaintiff's scheduled rotation from Worcester to Boston may have been inconvenient, it did not significantly alter Plaintiff's job responsibilities and did not constitute an adverse action, particularly as Plaintiff never participated in the rotation. The evidence will show that the temporary rotation was legitimately intended to address staffing shortages in Boston Court Operations, and was not gender based or retaliatory in nature.

Plaintiff's 2003 transfer back to the Boston office to fill a vacant position in Court Operations did not constitute an adverse employment action. Plaintiff returned to the duty station to which she had been assigned prior to USM Dichio's arrival in the District.

In order to prevail, the "adverse acts" alleged by plaintiff must have been substantial enough to result in a material disadvantage with respect to salary, grade or other objective terms and conditions of employment. *Connell v. Bank of Boston*, 924 F.2d 1169, 1179-80 (1st Cir. 1991); *see also Tang v. State of Rhode Island*, 163 F.3d 7, 12-13 (1st Cir. 1998). There must also be concrete evidence of a link between the protected activity and the allegedly retaliatory treatment. Conclusory allegations and unsupported inferences are insufficient, as is the plaintiff's personal belief that the subsequent events were motivated by a retaliatory animus.

8

*Lewis v. Gillette Co.*, 22 F.3d 22, 25 (1st Cir. 1994); *Ramos v. Roche Products, Inc.*, 936 F.2d 43, 49 (1st Cir. 1991).

A transfer that involves no significant changes in an employee's conditions of employment, even though the employee views the transfers either positively or negatively does not of itself render the denial or receipt of the transfer an adverse employment action. Title VII discrimination claims should be limited to a materially adverse change in the terms and conditions of employment which must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. *See*, *Craven v. Texas Department of Criminal Justice Division, et. al.*, 151 F.Supp.2d 757, 767-68 (N.D. Tex. 2001); *Sanchez v. Denver Public Schools*, 164 F.3d 527, 532 n.6 (10th Cir. 1998)(longer commute and insignificant alteration in job responsibilities); *see also Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1448-49 (11th Cir. 1998)(Americans with Disabilities Act case); *Kindred v. Northome/Indus. Sch. Dist. No. 363*, 154 F.3d 801, 802-04 (8th Cir. 1998)(assigning bus driver to longer school bus route without increase in pay), *cert. denied*, 525 U.S. 1109 (1999); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994)(different duties and more stressful job, but no reduction in title, salary, or benefits; "[c]hanges in duties or working conditions that cause no materially significant disadvantage, such as Harlston's reassignment, are insufficient to establish the adverse conduct required to make a *prima facie* case;"); *Smith v. Schering-Plough Health Care Products, Inc.*, 6 F.Supp. 2d 631, 734 (W.D. Tenn. 1997) (plaintiff conceded that transfer

9

was not a demotion, and that he suffered no emotional injuries, serious stress, or ruined reputation); *Joiner v. Ohio Dep't of Transp.*, 949 F.Supp. 562, 567 (S.D. Ohio 1996)(no "loss of prestige or an objectively demeaning change of working conditions"; new title and "the loss of opportunity for overtime and the loss of supervisory responsibility" insufficient to constitute adverse employment action).

Here, Plaintiff was assigned to perform duties that are characteristically performed by either 082 or 1811 DUSMs. Plaintiff's perception that she was being slighted simply because her predecessor in the position had been an 082 is simply not sufficient grounds to support a finding that assignment to the position constituted an adverse action. Similarly, there will be nothing presented at trial to support Plaintiff's claim that Defendant was obligated to move her out of Court Operations to Warrants or to any other position as soon as other DUSMs arrived in the District. It will be clear from the evidence presented at trial that the greatest staffing need continued to be in Court Operations. Retaining Plaintiff in a position for which she is trained and which falls within the duties commonly performed by 1811 series DUSMs can in no way be considered an adverse action. Simply put, there is no evidence that Plaintiff's reassignment to a Boston Court Operations position or her retention in Court Operations after the assignment of additional DUSMs to the District were either gender based or retaliatory actions. The evidence shows that Plaintiff's assignment and retention within Boston Court Operations were legitimately designed to alleviate staff shortages within that section.

Similarly, plaintiff did not suffer an adverse impact as a result of the selection of DUSM Hodgkins and DUSM Sugrue for acting supervisory positions for which Plaintiff had applied in April 2003. Plaintiff was considered for both positions but already had an acting supervisory

10

position in Worcester to her credit.  The fact that Plaintiff had already held such a position

legitimately factored into the Marshal's determination to accept the recommendations of his

management staff, intended to ensure equal opportunity for development and advancement to all

DUSMs who desired supervisory experience.  Plaintiff suffered no more by her non-selection

than any other DUSM considered but not selected for a temporary promotion.  There is no

evidence that the recommendations of Chief Dimmitt and Assistant Chief Taylor to appoint

DUSM  Hodgkins as acting supervisor of Court Operations and DUSM Sugrue as acting

supervisor of Warrants and the acceptance of those recommendations by USM Dichio, involved

Plaintiff's protected status as a female or were based upon any retaliatory animus.  The evidence

will indicate that the appointments were legitimately intended to maximize supervisory

opportunities by spreading them out among DUSMs who had not yet had supervisory

experience.

        Plaintiff alleges that she suffered an adverse action in being denied appointment to the

acting Court Operations supervisory position after DUSM Hodgkins' 120 day assignment was

complete.  As noted above, however, because the underlying GS-13 position was not being

replaced, this supervisory position was no longer a paid position.  DUSM Hodgkins continued to

perform the duties of this position in unpaid status from on or about August 28, 2003 until on or

about October 3, 2003, approximately one month later, when two newly promoted GS-13

supervisory deputies assumed those duties.  Plaintiff has not established that she suffered

adversely from Management's decision not to fill a short term position at the end of DUSM

Hodgkin's 120 day assignment, or that the decision was gender based or retaliatory in nature..

        Although Plaintiff has alleged that the actions taken by USMS management, and USM

11

Dichio in particular, were gender based and retaliatory, Plaintiff's transfer from Boston to
Worcester in October 2003 was necessitated by her husband's promotion to supervisory status,
and was a reasonable measure, taken by other districts, to ensure that SDUSM Bohn would not
be placed in the position of supervising his spouse.  Again, this change in duty location cannot
be considered an "adverse action" for the reasons set forth above.  Plaintiff's reassignment to
Worcester after her spouse's promotion to supervise Court Operations, where Plaintiff was then
assigned, was a legitimate, non-discriminatory action taken by management to address Plaintiff's
then-existing situation while executing its primary responsibility to performance of the agency
mission, and was neither gender based nor retaliatory.

Defendant attempted to accommodate Plaintiff by securing enough light duty
assignments to keep Plaintiff in a duty status through her pregnancy.  In signing her limited duty
letter, Plaintiff recognized that she would be required to travel to the location where those
limited duty assignments were available.  The initial light duty plan was modified over time,
diminishing from a three city rotation, to the Boston-Worcester rotation, and ultimately to
Boston, as that was where limited duty most beneficial to the District and its mission could be
performed.  Plaintiff's assignment to the Boston Control Room was intended to provide Plaintiff
a limited duty assignment while providing the District an operational cost savings.  Plaintiff was
assigned duties commonly performed by DUSMs in 1811 status, and her assignment to the
Boston Control Room does not constitute an adverse action.  Plaintiff's assignment to the Boston
Control Room was a reasonable accommodation to Plaintiff, and was a legitimate, non-
discriminatory management determination.

12

## IV.  EVIDENTIARY ISSUES

### A.    The Trial Should Be Bifurcated.

Particularly inasmuch as the retrial of this matter involves the first of at least three EEO complaints filed by plaintiff, one of which is currently the subject of another pending lawsuit, there is a substantial risk of prejudice should the jury hear damages evidence before it has decided liability in this case.  Defendant is unaware whether plaintiff sought or received any medical treatment or counseling at a time proximate to the allegations contained within the instant complaint, but has been placed on notice, through the recently filed amendment to plaintiff's witness list, that medical testimony of some sort will be proffered at trial.  Defendant will object to the introduction of such testimony for the reasons articulated below.

The jury should make its liability determination based on the actionable events alleged within the instant complaint, and only if the jury decides the defendant is liable for gender discrimination and retaliation as alleged by plaintiff herein, should it be allowed to hear any medical evidence post-dating the filing of the amended complaint in this matter that encompasses after-the-fact reports of years-old events and may include events that are not the subject of this litigation.  This matter involves specific allegations of gender discrimination and retaliation which purportedly occurred between 2002 and 2004.  Under these circumstances, the Court should exercise its considerable discretion to bifurcate the trial to serve the interests of judicial economy and avoid the substantial prejudice to the defendant that would otherwise result.  See Krocka v. City of Chicago, 203 F.3d 507, 516 (7th  Cir. 2000).

### B.  The Court should preclude the testimony of witnesses Polizoti and Sanditen.

Defendant became aware that plaintiff intends to call as witnesses Leo F. Polizoti, PhD.,

13

and Judith Sanditen, Psy.D., on June 9, 2008. No other information has been provided to

defendant regarding these proposed witnesses, and defendant assumes, for the purpose of the

instant argument, that they will be called to provide medical testimony of some sort during the

damages phase of the trial. Defendant is unaware whether the named witnesses will be called to

provide expert testimony or as treating physicians, nor has defendant been provided any

discovery with regard to medical records upon which the testimony will be based.

Fed.R.Civ.P. 26(a)(2) provides in pertinent part:

> (2) Disclosure of Expert Testimony
> (B) Except as otherwise stipulated or directed by the court, this
> disclosure shall, with respect to a witness who is retained or
> specially employed to provide expert testimony in the case or
> whose duties as an employee of the party regularly involve giving
> expert testimony, be accompanied by a written report prepared and
> signed by the witness. The report shall contain a complete
> statement of all opinions to be expressed and the basis and reasons
> therefor; the data or other information considered by the witness in
> forming the opinions; any exhibits to be used as a summary of or
> support for the opinions; the qualifications of the witness,
> including a list of all publications authored by the witness within
> the preceding ten years; the compensation to be paid for the study
> and testimony; and a listing of any other cases in which the witness
> has testified as an expert at trial or by deposition within the
> preceding four years.

Rule 26(a)(2)(C) requires such disclosure to be made at least 90 days before trial.

Local Rule 26.4 essentially mirrors this provision. The Uniform Pretrial Scheduling

Order utilized in the Northern District of New York mandates that when a treating physician is

expected to be called as a witness, he or she must also be identified in accordance with the

timetable set forth within the Order. This is intended to avoid prejudice and to ensure that any

evidentiary issues prompted by the testimony of a treating physician are addressed and resolved

in advance of trial.

14

Plaintiff has known the trial date of this matter for almost two months, yet has failed to provide any discovery regarding the above-referenced medical witnesses or their relationship to the Plaintiff. Defendant is not aware whether plaintiff intends to produce medical records at trial - certainly no such records have been provided to defendant to this point. Accordingly, defendant has been deprived of the opportunity to raise potential evidentiary issues to the Court regarding such evidence. For example, while the plaintiff's records may be admissible under the business records exception to the hearsay rule, Fed. R. Evid. 803 (6) 2001, see Petrocelli v. Gallison 679 F.2d 286, 289 (1st Cir. 1982), a patient's statements to medical professionals about what the patient believes are the cause(s) of symptoms which the medical professional subsequently writes in the patient record are inadmissible under Fed. R. Evid. 803(6). That is because a patient's relating of his or her own history is not part of a regularly conducted business practice, and a person with knowledge in the context of hospital records is a nurse, doctor, or other medical professional. Id. At 289-290.

Further, without opportunity to discovery the underlying basis for the proposed testimony of these medical witnesses, the defendant stands to be severely prejudiced by the introduction of opinion testimony based upon consideration of events which post-date or are otherwise not a part of the instant litigation. Plaintiff has an obligation, pursuant to Fed.R.Civ.P. 37 to disclose and to supplement previously disclosed information. Having failed to do so, whatever evidence plaintiff now seeks to introduce by ambush should not be allowed by the Court nor considered by the jury. Plaintiff's failure to timely disclose these witnesses further underscores the necessity for a bifurcated trial.

**V. REMEDIES**

15

Should the jury return a verdict for the plaintiff, she is entitled to seek redress for any injuries proximately caused by the discriminatory or retaliatory acts proved. Under the Civil Rights Act of 1991, however, the jury may only decide the compensatory damages to which plaintiff might be entitled.

Respective Roles of the Judge and Jury

As initially enacted, Section 706(g) of Title VII of the Civil Rights Act of 1964 provided only equitable relief to remedy employment discrimination, such as back pay, reinstatement, front pay when reinstatement was inappropriate and injunctive relief. 42 U.S.C. § 2000e-5(g); Ramos v. Roche Prods., Inc., 936 F.2d 43, 50 (1st Cir. 1991). Such relief was awarded by the Court.

With the passage of the Civil Rights Act of 1991, Congress broadened the available relief to include compensatory damages, and provided for a right to a trial by jury on such damages claims. 42 U.S.C. § 1981a.[2] Compensatory damages were defined to include pecuniary losses, such as job search expenses, psychiatric expenses and other quantifiable out-of-pocket expenses incurred as a result of discriminatory conduct. They also include nonpecuniary losses resulting from emotional pain, suffering, inconvenience, mental anguish and loss of enjoyment of life.

---

[2] The law does not permit the award of punitive damages in employment actions filed against the federal government. Thus, the jury in this case should be instructed that it may not base any monetary award on a desire to punish the defendant, to prevent any unlawful discrimination or retaliation from being repeated in the future, or to warn other employers not to engage in unlawful discrimination or retaliation. Rather, any monetary award must be calculated solely to provide fair compensation to Ms. Bell for her actual injuries (if any) caused by unlawful discrimination or retaliation committed against her, and on no other basis. E.g., Beth v. Espy, 854 F. Supp. 735 (D. Kan. 1994) (no punitive damages against government under Title VII); Erickson v. Hunter, 932 F. Supp. 1380 (M.D. Fla. 1996) (same); Smith v. Office of Personnel Mgmt, 778 F.2d 258 (5th Cir. 1985) (no liquidated damages against federal government under Age Discrimination in Employment Act); Chambers v. Weinberger, 591 F. Supp. 1554 (N.D. Ga. 1984) (same).

16

See *EEOC Enforcement Guidance: Compensatory and Punitive Damages Available under Section 102 of the Civil Rights Act of 1991*.  In order to award damages for such injuries, the jury must find that the injuries were caused by the defendant's alleged discriminatory or retaliatory acts against Bohn.[3]

Congress expressly excluded from compensatory damages to be awarded by a jury "backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964."  42 U.S.C. § 1981a(b)(2).  Thus, a jury cannot include in its damages award any amounts for lost salary or pension benefits.  These amounts fall under the categories of back pay and front pay and, pursuant to section 706(g), are the Court's responsibility to determine, not the jury's.  E.g., Hertzberg v SRAM Corp., 261 F.3d 651, 657 (7th Cir. 2001); Hall v. Claussen, 6 Fed.Appx. 655, 679-80; Allison v. Citgo Petroleum Corp., 151 F.3d 402, 423 n.19 (5th Cir. 1998) ("[T]he right to a jury trial provided by [42 U.S.C.] section 1981a(c) does not include the power to determine the availability of back pay or front pay. . . . These are equitable remedies to which no right to jury trial attaches."); McCue v. State of Kansas, 165 F.3d 784, 792 (10th Cir. 1999) ("Damages awarded under section 2000e-5(g) are equitable relief to be determined by the court, while damages awarded under section 1981a are legal damages that may be submitted to a jury.").

Applying this framework, the sole remedies issue that should be decided by the jury in this case is Bohn's claim for emotional distress damages.

## VI. DEFENSE WITNESSES

---

[3] A maximum cap of $300,000 exists on any award of compensatory damages.

17

The following witnesses may be called to testify for Defendant at trial:

SDUSM Thomas Bezanson

USM Yvonne Bonner (Damages phase only)

Anthony Dichio

CDUSM David Dimmitt

SA Theodore Distaso, FBI (Damages phase only)

SDUSM Paul Dunne

CDUSM William Fallon

SDUSM Alison Hodgkins

Barbara Spangler, USMS Headquarters

CDUSM David Taylor

Defendant respectfully requests leave to supplement said list if necessary after close of Plaintiff's direct case.

## VII.  REQUESTED VOIR DIRE

The defendant respectfully requests that the Court make inquiry into whether any prospective juror or a family member of a prospective juror has had occasion to file a formal or informal EEO complaint, whether that complaint was resolved, and whether the experience would have an impact on the ability to sit as a fair and impartial juror.

Respectfully submitted,

GLENN T. SUDDABY
UNITED STATES ATTORNEY
NORTHERN DISTRICT OF NEW YORK

BY:  _____/s/_____

18

BARBARA D. COTTRELL
Assistant U.S. Attorney
Bar Roll No. 101411
218 James T. Foley U.S Courthouse
445 Broadway
Albany, New York 12207
(518)431-0247

Dated: June 11, 2008

<u>CERTIFICATION</u>

I hereby certify that a true copy of the above document was served upon Plaintiff's attorney of record, Indira Talwani, Esq., Segal, Roitman & Coleman, 11 Beacon Street, Suite 500, Boston, Massachusetts 02108, by ECF filing, on June 11, 2008.

_____/s/_____
BARBARA D. COTTRELL
Assistant U.S. Attorney
Bar Roll # 101411 (NDNY)